Page 1

1   UNITED STATES BANKRUPTCY COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   Case No. 16-11895-jlg

4   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5

6   In the Matter of:

7

8   CHINA FISHERY GROUP LIMITED (Cayman),

9

10                   Debtor.

11

12   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

13

14                   United States Bankruptcy Court

15                   One Bowling Green

16                   New York, New York

17

18                   July 11, 2016

19                   10:20 a.m.

20

21

22

23   B E F O R E :

24   HON JAMES L. GARRITY

25   U.S. BANKRUPTCY JUDGE

1    Joint Admin Motion

2

3    Application to Extend Time to File Schedules

4

5    Motion to Impose Automatic Stay

6

7    Case management motion

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25   Transcribed by:   Sherri L. Breach, CERT*D-397

```
 1   A P P E A R A N C E S :

 2   MEYER, SUOZZI, ENGLISH & KLEIN, P.C.

 3        Attorneys for Debtors

 4        990 Stewart Avenue

 5        Garden City, New York 11530

 6

 7   BY:  HOWARD B. KLEINBERG, ESQ.

 8        EDWARD J. LOBELLO, ESQ.

 9

10   BRYAN CAVE, LLP

11        Attorneys for TMF Trustee

12        1290 Avenue of the Americas

13        New York, New York 10104

14

15   BY:  STEPHANIE WICKOUSKI, ESQ.

16

17   SIDLEY AUSTIN, LLP

18        Attorneys for Bank of America

19        787 Seventh Avenue

20        New York, New York 10019

21

22   BY:  ANDREW P. PROPPS, ESQ.

23        LEE S. ATTANASIO, ESQ.

24

25
```

Page 4

1    LUSKIN, STERN & EISLER, LLP

2         Attorneys for Rabo Bank

3         Eleven Times Square

4         New York, New York 10036

5

6    BY:  MIHCAEL LUSKIN, ESQ.

7

8    DLA PIPER, LLP (US)

9         Attorneys for Rabo Bank, Standard Charter & DBS Bank

10        1201 North Market Street

11        Suite 2100

12        Wilmington, Delaware 19801

13

14   BY:  R. CRAIG MARTIN, ESQ.

15        JOHN LYONS, ESQ.

16

17   KIRKLAND & ELLIS, LLP

18        Attorneys for Ad Hoc Committee

19        300 North LaSalle

20        Chicago, Illinois 60654

21

22   BY:  PATRICK J. NASH, JR., ESQ.

23

24

25

Page 5

1   MAYER BROWN

2         Attorneys for Maybank

3         1221 Avenue of the Americas

4         New York, New York 10020

5

6   BY:   FREDERICK D. HYMAN, ESQ.

7

8   OFFICE OF THE UNITED STATES TRUSTEE

9         Attorneys for U.S. Trustee

10        U.S. Federal Office Building

11        201 East Varick Street, Suite 1006

12        New York, New York 10014

13

14   BY:   BRIAN MASUMOTO, ESQ.

15

16   ALSO APPEARING:

17   GUSTAVO MIRO QUESADA, ESQ.

18

19

20

21

22

23

24

25

```
1                    P R O C E E D I N G S

2              THE COURT:  All right.  China Fishery Group

3    Limited.  Could I get appearances, please?

4              MR. KLEINBERG:  Good morning, Your Honor.  Howard

5    Kleinberg, Meyer Suozzi, proposed counsel for the debtor.

6    My partner, Edward LoBello as well.

7              MR. LOBELLO:  Good morning, Your Honor.

8              THE COURT:  Good morning.

9              MR. MASUMOTO:  Good morning, Your Honor.  Brian

10   Masumoto for the Office of the United States Trustee.

11             THE COURT:  Mr. Masumoto.

12             MR. MARTIN:  Good morning, Your Honor.  Craig

13   Martin, with my partner, John Lyons, from DLA Piper, LLP

14   appearing on certain of the club group lender parties, by

15   shorthand Rabo Bank, Standard Charter and DBS Bank in Hong

16   Kong.

17             THE COURT:  All right.  Mr. Martin.

18             MR. HYMAN:  Good morning, Your Honor.  Rick Hyman

19   from Mayer Brown on behalf of Malayan Banking Berhad known

20   short -- in short form as --

21             THE COURT:  Maybank.

22             MR. HYMAN:  -- Maybank.  Yes.

23             THE COURT:  Thank you.

24             MR. NASH:  Good morning, Your Honor.  Pat Nash

25   from Kirkland & Ellis on behalf on an ad hoc group of
```

1    holders of the nine-and-three-quarter percent senior notes.

2              THE COURT:  Mr. Nash.

3              MS. ATTANASIO:  Good morning, Judge.  Lee

4    Attanasio, Sidley Austin, here with my colleague, Andrew

5    Props, on behalf of Bank of America.

6              THE COURT:  Thank you.

7              MR. LUSKIN:  Your Honor, Michael Luskin, Luskin,

8    Stern & Eisler for Rabo Bank.

9              THE COURT:  Mr. Luskin.

10             Anyone else?

11             MR. KLEINBERG:  All right.  Why don't we get

12   started?

13             MR. KLEINBERG:  Thank you, Your Honor.

14             If I may begin with brief introductions, not in

15   the nature of appearances, from some of the debtors'

16   personnel.  As I mentioned my partner, Ed LoBello, Ni -- Yi

17   -- Qua Yi Nang (ph), commonly referred to as Jessie in the

18   audience, Your Honor.

19             THE COURT:  Good morning.

20             MR. KLEINBERG:  She is the senior officer of all

21   of the 16 debtors.

22             THE COURT:  All right.

23             MR. KLEINBERG:  As I said referred to commonly as

24   Jessie.  David Prager (ph) and Robin Chu (ph) from Gold &

25   Associates are here.  They are the debtors proposed

1   financial advisors.  Robert Rosenfeld is here from RSR

2   Consulting.  He is the debtors' proposed accounting

3   professional.

4          THE COURT:  All right.

5          MR. KLEINBERG:  If I may begin, Your Honor, I

6   would like to give the Court a brief overview of the debtors

7   and the debtors in relationship to the non-debtor entities.

8   We provided Your Honor with a color corporate organization

9   chart.  We have extras available.  It's being projected on

10  the screen.

11         THE COURT:  Terrific.

12         MR. KLEINBERG:  I still prefer to work off the

13  easel that's the foam board version if that's acceptable to

14  Your Honor --

15         THE COURT:  Sure.  That's fine.

16         MR. KLEINBERG:  -- but I'll --

17         THE COURT:  Let me just ask you before we get

18  started have you had an opportunity to speak to -- speak

19  with counsel to all of the parties that have weighed in on

20  these motions?

21         MR. KLEINBERG:  Only briefly this morning, Your

22  Honor, to the effect of two things.

23         One is for what it's worth to them I offered them

24  my assurances or my offer that I think they'll feel better

25  about the case after today's presentation.

Page 9

1            And perhaps more importantly I offered them the

2    opportunity to meet with the debtor, its counsel, its

3    proposed financial professionals on Thursday in the

4    afternoon --

5            THE COURT:  All right.

6            MR. KLEINBERG:  -- at Mr. Prager's office so that

7    some of their concerns and their issues can be laid out on

8    the table and addressed.  In my view this case should and

9    can be done on a consensual basis and it's our hope to

10   achieve that, and I've offered that out to the banks.

11           THE COURT:  All right.

12           MR. KLEINBERG:  And I believe I had a few

13   headshakes and we'll see what develops from there.

14           THE COURT:  All right.  Why don't you proceed?

15           MR. KLEINBERG:  So with respect to the debtors we

16   have 16 debtors before the Court.  Six of the debtors are

17   holding companies and six of them have dormant or not

18   substantial operations.  And I can through them by name, but

19   I'm not sure if it serves any real purpose.

20           One of the debtors is a fishing company service

21   provider.  That's South Pacific Shipping Agency down in the

22   lower left of the chart.

23           THE COURT:  All right.

24           MR. KLEINBERG:  One of the debtors is -- was -- is

25   winding down or has fully wound down its trading operations.

1   That's Protein Trading Limited over here.

2          One of the debtors is a small real estate holding

3   company, that's CFGL Singapore Private Limited.  And I

4   apologize for the similarity of names.  It's been a

5   challenge for me to get familiar with them.

6          THE COURT:  Let me just interrupt you --

7          MR. KLEINBERG:  Yeah.

8          THE COURT:  -- for a second.  I've spent a lot of

9   time looking at the papers and I'm not going to cut you off.

10  I want you --

11         MR. KLEINBERG:  Yeah.

12         THE COURT:  -- to make your presentation.  But I

13  just want to make sure I'm clear on a couple of things.

14         First off, Pacific Andes Group, that's a defined

15  term.  Is that all of the boxes in the chart?

16         MR. KLEINBERG:  Exactly.

17         THE COURT:  Okay.

18         MR. KLEINBERG:  Pacific Andes Group --

19         THE COURT:  Right.

20         MR. KLEINBERG:  -- is all of these companies --

21         THE COURT:  Yeah.

22         MR. KLEINBERG:  -- and more that are not on the

23  chart --

24         THE COURT:  Right.

25         MR. KLEINBERG:  -- because the chart focuses on

1     their debt relationships.

2              THE COURT:  Right.  But for our purposes in that

3     -- in the affidavit that's what that refers to.  What I

4     couldn't find is you used the term, CFG Group.  You used CFG

5     Group debtors.  That's defined.  I didn't see how CF -- what

6     is CF Group?

7              MR. KLEINBERG:  CF Group is a subset of the

8     Pacific Andes Group --

9              THE COURT:  Right.

10             MR. KLEINBERG:  -- known primarily for its

11     operations and work in Peru.

12             THE COURT:  So is that -- on the bottom, is that

13     the right side, the bottom --

14             MR. KLEINBERG:  Generally speaking, Your Honor, it

15     starts in the middle --

16             THE COURT:  Oh, right.  Okay.

17             MR. KLEINBERG:  -- roughly with Super Investments.

18             THE COURT:  Right.

19             MR. KLEINBERG:  And it goes down to the right --

20             THE COURT:  Okay.

21             MR. KLEINBERG:  -- which is Peru --

22             THE COURT:  Yeah.

23             MR. KLEINBERG:  -- which is mostly either a non-

24     debtor, Chapter 15 debtors.  We have one 11 debtor over

25     here.

```
 1              THE COURT:  Right.  That's Protein you were

 2     talking about.

 3              MR. KLEINBERG:  Protein, but also CFG Peru

 4     Investments Limited Singapore at the top of the right-hand

 5     --

 6              THE COURT:  Right.  Okay.

 7              MR. KLEINBERG:  -- section.  And it's also the

 8     left-hand section which for the most part is the bulk of the

 9     dormant companies, but for South Pacific Shipping Agency.

10              THE COURT:  So for my purposes in looking at this

11     when I see a reference to CF Group, I should just be looking

12     -- starting at Super Investment Limited and down -- and

13     below that, that CF Group.

14              MR. KLEINBERG:  That's correct.  To --

15              THE COURT:  Okay.

16              MR. KLEINBERG:  -- the left and to the right.

17              THE COURT:  Right.

18              MR. KLEINBERG:  -- below that.

19              THE COURT:  Okay.

20              MR. KLEINBERG:  And pardon me if I've not matched

21     to the hundred percent precision the definitions in the

22     affidavits, but that's generally -- I think I have, but

23     that's generally where we are.

24              THE COURT:  Okay.  And that's fine.  So I'm sorry.

25     I apologize.
```

Page 13

1          MR. KLEINBERG:  No.  That's fine.  That was next

2      on my agenda --

3          THE COURT:  All right.

4          MR. KLEINBERG:  -- is to introduce the companies

5      on this chart as the companies constituting what's called

6      the Pacific Andes Group of which we have 16 Chapter 11

7      debtors, the possibility of two additional Chapter 11

8      debtors over here for Premium Choice and Ringston (ph)

9          THE COURT:  Okay.

10         MR. KLEINBERG:  -- pending determination or

11     resolution of issues concerning those companies' proper

12     authorizations to file 11.  But they're not substantial

13     companies and they're in here for the debt.

