1                         UNITED STATES BANKRUPTCY COURT
                          SOUTHERN DISTRICT OF NEW YORK
2                                           .
IN RE:                                      .    Chapter 11
3                                           .
CHINA FISHERY GROUP, LIMITED    .    Case No. 16-11895-jlg
4  (CAYMAN)                                  .
                                            .    New York, New York
5                           Debtor.    .    Tuesday, July 19, 2016
. . . . . . . . . . . . . . . .    2:38 p.m.
6
                      TRANSCRIPT CASE MANAGEMENT MOTION
7               **BEFORE THE HONORABLE JAMES L. GARRITY**
                   **UNITED STATES BANKRUPTCY JUDGE**
8
APPEARANCES:
9
For the Debtor:              Howard B. Kleinberg, Esq.
10                              Edward J. LoBello, Esq.
                              MEYER, SUOZZI, ENGLISH & KLEIN, PC
11                              990 Stewart Avenue
                              Garden City, New York 11530
12
For Certain Club
13  Lender Parties:          R. Craig Martin, Esq.
                              DLA PIPER, LLP (US)
14                              1201 North Market Street
                              Suite 2100
15                              Wilmington, Delaware 19801

16                              John K. Lyons, Esq.
                              DLA PIPER, LLP (US)
17                              203 North LaSalle Street
                              Suite 1900
18                              Chicago, Illinois 60601

19  (Appearances Continued)

20  Audio Operator:          Electronically Recorded
                              by J. Pereyra, ECRO
21
Transcription Company:    Reliable
22                              1007 N. Orange Street
                              Wilmington, Delaware 19801
23                              (302)654-8080
                              Email:  gmatthews@reliable-co.com
24
Proceedings recorded by electronic sound recording, transcript
25  produced by transcription service.

```
 1   APPEARANCES:   (Continued)

 2   For Maybank:                   Frederick D. Hyman, Esq.
                                    MAYER BROWN, LLP
 3                                  1221 Avenue of the Americas
                                    New York, New York 10020
 4
     For Bank of America:           Lee S. Attanasio, Esq.
 5                                  Andrew P. Propps, Esq.
                                    SIDLEY AUSTIN, LLP
 6                                  787 Seventh Avenue
                                    New York, New York 10019
 7
     For the Ad Hoc Group of
 8   Senior Noteholders:            Gregory F. Pesce, Esq.
                                    KIRKLAND & ELLIS, LLP
 9                                  300 North LaSalle
                                    Chicago, Illinois 60654
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1      (Proceedings commence at 2:36 p.m.)

2           THE COURT:  China Fishery Group.  Can I get

3  appearances, please?

4           MR. KLEINBERG:  Good afternoon, Your Honor.  Howard

5  Kleinberg, Meyer Souzzi, counsel for the debtor, along with my

6  partner Edward LoBello.

7           THE COURT:  All right.

8           MR. MARTIN:  Good afternoon, Your Honor.  Craig Martin

9  and John Lyons from DLA Piper, LLP (US).  We appear on behalf

10  of certain of the club lender parties, Bravo Bank, DBS,

11  Standard Charter, Ascetic China (phonetic).

12           THE COURT:  All right.  Anyone else want to appear?

13           MR. HYMAN:  Good morning, Your Honor [sic].  Rick

14  Hyman from Mayer Brown on behalf of Maybank.

15           THE COURT:  All right.

16           MR. PESCE:  Good afternoon, Your Honor.  Gregory

17  Pesce, Kirkland & Ellis, on behalf of the Ad Hoc Committee of

18  Senior Noteholers.

19           THE COURT:  All right.

20           MS. ATTANASIO:  Lee Attanasio, with my colleague

21  Andrew Propps, on behalf of -- of Sidley Austin, on behalf of

22  Bank of America.

23           THE COURT:  Okay.

24           MR. LUSKIN:  Your Honor, Michael Luskin, Luskin, Stern

25  & Eisler, for Rabo Bank, as agent on the club loan.

1          THE COURT:  All right.  Mr. Kleinberg.

2          MR. KLEINBERG:  Yes.  Thank you, Your Honor.

3          So this is a status conference that was requested by

4    the lenders during the first-day hearings, held on July 11th,

5    last Monday, before Your Honor.  If I may briefly report on

6    what's transpired since then.

7          Following the Monday first-day hearing, we did

8    schedule a meeting with a large number of bank participants and

9    their attorneys, as well as the senior noteholders and their

10   attorneys; the meeting was held on Thursday afternoon, and Mr.

