**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
---------------------------------------------------------------- x
In re:                                                                      :
                                                    :    Chapter 11

**CHINA FISHERY GROUP LIMITED (CAYMAN),** :
        *et. al.*[1]                                                :    Case No. 16-11895 (JLG)
                                                    :
                          Debtors.               :    (Jointly Administered)
                                                    :
---------------------------------------------------------------- x

## <u>DECLARATION OF AMANDA MCQUEEN</u>

Pursuant to 28 U.S.C. § 1746, I, Amanda McQueen, declare the following:

1.       I have been employed by Bank of America, N.A. ("<u>BANA</u>"),[2] and I have also done work for various of its affiliates and subsidiaries (collectively, the "<u>Bank</u>") in different capacities, since October 1999.  I currently am a Director in the Special Assets Group at Bank of America Merrill Lynch International Limited.  The Special Assets Group is responsible for handling certain of the Bank's criticized and classified assets including non-performing corporate loans.

2.       In 1998, I received a Bachelor of Science in finance from the University of Illinois at Urbana-Champaign, College of Business.  Before joining the Bank, I was employed by PricewaterhouseCoopers.

3.       I have personal knowledge of the facts set forth herein based on my participation and involvement in this matter, or I have familiarized myself with relevant business records

---

[1] The Debtors are China Fishery Group Limited (Cayman) ("<u>CFGL</u>"), Pacific Andes International Holdings Limited (Bermuda) ("<u>PAIH</u>"), N.S. Hong Investment (BVI) Limited ("<u>N.S. Hong</u>"), South Pacific Shipping Agency Limited (BVI) ("<u>SPSA</u>"), China Fisheries International Limited (Samoa) ("<u>CFIL</u>"), CFGL (Singapore) Private Limited, Chanery Investment Inc. (BVI), Champion Maritime Limited (BVI), Growing Management Limited (BVI), Target Shipping Limited (HK), Fortress Agents Limited (BVI), Ocean Expert International Limited (BVI), Protein Trading Limited (Samoa), CFG Peru Investments Pte. Limited (Singapore), Smart Group Limited (Cayman), and Super Investment Limited (Cayman).

[2] Any capitalized terms used but not defined herein are used as defined in BANA's Joinder to the Club Lender Parties' Motion for the Entry of an Order Directing the Appointment of a Chapter 11 Trustee, filed contemporaneously herewith.

maintained by the Bank, and, if called to do so, I would and could testify to the matters stated herein.

4.       Since my involvement in this matter began, I have had a front-row seat to the Debtors' and their affiliates' disregard for the interests of their creditors.  In November 2015 the CF Obligors and PAE Obligors (each as defined below) defaulted on indebtedness to BANA. but continued to make payments to certain other lenders.  CFGL and CFIL subsequently became subject to insolvency proceedings in the Cayman Islands, pursuant to which joint provisional liquidators were appointed.  Following the appointment of the joint provisional liquidators, management of certain of the group's entities agreed, in two separate court-sanctioned undertakings, to a critically important oversight regime.  As part of this agreement, management also agreed to engage in a sale process of their valuable Peruvian assets of CFGL and its subsidiaries (the "CF Group") as a means of repaying their creditors the hundreds of millions of dollars then owing.  One of the undertakings included an acknowledgement from CFGL and CFIL that "the sale of the Peruvian business and/or assets of [the CF Group] must now be pursued in order to address CF Group's financial issues . . . ."  Ex. 8, Recital E.  The undertakings led to the appointment of two chief restructuring officers (at two different levels of the group).  The undertakings also led to the appointment of accounting firms and an investment bank to coordinate the Peruvian sale.  These undertakings provided a framework to ensure that either the sale and resulting debt repayment would take place expeditiously through management's compliance with its undertakings to both the Cayman and Hong Kong Courts, or that BANA and HSBC (as defined below) would individually be at liberty to apply for the immediate re-appointment of  the joint provisional liquidators in order to complete the sale and/or take other appropriate steps to safeguard the interests of creditors.  Most importantly, the

process to achieve a sale and repayment of creditor claims was intended to be conducted in a transparent way, with the full cooperation of the CF Group in implementing a sales process as soon as reasonably practicable.  But creditors had been duped.  Instead of pursuing the Peruvian Sale (as defined below) in good faith, management took the benefit of the forbearance afforded to them by the terms of the undertakings and then, without warning to BANA and/or the other lenders, orchestrated or commenced insolvency proceedings around the world, obliterating the protections that had been negotiated and relied upon by BANA and the other lenders.  BANA believes that it and other lenders, and various international courts, have been misled by the Debtors and their affiliates, and BANA has no confidence in management and believes that the appointment of a chapter 11 trustee is necessary in order to achieve any meaningful independence and oversight that would be essential to a successful reorganization.

***The Facility Letters***

5.      BANA is a creditor of Debtors CFIL and SPSA (together the "CF Obligors") under a US$35 million facility letter dated August 26, 2014 (the "CF Facility Letter").  The CF Obligors were permitted to make drawdowns (the "CF Drawdowns"), up to US$35 million in total.  The amounts outstanding to BANA under the CF Facility Letter are owed on a joint and several basis by the CF Obligors and are guaranteed by Debtor CFGL.  A true and accurate copy of the CF Facility Letter, along with the accompanying General Agreement for Commercial Business and the Continuing Guarantee of CFGL, is annexed hereto as Exhibit 1.

6.      BANA also is the lender under a separate US$15 million facility letter dated August 26, 2014 (the "PAE Facility Letter") among Pacific Andes Enterprises (BVI) Limited ("PAE"), Parkmond Group Limited (BVI) ("PGL"), PARD Trade Limited (BVI) ("Trade," and together with PAE and PGL, the "PAE Obligors"), and BANA.  The PAE Obligors were

permitted to make drawdowns (the "PAE Drawdowns"), up to US$15 million in total. The amounts outstanding to BANA under the PAE Facility Letter are owed by the PAE Obligors on a joint and several basis and are guaranteed by Pacific Andes Resources Development Limited ("PARD"), a limited company incorporated in Bermuda. The PAE Obligors and PARD are not debtors in these proceedings, but are indirect subsidiaries and affiliates of the Debtors. A true and accurate copy of the PAE Facility Letter, along with the accompanying General Agreement for Commercial Business and the Continuing Guarantee of PARD, is annexed hereto as Exhibit 2.

### *Dealings with Management*

7.      Throughout BANA's relationship with the Debtors and their affiliates, we dealt with the same small group of individuals in management, including Ng Joo Sain, the former chairman. He was later replaced by his sister, Ng Puay Yee, known as "Jessie Ng." I understand from public documents, including the Debtors' statements of financial affairs filed on or about July 29, 2016, that the Ng family has historically dominated management, and that it continues to do so today.

### *Regulatory Investigations*

8.      On August 18, 2015, PAIH announced that PARD and CFGL had received notices from the Secondary Markets Conduct and Enforcement Division, Market Conduct Department, Monetary Authority of Singapore (the "MAS") and the Commercial Affairs Department (the "CAD"). I understand that MAS and CAD were investigating offenses under Singapore securities laws. On the following day, trading in PAIH's stock on The Stock Exchange of Hong Kong Limited was temporarily halted.

9.      On August 20, 2015, PAIH also announced that it had received two notices from the Securities and Futures Commission of Hong Kong (the "SFC") to produce records and documents in connection with an investigation and that the SFC had attended the offices of PAIH on August 18, 2015, to obtain certain documents of the PAIH group.  On November 29, 2015, PAIH announced that each of PARD and CFGL had requested a trading halt of their respective securities on the Singapore Exchange Securities Trading Limited.

***Defaults under the Facility Letters***

10.      The CF Obligors informed BANA on September 11, 2015 that they would only be able to pay $1 million of the $10 million of CF Drawdowns due to BANA that day.  At this point, I became involved.

11.      The currently outstanding amounts advanced under the CF Facility Letter are US$28,249,740 of CF Drawdowns (after certain offsets), plus accrued interest, fees and expenses (including legal fees).  Certain of the CF Drawdowns, totaling approximately US$12,500,000, were maturing on October 6, 2015.  The CF Obligors and CFGL requested that BANA roll over such CF Drawdowns, subject to a proposed amortization schedule, which included a first installment of $2 million payable on October 9, 2015.  On October 6, 2015, BANA agreed to do so, provided that the borrowers (i) confirm that there were no material payment defaults outstanding under any other lending facility, and (ii) provide a guaranty by Corporación Pesquera Inca S.A.C. ("Copeinca," which is one of the chapter 15 debtors).  The borrowers agreed (although they noted that the Copeinca guaranty would take some time to procure).  However, just 3 days later, on October 9, 2015, when the first installment was due, the CF Obligors and CFGL were unable to make the agreed-upon $2 million payment.

12.     By November 19, 2015, all CF Drawdowns matured but remained outstanding. On November 20, 2015, BANA exercised rights of setoff and applied US$363,779.41 in partial satisfaction of the amounts due.  After that setoff, the CF Obligors and CFGL owed BANA, on a joint and several basis, the principal sum of US$27,885,960.59, plus accrued interest, fees and expenses (including legal fees).

13.     Having not received payment of the outstanding and matured CF Drawdowns, BANA sent a demand letter for such amounts to the CF Obligors (the "CF Obligors Demand Letter") on November 23, 2015.  A true and accurate copy of the CF Obligors Demand Letter is annexed hereto as Exhibit 3.  As no payment was forthcoming from the CF Obligors, BANA sent a demand letter to CFGL as guarantor under the CF Facility Letter on November 24, 2015, with respect to the same outstanding amounts (the "CFGL Demand Letter").  A true and accurate copy of the CFGL Demand Letter is annexed hereto as Exhibit 4.  No payments have been made to BANA by either the CF Obligors or CFGL pursuant to the CF Obligors Demand Letter or the CFGL Demand Letter, and the CF Obligors and CFGL continue to owe BANA, on a joint and several basis, the principal sum of US$27,885,960.59, plus accrued interest, fees and expenses (including legal fees).

14.     The currently outstanding PAE Drawdowns were advanced in May and June 2015, and matured on November 19, 2015.  On November 20, 2015, BANA exercised rights of setoff and applied US$146,423.59 in partial satisfaction of amounts due.  After that setoff, the PAE Obligors and PARD owed BANA, on a joint and several basis, the principal sum of US$14,853,576.41 (after setoff), plus accrued interest, fees and expenses (including legal fees) under the PAE Facility Letter.

15.     Having not received payment of the outstanding and matured PAE Drawdowns, BANA sent a demand letter for such amounts to the PAE Obligors (the "<u>PAE Obligors Demand Letter</u>") on November 23, 2015.  A true and accurate copy of the PAE Obligors Demand Letter is annexed hereto as <u>Exhibit 5</u>.  As no payment was forthcoming from PAE, PGL, or Trade, BANA sent a demand letter to PARD as guarantor under the PAE Facility Letter on November 24, 2015, with respect to the amounts owed by the PAE Obligors (the "<u>PARD Demand Letter</u>," and with the CF Obligors Demand Letter, the CFGL Demand Letter, and the PAE Obligors Demand Letter, the "<u>Demand Letters</u>").  A true and accurate copy of the PARD Demand Letter is annexed hereto as <u>Exhibit 6</u>.  No payments (whether principal or interest) have been made to BANA by PAE, PGL, Trade, or PARD pursuant to the PAE Obligors Demand Letter or the PARD Demand Letter, and the PAE Obligors and PARD continue to owe BANA, on a joint and several basis, the principal sum of US$14,853,576.41 (after setoff), plus accrued interest and fees and expenses (including legal fees).

***The Undertakings***

16.     Hong Kong and Shanghai Banking Corporation Limited ("<u>HSBC</u>") instituted insolvency proceedings against CFGL and CFIL just after BANA sent the Demand Letters. HSBC petitioned for the winding-up of CFGL and CFIL and the appointment of joint provisional liquidators ("<u>JPLs</u>") in Hong Kong on November 25, 2015, and for the winding-up of CFGL and CFIL and appointment of JPLs in the Cayman Islands on November 27, 2015.  Those proceedings ultimately resulted in two separate deeds of undertaking among some of the Debtors and their affiliates and various of their creditors.

17.     The first deed of undertaking (the "<u>December 2015 Undertaking</u>" (annexed hereto as <u>Exhibit 7</u>)), dated December 28, 2015, was among three of the Club Lender Parties

(Coöperatieve Centrale Raiffeisen-Boerenleenbank B.A. (also known as Rabobank

International), Hong Kong Branch, Standard Chartered Bank (Hong Kong) Limited, and DBS

Bank (Hong Kong) Limited), as well as PARD, PAIH, and the High Court of the Hong Kong

Special Administrative Region (the "Hong Kong Court").[3]  Pursuant to the December 2015

Undertaking, PARD and PAIH agreed to the appointment of PricewaterhouseCoopers Limited

("PwC") as independent reporting accountant and to the appointment of a Chief Restructuring

Officer (the "PARD CRO"), in exchange for the Club Lender Parties' support in dismissing the

Hong Kong and Cayman insolvency proceedings.  PARD and PAIH appointed Mr. Patrick

Wong as the PARD CRO.  On January 5, 2016, the Hong Kong Court dismissed HSBC's

application to continue the November 25, 2015 order appointing the Hong Kong JPLs.

18.    The second deed of undertaking (the "HSBC Undertaking" (annexed hereto as

Exhibit 8), and with the December 2015 Undertaking, the "Undertakings") was entered into by

CFGL, CFIL, and HSBC on January 20, 2016.  Pursuant to the HSBC Undertaking, HSBC

agreed to withdraw any appeal of the order dismissing HSBC's application in Hong Kong, to

seek an order dismissing the winding up petition filed in the Grand Court of the Cayman Islands

(the "Cayman Court") and the JPL petition in the Hong Kong Court, and to discharge the

Cayman JPLs.  In exchange, CFGL and CFIL undertook, among other things, (i) to appoint Mr.

Paul Brough as the Chief Restructuring Officer ("CF CRO") of CFGL and CFIL; (ii) to have

CFGL engage Grant Thornton Recovery & Reorganisation Limited ("Grant Thornton") as

independent reporting accountant; (iii) to procure the full cooperation by management of all CF

Group companies with the CF CRO and Grant Thornton to allow them to carry out their roles

and, with respect to the CF CRO, for the sale of the Peruvian business to be implemented as soon

---

[3] The Club Lender Parties and HSBC are sometimes referred to collectively as the "Club Lenders".

as reasonably practicable (the "Peruvian Sale"); and (iv) to repay in full all amounts owed to

BANA, the Club Lenders and the Bondholders by the CF Group (the "Debt") by the Repayment

Date, defined in the HSBC Undertaking as the date six months from the date of the HSBC

Undertaking (or July 20, 2016).[4]  Ex. 8, Cl. 2.  Even though BANA was not a signatory to the

HSBC Undertaking, Clause 8 of the HSBC Undertaking provided that it was entered into "for the

benefit of (a) the parties specifically named at the beginning of this Deed; and (b) [BANA]."

Under the HSBC Undertaking, BANA, along with HSBC, had certain monitoring and approval

rights, and BANA, along with HSBC, had the power to cause the termination of the HSBC

Undertaking or to agree to its extension.

19.    After the Undertakings were executed, BANA fulfilled its obligation under the

HSBC Undertaking to afford management the opportunity to work with the CF CRO to close the

Peruvian Sale and get the Debt repaid by the Repayment Date, and HSBC fulfilled its obligations

to fully dismiss all proceedings pending before the Hong Kong Court and the Cayman Court as

required by the HSBC Undertaking.  *See* Ex. 8, Cl. 2.1, 3.1.  CFGL and CFIL, working with the

CF CRO and with their reporting accountant, Grant Thornton, commenced the Peruvian Sale

process required by the HSBC Undertaking.  CFGL engaged CITIC-CLSA as investment banker

(specifically with an M&A mandate).  The HSBC Undertaking, absent earlier termination for

cause or extension, would expire on July 15, 2016, and if it expired without the Repayment Date

having occurred (and therefore without the Peruvian Sale having been consummated), either

HSBC or BANA would be permitted to petition the Cayman Court for an immediate re-

appointment or appointment of JPLs.  Ex. 8, Cl. 4, 6.5.  Thus, if the Peruvian Sale did not occur

---

[4] The Repayment Date is defined in the HSBC Undertaking to be the date six months after the execution of the HSBC Undertaking, which was July 20, 2016.  However, Clause 6.2 of the HSBC Undertaking also provides that it will terminate on the earliest of, amongst other criteria, (i) the date on which the debt is paid in full or (ii) July 15, 2016 or such later date as HSBC and BANA may agree in writing.

under the CF CRO's watch, BANA still would be able to seek to have JPLs appointed to take over and oversee a sale of CFGL's assets, including ultimately the Peruvian business.

20.    Although BANA had the ability at this time to pursue remedies against the obligors under the Facility Letters, BANA was willing to accept the arrangement embodied in the HSBC Undertaking.  That arrangement gave CFGL and CFIL time to arrange an orderly sale to discharge the Debt by the Repayment Date, with BANA retaining remedies if a sale could not be arranged or if CFGL and CFIL otherwise breached the HSBC Undertaking.  It also ensured independent oversight and monitoring of CFGL, CFIL, the Peruvian business, and the Peruvian Sale. The Peruvian Sale was important to BANA and other creditors because the Peruvian business is the most valuable asset of the Debtors and their affiliates, providing the majority of their revenue.  The companies operating the Peruvian assets collectively are allocated the largest quota for fishing in Peruvian waters, and they have a well-established presence in Peru.  The Peruvian Sale therefore was, and still is, key to a recovery for creditors, including BANA.

*Discriminatory Payments*

21.    In March 2016, BANA learned that PARD and PAE had been making interest payments to certain creditors, despite the fact that the indebtedness to BANA was in default, repayment had been demanded, and no monies had been received.  Given the defaults under the Facility Letters, and PARD and PAE's financial condition at the time, PARD and PAE should have been paying their creditors on a *pari passu* basis, if at all.  On April 8, 2016, BANA wrote to PARD and PAE requesting an explanation for their choosing to pay some creditors and not BANA, as well as demanding that they pay all creditors on a *pari passu* basis if they chose to continue making payments.  To date, BANA has not received a satisfactory explanation from PARD or PAE of their decision to pay other creditors and not to pay BANA.

*Last Efforts to Advance the Peruvian Sale and the Worldwide Insolvency Filings*

22.    In May 2016, the CF CRO advised BANA and the other lenders that, in order to consummate the Peruvian Sale, shareholder approval at the CF Group, PARD, and PAIH levels would be required. This meant that if the Ng family did not approve the Peruvian Sale, it may not be consummated. BANA sought assurances that the Ng family would provide such approval, but no such assurances were forthcoming.

23.    The CF CRO also informed BANA and the other lenders that he was reviewing the contents of the shareholder circulars required at the PAIH level which may have required the inclusion of audited accounts. The CF CRO expressed concern that preparation of the audited financial statements was being delayed by the forensic exercise (at that time being undertaken by PwC), which did not appear to be progressing. On June 6, 2016, less than six weeks prior to the deadline to complete the Peruvian Sale under the HSBC Undertaking, PAIH announced in a press release that it had replaced the PwC team with a team from RSM Corporate Advisory (Hong Kong) Limited.  A true and accurate copy of the June 6, 2016 press release is annexed hereto as Exhibit 9.

24.    I attended a lender meeting held in Hong Kong on June 30, 2016 (two weeks prior to the effective deadline for the Peruvian Sale), at which the PARD CRO was present. At that meeting, we learned that management wanted to put forward an alternative restructuring proposal. But in any event, given these circumstances, the simultaneous commencement or orchestration of separate insolvency proceedings in four separate jurisdictions around the world was contrary to everything that had been agreed or discussed, and took me by complete surprise. I learned of the filings when my plane landed in London on July 1, 2016. To put it mildly,

management had not been remotely candid with BANA or its other creditors, despite the many compromises and accommodations made by such creditors.

25.    On June 30, 2016, the same date on which the Debtors filed their petitions in this Court (the "Petition Date"), involuntary petitions, orchestrated by the Debtors, were filed against CFG Investment S.A.C., Sustainable Fishing Resources S.A.C. and Copeinca in Peru by local creditors holding less than one percent of the total debt of those entities, which also filed chapter 15 petitions in this Court on the same day.  PARD sought relief for itself in the Republic of Singapore under Section 210(10) of the Companies Act, which requested relief included a "moratorium" (essentially a stay of the continuation of, or restraint on commencement of, proceedings against PARD).  A true and accurate copy of PARD's *ex parte* Originating Summons filed in the High Court of the Republic of Singapore, along with an annexed Affidavit of Ng Puay Yee (the "June 30 Ng Affidavit"), is annexed hereto as Exhibit 10.  The June 30 Ng Affidavit states that in addition to seeking relief for itself, PARD sought that its moratorium be extended to certain other related entities, including PAE, PGL and Trade.  June 30 Ng Affidavit ¶¶ 10, 96-99.  Furthermore, I understand that on the Petition Date, Sahara Investment Group Private Limited ("Sahara") applied to the High Court of Justice of the Virgin Islands (the "BVI Court") for the appointment of a provisional liquidator for Richtown Development Limited ("Richtown") (a direct wholly-owned subsidiary of PARD and an indirect parent of CFGL), with Richtown's consent.

26.    Shortly after the Petition Date, I understand that PwC was terminated by PARD, and that Mr. Wong is no longer the PARD CRO.  Similarly, I understand that Mr. Brough resigned as the CF CRO following the board meetings at which CFGL and CFIL resolved to file chapter 11 petitions and that CFGL terminated Grant Thornton's engagement.  Furthermore, I

understand that CFGL's engagement of CITIC-CLSA as investment banker in connection with the Peruvian Sale was terminated on or shortly after the Petition Date, and any sale of the assets in Peru is now mired in Peruvian bankruptcy proceedings, unless such proceedings can be halted.

27.    Because of actions by management, including those described above, BANA has lost any confidence that management will act in the best interests of the Debtors' creditors.  I believe that the appointment of a chapter 11 trustee is necessary to ensure that there is the necessary oversight and independence such that creditors can participate effectively in a reorganization.

*[Signature Page Follows]*

I declare under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct.

Dated: London, England
       August 10, 2016

Amanda McQueen

# EXHIBIT 1



**REGISTERED & CONFIDENTIAL**                                      August 26, 2014

China Fisheries International Limited
South Pacific Shipping Agency Limited

Room 3201-10 Hong Kong Plaza
186 Connaught Road West
Hong Kong

Attention:        Mr. Dennis Chan
                  Financial Controller

Dear Sirs,

We are pleased to inform you that we will consider requests by you for the facilities (**"Facilities"**) specified in the Schedule to this Letter ("**Schedule**") up to, if applicable, an aggregate principal amount not exceeding at any time the Total Facility Amount (as defined in the Schedule) (or the equivalent, at our spot selling rates for the time being, in other currencies) on the terms and conditions set out in this Letter. This is a general statement of the terms applicable to the Facilities, if extended, and is not a commitment to extend any financing to you. The terms set out in this Letter supersede and replace those set out in our letter of January 27, 2014.

1.      **Facilities**

(a)     The Facilities are more particularly set out in the Schedule, in each case up to the individual limit (if specified) set opposite the description of the relevant Facility in the Schedule.

(b)     Borrowings and other utilizations in any currency are subject to availability of funds in that currency at the time the borrowings or utilizations are requested.

2.      **Applications for Facilities**

(a)     The Facilities are subject to review by us on a periodic basis. We reserve the right to increase, reduce or cancel the Facilities or any part of it and/or vary the types of Facilities or instruments under any type of Facilities made available to you under this Letter at any time without prior notice to, or consent from, you. We will, however, notify you as soon as reasonably practicable after such change has been effected.

(b)     Each application by you to use any of the Facilities in whole or in part shall be a request by you to us to extend financing on the terms set out or referred to in this Letter. No commitment by us to extend financing shall arise under this Letter until any application by you is accepted by us either expressly or by our extending such financing to you.

(c)     Such applications shall be made, where applicable, on our standard forms and supported by such documentation (in form and substance satisfactory to us) as we may require.

(d)     No applications by you to use any of the Facilities will be accepted by us unless you comply with the terms set out or referred to in this Letter and such other conditions as we may determine from time to time.

T 852.3508.8888

Bank of America, N.A.
52/F, Cheung Kong Center
2 Queen's Road Central, Central, Hong Kong

A company wholly owned by Bank of America Corporation



3.      **Security**

(a)      Your obligations in respect of the Facilities shall be secured or supported by an unconditional 100% continuing guarantee executed by China Fishery Group Limited (**"Guarantor"**) in form and substance satisfactory to us.

(b)      You consent that we may provide the security provider or guarantor (as the case may be) with any information in relation to the Facilities or any outstanding thereunder and/or financial information in relation to you, including without limitation the following documents:

(i)      a copy or summary of the contract evidencing the obligations to be guaranteed or secured;

(ii)      a copy of any demand for overdue payment that is sent to you in the case where you have failed to settle any overdue amount; and

(iii)      upon request from the security provider or guarantor, a copy of the latest statement of account provided to you, if any.

4.      **Undertakings**

(a)      ***Pari passu ranking:*** You must procure that all your obligations in connection with the Facilities will at all times rank at least pari passu in terms of security and support (including third party) with all your other short-term present and future obligations, except for obligations mandatorily preferred by law applying to companies generally.

(b)      ***Accounts:*** You must provide your annual audited financial statements within 8 months after end of financial period and will promptly provide any other information which we may request.

You must provide the annual audited consolidated and semi-annual unaudited financial statements of your Guarantor within 120 days and 90 days after the end of financial period and will promptly provide any other information which we may request.

5.      **Expenses**

(a)      You shall pay all costs and expenses (including legal fees of both internal and external legal advisers) incurred by us in connection with the preparation, perfection, performance or enforcement of or preservation of rights under this Letter or any security provided by you or any third party in respect of your obligations to us.

(b)      You shall pay all taxes, reserves and fees payable in respect of this Letter or the transactions contemplated by it.

6.      **Interests and charges**

Any financing extended by us will be subject to interest rates, commissions and/or other charges determined by us from time to time.

A company wholly owned by Bank of America Corporation





7.   **Other conditions**

The Facilities shall be subject to:

(a)   the terms of the General Agreement for Commercial Business entered into between you and us (and if more than one has been entered into, the latest one); and

(b)   the terms and conditions set out in all current standard agreements and other documentation signed by you or on your behalf in respect of the credit and other banking facilities and banking services granted or continued by us to you.

(c)   execution of Bank's Standard documentation.

(d)   each Facility and its related interest and charges shall be repaid or paid in the currency disbursed or incurred.

8.   **Amendments**

(a)   No provision of this Letter may be amended except by an instrument in writing signed by us.

(b)   Our rights under this Letter may be exercised as often as necessary, are cumulative and not exclusive of our rights under the general law and may be waived only in writing and specifically.   Delay in exercising or non-exercise of any such right is not a waiver of that right.

9.   **Joint and several liability**

If this Letter is addressed to more than one person, each addressee accepting the terms and conditions set out in this Letter is jointly and severally liable with the other addressee accepting the same.   The obligations and liabilities of each addressee shall take effect immediately upon its acceptance of the terms and conditions of this Letter, whether or not any other addressee accepts the same.

10.   **Governing Law**

This Letter is governed by and construed in accordance with the laws of the Hong Kong Special Administrative Region.

11.   **Jurisdiction**

(a)   You agree that the courts of Hong Kong have jurisdiction to settle any disputes in connection with this Letter and accordingly submit to the non-exclusive jurisdiction of the Hong Kong courts.

(b)   Without prejudice to any other mode of service, you:-

(i)   irrevocably appoint Pacific Andes Food (Hong Kong) Company Limited having its registered office at Room 3201-10, Hong Kong Plaza, 186 Connaught Road West, Sai Ying Pun, Hong Kong as your agent for service of process in relation to any proceedings before the Hong Kong courts in connection with this Letter;

(ii)   agree that failure by a process agent to notify you of the process shall not invalidate the proceedings concerned; and

3

A company wholly owned by Bank of America Corporation



**Bank of America**
**Merrill Lynch**

(iii)    agree that if the appointment of any person mentioned in sub-paragraph (i) above
ceases to be effective, you shall immediately appoint a further person in Hong Kong
to accept service of process on your behalf in Hong Kong and, failing such
appointment within 15 days, we are entitled to appoint such person by notice to you.

Please confirm your agreement to the terms and conditions of this Letter by signing and returning to
us (marked for the attention of **"Angel Kwan – Director"**) the enclosed duplicate copy of this Letter
at your earliest convenience.

Yours faithfully,
for and on behalf of
BANK OF AMERICA, N.A.

...................................................    ...............................................
Cordelia Chan                                         Angel Kwan
Managing Director                                     Director

DUPLICATE

A company wholly owned by Bank of America Corporation


**Bank of America**
**Merrill Lynch**

<u>Borrowers</u>

We confirm our agreement to the terms and conditions set out above:

For and on behalf of
China Fisheries International Limited

For and on behalf of
China Fisheries International Limited

For and on behalf of
China Fisheries International Limited

....................................................
.............Authorised Signature(s)...

Name:   NG JOO SIANG
Title:   DIRECTOR

Dated.........28 AUG 2014..........

For and on behalf of
China Fisheries International Limited

....................................................
.............Authorised Signature(s)..

Name:   CHAN TAK HEI
Title:   DIRECTOR

Dated...........28 AUG 2014..........

*SIG. (S) VERIFIED BY*

*DUPLICATE*

For and on behalf of
South Pacific Shipping Agency Limited

For and on behalf of
South Pacific Shipping Agency Limited

For and on behalf of
South Pacific Shipping Agency Limited

....................................................
.............Authorized Signature(s)...

Name:   NG JOO SIANG
Title:   DIRECTOR

Dated.........28 AUG 2014..........

For and on behalf of
South Pacific Shipping Agency Limited

....................................................
.............Authorized Signature(s)..

Name:   CHAN TAK HEI
Title:   DIRECTOR

Dated...28 AUG 2014..........

*SIG. (S) VERIFIED BY*

A company wholly owned by Bank of America Corporation



**Guarantor**

We confirm our agreement to the terms and conditions set out above:

For and on behalf of
China Fishery Group Limited

*For and on behalf of*
CHINA FISHERY GROUP LIMITED

x .................................................
................. *Authorized Signature(s)* ........
Name:    NG JOO SIANG
Title:    DIRECTOR

Dated.......... 28 AUG 2014 ..................

For and on behalf of
China Fishery Group Limited

*For and on behalf of*
CHINA FISHERY GROUP LIMITED

x .................................................
................. *Authorized Signature(s)* ........
Name:    CHAN TAK HEI
Title:    DIRECTOR

Dated.......... 28 AUG 2014 ..................

