UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X

In re:                                                                    Chapter 11

CHINA FISHERY GROUP LIMITED
(CAYMAN), *et al.*,                                             Case No. 16-11895 (JLG)

                                               Debtors.[1]        (Jointly Administered)

--------------------------------------------------------X


### DEBTORS' MEMORANDUM OF LAW IN OPPOSITION TO CLUB LENDER PARTIES' MOTION FOR THE ENTRY OF AN ORDER DIRECTING THE APPOINTMENT OF A CHAPTER 11 TRUSTEE PURSUANT TO 11 U.S.C. § 1104(a)(2)

Paul F. Millus
Thomas R. Slome
Howard B. Kleinberg
Daniel B. Rinaldi
MEYER, SUOZZI, ENGLISH & KLEIN, P.C.
1350 Broadway, Suite 501
New York, New York 11018
Telephone: (212) 239-4999
Facsimile: (212) 239-1311

*Counsel to Debtors and Debtors-in-Possession*

---

[1] The Debtors are N.S. Hong Investment (BVI) Limited ("NS Hong"), Super Investment Limited (Cayman) ("Super Investment"), Pacific Andes International Holdings Limited (Bermuda) ("PAIH"), China Fishery Group Limited (Cayman) ("CFGL"), Smart Group Limited (Cayman) ("Smart Group"), Protein Trading Limited (Samoa) ("Protein Trading"), South Pacific Shipping Agency Limited (BVI) ("SPSA"), CFG Peru Investments Pte. Limited (Singapore) ("CFG Peru Singapore"), China Fisheries International Limited (Samoa) ("CFIL"), Growing Management Limited (BVI) ("Growing Management"), Chanery Investment Inc. (BVI) ("Chanery"), Champion Maritime Limited (BVI) ("Champion"), Target Shipping Limited (HK) ("Target Shipping"), Fortress Agents Limited (BVI) ("Fortress"), CFGL (Singapore) Private Limited ("CFGLPL"), and Ocean Expert International Limited (BVI) ("Ocean Expert").

## TABLE OF CONTENTS

Table of Authorities.................................................................................................................ii

PRELIMINARY STATEMENT ...........................................................................................1

STATEMENT OF FACTS....................................................................................................5

ARGUMENT .......................................................................................................................16

THE APPOINTMENT OF A CHAPTER 11 TRUSTEE PURSUANT
TO 11 U.S.C. § 1104(a)(2) IS UNWARRANTED UNDER THE
FACTS AND CIRCUMSTANCES OF THIS CASE ..............................................................16

    A.     The High Standard and Multiple Factors To Be Considered .......................................16

    B.     Debtors' Management is Trustworthy...........................................................................18

    C.     The Debtors' Prospects for Rehabilitation are Good ....................................................27

    D.     Debtors are Deserving of the Movants' and Others' Confidence ................................30

    E.     The Movants Ignore the Interests of the Debtors,
          the Chapter 15 Debtors, and their Shareholders............................................................32

    F.     The Costs and Harms of Appointing a Trustee Greatly Outweigh the Benefits ...........33

CONCLUSION .....................................................................................................................36

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re The 1031 Tax Group., LLC*,
  374 B.R. 78 (Bankr. S.D.N.Y. 2007) ................................................................... 29

*In re Adelphia Commc'ns Corp.*,
  336 B.R. 610 (Bankr. S.D.N.Y. 2006) ........................................................... 16, 17

*In re Bayou Grp., LLC*,
  564 F.3d 541 (2d Cir. 2009) ................................................................... *passim*

*In re BLX Group, Inc.*,
  419 B.R. 457 (Bankr. D. Mont. 2009) ............................................................ 25, 26

*In re Colorado-Ute Elec. Ass'n, Inc.*,
  120 B.R. 164 (Bankr. D. Colo. 1990) ........................................................ 26, 30, 31

*In re Euro-American Lodging Corp.*,
  365 B.R. 421 (Bankr. S.D.N.Y. 2007) ................................................................ 26

*In re Eurospark Indus., Inc.*,
  424 B.R. 621 (Bankr. E.D.N.Y. 2010) ........................................................ 24, 25, 29

*In re Fairwood Corp., Debtor*,
  No. 99 CIV. 3177, 2000 WL 264319 (S.D.N.Y. Mar. 9, 2000) ............................................ 17

*In re General Oil Distributors, Inc.*,
  42 B.R. 402 (Bankr. E.D.N.Y. 1984) ........................................................ 27, 29, 34

*In re H & S Transp. Co., Inc.*,
  55 B.R. 786 (Bankr. M.D. Tenn. 1982) ................................................................ 30

*In re Hotel Associates, Inc.*,
  3 B.R. 343 (Bankr. E.D. Pa. 1980) ............................................................ 29, 30

*In re Ionosphere Clubs, Inc.*,
  113 B.R. 164 (Bankr. S.D.N.Y. 1990) ................................................................ 26

*In re Keeley & Grabanski Land P'ship*,
  455 B.R. 153 (B.A.P. 8th Cir. 2011) ............................................................ 26, 29

*In re L. S. Good & Co.*,
  8 B.R. 312 (Bankr. N.D.W. Va. 1980) ............................................................ 26, 29

*In re McCorhill Pub., Inc.*,
    73 B.R. 1013 (Bankr. S.D.N.Y. 1987) ............................................................... 25

*In re Microwave Products of Am., Inc.*,
    102 B.R. 666 (Bankr. W.D. Tenn. 1989) ........................................................... 31

*In re MSR Hotels & Resorts, Inc.*,
    No. 13-11512, 2013 WL 5716897 (Bankr. S.D.N.Y. Oct. 1, 2013) ..................... 32

*In re North Star Contracting Corp.*,
    128 B.R. 66 (Bankr. S.D.N.Y 1991) ....................................................... 16, 33, 34

*In re Patman Drilling International, Inc.*,
    No. 07-34622, 2008 WL 724086 (Bankr. N.D. Tex. March 14, 2008) ................. 30

*Petit v. New England Mortgage Servs. Inc.*,
    182 B.R. 64 (D. Me. 1995) ................................................................................. 25

*In re Ridgemour Meyer Properties, LLC*,
    413 B.R. 101 (Bankr. S.D.N.Y. 2008) ............................................................... 25

*In re Sharon Steel Corp.*,
    871 F.2d 1217 (3d Cir. 1989) ............................................................................ 25

*In re Sletteland*,
    260 B.R. 657 (Bankr. S.D.N.Y. 2001) ......................................................*passim*

*In re Soundview Elite, Ltd.*,
    503 B.R. 571 (Bankr. S.D.N.Y. 2014) ...................................................22, 23, 24

*In re Stein & Day, Inc.*,
    87 B.R. 290 (Bankr. S.D.N.Y. 1988) ........................................................... 16, 17

*In re STN Enterprises*,
    779 F.2d 901 (2d Cir. 1985) .............................................................................. 27

*In re Taub*,
    427 B.R. 208 (Bankr. E.D.N.Y. 2010) ......................................................... 17, 26

*In re University Heights Ass'n, Inc.*,
    No. 06-12672, 2007 WL 316281 (Bankr. N.D.N.Y. Jan. 22, 2007) ................22, 26

**Statutes**

11 U.S.C. § 326(a) ..................................................................................................34-35

11 U.S.C. § 1104(a)(1) ......................................................................................... 18, 23

11 U.S.C. § 1104(a)(2) .......................................................................................*passim*

11 U.S.C. § 1108 ................................................................................................................. 16

The above-captioned debtors and debtors-in-possession (the "Debtors"), by their undersigned counsel, respectfully submit this memorandum of law in opposition (the "Opposition") to the Club Lender Parties' Motion For The Entry Of An Order Directing The Appointment Of A Chapter 11 Trustee Pursuant To 11 U.S.C. § 1104(a)(2) (the "Motion").

## PRELIMINARY STATEMENT

The Debtors can and should be reorganized under the stewardship of current management, which can and will reorganize the Debtors through a sale, debt restructuring, equitization, or other means. The Debtors have the intent and ability, if given a fair chance, to maximize value for all constituencies, direct creditors of the Debtors, creditors of the Debtors' non-Debtor affiliates, including the debtors in the Chapter 15 cases pending before this Court (the "Chapter 15 Debtors"),[2] and equity holders.

