**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------x
In re:                                                  :         Chapter 11
                                                        :
CHINA FISHERY GROUP LIMITED                             :         Case No. 16-11895 (JLG)
(CAYMAN), *et al.*,                                     :
                                                        :         (Jointly Administered)
                        Debtors.[1]                     :
-------------------------------------------------------------x

## OBJECTION OF CFG INVESTMENT S.A.C., CORPORACION PESQUERA INCA S.A.C., AND SUSTAINABLE FISHING RESOURCES S.A.C. TO THE CLUB LENDER PARTIES' MOTION FOR THE ENTRY OF AN ORDER DIRECTING THE APPOINTMENT OF A CHAPTER 11 TRUSTEE

**KELLEY DRYE & WARREN LLP**
James S. Carr
Jason R. Adams
William S. Gyves
101 Park Avenue
New York, New York 10178
Telephone: (212) 808-7800
Facsimile: (212) 808-7897

*Special Litigation Counsel to CFG Investment S.A.C.,*
*Corporacion Pesquera Inca S.A.C., and*
*Sustainable Fishing Resources S.A.C.*

---

[1]     The Debtors are N.S. Hong Investment (BVI) Limited, Super Investment Limited (Cayman), Pacific Andes International Holdings Limited (Bermuda), China Fishery Group Limited (Cayman), Smart Group Limited (Cayman), Protein Trading Limited (Samoa), South Pacific Shipping Agency Limited (BVI), CFG Peru Investments Pte. Limited (Singapore), China Fisheries International Limited (Samoa), Growing Management Limited (BVI), Chanery Investment Inc. (BVI), Champion Maritime Limited (BVI), Target Shipping Limited (HK), Fortress Agents Limited (BVI), CFGL (Singapore) Private Limited, and Ocean Expert International Limited (BVI).

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ...................................................................................................1

BACKGROUND ..........................................................................................................................5

    A.    General Background ...................................................................................5

    B.    The Peruvian Companies ..........................................................................5

    C.    Factors Affecting Fishmeal Companies' Business .................................7

    D.    Additional Obstacles as a Result of the JPLs........................................8

    E.    The Local Managers' Efforts to Continue Operations...........................10

OBJECTION ...............................................................................................................................11

I.    The Club Lender Parties Have Failed To Satisfy Their Heavy Burden  To Justify
The Appointment of a Chapter 11 Trustee ........................................................................11

    A.    The Trustworthiness of Management ....................................................13

    B.    Past and Present Performance and Prospects of Rehabilitation............15

    C.    Confidence in Management ....................................................................15

    D.    The Cost of a Chapter 11 Trustee Outweighs any Potential Benefits....17

II.    The Peruvian Insolvency Proceedings ..............................................................................18

CONCLUSION.............................................................................................................................21

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Adams v. Marwil* (*In re Bayou Group, LLC*),
  564 F.3d 541 (2d Cir. 2009).................................................................12, 13

*CEPSA v. Pepsi Cola Co.*,
  114 Fed. Appx. 423 (2d Cir. 2004).................................................................18

*Compania Embotelladora Del Pacifico, S.A. v. Pepsi Cola Co.*,
  650 F. Supp. 2d 314 (S.D.N.Y. 2009).................................................................18

*In re Adelphia Comm'ns Corp.*,
  336 B.R. 610 (Bankr. S.D.N.Y. 2006), *aff'd*, 342 B.R. 122 (S.D.N.Y. 2006) ...........11, 12, 13

*In re Colorado-UTE Electric Ass'n.*,
  120 B.R. 164 (Bankr. D. Colo. 1990) .................................................................17

*In re Euro-American Lodging Corp.*,
  365 B.R. 421 (Bankr. S.D.N.Y. 2007) .................................................................11, 13

*In re Fairwood Corp.*,
  2000 U.S. Dist. LEXIS 2606 (S.D.N.Y. Mar. 9, 2000), *aff'd*, 1 Fed. Appx. 12
  (2d Cir. 2001).................................................................12

*In re General Oil Distributors, Inc.*,
  42 B.R. 402 (Bankr. E.D.N.Y. 1984).................................................................12

*In re Ionosphere Clubs, Inc.*,
  113 B.R. 164 (Bankr. S.D.N.Y. 1990) .................................................................12

*In re LHC, LLC*,
  497 B.R. 281 (Bankr. N.D. Ill. 2013) .................................................................13

*In re Marvel Entm't Group, Inc.*,
  140 F.3d 463 (3d Cir. 1998).................................................................12

*In re North Star Contracting Corp.*,
  128 B.R. 66 (Bankr. S.D.N.Y. 1991) .................................................................12

*In re Smart World Technologies, LLC*,
  423 F.3d 166 (2d Cir. 2005).................................................................13

*In re Soundview Elite, Ltd.*,
  503 B.R. 571 (Bankr. S.D.N.Y. 2014) .................................................................13

*In re The 1031 Tax Group LLC*,
374 B.R. 78 (Bankr. S.D.N.Y. 2007) .......................................................................12

*In re Tricycle Enters.*,
2006 Bankr. LEXIS 4261 (Bankr. N.D.N.Y. Mar. 29, 2006) ...................................13

*Pravin Banker Assocs. v. Banco Popular del Peru*,
165 B.R. 379 (S.D.N.Y. 1994), *aff'd*, 109 F.3d 850 (2d Cir. 1997) .......................18

**Statutes**

11 U.S.C. § 1104 ..............................................................................................11, 13

11 U.S.C. § 1108 ......................................................................................................12

Peruvian Insolvency Law ...........................................................................5, 18, 19, 20

