UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>**CHINA FISHERY GROUP LIMITED (CAYMAN), et al.,**<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 16-11895 (JLG)<br><br>(Jointly Administered) |

**MOTION TO STRIKE THE DECLARATION OF NG PUAY YEE
IN OPPOSITION TO THE LENDERS' MOTION FOR THE ENTRY
OF AN ORDER DIRECTING THE APPOINTMENT OF A CHAPTER 11
TRUSTEE PURSUANT TO 11 U.S.C. § 1104(a)(2) [DOCKET NO. 105]**

Pursuant to the Scheduling Order for Lenders' Motion for Entry of an Order Directing the Appointment of a Chapter 11 Trustee Under Section 1104(a)(2) of the Bankruptcy Code [Dkt. No. 56] and Federal Rule of Evidence 602, movants Coöperatieve Rabobank U.A., Standard Chartered Bank (Hong Kong) Limited, and DBS Bank (Hong Kong) (collectively the "Club Lender Parties"), hereby move to strike the *Declaration of Ng Puay Yee in Opposition to the Lenders' Motion for the Entry of an Order Directing the Appointment of a Chapter 11 Trustee Pursuant to 11 U.S.C. § 1104(a)(2)* [Docket No. 105]. In support of this Motion, the Club Lender Parties hereby state as follows:

---

[1] The Debtors are N.S. Hong Investment (BVI) Limited ("NS Hong"), Super Investment Limited (Cayman) ("Super Investment"), Pacific Andes International Holdings Limited (Bermuda ("PAIH"), China Fishery Group Limited (Cayman) ("CFGL"), Smart Group Limited (Cayman) ("Smart Group"), Protein Trading Limited (Samoa) ("Protein Trading"), South Pacific Shipping Agency Limited (BVI) ("SPSA"), CFG Peru Investments Pte. Limited (Singapore) "CFG Peru Singapore"), China Fisheries International Limited (Samoa) ("CFIL"), Growing Management Limited (BVI) ("Growing Management"), Chanery Investment Inc. (BVI) ("Chanery"), Champion Maritime Limited (BVI) ("Champion"), Target Shipping Limited (HK) ("Target Shipping"), Fortress Agents Limited (BVI) ("Fortress"), CFGL (Singapore) Private Limited ("CFGLPL") and Ocean Expert International Limited (BVI) ("Ocean Expert").

EAST\128087075.2

1.    The evidentiary hearing on the Club Lender Parties' Motion for the Entry of an Order Directing the Appointment of a Chapter 11 Trustee Pursuant to 11 U.S.C. § 1104(a)(2) [Dkt. No. 57] (the "Trustee Motion") is scheduled to begin on Monday, August 29, 2016.

2.    Pursuant to the associated Scheduling Order [Dkt. No. 56], the Debtors were required to file their opposition to the Trustee Motion on August 23, 2016 along with all supporting declarations that will serve as their direct trial testimony.

3.    The Debtors filed their opposition on August 23, 2016, and included four declarations including that of Ng Puay Yee [Dkt. No. 105], who was previously disclosed as one of the Debtors' fact witnesses.

4.    Ms. Ng's Declaration should be stricken in its entirety, as it: (i) is facially not based on her personal knowledge; and (ii) includes improper legal argument.

**Ms. Ng Lacks Sufficient Personal Knowledge for her Testimony**

5.    Federal Rule of Evidence 602 provides that a fact witness' testimony must be based on personal knowledge:

> A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may consist of the witness's own testimony.