14         I mentioned Protein Trading.  I mentioned the real

15     estate holding company.  I wanted to mention CFIL China

16     Fisheries International Limited, first up on the left --

17         THE COURT:  Right.

18         MR. KLEINBERG:  -- which is a treasury management

19     company for the CF Group.  And I wanted to mention that --

20         THE COURT:  And that's where -- I'm sorry to

21     interrupt you.  That's where -- that and China Fishery Group

22     and International, that's where the JPLs were pointed?

23         MR. KLEINBERG:  That's correct.

24         THE COURT:  All right.  Just for those -- it was

25     just for those two; is that right?

1          MR. KLEINBERG:  That's correct.

2          THE COURT:  Okay.

3          MR. KLEINBERG:  That's correct.

4          THE COURT:  All right.

5          MR. KLEINBERG:  And also that CFGL, China Fishery

6    Group Limited --

7          THE COURT:  Right.

8          MR. KLEINBERG:  -- here in the middle as well as

9    PAIH Bermuda, second from the top are public companies

10   listed in Hong Kong and Singapore stock exchanges

11   respectively, trading suspended.

12         THE COURT:  Wait.  I'm sorry.  Is PARD publicly

13   traded?

14         MR. KLEINBERG:  Yeah.

15         THE COURT:  Oh, okay.

16         MR. KLEINBERG:  Judge, you're one sentence ahead

17   of me here --

18         THE COURT:  All right.

19         MR. KLEINBERG:  -- at all times.  PARD which is a

20   non-debtor before this Court, either in 11 or 15, and --

21         THE COURT:  I'm sorry.  You said PARD?

22         MR. KLEINBERG:  PARD which is what you just

23   referred to.

24         THE COURT:  Right.  You show that as a Chapter 15

25   case.

1          MR. KLEINBERG:  Yeah.  It's a mistake on the

2     chart, Judge.

3          THE COURT:  Oh.

4          MR. KLEINBERG:  I apologize.  I thought we had

5     provided Your Honor with revised charts.  I have them if you

6     would like to substitute.

7        (Pause)

8          MR. KLEINBERG:  May I approach?

9          THE COURT:  Yes, please.

10         MR. KLEINBERG:  We have extras for

11    (indiscernible).

12         THE COURT:  Thank you.

13         MR. KLEINBERG:  The Pacific Andes Resources

14    Development, commonly referred to as PARD, is not a Chapter

15    15 debtor, but it is in its own insolvency proceeding in

16    Singapore.

17         THE COURT:  And so, again, China Fishery Group

18    Limited and PA -- what is that, PAIH, are traded on the Hong

19    Kong exchange?

20         MR. KLEINBERG:  Correct.  One is on one exchange

21    and one is on the other.  I can --

22         THE COURT:  Of the Singapore.

23         MR. KLEINBERG:  -- clarify that if I flip through

24    my notes.

25         THE COURT:  No.  That's all right.  You can pick

1    it up later.

2              MR. KLEINBERG:  PAIH, China Fishery Group Limited,

3    two of our Chapter 11 debtors, are public companies on

4    Asian stock exchanges.  PARD, as I mentioned, which is in an

5    insolvency proceeding in Singapore is also a publicly traded

6    company in one of the Asian exchanges.

7              So we have 16 debtors.  Six -- as I said, six are

8    dormant. Six function primarily as holding companies for the

9    companies below them.  They are NS Hong, which starts at the

10   top of the chart, PAIH that we discussed, Super Investments,

11   which we've mentioned, CFGL which we've mentioned, the

12   public company, Smart Group is a holding company, and over

13   here on the right one notch below CFG Peru Investments PTU

14   Limited is a holding company for the Peruvian operating

15   companies.

16             So, Your Honor, why are we here?  It's a

17   legitimate question.  The creditors have asked it.  I think

18   the answer lies in the structural relationship between these

19   debtors on this chart.  The word that I became more familiar

20   with as I undertook this engagement is structural

21   subordination.  You have certain creditors -- because of the

22   highly verticalized corporate structure that we have been

23   dealt here we have different creditor interests at different

24   levels of the organization structure, but you'll see all of

25   our Chapter 11 debtors, substantially all of them, are

1    obligors on substantial debts, primarily the club lenders

2    and also to the senior note holders.

3            The theory of the filing is that to preserve

4    values and I think we all understand, subject to some nuance

5    here, but the value of these -- this enterprise lies

6    primarily down here with the Peruvian operating companies,

7    which run a substantial business processing anchovies into

8    fish meal and fish oil which is sold on the commercial

9    markets.

10           Fish meal is used, as I understand it, in

11    aquaculture.  It's used as fish food for other fish,

12    primarily of penned in salmon farming operations. Fish oil

13    is sold for commercial uses elsewhere in the market.

14           So the value speaking generally is here.  But to

15    preserve the corporate structure and to be fair to

16    creditors, every level of the corporate chart, not just the

17    club lenders and not just the senior note holders, we felt

18    that they're important, certainly, and they're big.  We felt

19    that filing based on these particularities of the Chapter 11

20    companies was necessary because if enforcement action were

21    to be taken in one or more jurisdiction, most likely outside

22    of the United States, against an upper level company, that

23    creditor could conceivably attain control of the entity,

24    control of the board of directors of the downstream entities

25    and have completely control over the disposition of the

1    valued parts of the company.

2            So we felt it was necessary to bring these

3    entities into 11s in order to preserve the value of the

4    structure for everyone.

5            It's really stated very precisely in paragraph 19

6    of our Rule 1007 declaration that Jessie submitted, which I

7    quote from very, very briefly it says -- or paraphrase, at

8    the risk of one creditor destabilizing the corporate

9    structure through enforcement action is what these cases is

10   about.  It prevents lenders from acting to satisfy

11   themselves only to the detriment of those who are

12   structurally subordinated to them.

13           THE COURT:  These are the same lenders who entered

14   into the understanding; is that what it --

15           MR. KLEINBERG:  No.  No.

16           THE COURT:  Okay.

17           MR. KLEINBERG:  The lenders who entered into the

18   deed of understanding are primarily -- exclusively the club

19   members.

20           THE COURT:  Well, they're the club --

21           MR. KLEINBERG:  Yeah.

22           THE COURT:  Yeah.  But it's being -- that -- am I

23   correct that that process was being supported by the other

24   creditors?

25           MR. KLEINBERG:  No.  It was --

Page 19

1              THE COURT:  Oh, maybe not.

2              MR. KLEINBERG:  -- not.

3              THE COURT:  Okay.

4              MR. KLEINBERG:  Yeah.  In fact, the club lenders

5    themselves sit here today supported -- not supported by one

6    of their very own members, HSBC.  HSBC was the most

7    aggressive club lender prior to the petition date in the

8    Hong Kong Court and in the Cayman Islands Court.  HSBC

9    received, if I can characterize it, a fairly stinging rebuke

10   from the Hong Kong Court for its actions in bringing the

11   liquidation proceedings and seeking the appointment of the

12   provisional liquidators.

13             There is a written decision by that Hong Kong

14   Court that fairly aggressively attacks the role of HSBC in

15   those proceedings.  That's confidential to that Court and

16   we're going to effort in Hong Kong to have that

17   confidentiality restriction lifted, if possible, so we can

18   present Your Honor with a copy of that.

19             THE COURT:  But that was -- as part of the

20   understanding is it if the sale didn't get done by July 15th

21   those proceedings would be reinstated?

22             MR. KLEINBERG:  It was a remedy for the bank

23   lenders.  Correct.

24             THE COURT:  Right.  Okay.

25             MR. KLEINBERG:  And I'll talk about that in a

Page 20

1    moment or as Your Honor likes.

2           But to go back to the general reasons for filing.

3    So you have the structural -- you have the corporate

4    structure situation, which is not good for a business to be

5    in this position, but it is what it is.  You have structural

6    subordination.  You have business reasons for filing.

7    They're addressed extensively in the Rule 1007, if I may

8    just take a moment to mention some of them.

9           The effect of the weather phenomenon known as El

10   Nino has played a very dramatic and detrimental impact on

11   the fishing business of the Peruvian subsidiaries, obviously

12   resulting in diminished cash flow compared to historically,

13   suspension of the second season of fishing beginning in

14   2014.  The fishing is divided up into two seasons.

15          Your Honor should understand the fishing is

16   fairly, if not extremely heavily regulated by the Peruvian

17   governmental authorities.  It's controlled by season.  It's

18   controlled by quota.  In fact, the valuable asset -- anybody

19   can put a boat together and hire a crew and fish with, you

20   know, sufficient capital allocated to that.  The value of

21   the Peruvian companies is in their quotas.  They hold quotas

22   that are not non-reproducible in the market.  There's -- you

23   know, you can only go up to 100 percent on an allocation and

24   we hold roughly 16, 17 percent of -- pardon?

25          UNIDENTIFIED SPEAKER:  16.9.

1          MR. KLEINBERG:   -- 16.9 percent of the Peruvian

2    anchovy fish quota in Peru.

3          So El Nino has hurt the ability to profit --

4    profitability harvest fish and process into, as I said, fish

5    meal and fish oil for sale.

6          I mean, I could, but I won't belabor what we

7    consider to be the egregious conduct of the four individual

8    gentlemen who were partners of KPMG who were appointed as

9    JPLs by the Hong Kong and Cayman courts who, in our

10   allegations and in our opinion, went ballistic, went far

11   beyond the scope of their mandate, caused material,

12   substantial material damages to -- damage to the operations

13   of the public company debtors by reputation, the Peruvian

14   company debtors by action including literally going down to

15   Peru and meeting with local vendors and banks, all of which

16   scared them into the hills and caused us to suffer a very

17   severe liquidity shortage that continues to this day where

18   we are struggling, Peru is struggling to get working capital

19   to fund its fishing seasons, certainly in part because of El

20   Nino, but more so because when fishing season starts there

21   is reputational damage and credit industry fear because of

22   the appointment of the JPLs who, as Your Honor knows, were

23   tossed back out once a full hearing was held before the Hong

24   Kong Court.

25          It was nice of the -- nice enough of them also not

1    to leave once they were tossed out by the court until they

2    exerted a lot of leverage over the debt -- over the

3    companies to get their fees, which received millions of

4    dollars in Hong Kong dollars to get their fees paid.  So

5    that's a factor.

6              THE COURT:  You also lost a boat, right, the use

7    of the largest vessel, isn't --

8              MR. KLEINBERG:  Yes.

9              THE COURT:  -- that right or --

10             MR. KLEINBERG:  Yes.

11             THE COURT:  -- kind of in the penalty box now?

12             MR. KLEINBERG:  Yes.  That -- I don't think that

13   directly affected the anchovy processing business.