11   Prager's office, who's with Goldin Associates, who's here in

12   court today, as well, and you know, half a dozen or so core

13   issues were discussed.

14         And on Friday, where noted in an email exchange

15   between our group and Mr. Lyons, who was the point person for

16   the lender group.  Emails were exchanged on Saturday.  We had a

17   conference call under which the Peruvian operating company's

18   counsel, who did, in fact, appear before Your Honor the prior

19   Monday, was presented to the lenders and their Peruvian

20   counsel, for an exchange of information and legal positions

21   regarding the Peruvian bankruptcies.  And both Sunday, we

22   exchanged further emails, and this morning, further emails.

23   And finally, we did speak with the lender groups in the

24   conference room that Your Honor provided, graciously, in the

25   hallway, a few moments ago.

1    I believe that we were in the process of making some

2  progress on a number of the issues.  But there is one issue

3  that came up that, apparently, is a stop point for the lenders.

4  And unfortunately, we did break up the meeting, and are not, in

5  our view, perhaps in the lenders' view, as well, really able to

6  continue the negotiations any further.

7    I know the lenders are actually to address with Your

8  Honor their desire to immediately file and prosecute motions.

9    THE COURT:  Well, can I ask what the issue is, or is

10  that something that is better left unspoken on the record?

11    MR. MARTIN:  I'm happy to address it.  I hesitate to

12  do so without --

13    MR. KLEINBERG:  I'm happy to discuss the proposal, as

14  well.

15    THE COURT:  I mean, are we talking -- are we at a

16  point where, if we get this issue resolved, do we have a basis

17  for sort of trying to move this forward in a cooperative way,

18  or is it really just, you know, the damage has been done?  And

19  look, I appreciate there's a long history here that predates my

20  involvement in this.  I just need -- I just want to get a sense

21  for it before we start talking about, you know, motions to

22  appoint trustees and all of that sort of thing.

23    MR. MARTIN:  The sense is, is that we have an issue

24  that's very critical, and it has to do with pending foreign

25  insolvency proceedings.

1     We believe, and we've modified some of our proposal

2  to, in fact, address specifically input from the debtor's

3  Peruvian counsel.  As Mr. Kleinberg indicated, we had a call on

4  Saturday, our counsel, their counsel; we listened to them.  But

5  under Peruvian law, we have taken advice of counsel, and we

6  understand that, once there is publication notice of the

7  proceedings in the Gazette, by the organization that you heard

8  referred to last time as "Indecopi" --

9     THE COURT:  Right.

10     MR. MARTIN:  -- then the proceeding is somewhat fixed.

11     So one of the reasons why we're in such a hurry-up

12  standpoint is, if we can't have that -- those Peruvian

13  proceedings addressed in a way that satisfies us through

14  withdrawal or some other form of agreement, we need to move

15  quickly, and I have a plan for how we might be able to do that.

16  But that's the core issue, from our clients' standpoint, is,

17  once we cross that line, we feel like there's no coming back.

18     THE COURT:  And do we know when that's going to happen

19  --

20     MR. MARTIN:  We know --

21     THE COURT:  -- or is your --

22     MR. MARTIN:  We know from the statute that it is to

23  happen within 30 days of -- roughly 30 days of the filing

24  having been submitted, which was on June 30th.

25     MR. KLEINBERG:  By the way, I'm sorry to interrupt,

1   but that's not our understanding.  Correct?

2          MR. LOBELLO:  Yeah, Your Honor, I don't know that we

3   agree on that.  I thought that, unless we're missing each other

4   -- you know, we all have Peruvian counsel.  But from my --

5   first of all, I don't understand why there's no turning back at

6   that point.  But putting that aside, I think it's three to four

7   months in, and I -- and what I heard counsel say was maybe 30

8   days in.  So I'm -- we're missing each other on that point.

9          MR. MARTIN:  Well, I was interrupted, Your Honor.  I

10  was going to say --

11         THE COURT:  Yes.

12         MR. MARTIN:  -- that the statute says it's 30 days,

13  and then there's a publication, I think the first Monday, some

14  point thereafter.