DUPLICATE

6

A company wholly owned by Bank of America Corporation



**Bank of America**
**Merrill Lynch**

### Schedule - Facilities

**Total Facility Amount**: <u>US$35,000,000</u>

| <u>Facility:</u> | **Individual Limit** |
|---|---|
| (available to China Fisheries International Limited and South Pacific Shipping Agency Limited) | |

(i)     ***Clean Advances:*** *Advances for purposes approved by us of up to 120 days from date of advance. A clean-down period of at least 3 business days is required for each individual Clean Advance Drawdown.*
*(Effective Date: January 16, 2014)*

<div align="right"><u>US$17,000,000</u></div>

(ii)     ***Clean Advances:*** *Advances for purposes approved by us of up to 120 days from date of advance. The facility is subject to the receipt of a valid Export Letter of Credit satisfactory to us. For each drawdown, the amount is equal to 85% the amount of the respective Export Letter of Credit.*
*(Effective Date: June 11, 2014)*

<div align="right"><u>US$18,000,000</u></div>

DUPLICATE

A company wholly owned by Bank of America Corporation

To: **Bank of America,**
National Association


**Bank of America**

# GENERAL AGREEMENT FOR COMMERCIAL BUSINESS
## THIS IS AN IMPORTANT DOCUMENT. SIGN ONLY IF YOU INTEND TO BE BOUND BY IT.

The following terms and conditions are agreed between each party signing this Agreement as customer (each a "**Customer**" and "**Customers**" means any two or more of them) and Bank of America, National Association (the "**Bank**" which includes all the branches and offices of Bank of America, National Association wherever situated, its successor and assigns), on the date specified in the Schedule to this Agreement.

**1.    Interpretation**

(a)    In this Agreement:

(i)    "**affiliate**" means, in respect of the Bank, any of its subsidiaries or associated companies or holding companies or any subsidiary or associated company of that holding company;

(ii)    "**assets**" including present and future properties, revenues and rights of every description;

(iii)    "**authorisation**" includes an authorisation, consent, approval, resolution, licence, exemption, filing, registration and notarisation;

(iv)    "**Bank of America Group**" means the Bank and its affiliates;

(v)    a provision of law is a reference to that provision as amended or re-enacted;

(vi)    a Clause, Schedule or an Annex is a reference to a clause of or a schedule or annex to this Agreement;

(vii)    a person includes its successors and assigns;

(viii)    unless the context otherwise requires, words importing the singular include the plural and vice versa and the neuter gender includes the other genders;

(ix)    each of the rights, powers and remedies given to the Bank by this Agreement are in addition to all other rights, powers and remedies given it or by virtue of any other security, statute or rule of law;

(x)    the liabilities and obligations of the Customer to the Bank include all its past, present and future, actual and contingent liabilities and obligations to the Bank; and

(xi)    a document is a reference to that document as amended or supplemented.

(b)    If this Agreement is signed by more than one person as Customer, the obligations of each Customer under this Agreement are joint and several.

(c)    This Agreement is a continuing agreement and all the rights, powers and remedies under this Agreement shall apply to all the Customer's obligations to the Bank notwithstanding any event affecting the capacity of the Customer to be bound by this Agreement.

(d)    The headings in this Agreement are for convenience only and are to be ignored in construing this Agreement.

**2.    Repayment on demand and cancellation**

(a)    (i)    The Customer shall on demand pay to the Bank all moneys which are now, or will in the future become, owing to the Bank by the Customer (whether as principal or surety, alone or jointly with any other person); and

(ii)    upon such demand being made, all credit and other facilities and accommodation granted to the Customer by the Bank shall be automatically cancelled.

(b)    The Customer shall, immediately upon request by the Bank, execute and deliver to the Bank promissory note(s) payable on demand for the total amount owing to the Bank by the Customer.

(c)    All payments to be made by the Customer shall be made without any deduction or withholding for or on account of any tax unless the deduction or withholding is required by law. If any tax or amounts in respect of tax must be deducted, or any other deduction must be made, from any amount payable or paid by the Customer, it shall pay such additional amounts as may be necessary to ensure that the Bank receives a net amount equal to the full amount which it would have received had payment not been made subject to tax or any other deduction. The Customer shall pay all taxes or similar charges due with respect to all payments made by the Customer to the Bank and shall provide the Bank with evidence satisfactory to the Bank that each such payment has been paid to the relevant taxing authority within the time allowed by law.

**3.    Security**

(a)    The Bank holds all assets of the Customer (including those assets held to the Bank's order or for account of the Customer (whether for safe custody, collection, security or for any specific purpose or generally)) as continuing security for the payment and discharge of all the Customer's obligations to the Bank.

(b)    The Bank may (at any time, without prior notice to the Customer or any other person and in such manner as the Bank thinks fit) sell, dispose of or otherwise deal with any of the assets of the Customer the subject of the security created by this Agreement.

(c)    The Bank may apply the net proceeds of any sale, disposition or dealing pursuant to paragraph (b) above in or towards discharge of the Customer's obligations to the Bank.

(d)    The Customer shall maintain insurance cover against losses or damages with financially sound and reputable insurers acceptable to the Bank with respect to the assets of the Customer the subject of the security created by this Agreement.

(e)    The Customer shall, immediately upon request by the Bank:

(i)    execute and deliver to the Bank one or more security documents in form and substance satisfactory to the Bank over any of the Customer's assets as the Bank specifies in any such request;

(ii)    register or procure the registration of the security interest created under this Agreement with the appropriate authority(ies); and

(iii)    provide such further security in such form as may be required by the Bank and in amounts and/or values sufficient in the opinion of the Bank to secure any of the Customer's obligations to the Bank.

HX-12 (5-08) GP

Ron 4/28/4

4.    **Interest**

(a)    The Customer acknowledges the Bank's policy on interest rates and that no single rate of interest can be fixed on any sum(s) owing by it to the Bank from time to time as the rate of interest in each case will depend on circumstances including the type of transaction involved, the credit risk involved and the general interest rates applicable at the time of such transaction.

(b)    The Bank may charge interest on any sum(s) outstanding or owing by the Customer from time to time. In the absence of express agreement, such interest shall accrue, be calculated and become due and payable on such bases and shall be compounded in such manner as the Bank may determine in its absolute discretion.

(c)    The Bank may charge default interest (at such rate or rates as the Bank may reasonably determine) on any moneys not paid by the Customer when due. The obligation of the Customer to pay default interest on overdue amount shall continue until all sums owing by the Customer to the Bank have been irrevocably paid in full.

5.    **Drawing**

If the Bank permits the Customer to draw against funds to be collected or transferred from any account(s), the Customer shall on demand reimburse the Bank in full the amount so drawn if the Bank does not receive the funds in full at the time when the Bank ought to have received the same or if, after the Bank has accepted the transfer, the Bank is prevented from collecting or freely dealing with the funds in accordance with usual banking practice.

6.    **Cheque discounting**

(a)    If the Bank agrees to enter into discounting arrangements with the Customer or into any arrangements involving the purchase by the Bank of bills of exchange and/or other negotiable instruments, the Customer agrees to guarantee the full payment at maturity of all cheques or other negotiable instruments discounted or purchased by the Bank under such arrangements.

(b)    The Customer shall, immediately upon request by the Bank, enter into or procure the entering into of such further guarantee(s) and/or indemnity(ies) in connection with the arrangement referred to in paragraph (a) above.

(c)    The Customer waives the requirement for the Bank to give notice of dishonour and/or to note and protest any dishonoured cheques or negotiable instruments to which the Customer is a party and of which the Bank is holder.

7.    **Undertakings**

The following undertakings remain in force from the date of this Agreement for so long as any amount is or may be owing by the Customer to the Bank:

(a)    *Accounts:* The Customer shall, immediately upon request by the Bank, supply to the Bank the latest audited financial statements of the Customer (consolidated in the case of the Customer having subsidiaries).

(b)    *Changes to financial conditions:* The Customer shall, immediately upon occurrence, supply any information regarding any significant changes in the financial condition of the Customer.

(c)    *Further assurances:* The Customer shall, at its own expense, take whatever action the Bank may require for perfecting the Bank's title to any goods and documents in connection with which any service is performed by the Bank and for vesting the same in any purchaser from the Bank or otherwise to carry out the transactions contemplated by this Agreement.

8.    **Evidence and calculations**

Any certification or determination by the Bank of a rate or amount under this Agreement is, in the absence of manifest error, conclusive evidence of the matters to which it relates.

9.    **Foreign currency transactions**

(a)    **Currency conversion:** If, in any foreign currency transaction entered into between the Bank and the Customer, the Bank has made a payment in one currency (the "**first currency**"), the Customer shall settle such transaction on the agreed date (the "**Settlement Date**") in such other currency (the "**second currency**") as is agreed between them by paying to the Bank an amount in the second currency equivalent to the amount paid by the Bank calculated at the Bank's spot rate of exchange prevailing at such time on the Settlement Date as the Bank may in its absolute discretion determines for the purchase of the second currency with the first currency.

(b)    **Payments on behalf of the Customer:** In any foreign currency transaction entered into by the Bank on behalf of the Customer, the Bank is not obliged to pay an amount in one currency to or to the order of the Customer on any agreed Settlement Date unless and until the Bank has received from the Customer on the Settlement Date the agreed amount in such other currency as may be agreed between them.

(c)    **Approvals:** The Customer shall obtain all necessary authorisations for any foreign currency transaction with the Bank and the Customer agrees that performance of the Bank's obligations in respect of such transaction is at all times subject to compliance in such manner as the Bank may think fit with any exchange control or other restrictions or rules from time to time in force in any relevant jurisdiction.

(d)    **Currency indemnity:**

(i)    If the Bank receives an amount in respect of the Customer's liability to the Bank or if that liability is converted into a claim, proof, judgment or order in a currency other than the currency (the "**contractual currency**") in which the amount is expressed to be payable:-

(A)    the Customer shall indemnify the Bank as an independent obligation against any loss or liability arising out of or as a result of the conversion;

(B)    if the amount received by the Bank, when converted into the contractual currency at a market rate in the usual course of its business is less than the amount owed in the contractual currency, the Customer shall forthwith on demand pay to the Bank an amount in the contractual currency equal to the deficit; and

(C)    the Customer shall pay to the Bank forthwith on demand any exchange costs and taxes payable in connection with any such conversion.

(ii)    the Customer waives any right it may have in any jurisdiction to pay any amount owing to the Bank in a currency other than that in which it is expressed to be payable.

10. **Indemnity**

(a)  The Customer shall indemnify the Bank against any liability, cost, expense or loss incurred by the Bank in connection with this Agreement or any transactions contemplated by this Agreement, other than those liabilities or losses arising directly from the Bank's gross negligence or wilful misconduct.

(b)  The Customer shall, immediately upon request by the Bank, appear in and defend at its own cost and expense any action which may be brought against the Bank in connection with this Agreement.

11. **Exoneration**

(a)  The Bank shall not be liable to the Customer for any action taken or not taken by it under this Agreement unless directly caused by the Bank's gross negligence or wilful misconduct.

(b)  Notwithstanding that the Customer may have given instructions to the contrary, the Bank shall not be liable to the Customer for any loss or damage which may be caused by the Bank acting in accordance with applicable laws, regulations or rules (including rules and regulations of the various payment systems), or with the terms of the Bank's agreements with other banks or financial institutions regarding the transaction of business with those banks or institutions.

12. **Expenses**

The Customer shall pay all costs and expenses (including legal fees of both internal and external legal advisers) incurred by the Bank in connection with the preparation, perfection, performance or enforcement of or preservation of rights under this Agreement or any security provided by the Customer or any third party in respect of the Customer's obligations to the Bank.

13. **Waivers**

The rights of the Bank under this Agreement:-

(a)  may be exercised as often as necessary;

(b)  are cumulative and not exclusive of its rights under the general law; and

(c)  may be waived only in writing and specifically.

Delay in exercising or non-exercise of any such right is not a waiver of that right.

14. **Set-off**

(a)  The Bank may set off any matured obligation owed by the Customer to the Bank (to the extent beneficially owned by the Bank) against any obligation (whether or not matured) owed by the Bank to the Customer, regardless of the place of payment, the branch through which the Bank is acting or currency of either obligation.

(b)  If the obligations referred to in paragraph (a) above are in different currencies, the Bank may convert either obligation at a market rate of exchange in its usual course of business for the purpose of the set-off.

(c)  If any of the obligations referred to in paragraph (a) above is unliquidated or unascertained, the Bank may set off in an amount estimated by it in good faith to be the amount of that obligation.

15. **Confidentiality**

(a)  Any personal data (as defined in the Personal Data (Privacy) Ordinance (Cap. 486, Laws of Hong Kong)) which the Customer provides to the Bank shall be treated in accordance with the "Bank's Personal Data (Privacy) Ordinance Notification" from time to time provided to the Customer and which is incorporated in this Agreement by this reference.

(b)  The Customer acknowledges and agrees that the Bank may disclose and transfer from time to time all information in connection with this Agreement or other information in respect of the Customer, the Customer's accounts, business or transaction with the Bank, provided to the Bank by the Customer or otherwise known to the Bank (including personal data) ("Customer Information") (i) to the head office, any branch, subsidiary, affiliate, associate, related company, staff, agent and representative of the Bank or any other member of the Bank of America Group, (ii) to its accountants, auditors, internal and external legal counsel, (iii) to any actual or proposed assignee, transferee, participant or sub-participant of the Bank under or in connection with this Agreement, any other agreement or all or any part of the assets or business of the Bank or the Bank of America Group, (iv) to any banking, supervisory or regulatory authority having jurisdiction over the Bank or any member of the Bank of America Group or (v) if required or permitted to do so by any law, regulation or court order.

(c)  Paragraph (a) does not apply if the Customer is a limited liability company.

16. **Notice to Customer**

(a)  All notices or other communications in connection with this Agreement are to be sent at the Customer's risk. The Bank does not assume any responsibility for any inaccuracy, interruption, error or delay or total failure in transmission or delivery by post, facsimile or other written form of electronic communication.

(b)  All notices or other communications from the Bank to the Customer must be given in writing and unless otherwise stated, may be made by letter or facsimile. Any such notice shall be deemed to be given as follows:-

(i)  if by letter, when delivered personally or, when sent by prepaid post, two working days following that on which it was so posted; and

(ii)  if by facsimile, when confirmed by an activity report confirming the facsimile number to which such notice was sent, the number of pages transmitted and that such transmission was successfully completed.

(c)  The address and facsimile number of the Customer for all notices under or in connection with this Agreement are:-

(i)  those set out in the Schedule; or

(ii)  any other notified by the Customer for this purpose to the Bank by not less than 5 working days' notice.

17. **Notice to the Bank**

Any notice by the Customer to the Bank must be given in writing and may only be sent by personal delivery or by post addressed to the manager of the branch of the Bank through which the relevant banking services are provided to the Customer and shall only be effective when actually received.

18. **Severability**

If a provision of this Agreement is or becomes illegal, invalid or unenforceable in any jurisdiction, that shall not affect:-

(a)    the validity or enforceability in that jurisdiction of any other provision of this Agreement; or

(b)    the validity or enforceability in other jurisdictions of that or any other provision of this Agreement.

19. **Variation**

The Bank may by notice to the Customer vary, amend or supplement the terms and conditions of this Agreement and such variation, amendment or supplement shall take effect as between the Customer and the Bank on the date of the notice setting out the details of such variation, amendment or supplement or, if later, the date specified in the notice.

20. **Conflict of terms**

In the event of any conflict or inconsistency between the provisions of this Agreement and any provisions of any agreement between the Customer and the Bank, the latter shall prevail.

21. **Partnership**

(a)    If the Customer is carrying on business in partnership, the dissolution of the partnership for any reason shall not affect the liabilities of the Customer as partner(s) until the Bank receives written notice from the Customer to such effect but no notice shall affect the Customer's liability for any transaction made with the Bank prior to the Bank's receipt of such notice.

(b)    In case of the death of a partner, the liability of the estate of the deceased partner to the Bank shall cease only with regard to transactions made with the Bank subsequent to the receipt by the Bank of written notice of the death of the deceased partner.

22. **Successors and assigns**

This Agreement shall operate for the benefit of the Bank and its successors and assigns, notwithstanding any change by way of amalgamation, consolidation or otherwise in the constitution of the Bank or of any such successor or assigns. The Bank may assign or transfer all or any of its rights, interest and benefits under this Agreement and any transactions to which this Agreement relates and/or the goods, documents and other properties in respect of which the Bank has a security interest and may deliver the same to the assignee(s) or transferee(s), who shall thereupon become vested with all the rights and powers in respect thereof which were formerly vested with the Bank. The Bank shall be released and discharged from any liability or responsibility in respect of the goods, documents or other properties so assigned or transferred, but shall retain all its rights and powers of the goods, documents or other properties not so assigned or transferred.

23. **Further obligations**

Nothing in this Agreement requires the Bank to give or to continue to give any credit to the Customer or to perform or continue to perform any service for the Customer.

24. **Trade Finance Annex**

The Trade Finance Annex to this Agreement forms part of this Agreement unless the Customer otherwise specifies in the Schedule.

25. **Governing law**

This Agreement is governed by and construed in accordance with the laws of Hong Kong Special Administrative Region ("**Hong Kong**").

26. **Jurisdiction**

(a)    The Customer agrees that the courts of Hong Kong have jurisdiction to settle any disputes in connection with this Agreement and accordingly submits to the non-exclusive jurisdiction of the Hong Kong courts.

(b)    If the Customer is not ordinarily resident in Hong Kong nor a company incorporated under the laws of Hong Kong nor a foreign company registered under section 333 of the Companies Ordinance (Cap.32, Laws of Hong Kong), without prejudice to any other mode of service, the Customer:-

(i)    irrevocably appoints a company incorporated in Hong Kong and specified in the Schedule as its agent for service of process in relation to any proceedings before the Hong Kong courts in connection with this Agreement;

(ii)    agrees that failure by a process agent to notify the Customer of the process shall not invalidate the proceedings concerned; and

(iii)    agrees that if the appointment of any person mentioned in paragraph (i) above ceases to be effective, the Customer shall immediately appoint another company incorporated in Hong Kong to accept service of process on its behalf in Hong Kong and, failing such appointment within 15 days, the Bank is entitled to appoint such person by notice to the Customer.

## TRADE FINANCE ANNEX

**1. Interpretation**

(a)   In this Annex:

"**Discrepancies**" has its meaning defined in Clause 6(b) of this Annex.

"**Documents**" means any documents, drafts and/or bill of exchange.

(b)   For the avoidance of doubt:

(i)   "**assets**" as used in this Agreement also includes all goods, bills of exchange, promissory notes and negotiable instruments of any description, all bills of lading, dock warrants, delivery orders, warehouse warrants and receipts and other documents of title or documents relating to goods; and

(ii)   the obligations of the Customer under Clause 10 (Indemnity) cover any liability, cost, expense or loss incurred by the Bank in connection with any guarantee or indemnity given by it as contemplated in this Annex.

**2. Letters of credit**

All letters of credit issued or to be issued by the Bank at the request of the Customer are subject to the Bank's usual terms and conditions generally applicable in the geographical area where such credit is to be established.

**3. Trust receipt**

The Bank may deliver or cause to be delivered to the Customer any goods or documents relating to goods pledged to the Bank or over which the Bank has a lien. On the Bank's delivery of such goods or documents, the Customer shall execute and deliver to the Bank trust receipts in form and substance acceptable to the Bank together with such other documents as the Bank may require.

**4. Collection**

If the Bank:

(a)   makes any collection on any Documents at the request of the Customer and credit has been given by the Bank to the Customer against those Documents; or

(b)   accepts any Documents as cash settlement of any of the Customer's obligations to the Bank,

such credit or settlement shall be conditional upon the Bank's receipt of full payment in immediately available and freely disposable funds on the relevant Documents, failing which the Customer shall reimburse the Bank on demand the full amount of the credit so given or settlement so made.

**5. Pre-export Loan**

(a)   If the Customer applies for a pre-export loan from the Bank, the Customer undertakes to present to the Bank the Documents for negotiation properly drawn and conforming to the terms of the letter of credit referred to in such application as soon as available and in any case not later than the date fixed in the Customer's application as approved by the Bank.

(b)   If the Customer does not deliver the Documents to the Bank on or before the date referred to in paragraph (a) above, the Customer shall immediately pay to the Bank in full all advances made by the Bank pursuant to the relevant pre-export loan together with interest accrued on them.

**6. Negotiation and purchase of documents and drafts relating to letters of credit**

If the Bank, upon the request of the Customer:

(a)   makes payments in negotiating or purchasing from the Customer any Documents relating to letters of credit; and

(b)   discrepancies exist between the Documents presented and the terms of the applicable letters of credit ("**Discrepancies**"),

the Customer agrees to refund to the Bank, immediately upon demand by the Bank, all moneys paid by the Bank in respect of such Documents.

**7. Guarantee or indemnity issued in connection with Letters of Credit**

(a)   The Bank may, but is not obliged to, at the request of the Customer, countersign or issue or authorise its correspondents to countersign or issue letters of guarantee or letters of indemnity covering Discrepancies.

(b)   The Customer shall, immediately upon demand, pay to the Bank all moneys paid by the Bank arising out of the non-acceptance of or the non-payment in connection with any Documents.

**8. Guarantee or indemnity covering release of goods**

(a)   The Bank may, but is not obliged to, at the request of the Customer, countersign or issue letters of guarantee or letters of indemnity covering the release of goods without production to shipping companies and/or their agents and/or forwarding agents of the relevant bills of lading or other documents of title.

(b)   The Customer further undertakes that:

(i)   it will use its best efforts to obtain the bills of lading and/or other documents of title to the goods referred to in paragraph (a) above; and

(ii)   upon receipt of the bills of lading and/or other documents of title referred to in paragraph (a) above, the Customer shall deliver them to the Bank and procure the release of the Bank from any guarantee or indemnity given by it under paragraph (a) above and the return of the relevant guarantee or indemnity to the Bank for cancellation.

(c)    The Customer authorises the Bank to endorse in the Customer's name all relevant bills of lading so that such bills of lading may be delivered directly by the Bank to shipping companies and/or their agents and/or forwarding agents.

(d)    In the case of shipments under letters of credit and in order to facilitate the endorsement by the Bank under paragraph (c) above, the Customer shall disregard all Discrepancies and accept all the Documents presented under the relevant letter of credit.

9.    **Cash cover for guarantees and indemnities**

The Customer shall, on demand by the Bank, deposit with the Bank such sum or sums equal to the Bank's obligations in respect of the letters of credit, letters of guarantee or letters of indemnity given by the Bank without regard to whether the Bank has been demanded to pay under the letters of credit, letters of guarantee or letters of indemnity during the time the liabilities under such letters of credit, letters of guarantee or letters of indemnity are outstanding until they are released and returned to the Bank.

10.    **Location of goods**

The Customer shall immediately upon request by the Bank from time to time provide the Bank with written details of all of the goods of the Customer whether or not in its possession or stored in warehouses or godowns or elsewhere or in the possession of persons other than the Customer together with the details of the location of such goods.

11.    **Insurance**

(a)    The Customer shall maintain insurance cover against losses or damages with financially sound and reputable insurers acceptable to the Bank with respect to the goods, shipping documents, warrants, documents of title and other items of value in connection with any business the Customer may have with the Bank.

(b)    The amount due under any insurance maintained by the Customer under paragraph (a) above shall be paid to:

    (i)    in the case of loss or destruction, the Bank; and

    (ii)    in the case of damage, unless otherwise agreed by the Bank, be applied in repairing or reinstating the insured property.

(c)    The Customer authorises the Bank to collect the amounts due under any policy or policies of insurance.

(d)    The Customer shall, immediately upon request, lodge with the Bank all evidence of such insurance (including policies and premium receipts) with the Bank's interest in such insurance duly endorsed.

(e)    If the Customer fails to effect or maintain any such insurance or in producing any policy to the Bank or if any insurance effected by the Customer is, in the Bank's opinion, insufficient, the Bank may effect such insurance and in such sum as it thinks fit. All moneys expended by the Bank for such insurance shall be paid forthwith to the Bank by the Customer.

12.    **Exoneration**

(a)    Neither the Bank nor any of its agents shall be responsible for:

    (i)    the discrepancy, description, quality, quantity, value or delivery of any goods;

    (ii)    the correctness, genuineness, regularity or validity of any Documents;

    (iii)    general or particular conditions stipulated in any Documents; or

    (iv)    any delay or deviation from instructions relating to shipments.

(b)    The Bank and/or its agent, acting bona fide and in accordance with its normal policy or practice, is entitled to honour drafts drawn under any letter of credit opened by the Bank at the request of the Customer notwithstanding that the Bank and/or its agents is not obliged or should refuse under such letter of credit and/or the applicable edition of the Uniform Customs and Practice for Documentary Credits to honour such drafts on the ground that there are Discrepancies.

(c)    The existence of Discrepancies of any nature whatsoever shall not affect in any way the Customer's liabilities to the Bank in respect of or arising out of such letter of credit.

(d)    The Bank is not responsible for any goods, documents or items in its possession beyond the exercise of reasonable care and is not liable in any way for the default or negligence of any duly selected agent or correspondent or for any loss in transit.

(e)    The Bank further agrees that in receiving any items for deposit or collection, the Bank assumes no responsibility for them beyond the exercise of reasonable care and the Bank shall not be liable in any way whatsoever for the default or negligence of any duly selected agent or correspondent or for any loss in transit.

13.    **Expenses**

(a)    The Customer shall pay freight, landing and storage charges and all other charges and expenses incurred or to be incurred in connection with any business between the Bank and the Customer.

(b)    The Customer shall, immediately upon demand by the Bank, provide the Bank with funds to meet all charges and disbursements including commission, interest and charges.

**SCHEDULE**

**Date of this Agreement:**

| | |
|---|---|
| Date of this Agreement: | 13 APRIL 2011 |

**Details of Customer:**

Name(s):
(1) CHINA FISHERIES INTERNATIONAL LIMITED
(2) SOUTH PACIFIC SHIPPING AGENCY LIMITED
(3)
(4)

Type:    Sole Proprietor/Limited Liability Company/Partnership *(please delete as applicable)*

Address:   ROOM 3201-10 32/F HONG KONG PLAZA 186 CONNAUGHT ROAD WEST HONG KONG

Facsimile:   28577754

**Trade Finance Annex (please see Clause 24):**

The Trade Finance Annex does not form part of this Agreement.

*(if applicable, ALL signatories of the Customer to initial here)*

**Details of Process Agent of the Customer (if applicable – see Clause 26 (b)):**

Name of Company:   PACIFIC ANDES FOOD (HONG KONG) COMPANY LIMITED

Registered office in Hong Kong:   ROOM 3201-10 32/F HONG KONG PLAZA 186 CONNAUGHT ROAD WEST HONG KONG

Facsimile:   28577754

**********************

**Customer**

Signed by or on behalf of the Customer:

**For and on behalf of China Fisheries International Limited**

(1)                     (2)

*Authorized Signature(s)*
Print name(s) of signatory(ies):
(1) NG JOO SIANG AND NG JOO PUAY, FRANK
(2) NG JOO SIANG AND NG JOO PUAY, FRANK
(3)                     (4)

*For and on behalf of*
**South Pacific Shipping Agency Limited**

Witness Signature:

Print Witness Name:   YIP KWOK KUEN

*Authorized Signature(s)*

**The Bank**

*For and on behalf of*
Bank of America, National Association

SIG. (S) VERIFIED
BY............la..............

Authorised signatory

To: **Bank of America,**
National Association
Incorporated in U.S.A. with Limited Liability



## CONTINUING GUARANTEE

**THIS IS AN IMPORTANT DOCUMENT. SIGN ONLY IF YOU INTEND TO BE BOUND BY IT**

The following terms and conditions are agreed between the person(s) executing this Guarantee as guarantor (the "**Guarantor**") and Bank of America, National Association (the "**Bank**" which includes all the branches and offices of Bank of America, National Association wherever situated and its successors and assigns) on the date specified in the Schedule to this Guarantee.

### 1.   Interpretation

(a) In this Guarantee:

    (i)   "**Debtor**" means the person(s) identified as such in the Schedule;

    (ii)  "**Guaranteed Obligations**" means, in respect of a Debtor, all past, present and future liabilities of whatever nature of that Debtor to the Bank whether actual, contingent, joint and/or several or otherwise;

    (iii) "**Limit**" means, in respect of a Debtor, the amount specified as such opposite its name in the Schedule or, in respect of all Debtors, the amount specified as such opposite the reference to "all Debtors" in the Schedule;

    (iv) a Clause or Schedule is a reference to a clause of or a schedule to this Guarantee;

    (v)  a person includes an individual, a company, partnership or body unincorporate and its successors and assigns;

    (vi) unless the context otherwise requires, words importing the singular include the plural and vice versa and the neuter gender includes the other genders;

    (vii) a document is a reference to that document as amended or supplemented; and

    (viii) if the Bank considers that a payment in respect of any Guaranteed Obligation is capable of being avoided or otherwise set aside on the bankruptcy, liquidation or administration or supervision of the person making that payment or otherwise, then that amount shall not be considered to have been irrevocably paid for the purposes of this Guarantee.

(b) If this Guarantee is executed by more than one person as Guarantor, the obligations of each Guarantor under this Guarantee are joint and several.

(c) The headings in this Guarantee are for convenience only and are to be ignored in construing this Guarantee.

(d) Where the Debtor or the Guarantor consists of partners, trustees or joint account holders, references to the Debtor or the Guarantor, where the context admits, are references to the persons who constitute the Debtor or, as the case may be, the Guarantor for the time being.

### 2.   Guarantee

For good and valuable consideration, receipt of which is acknowledged, the Guarantor irrevocably and unconditionally:

    (a)  as principal obligor guarantees to the Bank prompt performance by each Debtor of all its Guaranteed Obligations;

    (b)  undertakes with the Bank that whenever a Debtor does not pay any amount when due in connection with any of its Guaranteed Obligations, the Guarantor will immediately on demand by the Bank pay that amount as if the Guarantor instead of that Debtor were expressed to be the principal obligor; and

    (c)  indemnifies the Bank on demand against any loss or liability suffered by it if any of the Guaranteed Obligations is or becomes unenforceable, invalid or illegal.

### 3.   Default interest

If the Guarantor fails to pay in full the sum demanded from it under Clause 2 (Guarantee), the Guarantor will pay interest from the date of demand on the outstanding sum (both before and after any judgement) at the same rate as that payable (or deemed payable) by a Debtor in respect of its Guaranteed Obligations.

### 4.   Limit on the amount of the Guaranteed Obligations

(a) This Guarantee is a guarantee for all Guaranteed Obligations but if a Limit is specified in the Schedule in respect of a Debtor or all Debtors, the amount payable by the Guarantor in respect of the Guaranteed Obligations of that Debtor or, as the case may be, all Debtors is limited to the aggregate of:

    (i)  in respect of the principal amount of those Guaranteed Obligations and subject to paragraph (b) below, the applicable Limit; and

    (ii) interest, principal consisting of capitalised interest, commission, banking and other charges and expenses comprised in those Guaranteed Obligations which accrue or are incurred up to the date of demand against the Guarantor.

(b) If the Limit in respect of a Debtor or all the Debtors is denominated in a currency (the "**Limit Currency**") which differs from any of the currencies in which the Guaranteed Obligations of that Debtor or, as the case may be, all the Debtors are denominated (the "**Obligation Currency**"), and any one or more of the Obligation Currencies strengthen against the Limit Currency (during the period between the date of this Guarantee and the date of payment by the Guarantor), that Limit (as denominated in the Limit Currency) will be increased in proportion to such strengthening.

(c) For the avoidance of doubt,

    (i)  if no Limit is specified in the Schedule, the amount payable by the Guarantor in respect of the Guaranteed Obligations of any Debtor is unlimited; and

    (ii) if no limit is specified in the Schedule in respect of a Debtor, the amount payable by the Guarantor in respect of the Guaranteed Obligations of that Debtor is unlimited.