The assertions of the initial movants making the Motion (the "Club Lender Parties")[3] and some of those entities that have joined in the Motion (together, the "Movants"),[4] (representing approximately 38% of the Debtors' debt in the capacities asserted in the Motion and joinders) reflect a self-serving, narrow, and reactionary viewpoint determined and motivated by their structurally senior claims to the proceeds of a liquidation sale of the Peruvian companies. By

---

[2] CFG Investment S.A.C. ("CFG Investment") (Case No. 16-11891 (JLG)), Corporación Pesquera Inca S.A.C. ("Copeinca") (Case No. 11-11892 (JLG)), and Sustainable Fishing Resources S.A.C (Case No. 11-11894 (JLG)).
[3] The "Club Lender Parties" are Coöperatieve Rabobank U.A. ("Rabobank"), Standard Chartered Bank (Hong Kong) Limited ("Standard Chartered"), DBS Bank (Hong Kong) Limited ("DBS Bank"). China CITIC Bank International Limited ("CITIC Bank"), although initially one of the Club Lender Parties, no longer supports the appointment of a Chapter 11 trustee. [Dkt. No. 76] The Hong Kong and Shanghai Banking Corporation Limited ("HSBC"), although one of the "Club Lenders," has not appeared in these Chapter 11 proceedings and is not a movant. The "Club Lenders" are Rabobank, Standard Chartered, DBS Bank, CITIC Bank, and HSBC.
[4] The entities that have joined in the Motion are Malayan Banking Berhad, Hong Kong Branch [Dkt. No. 61], a committee of holders of senior notes (the "Senior Notes") issued by CFG Investment S.A.C. (the "Ad Hoc Noteholder Committee") [Dkt. No. 62]; Bank of America, N.A. ("BANA") [Dkt. Nos. 63-64]; and the insolvency administrator of a group of debtors in a German insolvency proceeding [Dkt. No. 65]. As noted, CITIC no longer joins in the Motion. [Dkt. No. 76] Three more creditors, Agricultural Bank of China, Qingdao Chengyang Branch, Industrial Commercial Bank of China, Qinqdao Shibei District No. 2 Sub-Branch and China CITIC Bank, Qingdao Branch join the Debtors in opposing the Motion. [Dkt. Nos. 91, 96, and 97, respectively.] The Chapter 15 Debtors and the equity holders will also be opposing the Motion.

contrast, viewed from the broader and objective perspective mandated by section 1104(a)(2) of the Bankruptcy Code of the interests of all creditors and equity security holders, the Debtors' existing management should be left in place to develop the reorganization plan under the guidance of their retained professionals and subject to Bankruptcy Court supervision.

The Debtors, their current management, and their professionals are working to develop a plan for this large and complex multi-national business conglomerate, with welcome and desired participation by all constituencies.

Moreover, since the filing of these Chapter 11 cases on June 30, 2016 (the "Petition Date"), the Debtors have expressed a willingness to retain a chief restructuring officer as the Club Lenders required the Debtors to retain prepetition, on terms mutually agreeable to the Movants and the Debtors. Unfortunately, discussions to bring about independent oversight were cut short by the Movants. They conditioned any agreement (based on such protections) to refrain from filing the Motion, upon the Debtors' and Chapter 15 Debtors' immediate agreement to terminate the Peruvian insolvency proceedings (the "Peruvian Proceedings"), a condition that Peruvian management found to be unreasonable, baseless, and unacceptable. As set forth in this Opposition and the supporting declarations and report,[5] the Movants' fears about the Peruvian Proceedings are unfounded and the decision to continue those proceedings was justified and proper.

Indeed, the Peruvian Proceedings and their corresponding Chapter 15 cases are necessary both to implement a comprehensive restructuring of the complex group of multi-national companies comprised of the Debtors, the Chapter 15 Debtors, and certain of the various affiliates that make up the worldwide fishing business commonly referred to as the "Pacific Andes

---

[5] The declarations and report supporting Debtors' opposition to the Motion are by Ng Puay Yee (the "Ng Declaration"), David W. Prager (the "Prager Report"), Francisco Paniagua (the "Paniagua Declaration"), and Gustavo Miró-Quesada Milich (the "Quesada Declaration").

Group," including to prevent creditors of the Chapter 15 Debtors from taking action in Peru to dismantle their assets in a piecemeal fashion, which would be extremely detrimental to these estates.

The Movants do not seriously challenge the very positive prospects for Debtors' rehabilitation—a fact weighing heavily against the appointment of a trustee. The Movants rely primarily on their desire to effectuate a sale that might be in their own best interests, but not necessarily in the best interests of all constituencies. Largely through innuendo and subjective and self-serving bias, they assert that they do not trust current management, but they proffer no admissible objective evidence that any of the Debtors' current—or even former—management teams have done anything to warrant a level of distrust that requires the appointment of a trustee. Indeed, the Movants' asserted basis for distrust can be viewed as actions taken by management, including independent directors of CFGL and PAIH, in the necessary and proper exercise of their fiduciary duties to protect all constituencies. This basis amounts to at most no more than any Chapter 11 debtor's *ipso facto* contractual default due to commencement of a bankruptcy case. Moreover, management has fully complied with all its fiduciary and statutory duties since the inception of these cases.

In short, the lenders' dislike of, or unhappiness and disagreement with, management's reasonable business judgment decisions, and unfounded speculation about adverse future conduct, is neither a credible basis for distrust nor a proper basis for the appointment of a trustee. The Movants have shown only that they do not have confidence that management will do only what most of the Movants want—a sale under which only they would get paid back immediately notwithstanding what harm that may cause to others—and they do not want to rely on the normal tools available to any creditor in a Chapter 11 case to protect their parochial interest.

In asserting their subjective views, the Movants fail to address the objective and substantial downside—even to them—of the appointment of a trustee for a group of multinational companies that rely upon management's relationships with the group's customers, suppliers, and creditors of all types around the world.

Of the four factors commonly applied by the courts in an analysis under section 1104(a)(2) of the Bankruptcy Code, three out of the four weigh heavily against the appointment of a trustee (*i.e.*, trustworthiness of management, prospects for rehabilitation and substantial detriment of a trustee). The remaining factor, confidence of the business community in management, also weighs against such appointment, when viewed in the full context of the Movants' motivations and the opposition to such appointment expressed by other substantial creditors and parties in interest.

The major complaint of the Club Lender Parties, BANA, and the Ad Hoc Noteholder Committee is that management would not permit a sale that they would get them a quick recovery, and the major complaint of the structurally junior remaining Movants is that sufficient oversight is lacking. This purported lack of confidence must be considered in full context: (a) the interest of some of the Movants in a quick sale is contrary to the interests of other creditors, as well as the interests of the Debtors, the Chapter 15 Debtors, and equity holders; (b) management's motivation for a controlled, fair, and even-handed process for the possible benefit of all is not an objective basis for lack of confidence; (c) much of the business community, including the opposing creditors and numerous vendors and customers, have confidence in management—something that would be lost if a trustee were appointed; and (d) there are many methods in the normal Chapter 11 process to bolster creditor confidence other than through the draconian remedy of appointing a trustee (*e.g.*, creditor reporting and engagement of a chief

restructuring officer). The Debtors have provided and have agreed to provide extensive financial reporting, including of non-Debtor affiliates, and are willing to appoint a chief restructuring officer.

## STATEMENT OF FACTS

The Debtors are managed by NG Puay Yee ("Ms. Ng"), who is the Managing Director of Debtor PAIH, the Chief Executive Officer of Debtor CFGL, and a director of all of the Debtors. Ms. Ng has been employed by the Pacific Andes Group since 1995. (Ng Declaration ¶¶ 1-2; Declaration of Ng Puay Yee Pursuant to Rule 1007-2 [Dkt. No. 2] ("Rule 1007-2 Decl.") ¶ 4.)

Since late 2015 and early 2016, when Ms. Ng was put at the helm of the Debtors with the agreement of the Club Lender Parties, she has been responsible for overall executive management of the Debtors and the rest of the Pacific Andes Group. Her responsibilities include building and consolidating the group's management team across all functions and for the performance and finances of the group, including negotiating with creditors of the companies that make up the group. (Ng Declaration ¶¶ 5-6; Rule 1007-2 Decl. ¶ 9.)

The Pacific Andes Group began back in 1986 and grew to be one of the largest seafood companies in the world. Its businesses span the globe, with major operations in China, the United States and Peru, and processing operations in China, the United States and Peru. (Rule 1007-2 Decl. ¶¶ 29-30.)

The companies comprising a subset of the Pacific Andres Group, referred to as the "China Fishery Group,"[6] were formed and/or acquired between approximately 2006 and 2013. This acquisition extended the reach of the Pacific Andes Group into industrial fishing and included rights to fish in some of the world's most lucrative fisheries, including the anchovy

---

[6] Included in the China Fishery Group are Debtors CFGL, Smart Group, Protein Trading, SPSA, CFG Peru Singapore, CFIL, Growing Management, Chanery, Champion, Target Shipping, Fortress, CFGLPL, Ocean Expert, and Chapter 15 Debtors CFG Investment and Copeinca.

fishery in Peru. The China Fishery Group (primarily through CFG Investment and Copeinca),[7] is currently one of the world's leading producers of fishmeal and fish oil, and its growth and success, as well as its current business operations, rely on management's long-standing relationships across the industry. Anchovy fishing in Peru is regulated by the government of Peru through the issuance of ship-specific quotas and the seasonal adjustment of the total allowable catch. It is well recognized in Peru, including by lenders to industrial fishing businesses, that catch volumes are affected principally by these governmental quotas and environmental factors such as El Niño and La Niña. (Ng Declaration ¶¶ 7, 9, 36, 43-44, 68; Rule 1007-2 Decl. ¶ 33; Paniagua Declaration ¶¶ 9-29.)