CFG Investment S.A.C. ("CFGI"), Corporacion Pesquera INCA S.A.C. ("Copeinca") and Sustainable Fishing Resources S.A.C. (collectively, the "Peruvian Companies"), each subject to an involuntary Peruvian insolvency proceeding (the "Peruvian Insolvency Proceedings") before El Instituto de Defensa de la Propiedad Intelectual (the National Institute for the Defense of Competence and Protection of Intellectual Property, or "INDECOPI") and each a chapter 15 debtor before this Court, by and through their undersigned counsel, hereby submit this objection (the "Objection") to the *Club Lender Parties' Motion For Entry of an Order Directing the Appointment of a Chapter 11 Trustee Pursuant to 11 U.S.C. §1104(a)(2)* (the "Trustee Motion").[2]  In support of this Objection, the Peruvian Companies rely upon the report of David W. Prager and the declarations of (i) Francisco Javier Paniagua Jara (the "Paniagua Decl."); (ii) Gustavo Miró-Quesada Milich (the "Miró-Quesada Decl."); and (iii) Ng Puay Yee.  In support of this Objection, the Peruvian Companies respectfully represent as follows:

## PRELIMINARY STATEMENT

1.       The appointment of a chapter 11 trustee is an extraordinary remedy negating the primary purpose of chapter 11 -- providing a debtor breathing room to allow management to guide the restructuring process in light of their experience with the business so that the debtor can ultimately formulate a plan to restructure its debt or otherwise dispose of its assets.  The appointment of a chapter 11 trustee is the exception, rather than the rule.

2.       Here, the Club Lender Parties filed the Trustee Motion 40 days after these cases were commenced and before expiration of the Debtors' initial exclusive period to file a plan.  After parsing through 60 pages of unsupported allegations and unfounded concerns, the Trustee Motion

---

[2]       Docket No. 57.  Capitalized terms used but not otherwise defined in this Objection shall have the meanings set forth in the Trustee Motion.

can be reduced to a simple allegation -- the Club Lender Parties are dissatisfied with the Debtors'
decision to explore a potential restructuring rather proceed with an expedited sale of the Peruvian
Companies.  The Trustee Motion is a thinly-veiled attempt to manipulate the bankruptcy process
to obtain the result the Club Lender Parties believe serves their own best interests -- an expedited
sale.  The Club Lender Parties, however, present no evidence that such a sale is in the best interest
of all stakeholders.

3.      The Debtors and the Peruvian Companies do not believe such a strategy will
maximize value.  Faced with the prospects of a forced sale, management exercised sound business
judgment in accordance with their fiduciary duties and authorized the initiation of restructuring
proceedings to preserve value and prevent the Club Lender Parties from seeking relief that could
damage the interests of other stakeholders.

4.      The facts demonstrate that an expedited sale is not in the best interest of all
stakeholders.  The Peruvian Companies' fishmeal and fish oil operations are valuable enterprises
that are recovering from three uncontrollable external factors that have hampered operations as
opposed to any alleged mismanagement.  First, and most critically, was the unusually strong and
long-lasting El Niño that has drastically reduced anchovy harvesting in Peru since 2014.

5.      Second, in November 2015, while dealing with the ramifications of this El Niño,
the Peruvian Companies' financial stability was threatened by HSBC's efforts to appoint joint
provisional liquidators in Hong Kong (the "JPLs").  Although the JPLs were ultimately dismissed
in January 2016, their presence in Peru, and interactions with local lenders, directly resulted in the
Peruvian Companies' loss of critical financing to fund operations.  Only through the efforts of
management were the Peruvian Companies able to preserve value by securing minimal emergency
financing to fund critical payments to suppliers and employees.

6.      Third, a shift in Peruvian governmental policy decreased the amount of anchovy the Peruvian Companies could harvest as well as limited the area in which anchovy harvesting could occur.  As a result of these factors, the Peruvian Companies' revenues have declined and the overall value of the business became artificially depressed.  There is simply no worse time to pursue an expedited sale.

7.      The effects of the El Niño are now disappearing and anticipated changes in Peruvian regulations are expected to reverse the prior administration's limitations on the anchovy fishing industry.  As a result, the Peruvian Companies expect a return to normalized anchovy fishing that will drive revenue and increase the value of the business.

8.      Following the dismissal of the JPLs, the Debtors attempted to work with the Club Lenders to address their concerns.  However, when it became clear the Club Lenders would consider no alternative but an expedited sale, management of the Peruvian Companies determined the Peruvian Insolvency Proceedings were necessary to safeguard the Peruvian Companies and prevent further harm that could have been inflicted from the reappointment of the JPLs.

9.      The Club Lender Parties' assertion that the Peruvian Insolvency Proceedings are improper and will somehow be manipulated by related parties demonstrates a fundamental misunderstanding of Peruvian insolvency laws and disregards basic principles of comity.  Peruvian bankruptcies are sophisticated and based upon a well-developed Peruvian insolvency law that was derived in part from U.S. bankruptcy law.  There is a standardized claim process, with heightened scrutiny for related party claims, and the fate of a debtor, whether it be a sale or restructuring, is controlled by the creditors.

10.     The Club Lender Parties knowingly provided unsecured loans to the Peruvian Companies, fully aware that substantially all operations were located in Peru.  The complaint, therefore, about being forced to participate in the Peruvian Insolvency Proceedings rings hollow.  In fact, since the filing of the Trustee Motion, the Club Lender Parties' own Peruvian counsel has sent letters to, and participated in a meeting with, INDECOPI, on behalf of HSBC, attempting to disrupt the Peruvian Insolvency Proceedings.