6.    Courts routinely recognize Rule 602's requirement that sworn statements must be based on personal knowledge. *See, e.g., Anyanwu v. City of New York*, No. 10 Civ. 8498(AJN)(THK), 2013 WL 5193990, at *7 (S.D.N.Y. Sept. 16, 2013) (citing Rule 602 to require admissible testimony be based on "personal knowledge" and rejecting testimony not based on personal knowledge but potentially discussions with others); *Risco v. McHugh*, 868 F. Supp. 2d 75, 85 n. 2 (S.D.N.Y. 2012) (holding that "Plaintiff's Affidavit is replete with improper averments, including statements not based on personal knowledge…"). Ms. Ng cannot obviate this requirement by claiming to be some sort of corporate representative. *See, e.g., Capitol*

*Records, Inc. v. MP3tunes, LLC*, No. 07 Civ. 9931(WHP), 2014 WL 903959, at *11 (S.D.N.Y. Jan. 29, 2014) (recognizing that a corporate representative "cannot necessarily testify as interchangeable conduits for the collective knowledge of a corporation" and any such representative offered at trial by a party on its own behalf must still testify based on the witness' personal knowledge in compliance with Federal Rules of Evidence 602 and 703).

7. Ms. Ng expressly disavows that her testimony is based on her own personal knowledge. Rather, she testifies in her Declaration:

> Except as otherwise indicated herein, the facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, information provided to me by employees working under my supervision, professional advisors and consultants, or my opinion based upon my experience, knowledge and information concerning the operations of the Pacific Andes Group. [Ng Dec. ¶ 3.][2]

8. That is, Ms. Ng expressly acknowledges that her proposed testimony is not solely based on personal knowledge. Rather, the Club Lender Parties, all joinder parties and the Court are left to surmise the bases for any particular allegation. Indeed, the allegations could even be based on privileged communications from Ms. Ng's "professional advisors." This does not satisfy Rule 602's requirement to introduce evidence "sufficient to support a finding that the witness has personal knowledge of the matter."

9. Moreover, it is clear from the deposition of Ms. Ng, taken the day before the Debtors filed her Declaration, that many of her allegations came from others putting words into her mouth. While it would difficult and patently unfair to require the Club Lender Parties to

---

[2] Ms. Ng also purports to incorporate her Declaration submitted on June 30, 2016 pursuant to Rule 1007-2 of the local bankruptcy rules in support of the Debtors' first day motions and applications (the "First Day Declaration") in its entirety. (Ng Decl. ¶ 4.) Like the Ng Declaration here, the First Day Declaration is not based solely on her personal knowledge (First Day Declaration ¶ 13), and the same arguments apply to the wholesale admissibility of the First Day Declaration. It should not be admitted in its entirety.

address all such instances, the following are just a few examples of allegations contained in Ms. Ng's Declaration on which she had no knowledge 24 hours before it was filed:

10.  First, numerous statements unquestionably constitute inadmissible hearsay not based on Ms. Ng's personal knowledge, particularly with respect to information obtained by former Chief Restructuring Officer Paul Brough:

- "Indeed, the chief restructuring office of the China Fishery Group, Mr. Brough, appointed at the request of and hand-picked by the lenders, has on many occasions emphasized that a sale in the manner that the creditors propose is not in the interest of the Pacific Andes Group or its stakeholders." (Ng Decl. ¶ 13.)

- "Indeed, Mr. Brough himself expressed extreme displeasure with this and described HSBC's conduct as 'unprofessional.'"[3] (Ng Decl. ¶ 91.)

- "It is my understanding based on communications with Mr. Brough that, at a meeting between Mr. Brough and the Club Lender Parties held on April 12, 2016, at which I understand Mr. Brough threatened to resign from his role by April 15, 2016 if the Club Lender Parties and other lenders did not provide him with the good faith support necessary to proceed with a successful sales process." (Ng Decl. ¶ 98.).[4]

*See* Federal Rules of Evidence 801-03.

11.  Second, Ms. Ng testifies about the purpose of certain powers of attorney she has. (Ng Decl. ¶ 37.) To the extent that this newfound discussion of her powers of attorney comes from her attorneys, as she claims some of her knowledge comes from "professional advisors and consultants" (Ng Dec. ¶ 3), she cannot now testify about that same topic when her counsel precluded her from testifying about her understanding of her powers of attorney if that information came from her attorneys (as it presumably did, in light of her deposition testimony):

---

[3] Ms. Ng attempts to bolster this statement by attaching an e-mail from the Movants' production. She is not a recipient of that e-mail, underscoring her lack of personal knowledge and improper testimony. (Ng Decl. Ex. F.)