14             UNIDENTIFIED SPEAKER:  Correct.

15             MR. KLEINBERG:  It was used for (indiscernible)

16   fish?

17             UNIDENTIFIED SPEAKER:  Yes.

18             MR. KLEINBERG:  So that --

19             THE COURT:   For what?

20             MR. KLEINBERG:  -- vessel commonly referred to as

21   the DMZ, was owned by this company here, Sustainable Fishing

22   Resources SAC.

23             THE COURT:  Okay.

24             MR. KLEINBERG:  It's --

25             THE COURT:  But that wasn't one of the events that

Page 23

1    precipitated the filing?

2              MR. KLEINBERG:  No.

3              THE COURT:  Okay.  Thank you.

4         (Pause)

5              MR. KLEINBERG:  Your Honor, I have a detailed and

6    perhaps lengthy presentation regarding the particular

7    business that each of these companies engages in.  I'll be

8    guided by the Court as to whether you have questions about

9    particular entities, whether you want me to go through them

10   quickly or generally or not at all.

11             THE COURT:  I've got a lot of questions.  They

12   don't really focus so much on what all the companies do.  If

13   you want to just give an overview and go over that, that's

14   fine.  I mean, do what you need to do in order to make the

15   evidentiary record that you need for the matters that are

16   before us.  But then I've got questions about Peruvian

17   insolvency law and some other --

18             MR. KLEINBERG:  Very --

19             THE COURT:  -- things.

20             MR. KLEINBERG:  Very good, Judge.

21             THE COURT:  So -- but -- so why don't we do this?

22   Why don't you go through your presentation and just

23   understand that a lot of my questions are keyed off of the

24   points that were raised in the opposition papers.

25             MR. KLEINBERG:  Understood.

```
 1              THE COURT:  Right.  And so if you want to, after
 2    you've done that -- you know, again, I don't mean to -- I
 3    don't want to interfere with your presentation.  I'm not
 4    sure that today is a day where we need an in depth
 5    discussion of the businesses, but please do what you think
 6    you need to do.
 7              MR. KLEINBERG:  I'll just do it very, very
 8    briefly.  I've already talked about Peruvian fishing and the
 9    anchovy business down here.  I've mentioned the holding
10    companies.  I've mentioned the few companies over here that
11    while still in business have very limited operations.  SPSA
12    South Pacific, as I said, is a company that supplies
13    equipment for other fishing boats, nets, mystical support
14    and that sort of thing.
15              What's interesting, Judge, that you should know is
16    over here where I'm referring to, looking at the chart from
17    my perspective to the right of PAIH, PAIH and a similarly
18    named, but different entity called Pacific Andes
19    International Holdings BVI Limited right next to it are
20    engaged in a very large business of processing and producing
21    and selling at retail in China fish for eating, fish for
22    human consumption, primarily Alaskan pollock.
23              So they trade in that.  They process it, literally
24    gutting and heading and filleting fish, (indiscernible) them
25    into blocks and then through various sales mechanisms, again
```

1       working through governmental quotas with China which

2       explains some of the existence of some of these other

3       entities.  The Euro Pacos that we see down here over to the

4       right are quota for import -- no, no, no.  They're on a

5       credit insurance specific sales agencies for this fish

6       fillets.

7               Okay.  National Fish and its grouping over here is

8       a Massachusetts based company that does the same frozen fish

9       fillet business --

10              THE COURT:  All right.  So this -- so I was going

11      to ask you, which of these entities has U.S. operations?

12              MR. KLEINBERG:  National Fish and Seafood, and the

13      two companies grouped around it which is its holding

14      company, Peaksville (ph), and its subsidiary have U.S.

15      operations, fairly independent, completely independent.

16      They sell a particular brand of frozen fish sticks and

17      fillets in markets in the U.S. and Canada.

18              THE COURT:  All right.  And where are those

19      operations?

20              MR. KLEINBERG:  In Gloucester, Massachusetts.

21              THE COURT:  All right.  Thank you.

22              MR. KLEINBERG:  Again, just (indiscernible) the

23      Pick and Pack group of companies are buyers, they're purple

24      shaded below National Fish, were also processors and

25      distributors of fish fillet products in Europe.  Those

1   companies are the subject of their own insolvency

2   proceedings in Germany and as to Gilmer (ph) in France.

3   PAIH is the guarantor of certain of that debt and those

4   debts will be addressed in the Chapter 11.  The

5   (indiscernible) sales company as I mentioned, and I think

6   that's it.

7              THE COURT:  All right.

8              MR. KLEINBERG:  So, Your Honor, I've certainly

9   read the bank -- the four banks who made statements.  I

10  would like to address that now if I may for a minute.

11             THE COURT:  Sure.

12             MR. KLEINBERG:  Again, at the level of argument, I

13  think what I want to say to Your Honor and to the banks is a

14  couple of things.

15             We're advocates for the debtor.  We recognize

16  that.  But we're also officers of the court, Counsel, I

17  mean, the profess -- and the financial and accounting

18  professionals that we've hired.  We recognize our duties to

19  the court and to creditors.  We intend to take those very

20  seriously.  We would not have taken this case on in a way

21  other than taking those duties very seriously.

22             So what I really want to say to the banks and to

23  Your Honor is everything the banks are fearful of, that

24  they've expressed anxiety about in their papers, that

25  they've expressed hostility about in their papers, the

1    purpose of these bankruptcy, in our view, is the opposite of

2    that.  We intend to provide them with the things that I

3    think they're worried about.  I'm not guaranteeing

4    recoveries to them.  I'm not guaranteeing that they won't be

5    unhappy, that there won't be difficult negotiations.

6         But one of the banks, Bank of America, was nice

7    enough to accuse of us disregarding the bankruptcy process.

8    And I really resent that, Judge.  I think that's not true.

9    Yes, our filings are a little perhaps hastily put together

10   due to the pressures and we felt there was enforcement

11   pressure happening in Europe, in Hong Kong as we approached

12   June 30th.

13        But I think that in terms of -- well, not only are

14   we not going to disregard the bankruptcy process, we're

15   going to play it to the letter of the law.  So with respect

16   to things like transparency, and access to information, and

17   proper corporate governance -- and I'm not suggesting that

18   there was improper corporate governance beforehand.  But

19   certainly as counsel it's our intent to enforce or advise

20   and enforce as possible strict compliance with corporate

21   governance duties.

22        THE COURT:  Who is running the business?

23        MR. KLEINBERG:  Jessie is the senior executive of

24   all the companies.  She has a various staff at various

25   levels, management officials who run the companies.  Mr.

```
 1    Rosenfeld, who was brought in as -- or is being brought in

 2    as a bankruptcy accounting and consultant is, and has been

 3    for ten days or so, heavily involved in getting an

 4    understanding of how the companies are run, consulting with

 5    the CFO, consulting with the --

 6              THE COURT:  Who is the CFO?

 7              MR. KLEINBERG:  The CFO is Stella Ang (ph).

 8              Your Honor, there is a company -- it's not a

 9    debtor.  It's -- I don't believe it's on our chart -- called

10    Pacific Andes Enterprises Hong Kong --

11              THE COURT:  Right.

12              MR. KLEINBERG:  -- which is a employee and

13    treasury management company.  It has 60 employees or so,

14    financial professionals, financial managers.  They run SAP

15    software.  This is a sophisticated company.  And the

16    operations of the non-debtors and to this point the debtors

17    were managed and run through those services of those

18    employees.

19              THE COURT:  And what is there -- is there a

20    contract that exists between the entities?

21              MR. KLEINBERG:  Is there a contract?

22              UNIDENTIFIED SPEAKER:  No.

23              MR. KLEINBERG:  There's not a contract.  There is

24    a practice over many years of inter -- there's an

25    intercompany practice and course of dealing.  And we will
```

Page 29

```
 1    look into whether that needs to be contractually set forth

 2    and bring it to this Court as necessary for approval and

 3    certainly for a high degree of transparency.

 4              So the company is run from the fish -- the workers

 5    who work on the floor of the Chinese fish processing

 6    companies, which are not debtors, but work closely with PAIH

 7    at the executive level.  It's Ms. Ang, her two brothers, Joo

 8    Si Ang and Joo Thie Ang, were running the companies, if you

 9    want nuances or distinctions as to the highest officers,

10    until approximately December or January of this year when

11    they left under pressure from the banks.

12              Ms. Jessie stepped up.  She's been with the

13    company for 15 or 20 years, if not more, whatever accounting

14    based on her affidavit is.  And she is running the company

15    on the day to day basis.

16              THE COURT:  Okay.  Is there a board?

17              MR. KLEINBERG:  Each company has a board of

18    directors.  We filed a list of the board members in our

19    exhibit.  Jessie is a board member of each company.  There

20    are other directors.

21              A quick glance at our corporate resolution shows

22    that there was -- there is a governance process.  It's

23    documented for our secretaries and attestation officials and

24    so forth.

25              So I think I was talking about the statements that
```

1    the banks made.  I think I've addressed them at least as to

2    process and our intent to make this an open and transparent

3    process.  We -- as I mentioned we have high quality

4    financial and accounting professionals on board to assist in

5    that.  We have offered the banks, I've chatted with a few of

6    the bank attorneys as before the hearing started, a lawyers

7    and financial professionals meeting Thursday if they can

8    make it in order to get this process underway and to

9    hopefully ease some of their concerns.

10            Any thought that this 11 was strategically

11   designed to somehow shield or divert or any other nefarious

12   purpose that you could think of the value of the Peruvian

13   operating company entities is wrong and it's false.  We

14   recognize that that value is the base -- super baseline of

15   the company and we're interested in a process that

16   capitalizes that value one way or the other.  It doesn't

17   necessarily have to be a sale, but a sale is certainly an

18   obvious and potentially viable option for that debtor.

19            What we need is for these 11s to maintain the

20   structure, structural integrity of the corporate structure.

21   We do need a breathing space.  We need to organize the

22   Chapter 11s.  The Chapter 11s, it's obvious we haven't filed

23   a cash management motion yet and we are working very

24   diligently on that, but we want to get it right.  And it's

25   not easy getting it right where you have a 20 or 30 year

1    history of a non-bankrupt company used to doing intercompany

2    accounting.

3           And we're working hard with the company's

4    financial professionals to segregate that out and to

5    understand it and propose meaningful cash budgets and cash

6    flow pro formas to the creditors and to the Court so that we

7    could see what's going on.

8           But it's clear also that these Chapter 11

9    companies don't do a lot currently.  They don't have a lot

10    of expenses.  Your Honor, we're talking about maybe around

11    120 creditors for all 16 debtors in the aggregate, one of

12    the reasons we decided not to spend money on a claims agent,

13    because we think we can handle the service and noticing

14    requirements for 120 creditors, all of whom are overseas.

15           THE COURT:  Well, maybe it would be helpful.  Let

16    me ask you some questions.  Okay.  Can we start with the

17    operations in Peru?  Now is -- what I understand to be the

18    case is that it's the operations in Peru that generate the

19    revenue that then gets upstreamed; is that right?  Is that

20    where the money comes that the debtor uses to operator, or

21    the debtors --

22           MR. KLEINBERG:  No.

23           THE COURT:  -- use?

24           MR. KLEINBERG:  Yeah.  In the past, Judge, the

25    Peruvian entities, when they reached points of free cash

1    flow or profitability, did upstream cash to the entities

2    above them.  It's our intention as far as feasible to not

3    make that happen.  Mr. Paniaqua (ph) is here, Francisco

4    Paniaqua is the senior executive of those Peruvian

5    operations.  Mr. Gustavo Militch (ph) is here.  He is the

6    bankruptcy attorney for the Peruvian companies in the COPI

7    proceeding in Lima, Peru.