15         We further understand that, even though they can

16  publish firstly within 30 days, they might take a week, two

17  weeks.  We haven't exactly figured out the exact time frame in

18  which that publication will occur, which, as you can imagine,

19  makes us nervous because, when we read the statute, it could be

20  as early as a few weeks from now; although it's possible that

21  the debtor's counsel is correct, and it -- you know, it's more

22  like 45 days.  But that's still not far away from where we sit

23  now.

24         THE COURT:  All right.  And the concern that the --

25  your group has, your extended group has, is that, once that

1  gets published, it can't be withdrawn or dismissed?

2          MR. MARTIN:  We have not yet taken advice that it can

3  be withdrawn.

4          THE COURT:  Right.

5          MR. MARTIN:  We understand that, once that happens,

6  there then begins the time frame to submit what's called a

7  "restructuring plan."  And while there is what's called an

8  "equity restructuring" possible under Peruvian law, if it's not

9  done within certain time frames, then the only other option is

10 liquidation.

11         Also, from the filing of that Gazette notice, there

12 are then complicated procedures regarding filing claims, having

13 those claims fixed, powers of attorneys that our clients would

14 have to submit, creditors board meetings that have to take

15 place.  From our analysis of the law, there are very

16 complicated things that occur, which permit a restructuring

17 that we believe would be inconsistent with U.S. law.

18         THE COURT:  All right.

19         MR. KLEINBERG:  Your Honor, we've offered to the

20 lenders, just this morning, further access to both Peruvian

21 counsel and Peruvian management, to help clarify some of these

22 issues, and they took that for what it's worth, at face value.

23 But it was not enough, apparently, to dissuade them from their

24 litigious course of conduct which they wish to pursue.

25         We've also offered them -- so the core issue -- I

1   mean, the cat is out of the bag.  The core issue is the lenders

2   have demanded that the Peruvian operating companies, which are

3   not the Chapter 11 debtors --

4            THE COURT:  Right.

5            MR. KLEINBERG:  -- but are the --

6            THE COURT:  Chapter 15.

7            MR. KLEINBERG:  -- Chapter 15 debtors --

8            THE COURT:  Right.

9            MR. KLEINBERG:  -- that the management of those

10  companies act to immediately dismiss the Peruvian insolvency

11  proceedings and --

12           THE COURT:  Right.  Well, they want to reinstitute the

13  sale process.

14           MR. KLEINBERG:  Well, I don't think that -- that there

15  necessarily is a correspondence between the two of them.  The

16  lenders have their own reasons -- I won't speak for them -- as

17  to why they want the Peruvian proceeding dismissed.

18           But a sale process or a restructuring process, with,

19  say, a refinancing, is, in our view, a viable option to go

20  forward, with the Peruvian proceeding remaining in place.  So,

21  frankly, we don't understand why that's a hot button for them.

22  I guess, to be fair, they don't understand why we need -- the

23  Peruvian companies feel they need the protections of that

24  proceeding.  But unfortunately, the talks broke down rather

25  quickly at that philosophical, if you will, impasse.

1        THE COURT:  All right.  Have you done -- I didn't -- I

2   haven't seen it.  But have you circulated a cash management

3   order yet?

4        MR. KLEINBERG:  Yes, we circulated a management order

5   on Wednesday to the lender group; we received comments from one

6   counsel on the proposed order.  The motion itself was filed

7   this past Friday, with a generous hearing date set for August

8   18th, and we continue to collect comments.

9        And certainly, cash management reporting, the

10  implementation of another level of restructuring officer

11  supervision for the debtors, those are all part and parcel of

12  the discussions that we've had with the lender group, and which

13  I feel that we were potentially, if not actually, making some

14  progress on.  But this Peruvian governance question and

15  insolvency question is where we stopped.

16       THE COURT:  All right.  So, Mr. Martin, what is your

17  ask?

18       MR. MARTIN:  So, Your Honor, obviously, our goal in

19  negotiating with the debtor was to try to simplify the case by

20  getting rid of some of the multiple proceedings.  And in so

21  doing, we believe, while there are still some details to be

22  discussed, we could deliver forbearance and liquidity that

23  would solve some of the issues that have been identified.

24       But to the extent that we are at an impasse -- and

25  we're willing to, perhaps, continue talking for a day or two.