### 5.   Limit on the duration of the Guaranteed Obligations

(a) This Guarantee is irrevocable but the Guarantor may by notice to the Bank limit its liability under this Guarantee to those Guaranteed Obligations incurred by the Debtor before the date falling 3 months after the date on which such notice is received by the Bank (the "**Cut-off Date**").

(b) The Guarantor will remain liable for all Guaranteed Obligations outstanding at the Cut-off Date (together with interest, commission, banking and other charges and expenses which continue to accrue in respect of those Guaranteed Obligations after the Cut-off Date) including:

    (i)  advances made by the Bank at any time pursuant to any commitment provided by it to the Debtor before the Cut-off Date;

    (ii) any bills of exchange, cheques, promissory notes and any other instruments dated before the Cut-off Date;

    (iii) any Guaranteed Obligations incurred before the Cut-off Date but mature after that date; and

    (iv) any increase in those Guaranteed Obligations as a result of any bills of exchange, cheques, promissory notes and any other instruments being credited to the Debtor's account before the Cut-off Date but which are dishonoured after that date.

(c) If there are two or more persons included in the expression "Guarantor" and the notice under paragraph (a) above has not been given by all such persons, the liability of those who have not given such notice will not be affected.

**6. Continuing guarantee**

(a)  This Guarantee is a continuing security and shall not be satisfied by any intermediate payment or discharge of the whole or any part of the Guaranteed Obligations of a Debtor but shall secure the ultimate balance of those Guaranteed Obligations.

(b)  If for any reason the security constituted by this Guarantee ceases to be a continuing security in respect of a Debtor, the Bank may open a new account with or continue any existing account with that Debtor and the liability of that Debtor in respect of its Guaranteed Obligations at the date of such cessation shall remain regardless of any payments in or out of any such account.

**7. Reinstatement**

(a)  Where any discharge is made in whole or in part or any arrangement is made on the faith of any payment, security or other disposition which is avoided or must be repaid on insolvency, liquidation or otherwise without limitation, the liability of the Guarantor under this Guarantee shall continue as if the discharge or arrangement had not occurred.

(b)  The Bank may concede or compromise any claim that any payment, security or other disposition is liable to avoidance or restoration.

**8. Representations and warranties**

(a)  The Guarantor represents and warrants to the Bank that:

   (i)  the Guarantor has the legal capacity and powers to execute and perform this Guarantee and if the Guarantor is a limited liability company, it is a limited liability company, duly incorporated and validly existing under the laws of the jurisdiction of its incorporation;

   (ii)  the Guarantor has taken all necessary action to authorise the entry into, performance and delivery of this Guarantee;

   (iii)  this Guarantee constitutes legal, valid and binding obligations of the Guarantor in accordance with its terms;

   (iv)  this Guarantee does not and will not breach any agreement by which the Guarantor is bound or, if the Guarantor is a limited liability company, its constitutional documents; and

   (v)  all necessary consents and authorisations in respect of this Guarantee have been obtained and are in full force.

(b)  The representations and warranties set out in paragraph (a) above are deemed to be repeated by the Guarantor on each day during the period in which any of the Guaranteed Obligations is or may be outstanding with reference to the facts and circumstances then existing.

**9. Preservation of the Bank's rights**

Following the discharge of all the Guaranteed Obligations of a Debtor, the Bank may retain this Guarantee and any security held by the Bank in respect of the Guarantor's liability under this Guarantee for a further period of seven months or, if the Bank or the Guarantor is an associate of a Debtor for the purposes of sections 49 to 51A of the Bankruptcy Ordinance (Cap. 6, Laws of Hong Kong), 25 months and, if that Debtor becomes insolvent during that period, the Bank may further retain this Guarantee and that security until the Bank is satisfied that the Bank will not have to make any repayment under any insolvency laws or regulations.

**10. Arrangements with the Debtor and others; other security**

The obligations of the Guarantor under this Guarantee shall not be affected by any matter or thing which but for this provision might operate to affect such obligations including without limitation (a) any time or indulgence granted to or composition with any Debtor or any other person, (b) the taking, variation, renewal or release of, or neglect to perfect or enforce, any rights, remedies or securities against any Debtor or any other person, (c) any incapacity or lack of powers, authority or legal personality of or dissolution or change in the members or status of any Debtor or any other person or (d) any unenforceability or invalidity of any obligations of a Debtor or any other person so that this Guarantee shall be construed as if there were no such unenforceability or invalidity.

**11. Immediate recourse**

The Guarantor waives any right it may have of first requiring the Bank to proceed against or enforce any other rights or security or claim payment from any person before claiming from the Guarantor under this Guarantee.

**12. Suspension of Guarantor's claims against the Debtor**

(a)  Until all amounts which may be or become payable by a Debtor in connection with its Guaranteed Obligations have been irrevocably paid in full, the Guarantor will not, after a claim has been made or by virtue of any payment or performance by it under this Guarantee in respect of the Guaranteed Obligations of that Debtor:

   (i)  be subrogated to any rights, security or moneys held, received or receivable by the Bank or be entitled to any right of contribution or indemnity in respect of any payment made or moneys received on account of the Guarantor's liability under this Guarantee;

   (ii)  claim, rank, prove or vote as a creditor of that Debtor or its estate in competition with the Bank; or

   (iii)  receive, claim or have the benefit of any payment, distribution or security from or on account of that Debtor, or exercise any right of set-off as against that Debtor.

(b)  The Guarantor warrants that it has not taken (and agrees not to take) any security from any Debtor or from any other Guarantor in relation to this Guarantee.

(c)  The Guarantor shall hold in trust for and forthwith pay or transfer to the Bank any payment or distribution or benefit of security received by it contrary to this Clause.

**13. Appropriation and Suspense Account**

Until all amounts which may be or become payable by each Debtor in connection with its Guaranteed Obligations have been irrevocably paid in full, the Bank may:

(a)  refrain from applying or enforcing any other moneys, security or rights held or received by the Bank in respect of those amounts, or apply and enforce the same in such manner and order as it sees fit (whether against those amounts or otherwise) and the Guarantor shall not be entitled to the benefit of the same; and

(b)  hold in a suspense account any moneys received from the Guarantor or on account of the Guarantor's liability under this Guarantee, without liability to pay interest on those moneys.

**14. Additional security**

This Guarantee is additional to and is not in any way prejudiced by, and will not prejudice, any other security or guarantee now or subsequently held by the Bank in respect of any Guaranteed Obligations.

**15. Payment**

(a)  **Place:** All payments by the Guarantor under this Guarantee will be made to the Bank to its account at such office or bank as it may notify to the Guarantor for this purpose.

(b)  **Funds:** Payments under this Guarantee to the Bank will be made for value on the due date at such times and in such funds as the Bank may specify to the Guarantor as being customary at the time for the settlement of transactions in the relevant currency.

(c)  **No counterclaim:** All payments made by the Guarantor under this Guarantee will be made without set-off or counterclaim.

(d)  **Currency:** Amounts payable in respect of costs, expenses and taxes and the like are payable in the currency in which they are incurred. Any other amount payable in respect of any Guaranteed Obligations under this Guarantee is payable in the currency in which those Guaranteed Obligations are denominated.

**16. Currency indemnity**

(a) If the Bank receives an amount in respect of the Guarantor's liability to the Bank or if that liability is converted into a claim, proof, judgment or order in a currency other than the currency (the **"contractual currency"**) in which the amount is expressed to be payable:

    (i) the Guarantor shall indemnify the Bank as an independent obligation against any loss or liability arising out of or as a result of the conversion;

    (ii) if the amount received by the Bank, when converted into the contractual currency at a market rate in the usual course of its business is less than the amount owed in the contractual currency, the Guarantor shall forthwith on demand pay to the Bank an amount in the contractual currency equal to the deficit; and

    (iii) the Guarantor shall pay to the Bank forthwith on demand any exchange costs and taxes payable in connection with any such conversion.

(b) The Guarantor waives any right it may have in any jurisdiction to pay any amount owing to the Bank in a currency other than that in which it is expressed to be payable.

**17. Tax**

(a) All payments to be made by the Guarantor will be made free and clear of and without deduction for or on account of any tax unless it is required to make such a payment subject to the deduction or withholding of tax. If any tax or amounts in respect of tax must be deducted, or any other deductions must be made, from any amounts payable or paid by the Guarantor under this Guarantee, it will pay such additional amounts as may be necessary to ensure that the Bank receives a net amount equal to the full amount which it would have received had payment not been made subject to tax or any other deduction.

(b) The Guarantor will pay all present or future taxes or similar charges due with respect to all payments made by the Guarantor to the Bank which may be imposed by any governmental authority. The Guarantor will provide the Bank with official receipts evidencing payment of such taxes or similar charges within 30 days after the due date for each such payment.

**18. Evidence and calculation**

Any certificate or determination by the Bank of a rate or amount under this Guarantee is, in the absence of manifest error, conclusive evidence of the matters to which it relates.

**19. Expenses**

The Guarantor shall immediately on demand pay all costs and expenses (including legal fees of both internal and external legal advisers) incurred by the Bank in connection with the preparation, perfection, performance or enforcement of or preservation of rights under this Guarantee.

**20. Waivers**

The rights of the Bank under this Guarantee:

    (a) may be exercised as often as necessary;

    (b) are cumulative and are not exclusive of its rights under the general law; and

    (c) may be waived only in writing and specifically.

Delay in exercising or non-exercise of any such right is not a waiver of that right.

**21. Set-off**

(a) The Bank may set off any matured obligation owed by each Guarantor under this Guarantee to the Bank (to the extent beneficially owned by the Bank) against any obligation (whether or not matured) owed by the Bank to that Guarantor, regardless of the place of payment, the branch through which the Bank is acting or currency of either obligation.

(b) If the obligations referred to in paragraph (a) above are in different currencies, the Bank may convert either obligation at a market rate of exchange in its usual course of business for the purpose of the set-off.

(c) If any of the obligations referred to in paragraph (a) above is unliquidated or unascertained, the Bank may set off in an amount estimated by it in good faith to be the amount of that obligation.

**22. Notices to the Guarantor**

(a) All notices or other communications in connection with this Guarantee are to be sent at the Guarantor's risk. The Bank does not assume any responsibility for any inaccuracy, interruption, error or delay or total failure in transmission or delivery by post, facsimile or other written form of electronic communication.

(b) All notices or other communications from the Bank to the Guarantor must be given in writing and unless otherwise stated, may be made by letter or facsimile. Any such notice will be deemed to be given as follows:

    (i) if by letter, when delivered personally or when sent by prepaid post, two working days following that on which it was so posted; and

    (ii) if by facsimile, when confirmed by an activity report confirming the facsimile number to which such notice was sent, the number of pages transmitted and that such transmission was successfully completed.

(c) The address and facsimile number of the Guarantor for all notices under or in connection with this Guarantee are:

    (i) those set out in the Schedule; or

    (ii) any other notified by the Guarantor for this purpose to the Bank by not less than 5 working days' notice.

**23. Notice to the Bank**

Any notice by the Guarantor to the Bank must be given in writing and may only be sent by personal delivery or post addressed to the manager of the branch of the Bank through which the relevant banking services are provided to the Debtor and will only be effective when actually received.

**24. Severability**

If a provision of this Guarantee is or becomes illegal, invalid or unenforceable in any jurisdiction, that will not affect:

    (a) the validity or enforceability in that jurisdiction of any other provision of this Guarantee; or

    (b) the validity or enforceability in other jurisdictions of that or any other provision of this Guarantee.

**25. Governing Law**

This Guarantee is governed by and construed in accordance with laws of the Hong Kong Special Administrative Region (**"Hong Kong"**).

**26. Jurisdiction**

(a) The Guarantor agrees that the courts of Hong Kong have jurisdiction to settle any disputes in connection with this Guarantee and accordingly submits to the non-exclusive jurisdiction of the Hong Kong courts.

(b) If the Guarantor is not ordinarily resident in Hong Kong or a company incorporated under the laws of Hong Kong or a foreign company registered under section 333 of the Companies Ordinance (Cap.32, Laws of Hong Kong), without prejudice to any other mode of service, the Guarantor:

    (i) irrevocably appoints a company incorporated in Hong Kong and specified in the Schedule as its agent for service of process in relation to any proceedings before the Hong Kong courts in connection with this Guarantee;

    (ii) agrees that failure by a process agent to notify the Guarantor of the process shall not invalidate the proceedings concerned; and

    (iii) agrees that if the appointment of any person mentioned in paragraph (i) above ceases to be effective, the Guarantor shall immediately appoint another company incorporated in Hong Kong to

**SCHEDULE**

Date of this Guarantee:

Date of this Guarantee: **13 APRIL 2011**

Details of the Guarantor:

(1) Name:     CHINA FISHERY GROUP LIMITED

Type:     ~~Sole Proprietor~~ / Limited Liability Company / ~~Partnership~~ (please delete if inapplicable)

Address:     ROOM 3201-10 32/F HONG KONG PLAZA 186 CONNAUGHT ROAD WEST HONG KONG

Facsimile:     28577754

(2) Name: _____

Type:     Sole Proprietor / Limited Liability Company / Partnership (please delete if inapplicable)

Address: _____

Facsimile: _____

(3) Name: _____

Type:     Sole Proprietor / Limited Liability Company / Partnership (please delete if inapplicable)

Address: _____

Facsimile: _____

(4) Name: _____

Type:     Sole Proprietor / Limited Liability Company / Partnership (please delete if inapplicable)

Address: _____

Facsimile: _____

**Debtors:**

| | | |
|---|---|---|
| (1) | Name: | CHINA FISHERIES INTERNATIONAL LIMITED |
| | Address: | ROOM 3201-10 32/F HONG KONG PLAZA 186 CONNAUGHT ROAD WEST HONG KONG |
| (2) | Name: | SOUTH PACIFIC SHIPPING AGENCY LIMITED |
| | Address: | ROOM 3201-10 32/F HONG KONG PLAZA 186 CONNAUGHT ROAD WEST HONG KONG |
| (3) | Name: | |
| | Address: | |
| (4) | Name: | |
| | Address: | |

**Limit (please see Clause 4):**

Debtor (1):

Debtor (2):

Debtor (3):

Debtor (4):

All Debtors:

**Details of Process Agent of the Guarantor (if applicable - see Clause 26 (b)):**

| | |
|---|---|
| Name of Company: | PACIFIC ANDES FOOD (HONG KONG) COMPANY LIMITED |
| Registered office in Hong Kong: | ROOM 3201-10 32/F HONG KONG PLAZA 186 CONNAUGHT ROAD WEST HONG KONG |
| Facsimile: | 28577754 |

* * * * * * * * * * * * * * * * * * * *

**Guarantor**

(1)   Executed as a deed by Guarantor (1):   *For and on behalf of*
      CHINA FISHERY GROUP LIMITED

      Signature:   _____

                   *Authorized Signature(s)*

      Name of signatory:   NG JOO SIANG

                   *For and on behalf of*
      CHINA FISHERY GROUP LIMITED

      Signature:   _____

      Name of signatory:   NG JOO PUAY, FRANK   *Authorized Signature(s)*

(2)   Executed as a deed by Guarantor (2):

      Signature:   _____

      Name of signatory:   _____

      Signature:   _____

      Name of signatory:   _____

(3)   Executed as a deed by Guarantor (3):

      Signature:   _____

      Name of signatory:   _____

      Signature:   _____

      Name of signatory:   _____

(4)   Executed as a deed by Guarantor (4):

      Signature:   _____

      Name of signatory:   _____

      Signature:   _____

      Name of signatory:   _____

L.S

L.S

L.S

**Witness**

Witness' Signature:   _____

Print Witness' Name:   YIP KWOK KUEN

*Note:*

A certified copy of the resolutions of the board of directors of the Guarantor (if it is a company) should be supplied.

If the Debtor is not a wholly-owned subsidiary of the Guarantor (if it is a company), a certified copy of the resolutions of the shareholders of the Guarantor should be supplied.

To : **Bank of America,**
National Association
Incorporated in U.S.A. with Limited Liability

**CERTIFIED COPY OF BOARD RESOLUTIONS
AUTHORISING A COMPANY TO EXECUTE A GUARANTEE**

In consideration of Bank of America, National Association ("**Bank**" which expression includes all branches and offices of Bank of America, National Association wherever situated and its successors and assigns) making or continuing to make advances or banking facilities available to the person or persons set out in paragraph 3 of the Schedule to these Resolutions ("**Debtor**" and if more than one person is set out in paragraph 3 as Debtor, "**Debtor**" means all or any of them) or allowing the Debtor time for repayment, the company set out in paragraph 1 of the Schedule to these Resolutions ("**Company**") agrees to grant a guarantee in favour of the Bank in form and substance satisfactory to the Bank ("**Guarantee**").

At a duly convened meeting of the Directors of the Company held at the place and time set out in paragraph 2 of the Schedule to these Resolutions ("**Meeting**") and at which a copy of the Guarantee was tabled:

1.  It was noted that due notice of the Meeting had been given to all Directors of the Company and a quorum was acting throughout.

2.  It was noted and/or confirmed that:

    (a)  all the Directors present at the Meeting had declared their relevant interests (if any) in the business to be transacted at the Meeting and were entitled to vote and be counted in the quorum at the Meeting in accordance with the articles of association or other constitutional documents of the Company and the applicable laws and regulations;

    (b)  the shareholding relationship between the Debtor and the Company is set out in paragraph 4 of the Schedule to these Resolutions; and

    (c)  the Company will be solvent (able to pay its liabilities as they become due) when entering into the Guarantee and will remain solvent for the duration of the Guarantee.

3.  The following resolutions were passed:

    (a)  In the opinion of the Directors of the Company, it is in the interests and for the commercial benefit of the Company to enter into the Guarantee;

    (b)  the Guarantee and the transactions contemplated by it be approved;

    (c)  (i)  any two directors of the Company; or

        (ii)  a director and a secretary of the Company; or

        (iii)  where required or permitted by the articles of association or other constitutional documents of the Company, the persons listed in paragraph 5 of the Schedule to these Resolutions ("**Authorised Persons**") in such number and combination provided in paragraph 6 of the Schedule to these Resolutions,

    (each group of such persons being referred to as the "**Authorised Signatories**") be authorised to execute the Guarantee on behalf of the Company with such amendments as the Authorised Signatories may approve (such approval to be conclusively evidenced by the Authorised Signatories' execution of the Guarantee);

    (d)  the common or corporate seal of the Company be affixed to the Guarantee in the presence of the Authorised Signatories in accordance with the articles of association or other constitutional documents of the Company;

    (e)  the Authorised Signatories be authorised to sign any other notices or documents in relation to the Guarantee or the transactions contemplated by it and to do such act or thing, as may in the sole opinion of such Authorised Signatory be necessary or desirable for purpose of giving effect to the Guarantee or the coming into effect of or otherwise consummating or completing or procuring the performance and completion of the Guarantee; and

    (f)  any action taken by any Director of the Company or the Authorised Signatories before the Meeting in connection with the transactions contemplated by the Guarantee and/or any transactions discussed at the Meeting be ratified and confirmed.

4.  The Authorised Signatories be authorised on behalf of the Company to execute and deliver to the Bank such transfers, undertakings and security documents mortgaging, charging, pledging, hypothecating, assigning, conveying or otherwise encumbering or granting a security interest in the whole or any part of the Company's property and assets of whatsoever nature both present and future as the Bank may from time to time require and as the Authorised Signatories may approve (such approval to be conclusively evidenced by the Authorised Signatories' execution of any agreements or documents in respect of or evidencing such security interest) as security for the payment and discharge of all obligations and liabilities of the Company under the Guarantee and if necessary, to affix the common or corporate seal of the Company to the relevant agreement or document and to do all act or thing, which in the sole opinion of such Authorised Signatory, is incidental thereto.

5.  A copy of these Resolutions certified by the Chairman of the Meeting, any Director or the Secretary of the Company be delivered to the Bank.

## SCHEDULE

1. **Details of the Company**

    Full name of the Company: CHINA FISHERY GROUP LIMITED

    Place of incorporation: CAYMAN ISLANDS

2. **Details of meeting**

    Place of meeting: ROOM 3201-10 32/F HONG KONG PLAZA 186 CONNAUGHT ROAD WEST HONG KONG

    Date of meeting: 13 APRIL 2011

    Time of meeting: 10:00AM

3. **Details of the Debtor**

    Full name of Debtor (1): CHINA FISHERIES INTERNATIONAL LIMITED

    Full name of Debtor (2): SOUTH PACIFIC SHIPPING AGENCY LIMITED

    Full name of Debtor (3): ............................................................

    Full name of Debtor (4): ............................................................

4. **Shareholding relationship**

    The Debtor is *a wholly-owned subsidiary of the Company / ~~XXXXXXX XXXXXX XXX XXXXXXX~~

5. **List of Authorised Persons**

    | Full name and official position | I.D./passport number | Specimen signature |
    |---|---|---|
    | NG JOO SIANG (DIRECTOR) | K701590(9) | |
    | NG JOO PUAY, FRANK (MANAGER) | K508738(4) | |
    | .......................... | .......................... | |
    | .......................... | .......................... | |

6. **Number of Authorised Persons required to act** *(please check articles of association or other constitutional documents of the Company)*

    Any one Authorised Person / any two Authorised Persons / others (please specify name of each person authorised to act (who must be an Authorised Person) and in such number and combination as appropriate)*

    ANY TWO OF THE AUTHORISED PERSONS JOINTLY WITH COMPANY CHOP

    *Please delete as applicable

    For and on behalf of
    CHINA FISHERY GROUP LIMITED

    \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

    ......................................................
    Authorized Signature(s)

I certify that the above Resolutions (i) have been duly entered in the minute book for meetings of the Directors of the Company and the minutes recording the above Resolutions have been signed by the Chairman of the Meeting, (ii) are still in full force and effect in all respects and (iii) do not exceed the objects or powers of the Company or the powers of its Directors. I confirm that the specimen signature(s) set out in paragraph 5 of the Schedule above is (are) the true signature(s) of the present Authorised Person(s).

......................................................
Chairman of the Meeting/Director/Secretary

Date: 13 APRIL 2011

Name: NG JOO SIANG X
*(please print)*

NOTE:

(1) Any amendments or deletions should be initialled by the person certifying these Resolutions.

(2) The following copy documents (certified as true copies by the person certifying these Resolutions) should be given to the Bank (unless already supplied):-

    (a)   Certificate of Incorporation and, if applicable, Certificate of Incorporation upon Change of Name.

    (b)   Memorandum and Articles of Association (or other equivalent constitutional documents) and any amendments to them.

    (c)   Business Registration Certificate (not required if the Company does not carry on business in Hong Kong).

(3) If the Debtor is not a subsidiary of the Company, then a certified copy of the resolutions of the shareholders of the Company should be supplied.

## FORM OF ACCEPTANCE OF APPOINTMENT OF PROCESS AGENT

From: CHINA FISHERY GROUP LIMITED

Date: 13 APRIL 2011

ROOM 3201-10 32/F HONG KONG PLAZA
186 CONNAUGHT ROAD WEST HONG KONG

To PACIFIC ANDES FOOD (HONG KONG) COMPANY LIMITED
ROOM 3201-10 32/F HONG KONG PLAZA
186 CONNAUGHT ROAD WEST HONG KONG

Attention:

Dear Sirs,

We agree to appoint you on the terms set out below to receive on our behalf service of process issued out of the courts of the Hong Kong Special Administrative Region in respect of any legal action or proceedings arising out of or in connection with each document set out in the Schedule to this letter.

1.  Upon receipt of any such service of process addressed to us, you will on our behalf accept such service and will notify us by facsimile at the number set out in the Schedule to this letter (or such other number as may from time to time be specified by us in writing) to the effect that you have accepted service of process on our behalf. Such notification must include the name of the party issuing the proceedings, the date upon which you accepted service of process and the date (if any) by which action must be taken to avoid judgement being entered against us in default of acknowledgement of service.

2.  Following such notification by facsimile you will confirm the acceptance to us by post (airmail if such confirmation is posted to an overseas address) at the address set out in the Schedule to this letter (or such other address as may from time to time be specified by us in writing), enclosing the process documents which you have received.

3.  Upon receiving the duplicate of this letter duly signed by you by way of acceptance of this appointment, we will notify the other party(ies) to each document set out in the Schedule to this letter (by delivery to them a copy of such duplicate) of your acceptance of your appointment.

Please sign the duplicate of this letter by way of acceptance of this appointment.

Yours faithfully,

For and on behalf of
CHINA FISHERY GROUP LIMITED

_____
Authorized Signature(s)

CHINA FISHERY GROUP LIMITED
We confirm our appointment as process agent on the terms set out above.
PACIFIC ANDES FOOD (HONG KONG) COMPANY LIMITED

For and on behalf of
PACIFIC ANDES FOOD (HONG KONG) COMPANY LIMITED
_____
Authorized Signature(s)
Date: 13 APRIL 2011

### SCHEDULE

Full postal address: ROOM 3201-10 32/F HONG KONG PLAZA 186 CONNAUGHT ROAD WEST HONG KONG

Facsimile no: 28577754

Telephone no: 25894167

Name and title of person to contact: MR. TIMMY YIP

Details of document(s) concerned in appointment:

Document: CONTINUING GUARANTEE    Date: 4/13/11

Parties: CHINA FISHERY GROUP LIMITED, BANK OF AMERICA, N.A.

# **<u>EXHIBIT 2</u>**



**Bank of America**
**Merrill Lynch**

**REGISTERED & CONFIDENTIAL**                                    August 26, 2014

Pacific Andes Enterprises (BVI) Limited
Parkmond Group Limited
PARD Trade Limited

Room 3201-10 Hong Kong Plaza
186 Connaught Road West
Hong Kong

Attention:        Mr. Dennis Chan
                  Financial Controller

Dear Sirs,

We are pleased to inform you that we will consider requests by you for the facilities ("**Facilities**")
specified in the Schedule to this Letter ("**Schedule**") up to, if applicable, an aggregate principal
amount not exceeding at any time the Total Facility Amount (as defined in the Schedule) (or the
equivalent, at our spot selling rates for the time being, in other currencies) on the terms and conditions
set out in this Letter.  This is a general statement of the terms applicable to the Facilities, if extended,
and is not a commitment to extend any financing to you.  The terms set out in this Letter supersede
and replace those set out in our letter of January 27, 2014.

1.        **Facilities**

(a)       The Facilities are more particularly set out in the Schedule, in each case up to the individual
          limit (if specified) set opposite the description of the relevant Facility in the Schedule.

(b)       Borrowings and other utilizations in any currency are subject to availability of funds in that
          currency at the time the borrowings or utilizations are requested.

2.        **Applications for Facilities**

(a)       The Facilities are subject to review by us on a periodic basis. We reserve the right to increase,
          reduce or cancel the Facilities or any part of it and/or vary the types of Facilities or
          instruments under any type of Facilities made available to you under this Letter at any time
          without prior notice to, or consent from, you.  We will, however, notify you as soon as
          reasonably practicable after such change has been effected.

(b)       Each application by you to use any of the Facilities in whole or in part shall be a request by
          you to us to extend financing on the terms set out or referred to in this Letter.  No
          commitment by us to extend financing shall arise under this Letter until any application by
          you is accepted by us either expressly or by our extending such financing to you.

(c)       Such applications shall be made, where applicable, on our standard forms and supported by
          such documentation (in form and substance satisfactory to us) as we may require.

(d)       No applications by you to use any of the Facilities will be accepted by us unless you comply
          with the terms set out or referred to in this Letter and such other conditions as we may
          determine from time to time.

T 852.3508.8888

Bank of America, N.A.
52/F, Cheung Kong Center
2 Queen's Road Central, Central, Hong Kong

A company wholly owned by Bank of America Corporation

**Bank of America**
**Merrill Lynch**

3.    **Security**

(a)    Your obligations in respect of the Facilities shall be secured or supported by an unconditional 100% continuing guarantee executed by Pacific Andes Resources Development Limited (**"Guarantor"**) in form and substance satisfactory to us.

(b)    You consent that we may provide the security provider or guarantor (as the case may be) with any information in relation to the Facilities or any outstanding thereunder and/or financial information in relation to you, including without limitation the following documents:

    (i)    a copy or summary of the contract evidencing the obligations to be guaranteed or secured;

    (ii)    a copy of any demand for overdue payment that is sent to you in the case where you have failed to settle any overdue amount; and

    (iii)    upon request from the security provider or guarantor, a copy of the latest statement of account provided to you, if any.

4.    **Undertakings**

(a)    *Pari passu ranking:* You must procure that all your obligations in connection with the Facilities will at all times rank at least pari passu in terms of security and support (including third party) with all your other short-term present and future obligations, except for obligations mandatorily preferred by law applying to companies generally.

(b)    *Accounts:* You must provide your annual audited financial statements within 8 months after end of financial period and will promptly provide any other information which we may request.

You must provide the annual audited consolidated and semi-annual unaudited financial statements of your Guarantor within 120 days and 90 days after the end of financial period and will promptly provide any other information which we may request.

5.    **Expenses**

(a)    You shall pay all costs and expenses (including legal fees of both internal and external legal advisers) incurred by us in connection with the preparation, perfection, performance or enforcement of or preservation of rights under this Letter or any security provided by you or any third party in respect of your obligations to us.

(b)    You shall pay all taxes, reserves and fees payable in respect of this Letter or the transactions contemplated by it.

6.    **Interests and charges**

Any financing extended by us will be subject to interest rates, commissions and/or other charges determined by us from time to time.

2

A company wholly owned by Bank of America Corporation

**Bank of America**
**Merrill Lynch**

7.    **Other conditions**

The Facilities shall be subject to:

(a)    the terms of the General Agreement for Commercial Business entered into between you and us (and if more than one has been entered into, the latest one); and

(b)    the terms and conditions set out in all current standard agreements and other documentation signed by you or on your behalf in respect of the credit and other banking facilities and banking services granted or continued by us to you.

(c)    execution of Bank's Standard documentation.

(d)    each Facility and its related interest and charges shall be repaid or paid in the currency disbursed or incurred.

8.    **Amendments**

(a)    No provision of this Letter may be amended except by an instrument in writing signed by us.

(b)    Our rights under this Letter may be exercised as often as necessary, are cumulative and not exclusive of our rights under the general law and may be waived only in writing and specifically.  Delay in exercising or non-exercise of any such right is not a waiver of that right.

9.    **Joint and several liability**

If this Letter is addressed to more than one person, each addressee accepting the terms and conditions set out in this Letter is jointly and severally liable with the other addressee accepting the same.  The obligations and liabilities of each addressee shall take effect immediately upon its acceptance of the terms and conditions of this Letter, whether or not any other addressee accepts the same.

10.    **Governing Law**

This Letter is governed by and construed in accordance with the laws of the Hong Kong Special Administrative Region.

11.    **Jurisdiction**

(a)    You agree that the courts of Hong Kong have jurisdiction to settle any disputes in connection with this Letter and accordingly submit to the non-exclusive jurisdiction of the Hong Kong courts.

(b)    Without prejudice to any other mode of service, you:

(i)    irrevocably appoint Pacific Andes Food (Hong Kong) Company Limited having its registered office at Room 3201-10, Hong Kong Plaza, 186 Connaught Road West, Sai Ying Pun, Hong Kong as your agent for service of process in relation to any proceedings before the Hong Kong courts in connection with this Letter;

(ii)    agree that failure by a process agent to notify you of the process shall not invalidate the proceedings concerned; and

3



**Bank of America**
**Merrill Lynch**

(iii)    agree that if the appointment of any person mentioned in sub-paragraph (i) above ceases to be effective, you shall immediately appoint a further person in Hong Kong to accept service of process on your behalf in Hong Kong and, failing such appointment within 15 days, we are entitled to appoint such person by notice to you.