Over the past twenty years, the Pacific Andes Group has cultivated long-term relationships with its lenders, including the Movants, and has raised substantial sums of money to finance its operations and growth, not only with debt financing, but equity financing and public rights offerings.[8] (Ng Declaration ¶¶ 15-21.)

The Pacific Andes Group has at all times had responsible and accountable management teams in place who have facilitated and supported transparency and oversight with respect to its businesses, including independent directors of the public companies. These directors are individuals of impeccable standing and reputation and have at all times been involved in the review and approval of important and strategic decisions made by each of the public companies. In the last eighteen months, when the Pacific Andes Group began facing serious financial difficulties due mainly to El Niño (as described below), no independent director has resigned from the board of any public company. (Ng Declaration ¶¶ 25-27.)

---

[7] These companies are debtors in Chapter 15 cases related to these Chapter 11 cases.
[8] Debtors PAIH and CFGL are public companies.

6

To address allegations of impropriety with respect to certain businesses of the Pacific Andes Group since the group's financial difficulties began, independent review committees have been formed at each of PAIH and that of an affiliate, Pacific Andes Resources Development Limited ("PARD"),[9] to address and investigate such allegations. The Pacific Andes Group's management proactively engaged in discussions with its lenders, retaining Deloitte & Touche Financial Advisory Limited ("Deloitte Financial Advisory") to be given access to its books and records and to provide reporting to its lenders, including cash flow forecasts and restructuring timelines to address the group's financial difficulties. The various lenders were supportive of the engagement, role, and oversight of Deloitte Financial Advisory, which included site visits to the Peruvian operations together with a representative of Club Lender Rabobank. In October 2015, however, certain lenders, HSBC in particular, requested that the group retain additional financial advisors of HSBC's choosing, namely KPMG, which the Pacific Andes Group agreed to retain. (Ng Declaration ¶¶ 29, 50-53.)

In addition, to help bolster the finances of the Pacific Andes Group, in mid to late 2014, the Ng family (*i.e.*, the shareholders of Debtor NS Hong) directly and indirectly contributed $189 million in equity and/or debt capital to repay debt owed to various lenders and provided certain guaranties with respect to over $240 million in lender obligations. (Ng Declaration ¶¶ 48, 56-57.)

As detailed in the Ng Declaration, around the time of the Petition Date, the PricewaterhouseCoopers ("PwC") team that had been conducting a forensic audit of certain transactions in 2012-13 related to the PA Group's Russian fishing business, under the auspices of an independent review committee of PAIH's board, was replaced with RSM Corporate Advisory (Hong Kong) Limited ("RSM"). That was done with the consent of the Club Lender Parties,

---

[9] PARD is a debtor in an insolvency proceeding filed in the Republic of Singapore in coordination with these Chapter 11 filings and the related Chapter 15 filings.

primarily due to PwC's slow progress and high costs. RSM is in the process of completing its investigation, which is expected in late September. The Pacific Andes Group's auditors, Deloitte Touche Tohmatsu ("Deloitte"), has deferred providing an audit opinion pending the completion of RSM's work. (Ng Declaration ¶¶ 30-35.)

The Peruvian fishmeal and fish oil business is independently managed by professional and experienced management. It is led by Francisco Paniagua and Jose Miguel Tirado, who have managed the Peruvian fishmeal operations for more than ten years, since the China Fishery Group was first established by the Pacific Andes Group. Messrs. Paniagua and Tirado are professional managers who manage the day-to-day business and operations of the Peruvian companies and are generally well-regarded by the Club Lenders and other lenders. (Paniagua Declaration ¶¶ 12-13; Ng Declaration ¶¶ 36-37.)

While management sought to maintain the business through the effects of a particularly adverse El Niño and deal with the other issues described above, including numerous lender demands, management began to explore ways to address its debt burden and preserve value to the maximum extent possible. From the period commencing in September 2014 and ending in June 2016, the Pacific Andes Group repaid debt owing to its lenders by more than $650 million. (Ng Declaration ¶¶ 43-48.)

Unfortunately, on November 25, 2015, all negotiations in this regard were derailed by HSBC's *ex parte* commencement of an action in the High Court of the Hong Kong Special Administrative Region (the "Hong Kong Court") seeking the winding up of Debtors CFGL and CFIL and the appointment of joint provisional liquidators ("JPLs"). HSBC's application was not supported by the other Club Lenders. The Hong Kong Court ultimately found HSBC's application to be wholly without merit, and it issued a decision declining to continue the JPLs'

appointment. HSBC also filed a subsequent action in the Cayman Islands based in large part on the interim findings and rulings of the Hong Kong Court (which subsequent action was also later withdrawn). (Ng Declaration ¶¶ 62-77.)

The sudden and unexpected appointment of the JPLs—coming at a time when HSBC gave the appearance of being in consensual restructuring discussions less than twenty-four hours earlier—had a devastating effect on the Pacific Andes Group, including and especially its Peruvian operations. As discussed in greater detail in the Ng and Paniagua Declarations, the JPLs' actions raised concern and anxiety among the local communities and banks about, and called into question, the long term viability of the China Fishery Group and, in particular, its Peruvian operations. Upon learning of the appointment of the JPLs, local banks Banco Bilbao Vizcaya Argentaria, S.A. (BBVA) and Scotia Bank suspended all financing. The Peruvian operating companies' largest inventory lender, Banco de Crédito del Perú ("BCP"), reduced the amount of available financing from $100 million to $8 million. Consequently, a tight liquidity position caused by declining anchovy catch revenue due to El Niño became a liquidity crisis, thereby threatening the Debtors' very ability to survive. (Ng Declaration ¶¶ 62-77; Paniagua Declaration ¶¶ 30-37.)

The damage to the China Fishery Group was exacerbated when the JPLs, together with their Hong Kong legal counsel, met with BCP in Peru. The Ng Declaration and the Paniagua Declaration describe in detail the deleterious effect that the appointment of the JPLs and their overly aggressive conduct had at all levels of the Pacific Andes Group. For example, a member of the group was forced into a German insolvency proceeding, suppliers demanded collateral, and working capital shrunk, forcing operations to be down-sized. (Ng Declaration ¶¶ 62-77; Paniagua Declaration ¶¶ 30-37.)

The Hong Kong Court discharged the JPLs on January 5, 2016, finding that the JPLs should not have been appointed. HSBC nevertheless insisted on proceeding with its winding up petitions in the Cayman Islands and Hong Kong. The mutual interests of HSBC and the Pacific Andes Group in not incurring further litigation costs encouraged both parties to enter into settlement discussions, pursuant to which HSBC demanded certain undertakings from CFGL and CFIL in exchange for a six-month standstill, within which there would be a sale process implemented for the group's Peruvian business. Extensive negotiations resulted in a Deed of Undertaking dated January 20, 2016 (the "HSBC Undertaking"), an agreement that, among other things, required the China Fishery Group be sold by July 15, 2016 and HSBC withdraw its winding up petitions in Hong Kong and the Cayman Islands. Previously, the other Club Lenders had obtained an undertaking (the "December 2015 Undertaking") from PAIH and PARD in exchange for their support for the discharge of the JPLs. (Ng Declaration ¶¶ 79-83.)

In accordance with the HSBC and December 2015 Undertakings, Paul Brough and Patrick Wong were appointed as chief restructuring officers ("CROs") at the CFGL and PAIH levels, respectively. In addition, PwC and Grant Thornton LLP were engaged as monitoring accountants with respect to the finances of the Pacific Andes Group. They provided regular updates directly to the lenders, mostly without any input from, or consultation with, the Pacific Andes Group's management. (Ng Declaration ¶ 86.)

The access provided by the Pacific Andes Group to the monitoring accountants provided full visibility to all financial affairs and transactions of the Pacific Andes Group on past, present, and forward-looking bases. The monitoring accountants provided bi-weekly reports to the lenders, and there was constant interaction among the lenders, the CROs, and the monitoring accountants. The level of access provided to the monitoring accountants also meant that cash

10

transfers were not possible unless the monitoring accountants had effectively "approved" any such transfers. (Ng Declaration ¶ 86.)

Paul Brough, the CRO of CFGL, was given effective and de facto control of the sale of the Peruvian business in order to ensure transparency and to give the Club Lenders confidence. Mr. Brough's initial focus was to attempt to obtain working capital from the lenders in an effort to resuscitate the Peruvian fishmeal operations. (Ng Declaration ¶¶ 88-89.) However, the Club Lenders' reluctance to provide support for refinancing efforts almost brought about the early resignation of Mr. Brough as CRO. At a meeting between him and the Club Lenders held on April 12, 2016, Mr. Brough threatened to resign from his role by April 15, 2016 if the Club Lenders and other lenders did not provide him with the good faith support necessary to proceed with a successful sale process. (Ng Declaration ¶ 98.)

Even without these and other difficulties described in the Ng Declaration, it was a monumental task to attempt to sell a complex set of businesses valued at $1.6 billion or more in a period of six months. CITIC CLSA was engaged as a financial advisor with respect to the sale. While its engagement was only formally signed in April due to negotiations involving fees, CITIC CLSA had commenced work to market the Peruvian fishmeal business in February. CITIC CLSA assembled a comprehensive data room, teasers to send out to prospective investors and purchasers, and a detailed information memorandum with the assistance and input of the China Fishery Group (under the direction of Mr. Brough). (Ng Declaration ¶ 99.)