11.     Finally, the Trustee Motion is far from universally supported.  In fact, one of the original movants, China CITIC Bank International Limited ("CITIC"), has withdrawn its support for the Trustee Motion and, as of the date of the filing of this Objection, four objections have been filed by creditors, including CITIC.

12.     The Club Lender Parties have presented no evidence that the Debtors' management has taken any actions either prior to or since the bankruptcy filings that have damaged or undermined the value of the Peruvian Companies.  A trustee will not have the industry experience or knowledge to maintain operations.  Instead, it is more likely that the appointment of a chapter 11 trustee will be viewed similarly to the appointment of the JPLs by Peruvian suppliers, employees and lenders.  This will further erode local Peruvian support and will lead to further financial problems and potential operational issues.

13.     The Club Lender Parties have failed to satisfy their heightened burden of demonstrating by clear and convincing evidence that a chapter 11 trustee is in the best interest of all stakeholders.  A chapter 11 trustee is, therefore, not in the best interest of all stakeholders and the Trustee Motion must be denied.

## BACKGROUND

### A.    General Background

14.     On June 30, 2016 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code with this Court.  Since the Petition Date, the Debtors have continued to operate and manage their businesses as debtors-in-possession pursuant to sections 1107 and 1008 of the Bankruptcy Code.

15.     On the Petition Date, insolvency proceedings were commenced in Peru with respect to the Peruvian Companies under Article 26 of the General Law of the Bankruptcy System (Law No. 27809) (the "Peruvian Insolvency Law").  Each of the Peruvian Companies also filed a voluntary petition for relief under chapter 15 of the Bankruptcy Code with this Court.

16.     On August 9, 2016, Coöperatieve Rabobank U.A. ("Rabobank"), Standard Chartered Bank (Hong Kong) Limited, China CITIC Bank International Limited ("CITIC"), and DBS Bank (Hong Kong), Limited filed the Trustee Motion.[3]  However, on August 12, 2016, CITIC notified the Court it no longer supported the Trustee Motion.[4]  Four joinders and statements in support of the Trustee Motion were filed on August 10, 2016.[5]

### B.    The Peruvian Companies

17.     CFGI was formed in 2006 to enter the Peruvian fishmeal and fish oil business. Through a series of transactions over the next ten years, CFGI expanded its operations and today holds the largest quota for anchovy harvesting in Peru.  Paniagua Decl., ¶ 19.  The most significant transaction was the 2013 acquisition of Copeinca (and together with CFGI, the "Fishmeal

---

[3]      Docket No. 57.

[4]      Docket. No. 76.

[5]      *See* Docket Nos. 61-63 and 65.

Companies"). Paniagua Decl., ¶ 20. The Fishmeal Companies currently own 54 vessels and 10 processing plants and have over 2,400 employees. Paniagua Decl., ¶¶ 21, 12.

18.      Through their fleet of vessels, the Fishmeal Companies harvest anchovy in Peru's northern-central and southern regions. The majority of anchovy are located in the northern-central region. Harvesting is strictly regulated by the Peruvian Government and only permitted during two limited fishing seasons in each region. Paniagua Decl., ¶ 14.

19.      The Peruvian Government limits the amount of anchovy that can be harvested to ensure sustainability. For each fishing season, the Peruvian Government establishes a total allowable catch ("TAC") for the industry. The annual TAC in a normal year is between 4.5 million and 5 million tons in the northern-central region and 600,000 and 800,000 tons in the southern region. Paniagua Decl., ¶ 18.

20.      Since 2009, the Peruvian Government has further regulated anchovy fishing through a quota system. Paniagua Decl., ¶ 18. Following the Copeinca acquisition, the Fishmeal Companies have the highest quota in Peru (16.9% for the northern-central zone and 14.7% for the southern zone). Paniagua Decl., ¶ 20.

21.      The quality of fishmeal is dependent upon the amount of time it takes from harvesting to processing. The Fishmeal Companies' processing plants are strategically located along the coastline and the Fishmeal Companies have 21 fishing vessels with cooling systems to preserve the anchovy quality for transportation to more remote processing plants. Paniagua Decl., ¶ 15.

22.      Fishmeal is produced by cooking, pressing, drying and milling the anchovy. During the pressing process, liquid is captured and run through a centrifuge to extract the fish oil. Once processed, the fishmeal and fish oil is packaged for worldwide distribution, the majority of which

is in China.  In a normalized year, the Fishmeal Companies produce between 280,000 and 300,000 metric tons of fishmeal and between 40,000 and 50,000 metric tons of fish oil, generating between $535-$585 million in revenue and $180-200 million in EBITDA.  Paniagua Decl., ¶ 22.

23.     The Fishmeal Companies are run by Francisco Paniagua and Jose Miguel Tirado (the "Local Managers") who are responsible for the administrative, financial, operational and business affairs of the Fishmeal Companies, including (i) managing the day-to-day operations; (ii) managing over 2,400 employees, (iii) managing relationships with local suppliers; (iv) interacting with local authorities and other stakeholders in the fishing industry; and (v) negotiating and maintaining relationships with local lenders.  Paniagua Declaration ¶ 12.

24.     Given the seasonal nature of the industry, the Fishmeal Companies require financing to fund operations during the harvesting season until fishmeal and fish oil can be sold. Such financing has historically been provided by local lenders.  The Fishmeal Companies' primary lender has been Banco de Crédito del Perú ("BCP"), which has typically provided inventory financing of up to approximately $100 million.  Paniagua Decl., ¶ 17.