[4] The Movants are filing a separate motion *in limine* to exclude the documents attached to support some of her statements, particularly with respect to Mr. Brough, as those documents were never produced during the discovery. Any reliance on them is improper.

| Compare Ng Declaration | With Prior Day's Deposition Testimony |
|---|---|
| "While Ng Joo Thieng and myself have powers of attorney in our capacity as general managers of the Peruvian Fishmeal Companies…" with a footnote explaining "The members of the Ng family hold the powers of attorney of the Peruvian Fishmeal Companies in order to manage and direct the sale of fishmeal and fish oil in their capacity as general managers which is typical of a holding company and operating company structure in the Peruvian fishmeal industry." (Ng Decl. ¶ 37.) | Q. What do you understand the scope of your powers of attorney to be?<br><br>A. I don't have a very clear understanding. (Ng Dep. 43:15-18)<br><br>And:<br><br>Q. Okay. And did you have any understanding in April of 2016 of what the scope of your powers of attorney were?<br><br>MR. MILLUS: Objection. Except to the extent that you learned of that scope from your attorney, that would be privileged communication. So other than that, if you have any understanding as to the scope of your powers of attorney, then that's fine to answer.[5]<br><br>A. All my understanding of power of attorney was from my counsel.<br><br>***<br><br>So you don't have any understanding of the document [that] lays out your scope of your power of attorney in Peru.<br><br>MR. MILLUS: I'm just going to object as to form. You may answer.<br><br>    A. No.<br><br>(Ng Dep. 105:8-20; 105:24-106)[6] |

By so shielding disclosure of these facts during her deposition, Ms. Ng has conceded that she has no personal knowledge on these topic. Nor can she fail to testify to the information

---

[5] The Club Lender Parties' counsel objected during the deposition to this assertion of privilege over what is obviously a fact question. (Ng Dep. 106:7-24.)

[6] The cited pages of Ms. Ng's deposition are attached hereto as Exhibit A.

during a deposition based on an assertion of privilege, and then testify on the same topic without any such apparent limitation at trial.

12. Third, Ms. Ng now testifies about alleged consensual discussions between Richtown, an entity affiliated with the Debtors, and a creditor Sahara Investment Limited for the filing of an insolvency proceeding for Richtown in the British Virgin Islands, to which she previously testified she had no personal knowledge:

| Compare Ng Declaration | With Deposition Testimony |
| --- | --- |
| "The appointment of a provisional liquidator in the British Virgin Island[s] for the purpose of implementing a restructuring was made based on negotiations between Sahara Investments Pte. Ltd. and Richtown Development Limited, a subsidiary of PARD." (Ng Decl. ¶ 37.) | Q. Okay. Were you involved with any discussions with Sahara about the potential for filing a petition in the British Virgin Islands for Rich Town (sic)?<br>A. Me personally, no. (Ng Dep. 73:8-12) |

Ms. Ng then compounds that with stating that the Richtown filing "was undertaken in a transparent and effective jurisdiction." (Ng Decl. ¶ 123.) She provides no basis whatsoever for how she can testify about the judicial system in the British Virgin Islands. In fact, when asked questions about why a joint provisional liquidator was sought in the British Virgin Island court, she stated that "all the filings are done under the advice of restructuring counsel. I had no idea how everything works." (Ng Dep. 294:23-295:1.)