8             So, yes, previously they have -- we're acutely

9    aware that lenders at that level are concerned about

10   dissipation of value.  There is no current intention to

11   upstream.  We may, as need be, propose things to the Court

12   and to the creditors if cash permits.  And you have to

13   understand, right now the Peruvian operating companies are

14   not in a great position.  They've been -- their working

15   capital has dried up.  Their hand to mouth funding, a

16   current fishing season which got started just last month,

17   they hope to turn that into a lucrative season.  Anchovy

18   forecasts, I understand, are improving for this season.

19             I hope that answers Your Honor's question.

20             THE COURT:  All right.  Where do the debtors get

21   their money?

22             MR. KLEINBERG:  The debtors historically got their

23   money from intercompany loans.

24             THE COURT:  All right.  They got it from Peru?

25             MR. KLEINBERG:  Some from Peru, but more in the

Page 33

1    nature of periodic upstreams of substantial buckets of cash

2    --

3              THE COURT:  From --

4              MR. KLEINBERG:  -- as profit at the end of the

5    season.

6              THE COURT:  Okay.  From?

7              MR. KLEINBERG:  From the Peruvian chain here.

8              THE COURT:  Okay.  So --

9              MR. KLEINBERG:  But --

10             THE COURT:  So Peru was profitable.  Money comes

11   up and the debtors have the cash they need to operate; is

12   that right?

13             MR. KLEINBERG:  There are other sources of --

14             THE COURT:  Okay.

15             MR. KLEINBERG:  -- for these debtors.  First of

16   all, you have to understand debtors, due to business reasons

17   over here, have discontinued a substantial number of

18   operations --

19             THE COURT:  All right.

20             MR. KLEINBERG:  -- over the last two or three

21   years.  So their cash needs going forward --

22             THE COURT:  What do the debtors do?

23             MR. KLEINBERG:  Well, let me --

24             THE COURT:  I mean --

25             MR. KLEINBERG:  -- go through that.

Page 34

1          THE COURT:  -- it would be helpful to me because

2     there are these issues about the bank accounts not being in

3     the U.S., the suggestion that there may be administrative

4     insolvency.  But what would be helpful, I guess, going back

5     to the question you had asked me as far as what I needed and

6     maybe I should have thought about it a little bit more when

7     you asked it.  Tell me what the U.S. entities do, what the

8     source of their money is and how they're going to operate

9     going forward --

10          MR. KLEINBERG:  Okay.

11          THE COURT:  -- please.

12          MR. KLEINBERG:  So just to be clear the U.S.

13     entities are not part of the --

14          THE COURT:  I'm sorry.  All I'm -- there are no U

15     -- no, excuse me, I know there's one U.S. entity.  I meant

16     to say, and thank you for correcting me.  I meant to say the

17     debtors.

18          MR. KLEINBERG:  Okay.  So I understood the

19     question.

20          So N.S. Hong does nothing but hold an investment

21     interest in PAIH.  PAIH, by contrast, is both a public

22     company.  It's main asset is its investment in this company,

23     the Pacific Andes Holdings International BVI Limited which

24     is (indiscernible).

25          THE COURT:  Right.

1          MR. KLEINBERG:  PAIH, the debtor, which is the

2    Bermuda company, provides for intercompany advances.  It

3    receives interest income.  It acts as a -- I have my notes

4    here.  So PAIH is a company that sources raw material and

5    then resells the materials -- which raw material in this

6    business is fish -- to customers around the world, including

7    --

8          THE COURT:  I'm sorry.  That's PAIH?

9          MR. KLEINBERG:  Yeah.  That's this -- the second

10   debtor in line.

11         THE COURT:  Okay.

12         MR. KLEINBERG:  Sorry.  It's a trading company in

13   fish.  It sells and processes and does business with the

14   entities to the right of it, in particular Pacific Andes

15   International Holdings BVI and Euro Paco down here.

16         THE COURT:  All right.

17         MR. KLEINBERG:  So it -- so if you look at the two

18   entities in red dots --

19         THE COURT:  Right.

20         MR. KLEINBERG:  -- and the one in black, these are

21   companies that own and operate and source for large, in fact

22   the largest in the world fish processing factories in China.

23   They have their own debt.  They're run independently.

24   They're run in China.  PAIH assists in their sourcing needs,

25   in their cash flow needs, in their sales needs --

```
 1              THE COURT:  Okay.

 2              MR. KLEINBERG:  -- and so forth.

 3              THE COURT:  So -- but these are all non-debtors.

 4              MR. KLEINBERG:  Agreed.  They're non-debtors.

 5              THE COURT:  Right.

 6              MR. KLEINBERG:  PHI is a debtor.

 7              THE COURT:  Yeah.

 8              MR. KLEINBERG:  And cash is sometimes available

 9   for PAIH from these companies.

10              THE COURT:  And when PAIH gets the cash what does

11   it do with it?

12              MR. KLEINBERG:  It pays its operating expenses --

13              THE COURT:  Okay.

14              MR. KLEINBERG:  -- and it used to pay its debts.

15              THE COURT:  Right.

16              MR. KLEINBERG:  Clamford below it, who is not a

17   debtor, but it's just a holding company, and PARD (sic) is

18   part of the same four entities which we've recently

19   mentioned.

20              THE COURT:  Right.

21              MR. KLEINBERG:  Those are the trading and

22   logistics and supply company.  PARD has ceased its

23   operations due to issues that came out of the company's

24   former business in Russian seafood procuring -- procurement.

25   So right now PARD is basically a holding company.
```

1              THE COURT:  All right.

2              MR. KLEINBERG:  I'm going to jump down to Super

3    Investments which is a holding company.

4              THE COURT:  Right.

5              MR. KLEINBERG:  China Fishery Group Limited, which

6    is a public company, but essentially a holding company.

7              THE COURT:  Right.

8              MR. KLEINBERG:  Smart Group is a holding company.

9              THE COURT:  Right.

10             MR. KLEINBERG:  And then we dip down into the Peru

11   side and to the left you dip down into a group of companies

12   that used to be involved in the Pacific Andes groups' fleet

13   fishing business in Russian waters.

14             THE COURT:  All right.

15             MR. KLEINBERG:  A business which has been

16   discontinued since late 2014 or so.  So these companies

17   don't do anything except for the South Pacific which has a

18   small business in fishing fleet vessel supply and

19   maintenance.

20             THE COURT:  So how many employees are there?  How

21   many does the debtor -- how many employees do the debtors

22   have?

23             MR. KLEINBERG:  The debtor has a very minimal

24   number of employees.  I didn't count them, but if you look

25   at Exhibit H to the Rule 1007, you can see that China

Page 38

```
 1    Fisheries International has one, two, three, four, five

 2    operational employees.

 3              THE COURT:  Right.

 4              MR. KLEINBERG:  I should mention that -- well,

 5    Pacific Andes International Holdings has listed employees

 6    who are directors.  So we listed the employees -- the

 7    directors as employees for the sake of disclosure.  But --

 8              THE COURT:  Are you saying that the --

 9              MR. KLEINBERG:  But the directors are not going to

10    be receiving compensation.

11              THE COURT:  So -- and I'm sorry.

12              MR. KLEINBERG:  Yeah.

13              THE COURT:  Exhibit H then --

14              MR. KLEINBERG:  Yeah.

15              THE COURT:  -- lists all of the employees of the

16    debtor?

17              MR. KLEINBERG:  It's styled as a projected 30 day

18    payroll.

19              THE COURT:  Right.

20              MR. KLEINBERG:  So I don't want to literally say

21    that it's every single employee.

22              THE COURT:  Right.

23              MR. KLEINBERG:  But I believe it's nearly

24    complete.  If I could have a moment to confer maybe I could

25    give some more precision to that.
```

Page 39

1            THE COURT:  Okay.

2        (Pause)

3            MR. KLEINBERG:  So thank you, Your Honor.  I am

4    able to confirm that the employees listed on Exhibit H are

5    the exclusive employees of the 16 debtors.

6            THE COURT:  All right.  So other than the

7    directors --

8            MR. KLEINBERG:  Right.

9            THE COURT:  -- there are --

10           MR. KLEINBERG:  Who are waiving their

11   compensation.

12           THE COURT:  -- one, two, three, four -- there are

13   five employees.

14           MR. KLEINBERG:  Correct.  Correct.

15           THE COURT:  And that's at China Fisheries

16   International.  Okay.

17           MR. KLEINBERG:  Correct.  Your Honor should know

18   that the Pacific Andes Group across its broad spectrum has

19   2,000 or more employees, and the Peruvian companies have an

20   additional 2 to 2,500 or so employees.

21           THE COURT:  Right.  And so just as far as the big

22   picture goes, you're saying -- I think you were well, no,

23   maybe there will be a sale, maybe there's some

24   reorganization.  How are you going to reorganize?  What's

25   the plan for reorganizing these businesses that are dormant

Page 40

1    or otherwise, you know, not operating?

2              MR. KLEINBERG:  If they did not have debt on them,

3    which in this case is senior note debt --

4              THE COURT:  Right.

5              MR. KLEINBERG:  -- there would have been no reason

6    to file for them.  So the --

7              THE COURT:  So this is about selling the Peruvian

8    about.  That's what this case is about.

9              MR. KLEINBERG:  It's not -- in our view it's not

10   exclusively about selling the business.

11             THE COURT:  All right.

12             MR. KLEINBERG:  There are other reorganization

13   options.  I would like to give David Prager and Golden more

14   than a day or two of opportunity to come up with those

15   options.  But certainly it's not surprise to anyone that a

16   sale is a strong contender.

17             THE COURT:  All right.

18             MR. KLEINBERG:  Not a strong contender, Your

19   Honor.

20             THE COURT:  Tell me then what -- and thank you for

21   the additional discussion about the debtors' operations.

22             Peruvian insolvency law, first off, what is the

23   status -- there was an involuntary petition filed.

24             MR. KLEINBERG:  I'm going to ask my partner, Mr.

25   LoBello, who is our Chapter 15 specialist, to address that

Page 41

 1    if that's acceptable to Your Honor?

 2              THE COURT:  Of course.

 3              MR. LOBELLO:  Good morning, Your Honor.

 4              THE COURT:  Good morning.

 5              MR. LOBELLO:  Your Honor, if I could give you a

 6    status with respect to the Chapter 15s and the Peruvian

 7    proceedings.

 8              THE COURT:  All right.

 9              MR. LOBELLO:  You know, we recognize that this

10    morning's calendar only the Chapter 11 cases appear, but we

11    anticipated that you might have some questions with respect

12    to the Peruvian companies --

13              THE COURT:  All right.

14              MR. LOBELLO:  -- the Chapter 15s.

15              As Mr. Kleinberg explained to the Court, the three

16    Peruvian companies that are now debtors in Peru, which are

17    CFG Investment SAC, (indiscernible) Inca, SAC and

18    Sustainable Fishing Resources, SAC, are all obligors as

19    reflected in the corporate chart.