1  But our clients have told us, rather firmly, that they want us

2  to move forward with the trustee motion.  So I've been trying

3  to balance how do we, perhaps, continue a dialogue, make the

4  Court happy, but also keep the dates moving forward.  And so

5  what I've come up with is the following:

6        We would, at the point in time, most likely within the

7  next two to three days, file a motion for a trustee.  But we

8  wouldn't agree to a date by which that had to be filed; so

9  that, if we wanted to wait through the weekend, if things or

10  discussions change, we could.  But if not, and we filed it, we

11  would then ask that the debtor respond within one week, natural

12  days, one business week.  We would then be prepared to reply

13  within two business days.  And we would request that the Court,

14  thereafter, have a hearing as promptly as possible.

15        However, we recognize that trustee hearings are

16  oftentimes long and factually intensive, especially when the

17  parties are seeking appointment of a trustee for cause.  So we

18  would actually propose that we bifurcate the hearing on the

19  trustee motion, where we take up 1104(a)(2) issues first, the

20  best interest of creditors.

21        And as I think Your Honor appreciates, the creditors

22  on this side of the table are roughly a billion dollars.  And

23  while we are different levels of the capital structure, both

24  with Chapter 11 debtors, Chapter 15 debtors, and some non-

25  debtors, and there might be some difference in tactics, the

1  creditors of these estates are almost uniform in their desire

2  to have some type of transparency and oversight put in place.

3       THE COURT:  So let me ask you something.  So you get a

4  trustee.  How does that impact the Peruvian proceedings?

5       MR. MARTIN:  Firstly, Your Honor, it brings the type

6  of transparency; such that, if someone is telling us they need

7  to stay in place, and they should remain in Peru, that we have

8  some confidence in that.

9       But secondly, it allows the China Fishery Group

10  entities in the corporate structure, where we believe the

11  trustee could take necessary actions to dismiss the Peruvian

12  case, and if it makes sense, work with local management to

13  pursue the sale; and if not, using the share holdings of the

14  Chapter 11 debtors, effect the necessary change to bring the

15  sale process forward.

16       Obviously, it's quite complex, and I'm not here to

17  tell the Court that I've --

18       THE COURT:  You basically --

19       MR. MARTIN:  -- sorted out all the answers --

20       THE COURT:  You're basically saying that, because you

21  represent -- your group represents virtually all the debt in

22  the case -- is that what you're saying -- that, therefore, you

23  should be able to get a representative in place, who's going to

24  do what the folks -- what you wanted done prepetition?

25       MR. MARTIN:  Yeah.  And it's not just that we

1  represent all the debt because that, probably alone, would be

2  insufficient.

3          There was a -- there was a December 28th undertaking

4  that my client signed, where CROs and accounting oversight was

5  offered voluntarily, by these debtor's affiliates, and where a

6  sale time frame was agreed to.  Another creditor, HSBC,

7  dismissed court proceedings, under a deed of undertaking in the

8  Cayman Islands and in Hong Kong, to have accounting oversight,

9  a forensic accountant was appointed; to have a CRO put in

10  place; and to pursue a sale time frame.

11          So our creditors feel like another factor for this

12  Court to consider is the fact that this debtor has,

13  essentially, violated two court-approved deeds of undertakings

14  for the purposes of delaying the very voluntary relief that

15  they afforded, to allow these assets to be sold to pay off

16  these creditors.

17          And we believe that that exercise, to delay payment to

18  its creditors, for what we fear might be six, nine, twelve

19  months, when everyone acknowledges that the value is in the

20  Peruvian business, that there either sufficient or we're

21  prepared to provide sufficient liquidity to make sure local

22  creditors are paid on time and kept current; and essentially,

23  what we need is an independent voice, with an independent

24  investment banker to run a sale process.

25          And we think that the relief that we've requested,

1   while we understand that there are some differences in the

2   legal points, you know, seeking the appointment of a CRO --

3           THE COURT:  Okay.

4           MR. MARTIN:  -- for holding companies that have

5   $300,000 in cash on the date of filing, to run a sale process,

6   to pay off creditors under a Chapter 11 process, is relatively

7   straightforward, standard relief.  And we feel that, if we're

8   at an impasse, absent an independent voice to assess things,

9   we're going to be stuck in a process that delays our clients

10  another eight, nine, twelve months.

11          And while all of us at this table are new to this, and

12  everyone on this side of the room is new to this, there are

13  people in Hong Kong that we got on the phone with that have

14  been dealing with this for ten months.  And I assure you, they

15  are quite angry, and they feel quite aggrieved by these

16  proceedings.