Please confirm your agreement to the terms and conditions of this Letter by signing and returning to us (marked for the attention of "**Angel Kwan – Director**") the enclosed duplicate copy of this Letter at your earliest convenience.

Yours faithfully,
for and on behalf of
BANK OF AMERICA, N.A.

...................................................................          ..p.p.....................................................
Cordelia Chan                                                            Angel Kwan
Managing Director                                                        Director

4

A company wholly owned by Bank of America Corporation



**Bank of America**
**Merrill Lynch**

<u>Borrowers</u>

We confirm our agreement to the terms and conditions set out above:

For and on behalf of
Pacific Andes Enterprises (BVI) Limited

*For and on behalf of*
**PACIFIC ANDES ENTERPRISES (BVI) LIMITED**

Authorized Signature(s)

Name:  NG JOO SIANG
Title:  DIRECTOR
       28 AUG 2014
Dated...........................................

For and on behalf of
Pacific Andes Enterprises (BVI) Limited

*For and on behalf of*
**PACIFIC ANDES ENTERPRISES (BVI) LIMITED**

Authorized Signature(s)

Name: NG JOO PUAY, FRANK
Title: DIRECTOR
       28 AUG 2014
Dated...........................................

For and on behalf of
Parkmond Group Limited

*For and on behalf of*
**PARKMOND GROUP LIMITED**

Authorized Signature(s)

Name:  NG JOO SIANG
Title:  DIRECTOR
       28 AUG 2014
Dated...........................................

For and on behalf of
Parkmond Group Limited

*For and on behalf of*
**PARKMOND GROUP LIMITED**

Authorized Signature(s)

Name: NG JOO PUAY, FRANK
Title: DIRECTOR
Dated 28 AUG 2014

For and on behalf of
PARD Trade Limited

*For and on behalf of*
**PARD   Trade   Limited**

Authorized Signature(s)

Name:  NG JOO SIANG
Title:  DIRECTOR
       28 AUG 2014
Dated...........................................

For and on behalf of
PARD Trade Limited

*For and on behalf of*
**PARD   Trade   Limited**

Authorized Signature(s)

Name: NG JOO PUAY, FRANK
Title: DIRECTOR
Dated 28 AUG 2014

5

A company wholly owned by Bank of America Corporation



<u>Guarantor</u>

We confirm our agreement to the terms and conditions set out above:

For and on behalf of
Pacific Andes Resources Development
Limited

*For and on behalf of*
**PACIFIC ANDES RESOURCES DEVELOPMENT LIMITED**

...........................................................
**Authorized Signature(s)**
Name:   NG JOO SIANG
Title:   DIRECTOR
         28 AUG 2014
Dated....................................

For and on behalf of
Pacific Andes Resources Development
Limited

*For and on behalf of*
**PACIFIC ANDES RESOURCES DEVELOPMENT LIMITED**

...........................................................
**Authorized Signature(s)**
Name:   NG JOO PUAY, FRANK
Title:   DIRECTOR
         28 AUG 2014
Dated....................................

DUPLICATE

6

A company wholly owned by Bank of America Corporation



**Bank of America** ⩘
**Merrill Lynch**

### Schedule – Facilities

**Total Facility Amount: <u>US$15,000,000</u>**

| **<u>Facility:</u>** | **Individual Limit** |
|---|---|
| (available to Pacific Andes Enterprises (BVI) Limited, Parkmond Group Limited and PARD Trade Limited) | |
| (i)  ***Clean Advances:*** *Advances for purposes approved by us of up to 120 days from date of advance. A clean-down period of at least 3 business days is required for each individual Clean Advance Drawdown.* | <u>US$15,000,000</u> |
| *(Effective Date: January 16, 2014)* | |

DUPLICATE

7

A company wholly owned by Bank of America Corporation

To: **Bank of America,**
National Association



## GENERAL AGREEMENT FOR COMMERCIAL BUSINESS
**THIS IS AN IMPORTANT DOCUMENT. SIGN ONLY IF YOU INTEND TO BE BOUND BY IT.**

The following terms and conditions are agreed between each party signing this Agreement as customer (each a "**Customer**" and "**Customers**" means any two or more of them) and Bank of America, National Association (the "**Bank**" which includes all the branches and offices of Bank of America, National Association wherever situated, its successor and assigns), on the date specified in the Schedule to this Agreement.

**1.    Interpretation**

(a)    In this Agreement:

(i)    "**affiliate**" means, in respect of the Bank, any of its subsidiaries or associated companies or holding companies or any subsidiary or associated company of that holding company;

(ii)    "**assets**" including present and future properties, revenues and rights of every description;

(iii)    "**authorisation**" includes an authorisation, consent, approval, resolution, licence, exemption, filing, registration and notarisation;

(iv)    "**Bank of America Group**" means the Bank and its affiliates;

(v)    a provision of law is a reference to that provision as amended or re-enacted;

(vi)    a Clause, Schedule or an Annex is a reference to a clause of or a schedule or annex to this Agreement;

(vii)    a person includes its successors and assigns;

(viii)    unless the context otherwise requires, words importing the singular include the plural and vice versa and the neuter gender includes the other genders;

(ix)    each of the rights, powers and remedies given to the Bank by this Agreement are in addition to all other rights, powers and remedies given it or by virtue of any other security, statute or rule of law;

(x)    the liabilities and obligations of the Customer to the Bank include all its past, present and future, actual and contingent liabilities and obligations to the Bank; and

(xi)    a document is a reference to that document as amended or supplemented.

(b)    If this Agreement is signed by more than one person as Customer, the obligations of each Customer under this Agreement are joint and several.

(c)    This Agreement is a continuing agreement and all the rights, powers and remedies under this Agreement shall apply to all the Customer's obligations to the Bank notwithstanding any event affecting the capacity of the Customer to be bound by this Agreement.

(d)    The headings in this Agreement are for convenience only and are to be ignored in construing this Agreement.

**2.    Repayment on demand and cancellation**

(a)    (i)    The Customer shall on demand pay to the Bank all moneys which are now, or will in the future become, owing to the Bank by the Customer (whether as principal or surety, alone or jointly with any other person); and

(ii)    upon such demand being made, all credit and other facilities and accommodation granted to the Customer by the Bank shall be automatically cancelled.

(b)    The Customer shall, immediately upon request by the Bank, execute and deliver to the Bank promissory note(s) payable on demand for the total amount owing to the Bank by the Customer.

(c)    All payments to be made by the Customer shall be made without any deduction or withholding for or on account of any tax unless the deduction or withholding is required by law. If any tax or amounts in respect of tax must be deducted, or any other deduction must be made, from any amount payable or paid by the Customer, it shall pay such additional amounts as may be necessary to ensure that the Bank receives a net amount equal to the full amount which it would have received had payment not been made subject to tax or any other deduction. The Customer shall pay all taxes or similar charges due with respect to all payments made by the Customer to the Bank and shall provide the Bank with evidence satisfactory to the Bank that each such payment has been paid to the relevant taxing authority within the time allowed by law.

**3.    Security**

(a)    The Bank holds all assets of the Customer (including those assets held to the Bank's order or for account of the Customer (whether for safe custody, collection, security or for any specific purpose or generally)) as continuing security for the payment and discharge of all the Customer's obligations to the Bank.

(b)    The Bank may (at any time, without prior notice to the Customer or any other person and in such manner as the Bank thinks fit) sell, dispose of or otherwise deal with any of the assets of the Customer the subject of the security created by this Agreement.

(c)    The Bank may apply the net proceeds of any sale, disposition or dealing pursuant to paragraph (b) above in or towards discharge of the Customer's obligations to the Bank.

(d)    The Customer shall maintain insurance cover against losses or damages with financially sound and reputable insurers acceptable to the Bank with respect to the assets of the Customer the subject of the security created by this Agreement.

(e)    The Customer shall, immediately upon request by the Bank:

(i)    execute and deliver to the Bank one or more security documents in form and substance satisfactory to the Bank over any of the Customer's assets as the Bank specifies in any such request;

(ii)    register or procure the registration of the security interest created under this Agreement with the appropriate authority(ies); and

(iii)    provide such further security in such form as may be required by the Bank and in amounts and/or values sufficient in the opinion of the Bank to secure any of the Customer's obligations to the Bank.

**4.    Interest**

(a)    The Customer acknowledges the Bank's policy on interest rates and that no single rate of interest can be fixed on any sum(s) owing by it to the Bank from time to time as the rate of interest in each case will depend on circumstances including the type of transaction involved, the credit risk involved and the general interest rates applicable at the time of such transaction.

(b)    The Bank may charge interest on any sum(s) outstanding or owing by the Customer from time to time. In the absence of express agreement, such interest shall accrue, be calculated and become due and payable on such bases and shall be compounded in such manner as the Bank may determine in its absolute discretion.

(c)    The Bank may charge default interest (at such rate or rates as the Bank may reasonably determine) on any moneys not paid by the Customer when due. The obligation of the Customer to pay default interest on overdue amount shall continue until all sums owing by the Customer to the Bank have been irrevocably paid in full.

**5.    Drawing**

If the Bank permits the Customer to draw against funds to be collected or transferred from any account(s), the Customer shall on demand reimburse the Bank in full the amount so drawn if the Bank does not receive the funds in full at the time when the Bank ought to have received the same or if, after the Bank has accepted the transfer, the Bank is prevented from collecting or freely dealing with the funds in accordance with usual banking practice.

**6.    Cheque discounting**

(a)    If the Bank agrees to enter into discounting arrangements with the Customer or into any arrangements involving the purchase by the Bank of bills of exchange and/or other negotiable instruments, the Customer agrees to guarantee the full payment at maturity of all cheques or other negotiable instruments discounted or purchased by the Bank under such arrangements.

(b)    The Customer shall, immediately upon request by the Bank, enter into or procure the entering into of such further guarantee(s) and/or indemnity(ies) in connection with the arrangement referred to in paragraph (a) above.

(c)    The Customer waives the requirement for the Bank to give notice of dishonour and/or to note and protest any dishonoured cheques or negotiable instruments to which the Customer is a party and of which the Bank is holder.

**7.    Undertakings**

The following undertakings remain in force from the date of this Agreement for so long as any amount is or may be owing by the Customer to the Bank:

(a)    *Accounts:* The Customer shall, immediately upon request by the Bank, supply to the Bank the latest audited financial statements of the Customer (consolidated in the case of the Customer having subsidiaries).

(b)    *Changes to financial conditions:* The Customer shall, immediately upon occurrence, supply any information regarding any significant changes in the financial condition of the Customer.

(c)    *Further assurances:* The Customer shall, at its own expense, take whatever action the Bank may require for perfecting the Bank's title to any goods and documents in connection with which any service is performed by the Bank and for vesting the same in any purchaser from the Bank or otherwise to carry out the transactions contemplated by this Agreement.

**8.    Evidence and calculations**

Any certification or determination by the Bank of a rate or amount under this Agreement is, in the absence of manifest error, conclusive evidence of the matters to which it relates.

**9.    Foreign currency transactions**

(a)    **Currency conversion:** If, in any foreign currency transaction entered into between the Bank and the Customer, the Bank has made a payment in one currency (the **"first currency"**), the Customer shall settle such transaction on the agreed date (the **"Settlement Date"**) in such other currency (the **"second currency"**) as is agreed between them by paying to the Bank an amount in the second currency equivalent to the amount paid by the Customer calculated at the Bank's spot rate of exchange prevailing at such time on the Settlement Date as the Bank may in its absolute discretion determines for the purchase of the second currency with the first currency.

(b)    **Payments on behalf of the Customer:** In any foreign currency transaction entered into by the Bank on behalf of the Customer, the Bank is not obliged to pay an amount in one currency or to the order of the Customer on any agreed Settlement Date unless and until the Bank has received from the Customer on the Settlement Date the agreed amount in such other currency as may be agreed between them.

(c)    **Approvals:** The Customer shall obtain all necessary authorisations for any foreign currency transaction with the Bank and the Customer agrees that performance of the Bank's obligations in respect of such transaction is at all times subject to compliance in such manner as the Bank may think fit with any exchange control or other restrictions or rules from time to time in force in any relevant jurisdiction.

(d)    **Currency indemnity:**

(i)    If the Bank receives an amount in respect of the Customer's liability to the Bank or if that liability is converted into a claim, proof, judgment or order in a currency other than the currency (the **"contractual currency"**) in which the amount is expressed to be payable:-

(A)    the Customer shall indemnify the Bank as an independent obligation against any loss or liability arising out of or as a result of the conversion;

(B)    if the amount received by the Bank, when converted into the contractual currency at a market rate in the usual course of its business is less than the amount owed in the contractual currency, the Customer shall forthwith on demand pay to the Bank an amount in the contractual currency equal to the deficit; and

(C)    the Customer shall pay to the Bank forthwith on demand any exchange costs and taxes payable in connection with any such conversion.

(ii)    the Customer waives any right it may have in any jurisdiction to pay any amount owing to the Bank in a currency other than that in which it is expressed to be payable.

10. **Indemnity**

(a)     The Customer shall indemnify the Bank against any liability, cost, expense or loss incurred by the Bank in connection with this Agreement or any transactions contemplated by this Agreement, other than those liabilities or losses arising directly from the Bank's gross negligence or wilful misconduct.

(b)     The Customer shall, immediately upon request by the Bank, appear in and defend at its own cost and expense any action which may be brought against the Bank in connection with this Agreement.

11. **Exoneration**

(a)     The Bank shall not be liable to the Customer for any action taken or not taken by it under this Agreement unless directly caused by the Bank's gross negligence or wilful misconduct.

(b)     Notwithstanding that the Customer may have given instructions to the contrary, the Bank shall not be liable to the Customer for any loss or damage which may be caused by the Bank acting in accordance with applicable laws, regulations or rules (including rules and regulations of the various payment systems), or with the terms of the Bank's agreements with other banks or financial institutions regarding the transaction of business with those banks or institutions.

12. **Expenses**

The Customer shall pay all costs and expenses (including legal fees of both internal and external legal advisers) incurred by the Bank in connection with the preparation, perfection, performance or enforcement of or preservation of rights under this Agreement or any security provided by the Customer or any third party in respect of the Customer's obligations to the Bank.

13. **Waivers**

The rights of the Bank under this Agreement:-

(a)     may be exercised as often as necessary;

(b)     are cumulative and not exclusive of its rights under the general law; and

(c)     may be waived only in writing and specifically.

Delay in exercising or non-exercise of any such right is not a waiver of that right.

14. **Set-off**

(a)     The Bank may set off any matured obligation owed by the Customer to the Bank (to the extent beneficially owned by the Bank) against any obligation (whether or not matured) owed by the Bank to the Customer, regardless of the place of payment, the branch through which the Bank is acting or currency of either obligation.

(b)     If the obligations referred to in paragraph (a) above are in different currencies, the Bank may convert either obligation at a market rate of exchange in its usual course of business for the purpose of the set-off.

(c)     If any of the obligations referred to in paragraph (a) above is unliquidated or unascertained, the Bank may set off in an amount estimated by it in good faith to be the amount of that obligation.

15. **Confidentiality**

(a)     Any personal data (as defined in the Personal Data (Privacy) Ordinance (Cap. 486, Laws of Hong Kong)) which the Customer provides to the Bank shall be treated in accordance with the "Bank's Personal Data (Privacy) Ordinance Notification" from time to time provided to the Customer and which is incorporated in this Agreement by this reference.

(b)     The Customer acknowledges and agrees that the Bank may disclose and transfer from time to time all information in connection with this Agreement or other information in respect of the Customer, the Customer's accounts, business or transaction with the Bank, provided to the Bank by the Customer or otherwise known to the Bank (including personal data) ("Customer Information") (i) to the head office, any branch, subsidiary, affiliate, associate, related company, staff, agent and representative of the Bank or any other member of the Bank of America Group, (ii) to its accountants, auditors, internal and external legal counsel, (iii) to any actual or proposed assignee, transferee, participant or sub-participant of the Bank under or in connection with this Agreement, any other agreement or all or any part of the assets or business of the Bank or the Bank of America Group, (iv) to any banking, supervisory or regulatory authority having jurisdiction over the Bank or any member of the Bank of America Group or (v) if required or permitted to do so by any law, regulation or court order.

(c)     Paragraph (a) does not apply if the Customer is a limited liability company.

16. **Notice to Customer**

(a)     All notices or other communications in connection with this Agreement are to be sent at the Customer's risk. The Bank does not assume any responsibility for any inaccuracy, interruption, error or delay or total failure in transmission or delivery by post, facsimile or other written form of electronic communication.

(b)     All notices or other communications from the Bank to the Customer must be given in writing and unless otherwise stated, may be made by letter or facsimile. Any such notice shall be deemed to be given as follows:-

(i)     if by letter, when delivered personally or, when sent by prepaid post, two working days following that on which it was so posted; and

(ii)     if by facsimile, when confirmed by an activity report confirming the facsimile number to which such notice was sent, the number of pages transmitted and that such transmission was successfully completed.

(c)     The address and facsimile number of the Customer for all notices under or in connection with this Agreement are:-

(i)     those set out in the Schedule; or

(ii)     any other notified by the Customer for this purpose to the Bank by not less than 5 working days' notice.

17.   **Notice to the Bank**

Any notice by the Customer to the Bank must be given in writing and may only be sent by personal delivery or by post addressed to the manager of the branch of the Bank through which the relevant banking services are provided to the Customer and shall only be effective when actually received.

18.   **Severability**

If a provision of this Agreement is or becomes illegal, invalid or unenforceable in any jurisdiction, that shall not affect:-

(a)   the validity or enforceability in that jurisdiction of any other provision of this Agreement; or

(b)   the validity or enforceability in other jurisdictions of that or any other provision of this Agreement.

19.   **Variation**

The Bank may by notice to the Customer vary, amend or supplement the terms and conditions of this Agreement and such variation, amendment or supplement shall take effect as between the Customer and the Bank on the date of the notice setting out the details of such variation, amendment or supplement or, if later, the date specified in the notice.

20.   **Conflict of terms**

In the event of any conflict or inconsistency between the provisions of this Agreement and any provisions of any agreement between the Customer and the Bank, the latter shall prevail.

21.   **Partnership**

(a)   If the Customer is carrying on business in partnership, the dissolution of the partnership for any reason shall not affect the liabilities of the Customer as partner(s) until the Bank receives written notice from the Customer to such effect but no notice shall affect the Customer's liability for any transaction made with the Bank prior to the Bank's receipt of such notice.

(b)   In case of the death of a partner, the liability of the estate of the deceased partner to the Bank shall cease only with regard to transactions made with the Bank subsequent to the receipt by the Bank of written notice of the death of the deceased partner.

22.   **Successors and assigns**

This Agreement shall operate for the benefit of the Bank and its successors and assigns, notwithstanding any change by way of amalgamation, consolidation or otherwise in the constitution of the Bank or of any such successor or assigns. The Bank may assign or transfer all or any of its rights, interest and benefits under this Agreement and any transactions to which this Agreement relates and/or the goods, documents and other properties in respect of which the Bank has a security interest and may deliver the same to the assignee(s) or transferee(s), who shall thereupon become vested with all the rights and powers in respect thereof which were formerly vested with the Bank. The Bank shall be released and discharged from any liability or responsibility in respect of the goods, documents or other properties so assigned or transferred, but shall retain all its rights and powers of the goods, documents or other properties not so assigned or transferred.

23.   **Further obligations**

Nothing in this Agreement requires the Bank to give or to continue to give any credit to the Customer or to perform or continue to perform any service for the Customer.

24.   **Trade Finance Annex**

The Trade Finance Annex to this Agreement forms part of this Agreement unless the Customer otherwise specifies in the Schedule.

25.   **Governing law**

This Agreement is governed by and construed in accordance with the laws of Hong Kong Special Administrative Region ("**Hong Kong**").

26.   **Jurisdiction**

(a)   The Customer agrees that the courts of Hong Kong have jurisdiction to settle any disputes in connection with this Agreement and accordingly submits to the non-exclusive jurisdiction of the Hong Kong courts.

(b)   If the Customer is not ordinarily resident in Hong Kong nor a company incorporated under the laws of Hong Kong nor a foreign company registered under section 333 of the Companies Ordinance (Cap.32, Laws of Hong Kong), without prejudice to any other mode of service, the Customer:-

(i)   irrevocably appoints a company incorporated in Hong Kong and specified in the Schedule as its agent for service of process in relation to any proceedings before the Hong Kong courts in connection with this Agreement;

(ii)   agrees that failure by a process agent to notify the Customer of the process shall not invalidate the proceedings concerned; and

(iii)   agrees that if the appointment of any person mentioned in paragraph (i) above ceases to be effective, the Customer shall immediately appoint another company incorporated in Hong Kong to accept service of process on its behalf in Hong Kong and, failing such appointment within 15 days, the Bank is entitled to appoint such person by notice to the Customer.

## TRADE FINANCE ANNEX

**1.    Interpretation**

(a)    In this Annex:

"**Discrepancies**" has its meaning defined in Clause 6(b) of this Annex.

"**Documents**" means any documents, drafts and/or bill of exchange.

(b)    For the avoidance of doubt:

(i)    "**assets**" as used in this Agreement also includes all goods, bills of exchange, promissory notes and negotiable instruments of any description, all bills of lading, dock warrants, delivery orders, warehouse warrants and receipts and other documents of title or documents relating to goods; and

(ii)    the obligations of the Customer under Clause 10 (Indemnity) cover any liability, cost, expense or loss incurred by the Bank in connection with any guarantee or indemnity given by it as contemplated in this Annex.

**2.    Letters of credit**

All letters of credit issued or to be issued by the Bank at the request of the Customer are subject to the Bank's usual terms and conditions generally applicable in the geographical area where such credit is to be established.

**3.    Trust receipt**

The Bank may deliver or cause to be delivered to the Customer any goods or documents relating to goods pledged to the Bank or over which the Bank has a lien.  On the Bank's delivery of such goods or documents, the Customer shall execute and deliver to the Bank trust receipts in form and substance acceptable to the Bank together with such other documents as the Bank may require.

**4.    Collection**

If the Bank:

(a)    makes any collection on any Documents at the request of the Customer and credit has been given by the Bank to the Customer against those Documents; or

(b)    accepts any Documents as cash settlement of any of the Customer's obligations to the Bank,

such credit or settlement shall be conditional upon the Bank's receipt of full payment in immediately available and freely disposable funds on the relevant Documents, failing which the Customer shall reimburse the Bank on demand the full amount of the credit so given or settlement so made.

**5.    Pre-export Loan**

(a)    If the Customer applies for a pre-export loan from the Bank, the Customer undertakes to present to the Bank the Documents for negotiation properly drawn and conforming to the terms of the letter of credit referred to in such application as soon as available and in any case not later than the date fixed in the Customer's application as approved by the Bank.

(b)    If the Customer does not deliver the Documents to the Bank on or before the date referred to in paragraph (a) above, the Customer shall immediately pay to the Bank in full all advances made by the Bank pursuant to the relevant pre-export loan together with interest accrued on them.

**6.    Negotiation and purchase of documents and drafts relating to letters of credit**

If the Bank, upon the request of the Customer:

(a)    makes payments in negotiating or purchasing from the Customer any Documents relating to letters of credit; and

(b)    discrepancies exist between the Documents presented and the terms of the applicable letters of credit ("**Discrepancies**"),

the Customer agrees to refund to the Bank, immediately upon demand by the Bank, all moneys paid by the Bank in respect of such Documents.

**7.    Guarantee or indemnity issued in connection with Letters of Credit**

(a)    The Bank may, but is not obliged to, at the request of the Customer, countersign or issue or authorise its correspondents to countersign or issue letters of guarantee or letters of indemnity covering Discrepancies.

(b)    The Customer shall, immediately upon demand, pay to the Bank all moneys paid by the Bank arising out of the non-acceptance of or the non-payment in connection with any Documents.

**8.    Guarantee or indemnity covering release of goods**

(a)    The Bank may, but is not obliged to, at the request of the Customer, countersign or issue letters of guarantee or letters of indemnity covering the release of goods without production to shipping companies and/or their agents and/or forwarding agents of the relevant bills of lading or other documents of title.

(b)    The Customer further undertakes that:

(i)    it will use its best efforts to obtain the bills of lading and/or other documents of title to the goods referred to in paragraph (a) above; and

(ii)    upon receipt of the bills of lading and/or other documents of title referred to in paragraph (a) above, the Customer shall deliver them to the Bank and procure the release of the Bank from any guarantee or indemnity given by it under paragraph (a) above and the return of the relevant guarantee or indemnity to the Bank for cancellation.

(c)    The Customer authorises the Bank to endorse in the Customer's name all relevant bills of lading so that such bills of lading may be delivered directly by the Bank to shipping companies and/or their agents and/or forwarding agents.

(d)    In the case of shipments under letters of credit and in order to facilitate the endorsement by the Bank under paragraph (c) above, the Customer shall disregard all Discrepancies and accept all the Documents presented under the relevant letter of credit.

**9.    Cash cover for guarantees and indemnities**

The Customer shall, on demand by the Bank, deposit with the Bank such sum or sums equal to the Bank's obligations in respect of the letters of credit, letters of guarantee or letters of indemnity given by the Bank without regard to whether the Bank has been demanded to pay under the letters of credit, letters of guarantee or letters of indemnity during the time the liabilities under such letters of credit, letters of guarantee or letters of indemnity are outstanding until they are released and returned to the Bank.

**10.    Location of goods**

The Customer shall immediately upon request by the Bank from time to time provide the Bank with written details of all of the goods of the Customer whether or not in its possession or stored in warehouses or godowns or elsewhere or in the possession of persons other than the Customer together with the details of the location of such goods.

**11.    Insurance**

(a)    The Customer shall maintain insurance cover against losses or damages with financially sound and reputable insurers acceptable to the Bank with respect to the goods, shipping documents, warrants, documents of title and other items of value in connection with any business the Customer may have with the Bank.

(b)    The amount due under any insurance maintained by the Customer under paragraph (a) above shall be paid to:

(i)    in the case of loss or destruction, the Bank; and

(ii)    in the case of damage, unless otherwise agreed by the Bank, be applied in repairing or reinstating the insured property.

(c)    The Customer authorises the Bank to collect the amounts due under any policy or policies of insurance.

(d)    The Customer shall, immediately upon request, lodge with the Bank all evidence of such insurance (including policies and premium receipts) with the Bank's interest in such insurance duly endorsed.

(e)    If the Customer fails to effect or maintain any such insurance or in producing any policy to the Bank or if any insurance effected by the Customer is, in the Bank's opinion, insufficient, the Bank may effect such insurance and in such sum as it thinks fit. All moneys expended by the Bank for such insurance shall be paid forthwith to the Bank by the Customer.

**12.    Exoneration**

(a)    Neither the Bank nor any of its agents shall be responsible for:

(i)    the discrepancy, description, quality, quantity, value or delivery of any goods;

(ii)    the correctness, genuineness, regularity or validity of any Documents;

(iii)    general or particular conditions stipulated in any Documents; or

(iv)    any delay or deviation from instructions relating to shipments.

(b)    The Bank and/or its agent, acting bona fide and in accordance with its normal policy or practice, is entitled to honour drafts drawn under any letter of credit opened by the Bank at the request of the Customer notwithstanding that the Bank and/or its agents is not obliged or should refuse under such letter of credit and/or the applicable edition of the Uniform Customs and Practice for Documentary Credits to honour such drafts on the ground that there are Discrepancies.

(c)    The existence of Discrepancies of any nature whatsoever shall not affect in any way the Customer's liabilities to the Bank in respect of or arising out of such letter of credit.

(d)    The Bank is not responsible for any goods, documents or items in its possession beyond the exercise of reasonable care and is not liable in any way for the default or negligence of any duly selected agent or correspondent or for any loss in transit.

(e)    The Bank further agrees that in receiving any items for deposit or collection, the Bank assumes no responsibility for them beyond the exercise of reasonable care and the Bank shall not be liable in any way whatsoever for the default or negligence of any duly selected agent or correspondent or for any loss in transit.

**13.    Expenses**

(a)    The Customer shall pay freight, landing and storage charges and all other charges and expenses incurred or to be incurred in connection with any business between the Bank and the Customer.

(b)    The Customer shall, immediately upon demand by the Bank, provide the Bank with funds to meet all charges and disbursements including commission, interest and charges.

**SCHEDULE**

Date of this Agreement:

| Date of this Agreement: | 13 APRIL 2011 |

Details of Customer:

Name(s): (1) PACIFIC ANDES ENTERPRISES (BVI) LIMITED   (2) PARKMOND GROUP LIMITED

(3) PARD TRADE LIMITED   (4)

Type: Sole Trader/Partnership/Limited Liability Company/Partnership (please delete as applicable)

Address: ROOM 3201-10 32/F HONG KONG PLAZA 186 CONNAUGHT ROAD WEST HONG KONG

Facsimile: 28577754

Trade Finance Annex (please see Clause 24):

The Trade Finance Annex does not form part of this Agreement

(if applicable, ALL signatories of the Customer to initial here)

Details of Process Agent of the Customer (if applicable - see Clause 26 (b)):

Name of Company: PACIFIC ANDES FOOD (HONG KONG) COMPANY LIMITED

Registered office in Hong Kong: ROOM 3201-10 32/F HONG KONG PLAZA 186 CONNAUGHT ROAD WEST HONG KONG

Facsimile: 28577754

For and on behalf of
**PARD Trade Limited**

For and on behalf of
PACIFIC ANDES ENTERPRISES (BVI) LIMITED
Customer

************************

Authorized Signature(s)

For and on behalf of
PARKMOND GROUP LIMITED

Authorized Signature(s)

Authorized Signature(s)

(1)          (2)

(3)          (4)

Print name(s) of signatory(ies): (1) NG JOO SIANG AND   (2) NG JOO SIANG AND
NG JOO PUAY, FRANK      NG JOO PUAY, FRANK

(3) NG JOO SIANG AND   (4)
NG JOO PUAY, FRANK

Witness Signature:

Print Witness Name:   YIP KWOK KUEN

The Bank

For and on behalf of
Bank of America, National Association

Authorised signatory

# b104

To: **Bank of America,**
National Association
Incorporated in U.S.A. with Limited Liability


**Bank of America**

## CONTINUING GUARANTEE

THIS IS AN IMPORTANT DOCUMENT. SIGN ONLY IF YOU INTEND TO BE BOUND BY IT

The following terms and conditions are agreed between the person(s) executing this Guarantee as guarantor (the "**Guarantor**") and Bank of America, National Association (the "**Bank**" which includes all the branches and offices of Bank of America, National Association wherever situated and its successors and assigns) on the date specified in the Schedule to this Guarantee.