Throughout the sale process, Mr. Brough repeatedly lamented the fact that the most appropriate restructuring approach or strategy was by far a group wide restructuring. However, he was constrained by his mandate to sell the Peruvian business as provided in the HSBC Undertaking. Furthermore, he repeatedly communicated his concern to the management team of

11

the China Fishery Group (and the lenders) that the July deadline for the sale of the Peruvian business was simply too short and that an extension would inevitably be needed. (Ng Declaration ¶ 100.)

Given the situation it was in, the Pacific Andes Group and its advisors redoubled efforts to evaluate alternative options to a sale of the Peruvian business in light of the then-existing challenges and the fact that there were other restructuring options available for consideration (especially if a sale would result in a tremendous loss of value for many stakeholders of the Pacific Andes Group). (Ng Declaration ¶ 107.)

While these Chapter 11 cases (and other reorganization proceedings worldwide) have been commenced to broaden the restructuring options available to the Pacific Andes Group, the Debtors have repeatedly emphasized and reiterated that the possibility of a sale remains an option to be considered and explored. The Movants' allegations that the Debtors no longer have any intention of selling the Peruvian business is simply inaccurate. (Ng Declaration ¶ 112; Prager Report ¶¶ 21-28.)

These Chapter 11 cases and the related insolvency proceedings were commenced with the intention of protecting the Debtors and the value that otherwise would have been destroyed if these filings were not made. Management's decision was made in order to discharge its fiduciary duties. Indeed, every independent non-executive director of each of the public companies voted in favor of commencing these Chapter 11 cases and the other reorganization proceedings globally. (Ng Declaration ¶ 114.)

The global restructuring filings were not targeted at eliminating accounting oversight. Fresh oversight has been provided through the Debtors' filings and through both voluntary and mandatory reporting pursuant to the stringent requirements of the Bankruptcy Code, with which

the Debtors have complied and with which the Debtors will continue to comply moving forward. (Ng Declaration ¶¶ 115; Prager Report ¶¶ 76-88.)

The filings in the United States, Peru, British Virgin Islands and Singapore were undertaken in good faith and for the benefit of all stakeholders of the Pacific Andes Group. The filings were made in jurisdictions that are the most appropriate based on advice received from the professional advisors to the Pacific Andes Group. (Ng Declaration ¶¶ 120-21.) In particular, as noted in the Quesada Declaration, under Peruvian law, the filings commenced in respect of the Peruvian fishmeal companies could not have been made in any jurisdiction other than Peru. (Quesada Declaration ¶ 33.)

In light of the actions of HSBC and the JPLs, management of the Chapter 15 Debtors were concerned that HSBC or some other party would take direct action against the Chapter 15 Debtors' assets in Peru.[10] Involuntary proceedings to restructure and/or refinance the debtors of the Chapter 15 Debtors were commenced before El Instituto Nacional de Defensa de law Competencia y de la Protección de la Propiedad Intelectual (the National Institute for the Defense of Competence and Protection of Intellectual Property, also known as "INDECOPI") on June 30, 2016. INDECOPI is the authority that oversees the restructuring and bankruptcy of Peruvian companies which are subject to bankruptcy proceedings under the laws of the Republic of Peru and, in particular, the General Law of the Bankruptcy System (Law No. 27809) (the "Peruvian Insolvency Law"). (Paniagua Declaration ¶ 47; Quesada Declaration ¶ 2.)

The Chapter 15 Debtors, which could not voluntarily file in Peru without audited financial statements, worked with local creditors to file an involuntary proceeding that would

---

[10] Under Peruvian Insolvency Law, management of the Chapter 15 Debtors is authorized to continue to manage their affairs, but the Chapter 15 Debtors may not take certain prescribed actions, such as selling certain assets, granting liens, setting off debts or various major corporate transactions. (Quesada Declaration ¶¶ 68-70, 80-82.)

protect the assets of the Chapter 15 Debtors and preserve value for all creditors and stakeholders. (Quesada Declaration ¶¶ 41-44.)

The global nature of the Pacific Andes Group and the complex nature of its capital structure required a sophisticated jurisdiction such as the United States with a clear ability to deal with complex cross border restructurings, for a worldwide reorganization. Similarly, the filings in Singapore by PARD and certain of its subsidiaries are proper and were made in accordance with applicable law. Those filings also recognize and provide for the effective participation of the largest relevant creditor constituency (holding approximately 35% in outstanding principal amount of debt of PARD), namely retail holders of Singapore Dollar denominated bonds, most of whom would be unable to have any meaningful participation in a U.S. Chapter 11 case. The appointment of a provisional liquidator in the British Virgin Islands for Richtown Development Limited, a subsidiary of PARD, was based on negotiations between its major creditor Sahara Investments Pte. Ltd. That filing, too, was undertaken in a transparent and effective jurisdiction. (Ng Declaration ¶¶ 122-23.)

The management teams of the entities that are the subject of reorganization proceedings in different jurisdictions have sought advice with respect to the implementation of a court-to-court protocol for the coordination of the various proceedings throughout the world. The Singapore court has welcomed and, indeed, requested that a protocol between that court and the U.S. Bankruptcy Court for the Southern District of New York be considered, in order to ensure that the Singapore proceedings are coordinated with these Chapter 11 cases. While these types of protocols may not be available in the British Virgin Islands, the provisional liquidator there is committed to providing regular updates to each of the courts in the various different jurisdictions. The Debtors fully intend to submit appropriate protocol requests in these Chapter

11 cases but unfortunately have, to date, been inundated with expedited litigation from the Movants. (Ng Declaration ¶ 124.)

As discussed in the Quesada Declaration, the Movants' fears of manipulation of intercompany or other related party claims in the Peruvian Proceedings are unwarranted. There is no incentive for any member of the Ng family or related company to attempt to block any vote in the Peruvian Proceedings given that any "stalemate" will lead to an <u>automatic</u> liquidation of the Peruvian companies under the control of an INDECOPI-appointed liquidator. Automatic liquidation would be contrary to management's very reasons for commencing these Chapter 11 cases and would benefit no one other than perhaps the Club Lenders.[11] (Quesada Declaration ¶¶ 88-92.)

The extensive list of non-Debtor affiliates to which the Debtors have agreed to provide certain regular financial reporting, as memorialized in the Cash Management Order, shows the Debtors' good faith and commitment to providing transparency with respect to the entire Pacific Andes Group. Furthermore, the pre-Petition Date protections have not, for the most part, been eliminated after the filing of these Chapter 11 cases as the Movants assert. First, the independent review committees are continuing their work with respect to the Russian fishing business transactions questioned by the lenders. Second, notwithstanding the CROs' unilateral decisions to resign, the Debtors have indicated, and continue to indicate, a willingness to consider engaging a chief restructuring officer to assist the Debtors' restructuring efforts. Third, the forensic accountant RSM has been, and continues to be, in place investigating any and all allegations that have been raised. And the change from PwC to RSM as forensic accountant was

---

[11] Further, there is no evidence whatsoever, let alone clear and convincing evidence, to support the allegation that the non-Debtor entities that are treasury companies will file claims in Peru to control proceedings. In fact, the main treasury company for the China Fishery Group is CFIL, which is a Debtor in these Chapter 11 proceedings and within the purview and control of the U.S. Bankruptcy Court.

a change that was made in consultation with, and with the approval of, the Club Lenders. (Ng

Declaration ¶ 132.)

## ARGUMENT

### THE APPOINTMENT OF A CHAPTER 11 TRUSTEE PURSUANT TO 11 U.S.C. § 1104(a)(2) IS UNWARRANTED UNDER THE FACTS AND CIRCUMSTANCES OF THIS CASE

**A.**    **The High Standard and Multiple Factors To Be Considered**

The sole basis for the Motion is Section 1104(a)(2) of the Bankruptcy Code, which

provides for the appointment of a Chapter 11 operating trustee only "if such appointment is in

the interests of creditors, any equity security holders, and other interests of the estate, without

regard to the number of holders of securities of the debtor or the amount of assets or liabilities of

the debtor."

According to the Second Circuit Court of Appeals, the standard for the appointment of a

Chapter 11 trustee is "very high." *In re Bayou Grp., LLC*, 564 F.3d 541, 546 (2d Cir. 2009). It is

an "extraordinary remedy" that requires the movant to establish the need for a Chapter 11 trustee

by way of "clear and convincing evidence." *Id.* Accordingly, the appointment of a Chapter 11

trustee "should be the exception, rather than the rule." *In re Adelphia Commc'ns Corp.*, 336 B.R.

610, 655 (Bankr. S.D.N.Y. 2006).