C.      **Factors Affecting Fishmeal Companies' Business**

25.     The Fishmeal Companies' revenue is driven by the volume of anchovy that can be harvested.   This volume is driven by ocean conditions off the Peruvian coast which are impacted by El Niño and La Niña weather events.  Paniagua Decl., ¶ 24.  In an El Niño, ocean temperatures rise, reducing the population of anchovy and driving the anchovy stock closer to the coastline. Paniagua Decl., ¶ 25.

26.     The Fishmeal Companies' harvest over the last 30 months has significantly declined as a result of several factors, including the largest El Niño that Peru has experienced in the last 15 years.  Although a typical El Niño will only effect anchovy populations for a single

season, the most recent El Niño has continued to impact Peruvian anchovy fishing from 2014 through 2016.  In 2014, Peruvian fishing companies only caught 66% of the TAC for the first northern-central season, and the entire second season in both regions were cancelled.  These issues continued in 2015 and the first season of 2016.  Paniagua Decl., ¶ 24.

27.    With El Niño pushing anchovy stock closer to shore, the Peruvian anchovy industry faced further difficulties when, in August 2012, the Peruvian Government enacted regulations that prevented industrial fishing within 10 miles of the coast, as opposed to a historic 5-mile limitation.  Paniagua Decl., ¶ 25.  An association of ship owners subsequently obtained an injunction and within the last month, the new Minister of Production has supported the end of the 10-mile rule.  Paniagua Decl., ¶ 26.

28.    In addition, a shift in the Peruvian Government in 2011 lead to the decrease in seasonal TACs as compared to historic norms.  However, the new Minister of Production recently stated his intention to support Peru's commercial fishing industry C.  Paniagua Decl., ¶ 28.

29.    As a result of these factors, the Fishmeal Companies' harvests over the last 30 months has been well below historic norms and, as a consequence revenues for the last two years has been lower than projected.  However, in light of these regulatory changes and the end of the most recent El Niño, the Fishmeal Companies expect a strong second season in 2016 and a return to historic norms in 2017.  Paniagua Decl., ¶ 29.

**D.    Additional Obstacles as a Result of the JPLs**

30.    Notwithstanding these difficult conditions, the Local Managers maintained operations and the support of local suppliers, employees, and lenders.  In December 2015, however, the Fishmeal Companies were faced with a liquidity crisis as a result of actions taken by HSBC, one of the Club Lenders.  Paniagua Decl., ¶¶ 31-37.

31.     During the fall of 2015, the Local Managers understood the Club Lenders and the CF Group were working on a 1-year extension for payments under the Club Loan Facilities.  In fact, representatives of Rabobank, the agent for the Club Loan Lenders, came to Peru to get an update on operations and anticipated trends for the upcoming fishing seasons.  During this trip, the representatives from Rabobank assured the Local Managers that such extension was probable. Paniagua Decl., ¶ 30.

32.     A few weeks later, however, HSBC sought the appointment of joint provisional liquidators in Hong Kong over China Fishery Group Limited (Cayman) and China Fisheries International Limited, but none of the Peruvian Companies.  Similar relief was sought in the Cayman Islands.  On November 25, 2015, the Peruvian Companies learned that three joint provisional liquidators from KPMG (the "JPLs") were appointed by the Hong Kong court. Paniagua Decl., ¶ 31.

33.     Almost immediately, the JPLs attempted to take control of the Peruvian Companies and significantly interfered with operations.  Paniagua Decl., ¶¶ 31-36.  Although the Local Managers attempted to work cooperatively with the JPLs, including participating in several meetings, the JPLs, on December 1, 2015, met BCP, the Fishmeal Companies' most important local lender.  As a result of the appointment of the JPLs and their actions, BCP reduced availability to only $8 million and the Fishmeal Companies' other local lenders stopped funding altogether. Similarly, warehouse operators, who are critical in obtaining local financing, refused to do business with the Fishmeal Companies.  Paniagua Decl., ¶ 34.

34.     Without financing, the continued operations of the Fishmeal Companies were in peril during the second season of 2015, which commenced on November 17.  Operations only continued as a result of the Local Managers' efforts to obtain alternative financing through the sale of fishmeal to a local Peruvian company.  Paniagua Decl., ¶ 35.

35.     While attempting to work cooperatively with the JPLs, the Local Managers requested evidence that the JPLs had sufficient authority over the Fishmeal Companies.  Rather than doing so, the JPLs repeatedly demanded the Local Managers convene a shareholders meeting to remove general managers and revoke certain powers of attorney.  In addition, the JPLs repeatedly threatened the Local Managers with personal liability if they did not comply with their demands.  Paniagua Decl., ¶ 36.  Even after the appointment of the JPLs was withdrawn by the Hong Kong court on January 5, 2016, the JPLs continued to demand the Local Managers convene the shareholder meeting to remove the general managers.  Paniagua Decl., ¶ 37.

36.     In connection with the withdrawal of the JPLs by the Hong Kong and Cayman Island courts, the parties entered into two deeds of undertaking (the "Undertakings") providing for, among other things, the sale of Peruvian Companies over the next six months, the appointment of Paul Brough ("Brough") as chief restructuring officer, and the appointment of Grant Thornton.

**E.      The Local Managers' Efforts to Continue Operations**

37.     After the JPLs were terminated, the Fishmeal Companies endeavored to rectify the damage caused by the JPLs, conducting numerous meetings and negotiations with local banks, suppliers, and their employees to restore confidence in the companies.  The Fishmeal Companies, however, were still in need of working capital to operate.  Paniagua Decl., ¶ 38.