13. Fourth, Ms. Ng attempts to opine on Peruvian law, including whether Peru offers a highly transparent and creditor-friendly restructuring process, although she is not an attorney, has only been to Peru once, and provides no basis for how she can provide any information about the Peruvian bankruptcy process:

- "In addition, I understand that, under Peruvian law, the 12 month period before the commencement of the Peruvian insolvency proceeding is a 'suspect period' during which any actions that are prejudicial towards creditors will render management personally liable under civil and criminal laws. In addition, during the suspect period,

the powers of the general managers are limited to ordinary course business activities. The creditors will, at the creditors' meetings conducted pursuant to Peruvian bankruptcy law, be able to challenge any actions of the Peruvian debtors that have been taken during the one year before the commencement of the insolvency proceeding up to the time of the creditors' meeting." (Ng Decl. ¶ 39.)

- "The creditors who have moved for the appointment of a trustee do not appear to understand that Peru offers a highly transparent and creditor friendly restructuring process." (Ng Decl. ¶ 39.)

14. Fifth, Ms. Ng claims that the joint provisional liquidators caused damages to the Peruvian fishing companies' relationships with banks and includes statements about the management's meeting with banks, but admitted the day before she signed the Declaration that she had no contact herself with any of the banks:

| Compare Ng Declaration | With Deposition Testimony |
|---|---|
| "From January 2016 through May 2016, the CF Group's management met and negotiated with the local Peruvian banks in an attempt to reinstate the inventory financing; these efforts were unsuccessful given the reputational harm that the JPLs have caused during their time in Peru." (Ng Decl. ¶ 73.)<br><br>"The appointment of the JPLs also led to the withdrawal of the remaining working capital facilities that were available to PARD for the purposes of their frozen fish business and transportation and logistics business." (Ng Decl. ¶ 77) | Q. Do you have any familiarity with the CF Group's management meeting with local Peruvian banks in January 2016 through May 2016? Were you involved in any of those meetings?<br><br>A. No.<br><br>(Ng Dep. 146:24-147:16) |

15. Sixth, Ms. Ng alleges that the JPLs made "allegations of impropriety by the management of the China Fishery Group to BCP [Banco de Crédito de Perú]" (Ng Decl. ¶ 85), but admitted in her deposition that she had no personal knowledge of such an allegation. (Ng Dep. 140:13-142:43.) When asked the basis for this allegation, all she could testify to was that "[i]t would have been from our local management in Peru," but then could not even identify the

source, stating it was "probably Mr. Paniagua" or could have been "Mr. Jose Miguel Tirado." (Ng. Dep. 141:22-142:3.)

16. Seventh, Ms. Ng now testifies about the details of funding from an entity called Sahara Investment Group Private Limited and the purposes for the loan in December 2015 (Ng Decl. ¶ 130), the same loan about which she testified she had never seen before and was not involved with in December:

> Q. Are you aware that if [affiliated entity] Golden Target defaults, Sahara can demand up to eight percent of the equity of golden target (sic)?
>
> MR. MILLUS: Objection as to form. Are you aware of that, if, in fact, it's true?
>
> A. Like I said, I have never seen this document[7] before. This was entered into before I even – like, when is this entered into? It's 8th of December, before I came on-board to be on the --.
>
> (Ng Dep. 293:12-23.)

17. As an eighth and final example, Ms. Ng claims to testify about what the Club Lender Parties thought: "Indeed, the Club Lender Parties wanted to avoid a repayment of the $5 million working capital facility (that was in fact repaid to them in good faith) as they viewed having claims against CFG Peru would provide leverage to take control over the immediate shareholder of the Peruvian Fishmeal Companies." (Ng Decl. ¶ 40.) The letter which she attaches says nothing of the sort, and she has no basis to testify about the Club Lender Parties' motives.

18. Again, these are just eight examples as there is no ability for the reader – including the Club Lender Parties and this Court – to decipher what information is within Ms. Ng's own personal knowledge and what information is based on documents and people, including professionals, not identified. Rule 602 requires Ms. Ng to show that she has a

---

[7] The document in question is the convertible loan agreement from Sahara. (Ng Dep. 290:15-17).

sufficient basis, not for the Court and opposition parties to determine if she does not. To be clear, if the Declaration clearly set forth the allegations that were based on information outside Ms. Ng's personal knowledge, all of those allegations would have to be stricken.