20              As mentioned, these are particularly valuable

21    companies.  Together they hold 16.9 percent of the rights

22    for the anchovy fishing quota.  They own collectively 56

23    vessels and they have nine processing plants.

24              The Peruvian bankruptcy and the Chapter 15s before

25    this court is part of the global restructuring of the CF

1    Group by the debtors.

2          On June 30 Your Honor knows the Chapter 11s were

3    commenced before this court and at the same time the Chapter

4    15 for these three Peruvian companies were filed as well.

5    Earlier that day on June 30 there were ordinary bankruptcy

6    proceedings commenced before the National Institute for the

7    Defense of Competence and Protection of Intellectual

8    Property, otherwise known as INDECOPI.  A proceeding -- an

9    insolvency proceeding before INDECOPI is not identical to a

10   U.S. Chapter 11.  We're not suggesting that.  But there are

11   similarities.

12         THE COURT:  Well, the involuntaries, as I

13   understand it -- all right.  So three creditors, these are

14   the three creditors that the Peruvian entities reached out

15   to because you -- I note that you indicate in the affidavit

16   that the Peruvian entities weren't eligible to file

17   voluntarily, right, because of the failure to, what, have

18   accounting records or something?

19         MR. LOBELLO:  They didn't have -- as I understand

20   it, Your Honor, they did not have recent audited financials

21   which is a requirement under Peruvian insolvency law.  So

22   they did, as we disclosed in our declarations, reach out and

23   have a discussion with certain of their trade creditors in

24   Peru.

25         THE COURT:  All right.  So the trade creditors

Page 43

1   file involuntary petitions and, what, is that an involuntary

2   for reorganization?  There are two ways, right?  You can

3   either file an involuntary to liquidate or to reorganize.

4           MR. KLEINBERG:  As I understand it, Your Honor,

5   and I want to respond to your question, I don't think it's

6   yet been determined.  It could be a restructuring.  It could

7   be a liquidation under Peruvian law.

8           THE COURT:  So that when the petitions got filed

9   there wasn't a request in it to say -- if -- as -- it's not

10  like filing an involuntary Chapter 7 petition against an

11  entity or an involuntary 11.  You're saying they filed this

12  involuntary and they didn't ask to liquidate -- and I

13  appreciate that there's -- and maybe you can talk about it

14  some more.  But there's an opportunity for creditors to be

15  heard, et cetera.

16          But what is -- what's the status of what's -- of

17  the proceeding in Peru?

18          MR. LOBELLO:  So it -- and by the way Gustavo

19  Militch, the Peruvian insolvency lawyer for the three

20  Peruvian debtors is in the courtroom and so obviously he is

21  more expert than I.  But he spent a little bit of time with

22  me trying to train me, so I'll answer generally and if the

23  Court has more specifics I'll refer to Mr. Militch.

24          THE COURT:  All right.

25          MR. LOBELLO:  I understand that it was a -- for

1    example, maybe we should do a little bit of a timeline.  So

2    day one there's an in -- there's a filing by the particular

3    creditors.  We disclosed the names in the petition.  They

4    commence the -- what's called an ordinary proceeding in --

5    before INDECOPI.

6            I don't believe that they choose a restructuring

7    or a liquidation that culminates later on in the process.

8            THE COURT:  Okay.

9            MR. LOBELLO:  After the filing in approximately 30

10   days INDECOPI which, Judge, is not a court to be clear.  It

11   is an administrative body.  That administrative body will

12   notify the debtor of the filing of the ordinary proceeding

13   by the creditors.  INDECOPI is comprised of five

14   commissioners who are appointed.  The commissioners select

15   bankruptcy officials and analysts who are responsible for

16   administration of the bankruptcy cases.

17           THE COURT:  So who is operating those businesses

18   now?

19           MR. LOBELLO:  Right now, Your Honor, the -- Mr.

20   Francisco Paniaqua, the foreign representative who is also

21   the general manager, he has continued to operate those

22   businesses.

23           THE COURT:  All right.  So they remain in

24   possession of the business?

25           MR. LOBELLO:  That's the way I would look at it as

1      an American bankruptcy lawyer.  Yes, Your Honor.

2              THE COURT:  Okay.  And that is for the duration of

3      the proceeding or what?

4              MR. LOBELLO:  It is for the duration of the

5      proceeding, although the creditors play a role in the

6      insolvency proceeding.  And management can, in fact, be

7      displaced.  That is part of the Peruvian bankruptcy scheme.

8              THE COURT:  But is -- and that's after the 30

9      days' notice?

10             MR. LOBELLO:  Well, let me see if I can respond to

11     the Court.

12             So day one is the filing.  Day 30 INDECOPI makes

13     its pronouncement with respect to the filing.  Day 40, so

14     ten days after that, the debtor can respond with respect to

15     the ordinary proceeding.  The way I look at it, that -- you

16     know, the debtor can contest the involuntary.  That's -- I

17     think that's part of our nomenclature.

18             THE COURT:  Right.  But that's not going to happen

19     here because the debtor invited it.

20             MR. LOBELLO:  That's correct, Your Honor.

21             THE COURT:  Okay.

22             MR. LOBELLO:  And, again, that's laid out in our

23     papers crystal clear.  So, you know, we -- that -- and as I

24     understand it that is not an uncommon practice in Peru

25     bankruptcy proceedings.

Page 46

1               THE COURT:  All right.

2               MR. LOBELLO:  There -- there then is a period of

3    time, perhaps 60 to 90 days, in which INDECOPI will -- after

4    which INDECOPI will issue its decision regarding whether the

5    requirements for insolvency are met.  And INDECOPI then

6    publishes in a local paper its decision regarding whether,

7    in fact, the requirements for insolvency have been met.  And

8    at that point in time, upon publication, a stay is imposed.

9               THE COURT:  So there's no stay in place right now?

10              MR. LOBELLO:  As we speak my understanding is no.

11              THE COURT:  All right.

12              MR. LOBELLO:  After the publication --

13              THE COURT:  Excuse me.  Wait.  Wait just one

14   second.

15        (Pause)

16              THE COURT:  Okay.  Go ahead.  Sorry.

17              MR. LOBELLO:  After the publication the debtor

18   then files a schedule -- schedules of assets and liabilities

19   for the benefit of creditors.

20              THE COURT:  Is the debtor authorized to divest --

21   sell assets during this period?

22              MR. LOBELLO:  Bear with me, Your Honor.

23              THE COURT:  All right.

24              MR. LOBELLO:  I think I can answer that.

25              THE COURT:  Okay.

1            MR. LOBELLO:  During the reorganization process in

2     Peru my understanding is, is that creditors decide whether

3     or not existing management to the debtor can stay in place

4     --

5            THE COURT:  Right.

6            MR. LOBELLO:  -- or whether it should be replaced.

7     That is a question --

8            THE COURT:  All right.  And when does that happen?

9     That would have to be after the 40th day I'm guessing.

10            MR. LOBELLO:  Yeah.  I don't think that begins

11     immediately.  I think it's somewhere along the process.

12     And, Judge, I apologize.  I can't be more granular.  I would

13     just be guessing.

14            THE COURT:  All right.  But I'm sorry.  So they

15     have a -- they have the right to be heard on that.  But

16     irrespective of that, if management said tomorrow, gee,

17     we've got a great offer for this business.  We really want

18     to sell it.  Can they do that and do they need court

19     approval?

20            MR. LOBELLO:  I know that there is creditor

21     participation.  INDECOPI is not a court.  It is an

22     administrative body.

23            THE COURT:  Okay.

24            MR. LOBELLO:  Its decisions are subject to review

25     on appeal to, in fact, a court, a tribunal.  I can't answer

1    the Court's question specifically about how a sale would

2    take place.  And if you would like, Your Honor, I'm more

3    than happy to take a moment, if I might, and confer with Mr.

4    Militch.

5             THE COURT:  Well, why don't we keep going and I'm

6    -- maybe we'll come back to that.

7             But -- so at this point we're sure that there's no

8    stay in place in Peru and that the -- and my guess is --

9    well, you'll find out as to what the limitations are on the

10   right of the entities that are the subject of the

11   involuntaries to sell assets.

12            MR. LOBELLO:  Right.

13            THE COURT:  Okay.

14            MR. LOBELLO:  And, Your Honor, I believe the

15   answer is going to be that it's ordinary course of business

16   similar to the American concept.

17            THE COURT:  Right.  But --

18            MR. LOBELLO:  But we will confer --

19            THE COURT:  -- selling the business is not --

20            MR. LOBELLO:  Is not ordinary course.

21            THE COURT:  -- the ordinary course of a fishing

22   business, right?

23            MR. LOBELLO:  Yes.

24            THE COURT:  Right.

25            MR. LOBELLO:  Yes.

1              THE COURT:  Okay.  So can we then just agree for

2       the purposes of what we're talking about now and subject to,

3       you know, that they can't sell the assets at this point?

4              MR. LOBELLO:  And I'm not suggesting any -- I'm

5       just professing a little bit of ignorance with respect to

6       Peruvian law.  I am not trying to suggest that anyone has

7       the power to sell the entire business.

8              THE COURT:  All right.  When we break I would like

9       you to ask your expert here, you know, the --

10             MR. LOBELLO:  Mr. Militch.

11             THE COURT:  Yes, please, about that.

12             MR. LOBELLO:  It would be my pleasure.

13             THE COURT:  All right.

14             MR. LOBELLO:  Your Honor, around the time of the

15      publication creditors will be required to file claims.  And

16      INDECOPI reviews those claims and ultimately publishes a

17      list of allowed claims.

18             Thereafter, there are several meetings of

19      creditors that are held.  There's a first official meeting

20      in which seems to be informational in large part.  Creditors

21      can ask questions and gather information.

22             The second -- there's a second and third meeting.

23      The second meeting is very important.  Usually during the

24      second meeting there is a decision by creditors whether the

25      debtor should be reorganized or liquidated.

1           And subsequently there is a third meeting.

2     Assuming that the creditors decide that there should be a

3     reorganization at the third meeting and thereafter the

4     specific terms of the restructuring are hammered out.

5           Your Honor, one other thing with respect to

6     Peruvian law and Peruvian insolvency.  Creditors have raised

7     questions in their papers why these Peruvian entities are

8     not Chapter 11 debtors, but instead are Chapter 15 debtors.

9     And I don't think that there's a mystery here, but maybe not

10    everyone is aware of the facts that we are aware of.

11          First of all, as Mr. Kleinberg indicated, there

12    are quite a few employees in Peru, 2,400, 2,500 Peruvian

13    employees.  There are trade creditors in Peru.  Everybody in

14    this room appreciates how valuable Peru is compared to some

15    of the other operations.  Obviously, Peru is very important.

16    And the restructuring of Peru's -- of the Peruvian

17    companies' obligations is very important.

18          And, quite frankly, after discussing Peruvian

19    insolvency law with Mr. Militch, the debtors had concerns

20    with respect to what a Peruvian Court and what Peruvian

21    creditors, trade creditors who are so important to support

22    the business, what impact on that Peruvian Court and those

23    Peruvian creditors a U.S. court order might have.

24          Currently, the Peruvian law provides, and it's a

25    very serious provision that keeps coming up in different

Page 51

1    parts of the Peruvian insolvency law, that Peru takes the

2    position that they have exclusive jurisdiction over

3    insolvency issues with respect to companies that are

4    domiciled in Peru.  And these three companies that we're

5    talking about are clearly domiciled in Peru.