17          And so we would like to bring that all to the Court on

18  the expedited basis, to give the Court the opportunity to see

19  if the extraordinary remedy is appropriate in these

20  circumstances, and we submit that it is.  And the reason we

21  propose to bifurcate it is so that, you know, the 1104(a)(1)

22  cause for fraud, mismanagement, incompetence, et cetera, if we

23  can get the 1104(a)(2) best interests of creditors issue in

24  front of the Court, we think that's a much faster, maybe even a

25  half-a-day-type hearing; whereas, the (a)(1) hearing is

1    probably months of discovery.  And we fear that going the

2    1104(a)(1) route is, you know, a three-to-six-month-type

3    process.  Indecopi, in the meantime, enters its -- publishes

4    its statement in the Gazette, and we're out of time.

5            So, Your Honor, that's -- you know, as I said, I'm

6    trying to balance our clients and multiple lenders in the

7    capital structure with input we've had from the debtors and

8    with the Court's schedule and the case law on this -- sorry,

9    Your Honor, my colleague is writing me a note -- and that we

10   could bring that in front of the Court, to seek to try to

11   simplify these proceedings, and ensure that the Peruvian

12   business continues to operate.  And with the limited creditors

13   down there, and the fact that, as we understand it, this case

14   isn't really about protecting local Peruvian creditors; it's

15   about how this debt, sitting on this side of the table, is

16   going to be down there.

17           So that's the proposal that we have for the Court

18   today.

19           THE COURT:  So now, let's assume for a moment there is

20   a trustee appointed.  And he or she, what, then dismiss --

21   what, then seeks to dismiss the Peruvian proceedings?

22           MR. MARTIN:  Your Honor, as we understand it, under

23   Peruvian law, a trustee -- the Peruvian companies can make

24   available to the creditors the funds to pay off their debt.  If

25   you recall, there was, I think it was around a million dollars

1   for all three debtors, just local trade debt that wasn't paid.

2   The Peruvian law actually provides that the debtor can tender

3   money to them before that Gazette publication, and that would

4   dismiss the case, if the creditors accept it.  If they don't,

5   then their refusal to accept is one of the factors that

6   Indecopi takes into consideration before it publishes in the

7   Gazette.

8           So our hope would be that it -- with a trustee, we

9   could negotiate with the trustee for liquidity to fund the

10  cases, ensure that the Peruvian business has the liquidity it

11  needs, which would also include offering to pay those Peruvian

12  creditors, so that the case could be dismissed.  It's a

13  legitimate process under Peruvian law, to pay off those

14  involuntary creditors.

15          But as Your Honor noted on the very first day of the

16  case, it was pretty clear that this was an orchestrated filing

17  in Peru, and that this debtor, even though it's probably not

18  insolvent, from everything we can tell, is not going to fight

19  those Peruvian insolvency proceedings, let them stay in place,

20  and we feel that's being done for strategic reasons.

21          With a trustee in place, the trustee could evaluate

22  that.  And if the trustee came to us and said, look, guys, I've

23  looked at this, and I think that maybe it should stay in the

24  Peruvian proceedings, certainly, we would have to listen to

25  that and work with the trustee on that.  But we would have the

1   kind of independents telling us that, that this case has

2   lacked, and that these very filings were designed to take away.

3   Remember, we had a CRO under the undertakings.

4          We had forensic accountants.  They're all gone.  And

5   so, you know, without the governance changes in place that

6   existed under the undertakings, you know, in our view, we're

7   many, many steps behind where we are now.

8          We have a family that controls these businesses, who

9   we perceive are making the decisions.  There's been no

10  governance changes as a result of the Chapter 11 filing at any

11  level.  And so we have concerns that we're not being given the

12  straight strategy scope here.  And a trustee, obviously, would

13  be independent and would make his own decisions, and we would

14  have to deal with him or her.  But we would be prepared to do

15  so, and that would be the type of independence that we seek.

16          THE COURT:  All right.

17          MR. KLEINBERG:  If I may respond, Your Honor?

18          THE COURT:  Sure.

19          MR. KLEINBERG:  A number of points.

20          First of all, it sounded to me like Mr. Martin's

21  presentation started to slide from the best interests of

22  creditors, which was his proposal for an expedited trustee

23  proceeding, more into the cause aspect of Section 1104 Trustee

24  because he is starting to talk about their concerns about

25  existing corporate governance, about existing management.