**1.   Interpretation**

(a)   In this Guarantee:

   (i)    "**Debtor**" means the person(s) identified as such in the Schedule;

   (ii)    "**Guaranteed Obligations**" means, in respect of a Debtor, all past, present and future liabilities of whatever nature of that Debtor to the Bank whether actual, contingent, joint and/or several or otherwise;

   (iii)    "**Limit**" means, in respect of a Debtor, the amount specified as such opposite its name in the Schedule or, in respect of all Debtors, the amount specified as such opposite the reference to "all Debtors" in the Schedule;

   (iv)    a Clause or Schedule is a reference to a clause of or a schedule to this Guarantee;

   (v)    a person includes an individual, a company, partnership or body unincorporate and its successors and assigns;

   (vi)    unless the context otherwise requires, words importing the singular include the plural and vice versa and the neuter gender includes the other genders;

   (vii)    a document is a reference to that document as amended and supplemented; and

   (viii)    if the Bank considers that a payment in respect of any Guaranteed Obligation is capable of being avoided or otherwise set aside on the bankruptcy, liquidation or administration or supervision of the person making that payment or otherwise, then that amount shall not be considered to have been irrevocably paid for the purposes of this Guarantee.

(b)   If this Guarantee is executed by more than one person as Guarantor, the obligations of each Guarantor under this Guarantee are joint and several.

(c)   The headings in this Guarantee are for convenience only and are to be ignored in construing this Guarantee.

(d)   Where the Debtor or the Guarantor consists of partners, trustees or joint account holders, references to the Debtor or the Guarantor, where the context admits, are references to the persons who constitute the Debtor or, as the case may be, the Guarantor for the time being.

**2.   Guarantee**

For good and valuable consideration, receipt of which is acknowledged, the Guarantor irrevocably and unconditionally:

   (a)    as principal obligor guarantees to the Bank prompt performance by each Debtor of all its Guaranteed Obligations;

   (b)    undertakes with the Bank that whenever a Debtor does not pay any amount when due in connection with any of its Guaranteed Obligations, the Guarantor will immediately on demand by the Bank pay that amount as if the Guarantor instead of that Debtor were expressed to be the principal obligor; and

   (c)    indemnifies the Bank on demand against any loss or liability suffered by it if any of the Guaranteed Obligations is or becomes unenforceable, invalid or illegal.

**3.   Default interest**

If the Guarantor fails to pay in full the sum demanded from it under Clause 2 (Guarantee), the Guarantor will pay interest from the date of demand on the outstanding sum (both before and after any judgement) at the same rate as that payable (or deemed payable) by a Debtor in respect of its Guaranteed Obligations.

**4.   Limit on the amount of the Guaranteed Obligations**

(a)   This Guarantee is a guarantee for all Guaranteed Obligations but if a Limit is specified in the Schedule in respect of a Debtor or all Debtors, the amount payable by the Guarantor in respect of the Guaranteed Obligations of that Debtor or, as the case may be, all Debtors is limited to the aggregate of:

   (i)    in respect of the principal amount of those Guaranteed Obligations and subject to paragraph (b) below, the applicable Limit; and

   (ii)    interest, principal consisting of capitalised interest, commission, banking and other charges and expenses comprised in those Guaranteed Obligations which accrue or are incurred up to the date of demand against the Guarantor.

(b)   If the Limit in respect of a Debtor or all the Debtors is denominated in a currency (the "**Limit Currency**") which differs from any of the currencies in which the Guaranteed Obligations of that Debtor or, as the case may be, all the Debtors are denominated (the "**Obligation Currency**"), and any one or more of the Obligation Currencies strengthen against the Limit Currency (during the period between the date of this Guarantee and the date of payment by the Guarantor), that Limit (as denominated in the Limit Currency) will be increased in proportion to such strengthening.

(c)   For the avoidance of doubt:

   (i)    if no Limit is specified in the Schedule, the amount payable by the Guarantor in respect of the Guaranteed Obligations of any Debtor is unlimited; and

   (ii)    if no limit is specified in the Schedule in respect of a Debtor, the amount payable by the Guarantor in respect of the Guaranteed Obligations of that Debtor is unlimited.

**5.   Limit on the duration of the Guaranteed Obligations**

(a)   This Guarantee is irrevocable but the Guarantor may by notice to the Bank limit its liability under this Guarantee to those Guaranteed Obligations incurred by the Debtor before the date falling 3 months after the date on which such notice is received by the Bank (the "**Cut-off Date**").

(b)   The Guarantor will remain liable for all Guaranteed Obligations outstanding at the Cut-off Date (together with interest, commission, banking and other charges and expenses which continue to accrue in respect of those Guaranteed Obligations after the Cut-off Date) including:

   (i)    advances made by the Bank at any time pursuant to any commitment provided by it to the Debtor before the Cut-off Date;

   (ii)    any bills of exchange, cheques, promissory notes and any other instruments dated before the Cut-off Date;

   (iii)    any Guaranteed Obligations incurred before the Cut-off Date but mature after that date; and

   (iv)    any increase in those Guaranteed Obligations as a result of any bills of exchange, cheques, promissory notes and any other instruments being credited to the Debtor's account before the Cut-off Date but which are dishonoured after that date.

(c)   If there are two or more persons included in the expression "Guarantor" and the notice under paragraph (a) above has not been given by all such persons, the liability of those who have not given such notice will not be affected.

BK-45 (3.01) GP   Original kept by CS

**6.  Continuing guarantee**

(a)  This Guarantee is a continuing security and shall not be satisfied by any intermediate payment or discharge of the whole or any part of the Guaranteed Obligations of a Debtor but shall secure the ultimate balance of those Guaranteed Obligations.

(b)  If for any reason the security constituted by this Guarantee ceases to be a continuing security in respect of a Debtor, the Bank may open a new account with or continue any existing account with that Debtor and the liability of that Debtor in respect of its Guaranteed Obligations at the date of such cessation shall remain regardless of any payments in or out of any such account.

**7.  Reinstatement**

(a)  Where any discharge is made in whole or in part or any arrangement is made on the faith of any payment, security or other disposition which is avoided or must be repaid on insolvency, liquidation or otherwise without limitation, the liability of the Guarantor under this Guarantee shall continue as if the discharge or arrangement had not occurred.

(b)  The Bank may concede or compromise any claim that any payment, security or other disposition is liable to avoidance or restoration.

**8.  Representations and warranties**

(a)  The Guarantor represents and warrants to the Bank that:

(i)  the Guarantor has the legal capacity and powers to execute and perform this Guarantee and if the Guarantor is a limited liability company, it is a limited liability company, duly incorporated and validly existing under the laws of the jurisdiction of its incorporation;

(ii)  the Guarantor has taken all necessary action to authorise the entry into, performance and delivery of this Guarantee;

(iii)  this Guarantee constitutes legal, valid and binding obligations of the Guarantor in accordance with its terms;

(iv)  this Guarantee does not and will not breach any agreement by which the Guarantor is bound or, if the Guarantor is a limited liability company, its constitutional documents; and

(v)  all necessary consents and authorisations in respect of this Guarantee have been obtained and are in full force.

(b)  The representations and warranties set out in paragraph (a) above are deemed to be repeated by the Guarantor on each day during the period in which any of the Guaranteed Obligations is or may be outstanding with reference to the facts and circumstances then existing.

**9.  Preservation of the Bank's rights**

Following the discharge of all the Guaranteed Obligations of a Debtor, the Bank may retain this Guarantee and any security held by the Bank in respect of the Guarantor's liability under this Guarantee for a further period of seven months or, if the Bank or the Guarantor is an associate of a Debtor for the purposes of sections 49 to 51A of the Bankruptcy Ordinance (Cap. 6, Laws of Hong Kong), 25 months and, if that Debtor becomes insolvent during that period, the Bank may further retain this Guarantee and that security until the Bank is satisfied that the Bank will not have to make any repayment under any insolvency laws or regulations.

**10.  Arrangements with the Debtor and others; other security**

The obligations of the Guarantor under this Guarantee shall not be affected by any matter or thing which but for this provision might operate to affect such obligations including without limitation (a) any time or indulgence granted to or composition with any Debtor or any other person, (b) the taking, variation, renewal or release of, or neglect to perfect or enforce, any rights, remedies or securities against any Debtor or any other person, (c) any incapacity or lack of powers, authority or legal personality of or dissolution or change in the members or status of any Debtor or any other person or (d) any unenforceability or invalidity of any obligations of a Debtor or any other person so that this Guarantee shall be construed as if there were no such unenforceability or invalidity.

**11.  Immediate recourse**

The Guarantor waives any right it may have of first requiring the Bank to proceed against or enforce any other rights or security or claim payment from any person before claiming from the Guarantor under this Guarantee.

**12.  Suspension of Guarantor's claims against the Debtor**

(a)  Until all amounts which may be or become payable by a Debtor in connection with its Guaranteed Obligations have been irrevocably paid in full, the Guarantor will not, after a claim has been made or by virtue of any payment or performance by it under this Guarantee in respect of the Guaranteed Obligations of that Debtor:

(i)  be subrogated to any rights, security or moneys held, received or receivable by the Bank or be entitled to any right of contribution or indemnity in respect of any payment made or moneys received on account of the Guarantor's liability under this Guarantee;

(ii)  claim, rank, prove or vote as a creditor of that Debtor or its estate in competition with the Bank; or

(iii)  receive, claim or have the benefit of any payment, distribution or security from or on account of that Debtor, or exercise any right of set-off as against that Debtor.

(b)  The Guarantor warrants that it has not taken (and agrees not to take) any security from any Debtor or from any other Guarantor in relation to this Guarantee.

(c)  The Guarantor shall hold in trust for and forthwith pay or transfer to the Bank any payment or distribution or benefit of security received by it contrary to this Clause.

**13.  Appropriation and Suspense Account**

Until all amounts which may be or become payable by each Debtor in connection with its Guaranteed Obligations have been irrevocably paid in full, the Bank may:

(a)  refrain from applying or enforcing any other moneys, security or rights held or received by the Bank in respect of those amounts, or apply and enforce the same in such manner and order as it sees fit (whether against those amounts or otherwise) and the Guarantor shall not be entitled to the benefit of the same; and

(b)  hold in a suspense account any moneys received from the Guarantor or on account of the Guarantor's liability under this Guarantee, without liability to pay interest on those moneys.

**14.  Additional security**

This Guarantee is additional to and is not in any way prejudiced by, and will not prejudice, any other security or guarantee now or subsequently held by the Bank in respect of any Guaranteed Obligations.

**15.  Payment**

(a)  **Place:** All payments by the Guarantor under this Guarantee will be made to the Bank to its account at such office or bank as it may notify to the Guarantor for this purpose.

(b)  **Funds:** Payments under this Guarantee to the Bank will be made for value on the due date at such times and in such funds as the Bank may specify to the Guarantor as being customary at the time for the settlement of transactions in the relevant currency.

(c)  **No counterclaim:** All payments made by the Guarantor under this Guarantee will be made without set-off or counterclaim.

(d)  **Currency:** Amounts payable in respect of costs, expenses and taxes and the like are payable in the currency in which they are incurred. Any other amount payable in respect of any Guaranteed Obligations under this Guarantee is payable in the currency in which those Guaranteed Obligations are denominated.

**16. Currency indemnity**

(a) If the Bank receives an amount in respect of the Guarantor's liability to the Bank or if that liability is converted into a claim, proof, judgment or order in a currency other than the currency (the **"contractual currency"**) in which the amount is expressed to be payable:

    (i) the Guarantor shall indemnify the Bank as an independent obligation against any loss or liability arising out of or as a result of the conversion;

    (ii) if the amount received by the Bank, when converted into the contractual currency at a market rate in the usual course of its business is less than the amount owed in the contractual currency, the Guarantor shall forthwith on demand pay to the Bank an amount in the contractual currency equal to the deficit; and

    (iii) the Guarantor shall pay to the Bank forthwith on demand any exchange costs and taxes payable in connection with any such conversion.

(b) The Guarantor waives any right it may have in any jurisdiction to pay any amount owing to the Bank in a currency other than that in which it is expressed to be payable.

**17. Tax**

(a) All payments to be made by the Guarantor will be made free and clear of and without deduction for or on account of any tax unless it is required to make such a payment subject to the deduction or withholding of tax. If any tax or amounts in respect of tax must be deducted, or any other deductions must be made, from any amounts payable or paid by the Guarantor under this Guarantee, it will pay such additional amounts as may be necessary to ensure that the Bank receives a net amount equal to the full amount which it would have received had payment not been made subject to tax or any other deduction.

(b) The Guarantor will pay all present or future taxes or similar charges due with respect to all payments made by the Guarantor to the Bank which may be imposed by any governmental authority. The Guarantor will provide the Bank with official receipts evidencing payment of such taxes or similar charges within 30 days after the due date for each such payment.

**18. Evidence and calculation**

Any certificate or determination by the Bank of a rate or amount under this Guarantee is, in the absence of manifest error, conclusive evidence of the matters to which it relates.

**19. Expenses**

The Guarantor shall immediately on demand pay all costs and expenses (including legal fees of both internal and external legal advisers) incurred by the Bank in connection with the preparation, perfection, performance or enforcement of or preservation of rights under this Guarantee.

**20. Waivers**

The rights of the Bank under this Guarantee:

    (a) may be exercised as often as necessary;

    (b) are cumulative and are not exclusive of its rights under the general law; and

    (c) may be waived only in writing and specifically.

Delay in exercising or non-exercise of any such right is not a waiver of that right.

**21. Set-off**

(a) The Bank may set off any matured obligation owed by each Guarantor under this Guarantee to the Bank (to the extent beneficially owned by the Bank) against any obligation (whether or not matured) owed by the Bank to that Guarantor, regardless of the place of payment, the branch through which the Bank is acting or currency of either obligation.

(b) If the obligations referred to in paragraph (a) above are in different currencies, the Bank may convert either obligation at a market rate of exchange in its usual course of business for the purpose of the set-off.

(c) If any of the obligations referred to in paragraph (a) above is unliquidated or unascertained, the Bank may set off in an amount estimated by it in good faith to be the amount of that obligation.

**22. Notices to the Guarantor**

(a) All notices or other communications in connection with this Guarantee are to be sent at the Guarantor's risk. The Bank does not assume any responsibility for any inaccuracy, interruption, error or delay or total failure in transmission or delivery by post, facsimile or other written form of electronic communication.

(b) All notices or other communications from the Bank to the Guarantor must be given in writing and unless otherwise stated, may be made by letter or facsimile. Any such notice will be deemed to be given as follows:

    (i) if by letter, when delivered personally or when sent by prepaid post, two working days following that on which it was so posted; and

    (ii) if by facsimile, when confirmed by an activity report confirming the facsimile number to which such notice was sent, the number of pages transmitted and that such transmission was successfully completed.

(c) The address and facsimile number of the Guarantor for all notices under or in connection with this Guarantee are:

    (i) those set out in the Schedule; or

    (ii) any other notified by the Guarantor for this purpose to the Bank by not less than 5 working days' notice.

**23. Notice to the Bank**

Any notice by the Guarantor to the Bank must be given in writing and may only be sent by personal delivery or post addressed to the manager of the branch of the Bank through which the relevant banking services are provided to the Debtor and will only be effective when actually received.

**24. Severability**

If a provision of this Guarantee is or becomes illegal, invalid or unenforceable in any jurisdiction, that will not affect:

    (a) the validity or enforceability in that jurisdiction of any other provision of this Guarantee; or

    (b) the validity or enforceability in other jurisdictions of that or any other provision of this Guarantee.

**25. Governing Law**

This Guarantee is governed by and construed in accordance with laws of the Hong Kong Special Administrative Region (**"Hong Kong"**).

**26. Jurisdiction**

(a) The Guarantor agrees that the courts of Hong Kong have jurisdiction to settle any disputes in connection with this Guarantee and accordingly submits to the non-exclusive jurisdiction of the Hong Kong courts.

(b) If the Guarantor is not ordinarily resident in Hong Kong or a company incorporated under the laws of Hong Kong or a foreign company registered under section 333 of the Companies Ordinance (Cap.32, Laws of Hong Kong), without prejudice to any other mode of service, the Guarantor:

    (i) irrevocably appoints a company incorporated in Hong Kong and specified in the Schedule as its agent for service of process in relation to any proceedings before the Hong Kong courts in connection with this Guarantee;

    (ii) agrees that failure by a process agent to notify the Guarantor of the process shall not invalidate the proceedings concerned; and

    (iii) agrees that if the appointment of any person mentioned in paragraph (i) above ceases to be effective, the Guarantor shall immediately appoint another company incorporated in Hong Kong to accept service of process on its behalf in Hong Kong and, failing such appointment within 15 days, the Bank is entitled to appoint such person by notice to the Guarantor.

**SCHEDULE**

Date of this Guarantee:

| Date of this Guarantee: | 13 APRIL 2011 |
|---|---|

Details of the Guarantor:

| (1) | Name: | PACIFIC ANDES RESOURCES DEVELOPMENT LIMITED |
|---|---|---|
| | Type: | Sole Proprietor / Limited Liability Company / Partnership (please delete if inapplicable) |
| | Address: | ROOM 3201-10 32/F HONG KONG PLAZA 186 CONNAUGHT ROAD WEST HONG KONG |
| | Facsimile: | 28577754 |
| (2) | Name: | |
| | Type: | Sole Proprietor / Limited Liability Company / Partnership (please delete if inapplicable) |
| | Address: | |
| | Facsimile: | |
| (3) | Name: | |
| | Type: | Sole Proprietor / Limited Liability Company / Partnership (please delete if inapplicable) |
| | Address: | |
| | Facsimile: | |
| (4) | Name: | |
| | Type: | Sole Proprietor / Limited Liability Company / Partnership (please delete if inapplicable) |
| | Address: | |
| | Facsimile: | |

**Debtors:**

| | | |
|---|---|---|
| (1) | Name: | PACIFIC ANDES ENTERPRISES (BVI) LIMITED ✗ |
| | Address: | ROOM 3201-10 32/F HONG KONG PLAZA 186 CONNAUGHT ROAD WEST HONG KONG |
| (2) | Name: | PARKMOND GROUP LIMITED ✗ |
| | Address: | ROOM 3201-10 32/F HONG KONG PLAZA 186 CONNAUGHT ROAD WEST HONG KONG |
| (3) | Name: | PARD TRADE LIMITED ✗ |
| | Address: | ROOM 3201-10 32/F HONG KONG PLAA 186 CONNAUGHT ROAD WEST HONG KONG |
| (4) | Name: | |
| | Address: | |

**Limit (please see Clause 4):**

Debtor (1):

Debtor (2):

Debtor (3):

Debtor (4):

All Debtors:

**Details of Process Agent of the Guarantor (if applicable - see Clause 26 (b)):**

| | |
|---|---|
| Name of Company: | PACIFIC ANDES FOOD (HONG KONG) COMPANY LIMITED ✗ |
| Registered office in Hong Kong: | ROOM 3201-10 32/F HONG KONG PLAZA 186 CONNAUGHT ROAD WEST HONG KONG |
| Facsimile: | 28577754 |

* * * * * * * * * * * * * * * * * * * *

*For and on behalf of*
**PACIFIC ANDES RESOURCES DEVELOPMENT LIMITED**

**Guarantor**

(1)    Executed as a deed by Guarantor (1):    *Authorized Signature(s)*

Signature:    *Ng Joo Siang 吳昭洋*

Name of signatory:    NG JOO SIANG

*For and on behalf of*
**PACIFIC ANDES RESOURCES DEVELOPMENT LIMITED**

Signature:

Name of signatory:    NG JOO PUAY FRANK

*Authorized Signature(s)*

(2)    Executed as a deed by Guarantor (2):

Signature:

Name of signatory:

Signature:

Name of signatory:

(L.S)

(3)    Executed as a deed by Guarantor (3):

Signature:

Name of signatory:

Signature:

Name of signatory:

(L.S)

(4)    Executed as a deed by Guarantor (4):

Signature:

Name of signatory:

Signature:

Name of signatory:

(L.S)

**Witness**

Witness' Signature:

Print Witness' Name:    YIP KWOK KUEN

*Note:*

A certified copy of the resolutions of the board of directors of the Guarantor (if it is a company) should be supplied.

If the Debtor is not a wholly-owned subsidiary of the Guarantor (if it is a company), a certified copy of the resolutions of the shareholders of the Guarantor should be supplied.

To : **Bank of America,**
National Association
Incorporated in U.S.A. with Limited Liability

**CERTIFIED COPY OF BOARD RESOLUTIONS
AUTHORISING A COMPANY TO EXECUTE A GUARANTEE**

In consideration of Bank of America, National Association ("**Bank**" which expression includes all branches and offices of Bank of America, National Association wherever situated and its successors and assigns) making or continuing to make advances or banking facilities available to the person or persons set out in paragraph 3 of the Schedule to these Resolutions ("**Debtor**" and if more than one person is set out in paragraph 3 as Debtor, "**Debtor**" means all or any of them) or allowing the Debtor time for repayment, the company set out in paragraph 1 of the Schedule to these Resolutions ("**Company**") agrees to grant a guarantee in favour of the Bank in form and substance satisfactory to the Bank ("**Guarantee**").

At a duly convened meeting of the Directors of the Company held at the place and time set out in paragraph 2 of the Schedule to these Resolutions ("**Meeting**") and at which a copy of the Guarantee was tabled :

1.      It was noted that due notice of the Meeting had been given to all Directors of the Company and a quorum was acting throughout.

2.      It was noted and/or confirmed that:

   (a)   all the Directors present at the Meeting had declared their relevant interests (if any) in the business to be transacted at the Meeting and were entitled to vote and be counted in the quorum at the Meeting in accordance with the articles of association or other constitutional documents of the Company and the applicable laws and regulations;

   (b)   the shareholding relationship between the Debtor and the Company is set out in Paragraph 4 of the Schedule to these Resolutions; and

   (c)   the Company will be solvent (able to pay its liabilities as they become due) when entering into the Guarantee and will remain solvent for the duration of the Guarantee.

   (d)   *(applicable to Bermuda incorporated companies and only in the case where the Debtor is not a holding company or subsidiary of the Company)*, none of the Directors of the Company nor their family members own or control directly or indirectly more than 20% of the capital or loan debt of the Debtor and the Bank's credit facility to the Debtor (as supported by the Guarantee) will not be deemed to be a loan to a director under the Companies Act 1981 of Bermuda;

3.      The following resolutions were passed:

   (a)   In the opinion of the Directors of the Company, it is in the interests and for the commercial benefit of the Company to enter into the Guarantee;

   (b)   the Guarantee and the transactions contemplated by it be approved;

   (c)   (i)    any two directors of the Company; or

         (ii)   a director and a secretary of the Company; or

(iii)    where required or permitted by the articles of association or other constitutional documents of the Company, the persons listed in paragraph 5 of the Schedule to these Resolutions (**"Authorised Persons"**) in such number and combination provided in paragraph 6 of the Schedule to these Resolutions,

(each group of such persons being referred to as the **"Authorised Signatories"**) be authorised to execute the Guarantee on behalf of the Company with such amendments as the Authorised Signatories may approve (such approval to be conclusively evidenced by the Authorised Signatories' execution of the Guarantee);

(d)    the common or corporate seal of the Company be affixed to the Guarantee in the presence of the Authorised Signatories in accordance with the articles of association or other constitutional documents of the Company;

(e)    the Authorised Signatories be authorised to sign any other notices or documents in relation to the Guarantee or the transactions contemplated by it; and

(f)    any action taken by any Director of the Company or the Authorised Signatories before the Meeting in connection with the transactions contemplated by the Guarantee and/or any transactions discussed at the Meeting be ratified and confirmed.

4.    The Authorised Signatories be authorised on behalf of the Company to execute and deliver to the Bank such transfers, undertakings and security documents mortgaging, charging, pledging, hypothecating, assigning, conveying or otherwise encumbering or granting a security interest in the whole or any part of the Company's property and assets of whatsoever nature both present and future as the Bank may from time to time require and as the Authorised Signatories may approve (such approval to be conclusively evidenced by the Authorised Signatories' execution of any agreements or documents in respect of or evidencing such security interest) as security for the payment and discharge of all obligations and liabilities of the Company under the Guarantee and if necessary, to affix the common or corporate seal of the Company to the relevant agreement or document.

5.    A copy of these Resolutions certified by the Chairman of the Meeting, any Director or the Secretary of the Company be delivered to the Bank.

## SCHEDULE

1.    **Details of the Company**

                            Pacific Andes Resources Development Limited

    Full name of the Company:........................................................................................................

                              Bermuda

    Place of incorporation: ..............................................................................................................

2.    **Details of meeting**

                    Room 3201-10 32/F Hong Kong Plaza 186 Connaught Road West Hong Kong

    Place of meeting: ........................................................................................................................

    Date of meeting: ....13 APRIL 2011......................................................................................

    Time of Meeting: ......10:00 am.................................................................................................

Page 2 of 4

3. **Details of the Debtor**

   Pacific Andes Enterprises (BVI) Limited

   Full name of Debtor (1):................................................................................................

   Parkmond Group Limited

   Full name of Debtor (2):................................................................................................

   PARD Trade Limited

   Full name of Debtor (3):................................................................................................

   Full name of Debtor (4):................................................................................................

4  **Shareholding relationship**

   The Debtor is *a wholly-owned subsidiary of the Company / *X̶X̶x̶x̶x̶x̶x̶x̶x̶X̶x̶ ̶x̶w̶n̶e̶d̶ ̶b̶y̶ ̶t̶h̶e̶
   C̶o̶m̶p̶a̶n̶y̶.

5. **List of Authorised Persons**

   | Full name and official position | I.D./passport number | Specimen signature |
   |---|---|---|
   | Ng Joo Siang (Director) | K701590(9) | |
   | Ng Joo Puay, Frank (Director) | K508738(4) | |

6. **Number of Authorised Persons required to act** *(please check articles of association or other
   constitutional documents of the Company)*

   Any one Authorised Person / any two Authorised Persons / others (please specify name of each
   person authorised to act (who must be an Authorised Person) and in such number and combination
   as appropriate)*

   Any two of the authorised persons jointly with company chop

   ................................................................................................

   *Please delete as applicable

   ****************************

   *For and on behalf of*
   **PACIFIC ANDES RESOURCES DEVELOPMENT LIMITED**

   ●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●
   *Authorized Signature(s)*

I certify that the above Resolutions (i) have been duly entered in the minute book for meetings of the
Directors of the Company and the minutes recording the above Resolutions have been signed by the
Chairman of the Meeting, (ii) are still in full force and effect in all respects and (iii) do not exceed the
objects or powers of the Company or the powers of its Directors.  I confirm that the specimen signature(s)
set out in paragraph 5 of the Schedule above is (are) the true signature(s) of the present Authorised
Person(s).

Chairman of the Meeting/Director/Secretary                    Date   13 APRIL 2011

   Ng Joo Siang

Name ................................................................                    Page 3 of 4

NOTE:

(1)   Any amendments or deletions should be initialled by the person certifying these Resolutions.

(2)   The following copy documents (certified as true copies by the person certifying these Resolutions)
      should be given to the Bank (unless already supplied):-

      (a)   Certificate of Incorporation and, if applicable, Certificate of Incorporation upon Change
            of Name.

      (b)   Memorandum and Articles of Association (or other equivalent constitutional documents)
            and any amendments to them.

      (c)   Business Registration Certificate (not required if the Company does not carry on business
            in Hong Kong).

(3)   If the Debtor is not a subsidiary of the Company, then a certified copy of the resolutions of the
      shareholders of the Company should be supplied.

FORM OF ACCEPTANCE OF APPOINTMENT OF PROCESS AGENT

From: **PACIFIC ANDES RESOURCES DEVELOPMENT LIMITED**
**ROOM 3201-10 32/F HONG KONG PLAZA**
**186 CONNAUGHT ROAD WEST HONG KONG**

Date: 13 APRIL 2011

To: **PACIFIC ANDES FOOD (HONG KONG) COMPANY LIMITED**
**ROOM 3201-10 32/F HONG KONG PLAZA**
**186 CONNAUGHT ROAD WEST HONG KONG**

Attention:

Dear Sirs,

We agree to appoint you on the terms set out below to receive on our behalf service of process issued out of the courts of the Hong Kong Special Administrative Region in respect of any legal action or proceedings arising out of or in connection with each document set out in the Schedule to this letter.

1.  Upon receipt of any such service of process addressed to us, you will on our behalf accept such service and will notify us by facsimile at the number set out in the Schedule to this letter (or such other number as may from time to time be specified by us in writing) to the effect that you have accepted service of process on our behalf. Such notification must include the name of the party issuing the proceedings, the date upon which you accepted service of process and the date (if any) by which action must be taken to avoid judgement being entered against us in default of acknowledgement of service.

2.  Following such notification by facsimile you will confirm the acceptance to us by post (airmail if such confirmation is posted to an overseas address) at the address set out in the Schedule to this letter (or such other address as may from time to time be specified by us in writing), enclosing the process documents which you have received.

3.  Upon receiving the duplicate of this letter duly signed by you by way of acceptance of this appointment, we will notify the other party(ies) to each document set out in the Schedule to this letter (by delivery to them a copy of such duplicate) of your acceptance of your appointment.

Please sign the duplicate of this letter by way of acceptance of this appointment.

Yours faithfully,

*For and on behalf of*
**PACIFIC ANDES RESOURCES DEVELOPMENT LIMITED**

............................................................
*For and on behalf of*
**PACIFIC ANDES RESOURCES DEVELOPMENT LIMITED**
*Authorized Signature(s)*

We .... end .... agent as process agent on the terms set out above.

*For and on behalf of*
**PACIFIC ANDES FOOD (HONG KONG) COMPANY LIMITED**

............................................................
*For and on behalf of*
**PACIFIC ANDES FOOD (HONG KONG) COMPANY LIMITED**
*Authorized Signature(s)*

Date: 13 APRIL 2011

**SCHEDULE**

Full postal address: ROOM 3201-10 32/F HONG KONG PLAZA 186 CONNAUGHT ROAD WEST HONG KONG

Facsimile no: 28577754

Telephone no: 25894167

Name and title of person to contact: MR. TIMMY YIP

Details of document(s) concerned in appointment:

| Document | Date | Parties |
|---|---|---|
| Continuing Guarantee | 13 April 2011 | Pacific Andes Resources Development Limited, Bank of America, N.A. |

BA-20 (7/00) GP

To : **Bank of America,**
National Association
Incorporated in U.S.A. with Limited Liability

**CERTIFIED COPY OF BOARD RESOLUTIONS**
**AUTHORISING A COMPANY TO EXECUTE A GUARANTEE**

In consideration of Bank of America, National Association ("**Bank**" which expression includes all branches and offices of Bank of America, National Association wherever situated and its successors and assigns) making or continuing to make advances or banking facilities available to the person or persons set out in paragraph 3 of the Schedule to these Resolutions ("**Debtor**" and if more than one person is set out in paragraph 3 as Debtor, "**Debtor**" means all or any of them) or allowing the Debtor time for repayment, the company set out in paragraph 1 of the Schedule to these Resolutions ("**Company**") agrees to grant a guarantee in favour of the Bank in form and substance satisfactory to the Bank ("**Guarantee**").

At a duly convened meeting of the Directors of the Company held at the place and time set out in paragraph 2 of the Schedule to these Resolutions ("**Meeting**") and at which a copy of the Guarantee was tabled :

1.      It was noted that due notice of the Meeting had been given to all Directors of the Company and a quorum was acting throughout.

2.      It was noted and/or confirmed that:

      (a)      all the Directors present at the Meeting had declared their relevant interests (if any) in the business to be transacted at the Meeting and were entitled to vote and be counted in the quorum at the Meeting in accordance with the articles of association or other constitutional documents of the Company and the applicable laws and regulations;

      (b)      the shareholding relationship between the Debtor and the Company is set out in Paragraph 4 of the Schedule to these Resolutions; and

      (c)      the Company will be solvent (able to pay its liabilities as they become due) when entering into the Guarantee and will remain solvent for the duration of the Guarantee.