"The appointment of a trustee in a Chapter 11 case is not the usual procedure because 11

U.S.C. § 1108 contemplates that the debtor will continue to manage its property and operate its

business." *In re Stein & Day, Inc.*, 87 B.R. 290, 294 (Bankr. S.D.N.Y. 1988); *see also In re

North Star Contracting Corp.*, 128 B.R. 66, 70 (Bankr. S.D.N.Y 1991) (denying motion for

appointment of an operating trustee in part due to need for management's knowledge of, and

experience in, the business).  The movant bears the burden of rebutting the "strong presumption"

16

that the Chapter 11 debtor should remain in possession. *See*, *e.g.*, *In re Fairwood Corp., Debtor*, No. 99 CIV. 3177, 2000 WL 264319, at *2 (S.D.N.Y. Mar. 9, 2000).[12]

Whether a Chapter 11 trustee is warranted is a "fact-driven" analysis in which a bankruptcy court, exercising its discretion, looks to the "practical realities and necessities" of each case and carefully weighs any relevant factor, *Adelphia*, 336 B.R. at 658, keeping in mind that, as noted above, the appointment of a Chapter 11 trustee is an extraordinary remedy, and that the appointment of a Chapter 11 trustee will cause additional expense to the estate, *see*, *e.g.*, *Stein & Day*, 87 B.R. at 294. In fact, the Second Circuit Court of Appeals has cautioned that, "[i]n determining whether a § 1104 appointment is warranted . . . the bankruptcy court must bear in mind that the appointment of a trustee 'may impose a substantial financial burden on a hard pressed debtor seeking relief under the Bankruptcy Code,' by incurring the expenditure of 'substantial administrative expenses' caused by further delay in the bankruptcy proceedings." *Bayou*, 564 F.3d at 546-47.

Factors a court may consider in determining whether the appointment of a Chapter 11 trustee is appropriate under the circumstances are: (1) the trustworthiness of the debtor; (2) the debtor's prospects for rehabilitation; (3) the confidence of the business community and creditors in current management; and (4) the benefits flowing from the appointment of a Chapter 11 trustee balanced against the detriments. *See*, *e.g.*, *Adelphia*, 336 B.R. at 658.

Because these and other considerations weigh against the appointment of a Chapter 11 trustee in this case, and because the Movants have not otherwise justified the appointment of a

---

[12] The Movants' heavy burden here jibes with the well-established principal that management's decision-making is protected by the business judgment rule. "[T]here can be no doubt that the Bankruptcy Code imposes upon a debtor-in-possession the duty to conduct the business of the estate in a manner that, at a minimum, preserves the value of the estate," but a debtor-in-possession should nevertheless be permitted to "operate within the broad parameters of sound business judgment, and the debtor-in-possession's performance should not be assessed solely with the benefit of hindsight." *In re Taub*, 427 B.R. 208, 224 (Bankr. E.D.N.Y. 2010).

Chapter 11 trustee by clear and convincing evidence, the Movants have failed to carry their heavy burden of demonstrating that the appointment of a Chapter 11 trustee is necessary under the facts and circumstances of this case.

B.      **Debtors' Management is Trustworthy**

The Movants have not alleged any of the enumerated items of "cause" for the appointment of a trustee under 11 U.S.C. § 1104(a)(1), such as "fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management." Instead, the Movants rely on the more general and amorphous "best interests" prong of section 1104(a)(2). In doing so, the Movants rely in large part on their concerns that the Debtors' management will not cause the Debtors to act in a manner most suitable to their needs. They present only their own subjective, self-interested view of the Debtors. And they repackage their desire for a quick sale into an assertion that management cannot be trusted to protect the estate.

The only "facts" the Movants assert relating to trust are that the Debtors blocked a fire sale and prevented the re-appointment of JPLs under the HSBC Undertaking by filing these and other insolvency proceedings. However, these actions and every other action that the Debtors' management has taken thus far have been justified under the circumstances and in the best interests of all of the Debtors' constituencies.

The basis for the Movants' asserted lack of trustworthiness is actually concrete evidence of the opposite—the fulfillment by the Debtors, including management and the independent directors of the public companies, of their duty to ensure that the value of the Debtors' assets and recoveries were appropriately maximized for as many constituencies as reasonably possible.  The Movants seem to assert that the Debtors are somehow untrustworthy because they have used the Bankruptcy Code for one of the very tenets for which it was intended—to prevent one group of

creditors (the Movants) from advantaging themselves to a disproportionate share of the value of the estates.

The Movants' conclusory assertions must be considered in this full context. As discussed above, the Debtors entered into the HSBC Undertaking because, for all intents and purposes, they had no other choice. Only a couple of months prior, in November 2015, HSBC applied for, and was temporarily awarded, the appointment of JPLs on an *ex parte* basis before the Hong Kong Court. As described in detail in the Ng and Paniagua Declarations, the appointment of the JPLs, although temporary and found to have been unjustified, caused substantial damage to the Debtors' assets and related finances. (*See supra* pp. 8-10.)

In addition, at the time the JPLs were appointed, the Debtors were in advanced negotiations with two investment groups regarding the acquisition of some or all of the China Fishery Group. The two potential investors executed memoranda of understanding, but because the JPLs insisted on meeting with them, and due to the confusion that ensued as a result, those negotiations broke down and neither of the transactions ever progressed. (Rule 1007-2 Decl. ¶ 27.)

On January 5, 2016, the Hong Kong Court declined to continue the JPLs because  the petitioning party—HSBC, supported by BANA—failed to present credible evidence justifying the appointment of the JPLs in the first place. (*See supra* pp. 8-10.) HSBC nevertheless insisted on proceeding with its winding-up petition in Hong Kong and made clear that it planned on appealing the Hong Kong Court's decision. HSBC had also commenced similar proceedings in the Cayman Islands based in large part on the initial findings of the Hong Kong Court. Those proceedings were still pending when the Hong Kong Court discharged the JPLs. (*See supra* pp. 8-10.)

Rather than continue to litigate, the Debtors entered into the HSBC Undertaking, pursuant to which the proceedings in both Hong Kong and the Cayman Islands were dismissed. The Debtors' management reasoned (soundly) that it was more important that the JPLs be removed as quickly and as permanently as possible, and that the Debtors' Peruvian operating companies be allowed to resume their normal operations free of the JPLs' damaging interference. (*See supra* pp. 10-11.)

The HSBC Undertaking called for Debtors to sell their business by July 15, 2016 and to have JPLs re-appointed in the event a sale did not occur by the deadline. The substantial reduction in operations in Peru due to a severely harsh El Niño and the general uncertainty caused by the improvident appointment of the JPLs caused potential buyers and investors to be very skeptical. And, because the July 2016 deadline meant that a fire sale was still possible, many potential buyers and investors adopted a "wait-and-see" approach. (Rule 1007-2 Decl. ¶ 134.)

By late June, it became apparent that a sale could not be completed by the July 2016 deadline. The Debtors approached HSBC with the idea of extending the deadline. HSBC, however, was non-committal. So rather than risk a fire sale, the Debtors' management filed for bankruptcy protection. A fire sale, though likely beneficial to the Club Lenders, BANA, and possibly the holders of the Senior Notes, would have harmed a large number of other stakeholders. The Debtors' management reasoned (again, soundly) that, in order to maximize the value to be realized by all stakeholders, operations should be restarted and normalized, a feasible capital structure should be put in place under which all creditors of the China Fishery Group are to be paid in full, and the China Fishery Group's operations should be streamlined through these and other coordinated proceedings. (*See supra* pp. 11-16.)

The Debtors' filing for bankruptcy protection was not, as the Movants suggest, a breach of the HSBC Undertaking or a contempt of court. The HSBC Undertaking did not prohibit the Debtors from filing for bankruptcy protection, and the Debtors' filing for bankruptcy protection was an exercise of management's fiduciary duties to protect the value of the estate that otherwise may have been destroyed in a fire sale. (Ng Declaration ¶¶ 114-19.) All independent, non-executive directors of each of the listed companies voted in favor of filing for bankruptcy protection. (*See supra* pp. 12-13.)

Lastly, there is nothing nefarious to be inferred from the Debtors' commencement of insolvency proceedings in Peru. As discussed in greater detail in the Paniagua Declaration and the Quesada Declaration, the Debtors' management sought bankruptcy protection for their Peruvian operating companies in Peru because a stay of actions against them was necessary, particularly in light of HSBC's actions, and, under Peruvian law, Peru is the only jurisdiction in which they could lawfully seek relief.[13] Peru is a sophisticated, highly transparent, and creditor-friendly jurisdiction in which to conduct a bankruptcy case. Although related party debt can be claimed in Peruvian insolvency proceedings, there can be no serious concern that it would be used to, in the Movants' words, "block" a restructuring, as such could result in a stalemate and an <u>automatic</u> liquidation of the enterprise. Indeed, any such liquidation could be the very type of sale the Movants want. (*See supra* pp. 12-16.)