38.     The CF Group commenced negotiations with the Club Lenders, excluding HSBC, to provide up to $25.5 million of new financing to sustain operations through the first season of

2016.  Paniagua Decl., ¶ 39.  Although the Peruvian Companies received an initial $5 million, no additional amounts were advanced.  Paniagua Decl., ¶¶ 40-41.

39.    The $5 million advanced was used to pay employees who were threatening to strike, pay overdue taxes, and satisfy delinquent accounts with suppliers.  Paniagua Decl., ¶ 40. Moreover, the Fishmeal Companies did not have sufficient financing to support operations for the upcoming season.  Out of options, and facing the threat of shutting down operations, the Local Mangers were able to negotiate $6 million of financing from Cuantica Inversiones S.A.C. Although this financing had a high interest rate, it was fully unsecured and was the only option to ensure continued operations.  Paniagua Decl., ¶ 43.

40.    As negotiations with the Club Lenders continued to be unproductive, the Peruvian Companies were concerned the Club Lenders would seek the reappointment of the JPLs. Ultimately, the Peruvian Companies determined the commencement of the Peruvian Insolvency Proceedings was the only way to safeguard the Peruvian Companies and preserve value for all stakeholders.  Paniagua Decl., ¶¶ 46-47.

## OBJECTION

## I.    The Club Lender Parties Have Failed To Satisfy Their Heavy Burden To Justify The Appointment of a Chapter 11 Trustee

41.    Section 1104(a)(2) provides for the appointment of a chapter 11 trustee only if such appointment is in the best interests of all stakeholders, including equity security holders.[6]  As the Club Lender Parties acknowledge, the appointment of a trustee is an extraordinary remedy that must not be taken lightly and must only be done in rare circumstances.[7]

---

[6]    11 U.S.C. § 1104(a).

[7]    *See In re Euro-American Lodging Corp.*, 365 B.R. 421, 426 (Bankr. S.D.N.Y. 2007) (internal citations omitted); *In re Adelphia Comm'ns Corp.*, 336 B.R. 610, 656 (Bankr. S.D.N.Y. 2006), *aff'd*, 342 B.R. 122 (S.D.N.Y. 2006); *Ad Hoc. Comm. Of Bondholders v. Citicorp Venture Capital Ltd. (In re Fairwood Corp.)*, 2000 U.S. Dist. LEXIS 2606 (S.D.N.Y. Mar. 9, 2000), at *8, *aff'd*, 1 Fed. Appx. 12 (2d Cir. 2001).

42.     Chapter 11 is designed to allow a debtor to retain management to control its business operations and provide a breathing spell to address the issues leading to bankruptcy in order to propose a plan for the restructuring or liquidation of the debtor.[8]  There is, therefore, a strong presumption that a debtor is entitled to remain in possession during the case.[9]  As a result, the Second Circuit has noted that the standard for the appointment of a chapter 11 trustee is "very high."[10]

43.     As this Court explained in the *North* Star case, "[t]he appointment of a trustee in a Chapter 11 case is not the usual procedure because 11 U.S.C. § 1108 contemplates that the debtor will continue to manage its property and operate its business. The court must weigh all of the factors and interests carefully because the appointment of a trustee is an extraordinary remedy which will cause additional expense to the estate."[11]

44.     "Absent fraud or some other compelling reason, it is preferable to have the chapter 11 debtor's current management operate the debtor's business, rather than to appoint a trustee. Trustees are not the norm in chapter 11 cases because often a debtor's existing management will be more familiar with the company than a court-appointed trustee, and it would thus be better able to operate the debtor, while foregoing the expense of a trustee."[12]

---

[8]     *In re Adelphia*, 336 B.R. at 655 (internal citations and quotations omitted); *In re General Oil Distributors, Inc.*, 42 B.R. 402, 409 (Bankr. E.D.N.Y. 1984) (internal citations and quotations omitted)

[9]     *In re Adelphia*, 336 B.R. at 655 (internal citations omitted) ("[T]here is a strong presumption that the debtor should be permitted to remain in possession absent a showing of need for the appointment of a trustee"); *see also In re Marvel Entm't Group, Inc.*, 140 F.3d 463, 471 (3d Cir. 1998); *In re The 1031 Tax Group LLC*, 374 B.R. 78, 85 (Bankr. S.D.N.Y. 2007); *In re Ionosphere Clubs, Inc.*, 113 B.R. 164, 167 (Bankr. S.D.N.Y. 1990); *In re Fairwood Corp.*, 2006 U.S. Dist. LEXIS, at *8 (*citing In Re Ionosphere Clubs*, 113 B.R. at 167).

[10]    *Adams v. Marwil* (*In re Bayou Group, LLC*), 564 F.3d 541, 546 (2d Cir. 2009) (quoting *In re Smart World Techs., LLC*, 423 F.3d 166, 176 (2d Cir. 2005)).

[11]    *In re North Star Contracting Corp.*, 128 B.R. 66, 70 (Bankr. S.D.N.Y. 1991) (internal citations omitted).

[12]    *In re Tricycle Enters.*, 2006 Bankr. LEXIS 4261, at *24-25 (Bankr. N.D.N.Y. Mar. 29, 2006) (internal citations and quotations omitted).