19. By not providing details of the source of her information for each of her statements – such as being present at meetings or otherwise having personal knowledge based on an admissible source – combined with her deposition testimony of a lack of knowledge of many areas on which she now contends to have the requisite knowledge upon which to testify, Ms. Ng's entire Declaration fails to satisfy Section 602 and should be stricken.

**Ms. Ng's Declaration Contains Improper Legal Argument**

20. Ms. Ng's declaration also contains improper argument and legal conclusions. For instance, she argues that "many other innocent stakeholders will suffer irreparable harm if these creditors are not halted." (Ng Decl. ¶ 41.) She continues, "[t]heir self-interested strategy, and self-serving complaints about the Chapter 11 and Peruvian filings, are not valid reasons for claiming that creditors as a whole have lost confidence in management." (Ng Decl. ¶ 42.) Later, she argues "[a]s admitted by Guy Isherwood in his declaration and deposition…" (Ng Decl. ¶ 94.) And she further argues that the Movants' "motion for the appointment of a Chapter 11 trustee" is "just an excuse that hides their true strategy and intent." (Ng Decl. ¶ 125.) She follows that with the argument that "[t]heir true and only goal is to force a quick sale of the Peruvian business and they will stop at nothing in pursuing this plan. Their recent actions in Singapore make this palpably clear." (Ng Decl. ¶ 126.) She then argues to the court that the "concerns with respect to the purported manipulation of intercompany or other related party claims are unwarranted." (Ng Decl. ¶ 127.)

21.  These are not factual allegations. They are quintessential legal argument that is improper in the testimony of a fact witness. *See, e.g., A.D. v. Bd. Of Ed. Of City of New York*, 690 F. Supp. 2d 193, 217 (S.D.N.Y. 2010). No Federal Rule of Evidence allows Ms. Ng to include argument as her testimony. This is yet another problem with Ms. Ng's affidavit.

**Striking the Declaration is the Proper Remedy**

22.  It is not incumbent upon the Club Lender Parties to ascertain at the evidentiary hearing the basis for each and every statement in Ms. Ng's declaration, and then, depending on the response, move to strike the testimony. The Debtors were obligated to provide declarations that comply with the Federal Rules of Evidence in the first instance; they cannot place the onus on the Club Lender Parties to waste Court time and their own resources exposing the extent of the violations through a prolonged trial. As discussed above, the violations are vast and permeate Ms. Ng's entire Declaration.

23.  Ms. Ng's Declaration violates the bedrock of the United States adversarial process: that witnesses testify based on their own personal knowledge – not knowledge fed to them by other unnamed parties, including unnamed lawyers – and that a party have an opportunity to cross examine that witness in open court. Ms. Ng's Declaration thumbs its nose at such quaint fundamentals in an apparent attempt to hide the true actors here. Ms. Ng's Declaration must be stricken in its entirety.

WHEREFORE, the Club Lenders respectfully request that this Honorable Court strike the Declaration of Ng Puay Yee [Dkt. No. 105] and order the Debtors and Opposition Parties to file amended briefs that delete all references to Ms. Ng's Declaration and the facts contained therein.

Dated: New York, New York
August 25, 2016

DLA PIPER LLP (US)
By: _/s/ R. Craig Martin_
R. Craig Martin (RM1971)
Mordechai Y. Sutton (MS5781)
1251 Avenue of the Americas
New York, New York 10020
Telephone: (212) 335-4500
Facsimile: (212) 335-4501

Richard A. Chesley
John K. Lyons
Jeffrey Torosian
203 North LaSalle Street, Suite 1900
Chicago, Illinois 60601
Telephone: (312) 368-4000
Facsimile: (312) 236-7516

*Counsel to Coöperatieve Rabobank U.A.,*
*Standard Chartered Bank (Hong Kong)*
*Limited, and DBS Bank (Hong Kong), Limited*