6            THE COURT:  All right.

7            MR. LOBELLO:  So we ran the risk if we filed an 11

8    here, we would ultimately work hard, roll up our sleeves,

9    get some relief, hopefully reorganize, go down to Peru and

10   we would have years of process to have Peru recognize the

11   U.S. court order.

12           THE COURT:  All right.

13           MR. LOBELLO:  And it seemed to us that it made

14   more sense to go to the home court where the employees are

15   located, where the trade creditors are located, where the

16   life blood of that -- of these companies are and utilize

17   what Peru says is the exclusive jurisdiction, you know, that

18   they have reserved for their country and then seek Chapter

19   15 relief here to further the global reorganization efforts

20   of the debtors and of the foreign debtors.

21           THE COURT:  And so the thought then is through the

22   Chapter 15 you would ask for recognition of that and then

23   when you have a deal done a -- if, in fact, they reorganize

24   you would want recognition -- you would want to enforce the

25   Peruvian plan through the 15?  is that what the thinking is?

```
 1              MR. LOBELLO:  Well, we -- obviously the Peruvian

 2    proceeding, with all due respect to this Court, is viewed as

 3    the main insolvency proceeding by the foreign debtors.  We

 4    would press forward with a -- with respect to that

 5    insolvency proceeding as I think I must, and we would seek

 6    recognition of that Peruvian proceeding to supplement,

 7    augment whatever relief we're ultimately going to get in the

 8    Peruvian proceeding.

 9              THE COURT:  All right.

10              MR. LOBELLO:  All right.  So hopefully --

11              THE COURT:  Is that different than what I asked?

12              MR. LOBELLO:  I'm not sure --

13              THE COURT:  All right.

14              MR. LOBELLO:  -- Judge.

15              THE COURT:  All right.

16              MR. LOBELLO:  The -- did I -- I'm sorry.  Did I

17    answer your --

18              THE COURT:  I guess what I'm just trying -- I just

19    want to make sure I appreciate -- well, first off, and the

20    other thing I would ask you to find out is how long these --

21    between the first -- when does the first meeting take place

22    and how much time lapses between the first and the third

23    when you have a decision on -- from the creditors on what's

24    going to happen?

25              And, again, what you -- what you're going to be
```

1    asking for is recognition so that -- in the U.S. so that

2    whatever the solution is in Peru you would seek to enforce

3    that or give effect to it through the 15?

4              MR. LOBELLO:  Well, and certainly we would like

5    the benefit of the stay.

6              THE COURT:  Right.

7              MR. LOBELLO:  I think, you know, the papers

8    reflect that certain of the Peruvian debtors are party to an

9    indenture.

10             THE COURT:  Right.

11             MR. LOBELLO:  And there's a bundle of contract

12   rights that those Peruvian debtors have.  And if there's a

13   lawsuit presumably that would be commenced in New York.

14             THE COURT:  No. No.  I appreciate that's why

15   you're asking for recognition and I'm sure we're going to

16   hear the difference in the fact that there is no stay at

17   least right now in Peru.  But that's not in front of us

18   right now.

19             MR. LOBELLO:  Right.

20             THE COURT:  All right.  And so these entities are

21   operating.  Are they able to borrow money?  Are they able to

22   extend credit?

23             MR. LOBELLO:  Your Honor, subject to what Mr.

24   Militch will explain to me, I believe that they can conduct

25   their business in the ordinary course.  And similar to a

1    U.S. bankruptcy, anything outside the ordinary course is

2    subject to, you know, creditor discussion and creditor

3    approval.

4              THE COURT:  All right.

5              MR. LOBELLO:  There is creditor oversight, as I

6    understand it, in this proceeding and a right to be heard.

7              THE COURT:  All right.  Why don't you talk about

8    the bank accounts, the issues that were raised, or maybe

9    your partner wants to do it, the issues that were raised by

10   the parties objecting.  And maybe -- and, Mr. Masumoto, I

11   assume that you've probably looked at that as well.

12             So I'm just looking at some of these more

13   technical issues that have arisen.

14             MR. LOBELLO:  Your Honor, if I might --

15             THE COURT:  Sure.

16             MR. LOBELLO:  -- if I could pass the baton --

17             THE COURT:  Mr. Kleinberg.

18             MR. LOBELLO:  -- to Mr. Kleinberg.

19             THE COURT:  Sure.

20             MR. KLEINBERG:  We are hard at work and have been

21   on a cash management motion.  We acutely realize that it

22   would have been better to file it on the first day.  But we

23   didn't and the reason for that is we need to understand the

24   system as attorneys and fiduciaries for this Court.  It's

25   not an easy process where we're working with Asian-based

1    financial professionals who are used to doing business in a

2    certain way.  It's not an unusual experience in American

3    Chapter 11s when this happens.

4            We expect to file that motion shortly and we

5    expect to -- the motion will contain a proposal for the U.S.

6    Trustee to allow the continuation of the debtors' deposits

7    in the overseas banks because they are world recognized

8    banking institutions.  There is not going to be a ton of

9    cash in these accounts.  We are certainly willing to open --

10   to work with the U.S. Trustee as their requirements mandate

11   and if we need to make alternative arrangements, we will

12   certainly accommodate them.

13           There's a certain agreement, I think it's called a

14   depository bank agreement I think, that the U.S. Trustees

15   sometimes use to bring foreign banks within their comfort

16   zone and we're certainly open to working that process out.

17           THE COURT:  And where are the -- and there were

18   some concern expressed in some of the papers about the

19   solvency, the administrative insolvency of these entities

20   and where the money is coming from.

21           MR. KLEINBERG:  Yeah.  I tried to address that

22   part before, but let me be clear.

23           First of all, it's the first day of the case and

24   the question of administrative insolvency really should be

25   deferred until we've had a chance to get our ducks in a row,

Page 56

1    to have both of our financial professionals look at it.  We

2    don't think it is a -- it's going to be a problem.  There

3    are opportunities for the debtor to fund this case in a

4    number of different fashions.  We do need a little breathing

5    spell -- we are a debtor.  No debtor is perfect to say the

6    least -- to explore those opportunities and to make

7    proposals to the Court, whether it be for some sort of

8    debtor-in-possession financing or otherwise.

9            THE COURT:  All right.  But you have employees.

10   The -- leaving the directors out -- you've indicated the

11   directors aren't going to get paid anything -- you've got

12   five other people.  Where is the money coming to pay them?

13           MR. KLEINBERG:  Well, there is money in the bank.

14   There are some levels of intercompany transfers that are

15   made in the regular course of business, not from Peru.

16   We're not looking to invade that asset at the moment.  But

17   there is money that flows in from over here.

18           THE COURT:  Okay.

19           MR. KLEINBERG:  And we recognize that we have to

20   have crystal clear disclosure and transparency about that.

21   It's not our intention to let these employees go unpaid.

22   And we have other cash needs as well down here at this

23   shipping agency.  Some of it could potentially be offloaded

24   to a crew, an agency that provides crew members for these --

25   the ships that these -- this company services.

1                    We recognize there are issues here, Judge, and

2      we're working hard to resolve them.  But we are not going to

3      let this case go into administrative insolvency based on the

4      needs of these employees.  And they're paid as of the

5      current date, the petition date.  There is no need to do a

6      cross-petition date motion for them.

7                    THE COURT:  All right.  Okay.  Is there anything

8      further that you would like to add?

9                    MR. KLEINBERG:  Well, I guess the motions, Judge.

10                   THE COURT:  All right.  Why don't we talk about

11     the motions?

12                   MR. KLEINBERG:  We do have four motions on the

13     calendar for today.  If I may address those.

14                   THE COURT:  Yes, please.

15                   MR. KLEINBERG:  So first is our motion for joint

16     administration.  I believe it's non-controversial.  There

17     have been no objections to it.  I can make an offer of proof

18     to Your Honor basically incorporate -- reoffering the

19     statements made in the motion and in our rule -- Jessie's

20     Rule 1007 declaration that the 16 debtors are affiliates;

21                   That the basic court and party concerns of

22     efficiency and convenience of administration are satisfied

23     here.  Clearly having to file documents in one case rather

24     than 16 is efficient, avoids duplication.

25                   There are no substantive rights being implicated

1    by our motion for joint administration.  It's really, as we

2    all know, just setting up a lead debtor caption.

3              And there is no objection to that motion

4              THE COURT:  Does anyone else in the court wish to

5    be heard on the motion for joint administration filed in

6    this case?

7              Being no response based upon my review of the

8    motion and the evidence submitted in support of the motion I

9    find that the debtors have established cause for the relief

10   requested.  That motion is granted.

11             MR. KLEINBERG:  Thank you, Your Honor.  We will

12   upload or e-mail in an order this afternoon.

13             With respect to the second motion I would like to

14   deal with it's the motion for a case management procedure.

15             THE COURT:  Let's do that last.

16             MR. KLEINBERG:  Sure.  We have a motion to impose

17   or to recognize the imposition of certain basic bankruptcy

18   rights provided by the code that are fairly well known to at

19   least American companies and their attorneys, but maybe less

20   well known in Asia and Peru.  And so we've made this motion

21   to, as we styled it, to enforce the stay.  It's really to

22   reiterate the three basic provisions of the Bankruptcy Code

23   with regard to initial debtor protections, the automatic

24   stay under Section 362, the prohibition on defaults and

25   enforcement activity based on the ipso facto situations

1   under 365(e) of the code, and the antidiscrimination

2   provisions of Section 525.

3          Again, by way of offer of proof as previously

4   stated in the motion and the Rule 1007 we have all or almost

5   all foreign creditors.  We have an issue of customers,

6   creditors and vendors who may not be familiar, and we think

7   we would be in a better position to protect these debtors if

8   we had such an order from the Court which does not enhance

9   or detract any of the statutory provisions, but is an order.

10         And there's no objections to that motion.

11         THE COURT:  All right.  Is there anyone else in

12  the court today who would like to be heard on the debtors'

13  motion for an order enforcing Sections 362, 365(e)(1) and

14  525 of the Bankruptcy Code?

15         There being no response based upon my review of

16  the motion and the facts submitted in support of it, I find

17  that the debtor has established -- debtors have established

18  cause.  The motion is granted.  You'll please submit an

19  order.

20         MR. KLEINBERG:  Thank you, Your Honor.

21         THE COURT:  Here's what I would like to do.  I

22  would like to take just ten minutes.  I would like you to

23  please speak to your -- the -- your expert on --

24         MR. KLEINBERG:  Peruvian --

25         THE COURT:  -- Peruvian law to answer the

Page 60

1   questions that I had.  What I would also ask you to do is I

2   want you to talk to the people here who -- for the parties

3   who have filed objections because what we're coming up to is

4   the question on additional time for you to file your

5   schedules, which is being opposed, and also concerns that

6   are being raised and a desire for me to set a scheduling

7   order with regard to motions that they may want to bring.

8           MR. KLEINBERG:  Understood.

9           THE COURT:  So it's going to be very helpful to me

10  if you can talk with them and see if there isn't a way to

11  resolve what the objections are.

12          What I see happening here, at least in the short

13  term, is for people to sit down and to try to get to a point

14  where there's at least some understanding of what has

15  transpired, that there will be the kind of transparency that

16  people are concerned about.