1          I don't want to argue with him about that.  But I

2     think the so-called "streamlining" of the proposal that he's

3     made really is not going to hold water, and we are going to bog

4     down here with a three-, four-, five-, six-month trustee

5     litigation here.

6          I think it's an enormous waste of the estate's

7     resources and of everyone's time because --

8          THE COURT:  Well, help me.  When this started, I think

9     what I said the last time is that I just didn't understand why

10    you'd want to get started down the road in a case where you're

11    going to be fighting with people as to whether or not there

12    should be a trustee.  It didn't strike me as a way to get any

13    deal done.

14         And I'm just -- there was a CRO.  There were those --

15    that kind of independence; that was in place.  On the eve of

16    the filing, or maybe as a result of the filing -- I'm not sure

17    how it all goes -- all of that is gone.  Why can't -- and look,

18    if this is going to have to get litigated, it will get

19    litigated, and we'll deal with it.  But I just -- I'm at a loss

20    to understand why we're not able to find some middle ground to

21    get somebody with independence in there, and to look at this

22    stuff.  And as Mr. Martin said, if they look at it and say, you

23    know, the proceeding ought to be the proceeding, then that's

24    the end of it.  I'm just -- I'm --

25         MR. KLEINBERG:  Well, I'd like to --

1          THE COURT:  I'm struggling here.

2          MR. KLEINBERG:  I'd like to help Your Honor understand

3     that because I think there is a difference.  We, the debtors,

4     have proposed and accepted, in broad terms, the lenders'

5     proposals for all of those types of protections for the

6     lenders, that would provide transparency and financial

7     reporting.

8          So, for example, the CRO, who was in place in Hong

9     Kong prior to the commencement of these cases, was an

10    individual by the name of Paul Brough, B-r-o-u-g-h.  He was put

11    in place by HSBC Bank, which is one of the club lenders, but

12    not part of the group that DLA Piper is here representing

13    today.  Mr. Brough resigned his position, in part, we

14    understand because of the Chapter 11 filings, but in part,

15    because of his frustration with the directions he was getting

16    from HSBC.

17         Be that as it may, one of the proposals that the

18    lenders made to us was to reinstall Mr. Brough as CRO.  That's

19    acceptable, you know, in broad terms, to us.  No one has spoken

20    to him about it, so it has to be vetted with him, of course.

21         We also proposed an alternative name for a CRO.  The

22    lenders came back and said, well, we'd rather have Brough.  We

23    said okay.  We have --

24         THE COURT:  Hold on.  You know what I want to do?  I

25    want to take a recess.  I would ask that we -- I'd like to talk

1    to you folks across the hall, and take a few minutes and

2    discuss this.

3            MR. KLEINBERG:  Certainly.

4            THE COURT:  All right.  And you know, anyone who wants

5    to be in it, you're welcome to join.  Give me a few minutes,

6    and I'll be over to see you.

7        (Recess taken at 2:59 p.m.)

8        (Proceedings resume at 3:53 p.m.)

9        (Call to order of the Court)

10           THE COURT:  Be seated, please.

11           All right.  First, thank you very much for taking the

12   time to caucus off the record.  I think we had a very

13   productive discussion.

14           What we're going to do is we're going to adjourn this

15   hearing until Monday the 25th at two o'clock.  At that time,

16   the parties will report back to the Court on the progress made

17   in attempting to resolve the open disputed items.

18           If the parties are able to do that, we'll be going in

19   one direction; if not, there will be -- I'll be presenting with

20   a scheduling order, which will have been negotiated and, to the

21   greatest extent possible, agreed prior to coming here on the

22   25th.  And that scheduling order will address the timing on the

23   motion for the appointment of a trustee.

24           Does anyone have any questions or comments on that?

25       (No verbal response)

1          THE COURT:  Good.  Thank you all very much.  Thank

2   you.

3          COUNSEL:  Thank you, Your Honor.  Thank you, Your

4   Honor.  Thank you.  Appreciate it.

5      (Proceedings concluded at 3:55 p.m.)

6                          * * * * *

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter to the best of my knowledge and ability.

_____   July 20, 2016

Coleen Rand, AAERT Cert. No. 341

Certified Court Transcriptionist

For Reliable