      (d)      *(applicable to Bermuda incorporated companies and only in the case where the Debtor is not a holding company or subsidiary of the Company)*, none of the Directors of the Company nor their family members own or control directly or indirectly more than 20% of the capital or loan debt of the Debtor and the Bank's credit facility to the Debtor (as supported by the Guarantee) will not be deemed to be a loan to a director under the Companies Act 1981 of Bermuda;

3.      The following resolutions were passed:

      (a)      In the opinion of the Directors of the Company, it is in the interests and for the commercial benefit of the Company to enter into the Guarantee;

      (b)      the Guarantee and the transactions contemplated by it be approved;

      (c)      (i)      any two directors of the Company; or

              (ii)      a director and a secretary of the Company; or

Page 1 of 4

(iii)   where required or permitted by the articles of association or other constitutional documents of the Company, the persons listed in paragraph 5 of the Schedule to these Resolutions ("**Authorised Persons**") in such number and combination provided in paragraph 6 of the Schedule to these Resolutions,

(each group of such persons being referred to as the "**Authorised Signatories**") be authorised to execute the Guarantee on behalf of the Company with such amendments as the Authorised Signatories may approve (such approval to be conclusively evidenced by the Authorised Signatories' execution of the Guarantee);

(d)   the common or corporate seal of the Company be affixed to the Guarantee in the presence of the Authorised Signatories in accordance with the articles of association or other constitutional documents of the Company;

(e)   the Authorised Signatories be authorised to sign any other notices or documents in relation to the Guarantee or the transactions contemplated by it; and

(f)   any action taken by any Director of the Company or the Authorised Signatories before the Meeting in connection with the transactions contemplated by the Guarantee and/or any transactions discussed at the Meeting be ratified and confirmed.

4.   The Authorised Signatories be authorised on behalf of the Company to execute and deliver to the Bank such transfers, undertakings and security documents mortgaging, charging, pledging, hypothecating, assigning, conveying or otherwise encumbering or granting a security interest in the whole or any part of the Company's property and assets of whatsoever nature both present and future as the Bank may from time to time require and as the Authorised Signatories may approve (such approval to be conclusively evidenced by the Authorised Signatories' execution of any agreements or documents in respect of or evidencing such security interest) as security for the payment and discharge of all obligations and liabilities of the Company under the Guarantee and if necessary, to affix the common or corporate seal of the Company to the relevant agreement or document.

5.   A copy of these Resolutions certified by the Chairman of the Meeting, any Director or the Secretary of the Company be delivered to the Bank.

## SCHEDULE

OFAC/NIS/SFC/PEP
Checked :

1.   **Details of the Company**

Pacific Andes Resources Development Limited

Full name of the Company:.................................................................

Bermuda

Place of incorporation: .......................................................................

2.   **Details of meeting**

Room 3201-10 32/F Hong Kong Plaza 186 Connaught Road West Hong Kong

Place of meeting: ................................................................................

Date of meeting:  13 APRIL 2011 ....................................................

Time of Meeting: ...............................................................................

3. **Details of the Debtor**

Full name of Debtor (1): Pacific Andes Enterprises (BVI) Limited

Full name of Debtor (2): Parkmond Group Limited

Full name of Debtor (3): PARD Trade Limited

Full name of Debtor (4): ..........

4 **Shareholding relationship**

The Debtor is *a wholly-owned subsidiary of the Company / *Xxxxxxxx% owned by the Company.

5. **List of Authorised Persons**

| Full name and official position | I.D./passport number | Specimen signature |
|---|---|---|
| Ng Joo Siang (Director) | K701590(9) | [signature] |
| Ng Joo Puay, Frank (Director) | K508738(4) | |

OFAC/NIS/SFC/PEP Checked :

6. **Number of Authorised Persons required to act** ***(please check articles of association or other constitutional documents of the Company)***

Any one Authorised Person / any two Authorised Persons / others (please specify name of each person authorised to act (who must be an Authorised Person) and in such number and combination as appropriate)*

Any two of the authorised persons jointly with company chop

No co. chop

**Please delete as applicable*

******************************

I certify that the above Resolutions (i) have been duly entered in the minute book for meetings of the Directors of the Company and the minutes recording the above Resolutions have been signed by the Chairman of the Meeting, (ii) are still in full force and effect in all respects and (iii) do not exceed the objects or powers of the Company or the powers of its Directors. I confirm that the specimen signature(s) set out in paragraph 5 of the Schedule above is (are) the true signature(s) of the present Authorised Person(s).

[signature]
Chairman of the Meeting/Director/Secretary

Date 13 APRIL 2011

Name Ng Joo Siang

NOTE:

(1)    Any amendments or deletions should be initialled by the person certifying these Resolutions.

(2)    The following copy documents (certified as true copies by the person certifying these Resolutions) should be given to the Bank (unless already supplied):-

    (a)    Certificate of Incorporation and, if applicable, Certificate of Incorporation upon Change of Name.

    (b)    Memorandum and Articles of Association (or other equivalent constitutional documents) and any amendments to them.

    (c)    Business Registration Certificate (not required if the Company does not carry on business in Hong Kong).

(3)    If the Debtor is not a subsidiary of the Company, then a certified copy of the resolutions of the shareholders of the Company should be supplied.

# **EXHIBIT 3**

**BY HAND, BY POST AND BY FAX**

To:   China Fisheries International Limited (**CFIL**)
      South Pacific Shipping Agency Limited (**South Pacific** and, together with China Fisheries,
      the **Obligors**)
      Room 3201-10 Hong Kong Plaza
      186 Connaught Road West
      Hong Kong

      Fax number:            2857 7754

      For the attention of:   Mr. Dennis Chan

Copy:  China Fishery Group Limited as guarantor of the obligations of the Obligors to the Bank (as
       defined below)
       Room 3201-10 32/F Hong Kong Plaza
       186 Connaught Road West
       Hong Kong

       Fax number:            2857 7754

       For the attention of:   Mr. Dennis Chan

                                                            23 November 2015

Dear Sirs,

**US$35,000,000 facilities made available to the Obligors by Bank of America, N.A. (the Bank)
pursuant to the terms of a facility letter dated 26 August 2014 (the Facility Letter)**

We refer to:

a)     the Facility Letter;

b)     the reservation of rights letter from us to you dated 14 September 2015 providing our consent
       to the rollover of the 11 September Advance (as defined in that letter) on the terms set out in
       that letter;

c)     the second reservation of rights letter from us to you dated 25 September 2015; and

d)     the emails and correspondence between our Mr Alan Wong and your Mr Dennis Chan and Mr
       Timmy Yip documenting the terms on which we agreed to rollover loans in an aggregate
       principal amount of US$16,000,000 advanced to CFIL under the Facility Letter to 19
       November 2015 (the **Rollover Correspondence**).

Capitalised terms used in the Facility Letter shall have the same meaning when used in this letter.

**Demand for payment**

There has been no further rollover of the loans maturing on 19 November 2015 and accordingly those
sums are now due and payable together with the aggregate amount of the LC backed loans that
matured on 6 October 2015.

Pursuant to clause 2(a) (i) (Repayment on demand and cancellation) of the General Terms for Commercial Business to which the Facilities are subject (in accordance with clause 7 (Other conditions) of the Facility Letter) (the **General Terms**), the Bank hereby demands immediate repayment of all monies which are owing to the Bank by the Obligors.

As at close of business on 20 November 2015, the following amounts are outstanding and remain unpaid under the Facility Letter:

(a)    the principal amount of the loans outstanding: **US$27,885,960.59**; and

(b)    all other fees, costs and expenses (including legal fees) payable by the Obligors in accordance with clause 12 (Expenses) of the General Terms.

Interest, fees, costs and expenses (including legal fees) will continue to be incurred in connection with the Facility Letter and will be for the account of the Obligors in accordance with clauses 4 (Interest) and 12 (Expenses) of the General Terms.

On 20 November 2015, the Bank exercised its power of set-off and applied **US$363,779.41** in partial satisfaction of sums due to the Bank. The principal amount referred to above is the figure owed after such set-off.

**Reservation of Rights**

It is, however, important that we be clear that any commercial discussions or prior agreement to rollover did not and does not amount to any waiver of any of our rights. Accordingly, please note that:

(c)    no failure to exercise, nor any delay in exercising, on the part of the Bank, any right or remedy arising at law or under the Facility Letter or any document entered into under or in connection with the Facility Letter will operate as a waiver, nor will any single or partial exercise of any right or remedy prevent any further or other exercise or the exercise of any other right or remedy. The rights and remedies provided in the Facility Letter or any document entered into under or in connection with the Facility Letter are cumulative and not exclusive of any rights or remedies provided by law and may be waived only in writing and specifically; and

(d)    the Bank reserves any right or remedy it may have now or subsequently.

This letter is governed by Hong Kong law.

Yours faithfully,

...................................................
For
**BANK OF AMERICA N.A.**

23 November 2015

# **EXHIBIT 4**

**BY HAND, BY POST AND BY FAX**

To:     China Fishery Group Limited as guarantor of the obligations of the Obligors to the Bank (as
        defined below)
        Room 3201-10 32/F Hong Kong Plaza
        186 Connaught Road West
        Hong Kong

        Fax number:              2857 7754

        For the attention of:    Mr. Dennis Chan

24 November 2015

Dear Sirs,

**US$35,000,000 facilities made available to China Fisheries International Limited (CFIL), South
Pacific Shipping Agency Limited (South Pacific and, together with China Fisheries, the
Obligors) by Bank of America, N.A. (the Bank) pursuant to the terms of a facility letter dated
26 August 2014 (the Facility Letter)**

We refer to:

a)      the Facility Letter; and

b)      the continuing guarantee provided by you in respect of all past, present and future obligations
        of whatever nature of each Obligor to the Bank, whether actual, contingent, joint and/or
        several or otherwise dated 13 April 2011 (the **Guarantee**).

Capitalised terms used in the Guarantee shall have the same meaning when used in this letter.

**Demand under the Facility Letter**

Pursuant to various correspondence between our Mr Alan Wong and Mr Dennis Chan and Mr Timmy
Yip of CFIL, we agreed to rollover loans with an aggregate principal of US$16,000,000 advanced to
CFIL pursuant to the Facility Letter to 19 November 2015. There was no further rollover of the loans
maturing on 19 November 2015 and accordingly those sums are now due and payable together with
the aggregate amount of the LC backed loans that matured on 6 October 2015.

Pursuant to clause 2(a)(i) (Repayment on demand and cancellation) of the General Terms for
Commercial Business to which the Facilities are subject (in accordance with clause 7 (Other
conditions) of the Facility Letter) (the **General Terms**), on 23 November 2015 the Bank demanded
immediate repayment of all monies which are owing to the Bank by the Obligors (the **Borrower
Demand**). A copy of the Borrower Demand is attached as a schedule to this letter.

**Demand under the Guarantee**

Pursuant to clause 2 (Guarantee) of the Guarantee, the Bank hereby demands immediate payment of
all monies which are owing to the Bank by the Obligors.

As at close of business on 20 November 2015, the following amounts are outstanding and remain
unpaid under the Facility Letter:

(a)     the principal amount of the loans outstanding: **US$27,885,960.59**; and

(b)     all other fees, costs and expenses (including legal fees) payable by the Obligors in accordance with clause 12 (Expenses) of the General Terms.

Interest, fees, costs and expenses (including legal fees) will continue to be incurred in connection with the Facility Letter and the Guarantee and will be for the account of the Obligors in accordance with clauses 4 (Interest) and 12 (Expenses) of the General Terms and clause 3 (Default interest) of the Guarantee.

On 20 November 2015, the Bank exercised its power of set-off and applied **US$363,779.41** in partial satisfaction of sums due to the Bank. The principal amount referred to above is the figure owed after such set-off.

**Reservation of Rights**

Please note that:

(c)     no failure to exercise, nor any delay in exercising, on the part of the Bank, any right or remedy arising at law or under the Facility Letter, the Guarantee or any document entered into under or in connection with the Facility Letter or the Guarantee will operate as a waiver, nor will any single or partial exercise of any right or remedy prevent any further or other exercise or the exercise of any other right or remedy. The rights and remedies provided in the Facility Letter, the Guarantee  or any document entered into under or in connection with the Facility Letter or the Guarantee are cumulative and not exclusive of any rights or remedies provided by law and may be waived only in writing and specifically; and

(d)     the Bank reserves any right or remedy it may have now or subsequently.

This letter is governed by Hong Kong law.

Yours faithfully,

*Angel L*

..............................................................

For
**BANK OF AMERICA N.A.**

24 November 2015

**SCHEDULE**

24 November 2015

**BY HAND, BY POST AND BY FAX**

To:     China Fisheries International Limited (**CFIL**)
        South Pacific Shipping Agency Limited (**South Pacific** and, together with China Fisheries,
        the **Obligors**)
        Room 3201-10 Hong Kong Plaza
        186 Connaught Road West
        Hong Kong

        Fax number:              2857 7754

        For the attention of:    Mr. Dennis Chan

Copy:   China Fishery Group Limited as guarantor of the obligations of the Obligors to the Bank (as
        defined below)
        Room 3201-10 32/F Hong Kong Plaza
        186 Connaught Road West
        Hong Kong

        Fax number:              2857 7754

        For the attention of:    Mr. Dennis Chan

                                                                        23 November 2015

Dear Sirs,

**US$35,000,000 facilities made available to the Obligors by Bank of America, N.A. (the Bank)
pursuant to the terms of a facility letter dated 26 August 2014 (the Facility Letter)**

We refer to:

a)      the Facility Letter;

b)      the reservation of rights letter from us to you dated 14 September 2015 providing our consent
        to the rollover of the 11 September Advance (as defined in that letter) on the terms set out in
        that letter;

c)      the second reservation of rights letter from us to you dated 25 September 2015; and

d)      the emails and correspondence between our Mr Alan Wong and your Mr Dennis Chan and Mr
        Timmy Yip documenting the terms on which we agreed to rollover loans in an aggregate
        principal amount of US$16,000,000 advanced to CFIL under the Facility Letter to 19
        November 2015 (the **Rollover Correspondence**).

Capitalised terms used in the Facility Letter shall have the same meaning when used in this letter.

**Demand for payment**

There has been no further rollover of the loans maturing on 19 November 2015 and accordingly those
sums are now due and payable together with the aggregate amount of the LC backed loans that
matured on 6 October 2015.

Pursuant to clause 2(a) (i) (Repayment on demand and cancellation) of the General Terms for Commercial Business to which the Facilities are subject (in accordance with clause 7 (Other conditions) of the Facility Letter) (the **General Terms**), the Bank hereby demands immediate repayment of all monies which are owing to the Bank by the Obligors.

As at close of business on 20 November 2015, the following amounts are outstanding and remain unpaid under the Facility Letter:

(a)     the principal amount of the loans outstanding: **US$27,885,960.59**; and

(b)     all other fees, costs and expenses (including legal fees) payable by the Obligors in accordance with clause 12 (Expenses) of the General Terms.

Interest, fees, costs and expenses (including legal fees) will continue to be incurred in connection with the Facility Letter and will be for the account of the Obligors in accordance with clauses 4 (Interest) and 12 (Expenses) of the General Terms.

On 20 November 2015, the Bank exercised its power of set-off and applied **US$363,779.41** in partial satisfaction of sums due to the Bank. The principal amount referred to above is the figure owed after such set-off.

**Reservation of Rights**

It is, however, important that we be clear that any commercial discussions or prior agreement to rollover did not and does not amount to any waiver of any of our rights. Accordingly, please note that:

(c)     no failure to exercise, nor any delay in exercising, on the part of the Bank, any right or remedy arising at law or under the Facility Letter or any document entered into under or in connection with the Facility Letter will operate as a waiver, nor will any single or partial exercise of any right or remedy prevent any further or other exercise or the exercise of any other right or remedy. The rights and remedies provided in the Facility Letter or any document entered into under or in connection with the Facility Letter are cumulative and not exclusive of any rights or remedies provided by law and may be waived only in writing and specifically; and

(d)     the Bank reserves any right or remedy it may have now or subsequently.

This letter is governed by Hong Kong law.

Yours faithfully,

..........................................................
For
**BANK OF AMERICA N.A.**

23 November 2015

# **<u>EXHIBIT 5</u>**

**BY HAND, BY POST AND BY FAX**

To:   Pacific Andes Enterprises (BVI) Limited (**PAEL**)
      Parkmond Group Limited (**Parkmond**)
      PARD Trade Limited (**PARD**, and together with PAEL and Parkmond, the **Obligors**)
      Room 3201-10 32/F Hong Kong Plaza
      186 Connaught Road West
      Hong Kong

      Fax number:             2857 7754

      For the attention of:   Mr. Dennis Chan

Copy:  Pacific Andes Resources Development Limited as guarantor of the obligations of the Obligors
       to the Bank (as defined below)
       Room 3201-10 32/F Hong Kong Plaza
       186 Connaught Road West
       Hong Kong

       Fax number:             2857 7754

       For the attention of:   Mr. Dennis Chan

23 November 2015

Dear Sirs,

**US$15,000,000 facilities made available to the Obligors by Bank of America, N.A. (the Bank)
pursuant to the terms of a facility letter dated 26 August 2014 (the Facility Letter)**

We refer to:

(a)    the Facility Letter; and

(a)    the various emails and correspondence between our Mr Alan Wong and your Mr Dennis Chan
       and Mr Timmy Yip documenting the terms on which we agreed to rollover advances with an
       aggregate principal amount if US$15,000,000 made to PAEL pursuant to the Facility Letter to
       19 November 2015 (the **Rollover Correspondence**).

Capitalised terms used in the Facility Letter shall have the same meaning when used in this letter.

**Demand for payment**

There has been no further rollover of the loans maturing on 19 November 2015 and accordingly those
sums are now due and payable.

Pursuant to clause 2(a)(i) (Repayment on demand and cancellation) of the General Terms for
Commercial Business to which the Facilities are subject (in accordance with clause 7 (Other
conditions) of the Facility Letter) (the **General Terms**), the Bank hereby demands immediate
repayment of all monies which are owing to the Bank by the Obligors.

As at close of business on 20 November 2015, the following amounts are outstanding and remain unpaid under the Facility Letter:

(b)     the principal amount of the loans outstanding: **US$14,853,576.41**; and

(c)     all other fees, costs and expenses (including legal fees) payable by the Obligors in accordance with clause 12 (Expenses) of the General Terms.

Interest, fees, costs and expenses (including legal fees) will continue to be incurred in connection with the Facility Letter and will be for the account of the Obligors in accordance with clauses 4 (Interest) and 12 (Expenses) of the General Terms.

On 20 November 2015, the Bank exercised its power of set-off and applied **US$146,423.59** in partial satisfaction of sums due to the Bank. The principal amount referred to above is the figure owed after such set-off.

**Reservation of Rights**

It is, however, important that we be clear that any commercial discussions or prior agreement to rollover did not and does not amount to any waiver of any of our rights. Accordingly, please note that:

(a)     nothing in the Rollover Correspondence or any subsequent discussions or correspondence (including email) regarding any rollover request that has been made shall in any way be construed as a waiver, release, restriction, amendment, modification or alteration of any of the rights of the Bank at law or under the Facility Letter or any document entered into under or in connection with the Facility Letter or a waiver of any breach of any terms of the Facility Letter or any document entered into under or in connection with the Facility Letter save to the extent a right is expressly and specifically waived in writing;

(b)     no failure to exercise, nor any delay in exercising, on the part of the Bank, any right or remedy arising at law or under the Facility Letter or any document entered into under or in connection with the Facility Letter will operate as a waiver, nor will any single or partial exercise of any right or remedy prevent any further or other exercise or the exercise of any other right or remedy. The rights and remedies provided in the Facility Letter or any document entered into under or in connection with the Facility Letter are cumulative and not exclusive of any rights or remedies provided by law and may be waived only in writing and specifically; and

(c)     the Bank reserves any right or remedy it may have now or subsequently.

This letter is governed by Hong Kong law.

Yours faithfully,

.................................................................
For
**BANK OF AMERICA N.A.**

23 November 2015

# **<u>EXHIBIT 6</u>**

**BY HAND, BY POST AND BY FAX**

To:    Pacific Andes Resources Development Limited as guarantor of the obligations of the Obligors
to the Bank (as defined below)
Room 3201-10 32/F Hong Kong Plaza
186 Connaught Road West
Hong Kong

Fax number:            2857 7754

For the attention of:    Mr. Dennis Chan

24 November 2015

Dear Sirs,

**US$15,000,000 facilities made available to the Pacific Andes Enterprises (BVI) Limited (PAEL)
Parkmond Group Limited (Parkmond) PARD Trade Limited (PARD, and together with PAEL
and Parkmond, the Obligors) Obligors by Bank of America, N.A. (the Bank) pursuant to the
terms of a facility letter dated 26 August 2014 (the Facility Letter)**

We refer to:

(a)    the Facility Letter; and

(b)    the continuing guarantee provided by you in respect of all past, present and future obligations
of whatever nature of each Obligor to the Bank, whether actual, contingent, joint and/or
several or otherwise dated 13 April 2011 (the **Guarantee**).

Capitalised terms used in the Guarantee shall have the same meaning when used in this letter.

**Demand under the Facility Letter**

Pursuant to various correspondence between our Mr Alan Wong and Mr Dennis Chan and Mr Timmy
Yip of PAEL, we agreed to rollover loans with an aggregate principal amount of US$15,000,000
advanced to PAEL pursuant to the Facility Letter to 19 November 2015 (the **Rollover
Correspondence**). There was no further rollover of the loans maturing on 19 November 2015 and
accordingly those sums are now due and payable.

Pursuant to clause 2(a)(i) (Repayment on demand and cancellation) of the General Terms for
Commercial Business to which the Facilities are subject (in accordance with clause 7 (Other
conditions) of the Facility Letter) (the **General Terms**), on 23 November 2015 the Bank demanded
immediate repayment of all monies which are owing to the Bank by the Obligors (the **Borrower
Demand**). A copy of the Borrower Demand is attached as a schedule to this letter.

**Demand under the Guarantee**

Pursuant to clause 2 (Guarantee) of the Guarantee, the Bank hereby demands immediate payment of
all monies which are owing to the Bank by the Obligors.

As at close of business on 20 November 2015, the following amounts are outstanding and remain
unpaid under the Facility Letter:

(a)    the principal amount of the loans outstanding: **US$14,853,576.41**; and

(b)    all other fees, costs and expenses (including legal fees) payable by the Obligors in accordance with clause 12 (Expenses) of the General Terms.

Interest, fees, costs and expenses (including legal fees) will continue to be incurred in connection with the Facility Letter and the Guarantee and will be for the account of the Obligors in accordance with clauses 4 (Interest) and 12 (Expenses) of the General Terms and clause 3 (Default interest) of the Guarantee.

On 20 November 2015, the Bank exercised its power of set-off and applied **US$146,423.59** in partial satisfaction of sums due to the Bank. The principal amount referred to above is the figure owed after such set-off.

**Reservation of Rights**

Please note that:

(c)    no failure to exercise, nor any delay in exercising, on the part of the Bank, any right or remedy arising at law or under the Facility Letter, the Guarantee or any document entered into under or in connection with the Facility Letter or the Guarantee will operate as a waiver, nor will any single or partial exercise of any right or remedy prevent any further or other exercise or the exercise of any other right or remedy. The rights and remedies provided in the Facility Letter, the Guarantee or any document entered into under or in connection with the Facility Letter or the Guarantee are cumulative and not exclusive of any rights or remedies provided by law and may be waived only in writing and specifically; and

(d)    the Bank reserves any right or remedy it may have now or subsequently.

This letter is governed by Hong Kong law.

Yours faithfully,

...................................................
For
**BANK OF AMERICA N.A.**

2                                                    24 November 2015

**SCHEDULE**

24 November 2015

**BY HAND, BY POST AND BY FAX**

To:   Pacific Andes Enterprises (BVI) Limited (**PAEL**)
Parkmond Group Limited (**Parkmond**)
PARD Trade Limited (**PARD**, and together with PAEL and Parkmond, the **Obligors**)
Room 3201-10 32/F Hong Kong Plaza
186 Connaught Road West
Hong Kong

   Fax number:            2857 7754

   For the attention of:   Mr. Dennis Chan

Copy:   Pacific Andes Resources Development Limited as guarantor of the obligations of the Obligors
to the Bank (as defined below)
Room 3201-10 32/F Hong Kong Plaza
186 Connaught Road West
Hong Kong

   Fax number:            2857 7754

   For the attention of:   Mr. Dennis Chan

                                                    23 November 2015

Dear Sirs,

**US$15,000,000 facilities made available to the Obligors by Bank of America, N.A. (the Bank)
pursuant to the terms of a facility letter dated 26 August 2014 (the Facility Letter)**

We refer to:

(a)   the Facility Letter; and

(a)   the various emails and correspondence between our Mr Alan Wong and your Mr Dennis Chan
and Mr Timmy Yip documenting the terms on which we agreed to rollover advances with an
aggregate principal amount if US$15,000,000 made to PAEL pursuant to the Facility Letter to
19 November 2015 (the **Rollover Correspondence**).

Capitalised terms used in the Facility Letter shall have the same meaning when used in this letter.

**Demand for payment**

There has been no further rollover of the loans maturing on 19 November 2015 and accordingly those
sums are now due and payable.

Pursuant to clause 2(a)(i) (Repayment on demand and cancellation) of the General Terms for
Commercial Business to which the Facilities are subject (in accordance with clause 7 (Other
conditions) of the Facility Letter) (the **General Terms**), the Bank hereby demands immediate
repayment of all monies which are owing to the Bank by the Obligors.

As at close of business on 20 November 2015, the following amounts are outstanding and remain unpaid under the Facility Letter:

(b)    the principal amount of the loans outstanding: **US$14,853,576.41**; and

(c)    all other fees, costs and expenses (including legal fees) payable by the Obligors in accordance with clause 12 (Expenses) of the General Terms.

Interest, fees, costs and expenses (including legal fees) will continue to be incurred in connection with the Facility Letter and will be for the account of the Obligors in accordance with clauses 4 (Interest) and 12 (Expenses) of the General Terms.

On 20 November 2015, the Bank exercised its power of set-off and applied **US$146,423.59** in partial satisfaction of sums due to the Bank.  The principal amount referred to above is the figure owed after such set-off.

**Reservation of Rights**

It is, however, important that we be clear that any commercial discussions or prior agreement to rollover did not and does not amount to any waiver of any of our rights.  Accordingly, please note that:

(a)    nothing in the Rollover Correspondence or any subsequent discussions or correspondence (including email) regarding any rollover request that has been made shall in any way be construed as a waiver, release, restriction, amendment, modification or alteration of any of the rights of the Bank at law or under the Facility Letter or any document entered into under or in connection with the Facility Letter or a waiver of any breach of any terms of the Facility Letter or any document entered into under or in connection with the Facility Letter save to the extent a right is expressly and specifically waived in writing;

(b)    no failure to exercise, nor any delay in exercising, on the part of the Bank, any right or remedy arising at law or under the Facility Letter or any document entered into under or in connection with the Facility Letter will operate as a waiver, nor will any single or partial exercise of any right or remedy prevent any further or other exercise or the exercise of any other right or remedy.  The rights and remedies provided in the Facility Letter or any document entered into under or in connection with the Facility Letter are cumulative and not exclusive of any rights or remedies provided by law and may be waived only in writing and specifically; and

(c)    the Bank reserves any right or remedy it may have now or subsequently.

This letter is governed by Hong Kong law.


Yours faithfully,

..................................................................
For
**BANK OF AMERICA N.A.**


23 November 2015

# **<u>EXHIBIT 7</u>**

DATED   28 DECEMBER   2015


(1) PACIFIC ANDES INTERNATIONAL HOLDINGS LIMITED

- and -

(2) PACIFIC ANDES RESOURCES DEVELOPMENT LIMITED


IN FAVOUR OF

(4) COÖPERATIEVE CENTRALE RAIFFEISEN-BOERENLEENBANK B.A. (ALSO KNOWN AS RABOBANK INTERNATIONAL), HONG KONG BRANCH

- and -

(5) STANDARD CHARTERED BANK (HONG KONG) LIMITED

- and -

(6) DBS BANK (HONG KONG) LIMITED

- and -

(7) THE HIGH COURT OF THE HONG KONG SPECIAL ADMINISTRATIVE REGION


## DEED OF UNDERTAKING

**THIS DEED** is made by way of deed poll on **28 December 2015**

**BETWEEN:**

(1)     PACIFIC ANDES INTERNATIONAL HOLDINGS LIMITED ("PAIH");

(2)     PACIFIC ANDES RESOURCES DEVELOPMENT LIMITED ("PARD");

        Both at Rooms 3312-3314, Hong Kong Plaza, 188 Connaught Road West, Hong Kong, ("PA Group Parties" and each a "PA Group Party"),

**IN FAVOUR OF:**

(4)     COÖPERATIEVE CENTRALE RAIFFEISEN-BOERENLEENBANK B.A. (ALSO KNOWN AS RABOBANK INTERNATIONAL) HONG KONG BRANCH ("Rabobank") of 32/F, Three Pacific Place, 1 Queen's Road East, Hong Kong;

(5)     STANDARD CHARTERED BANK (HONG KONG) LIMITED ("SCB") of 32/F, Standard Chartered Bank Building, 4-4A Des Voeux Road Central, Hong Kong;

(6)     DBS BANK (HONG KONG) LIMITED ("DBS") of 16/F, The Center, 99 Queen's Road Central, Central, Hong Kong; and

(7)     THE HIGH COURT OF THE HONG KONG SPECIAL ADMINISTRATIVE REGION ("HK Court") of 38 Queensway, Central, Hong Kong

        ("Beneficiaries" and each a "Beneficiary").

**BACKGROUND:**

A       Rabobank, SCB and DBS ("Club Lenders") together with The Hongkong and Shanghai Banking Corporation Limited and China CITIC Bank International Limited are lenders under a US$650,000,000 facility agreement dated 20 March 2014 (as amended from time to time) between, among others, CFG Investment S.A.C., China Fisheries International Limited ("CFIL") and Corporacion Pesquera Inca S.A.C ("Club Facility").

B       The Club Lenders have each also provided certain facilities on a bilateral basis to certain subsidiaries of PAIH and PARD respectively ("Facilities").

C       On 25 November 2015, The Hongkong and Shanghai Banking Corporation Limited ("Petitioner") issued petitions for the winding up of China Fishery Group Limited ("CFGL") and CFIL in the High Court of Hong Kong. On 27 November 2015, the Petitioner issued a petition for the winding up of CFGL in the Grand Court of Cayman ("Cayman Court").

D       On 25 November 2015, Kris Beighton, Fergal Power and Edward Middleton of Messrs KPMG were appointed as joint and several provisional liquidators of CFGL and CFIL by the order of the HK Court ("JPLs"). On 8 December 2015, Fergal Power, Kris Beighton and Alex Lawson of Messrs KPMG were appointed as the JPLs of CFGL by order of the Cayman Court (together with the JPLs, the "PL Appointments").

E       The winding up petitions and the PL Appointments were initiated by the Petitioner without the knowledge of the Club Lenders. Whilst it is acknowledged that CFGL and its subsidiaries ("CF Group") have certain liquidity issues, the Club Lenders remain doubtful that the PL Appointments are the best solution to those issues currently faced by the CF Group.