The Movants' claim that the Debtors' management has a conflict of interest because the foregoing conduct reflects some kind of wrongdoing requiring further investigation is, at best, speculative. The Movants' speculation, conjecture, and other forms of guesswork are not

---

[13] The Debtors' Peruvian operating companies would have commenced bankruptcy proceedings in Peru voluntarily. if audited financial statements up to the end of May 2016 were ready. As discussed in the Quesada Declaration, involuntary proceedings commenced in consultation with local Peruvian creditors is a legitimate, recognized means of commence insolvency proceedings in Peru. (Quesada Declaration § 41-44.)

appropriate bases upon which to appoint a Chapter 11 trustee. *See In re Sletteland*, 260 B.R. 657, 672 (Bankr. S.D.N.Y. 2001) ("The philosophy of Chapter 11 is to give the debtor a second chance at business success. . . . Moreover, on a motion for the appointment of a trustee, the focus is on the debtor's current activities, not past misconduct. . . . Speculation that a debtor may do something in the future does not overcome the strong presumption that the debtor should be permitted to remain in possession in a Chapter 11 case or justify the additional costs of a trustee.") (internal quotation marks omitted); *see also In re University Heights Ass'n, Inc.*, No. 06-12672, 2007 WL 316281, at *3 (Bankr. N.D.N.Y. Jan. 22, 2007) (denying application for appointment of Chapter 11 trustee in part because movant "fails to give the court any facts to support its allegations.").

The Movants place their greatest reliance on Judge Gerber's decision in *In re Soundview Elite, Ltd.*, 503 B.R. 571 (Bankr. S.D.N.Y. 2014). They attempt to draw parallels between the cross-border cases involved there and the Debtors' cases. (Motion at 51-57.) The parallels do not, however, extend beyond the mere fact that both cases involve proceedings pending in two different countries. The Movants' reliance on the decision is therefore misplaced.

In *Soundview*, when the debtors commenced their Chapter 11 cases, they were already the subject of underlined liquidation proceedings in the Cayman Islands in which joint provisional liquidators had been appointed by a court. Those very same entities then filed Chapter 11 (*i.e.*, reorganization) proceedings in the United States. 503 B.R. at 576.

In the instant cases, however, the Debtors are subject to proceedings only in the United States, with affiliates subject to Peruvian insolvency proceedings. As discussed in the Quesada Declaration, such proceedings, like Chapter 11 proceedings, expressly contemplate management staying in control, subject to creditor and tribunal oversight. (Quesada Declaration ¶¶ 68-70, 80-

82.) Unlike in *Soundview*, where Judge Gerber found "in some respects conflicting, jurisdiction of the U.S. and Cayman courts," *id.* at 577, here, there are no conflicting jurisdictional issues.

*Soundview* involved one court (the Cayman Islands) exercising jurisdiction over a liquidation proceeding supported by the Cayman Islands Monetary Authority, in which court-appointed liquidators had displaced management, and another court (the United States) exercising jurisdiction over a reorganization proceeding, with debtors in possession. *Id.* at 576-77.

Indeed, in *Soundview*, Judge Gerber observed that one way the Cayman and U.S. proceedings could have been coordinated would have been for the U.S. proceedings to be Chapter 15 cases in support of the foreign proceedings. *Id.* at 594-95. What Judge Gerber was suggesting that would have been a good course of action in *Soundview* is exactly what we have here.   Judge Gerber also took into consideration the view expressed by another <u>court</u> (the Cayman court) that a fiduciary should take the place of the debtors' management. *Id.* at 576. Here, there is no such view of a foreign court. The only view expressed by any court anywhere about appointing a fiduciary to replace the Debtors' management was the Hong Kong Court's view that the JPLs should be discharged.

*Soundview*, like the Movants' other cases, is distinguishable and helpful to the Debtors' position for other significant reasons as well, including that Judge Gerber found "cause" under 11 U.S.C. § 1104(a)(1) for the appointment of a trustee in light of management's clear <u>and disclosed</u> self-dealing. *Id.* at 581-82. Here, the Movants have expressly stated that they are not seeking the appointment under subsection (a)(1). It would be rare indeed for the best interests test <u>not</u> to be satisfied where cause to appoint a trustee has been established by clear and convincing evidence.

Furthermore, *Soundview* involved a motion filed by the U.S. Trustee, not creditors with parochial interests for an expedited sale of the Debtors' assets. *Soundview* also involved a hedge fund that had ceased trading. To the contrary, this case involves a valuable world-wide group of companies with substantial operating value, seeking a coordinated restructuring (whether through a sale or otherwise) that would be harmed, not helped, by the appointment of a trustee.

Judge Gerber's observations about the reasons for the Chapter 11 filings in *Soundview* undercut the Movants' trustworthiness argument. Some of the movants in *Soundview* contended that it was bad faith where "the Debtors admittedly filed their chapter 11 petitions to take advantage of the automatic stay, and that the petitions were filed at the 'eleventh hour' to block the imminent appointment of liquidators in the Cayman Islands." *Id.* at 580. Judge Gerber found this purpose to be insufficient to find either bad faith or cause to dismiss the cases, observing: "Indeed, if I or any other U.S. court were to consider a desire to invoke the stay to be sufficient, a very significant portion of perfectly unobjectionable chapter 11 cases could never be filed." *Id.*

Although Judge Gerber was expressing his findings as to why the movants there had not carried their burden on a related motion to dismiss, his observation is equally applicable to the Movants' request here for the appointment of a trustee and strongly supports the denial of their Motion.

The other conflict-related cases that the Movants cite do not require a contrary conclusion and are readily distinguishable. In *In re Eurospark Indus., Inc.*, 424 B.R. 621, 627-30 (Bankr. E.D.N.Y. 2010), the court found, unlike here, that management had demonstrated, and even admitted, its inability to fulfill its fiduciary duty because it was taking positions contrary to the interests of the estate. Further, in that case, the motion was brought by the U.S. Trustee, joined in by many creditors and opposed by none, the business was not operating, and appointment of a

trustee would cause no harm. *Id.*[14] As described in the Prager Report (¶¶ 74-89), the Debtors have complied with, and exceeded, their statutory duties since the Petition Date.

In *In re Ridgemour Meyer Properties, LLC*, 413 B.R. 101, 112 (Bankr. S.D.N.Y. 2008), the court ordered the appointment of a trustee because, unlike here, management violated an arbitrator's order and the court found, based on specific conduct of management, that management was dishonest.

In *Petit v. New England Mortgage Servs. Inc.*, 182 B.R. 64, 70 (D. Me. 1995), the court specifically found debtor's management to be "obstructionist" and "evasive," including about substantial proceeds of a settlement that were unaccounted for and that the debtor failed to maintain any books or records, or even bank accounts.

In *In re Sharon Steel Corp.*, 871 F.2d 1217, 1226-28 (3d Cir. 1989), the court found management to be careless and prone to self-dealing and to have made improper payments on the eve of bankruptcy. Further, there were no countervailing considerations such as good prospects for rehabilitation or harm from appointment of a trustee. *Id.*

In *In re McCorhill Pub., Inc.*, 73 B.R. 1013, 1017 (Bankr. S.D.N.Y. 1987), the court found that the debtor was paying post-petition expenses of non-debtors and the debtor had no business records relating to the transactions. As in *Sharon Steel*, the debtor had poor prospects for rehabilitation and there was no prospect of harm from a trustee appointment. *Id.*

In *In re BLX Group, Inc.*, 419 B.R. 457, 472 (Bankr. D. Mont. 2009), the primary reason the court appointed a trustee was because management did not have the experience to properly

---

[14] The Movants appear to interpret *Eurospark* to mean that any time a debtor's management overlaps with its equity holders there is a conflict of interest requiring the appointment of a chapter 11 trustee. [Dkt. No. 63 at p.10 & n.5] That interpretation was rejected by the *Eurospark* court itself: "The [U.S. Trustee] has not taken the position, nor does this Court hold, that a Chapter 11 trustee is always warranted where the debtor-in-possession is managed by its sole shareholder. Rather, the determination whether to appoint a trustee turns on the particular circumstances of each case." 424 B.R. at 632.

run a golf course, and a trustee was beneficial as he or she would hire the appropriate business professionals to rehabilitate it for an eventual sale. Moreover, the *BLX Group* court appointed a trustee to prevent senior creditors from being the only ones to benefit:  A trustee would "be able to manage the [debtor] to benefit all legitimate creditors rather than permit the property to be given at a bargain 'fire sale' price to a first mortgagee." *Id*.

In re *L. S. Good & Co.*, 8 B.R. 312, 314 (Bankr. N.D.W. Va. 1980), the court found that the debtors' prospects for rehabilitation were remote, the debtor was generating no income, and assets were being depleted (*i.e.*, the "melting ice cube" we do not have here). The court also found no harm associated with the appointment of a trustee. *Id.*

Other decisions the Movants cite in which the court appointed a trustee are easily distinguishable as well. *See In re Colorado-Ute Elec. Ass'n, Inc.*, 120 B.R. 164, 176-77 (Bankr. D. Colo. 1990) (large operating losses, incapable management); *In re Euro-American Lodging Corp.*, 365 B.R. 421, 427 (Bankr. S.D.N.Y. 2007) (gross mismanagement, failure to pay taxes); *Taub*, 2010 WL 8961434, at *4-11 (continuing losses, accumulation of unpaid administrative expenses); *In re Ionosphere Clubs, Inc.*, 113 B.R. 164, 167-71 (Bankr. S.D.N.Y. 1990) (incompetent management, substantial operating losses in many months since date of filing).