45.     In order to justify the appointment of a chapter 11 trustee, the Club Lender Parties must prove that a trustee is in the best interest of all stakeholders, and not just a group of vocal creditors, by clear and convincing evidence.[13]  Such stakeholders include equity, whose views must be taken into account.[14]  The best interest test contemplates a "fact-driven analysis, principally balancing the advantages and disadvantages of taking such a step, and mindful of the many cases . . . that have held that appointment of a trustee is an extraordinary remedy, and should be the exception, rather than the rule."[15]

46.     In determining whether the appointment of a chapter 11 trustee is in the best interest of all stakeholders, courts generally look at the following four factors: (i) the trustworthiness of the debtors; (ii) the debtors' past and present performance and prospects for rehabilitation; (iii) confidence or lack thereof in the debtors' present managers; and (iv) a cost-benefit analysis.[16]

A.    **The Trustworthiness of Management**

47.     The assertion that the Debtors, and by implication management, cannot be trusted is wholly unsupported by the facts.  The Debtors, the Peruvian Entities, and their respective management teams have consistently cooperated with the Club Lenders Parties to address their concerns.  The Debtors' equity holders and management have: (i) contributed substantial capital to allow for the paydown of the unsecured debts owed to the Club Lender Parties; (ii) provided personal guarantees; (iii) agreed to retain independent third-party professionals requested by the

---

[13]    *Adams*, 564 F.3d at 546 (*citing In re Adelphia*, 336 B.R. at 656; *In re Smart World Techs.*, 423 F.3d at 176; *In re Euro-American Lodging*, 365 B.R. at 426 (*citing In re Sharon Steel Corp.*, 871 F.2d 1217, 1225 (3d Cir. 1989)); *In re LHC, LLC*, 497 B.R. 281, 309-10 (Bankr. N.D. Ill. 2013) ("§1104(a)(2) must be read in the conjunctive").

[14]    *In re LHC*, 497 B.R. at 310 (Bankr. N.D. Ill. 2013) ("the appointment of a trustee must be in the interests of equity security holders as well as creditors").

[15]    *In re Soundview Elite, Ltd.*, 503 B.R. 571, 583 (Bankr. S.D.N.Y. 2014) (*quoting In re Adelphia*, 336 B.R. at 658 (citations and quotations omitted)).

[16]    *In re Euro-American*, 365 B.R. at 427-28 (*quoting In re Ionosphere Clubs*, 113 B.R. at 168); *In re Adelphia*, 336 B.R. at 658; *In re Tricycle Enters.*, 2006 Bankr. LEXIS at *28-29 (*citing Schuster v. Dragone*, 266 B.R. 268, 273 (D. Conn. 2001); *In re Sanders*, 2000 Bankr. LEXIS 263, at *5 (Bankr. N.D. Ill. Mar. 2, 2000)).

Club Lender Parties; (iv) provided extensive financial reporting; and (v) formed an independent review committee to investigate issues raised by the Club Lender Parties. Far from being untrustworthy, the Debtors have acted transparently and agreed to substantial oversight to appease the Club Lender Parties.

48.     After weeding through the unfounded allegations of mismanagement, it is clear there is no real evidence to support the Trustee Motion. The Club Lender Parties are simply unhappy the Debtors did not pursue a expedited sale of the Peruvian Companies only benefiting the Club Lender Parties. Management instead exercised sound business judgement and acted in the best interest of all stakeholders to protect the value of the Peruvian Companies through the commencement of the Peruvian Insolvency Proceedings.

49.     The fact that the Debtors agreed in the Undertakings to pursue a sale does not translate to mismanagement. A debtor's failure to comply with the terms of a prepetition agreement is wholly insufficient to justify the appointment of a trustee.

50.     The argument that the Ng family could exercise control over the Fishmeal Companies and take actions detrimental to the Club Lender Parties' interests is speculative and unsupported by any past conduct. The Club Lender Parties fail to identify a single occurrence where the Ng family exercised control over the operations of the Fishmeal Companies. The Local Managers have run the day-to-day operations for the last 10 years. The Club Lender Parties have failed to raise any issue regarding the trustworthiness of the Local Managers or the actions they have taken. Instead, the Local Managers have maintained the Fishmeal Companies' operations through extremely difficult conditions, including the loss of local inventory financing as a result of the JPLs. It has only been through the efforts of the Local Managers that the value of the Fishmeal Companies has been preserved.

**B.** **Past and Present Performance and Prospects of Rehabilitation**

51.     The Debtors' past and present performance strongly favor denial of the Trustee

Motion.  In discussing this factor, the Club Lender Parties fail to address the Debtors' and the

Fishmeal Companies' past performance, instead only focusing on an alleged lack of a "path going

forward."  Trustee Motion, ¶ 68.

52.     In doing so, the Club Lender Parties ignore the actual performance of the Peruvian

Companies.  Since CFGI's formation in 2006, the Fishmeal Companies have become one of the

largest fishmeal and fish oil producers in the world.  Paniagua Decl., ¶ 21.  The Fishmeal

Companies hold the largest quota for anchovy in Peru.  Paniagua Decl., ¶ 20.  In a normalized

year, the Fishmeal Companies generate revenue of between $535 million and $585 million.

Paniagua Decl., ¶ 22.  The Club Lender Parties do not dispute these facts or question the viability

of the Peruvian Companies.

53.     Although the Peruvian Companies have, for the last two years, dealt with extremely

difficult conditions as a result of the most significant El Niño event to hit Peru in the last 15 years,

the Fishmeal Companies expect a return to normal conditions in the second anchovy fishing season

of 2016 and into 2017.  Paniagua Decl., ¶¶ 25, 46.  Now is the worst time to force an expedited

sale.  The expected return to normal fishing conditions will lead to a significant increase in the

value of the Fishmeal Companies, which will serve the best interests of all stakeholders and not

just the parochial interests of the Club Lender Parties.