17          It's not my desire that we start this case by

18  having motions made to appoint trustees.  It just doesn't

19  make sense to me.  Even if you're successful it's not going

20  to -- in defusing that it's probably not going to make for a

21  smooth trip through Chapter 11.

22          I'm not prejudging this or anything else.  I do

23  ask you, though, to talk to these folks and see if there's a

24  way that we can work through some of these, even if it's

25  just for a shorter period of time than when we get back

1    together again on it.

2            All right.  So I'm going to take ten minutes and

3    come back, and when I come back what I'll ask you to do is

4    to just fill in that information that I asked for with

5    regard to the Peruvian proceedings.

6            Again, what I'm concerned about -- not concerned

7    about, but curious about is you've got a proceeding in

8    there, right now there's no stay.  There eventually will be

9    a stay, and then there's a process for getting out of that.

10   And what you're asking for basically is through the 15, but

11   through these 11s as well is to try to harmonize all of

12   that.  And I just want to get a sense for what kind of a

13   time frame we're talking about as we move forward.

14           MR. KLEINBERG:  Well, we'll be happy to present

15   Mr. Militch who is an attorney and who is quite --

16           THE COURT:  All right.  He can --

17           MR. KLEINBERG:  -- a pleasure to speak to.

18           THE COURT:  -- he can speak -- again, I just need

19   --

20           MR. KLEINBERG:  Very well.

21           THE COURT:  -- I would just like to know that.

22           MR. KLEINBERG:  And I'm happy to speak to the

23   banks.  Can we use the courtroom during this --

24           THE COURT:  Yes.

25           MR. KLEINBERG:  -- interim?

Page 62

```
1              THE COURT:  Yes.  You can do that.

2              MR. KLEINBERG:  Thank you.

3              THE COURT:  Okay.

4              MR. KLEINBERG:  Yeah.

5              THE COURT:  Thank you very much.

6         (Recessed at 11:38 a.m.; resumed at 11:59 a.m.)

7              THE COURT:  -- if you needed more time to discuss

8    these issues.

9              MR. MARTIN:  Your Honor, I think we might need

10   some more time.  Craig Martin on behalf of the club lender

11   parties.  We've exchanged some ideas back and forth.

12             THE COURT:  Okay.

13             MR. MARTIN:  And I'm negotiating with a big group

14   of creditors here and taking --

15             THE COURT:  It's not a problem.  But before we

16   break can I just get the information that I was asking for

17   with regard to the Peruvian bankruptcy law?

18             MR. KLEINBERG:  Your Honor, with our -- with

19   permission we would ask Mr. Militch to join me at the

20   podium.

21             THE COURT:  Sure.  Please come forward, Mr.

22   Militch.

23             MR. KLEINBERG:  Your Honor may recall that this

24   gentleman did submit a declaration in support of the

25   verified petition of the three Peruvian Chapter 15 debtors.
```

1              THE COURT:  Yes.

2              MR. QUESADA:  Good morning, Your Honor.

3              THE COURT:  Good morning.

4              MR. QUESADA:  My name is Gustavo Miro Quesada.

5    I've been referred so far as Mr. Militch, but that's my

6    mother's family name so --

7              THE COURT:  Oh.

8              MR. QUESADA:  -- I would like to go on record as

9    Miro Quesada.

10             THE COURT:  All right.

11             MR. QUESADA:  Judge, I understand some of your

12   concerns.  I don't know if you find a good idea for me to

13   give you a quick overview.

14             THE COURT:  I just -- I'm just curious.  It's not

15   a concern.  I just want to make sure I understand that the

16   -- that, one, there's no automatic stay in place until the

17   petition is basically has been accepted.

18             MR. QUESADA:  Right.

19             THE COURT:  Right.  And that may be 40 days down

20   the road.

21             MR. QUESADA:  Even more.

22             THE COURT:  Even more?

23             MR. QUESADA:  Yes.

24             THE COURT:  Okay.  All right.  And then, second,

25   with regard to the ability of the -- well, the management

1    for the Peruvian entities stay in possession, they continue

2    to manage until creditors or creditors have an ability to

3    come in and -- would they be petitioning the INDECOPI or who

4    would they be asking about when they say we don't want them

5    to manage anymore?

6            MR. QUESADA:  Right.  I know it's a -- it's kind

7    of confusing, but back home in Peru the system is not only

8    administrative, but it is decided directly by the creditors.

9            THE COURT:  Okay.

10            MR. QUESADA:  There is no authority making a

11    decision or a trustee taking over.

12            THE COURT:  Okay.

13            MR. QUESADA:  The creditors will meet and they

14    will decide on the fate of the company.  They will decide on

15    the administration.

16            THE COURT:  Okay.

17            MR. QUESADA:  They can confirm the existing

18    administration or change it, and on the terms and conditions

19    of the restructuring plan or the liquidation agreement.

20            THE COURT:  All right.  And their decisions on

21    those things, they could then be reviewed by a court?

22            MR. QUESADA:  Yes.  Actually, any creditor can

23    challenge any decision made by the creditors' meeting.

24    Also, the debtor can do that.

25            THE COURT:  Okay.

1          MR. QUESADA:  In first instance the commission

2     will resolve either if that challenging has any -- has

3     sustained or not.

4          Then you can appeal it to the tribunal.

5          THE COURT:  Okay.

6          MR. QUESADA:  It's still an administrative

7     proceeding within INDECOPI.

8          Nevertheless if you disagree with the decision of

9     the second administrative instance, you can go to court.

10         THE COURT:  Okay.

11         MR. QUESADA:  And you will go straight to the

12    appeal court, the Court of Appeals.  Sorry.

13         THE COURT:  And roughly what is the time period

14    between the -- the first meeting of creditors would then be

15    60 or 90 days after the filing?

16         MR. QUESADA:  No.  It will take way longer.  In 90

17    days we expect for the stay to be in place.

18         THE COURT:  Okay.

19         MR. QUESADA:  In that moment all creditors are --

20    of the debtors are invited to file their proof of claim.

21         THE COURT:  Oh, okay.

22         MR. QUESADA:  Right.

23         THE COURT:  Okay.

24         MR. QUESADA:  And they have 30 days to do that if

25    they want to have a voting right in the creditors' meeting.

1   Then the authority can take as long as 90 days to rule on

2   each of the proof of claims.

3           Only after that period has ended the authority

4   will call for the creditors meeting to meet for the first

5   time.

6           THE COURT:  Okay.

7           MR. QUESADA:  Right.  In that first meeting

8   usually they don't make any decision.  They just want to

9   know who is there and --

10          THE COURT:  Sure.

11          MR. QUESADA: -- who is playing the game and what

12  is the information available.  However, it could happen that

13  in that --

14          THE COURT:  Right.

15          MR. QUESADA:  -- first meeting they make all

16  decisions available.  Right.  So as Edward was explaining

17  usually it takes three meetings:  The first one to get

18  information; the second to decide on the fate; and the third

19  one to appoint administration and the terms and conditions

20  of the restructuring plan.

21          THE COURT:  And the timing of those would be

22  dictated by the amount -- the number of creditors involved,

23  the complexity of the issues.  There's no -- the statute

24  doesn't dictate that it has to happen within a period of --

25  specific period of time?

1        MR. QUESADA:  This is a very important point.  The

2    creditors meeting can meet as many times as they want.

3        THE COURT:  Right.

4        MR. QUESADA:  But our -- the Peruvian Bankruptcy

5    Act states that the creditors meeting must make a decision

6    on the fate of the debtor, either to restructure or

7    liquidate, within 30 days since the first meeting.

8        THE COURT:  Oh, okay.

9        MR. QUESADA:  Okay.  And once they have decided

10   what is going to happen with the debtor, they have 45 days

11   to decide on the terms and conditions that is -- that are

12   going to apply to the fate of the debtor.

13        If they don't meet these two timelines,

14   liquidation will be mandatory --

15        THE COURT:  Okay.

16        MR. QUESADA:  -- and irreversible.

17        THE COURT:  Okay.

18        MR. QUESADA:  So it's a good incentive for the

19   creditors and debtor to --

20        THE COURT:  Right.

21        MR. QUESADA:  -- I mean, reach an agreement.

22        THE COURT:  Okay.

23        MR. QUESADA:  I just wanted to highlight, I think

24   it's important for the case that the system in Peru is very

25   inclined or pro-creditor, number one.  And number two that

Page 68

1    the sanctions and restrictions available for the management

2    that is in possession until the creditors meeting take over

3    or confirm that administration are quite severe.

4              For example, right now we are within the suspect

5    period, and under this period all acts of the administration

6    are presumed to be fraudulent so the burden of proof is

7    reversed.  Any creditor can challenge any of the acts of the

8    administration --

9              THE COURT:  Now going forward.

10             MR. QUESADA:  Exactly.

11             THE COURT:  Yeah.  Okay.

12             MR. QUESADA:  No.  They can even challenge --

13             THE COURT:  Anything that happened before.

14             MR. QUESADA:  -- anything that happened in the

15   last 12 months.

16             THE COURT:  Okay.

17             MR. QUESADA:  And from -- since the authority

18   formally notifies the debtor about the initiation of the

19   involuntary proceeding, there is a number of -- a list of

20   things that the administration cannot do.  They cannot

21   dispose of fixed assets.  They cannot do anything that is

22   not or falls within the ordinary course of business.  And

23   even if -- or if the administration performs any of those

24   acts which are not allowed, any creditor can challenge them.

25   And those acts will be declared ineffective and the

1    administration faces criminal liability --

2              THE COURT:  Okay.

3              MR. QUESADA:  -- for those.

4              So it's quite transparent and very delicate for

5    the administration since the proceeding is initiated either

6    by creditors or the debtor.

7              THE COURT:  Okay.  All right.  That was very

8    useful.  Thank you very much.

9              MR. QUESADA:  Happy to help.

10             THE COURT:  All right.  Thank you.

11             MR. QUESADA:  Thank you.

12             THE COURT:  All right.  So, Mr. Martin, another 15

13   minutes do you think?

14             MR. MARTIN:  I think that may be sufficient.  We

15   were getting on to some ideas right as Your Honor came back

16   in.

17             THE COURT:  All right.  Good.  Then -- well, why

18   don't we just say we'll reconvene at 12:30.  Okay.

19             MR. MARTIN:  Thank you, Your Honor.

20             THE COURT:  All right.  Thank you.

21             MR. KLEINBERG:  Thank you, Your Honor.

22        (Recessed at 12:07 p.m.; resumed at 12:36 p.m.)

23             THE COURT:  Mr. Kleinberg.

24             MR. KLEINBERG:  Thank you, Your Honor.  Thank you

25   for the time.  It's been productive.  We've discussed and

Page 70

1    agreed upon a protocol or a schedule for dealing with the

2    issues that were raised under the motion to extend the time

3    to file schedules.  I'll read it into the record and we will

4    produce an order that's acceptable to Your Honor embodying

5    these dates.

6              THE COURT:  Okay.

7              MR. KLEINBERG:  So the motion requested -- the

8    motion to extend the time to file schedules and make certain

9    waivers requested a waiver of the debtors' requirement under

10   Rule 1007 for the debtor to file lists of its equity

11   security holders for its public companies.  So we're

12   withdrawing the request for the waiver and we will endeavor

13   to put those lists together and file them by July 29, 7/29.