F       All parties agree that a sale of CF Group's Peruvian business and/or assets ("Peruvian Business") must now be pursued in order to address CF Group's financial issues however

---

AE/AE/2001027/7/ASIAM/19913491.1

1

149

the parties are concerned to ensure that this sales process is conducted in a transparent way which maximises value for all creditors concerned and the stakeholders.

G    Following discussions between the Club Lenders and the PA Group Parties, subject to the PA Group Parties providing an undertaking to the Beneficiaries on the terms and conditions set out in this Deed, the Club Lenders are prepared to support the directors of CFGL and CFIL in opposing the PL Appointments at the forthcoming hearing in the HK Court on 30 December 2015 and seeking the subsequent removal of the PL Appointments in the Cayman Court, and opposing the winding up petitions at the hearing in the Cayman Court on 8 January 2016 and at the hearing in the HK Court on 27 January 2016.

**IT IS AGREED:**

**1.    DEFINITIONS AND INTERPRETATIONS**

1.1    In this Deed, unless inconsistent with the subject or context, the following expressions bear the following meanings:

"**Business Day**" means a day (other than a Saturday, Sunday or a public holiday) on which commercial banks are open for general business in Hong Kong;

"**CFGI**" means CFG Investment S.A.C;

"**COP**" means Corporacion Pescquera Inca S.A.C;

"**CRO**" means chief restructuring officer;

"**FTI Report**" means the report dated 16 November 2015 prepared by FTI Consulting (Hong Kong) Limited for the Petitioner concerning a review of certain payment transactions between entities within the PAIH group of companies and with third party customers and suppliers;

"**HKSE**" means The Stock Exchange of Hong Kong Stock Limited;

"**IGS**" means Inmobiliara Gainesville S.A.C;

"**IRC**" means the independent review committee formed of Mr. Lew V Robert, Mr. Tao Kwok Lau, Clement and Mr. Nguyen Van Tu, Peter being three of the current independent non-executive directors of PAIH (together with such other individuals as may become members of the IRC from time to time);

"**PwC**" means Messrs PricewaterhouseCoopers;

"**SGX**" means the Singapore Exchange Limited; and

"**Spin-Off Transaction**" means the transaction in Peru involving the transfer of certain pieces of land and buildings (considered to be non-core to the Peruvian fishmeal business) from CFGI and COP to IGS.

1.2    In this Deed, unless the context otherwise requires, or unless otherwise expressly provided:

1.2.1    the singular shall include the plural and vice-versa;

1.2.2    references to a "person" include any company, unincorporated association or partnership, whether or not having separate legal personality, and references to a company include any company, corporation or body corporate, wherever incorporated;

2

1.2.3    headings are for ease of reference only and shall not affect the interpretation of this Deed; and

1.2.4    references to clauses are to clause of this Deed.

2.    **PA GROUP UNDERTAKINGS AND COVENANTS**

2.1    The PA Group Parties hereby, jointly and severally, irrevocably and unconditionally undertake and covenant in favour of each of the Beneficiaries (with the intention that each Beneficiary shall be entitled to rely on and enforce each such undertaking and covenant despite not being a party to this Deed) that the PA Group Parties shall procure the following:

2.1.1    the engagement, on or before 30 December 2015, of PwC (on terms acceptable to the Club Lenders and the PA Group Parties) to undertake an independent reporting accountant role in respect of PAIH and PARD (and their respective subsidiaries) (**"Reporting Accountant Engagement"**) pursuant to a scope of work reasonably acceptable (in the context of the situation) to the Club Lenders (as the same may be varied from time to time by the Club Lenders in consultation with the PA Group Parties) reporting to the bank lenders to PAIH and PARD. The PwC terms of engagement shall, amongst other terms, provide for following:

2.1.1.1    full access to the affairs of PAIH and PARD (and their respective subsidiaries) to allow PwC to undertake their engagement and independently report directly to the bank lenders of PAIH and PARD (including the Club Lenders) in accordance with the terms of the PwC engagement letter with respect to the Reporting Accountant Engagement; and

2.1.1.2    PAIH shall be responsible for payment of all fees reasonably incurred by PwC pursuant to the Reporting Accountant Engagement;

2.1.2    within 5 Business Days of the PL Appointments being dismissed (as applicable), the engagement of PwC (on terms acceptable to the Club Lenders and CF Group) by CF Group to undertake a similar independent reporting accountant (in addition to being fully involved in the sale process for the Peruvian Business), for lenders to CF Group pursuant to a scope of work reasonably acceptable (in the context of the situation) to the Club Lenders (as the same may be varied from time to time by the Club Lenders in consultation with the CF Group);

2.1.3    the appointment of a CRO (on terms, and being a candidate, who is reasonably acceptable to the Club Lenders and the PA Group Parties) by PAIH and PARD (and such of their subsidiaries as the CRO subsequently considers necessary, acting reasonably), such CRO candidate to be identified on or before 25 January 2016 and the engagement terms for such CRO to be finalised on or before 15 February 2016;

2.1.4    the CRO shall initially have board observer rights and shall be entitled to receive the same information and documents provided or circulated to the members of the board of directors of PAIH and/or PARD.  However, in the event that Club Lenders, in their reasonable discretion, have tangible evidence (in the reasonable opinion of the Club Lenders) of the CRO having insufficient transparency on the operations of PAIH and/or PARD (or their respective subsidiaries), the Club Lenders may, by written notice to the PA Group Parties request that the CRO be appointed to be board of PAIH and/or PARD (together with such other subsidiaries as the CRO may specify) and such request shall be actioned as soon as practicably possible, provided however that any such request made by the Club Lenders shall be in good faith and made on reasonable grounds after consultation with existing management of PAIH and PARD with a view to

rectifying any deficiencies in transparency identified by the Club Lenders.  For the avoidance of doubt, such tangible evidence shall include, but is not limited to, correspondence, reports, financial statements, news, press releases and statements, or any other document in hard copy or electronic format;

2.1.5   in the event of the PL Appointments being dismissed or withdrawn, the CRO's appointment shall, as soon as possible, be ratified by CFGL and extended to CFGL and the CF Group whereupon his scope of work shall include all aspects of the business and affairs of the CF Group, including in particular an active involvement in the sale process for the Peruvian Business in conjunction with existing management (as overseen by the IRC) and a professional advisory firm (whether an accountant, investment bank or boutique financial adviser (such mandate being on terms that are reasonably acceptable to the Club Lenders and the PA Group Parties));

2.1.6   in the event of the PL Appointments being dismissed or withdrawn, PAIH and PARD shall, as soon as possible, consult the Club Lenders on the constitution of the board of directors of CFGL (and the companies within the CF Group).  PAIH and PARD shall also reasonably procure that any requests of the Club Lenders to remove Chan Tak Hei and/or Ng Joo Siang from the board of directors of CFGL (and the companies of the CF Group) (which may be given by the Club Lenders from time to time) are given due legal effect, subject to compliance with the constituent documents of PAIH and PARD and in accordance with relevant laws and listing rules of the HKSE and SGX, where applicable;

2.1.7   that updates on the sales process for the Peruvian Business (on a full and transparent basis) shall be made to the Club Lenders on a weekly basis (or as otherwise agreed by the Club Lenders acting reasonably), or sooner if reasonably requested by the Club Lenders.  For the avoidance of doubt, the CRO shall have unfettered rights to communicate with the Club Lenders as regards such sale process for the Peruvian Business and also generally regarding the affairs of PAIH, PARD, the CF Group and any of their subsidiaries and/or associated entities in accordance with relevant laws and listing rules of the HKSE and SGX, where applicable;

2.1.8   that the CRO's engagement may not be terminated without 10 Business Days' prior written notice being given to each of the Beneficiaries (save for with the consent of the Club Lenders (acting reasonably) or in the case of gross negligence or wilful default);

2.1.9   the CRO shall be entitled to attend meetings of the IRC as an observer promptly upon his or her engagement becoming effective;

2.1.10  the separate engagement, on or before 30 December 2015, of PwC to undertake an independent forensic review of the matters referred to in the FTI Report ("Forensic Engagement") and to provide periodic updates to the Club Lenders ("Forensic Updates") (amongst other parties who the IRC consider appropriate);

2.1.11  the Forensic Updates shall occur every 2 weeks (or such other period as may reasonably be agreed between the Club Lenders and the IRC) in accordance with the terms of the PwC engagement letter with respect to the Forensic Engagement;

2.1.12  PAIH shall be responsible for payment (in full and without deduction) of all fees reasonably incurred by PwC pursuant to the terms of PwC's Forensic Engagement;

2.1.13  the appointment of a new chief financial officer ("CFO") for PAIH and PARD (and CF Group (if appropriate)) by 30 March 2016 (or such later date as the parties to

4

this Deed may subsequently agree) who shall be reasonably acceptable to the Club Lenders and the PA Group Parties, recognising that the existing CFO will need to continue being involved for a reasonable period of time in order to ensure a smooth transition of all financial and other relevant matters to the new CFO;

2.1.14    the disposal of certain properties owned by PAIH and PARD in Hong Kong, with such sales process involving the CRO in conjunction with existing management, who shall jointly provide weekly updates (as such other period as may subsequently be agreed by the bank lenders of PAIH and PARD) to lenders with the first such update to occur on or by 20 February 2016;

2.1.15    the continued cooperation of the management of CFGL and CFIL with the PL Appointments in relation to (inter alia) any reasonable requests of the PL Appointments as they seek to manage the CF Group's Peruvian Business in order to ensure that, pending the HK Court hearing on 30 December 2015, the business can be continued and preparations for a transparent sales process can be progressed by the PL Appointments so as to enable the best value to be achieved for all creditors and all other relevant stakeholders; and

2.1.16    the execution of a guarantee (on terms acceptable to the Club Lenders) by CFG Peru Investments Pte Limited in respect of the liabilities owed under the Club Facility by 15 January 2016 (subject to time extension(s) as agreed by the Club Lenders as may be reasonably required by the PA Group Parties to procure the execution of the guarantee by CFG Peru Investments Pte Limited);

2.1.17    recognising the latest developments that have been provided by existing management of PAIH with respect to the Spin-Off Transaction, the lenders under the Club Facility will obtain legal advice from Peruvian counsel in relation thereto and the PA Group Parties will agree to cooperate in good faith with the reasonable suggestions of the lenders under the Club Facility in relation thereto;

2.1.18    the payment and/or reimbursement or procurement of the payment and/or reimbursement of all invoices raised by DLA Piper for the period to 11 December 2015 by 30 December 2015 (with the existing 15% discount on DLA Piper hourly rates) and the payment of all future invoiced fees within 10 Business Days from the receipt of such invoice.  However invoices regarding CFGL, to the extent that PAIH and/or PARD cannot settle on CFGL's behalf, will be further arranged with the approval of the JPLs and the PA Group Parties hereby agree to provide such assistance to the Club Lenders as is required to secure a payment arrangement;

2.1.19    the provision of a written undertaking in identical terms to this Deed on behalf of the PA Group Parties (through counsel acting for CFGL, if necessary or appropriate) to the HK Court at the hearing scheduled for 30 December 2015; and

2.1.20    to co-operate and render all reasonably necessary assistance to the JPLs in the due and proper discharge of their duties to CFGL and CFIL as long as their appointment is continued by the HK Court and/or the Cayman Court.

3.    SUPPORT OF THE CLUB LENDERS

3.1    In consideration of the undertakings provided by the PA Group Parties in clause 2 of this Deed, each Club Lender hereby confirms (by accepting this Deed) that it shall support, by filing evidence and instructing counsel to make such submission to the relevant courts (and to provide other reasonable assistance), for the removal of the PL Appointments at the hearing before the HK Court on 30 December 2015 (or for any such adjourned hearing date thereof) and subsequently before the Cayman Court, and the dismissal of the winding up petition at the hearing of the Cayman Court on 8 January 2016 (or for any such adjourned hearing date

AE/AE/2001027/7/ASIAM/19913491.1

thereof) and of the winding up petition at the hearing in the HK Court on 27 January 2016. The support of the Club Lenders for the matters outlined in this clause 4.1 is conditional upon the full performance and compliance with the terms of this Deed by the PA Group Parties.

3.2    For the avoidance of doubt, the acceptance of this Deed by the Club Lenders is entirely without prejudice to the rights of the Club Lenders to take any action and/or initiate any proceedings under the terms of the Club Facility and/or other Facilities. All such rights are hereby expressly reserved by each of the Club Lenders individually and jointly.

3.3    In case any of the support of any of the Club Lenders as outlined in this Deed does not materialise, this Deed shall become null and void.

## 4.    GOVERNING LAW AND JURISDICTION

This Deed and any non-contractual obligations arising out of or in connection with it shall be governed by and construed in accordance with the laws of the Hong Kong Special Administrative Region and each of the PA Group Parties irrevocably submits to the exclusive jurisdiction of the HK Court. Notwithstanding anything above, any obligations of the PA Group Parties herein shall be subject to the relevant provisions of the applicable laws as well as listing rules and listing manual of the stock exchanges operated by HKSE and SGX.

## 5.    TERMINATION

This Deed may be terminated any time with the written agreement of all the parties (save for the HK Court) specifically named at the beginning of this Deed (parties (1) - (6)), or when the indebtedness of the PA Group Parties and CF Group owed to the Club Lenders has been repaid in full, whichever happens first.

## 6.    RIGHTS OF THIRD PARTIES

This Deed is solely for the benefit of the parties specifically named at the beginning of this Deed. No other party shall have any rights under this Deed (pursuant to the Contracts (Rights of Third Parties) Ordinance (Cap. 623) or otherwise) or shall be able to rely upon or enforce any provisions herein.

IN WITNESS whereof, this Deed was duly executed as a deed poll and delivered on the date stated at the beginning of this Deed.

**PACIFIC ANDES INTERNATIONAL HOLDINGS LIMITED**

Executed as a deed, but not delivered until the )
first date specified on page 1, by **PACIFIC** )
**ANDES INTERNATIONAL HOLDINGS** )
**LIMITED** acting by NG PUAY YEE )
its duly authorised representative in the
presence of:

Signature _____

Name (block capitals) NG PUAY YEE
Director

Witness signature _____

Witness name _____
(block capitals)

Witness address Room 3201-10 Hong Kong Plaza
18.6 Connaught Rd West
Hong Kong

7

**PACIFIC ANDES RESOURCES DEVELOPMENT LIMITED**

Executed as a deed, but not delivered until the                )
first date specified on page 1, by **PACIFIC**                 )
**ANDES RESOURCES DEVELOPMENT**                                )
**LIMITED** acting by ___NG POAY YEE___                        )
its duly authorised representative in the
presence of:

Signature _____

Name (block capitals) __NG PAY YEE__

**Director**

Witness signature _____

Witness name _____
(block capitals)

Witness address _____

_____

# **EXHIBIT 8**

**WITHOUT PREJUDICE**

Dated 20 January 2016

(1)  **CHINA FISHERY GROUP LIMITED**

- and –

(2) **CHINA FISHERIES INTERNATIONAL LIMITED**

- and -

(3) **THE HONGKONG AND SHANGHAI BANKING CORPORATION LIMITED**

# DEED OF UNDERTAKING

relating to China Fishery Group Limited and its subsidiaries

Linklaters

Linklaters
10th Floor, Alexandra House
Chater Road
Hong Kong

Telephone (+852) 2842 4888
Facsimile (+852) 2810 8133/2810 1695

Ref L-241542

RESTRICTED

**THIS DEED** is made on  20 January          2016

**BETWEEN:**

(1)    **CHINA FISHERY GROUP LIMITED ("CFGL");**

(2)    **CHINA FISHERIES INTERNATIONAL LIMITED ("CFIL");**

each at Rooms 3312-3314, Hong Kong Plaza, 188 Connaught Road West, Hong Kong, ("**CF Group Parties**" and each a "CF Group Party"); and

(3)    **THE HONGKONG AND SHANGHAI BANKING CORPORATION LIMITED ("HSBC")** of 1 Queen's Road Central, Hong Kong.

**BACKGROUND:**

(A)    China CITIC Bank International Limited, DBS Bank (Hong Kong) Limited, HSBC, Coöperatieve Centrale Raiffeisen-Boerenleenbank B.A. (also known as Rabobank International) Hong Kong Branch and Standard Chartered Bank (Hong Kong) Limited (the "**Club Lenders**") are lenders under a US$650,000,000 facility agreement dated 20 March 2014 (as amended from time to time) between, among others, CFG Investment S.A.C., CFIL and Corporacion Pesquera Inca S.A.C. (the "**Facility Agreement**").

(B)    Bank of America, N.A. ("**BoA**") has provided certain facilities on a bilateral basis to CFIL and certain other subsidiaries of CFGL.

(C)    On 25 November 2015, HSBC issued petitions for the winding up of CFGL and CFIL in the High Court of Hong Kong. On 27 November 2015, HSBC issued a petition for the winding up of CFGL in the Grand Court of the Cayman Islands ("**Cayman Court**").

(D)    On 25 November 2015, Kris Beighton, Fergal Power and Edward Middleton of KPMG were appointed as joint and several provisional liquidators of CFGL and CFIL by the order of the High Court of the Hong Kong Special Administrative Region ("**HK Court**"). On 8 December 2015, Fergal Power, Kris Beighton and Alex Lawson of Messrs KPMG were appointed as the joint provisional liquidators of CFGL by order of the Cayman Court (the "**PL Appointments**").  On 5 January 2016, the HK Court issued an order dismissing the application to continue the order dated 25 November 2015 relating to the JPLs (the "**HK Discharge Order**").

(E)    All parties agree that a sale of the Peruvian business and/or assets ("**Peruvian Business**") of CFGL and its subsidiaries ("**CF Group**") must now be pursued in order to address CF Group's financial issues but the parties are concerned to ensure that this sales process is conducted in a transparent way which maximises value for all creditors concerned and other stakeholders.  It is acknowledged that the sale of the Peruvian Business will be subject to relevant regulatory processes and approvals including those required under Peruvian laws and the listing rules of HKSE and SGX.

(F)    Following discussions between HSBC and the CF Group Parties, this Deed sets out the CF Group Parties' undertakings and other terms on  which HSBC agrees to withdraw or terminate any appeal with respect to the HK Discharge Order and apply for an Order from the Cayman Court that the PL Appointments be terminated and the JPLs discharged and apply to withdraw the petitions referred to in Recital C above.

**IT IS AGREED:**

## 1   DEFINITIONS AND INTERPRETATIONS

1.1   In this Deed, unless inconsistent with the subject or context, the following expressions bear the following meanings:

"**Agent**" has the meaning given to it in the Facility Agreement;

"**Banks**" means BoA and the Club Lenders in their capacity as creditors of the CF Group;

"**BoA**" has the meaning given to it in Recital B;

"**BoA Costs**" means the fees and expenses incurred by BoA in connection with the matters contemplated by this Deed but subject to agreement between the CF Group Parties and BoA in relation thereto;

"**Bondholders**" means the holders of the US$300 million 9.75% senior notes due 2019 issued by CFG Investment S.A.C. pursuant to an indenture dated 30 July 2012;

"**Business Day**" means a day (other than a Saturday, Sunday or a public holiday) on which commercial banks are open for general business in Hong Kong;

"**Cayman Court**" has the meaning given to it in Recital C;

"**Cayman Petition**" means the winding up petition that was set for hearing in the Cayman Court on 8 January 2016 and has been adjourned;

"**CF Group**" has the meaning given to it in Recital E;

"**Club Lenders**" has the meaning given to it in Recital A;

"**Consent Order**" means an order substantially in the form attached as Appendix 1;

"**CRO**" means the chief restructuring officer to be appointed under Clause 2.2.2;

"**Debt**" means all amounts owed to each of the Banks and the Bondholders by the CF Group, including all outstanding principal, all interest payable under the relevant contractual terms and all costs incurred, including (i) costs relating to the applications to the HK Court and Cayman Court (as applicable) for the winding-up of CFGL and CFIL and the PL Appointments and (ii) the BoA Costs;

"**Default**" has the meaning given to it in the Facility Agreement;

"**Event of Default**" has the meaning given to it in the Facility Agreement;

"**Facility Agreement**" has the meaning given to it in Recital A;

"**Financial Indebtedness**" means any indebtedness for or in respect of:

   (a)   moneys borrowed;

   (b)   any amount raised by acceptance under any acceptance credit facility or dematerialised equivalent;

   (c)   any amount raised pursuant to any note purchase facility or the issue of bonds, notes, debentures, loan stock or any similar instrument;

   (d)   the amount of any liability in respect of any lease or hire purchase contract which would, in accordance with GAAP, be treated as a finance or capital lease;

(e)  receivables sold or discounted (other than any receivables to the extent they are sold on a non-recourse basis);

(f)  any amount raised under any other transaction (including any forward sale or purchase agreement) of a type not referred to in any other paragraph of this definition having the commercial effect of a borrowing;

(g)  any derivative transaction entered into in connection with protection against or benefit from fluctuation in any rate or price (and, when calculating the value of any derivative transaction, only the marked to market value (or, if any actual amount is due as a result of the termination or close-out of that derivative transaction, that amount) shall be taken into account);

(h)  shares which are expressed to be redeemable;

(i)  any counter-indemnity obligation in respect of a guarantee, indemnity, bond, standby or documentary letter of credit or any other instrument issued by a bank or financial institution; and

(j)  the amount of any liability in respect of any guarantee or indemnity for any of the items referred to in paragraphs (a) to (i) above.

"**Grant Thornton**" means Grant Thornton Hong Kong;

"**HK Court**" has the meaning given to it in Recital D;

"**HK Discharge Order**" has the meaning given to it in Recital D;

"**HKSE**" means The Stock Exchange of Hong Kong Stock Limited;

"**Hong Kong Petition**" means the winding up petition set for hearing in the HK Court on 27 January 2016;

"**Interim Payment**" has the meaning given to it in Clause 2.3;

"**JPLs**" means the persons referred to in Recital D appointed as joint provisional liquidators by the HK Court and the Cayman Court;

"**KPMG**" means KPMG Hong Kong;

"**Non-Compliance**" means a failure to comply with any of the undertakings in Clause 2.4 that is notified by HSBC and/or BoA to the Banks and the CF Group Parties by the delivery of a written notice ("**Non-Compliance Notice**") of such an alleged failure;

"**PAIH Group**" means the group of companies or bodies corporate of which Pacific Andes International Holdings Limited is the ultimate holding company;

"**Peruvian Business**" has the meaning given to it in Recital E;

"**PL Appointments**" has the meaning given to it in Recital D;

"**Repayment Date**" means the date falling six (6) months from the date of this Deed or such later date as HSBC and BoA may (in consultation with the Banks) consent to, such consent not to be unreasonably withheld and shall in any event be given to such extension as may be reasonably necessary to obtain any regulatory consent required but not yet obtained with respect to the Sale (including from HKSE, SGX and under applicable Peruvian laws, if any) which the CF Group has applied for and used all reasonable commercial efforts to obtain;

"**Reporting Accountant Engagement**" has the meaning given to it in Clause 2.2.1;

"**Sale**" means the implementation of:

(a)     a sale of the Peruvian Business by the Repayment Date by CFGL and/or its relevant subsidiaries to either 中国合伙人（上海）股权投资基金管理有限公司 or 广州汇垠澳丰股权投资基金管理有限公司 on terms consistent with the memoranda of understanding dated 23 December 2015 and 24 December 2015 respectively; or

(b)     any other sale which can be completed by the Repayment Date and is on such other terms as are in the best interests of the CF Group's creditors;

"**SGX**" means the Singapore Exchange Limited; and

"**Tomlin Order**" means an order substantially in the form attached as Appendix 2.

1.2     In this Deed, unless the context otherwise requires, or unless otherwise expressly provided:

1.2.1     the singular shall include the plural and vice-versa;

1.2.2     references to a "person" include any company, unincorporated association or partnership, whether or not having separate legal personality, and references to a company include any company, corporation or body corporate, wherever incorporated;

1.2.3     headings are for ease of reference only and shall not affect the interpretation of this Deed; and

1.2.4     references to clauses are to clause of this Deed.

## 2     CF GROUP UNDERTAKINGS AND COVENANTS

The CF Group Parties hereby, jointly and severally, irrevocably and unconditionally undertake and covenant in favour of HSBC that the CF Group Parties shall procure:

2.1     immediately on the signing of this Deed the CF Group Parties shall sign a Consent Order and a Tomlin Order by which the undertakings in this Deed are given to the Cayman Court and the HK Court respectively and the parties shall take such steps as are necessary to procure that such orders are made by the Cayman Court and the HK Court; and

2.2     on or before 21 January 2016:

2.2.1     CFGL agrees to Grant Thornton being engaged by CFGL (on terms and with a scope of work to be agreed by HSBC and BoA after consultation with the Banks) to undertake an independent reporting accountant role in respect of the CF Group ("**Reporting Accountant Engagement**") reporting to the Banks. The Grant Thornton terms of engagement to which CFGL shall agree shall, amongst other terms, provide for the following:

(i)     full access to the affairs of the CF Group and its subsidiaries to allow Grant Thornton to undertake their engagement on terms reasonably acceptable to HSBC and BoA (following consultation with the Banks) and independently report directly to the Banks with respect to the Reporting Accountant Engagement;

(ii)     the provision of full support to the CRO as he deems necessary; and

(iii)    CFGL shall be responsible for payment of all fees reasonably incurred by Grant Thornton pursuant to the Reporting Accountant Engagement; and

**2.2.2**    Paul Brough be appointed as CRO (on terms reasonably acceptable to HSBC and BoA following consultation with the Banks) by CFGL and CFIL;

**2.2.3**    the CRO shall be appointed as a director of CFGL and the board of CFGL shall pass a resolution providing that the CRO shall participate fully in the Sale process (with all material actions related to the Sale process having to be approved by the CRO) and to ensure that the affairs and the finances of the CF Group are dealt with in the best interests of the relevant CF Group companies and their creditors; and

**2.2.4**    Ng Joo Siang and Mr Chan Tak Hei shall relinquish all board and management positions within the CF Group, and the board and management positions vacated by Ng Joo Siang shall be taken up by Ng Puay Yee (Jessie);

**2.3**    within 21 days of the date of this Deed, the sum of US$3,100,000 (the "**Interim Payment**") be paid to KPMG on account of the costs and expenses (including legal costs) of the JPLs provided that KPMG has undertaken to seek approval of such costs and expenses from the Cayman Court and the HK Court failing agreement with the CF Group Parties with respect to such fees and expenses and further to repay to the CF Group Parties any amount by which the Interim Payment exceeds the aggregate amount which is payable under this Clause 2.3;

**2.4**    implementation of the following undertakings:

**2.4.1**    the full repayment of the Debt by the Repayment Date;

**2.4.2**    to procure that the CRO be appointed as a director and CRO of all such subsidiaries in the CF Group as the CRO subsequently considers necessary as a result of the CRO having tangible evidence of him having insufficient transparency on the operations of the CF Group companies following discussions between the CRO and the CF Group Parties for a period of not less than seven (7) days in relation to any such enlargement of CRO functions;

**2.4.3**    updates on the Sale process (on a full and transparent basis) shall be provided to the Banks on a bi-weekly basis (or as otherwise agreed by the Banks acting reasonably), or sooner if reasonably requested by the Banks. For the avoidance of doubt, the CRO shall have unfettered rights to communicate with the Banks as regards such Sale process and also generally regarding the affairs of the CF Group in accordance with relevant laws and listing rules of the HKSE and SGX, where applicable;

**2.4.4**    to procure that the management of all CF Group companies provide full cooperation with the CRO and Grant Thornton to allow them to carry out their roles and, with respect to the CRO, for the Sale to be implemented as soon as reasonably practicable;

**2.4.5**    payment of such costs and expenses (including legal costs) of the JPLs as may be agreed or, if not agreed, as are approved by the HK Court or the Cayman Islands Court, to the extent such agreed or approved costs and expenses exceed the Interim Payment, such additional amount to be paid with fourteen (14) days of agreement or approval;

2.4.6    following delivery to CFGL by HSBC of details of its costs and expenses (including legal costs) incurred and a reasonable explanation for the incurrence of such costs and expenses, payment of HSBC's costs and expenses as a priority out of the proceeds of the Sale as soon as reasonably practicable after the Sale or forthwith in any event if the Sale has not occurred on or before the Repayment Date;

2.4.7    not to implement a Sale without the prior written approval of the CRO;

2.4.8    subject to Clause 2.4.9, no CF Group Party may incur any additional Financial Indebtedness including, without limitation, any additional Financial Indebtedness to another member of the CF Group or to another PAIH Group member;

2.4.9    Clause 2.4.8 shall not apply provided that such additional Financial Indebtedness is:

(i)    considered by management of such member of the CF Group to be necessary in the ordinary course of business including, without limitation, in respect of working capital requirements, trading activities and any other costs and expenses associated with any transaction contemplated by this Deed;

(ii)    approved by the CRO in writing; and

(iii)    incurred with a bank or financial institution or a trust, fund or other entity which is regularly engaged in or established for the purpose of making, purchasing or investing in loans, securities or other financial assets;

2.4.10    in collaboration with the CRO, the preparation of a financial budget for the CF Group that sets out the working capital needs of the CF Group for a period of six (6) and twelve (12) months from the date hereof; and

2.4.11    each CF Group Party shall ensure that at all times any unsecured and unsubordinated claims of the Banks and the Bondholders against it rank at least *pari passu* with the claims of all its other unsecured and unsubordinated creditors except those creditors whose claims are mandatorily preferred by laws of general application to companies.

3    **REMOVAL OF THE JPLs AND WITHDRAWAL OF PETITIONS**

3.1    Upon the full compliance with Clause 2.2 by 11.59pm Hong Kong time on 21 January 2016, HSBC shall immediately take all necessary action (and any action reasonably requested by the CF Parties) to (a) remove and terminate the PL Appointment; (b) apply for the dismissal of the Cayman Petition and the Hong Kong Petition; and (c) remove and terminate any appeal with respect to the HK Discharge Order. This Deed shall take effect on the date hereof and only terminate in accordance with the terms hereof.

3.2    Nothing in the Deed will or is intended to operate as a waiver of any Event of Default, any Default, any of the obligations of the CF Group Parties or any of HSBC's or BoA's rights and remedies save that HSBC agrees not to take any action or steps to enforce the Debt (or any part thereof) before the termination of this Deed.

4    **APPOINTMENT OF THE JPLs ON TERMINATION**

If this Deed is terminated pursuant to Clauses 6.1, 6.2, 6.3 or 6.5, each of HSBC and BoA shall individually be at liberty to apply to the Cayman Court for the immediate re-

appointment of the JPLs or the appointment of any other qualified individuals as joint and several provisional liquidators and the CF Parties hereby consent to such re-appointment or appointment (as applicable) provided that the CF Parties may oppose such re-appointment or appointment (as applicable) on the ground (and only upon the ground) that they assert that this Deed has not terminated.

## 5    GOVERNING LAW AND JURISDICTION

This Deed and any non-contractual obligations arising out of or in connection with it shall be governed by and construed in accordance with the laws of the Hong Kong Special Administrative Region and each of the CF Group Parties irrevocably submits to the exclusive jurisdiction of the HK Court. Notwithstanding anything above, any obligations of the CF Group Parties herein shall be subject to the relevant provisions of the applicable laws as well as listing rules and listing manual of the stock exchanges operated by HKSE and SGX.