While *In re Keeley & Grabanski Land P'ship*, 455 B.R. 153, 165 (B.A.P. 8th Cir. 2011), holds that allegations of misconduct need not be "proven" to justify the appointment of a Chapter 11 trustee, it does not in any way suggest that (a) conduct that is designed to protect the estates, but not the parochial interests of those seeking a trustee, or (b) pure speculation or innuendo of unfounded allegations of impropriety will suffice for the appointment of a trustee, *see Sletteland*, 260 B.R. at 672; *University Heights*, 2007 WL 316281, at *3. Nor does *Keeley* in any way

26

suggest that the movant can satisfy its burden of proof by presenting anything less than clear and convincing evidence. *See*, *e.g.*, *Bayou*, 564 F.3d at 546.[15]

## C.    **The Debtors' Prospects for Rehabilitation are Good**

Unlike many of the cases relied upon by the Movants, including where operations had ceased or finances were rapidly deteriorating, the Debtors' prospects for rehabilitation are good for a number of reasons. First, as discussed in greater detail in the Prager Report, the Debtors have many workable reorganization options available to them. Although these Chapter 11 proceedings were commenced only recently, the Debtors are considering several kinds of Chapter 11 reorganization plans. They include equitization (with potential refinancing), the controlled sale of the Debtors' Peruvian operating companies and/or other major assets, and the spinning off of Debtors' Peruvian operating companies combined with equitization or the sale of other assets. (Prager Report ¶¶ 21-32.)

Second, the Debtors' Peruvian operating companies are an appreciating asset—and certainly stabilizing—whose significant potential for increasing value is at serious risk of diminishing if a trustee is appointed. As discussed in greater detail in the Paniagua Declaration,

---

[15] Even if there were in fact some kind of misconduct worthy of further investigation, the Movants could conduct it themselves and pursue any warranted lawsuits. *See In re STN Enterprises*, 779 F.2d 901, 904 (2d Cir. 1985) ("These courts have allowed creditors' committees to initiate proceedings only when the trustee or debtor in possession unjustifiably failed to bring suit or abused its discretion in not suing to avoid a preferential transfer. We agree with these bankruptcy courts that [the Bankruptcy Code implies] a qualified right for creditors' committees to initiate suit with the approval of the bankruptcy court."). The appointment of a Chapter 11 trustee is also unusual where, as here, management's misconduct is alleged to have occurred pre-petition, as some amount of pre-petition misconduct is typical in any insolvency case. *See In re General Oil Distributors, Inc.*, 42 B.R. 402, 409 (Bankr. E.D.N.Y. 1984) ("[Creditor's] view would mandate appointment of a trustee for a single act of pre-petition incompetence or dishonesty. . . . one would expect to find some degree of incompetence or mismanagement in most businesses which have been forced to seek the protections of chapter 11. . . . Under [Creditor's] suggested approach, the court would be forced to appoint a trustee in most chapter 11 cases. Certainly, however, such an appointment was meant to be the extraordinary exception and not the rule. . . . There is a strong presumption that a debtor remains in possession absent a showing of need."); *In re Sletteland*, 260 B.R. 657, 672 (Bankr. S.D.N.Y. 2001) ("Some degree of mismanagement exists in virtually every insolvency case . . . mere mismanagement does not, by itself constitute cause. The philosophy of chapter 11 is to give the debtor a second chance at business success. . . . Moreover, on a motion for the appointment of a trustee, the focus is on the debtor's current activities, not past misconduct.") (internal quotation marks omitted).

the Peruvian operations, although historically very profitable, are at a cyclical low due to a particularly adverse El Niño, as a result of which the Peruvian government did not permit a second anchovy fishing season in 2014 and reduced the total allowable catch in the 2015 fishing seasons and the first fishing season of 2016. Climate conditions are expected to moderate and, as a result, the coming anchovy harvest is likely to be significantly better than last year's. (Paniagua Declaration ¶¶ 23-29; *see also* Prager Report ¶¶ 64-67.)

In addition, one of the Debtors' Peruvian operating companies—Copeinca—was only recently acquired. As a result, the Peruvian operating companies have never experienced a complete, normal season as an integrated operation. (Paniagua Declaration ¶¶ 19-22; Prager Report ¶ 64.)

Third, for reasons discussed in greater detail in the Prager Report, the Debtors have managed their assets and finances properly under difficult conditions. The Peruvian companies are adequately funded for their current operations and the Debtors have no immediate need for debtor-in-possession financing. The Movants' assertions that the Debtors have "no articulated path forward" and "no cash to operate" (Motion at 47) are therefore unfounded. (Prager Report ¶¶ 76-84; Ng Declaration ¶ 132.)

There is also no compelling reason to believe that consensual rehabilitation is, in the Movants' words, "highly unlikely, if not impossible." (Motion at 48.) The Movants' claim that the "Debtors have failed to live up to their agreements" and therefore "created a situation where consensual rehabilitation is highly unlikely, if not impossible" (Motion at 47-48) ignores the fact that the Debtors' management avoided the possibility of a fire sale under the terms of the HSBC Undertaking and instead filed for bankruptcy protection in order to protect the value of the estates. As discussed above, it was an exercise of the management's duty to protect all

stakeholders and was justified under the circumstances prevailing at the time. The Movants, in other words, have no objective basis for the skepticism and distrust they assert would prevent them from working with the Debtors toward a plan of reorganization beneficial to all stakeholders.

The Debtors are in many ways similar to the debtors in *In re General Oil Distributors, Inc.*, 42 B.R. 402 (Bankr. E.D.N.Y. 1984) and *In re The 1031 Tax Group., LLC*, 374 B.R. 78 (Bankr. S.D.N.Y. 2007), where the courts denied motions for the appointment of a Chapter 11 trustee in part because the debtors' prospects for rehabilitation were good. In *General Oil*, the court denied an application for the appointment of chapter 11 trustee in part because "[debtor's] attorneys have been more than diligent in their efforts toward confirmation of a workable plan of reorganization," and because, "[u]nder the present management," the debtor "has shown significant profits." 42 B.R. at 410. Likewise, in *1031 Tax Group*, the court denied an application for the appointment of a Chapter 11 trustee in part because of "positive developments" with respect to the confirmation of a reorganization plan. 374 B.R. at 91. The Debtors here are in the process of rehabilitating their operating businesses, and to say they have not been given a chance to negotiate a plan of reorganization with their creditors is a drastic understatement.[16]

The case law to which the Movants refer the Court on this factor is distinguishable. In *In re Hotel Associates, Inc.*, 3 B.R. 343, 345-46 (Bankr. E.D. Pa. 1980), the court ordered the appointment of a chapter 11 trustee in part because, "[a]lthough it is a possibility that the debtor might be able to effect reorganization under chapter 11 with the present plan, it is essential at this

---

[16] Decisions ordering the appointment of a chapter 11 trustee on rehabilitation grounds involve facts substantially different than those present here. *See, e.g.*, *Eurospark*, 424 B.R. at 631-32 (granting motion to appoint chapter 11 trustee in part because the bankruptcy proceedings had been pending for twelve years and the debtor had not been in operation for five of those years); *Keeley*, 455 B.R. at 165 (granting motion to appoint chapter 11 trustee in part because the debtor's "past performance casts serious doubt on its prospects of reorganization."); *L. S. Good*, 8 B.R. at 315 (granting motion to appoint chapter 11 trustee in part because debtor required "an infusion of fresh capital in a sum approximating five million dollars . . . to undergo a successful reorganization.").

time to have an independent third party investigate the situation and report to the court whether or not the debtor may be successfully reorganized." The court observed that, unlike here, the debtor failed "to keep adequate books and records" and improperly managed a valuable asset while it was in the debtor's control. *Id.* at 345.

In *In re H & S Transp. Co., Inc.*, 55 B.R. 786, 790 (Bankr. M.D. Tenn. 1982), the court ordered the appointment of a Chapter 11 trustee in part because three of the debtor corporations had "essentially ceased operations" with no apparent means or possibility of resuming or once again becoming profitable. The Debtors here, in contrast, are in a position to exit the cyclical low occasioned by El Niño and recover from the damage caused by the JPLs, events not of their making, and become profitable again.

## D.    Debtors are Deserving of the Movants' and Others' Confidence

The Movants argue that, "even had the Debtors internally devised a plan, the creditor body would have no confidence that such plan was put together in light of creditors' best interests," or that it was "proposed in the interests of maximizing value for the Debtors' estates and their creditors." But like the Movants' self-serving and unsupported assertions that the Debtors are untrustworthy, the Movants' purported lack of confidence in the Debtors is unfounded. As discussed above, Debtors' management has at all times acted in a way that was not only justified under the circumstances but in the best interests of all of the Debtors' creditors.