**C.** **Confidence in Management**

54.     In asserting their lack of confidence in the Debtors' management, the Club Lender

Parties again point to a lack of transparency – which is unfounded – and "unanswered questions"

– which are unarticulated.  Trustee Motion, ¶ 70.  As noted above, the Debtors have consistently

acquiesced to the Club Lender Parties' request for greater transparency.   In fact, the only thing

that the Club Lender Parties can point to for their lack of confidence is the decision not to move forward with an expedited sale and, instead, pursue the possibility of a global restructuring to serve the interests of all stakeholders.

55.     It bears noting that the Club Lender Parties' purported lack of confidence in management is far from universal.  Most notably, CITIC, one of the Club Lenders which was originally a movant, has since withdrawn its support of the Trustee Motion and expressed its belief that a chapter 11 trustee is not in the best interest of creditors.  The Club Lender Parties, therefore, do not even have the support of their entire lending group.

56.     It is, of course, not shocking that the Club Lender Parties are dissatisfied with the Debtors.  In every bankruptcy case, unsecured creditors are unhappy that their prepetition claims have not been satisfied.  Such dissatisfaction, however, does not equate to a justifiable lack of confidence in management and is not sufficient to warrant the appointment of a chapter 11 trustee. The Club Lender Parties have failed to present any evidence that the Fishmeal Companies have been mismanaged.  To the contrary, the facts demonstrate the Fishmeal Companies have been well managed and their value preserved.

57.     The Club Lender Parties' concern that management will not be able to formulate a plan in the creditors' best interests in similarly unfounded.  Trustee Motion, ¶ 70.  The Debtors have been in bankruptcy for less than two months and still retain their original exclusive right to file a plan.  There is nothing unusual about a debtor not having filed a plan in the first two months of a case.

58.     The Club Lender Parties cite to the *Colorado-UTE* case in support of this proposition.  In that case, however, the court determined that management and the board lacked business acumen.[17]  The Debtors, on the other hand, have decades of experience and have turned a small business into one of the premier seafood businesses in the world.  Similarly, the Local Managers have over 10 years of experience running the largest fishmeal company in Peru.

59.     Finally, the Club Lender Parties assert a lack confidence in management because the interests of the Debtors diverge from the interests of equity.  Trustee Motion, ¶ 71.  Nothing could be farther from the truth.  Equity's goals are exactly the same as the Debtors here -- maximizing the value of the Debtors.  In reality, it is the interests of the Club Lender Parties and their singular focus on forcing an expedited sale that diverge from the interests of other stakeholders.

**D.      The Cost of a Chapter 11 Trustee Outweighs any Potential Benefits**

60.     There would be no benefit to the appointment of a trustee.  A chapter 11 trustee will have neither the experience nor expertise to run the international operations of the Debtors and the Fishmeal Companies.  Current management is critical in maintaining the day-to-day operations  of the Debtors and the Peruvian Companies.  Far from providing a benefit, the appointment of a trustee could cripple operations, erode value, and will only lead to unnecessary increased costs.

61.     The appointment of a chapter 11 trustee will likely result in a quick sale of the Debtors and the Fishmeal Companies, which is exactly the outcome the Club Lender Parties desire.  Such an outcome, however, will not maximize value and will harm creditors and other

---

[17]      *In re Colorado-UTE Electric Ass'n.,* 120 B.R. 164, 176 (Bankr. D. Colo. 1990).

stakeholders.  In Peru, such a sale could very likely result in significant harm to suppliers, which could lose their business with the Fishmeal Companies, and employees who could lose their jobs.

## II.    The Peruvian Insolvency Proceedings

62.     The Club Lender Parties spend an inordinate portion of the Trustee Motion arguing that the Peruvian Insolvency Proceedings are improper and will be manipulated by insiders.  Such concerns, however, are unfounded, demonstrating a fundamental misunderstanding of Peruvian Insolvency Law and ignoring basic principles of comity.

63.     Insolvency proceedings in Peru are governed by the Peruvian Insolvency Law and are administered by INDECOPI, a specialized public agency that is part of Peru's Office of the Prime Minister.  Miró-Quesada Decl., ¶ 2.  The Peruvian Insolvency Law constitutes a robust scheme that (i) affords substantial protections to creditors; (ii) safeguards creditors that have no affiliation with a debtor from any over-reaching by affiliated creditors; (iii) imposes significant restrictions on how debtors are operated during the process; and (iv) requires extensive disclosures and transparency.  Peruvian insolvency proceedings have been recognized under principles of comity by numerous courts, including the United States Court of Appeals for the Second Circuit and the United States District Court for the Southern District of New York.[18]

64.     The Peruvian Insolvency Law is derived, in part, from the U.S. Bankruptcy Code.  As a result, the Peruvian Insolvency Law is designed to advance many of the same objectives as the Bankruptcy Code.  Miró-Quesada Decl., ¶ 33.  The purpose of the Peruvian Insolvency Law

---

[18]     *See CEPSA v. Pepsi Cola Co.*, 114 Fed. Appx. 423, 425-26 (2d Cir. 2004) (*quoting Finanz AG Zurich v. Banco Economico S.A.*, 192 F.3d 240, 246 (2d Cir. 1999)) (The Second Circuit has "'repeatedly noted the importance of extending comity to foreign bankruptcy proceedings.'"); *Compania Embotelladora Del Pacifico, S.A. v. Pepsi Cola Co.*, 650 F. Supp. 2d 314, 326 (S.D.N.Y. 2009) (*citing CEPSA*, 114 Fed. Appx. At 425-26) (Agreeing with "the Second Circuit expressly defer[ring] to Peruvian liquidation procedures [and] declining to substitute its judgment for that of creditors in Peru."); *Pravin Banker Assocs. v. Banco Popular del Peru*, 165 B.R. 379, 386 (S.D.N.Y. 1994), *aff'd*, 109 F.3d 850 (2d Cir. 1997) (internal citations and quotations omitted) ("The Peruvian bankruptcy procedures appear to share the central premise of the United State Bankruptcy Codes, which is to seek equality of distribution of assets among creditors . . . and correlatively avoid preference to some.").