14             THE COURT:  Okay.

15             MR. KLEINBERG:  Okay.  With respect to schedules

16   in SOFA themselves, we bifurcated that into two parts:

17   Schedules in SOFA for the debtors, for four of the debtors:

18   Protein Trading; SFG Peru Investments PTD Limited,

19   Singapore; China Fishery Group Limited and they are called

20   CFGL; and PAIH.  Those four debtors will file their

21   schedules and SOFA also on 7/29.

22             THE COURT:  Okay.

23             MR. KLEINBERG:  The remaining debtors' schedules

24   will be due on 8/15, August 15th.

25             THE COURT:  Okay.

1           MR. KLEINBERG:  The corporate financial

2    information due under Rule 2015.3 regarding substantial

3    interests in subsidiaries has also been bifurcated.  With

4    respect to the Peruvian entities, whichever debtor is going

5    to be the reporting entity, but it will cover the Peruvian

6    entities from Smart Group below, that will be due on August

7    19th, 8/19, and for all the other debtors September 2nd.

8           THE COURT:  All right.

9           MR. KLEINBERG:  We have committed to provide the

10   lenders with at least a confidential draft of the cash

11   management motion by Wednesday at noon --

12          THE COURT:  This Wednesday?

13          MR. KLEINBERG:  This Wednesday at noon.

14          THE COURT:  Okay.

15          MR. KLEINBERG:  That's our minimum standard in

16   case we feel that it needs more work.  They felt -- we

17   wanted the opportunity to not have to file it.  They wanted

18   the opportunity to review it.  So we've comprised that a

19   confidential not admissible draft by Wednesday at noon.

20   Obviously, if it's ready to be filed we'll do so.  And

21   that's in advance of the meeting which the lenders have

22   agreed to attend at our invitation scheduled for Thursday in

23   the afternoon, location to be determined.

24          THE COURT:  Okay.

25          MR. KLEINBERG:  And finally the lenders request

1    that Your Honor provide them the opportunity to report back

2    to Your Honor at a conference on either Friday of this week

3    or Monday or as Your Honor's schedule permits.

4              THE COURT:  Okay.  When if you file -- but you

5    expect to file the cash management motion this week?

6              MR. KLEINBERG:  I do.

7              THE COURT:  Okay.  And you'll be -- how much

8    notice are you going to give on that?  What is that, 14

9    days?

10             MR. KLEINBERG:  Either 14 days or the next omnibus

11   hearing date, Your Honor's preference.

12             THE COURT:  Well, we don't have an omnibus hearing

13   schedule yet.  So --

14             MR. KLEINBERG:  Right.  Understood.

15             THE COURT:  I think we have a little leeway on

16   this one.

17             MR. KLEINBERG:  Well, that's the next motion.  But

18   I'm willing to work under either of those parameters.

19             THE COURT:  Well, here's where I'm going.  The

20   reason I asked that is whether, and I direct this to Mr.

21   Martin and his colleagues, I don't have any problem with the

22   concept of coming back, keeping a short string on this so

23   that if there are concerns that the banks have they can

24   voice them.  I'm just wondering whether if we had a little

25   bit more time built into this, if we had the reporting date,

Page 73

1    the date of the cash -- the hearing on the cash management,

2    whether that would work for the lenders.

3            In other words you would -- rather than coming

4    back next Monday, maybe it would be, you know, a couple of

5    weeks after that.  Maybe that doesn't work.  I'm just trying

6    to get a sense for where the lenders are.

7            MR. MARTIN:  Your Honor, I think the important

8    thing to appreciate is that we're essentially reaching a

9    compromise here.  We have a lot of different lenders.  We've

10   been fortunate enough to cooperate.  But for many of the

11   lenders, especially the business people and especially in

12   Asia, it's important to appreciate that this has already

13   been an eight month process and it includes not just the

14   deed of undertaking that was referenced in the first day

15   affidavit that was signed by certain of the debtors in HSBC

16   in the Cayman Court, but there was actually a prior deed of

17   undertaking that certain of the club lenders, the ones that

18   we represent, signed in December of 2015.

19           Both of those deeds of undertaking required

20   account monitoring and CROs put in place.  The Chapter 11

21   filings have resulted in termination and/or resignation of

22   those individuals and Grant Thornton,

23   PriceWaterhouseCooper's reputable firms in Asia that were

24   exercising oversight.

25           And so as you can imagine the lenders are nervous

1    about time passing.  And so I always hate to push back on

2    the Court when the Court is indicating that more time might

3    be preferable, but I think in this instance not only do I

4    have to, but I believe that there are good grounds for it.

5              THE COURT:  All right.

6              MR. MARTIN:  And that's the reason that we asked

7    for that scheduling conference.

8              Now if -- you know, we never know what the future

9    may hold.  There are ways that there might be some things

10   achieved on Thursday, such as a consensual CRO.  There are

11   members in the lender group that have some doubts about the

12   Peruvian insolvency and think that those entities are likely

13   solvent, could pay off those creditors that filed the

14   involuntary.  Maybe we could have a process where we have a

15   financial restructuring of the Peruvian entities if they end

16   up filing in this case Chapter 11s.

17             So there are certainly some things that can be

18   done and accomplished on Thursday that might calm down

19   people who have been dealing with this for eight or ten

20   months.  But if not, I -- our clients are going to insist on

21   getting us back in front of Your Honor, filing the motions

22   that we've indicated as what we called threshold motions,

23   and trying to get a schedule to have those heard promptly.

24             THE COURT:  Okay.  All right.  Well, then let's do

25   this.  I can't bring you back on Friday.  I've got a

1    calendar -- unless you want to come back at about 6:00

2    Friday evening.  But --

3          MR. MARTIN:  You're getting a no from the other

4    lenders, Your Honor.  I was --

5          THE COURT:  Oh.

6          MR. MARTIN:  I was about --

7       (Laughter)

8          MR. MARTIN:  I thought they were going to give me

9    resounding yes's.  It's unanimous there.

10          THE COURT:  Could we do it on instead of Monday

11   Tuesday at 2:00?  Would that be alright, the 19th?

12          MR. MARTIN:  Yeah.  Certainly, Your Honor.

13          THE COURT:  All right.  So we can then have -- you

14   can build into the order a status conference at 2:00 on the

15   19th.

16          MR. MARTIN:  And Your Honor mentions an order.  Do

17   you think that the time frames that were laid out should be

18   set forth in a circulated scheduling -- order that deals

19   with that motion --

20          THE COURT:  Yes.

21          MR. MARTIN:  -- on schedules?

22          THE COURT:  Yes.  I think --

23          MR. MARTIN:  All right.

24          THE COURT:  I think -- yeah.  No, absolutely.

25   That will be the resolution of the motion to extend time, et

1    cetera.

2              MR. KLEINBERG:  I'll do two orders, one that will

3    address the motion for the extension of time and I'll do a

4    scheduling order.

5              THE COURT:  Right.  And you'll just -- you know,

6    you'll just do the motion indicating that you filed it; that

7    there was objection, parties conferred and this is the

8    agreed resolution and I'm -- I have no problem with it.

9              MR. KLEINBERG:  And I'll do a scheduling order as

10   well for Tuesday, the 19th.

11             THE COURT:  Sure.  That sounds fine.

12             MR. KLEINBERG:  Great.

13             THE COURT:  All right.  So that then leaves us

14   with the case management order.

15             MR. KLEINBERG:  Correct, Your Honor.  I think it's

16   non-controversial.  There are no objections to it.  It's

17   really up to Your Honor's comfort level with the proposed

18   case management procedures.  We've tried to keep it simple

19   and streamline it.

20             As mentioned, we're not currently anticipating

21   hiring claims agent, so my law office will be responsible

22   for service.  And so we've tried to do a few things here.  I

23   think some of it is perfunctory, the standard for notice of

24   motion and hearing.  The idea of omnibus hearing dates is

25   proposed, of course, subject to Your Honor's desires.  And

1    --

2              THE COURT:  Do you think we're going to need that?

3    Look, there's nothing in this order that I find

4    controversial.

5              MR. KLEINBERG:  Yeah.

6              THE COURT:  My biggest question was whether it was

7    necessary.

8              MR. KLEINBERG:  I don't think we need a lot of

9    them.  I think it would be helpful to have one for about 30

10   days out for some procedural or administrative motions that

11   may come along.  But I'm also happy to notice them on an ad

12   hoc basis and --

13             THE COURT:  Look, this is what I would like to do.

14   I would like you guys -- you're going to get together on

15   Thursday.  You're going to start talking about how this --

16   you might be able to deal with the various -- the parties

17   who have been objecting to some of the relief that's been

18   requested.

19             My sense is you're going to come out of that

20   meeting and either I'm going to find out on Tuesday that

21   there is a basis by which the banks find that they'll stand

22   down and they can move forward, or maybe there won't be.

23   And if there won't be, I think I'm going to be told that

24   there's a desire to tee up some motions.

25             So why don't we wait until we see where the case

Page 78

1    is going before we start putting together these -- this type

2    of motion?

3              MR. KLEINBERG:  That's fine.

4              THE COURT:  All right.

5              MR. KLEINBERG:  Very well.  Thank you, Your Honor.

6              THE COURT:  All right.  Is there anything else

7    that we need to -- so let's adjourn this.  All right.  Let's

8    just adjourn it, so that we don't lose it, to that Tuesday

9    at -- the 19th at 2:00.

10             MR. KLEINBERG:  The only aspect of the motion that

11   I would probably press for on Tuesday is just an

12   authorization to limit the service list to top -- I think we

13   proposed top 50 creditors, parties in interest, governmental

14   agencies.

15             THE COURT:  Right.

16             MR. KLEINBERG:  That saves us, the estate a bit of

17   mailing costs since everything goes overseas where it's not

18   e-mailable (sic).

19             THE COURT:  Right.

20             MR. KLEINBERG:  But we can focus a little bit more

21   --

22             THE COURT:  Okay.

23             MR. KLEINBERG:  -- on that Tuesday.

24             THE COURT:  Let's look at that on Tuesday.

25             MR. KLEINBERG:  Thank you very much, Your Honor.

1            THE COURT:  All right.  Anything further?

2            MR. KLEINBERG:  No, Your Honor.

3            THE COURT:  All right.  Thank you all very much.

4       (A chorus of thank you)

5       (Whereupon, these proceedings concluded at 12:48 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                        I N D E X

 2

 3                         RULINGS

 4                                        Page      Line

 5    Joint Admin Motion                   58        13

 6

 7    Application to Extend Time to File

 8    Schedules                            --        --

 9

10    Motion to Impose Automatic Stay      59        21

11

12    Case management motion               --        --

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1              C E R T I F I C A T I O N

2

3        I, Sherri L. Breach, CERT*D-397, certified that the

4    foregoing transcript is a true and accurate record of the

5    proceedings.

6
       Sherri              Digitally signed by Sherri Breach
7                          DN: cn=Sherri Breach, o=Veritext,
                           ou, email=digital@veritext.com,
                           c=US
       Breach
8    _____   Date: 2016.07.13 13:14:40 -04'00'

9    Sherri L. Breach

10   AAERT Certified Electronic Reporter & Transcriber CERT*D-397

11

12   Date:  July 12, 2016

13

14

15

16

17

18

19

20

21

22   Veritext Legal Solutions

23   330 Old Country Road

24   Suite 300

25   Mineola, NY 11501