## 6    TERMINATION

This Deed will terminate on the earliest of:

**6.1**    a breach by a CF Group Party of clause 2.3;

**6.2**    the date which is seven (7) days after delivery to CFGL of a Non-Compliance Notice by HSBC and/or BoA that remains unremedied;

**6.3**    delivery by the CRO or by BoA or by HSBC to the CF Group Parties (with copies to the Banks and the Agent) of a notice in writing stating that in his/its reasonable opinion there is no reasonable prospect of completing a Sale and fully discharging the Debt by the Repayment Date provided that the CF Group Parties shall have been given at least fourteen (14) days written notice by the CRO or by BoA or by HSBC, as appropriate, of his/its intention so to notify the CF Group Parties (with copies to the Banks and the Agent) and having been afforded the good faith opportunity to discuss the same with the CRO or BoA or HSBC as appropriate;

**6.4**    the date on which the Debt is repaid in full; or

**6.5**    15 July 2016 or such later date as HSBC and BoA may agree in writing.

## 7    NOTICE

Notice under Clause 6 shall be validly delivered if delivered by hand to CFGL at Rooms 3312-3314, Hong Kong Plaza, 188 Connaught Road West, Hong Kong for the attention of Ms Jessie Ng and copied by electronic mail to Jessie.ng@pacificandes.com and Bertie.Mehigan@ashurst.com.

## 8    RIGHTS OF THIRD PARTIES

This Deed is solely for the benefit of (a) the parties specifically named at the beginning of this Deed; and (b) BoA. No other party shall have any rights under this Deed (pursuant to the Contracts (Rights of Third Parties) Ordinance (Cap. 623) or otherwise) or shall be able to rely upon or enforce any provisions herein.

9    **DISCLOSURE**

The company may make such disclosure relating to this Deed as required under any laws and listing rules requirements under the HKSE and SGX.

10    **COUNTERPARTS**

This Deed may be entered into in any number of counterparts, all of which taken together shall constitute one and the same instrument. A party may enter into this Deed by executing any such counterpart.

**APPENDIX 1**

**Consent Order**

RESTRICTED - A31112260

**IN THE GRAND COURT OF THE CAYMAN ISLANDS**
**FINANCIAL SERVICES DIVISION**

**CAUSE NO: FSD 186 OF 2015 (AJJ)**

**Before The Honourable Justice Andrew Jones QC**
**In Chambers [In Open Court],            2016**

**IN THE MATTER OF THE COMPANIES LAW (2013 REVISION)**

**AND IN THE MATTER OF CHINA FISHERY GROUP LIMITED**

---

_____

**ORDER**

_____

**UPON** the parties having agreed terms of settlement as per Schedules 1 and 2 to this Order;

**AND UPON** China Fishery Group Limited (the "**Company**") providing undertakings to the Court which are identical to the undertakings set out in Clauses 2.2, 2.3 and 2.4 of the Deed of Undertaking dated [●] January 2016 entered into between the Petitioner, the Company and China Fisheries International Limited, a copy of which is appended at Schedule 2 to this Order;

**BY CONSENT IT IS ORDERED THAT:**

1.      All further proceedings in this matter be temporarily stayed until 11:59 pm Hong Kong time on 21 January 2016, upon the terms set out in Schedules 1 and 2 of this Order signed by attorneys for each party, except for the purpose of enforcing those terms in the interim period between the date of this Order and 11:59 pm Hong Kong time on 21 January 2016.

2.      Either party may be permitted to apply to the Court to enforce the terms set out in Schedules 1 and 2 in the interim period between the date of this Order and 11:59 pm Hong Kong time on 21 January 2016 without the need to bring a new claim.

1

4520580.2 H2592.H12482

3.      The Order made by this Honourable Court on 8 December 2015 appointing Kris Beighton, Alexander Lawson and Fergal Power of KPMG as Joint Provisional Liquidators ("**JPLs**") do hereby be varied to stay the duties and powers of the JPLs pending the discharge of the JPLs on or after 22 January 2016 in accordance with clause 3 of Schedule 2 hereof, and the JPLs are hereby authorised and directed to cooperate with the Petitioner with respect to its obligations under clause 3 of Schedule 2.

DATED the      day of      2016
FILED the       day of      2016

_____

**THE HONOURABLE MR. JUSTICE ANDREW JONES QC
JUDGE OF THE GRAND COURT**

This Order was filed by Walkers, Attorneys at Law for the Petitioner whose address for service is that of their said attorneys, 190 Elgin Avenue, George Town, Grand Cayman KY1-9001.

2

4520580.2 H2592.H12482

**AGREED AS TO FORM AND CONTENT**

_____

**Walkers**
Attorneys at Law for the Petitioner

_____

**Mourant Ozannes**
Attorneys at Law for China Fishery Group Limited

_____

**Harneys**
Attorneys at Law for Coöperatieve Centrale Raiffeisen-Boerenleenbank B.A. Hong Kong Branch, DBS Bank (Hong Kong) Limited, and Standard Chartered Bank (Hong Kong) Limited

_____

**Solomon Harris**
Attorneys at Law for China CITIC Bank International Limited

3

## Schedule 1

Unless otherwise stated, this Schedule will adopt the same terms as defined in the Deed of Undertaking appearing at Schedule 2 of this Order.

It is agreed by all parties that:-

1.     In the interim period between the date of this Order and 11:59 pm Hong Kong time on 21 January 2016, the Petitioner, HSBC, may specifically enforce Clause.2.2 of the Deed of Undertaking against the CF Group Parties;

2.     For avoidance of doubt, even if Clause 2.2 of the Deed of Undertaking is fully complied with by 11:59 pm Hong Kong time on 21 January 2016, the temporary stay under this Order shall nevertheless cease to have effect, and the Petitioner, HSBC, is at liberty to take further steps in this matter. The scope of this Order is not intended to cover clause 3.1 of the Deed of Undertaking or otherwise extend beyond 11:59 pm Hong Kong time on 21 January 2016; and

3.     If, in the interim period between the date of this Order and 11:59 pm Hong Kong time on 21 January 2016, the Deed of Undertaking is terminated pursuant to clause 6 of the Deed of Undertaking, the temporary stay under this Order shall be automatically lifted following which the Petitioner, HSBC, is at liberty to take further steps in this matter without reference to the CF Group Parties.

4520580.2 H2592.H12482

**Schedule 2**

**Copy of the Deed of Undertaking**

5

**APPENDIX 2**

**Tomlin Order**

**HCCW 367 / 2015**

### IN THE HIGH COURT OF THE

### HONG KONG SPECIAL ADMINISTRATIVE REGION

### COURT OF FIRST INSTANCE

### COMPANIES (WINDING-UP) PROCEEDINGS NO. 367 OF 2015

———————

**IN THE MATTER OF THE COMPANIES (WINDING UP AND MISCELLANEOUS PROVISIONS) ORDINANCE (CAP. 32)**

**AND**

**IN THE MATTER OF CHINA FISHERY GROUP LIMITED**

———————

—————————————————————

### DRAFT TOMLIN ORDER

—————————————————————

UPON the parties having agreed terms of settlement as per Schedules 1 and 2 to this Order

AND UPON China Fishery Group Limited (the "**Company**") providing undertakings to the Court which are identical to the undertakings set out in Clauses 2.2, 2.3 and 2.4 of the Deed of Undertaking dated [●] January 2016 entered into between the Petitioner, the Company and China Fisheries International Limited, a copy of which is appended at Schedule 2 to this Order

BY CONSENT

IT IS ORDERED THAT all further proceedings in this matter be temporarily stayed until 11:59 pm Hong Kong time on 21 January 2016, upon the terms set out in Schedules 1 and 2 of this Order signed by solicitors for each party, except for the purpose of enforcing those terms in the interim period between the date of this Order and 11:59 pm Hong Kong time on 21 January 2016.

AND IT IS FURTHER ORDERED THAT either party may be permitted to apply to the Court to enforce the terms set out in Schedules 1 and 2 in the interim period between the date of this Order and 11:59 pm Hong Kong time on 21 January 2016 without the need to bring a new claim.

Dated the        day of January 2016.


                                                                    Registrar



We hereby consent to an Order being made in the above terms.



_____          _____

**Linklaters**                          **Haldanes**
Solicitors for the Petitioner           Solicitors for China Fishery Group Limited

(Ref: DJK/MKYS/JYKT/L-241542)           (Ref: 2015324226/PCR/DJH)



_____          _____

**DLA Piper Hong Kong**                 **Joseph S.C. Chan & Co**
Solicitors for Coöperatieve Centrale Raiffeisen-   Solicitors for China CITIC Bank International
Boerenleenbank B.A. Hong Kong Branch, DBS          Limited
Bank (Hong Kong) Limited, and Standard
Chartered Bank (Hong Kong) Limited      (Ref: CM/CCF/C/23955/2015)

(Ref: AWB/2001027/14)

### Schedule 1

Unless otherwise stated, this Schedule will adopt the same terms as defined in the Deed of Undertaking appearing at Schedule 2 of this Tomlin Order.

It is agreed by all parties that:-

1.    In the interim period between the date of this Tomlin Order and 11:59 pm Hong Kong time on 21 January 2016, the Petitioner, HSBC, may specifically enforce Clause 2.2 of the Deed of Undertaking against the CF Group Parties;

2.    For avoidance of doubt, even if Clause 2.2 of the Deed of Undertaking is fully complied with by 11:59 pm Hong Kong time on 21 January 2016, the temporary stay under this Tomlin Order shall nevertheless cease to have effect, and the Petitioner, HSBC, is at liberty to take further steps in this matter. The scope of this Tomlin Order is not intended to cover clause 3.1 of the Deed of Undertaking or otherwise extend beyond 11:59 pm Hong Kong time on 21 January 2016; and

3.    If, in the interim period between the date of this Tomlin Order and 11:59 pm Hong Kong time on 21 January 2016, the Deed of Undertaking is terminated pursuant to clause 6 of the Deed of Undertaking, the temporary stay under this Tomlin Order shall be automatically lifted following which the Petitioner, HSBC, is at liberty to take further steps in this matter without reference to the CF Group Parties.

**<u>Schedule 2</u>**

**Copy of the Deed of Undertaking**

**HCCW 367 / 2015**

**IN THE HIGH COURT OF THE
HONG KONG SPECIAL ADMINISTRATIVE REGION
COURT OF FIRST INSTANCE**

**COMPANIES (WINDING UP) NO. 367 OF 2015**

———————

**IN THE MATTER OF THE COMPANIES
(WINDING UP AND MISCELLANEOUS
PROVISIONS) ORDINANCE (CAP. 32)**

**AND**

**IN THE MATTER OF CHINA FISHERY
GROUP LIMITED**

———————

---

**DRAFT TOMLIN ORDER**

---

Dated the　　　　day of January 2016.

Filed the　　　　day of January 2016.

Linklaters
Solicitors for the Petitioner
10th Floor, Alexandra House
Chater Road
Hong Kong
Tel: (852) 2842 4888
Fax: (852) 2810 8133

(Our Ref: DJK/MKYS/JYKT/L-241542)

**HCCW 368 / 2015**

### IN THE HIGH COURT OF THE

### HONG KONG SPECIAL ADMINISTRATIVE REGION

### COURT OF FIRST INSTANCE

### COMPANIES (WINDING-UP) PROCEEDINGS NO. 368 OF 2015

———————————

**IN THE MATTER OF THE COMPANIES (WINDING UP AND MISCELLANEOUS PROVISIONS) ORDINANCE (CAP. 32)**

**AND**

**IN THE MATTER OF CHINA FISHERIES INTERNATIONAL LIMITED**

———————————

———————————————————
### DRAFT TOMLIN ORDER
———————————————————

UPON the parties having agreed terms of settlement as per Schedules 1 and 2 to this Order

AND UPON China Fisheries International Limited (the "**Company**") providing undertakings to the Court which are identical to the undertakings set out in Clauses 2.2, 2.3 and 2.4 of the Deed of Undertaking dated [●] January 2016 entered into between the Petitioner, the Company and China Fishery Group Limited, a copy of which is appended at Schedule 2 to this Order

BY CONSENT

IT IS ORDERED THAT all further proceedings in this matter be temporarily stayed until 11:59 pm Hong Kong time on 21 January 2016, upon the terms set out in Schedules 1 and 2 of this Order signed by solicitors for each party, except for the purpose of enforcing those terms in the interim period between the date of this Order and 11:59 pm Hong Kong time on 21 January 2016.

AND IT IS FURTHER ORDERED THAT either party may be permitted to apply to the Court to enforce the terms set out in Schedules 1 and 2 in the interim period between the date of this Order and 11:59 pm Hong Kong time on 21 January 2016 without the need to bring a new claim.

Dated the      day of January 2016.


                                                            Registrar



We hereby consent to an Order being made in the above terms.


_____

**Linklaters**
Solicitors for the Petitioner
(Ref: DJK/MKYS/JYKT/L-241542)

_____

**Haldanes**
Solicitors for China Fisheries International Limited
(Ref: 2015324226/PCR/DJH)


_____

**DLA Piper Hong Kong**
Solicitors for Coöperatieve Centrale Raiffeisen-Boerenleenbank B.A. Hong Kong Branch, DBS Bank (Hong Kong) Limited, and Standard Chartered Bank (Hong Kong) Limited
(Ref: AWB/2001027/14)

_____

**Joseph S.C. Chan & Co**
Solicitors for China CITIC Bank International Limited
(Ref: CM/CCF/C/23955/2015)

## Schedule 1

Unless otherwise stated, this Schedule will adopt the same terms as defined in the Deed of Undertaking appearing at Schedule 2 of this Tomlin Order.

It is agreed by all parties that:-

1.      In the interim period between the date of this Tomlin Order and 11:59 pm Hong Kong time on 21 January 2016, the Petitioner, HSBC, may specifically enforce Clause 2.2 of the Deed of Undertaking against the CF Group Parties;

2.      For avoidance of doubt, even if Clause 2.2 of the Deed of Undertaking is fully complied with by 11:59 pm Hong Kong time on 21 January 2016, the temporary stay under this Tomlin Order shall nevertheless cease to have effect, and the Petitioner, HSBC, is at liberty to take further steps in this matter. The scope of this Tomlin Order is not intended to cover clause 3.1 of the Deed of Undertaking or otherwise extend beyond 11:59 pm Hong Kong time on 21 January 2016; and

3.      If, in the interim period between the date of this Tomlin Order and 11:59 pm Hong Kong time on 21 January 2016, the Deed of Undertaking is terminated pursuant to clause 6 of the Deed of Undertaking, the temporary stay under this Tomlin Order shall be automatically lifted following which the Petitioner, HSBC, is at liberty to take further steps in this matter without reference to the CF Group Parties.

## Schedule 2

**Copy of the Deed of Undertaking**

HCCW 368 / 2015

**IN THE HIGH COURT OF THE**
**HONG KONG SPECIAL ADMINISTRATIVE REGION**
**COURT OF FIRST INSTANCE**

**COMPANIES (WINDING UP) NO. 368 OF 2015**

_____

**IN THE MATTER OF THE COMPANIES**
**(WINDING UP AND MISCELLANEOUS**
**PROVISIONS) ORDINANCE (CAP. 32)**

**AND**

**IN THE MATTER OF CHINA FISHERIES**
**INTERNATIONAL LIMITED**

_____

---

**DRAFT TOMLIN ORDER**

---

Dated the           day of January 2016.

Filed the           day of January 2016.

Linklaters
Solicitors for the Petitioner
10th Floor, Alexandra House
Chater Road
Hong Kong
Tel: (852) 2842 4888
Fax: (852) 2810 8133

(Our Ref: DJK/MKYS/JYKT/L-241542)

**HCMP 44 / 2016**

## IN THE HIGH COURT OF THE

## HONG KONG SPECIAL ADMINISTRATIVE REGION

## COURT OF APPEAL

## MISCELLANEOUS PROCEEDINGS NO.  44 OF 2016

## (ON AN INTENDED APPEAL FROM HCCW NO. 367 OF 2015)

———————

**IN THE MATTER OF THE COMPANIES (WINDING UP AND MISCELLANEOUS PROVISIONS) ORDINANCE (CAP. 32)**

**AND**

**IN THE MATTER OF CHINA FISHERY GROUP LIMITED**

———————

**BETWEEN**

**THE HONGKONG AND SHANGHAI BANKING CORPORATION LIMITED**

**Petitioner**

and

**CHINA FISHERY GROUP LIMITED**

**Respondent**

**COÖPERATIEVE CENTRALE RAIFFEISEN-BOERENLEENBANK B.A. HONG KONG BRANCH**

**1st Interested Creditor**

**DBS BANK (HONG KONG) LIMITED**

**2nd Interested Creditor**

**STANDARD CHARTERED BANK (HONG KONG) LIMITED**

**3rd Interested Creditor**

**CHINA CITIC BANK INTERNATIONAL LIMITED**

**4th Interested Creditor**

———————————————————

**DRAFT TOMLIN ORDER**

———————————————————

UPON the parties having agreed terms of settlement as per Schedules 1 and 2 to this Order

AND UPON China Fishery Group Limited (the "**Company**") providing undertakings to the Court which are identical to the undertakings set out in Clauses 2.2, 2.3 and 2.4 of the Deed of Undertaking dated [●] January 2016 entered into between the Petitioner, the Company and China Fisheries International Limited, a copy of which is appended at Schedule 2 to this Order

BY CONSENT

IT IS ORDERED THAT all further proceedings in this matter be temporarily stayed until 11:59 pm Hong Kong time on 21 January 2016, upon the terms set out in Schedules 1 and 2 of this Order signed by solicitors for each party, except for the purpose of enforcing those terms in the interim period between the date of this Order and 11:59 pm Hong Kong time on 21 January 2016.

AND IT IS FURTHER ORDERED THAT either party may be permitted to apply to the Court to enforce the terms set out in Schedules 1 and 2 in the interim period between the date of this Order and 11:59 pm Hong Kong time on 21 January 2016 without the need to bring a new claim.

Dated the        day of January 2016.

Registrar

We hereby consent to an Order being made in the above terms.

_____

**Linklaters**
Solicitors for the Petitioner

(Ref: DJK/MKYS/JYKT/L-241542)

_____

**Haldanes**
Solicitors for the Respondent

(Ref: 2015324226/PCR/DJH)

_____

**DLA Piper Hong Kong**
Solicitors for the 1st, 2nd and 3rd Interested Creditors

(Ref: AWB/2001027/14)

_____

**Joseph S.C. Chan & Co**
Solicitors for the 4th Interested Creditor

(Ref: CM/CCF/C/23955/2015)

A31116831

3

## Schedule 1

Unless otherwise stated, this Schedule will adopt the same terms as defined in the Deed of Undertaking appearing at Schedule 2 of this Tomlin Order.

It is agreed by all parties that:-

1.      In the interim period between the date of this Tomlin Order and 11:59 pm Hong Kong time on 21 January 2016, the Petitioner, HSBC, may specifically enforce Clause 2.2 of the Deed of Undertaking against the CF Group Parties;

2.      For avoidance of doubt, even if Clause 2.2 of the Deed of Undertaking is fully complied with by 11:59 pm Hong Kong time on 21 January 2016, the temporary stay under this Tomlin Order shall nevertheless cease to have effect, and the Petitioner, HSBC, is at liberty to take further steps in this matter. The scope of this Tomlin Order is not intended to cover clause 3.1 of the Deed of Undertaking or otherwise extend beyond 11:59 pm Hong Kong time on 21 January 2016;

3.      If, in the interim period between the date of this Tomlin Order and 11:59 pm Hong Kong time on 21 January 2016, the Deed of Undertaking is terminated pursuant to clause 6 of the Deed of Undertaking, the temporary stay under this Tomlin Order shall be automatically lifted following which the Petitioner, HSBC, is at liberty to take further steps in this matter without reference to the CF Group Parties.

**Schedule 2**

**Copy of the Deed of Undertaking**

HCMP 44 / 2016

**IN THE HIGH COURT OF THE**
**HONG KONG SPECIAL ADMINISTRATIVE REGION**
**COURT OF APPEAL**
**MISCELLANEOUS PROCEEDINGS NO. 44 OF 2016**

**(ON AN INTENDED APPEAL**
**FROM HCCW 367 OF 2015)**

_____

**IN THE MATTER OF THE COMPANIES**
**(WINDING UP AND MISCELLANEOUS**
**PROVISIONS) ORDINANCE (CAP. 32)**

**AND**

**IN THE MATTER OF CHINA FISHERY**
**GROUP LIMITED**

_____

_____

**DRAFT TOMLIN ORDER**

_____

Dated the        day of January 2016.

Filed the         day of January 2016.

Linklaters
Solicitors for the Petitioner
10th Floor, Alexandra House
Chater Road
Hong Kong
Tel: (852) 2842 4888
Fax: (852) 2810 8133

(Our Ref: DJK/MKYS/JYKT/L-241542)

HCMP 45 / 2016

IN THE HIGH COURT OF THE

HONG KONG SPECIAL ADMINISTRATIVE REGION

COURT OF APPEAL

MISCELLANEOUS PROCEEDINGS NO.  45 OF 2016

(ON AN INTENDED APPEAL FROM HCCW NO. 368 OF 2015)

————————

IN THE MATTER OF THE COMPANIES (WINDING UP AND MISCELLANEOUS PROVISIONS) ORDINANCE (CAP. 32)

AND

IN THE MATTER OF CHINA FISHERIES INTERNATIONAL LIMITED

————————

BETWEEN

THE HONGKONG AND SHANGHAI BANKING CORPORATION LIMITED

Petitioner

and

CHINA FISHERIES INTERNATIONAL LIMITED

Respondent

COÖPERATIEVE CENTRALE RAIFFEISEN-BOERENLEENBANK B.A. HONG KONG BRANCH

1st Interested Creditor

DBS BANK (HONG KONG) LIMITED

2nd Interested Creditor

STANDARD CHARTERED BANK (HONG KONG) LIMITED

3rd Interested Creditor

CHINA CITIC BANK INTERNATIONAL LIMITED

4th Interested Creditor

——————————————————————

DRAFT TOMLIN ORDER

——————————————————————

UPON the parties having agreed terms of settlement as per Schedules 1 and 2 to this Order

AND UPON China Fisheries International Limited (the "**Company**") providing undertakings to the Court which are identical to the undertakings set out in Clauses 2.2, 2.3 and 2.4 of the Deed of Undertaking dated [●] January 2016 entered into between the Petitioner, the Company and China Fishery Group Limited, a copy of which is appended at Schedule 2 to this Order

BY CONSENT

IT IS ORDERED THAT all further proceedings in this matter be temporarily stayed until 11:59 pm Hong Kong time on 21 January 2016, upon the terms set out in Schedules 1 and 2 of this Order signed by solicitors for each party, except for the purpose of enforcing those terms in the interim period between the date of this Order and 11:59 pm Hong Kong time on 21 January 2016.

AND IT IS FURTHER ORDERED THAT either party may be permitted to apply to the Court to enforce the terms set out in Schedules 1 and 2 in the interim period between the date of this Order and 11:59 pm Hong Kong time on 21 January 2016 without the need to bring a new claim.

Dated the        day of January 2016.

Registrar

We hereby consent to an Order being made in the above terms.

_____

**Linklaters**

Solicitors for the Petitioner

(Ref: DJK/MKYS/JYKT/L-241542)

_____

**Haldanes**

Solicitors for the Respondent

(Ref: 2015324226/PCR/DJH)

_____

**DLA Piper Hong Kong**

Solicitors for the 1st, 2nd and 3rd Interested Creditors

(Ref: AWB/2001027/14)

_____

**Joseph S.C. Chan & Co**

Solicitors for the 4th Interested Creditor

(Ref: CM/CCF/C/23955/2015)

## Schedule 1

Unless otherwise stated, this Schedule will adopt the same terms as defined in the Deed of Undertaking appearing at Schedule 2 of this Tomlin Order.

It is agreed by all parties that:-

1.    In the interim period between the date of this Tomlin Order and 11:59 pm Hong Kong time on 21 January 2016, the Petitioner, HSBC, may specifically enforce Clause 2.2 of the Deed of Undertaking against the CF Group Parties;

2.    For avoidance of doubt, even if Clause 2.2 of the Deed of Undertaking is fully complied with by 11:59 pm Hong Kong time on 21 January 2016, the temporary stay under this Tomlin Order shall nevertheless cease to have effect, and the Petitioner, HSBC, is at liberty to take further steps in this matter. The scope of this Tomlin Order is not intended to cover clause 3.1 of the Deed of Undertaking or otherwise extend beyond 11:59 pm Hong Kong time on 21 January 2016;

3.    If, in the interim period between the date of this Tomlin Order and 11:59 pm Hong Kong time on 21 January 2016, the Deed of Undertaking is terminated pursuant to clause 6 of the Deed of Undertaking, the temporary stay under this Tomlin Order shall be automatically lifted following which the Petitioner, HSBC, is at liberty to take further steps in this matter without reference to the CF Group Parties.

A31119202

## Schedule 2

**Copy of the Deed of Undertaking**

HCMP 45 / 2016

**IN THE HIGH COURT OF THE**
**HONG KONG SPECIAL ADMINISTRATIVE REGION**
**COURT OF APPEAL**
**MISCELLANEOUS PROCEEDINGS NO. 45 OF 2016**

**(ON AN INTENDED APPEAL**
**FROM HCCW 368 OF 2015)**

———————

**IN THE MATTER OF THE COMPANIES**
**(WINDING UP AND MISCELLANEOUS**
**PROVISIONS) ORDINANCE (CAP. 32)**

**AND**

**IN THE MATTER OF CHINA FISHERIES**
**INTERNATIONAL LIMITED**

———————

---

**DRAFT TOMLIN ORDER**

---

Dated the          day of January 2016.

Filed the           day of January 2016.

Linklaters
Solicitors for the Petitioner
10th Floor, Alexandra House
Chater Road
Hong Kong
Tel: (852) 2842 4888
Fax: (852) 2810 8133

(Our Ref: DJK/MKYS/JYKT/L-241542)

**IN WITNESS** whereof, this Deed was duly executed as a deed and delivered on the date stated at the beginning of this Deed.

<u>CHINA FISHERY GROUP LIMITED</u>

Executed as a deed by **CHINA FISHERY**　　　　　)
**GROUP LIMITED** acting by　　　　　　　　　　)
<u>CHAN TAK HEI</u>　　its duly authorised　　　)
representative in the presence of:　　　　　　　)

Signature ..................................................

Name (block capitals)　<u>CHAN TAK HEI</u>

**Director**

Witness signature ..................................................

Witness name
(block capitals)　　Peter Chung

Witness address　　32 Floor  Hong Kong
Plaza, 186 Connaught
Road West, Hong Kong

**IN WITNESS** whereof, this Deed was duly executed as a deed and delivered on the date stated at the beginning of this Deed.

<u>**CHINA FISHERY GROUP LIMITED**</u>

Executed as a deed by **CHINA FISHERY**   )
**GROUP LIMITED** acting by      )
<u>CHAN TAK HEI</u> its duly authorised   )
representative in the presence of:    )

Signature

Name (block capitals)   CHAN TAK HEI

**Director**

Witness signature

Witness name
(block capitals)    Peter Chung

Witness address    32 Floor Hong Kong
Plaza, 186 Connaught
Road West, Hong Kong

Signed and sealed by Mark T. McKeown under the power of
attorney dated 6 August 2014 and thereby executed by **The
Hongkong and Shanghai Banking Corporation Limited** as
its deed in the presence of:

Name        Adam B. Clark

Address     Level 31, HSBC Main Building
            1 Queen's Road Central, Hong Kong

Occupation  Sr. Loan Management Manager

RESTRICTED - A31112260

# **EXHIBIT 9**

*Hong Kong Exchanges and Clearing Limited and The Stock Exchange of Hong Kong Limited take no responsibility for the contents of this announcement, make no representation as to its accuracy or completeness, and expressly disclaim any liability whatsoever for any loss howsoever arising from or in reliance upon the whole or any part of the contents of this announcement.*



## PACIFIC ANDES INTERNATIONAL HOLDINGS LIMITED
太平洋恩利國際控股有限公司

*(Incorporated in Bermuda with limited liability)*

**(STOCK CODE: 1174)**

# UPDATE ON SUSPENSION OF TRADING –
# CHANGE OF FORENSIC ACCOUNTANT

References are made to the announcements of the Company dated 17 December 2015, 31 December 2015, 1 March 2016, 20 March 2016, 5 April 2016 and 2 June 2016 (collectively, the "**Announcements**") relating to, among others, the Deed in favour of the Majority Club Lenders and the HK Court, the Resumption Conditions and the forensic review. Unless otherwise stated, capitalised terms used herein shall have the same respective meanings as those defined in the Announcements.

**CHANGE OF FORENSIC ACCOUNTANT**

As disclosed in the Announcements, pursuant to the Deed dated 28 December 2015, the PA Group Parties undertook and covenanted in favour of the Majority Club Lenders to, among other things, engage an independent accounting firm to conduct an independent forensic review in relation to the financial aspects of the Group. Subsequently, the IRC, through its legal advisor, appointed PwC as independent professional advisor to conduct the forensic review on the financial aspects of the Group. The forensic review commenced on 17 March 2016 and has not yet been completed.

The work of PwC has been subject to suspension while the IRC and the Company have been reviewing the projected cost and progress of the forensic review with a view to accelerating its completion, while keeping the cost within an acceptable budget.

Given that completion of the audit work of the Group for the financial year ended 28 September 2015, the publication of the preliminary results for the year ended 28 September 2015 and the 2016 Interim Results, the despatch of the annual report for the year ended 28 September 2015 and the 2016 Interim Report and the resumption of trading in the Shares are dependent on the timely completion of the forensic review, the IRC has reviewed the appointment of PwC so as to provide more certainty on the timing and cost of the forensic review. As a result, the IRC has recommended to appoint RSM Corporate Advisory (Hong Kong) Limited ("**RSM**") in place of PwC to complete the forensic review of the Group.

Having obtained the consent of the Majority Club Lenders on the said change of appointment, the IRC, through its legal advisor, appointed RSM on 6 June 2016 as independent forensic accountant to complete the forensic review of the financial aspects of the Group. Upon completion of their work, RSM will compile a report for the IRC's consideration. The Company will make further announcement(s) as and when appropriate.

## CONTINUED SUSPENSION OF TRADING

At the request of the Company, trading in the shares of the Company (the "**Shares**") on the Stock Exchange was halted from 9:00 a.m. on 26 November 2015. The Company has disclosed the Resumption Conditions imposed by the Stock Exchange on 1 March 2016, which include, among other things, publishing all outstanding financial results and addressing any audit qualifications.

Trading in the Shares on the Stock Exchange will remain suspended until further notice. Shareholders of the Company and potential investors of the Company should exercise caution when dealing in the Shares.

By Order of the Board
**Pacific Andes International Holdings Limited**
**Ng Puay Yee (Jessie)**
*Managing Director*

Hong Kong, 6 June 2016

*As at the date of this announcement, the executive directors of the Company are Ms. Ng Puay Yee (Jessie), Mr. Ng Joo Kwee and Mr. Ng Joo Puay, Frank, the non-executive director of the Company is Madam Teh Hong Eng whilst the independent non-executive directors of the Company are Mr. Lew V Robert, Mr. Tao Kwok Lau, Clement and Mr. Nguyen Van Tu, Peter.*