Like any other fact relevant to whether a Chapter 11 trustee is warranted under the circumstances, lack of confidence must be supported with clear and convincing evidence. *See*, *e.g.*, *Bayou*, 564 F.3d at 546; *cf. In re Patman Drilling International, Inc.*, No. 07-34622, 2008 WL 724086 (Bankr. N.D. Tex. March 14, 2008) (finding creditors lacked confidence due to management's inability to stem continuing post-petition losses). And although *Colorado-Ute*,

120 B.R. at 177, and *In re Microwave Products of Am., Inc.*, 102 B.R. 666, 676 (Bankr. W.D. Tenn. 1989), may be read to suggest that declining confidence in the debtor may engender litigation, which in turn may increase the estate's legal expenses, neither decision stands for the proposition that a creditor's conclusory, self-serving allegations will suffice to demonstrate lack of confidence. Moreover, as noted above, according to *Sletteland*, prior misconduct and speculation about future misconduct are irrelevant; once the cases are filed, the key issue is post-petition conduct.  260 B.R. at 672.

Creditors with parochial interests, even substantial ones, should not be allowed to replace management with a Chapter 11 trustee simply because they disagree with management's business judgment designed to protect the estate. This is particularly apt where, as here, the relevant asset is appreciating, most of the complaining creditors' structural priority likely assures them of full payment such that they have nothing to complain about other than the timing of their recovery, and the appointment of a Chapter 11 trustee will harm other creditors, if not the Movants themselves.

The Movants' other argument—that a Chapter 11 trustee is warranted on account of the acrimony between the Movants and the Debtors—is also meritless, if not contrived. The Movants' own case law demonstrates that the appointment of a Chapter 11 trustee is reserved for situations where, unlike here, the acrimony is unusually hostile or crippling and based on acrimony coming from both sides. For instance, in *Colorado-Ute*, 120 B.R. at 176, the court ordered the appointment of a Chapter 11 trustee in part because the debtor's own management could not agree on a way forward: "the serious conflicts in this case between and among the debtor, its board and creditors make the prospect for gridlock seem more probable than the ability to rehabilitate the debtor." Like a creditor's lack of confidence, creditor-debtor acrimony

31

cannot be manufactured to bring about the appointment of a Chapter 11 trustee. The Debtors are ready, willing, and able to engage in reorganization discussions once the parties are free of this highly expedited Motion filed by the Movants to leverage an unwarranted improvement for their position alone.

Lastly, the Debtors note that not all creditors necessarily lack confidence in the Debtors. First, the Movants represent substantially less than all creditors. (Prager Report ¶ 74.) Second, other large creditors have either withdrawn from the Motion or oppose it. CITIC Bank, one of the Club Lenders, <u>which was initially a Movant</u>, has withdrawn its support for the Motion, citing to less drastic approaches offered by the Debtors. [Dkt. No. 76-1] CITIC Bank's suggestion of a chief restructuring officer to deal with any perceived conflicts [Dkt. No. 76-1] of course weighs against the appointment of a Chapter 11 trustee. *See In re MSR Hotels & Resorts, Inc.*, No. 13-11512, 2013 WL 5716897, at *1 (Bankr. S.D.N.Y. Oct. 1, 2013) (denying application for appointment of Chapter 11 trustee in part because "the two most senior creditors here . . . agree with the debtor's proposed course of action . . . ."). In addition, other significant creditors oppose the Motion, stating that such an appointment could cause irreparable harm to good will and operations, and thus destroy value. [Dkt. Nos. 91, 96, 97]

**E.    The Movants Ignore the Interests of the Debtors,
the Chapter 15 Debtors, and their Shareholders**

The Movants, which bear a heavy burden of proof, note that 11 U.S.C. § 1104(a)(2) refers to the interests of "equity security holders," yet they make no attempt to demonstrate how the appointment of a Chapter 11 trustee would be in the best interests of equity, the Debtors, <u>or other parties in interest</u>, such as the Chapter 15 Debtors. In a similar case—*In re Sletteland*, 260 B.R. at 672—the court denied a creditor's motion to appoint a Chapter 11 trustee in part because it did not demonstrate how the appointment of a Chapter 11 trustee would benefit <u>all</u> parties with

a stake in the estate, including the debtor: "a creditor group, no matter how dominant, cannot justify the appointment of a trustee . . . simply by alleging that it would be in its interests. It must show that the appointment is in the interests of all those with a stake in the estate, which in this case would include the Debtor." The court reasoned that the use of the word "and" in 11 U.S.C. § 1104(a)(2) "suggests that creditors cannot on their own obtain the appointment of a trustee under the provision in order to disenfranchise equity security holders or other interests." *Id.* (internal quotation marks omitted).

The Movants have simply not presented any evidence, let alone clear and convincing evidence, that a trustee is in the best interests of the Debtors, their equity holders, the Chapter 15 Debtors and other parties in interest. Indeed, the Debtors submit that the Movants cannot even demonstrate how the appointment of a trustee is in their own best interests, particularly in light of the costs and other detrimental effects from a trustee described below. In and of itself, this lack of proof requires that the Motion be denied for the Movants' failure to present a *prima facie* case addressing all the statutory elements.

F.      **The Costs and Harms of Appointing a Trustee Greatly Outweigh the Benefits**

Like the other factors discussed above, a cost-benefit analysis of the appointment of a trustee weighs in favor of the Motion's denial. Either there are no benefits to the appointment of a Chapter 11 trustee in this case or such appointment is needlessly prophylactic at best. Under these conditions, a Chapter 11 trustee would just be an additional needless expense to an enterprise in the process of righting its ship. *See*, *e.g.*, *In re North Star Contracting*, 128 B.R. at 70 ("in weighing the expense and delay associated with the appointment of a chapter 11 trustee against the potential benefits to the estate, it is clear that a trustee would not benefit any interests

in this case. . . . The costs of a trustee will only burden this estate with additional administrative expenses and will not be in the best interests of creditors.").

The harm of a trustee here, on the other hand, is real and considerable. As discussed above, the appointment of JPLs in November of 2015 caused severe damage to the Debtors' assets and their finances. According to the Paniagua Declaration, the Ng Declaration and the Prager Report, the appointment of a Chapter 11 trustee would have this same effect. Like the JPLs, a Chapter 11 trustee will be viewed as a badge of economic distress, thus lowering the sale value of the Debtors' assets. The Debtors' carefully cultivated business relationships, particularly in emerging markets such as China and Peru, will also not survive the replacement of the Debtors' management with a Chapter 11 trustee, who would be, for all intents and purposes, a stranger to many of the Debtors' long-term customers and suppliers.  (Paniagua Declaration ¶¶ 49-54; Ng Declaration ¶78; Prager Report ¶¶ 68-73). *See North Star Contracting*, 128 B.R. at 70 (denying a creditor's motion to appoint a Chapter 11 trustee in part because the debtor's management's "experience and knowledge" were "essential" for the purposes of continuing to operate the debtor's business)[17]; *see also General Oil*, 42 B.R. at 408 ("the appointment of a trustee . . . would not be received very well within the oil community, and could cause [the debtor] difficulty in its ability to obtain customers and sources of supply.").

Finally, and separate and apart from the substantial damage a trustee could cause to these businesses, in very specific monetary terms the costs of a Chapter 11 trustee in these cases could be staggering. Pursuant to the commission scheme set forth in Section 326 of the Bankruptcy Code, a trustee could receive commissions of up to three percent of distributions in these cases—

---

[17] The JPLs, a Chapter 11 trustee may also experience difficulties navigating the regulatory obstacles associated with an enterprise comprised of dozens of entities incorporated and/or doing business in a variety of jurisdictions around the world. In other words, there is just no telling whether a chapter 11 trustee will be recognized in all the jurisdictions in which he/she will need to be recognized in order to perform his/her functions as efficiently and as effectively as possible. (Prager Report ¶ 68-73.)

34

distributions that can very well aggregate in the range of at least $1 billion, if not double that figure. 11 U.S.C. § 326(a).

The maximum commission on $1 billion would be $30 million. The fees of the trustee's professionals to gain the experience and expertise of management, and to attempt to overcome the lack of customer and vendor relationships, could be a similar amount. *See Bayou*, 564 F.3d at 546-47.

As discussed above, in light of (a) the likely harm from, and high costs of, a trustee, (b) management's demonstrated desire and ability to operate and rehabilitate the Debtors' business for the benefit of all stakeholders, (c) management's consistent exercise of its fiduciary duties in a manner that seeks to protect the estate and maximize its value for all of the Debtors' creditors, as demonstrated by these filings, and (d) Movants' failure to show, in any clear and convincing way, that their stated lack of confidence is based on something more than their subjective desire to bring in new management for a quick payoff, the Motion should be denied.

## **CONCLUSION**

For the reasons set forth above, the Debtors respectfully request that the Motion be denied in all respects.

Dated:   New York, New York
August 23, 2016

MEYER, SUOZZI, ENGLISH & KLEIN, P.C.


By: */s/ Howard B. Kleinberg*
Paul F. Millus
Thomas R. Slome
Howard B. Kleinberg
Daniel B. Rinaldi
1350 Broadway, Suite 501
New York, New York 11018
Telephone: (212) 239-4999
Facsimile: (212) 239-1311

*Counsel to Debtors and Debtors-in-Possession*

36