-18-

is to enhance creditor recovery through orderly proceedings and promote a suitable environment for negotiations between creditors and debtors in order to allow them to either reach a restructuring agreement or pursue a liquidation.  Miró-Quesada Decl., ¶ 34.

65.    Peruvian bankruptcy proceedings seek the participation of all creditors to obtain the greatest benefit for all creditors and seek to promote and protect the collective interest of creditors rather than the individual interest of each creditor.  Miró-Quesada Decl., ¶ 37.  Creditors have 30 days to submit their proofs of claim to INDECOPI.  Miró-Quesada Decl., ¶ 56.  INDECOPI reviews each claim and any claim submitted by related creditors is subject to heightened scrutiny.  Miró-Quesada Decl., ¶ 58.  In addition, if at any time during the process a creditor believes that another creditor is acting out of self-interest rather than for the benefit of all creditors, the complaining creditor can file an objection and pursue judicial remedies if it believes another creditor is engaging in an abuse of exercise of a right.  Miró-Quesada Decl., ¶ 71.

66.    Peruvian bankruptcy proceedings are creditor driven -- meaning that the creditors are responsible for deciding the fate of the debtor.  Once INDECOPI completes its claim review process, it convenes a creditors meeting at which the creditors have *sole* authority to vote on whether to pursue a restructuring or a liquidation.  Miró-Quesada Decl., ¶¶ 60-61.

67.    Typically, creditors holding two-thirds of the amount of all claims can decide the fate of the debtor.  However, when related creditors make up more than 50% of the creditor body, special rules apply – namely, on a first call, creditors with more than two-thirds of the class of related claims *and* creditors with more than two-thirds of unrelated claims must agree on a restructuring or liquidation.  Then, on a second call, more than two-thirds of *all* combined creditors (related and unrelated) must agree.  If creditors do not agree on the fate of the debtor, the Peruvian Insolvency Law requires INDECOPI to liquidate the debtor.  Miró-Quesada Decl., ¶¶ 62-66.

68.     The Peruvian Insolvency Law also imposes significant restrictions on how management operates the business.     Article 19.3 of the Peruvian Insolvency Law sets out prohibited actions by management, including entering into contracts (and making payments on existing contracts) outside of the ordinary course of business and mergers, takeovers or spin-offs. Miro-Quesada Declaration ¶¶ 69, 81.  If debtor's management does not comply with this provision, they are subject to criminal sanctions.  Miró-Quesada Decl., ¶ 70.

69.     As a result, the concerns raised by the Club Lender Parties and in their supporting declaration of Renzo Agurto (the "Agurto Declaration") regarding the Peruvian Insolvency Proceedings and the influence of related creditors are completely unfounded.

70.     The accusations regarding the manner in which the Peruvian Insolvency Proceedings were commenced have no basis in law.  Peruvian proceedings can be initiated voluntarily by the debtor or involuntarily by creditors.  In order to file voluntarily, a debtor must present audited financial statements that are no more than 2 months old.  The Peruvian Companies have yet to receive their audited financials because of the ongoing review of the IRC to investigate the concerns raised by the Club Lender Parties.  Therefore, in order to protect their assets, the Peruvian Companies worked with local creditors to initiate the Peruvian Insolvency Proceedings, which is not prohibited under the Peruvian Insolvency Law.  Miró-Quesada Decl., ¶ 42-44.

71.     No matter how a proceeding is initiated, there are no restrictions on a creditor's right to confer with a debtor or ultimately file an involuntary proceeding against that debtor. Therefore, the Peruvian Companies did not act unlawfully or even improperly when they worked with creditors who initiated the Peruvian Insolvency Proceedings.  Miró-Quesada Decl., ¶ 42-44.

72.    Finally, it bears noting that the Club Lender Parties' concerns regarding their ability to participate in the Peruvian Insolvency Proceedings ring hollow given recent actions taken by their Peruvian counsel.  Mr. Agurto recently had improper *ex parte* communications, including an in-person meeting, with INDECOPI in an attempt to disrupt and interfere with the Peruvian Insolvency Proceedings.  Miró-Quesada Decl., ¶ 94-97.  Besides the improper nature of these communications, such actions demonstrate that the Club Lender Parties have no issues with participating in the Peruvian Insolvency Proceedings, which is the proper forum for the Peruvian Companies' bankruptcy proceedings.

## **CONCLUSION**

WHEREFORE, the Peruvian Companies respectfully request that this Court enter an Order: (a) denying the Trustee Motion; and (b) granting such other relief as this Court deems just and proper.

Dated: New York, New York
      August 23, 2016

                                          KELLEY DRYE & WARREN LLP

                                          By: */s/ James S. Carr*
                                          James S. Carr
                                          Jason R. Adams
                                          William S. Gyves
                                          101 Park Avenue
                                          New York, New York 10178
                                          Telephone: (212) 808-7800
                                          Facsimile: (212) 808-7897

                                          *Special Litigation Counsel to CFG
                                          Investment S.A.C., Corporacion Pesquera
                                          Inca S.A.C., and Sustainable Fishing
                                          Resources S.A.C.*