UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X

In re:                                                    Chapter 11

CHINA FISHERY GROUP LIMITED                               Case No. 16-11895 (JLG)
(CAYMAN), *et al.*,
                                                          (Jointly Administered)

                              Debtors.[1]

-------------------------------------------------------X


### PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW OF THE DEBTORS, CFG INVESTMENT S.A.C., CORPORACION PESQUERA INCA S.A.C., SUSTAINABLE FISHING RESOURCES S.A.C. AND THE EQUITY HOLDERS OF DEBTORS N.S. HONG INVESTMENTS (BVI) LIMITED RELATING TO MOTION FOR THE APPOINTMENT OF A TRUSTEE

The above captioned debtors and debtors-in-possession (the "Debtors"), CFG Investment

S.A.C. ("CFGI"), Corporacion Pesquera Inca S.A.C. ("Copeinca" and together with CFGI, the

"Peruvian Fishmeal Companies"), Sustainable Fishing Resources S.A.C ("SFR" and together

with the Fishmeal Companies the "Peruvian Companies") and the equity holders of NS Hong

(the "Equity Holders"), by their respective undersigned counsel, submit the annexed proposed

findings of facts and conclusions of law.

---

[1] The Debtors are N.S. Hong Investment (BVI) Limited ("NS Hong"), Super Investment Limited (Cayman) ("Super Investment"), Pacific Andes International Holdings Limited (Bermuda) ("PAIH"), China Fishery Group Limited (Cayman) ("CFGL"), Smart Group Limited (Cayman) ("Smart Group"), Protein Trading Limited (Samoa) ("Protein Trading"), South Pacific Shipping Agency Limited (BVI) ("SPSA"), CFG Peru Investments Pte. Limited (Singapore) ("CFG Peru Singapore"), China Fisheries International Limited (Samoa) ("CFIL"), Growing Management Limited (BVI) ("Growing Management"), Chanery Investment Inc. (BVI) ("Chanery"), Champion Maritime Limited (BVI) ("Champion"), Target Shipping Limited (HK) ("Target Shipping"), Fortress Agents Limited (BVI) ("Fortress"), CFGL (Singapore) Private Limited ("CFGLPL"), and Ocean Expert International Limited (BVI) ("Ocean Expert").

Respectfully submitted,

MEYER, SUOZZI, ENGLISH & KLEIN, P.C          KELLEY DRYE & WARREN LLP

By:    /s/ Howard B. Kleinberg                      By:    /s/ James S. Carr
       Paul F. Millus                                      James S. Carr
       Thomas R. Slome                                     Jason R. Adams
       Howard B. Kleinberg                                 William S. Gyves
       Daniel B. Rinaldi                                   101 Park Avenue
       1350 Broadway, Suite 501                            New York, New York 10178
       New York, New York 11018                            Telephone: (212) 808-7800
       Telephone: (212) 239-4999                           Facsimile: (212) 808-7897
       Facsimile: (212) 239-1311                           *Special Litigation Counsel to CFG*
       *Counsel to Debtors and*                            *Investment S.A.C., Corporacion Pesquera*
       *Debtors-in-Possession*                             *Inca S.A.C., and Sustainable Fishing*
                                                           *Resources S.A.C.*

LOWENSTEIN SANDLER LLP

By:    /s/ Gerald C. Bender
       Gerald C. Bender
       Paul Kizel,
       Keara M. Waldron
       1251 Avenue of the Americas
       New York, New York 10020
       Telephone: (212) 262-6700
       Facsimile: (212) 262-7402
       *Counsel to the Equity Holders of N.S. Hong*
       *Investments (BVI) Limited*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------x

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| CHINA FISHERY GROUP LIMITED | : | Case No. 16-11895 (JLG) |
| (CAYMAN), et al., | : | |
| | : | (Jointly Administered) |
| Debtors. | : | |

-------------------------------------------------------------x

## PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

### I.

### PROPOSED FINDINGS OF FACT

A.    **Company Background**

1.      The Debtors' business began in 1986 as a small frozen seafood trading business in the western district of Hong Kong founded and run by the Ng family.  (Debtors' Ex. 2 ¶ 7).

2.      Over the next 30 years, the business grew and diversified under the continued management of the Ng family into a supply chain management business and, eventually, a fully integrated global seafood business collectively referred to as the "Pacific Andes Group." (Debtors' Ex. 2 ¶ 7).

3.      The Pacific Andes Group now comprises 3 public companies, Debtor PAIH, non-debtor Pacific Andes Resource Development Limited ("PARD") and Debtor CFGL, the former of which is listed on the Hong Kong Stock Exchange and the latter two of which are listed on the Singapore Stock Exchange, and are subject to the public disclosure and accountability requirements for public companies in the respective jurisdiction in which they report.  (Debtors' Ex. 2 ¶ 22; Debtors' Ex. 26 ¶ 10).

4.      Functionally and, in many ways, economically, the Debtors and their affiliates can be divided into groups on the basis of the controlling public company. Appendix A to the expert

1

report of David Prager, the Debtors' financial advisor,  sets forth a summary of the organizational structure, debt structure and operating descriptions of the primary Debtors and certain non-debtor affiliates. (Debtors' Ex. 26 ¶ 11).

5.    The board of directors of each public company within the Pacific Andes Group consists of independent directors as well as executive directors. (Debtors' Ex. 2 ¶ 26; Debtors' Ex. 27 ¶ 20).

**B.    The Peruvian Businesses**

6.    A significant element of the Pacific Andes Group is the China Fishery group of companies  (the "China Fishery Group"), which holds the largest quota for the harvest of anchovy in Peru through its wholly-owned group members, CFG Investment S.A.C. and Corporacion Pesquera Inca S.A.C. (Debtors' Ex. 2 ¶ 9; Debtors' Ex. 26 ¶ 12; Debtors' Ex. 27 ¶ 20).

7.    The "China Fishery Group" consists of the subsidiaries of Debtor CFGL and contains all of the Debtors, except Super Investment, PAIH and NS Hong. (Debtors' Ex. 26 ¶ 12).

8.    Outside the Peruvian Fishmeal Companies, the China Fishery Group also sources, harvests, onboard-processes and delivers mackerel for human consumption. (Debtors' Ex. 26 ¶ 13).

9.    PARD and its subsidiaries other than those in the China Fishery Group (the "PARD Group") are primarily focused on trading and sourcing fish for human consumption and providing ocean logistics. (Debtors' Ex. 26 ¶ 14).

10.    PARD indirectly owns 57% of CFGL, with the balance owned by public shareholders or other minority investors. (Debtors' Ex. 26 ¶ 14).

11.    PAIH indirectly owns 66% of PARD, with the balance owned by public

2

shareholders or other minority investors. (Debtors' Ex. 26 ¶ 15).

12.     Debtor NS Hong owns 54% of PAIH. (Debtors' Ex. 26 ¶ 15).

13.     The Debtors are borrowers, co-borrowers or guarantors on approximately 30 borrowings, with each of these borrowings having distinct rights and priorities. (Debtors' Ex. 26 ¶ 16).

14.     The companies comprising the China Fishery Group were formed and/or acquired between approximately 2006 and 2013. CFGI was first incorporated by the Pacific Andes Group with the acquisition of approximately $600 million in Peruvian fishmeal assets. (Debtors' Ex. 2 ¶ 36). The China Fishery Group acquired Copeinca (which held a 10.7% quota for the anchovy harvest) in 2013 for an acquisition cost of approximately $1.04 billion, implying roughly a $1.7 billion valuation of the Peruvian business. (Debtors' Ex. 2 ¶ 44; Ex. 27 ¶ 20).

15.     The Club Lender banks, Coöperatieve Rabobank U.A. ("Rabobank"), Standard Chartered Bank (Hong Kong) Limited ("Standard Chartered"), DBS Bank (Hong Kong) Limited ("DBS Bank"), China CITIC Bank International Limited ("CITIC Bank") and the Hong Kong & Shanghai Banking Corporation ("HSBC") (the "Club Lenders"), financed the acquisition of Copeinca via a loan facility on March 20, 2014, undoubtedly after they performed all requisite due diligence. (Movants' Ex. 176 ¶ 4).

16.     The Club Lenders and Bank of America, N.A., had long standing business relationships with the Pacific Andes Group companies dating back 6 to 21 years. (Debtors' Ex. 2 ¶ 15).

17.     The acquisition of the China Fishery Group extended the reach of the Pacific Andes Group into industrial fishing and included rights to fish in some of the world's most lucrative fisheries, including the anchovy fishery in Peru. (Debtors' Ex. 2 ¶ 9).

3

18.    The China Fishery Group (primarily through CFGI and Copeinca) is currently one of the world's leading producers of fishmeal and fish oil, and its growth and success, as well as its current business operations, rely on management's long-standing relationships across the industry. (Debtors' Ex. 2 ¶ 37; Debtors' Ex. 27 ¶ 21).

19.    Anchovy fishing in Peru is regulated by the government of Peru through the issuance of ship-specific quotas and the seasonal adjustment of the total allowable catch. It is well recognized in Peru, including by lenders to industrial fishing businesses, that catch volumes are affected principally by these governmental quotas and other regulations and environmental factors such as El Niño and La Niña. (Debtors' Ex. 2 ¶¶ 7, 9, 33, 36, 43-44, 68; Debtors' Ex. 27 ¶¶ 18, 23-29).

20.    The Peruvian fishmeal and fish oil business is independently managed by Francisco Paniagua and Jose Miguel Tirado, who have managed the Peruvian fishmeal operations since CFGI was first incorporated by the Pacific Andes Group in 2006. (Debtors' Ex. 2 ¶ 36; Debtors' Ex. 27, ¶¶ 1, 12).

21.    None of the Ng family members, nor N.S. Hong Investment (BVI) Limited (a Debtor in this case), are creditors of the Peruvian Companies. (Debtors' Ex. 2 ¶ 127).

22.    It is undisputed that the Peruvian business is well managed. Guy Isherwood of SCB, one of the Movants, acknowledged that there were no issues in connection with Peruvian management and that the business in Peru is good. (Tr. 85:5-12).

23.    The Peruvian business has historically enjoyed an extremely positive reputation in the fishmeal and fish oil industry in terms of corporate governance, sustainability and transparency. (Debtors' Ex. 2 ¶ 38).

24.    The success and viability of the business of the Peruvian Fishmeal Companies is

4

dependent upon its being able to harvest anchovy up to the quotas imposed by the Peruvian government. (Debtors' Ex. 2 ¶ 68).

25.    The Peruvian Fishmeal Companies rely on working capital and inventory financing to fund expenses and exporting fishmeal for the Peruvian fishing seasons. The period from the time fish is harvested to the time payment is received on fishmeal and fish oil can be anywhere from a few weeks to several months. (Debtors' Ex. 2 ¶ 70; Debtors' Ex. 27 ¶ 17).

26.    Ng Joo Thieng and Ms. Jessie Ng hold powers of attorney in their capacity as general managers of the Peruvian Fishmeal Companies to manage, direct and arrange the sale of fishmeal and fish oil to their extensive network of business relationships. (Debtors' Ex. 2 ¶ 37; Debtors' Ex. 27 ¶ 13).

27.    The Peruvian fishmeal business is a significant contributor to the entire Pacific Andes Group, with seventy percent of Peruvian business sales made in China through efforts of affiliated entities. (Tr. 295:25; 296:1-12).

### C.    Uncontrollable Events Impact the Pacific Andes Group Financial Condition

28.    The financial condition of the China Fishery Group began to suffer in the 30 months preceding the Debtors commencement of these chapter 11 cases on June 30, 2016. (Debtors' Ex. 27 ¶ 24). Just after the China Fishery Group's acquisition of Copeinca, the weather phenomenon known as El Niño occurred and dominated the weather pattern from 2014 through early 2016, disrupting two consecutive fishing seasons and causing damage to anchovy fishing. (Debtors' Ex. 2 ¶¶ 43, 44; Debtors' Ex. 27 ¶ 24; Tr. 85:13-25, 86:1-23).

29.    The occurrence of El Niño during two consecutive years has only occurred twice previously, in 1972 and 1982 and this most recent El Niño was the longest in 15 years. (Debtors' Ex. 2 ¶ 44; Debtors' Ex. 27 ¶ 24).

30.    Primarily, as a result of El Niño, the Pacific Andes Group found itself in a

5

difficult liquidity position. (Debtors' Ex. 2 ¶ 45).

31.    From April 2014, management of the Pacific Andes Group engaged its lenders, with whom they held a long and positive relationship, to obtain waivers. (Debtors' Ex. 2 ¶ 49).

32.    Entering 2014, the Debtors' primary banking relationship was with HSBC, with whom they had a strong relationship. (Debtors' Ex. 2 ¶ 46).

33.    During the course of 2014, HSBC demanded that the obligations of the Pacific Andes Group be immediately repaid. (Debtors' Ex. 2 ¶ 47).

34.    As a result of HSBC's demands, by December 31, 2014 the Debtors repaid $102,177,000 of debt owed to HSBC, leaving $96,503,494 in outstanding principal owing to HSBC under the Club Loan. (Debtors' Ex. 2 ¶ 47).

35.    Prior to the commencement of these cases, the Debtors reduced the debt outstanding to Standard Chartered by approximately $320 million. (Tr. 82:23-25).

36.    In September 2015, the Pacific Andes Group first considered a sale of the Peruvian fishmeal business in order to address their debt burden and to preserve and maximize value to the maximum extent possible. JRB Consultores S.A.C. estimated market value – based on the assumption that the annual catch volume would be approximately 5,000,000 metric tons – of $1.6 to $1.7 billion, which valuation was verified by Deloitte. (Debtors' Ex. 2 ¶ 62).

37.    In September 2015, the Pacific Andes Group proposed Deloitte & Touche Financial Advisory Limited ("Deloitte Financial Advisory") to act as financial advisor to the Pacific Andes Group to (i) enable full access to its books and records to the lenders of the Pacific Andes Group, (ii) provide cash flow forecasts, (iii) provide a restructuring timetable, and (iv) propose asset sales, with a view to providing transparency to the lenders of the Pacific Andes Group. (Debtors' Ex. 2 ¶¶ 50, 51).

38.     The appointment of Deloitte Financial Advisory in this capacity was approved by the lenders after disclosure of the fact that Deloitte Touche Tohmatsu was acting and had acted as auditors of the Pacific Andes Group since 1993. (Debtors' Ex. 2 ¶¶ 28, 33-34, 51).

39.     Deloitte Financial Advisory regularly communicated and met with the lenders of the Pacific Andes Group and produced bi-weekly presentations to the lenders. (Debtors' Ex. 2 ¶ 51).

40.     The boards of PARD and PAIH formed independent review committees ("IRCs") to address and investigate certain issues raised by the lenders, which remain in place today. (Debtors' Ex. 2 ¶ 29).

41.     The IRCs are led by Peter Van Tu Ngyuen, the former director of prosecution of Hong Kong and a former High Court Judge of the Hong Kong Court (at PAIH) and Lieutenant General Ng Jui Ping, the former Chief of Defence of the Republic of Singapore (at PARD). (Debtors' Ex. 2 ¶ 29).

42.     The IRCs retained PwC, who was later replaced, with the consent of the Club Lenders, by RSM, each well regarded forensic accounting firms. (Tr. 145:18-20, 147:16-25, 148:1-3).

43.     The independent review committees are separately advised by an independent law firm. (Debtors' Ex. 2 ¶ 29; Tr. 148:12-22).

44.     In October 2015, certain lenders and, in particular HSBC, requested that KPMG be retained as independent financial advisor for the benefit of all the lenders of the China Fishery Group to review the work conducted by Deloitte Financial Advisory. (Debtors' Ex. 2 ¶ 53; Tr. 112:21-23).

45.     Management agreed to KPMG's appointment in an effort to provide the lenders

with additional comfort and with a view to facilitating restructuring discussions. (Debtors' Ex. 2 ¶ 53).

46.     In November, 2015, Deloitte Financial Advisory conducted site visits to Peru and were accompanied by a representative of Club Loan lender, Rabobank, to verify the viability of the Peruvian fishmeal operations. (Debtors' Ex. 2 ¶ 51).

### D.    *Ex Parte* Appointment of JPLs

47.     On November 25, 2015, without prior notice to the Pacific Andes Group and at a time when the Pacific Andes Group was engaged in consensual negotiations with HSBC and the other Club Lenders, HSBC commenced an *ex parte* action in the Hong Kong Court seeking the winding up of CFGL and CFIL and the appointment of joint provisional liquidators (the "Hong Kong Action"). (Debtors' Ex. 2 ¶¶ 63, 65).

48.     Upon HSBC's initial application, the Hong Kong Court, without the knowledge that HSBC failed to disclose all material facts, initially granted the relief requested on an interim basis and ordered the appointment of three joint provisional liquidators. (Debtors' Ex. 2 ¶ 64).

49.     The Club Lenders other than HSBC were entirely unaware of HSBC's unilateral actions in seeking the appointment of JPL's came as a "surprise" and considered it a "drastic" move that was "premature". (Tr. 95:1-25, 96:1-11).

50.     HSBC filed a subsequent action in the Cayman Islands based on the Hong Kong Court proceedings. (Debtors' Ex. 2 ¶ 64).

51.     The appointment of the JPLs – just days before the commencement of the second fishing season of 2015 – had a severe negative impact on the Peruvian business. (Debtors' Ex. 2 ¶ 67 – 72; Debtors' Ex. C; Tr. 96:16-25, 97:1-21; Debtors' Exs. 25, 28, 29, 30, 34; Debtors' Ex. 27 ¶¶ 30-37).

52.     The JPLs, whose appointment is meant to be solely for the purpose of preserving

assets, moved quickly to take control of all the Peruvian businesses. (Debtors' Ex. 2 ¶¶ 67, 72; Debtors' Ex. 27 ¶ ¶ 31, 34).

53.    Even though the JPLs' authority did not reach the Debtors' businesses in Peru, they immediately took action to contact potential bidders, banks and employees in Peru. (Debtors' Ex. 2 ¶¶ 67, 72).

54.    Upon learning of the appointment of the JPLs, BBVA and Scotia Bank suspended all financing to the Peruvian business, and Banco de Crédito del Perú ("BCP") reduced the amount of available financing from $100 million to $8 million. (Debtors' Ex. 2 ¶ 68; Debtors' Ex. 27 ¶ 34).

55.    Due to a lack of funding, the Peruvian businesses had reduced fishmeal production in December 2015. (Debtors' Ex. 2 ¶ 70).

56.    After the visit of the JPLs, warehouse companies also were no longer willing to do business with the Peruvian Fishmeal Companies. (Debtors' Ex. 2 ¶ 72). The loss of warehouse facilities meant that the China Fishery Group's operations were shut down and its flow of revenue was terminated. (Debtors' Ex. 2 ¶ 72).

57.    The actions taken by the JPLs resulted in (a) the continued refusal by the Peruvian banks to restore the inventory financing needed by the Peruvian fishmeal companies to resume normal operations, and (b) the unwillingness of suppliers and trade counterparties to deal with the China Fishery Group, and in particular, the Peruvian Fishmeal Companies. (Debtors' Ex. 2 ¶ 85; Debtors' Ex. 27 ¶ 34).

58.    The JPLs caused severe damage to the Peruvian business, from which the China Fishery Group is still recovering today. (Debtors' Ex. 2 ¶ 73; Debtors' Ex. 27 ¶ 38).

59.    Despite the destructive nature of the JPL's appointment, CFGL and CFIL

9

complied with the extensive amounts of information demanded by the JPLs, and on December 8, 2015, met with one of the JPLs to offer to coordinate the provision of information demanded by the JPLs. (Debtors' Ex. 2 ¶ 119; Debtors' Ex. 25).

60.    CFGL and CFIL continued to demonstrate full cooperation, and it was the JPLs that were slow or reluctant to make information requests and did not always follow through when information was offered. (Debtors' Ex. 2 ¶ 119).

61.    Various news and media outlets picked up on the story and the negative coverage caused further instability and damage to the Pacific Andes Group business. (Debtors' Ex. 2 ¶ 78).

62.    In December 2015, following the unannounced appointment of the JPLs over CFGL and CFIL, certain members of the Pacific Andes Group paid a retainer for professional restructuring services in order to enable the group to fulfil its fiduciary obligation to consider all available options in the face of the JPLs and the financial turmoil the group was experiencing. (Debtors' Ex. 2 ¶ 113).   These professionals were not instructed to begin preparations for any filing until June 2016. (Debtors' Ex. 2 ¶ 113).

**E.    Deeds of Undertaking**

63.    On December 24, 2015, PAIH and PARD entered into a deed of undertaking with Rabobank, DBS Bank and Standard Chartered Bank (the "December 2015 Deed").   (Debtors' Ex. 2 ¶ 30; Movants' Ex. 10)

64.    In compliance with the December 2015 Deed, PricewaterhouseCoopers ("PwC") was engaged as forensic accountants to conduct a forensic investigation with respect to the lender's concerns.  (Debtors' Ex. 2 ¶ 30; Tr. 112:15-17).

65.    In addition, Patrick Wong was appointed as chief restructuring officer for PAIH and PARD with the lenders' consent. (Tr. 112:12-14).

66.    On January 5, 2016, following a hearing, the joint provisional liquidators were

dismissed (the "Hong Kong Decision"). (Debtors' Ex. 2 ¶¶ 63, 79).

67.    Despite the dismissal, HSBC expressed an intention to appeal the Hong Kong Decision and proceed with the winding up petition before the Grand Court of the Cayman Islands (the "Cayman Court"). (Debtors' Ex. 2 ¶ 80).

68.    With the threat of continued litigation, and the potential appointment of liquidators and the irreparable damage their appointment would cause to the businesses, the management of CFGL and CFIL agreed to a Deed of Undertaking dated January 20, 2016 (the "January 2016 Deed") pursuant to which, among other things, HSBC agreed to withdraw the winding up petition in Hong Kong and the Cayman Islands and CFGL and CFIL agreed to pursue a sale process of the Peruvian business to be completed by July 15, 2016, and to appoint a CRO to oversee the process. (Debtors' Ex. 2 ¶ 82; Movants' Ex. 11).

69.    CFGL and CFIL resisted the imposition of a finite date for the conclusion of the sale. (Tr. 195:1-25, 196:1-25).

70.    The Debtors were ultimately left with no choice but to agree to a fixed date for the consummation of the sale, without which HSBC would proceed with the winding up petition and the best they could negotiate was July 15, 2016. (Debtors' Ex. 2 ¶ 81; Tr. 196:13-25; 248:8-23).

71.    At the request of the lenders, Ng Joo Siang agreed to resign his leadership of the business after 30 years and Ng Puay Yee (Jessie) ("Ms. Ng") agreed to assume his role. (Debtors' Ex. 2 ¶¶ 59, 117).

72.    Ms. Ng was appointed Managing Director of PAIH on December 14, 2015, and Chief Executive Officer of CFGL on February 26, 2016, making Ms. Ng. the Managing Director and/or Chief Executive Officer to the direct or indirect parents of each of the Debtors. (Debtors' Ex. 2 ¶¶ 5, 6). Ms. Ng was also appointed as Executive Director of CFGL on January 21, 2016.

11

(Debtors' Ex. 2 ¶ 5; Debtors' Ex. 1 ¶ 4-5).

73.     BOA threatened to adopt HSBC's winding up petition if it was not made a beneficiary to the January 2016 Deed. (Debtors' Ex. 2 ¶ 83).

74.     BOA not only made demands of the Debtors' and HSBC, it initially demanded that its structurally subordinated claim be improved and demanded direct claims against the Peruvian fishmeal and fish oil business, notwithstanding that the funds that BOA had advanced to the China Fishery Group were not used by or for the benefit of any of the Peruvian fishmeal companies. (Debtors' Ex. 2 ¶ 83).

75.     The other lenders, including the Club Lenders, refused and ultimately BOA agreed that it would not adopt HSBC's winding up petition if it was made a beneficiary of the January 2016 Deed. (Debtors' Ex. 2 ¶ 83).

76.     PAIH, PARD, CFGL and CFIL entered into the Deeds in good faith and at all times thereafter acted in good faith to comply with their terms. (Debtors' Ex. 2 ¶ 113).

77.     The January 2016 Deed provided, *inter alia*, that it would terminate upon (a) a breach by the Debtors of clause 2.3 therein; (b) seven (7) days after receipt of a non-compliance notice by failure to comply with demands made by HSBC or BOA that remained unresolved; (c) that date upon which the debt was paid in full; or (d) July 15, 2016 or such later date that HSBC and BOA may agree in writing. (Movants' Ex. 11, Clauses 6.1-6.5).

78.     The January 2016 Deed further provided that if the Deed was terminated as set forth above, HSBC or BOA would "individually be at liberty to apply to the Cayman Court for the immediate reappointment of the JPL's . . . and the CF Parties hereby consent to such reappointment . . ." (emphasis added) (Movants' Ex. 11, Clause 4).

79.     In accordance with the January 2016 Deed, Paul Brough was appointed at the as

12

chief restructuring officer for CFGL. (Debtors' Ex. 2 ¶ 86; Tr. 83:5-8).

80.    In addition, PwC and Grant Thornton were also engaged as monitoring accountants with respect to the finances of the Pacific Andes Group.    All of these professionals were hand-picked by the lenders and assigned specific mandates. (Debtors' Ex. 2 ¶ 86; Tr. 83:4-25, 84:1-3, 112:5-25, 113:1-2).

81.    Pursuant to the Deeds, each of the hired professionals was required to provide, and did provide, regular updates to the lenders, including the provision of bi-weekly reports to the lenders. (Debtors' Ex. 2 ¶¶ 86, 87, Debtors' Exs. 31, 32).

82.    As a result of the execution of the December 2015 Deed and January 2016 Deed, there was a level of transparency that was satisfactory to the Club Lenders. (Tr. 112:5-9).

83.    The full access provided by the Pacific Andes Group to the monitoring accountants gave full visibility into all financial affairs and transactions of the Pacific Andes Group, not only on a forward looking basis, but on a historical basis as needed. (Debtors' Ex. 2 ¶ 87).

**F.    <u>Performance Under the Deeds and Subsequent Events</u>**

84.    Pursuant to the January 2016 Deed, Mr. Brough, the chief restructuring officer of the China Fishery Group, was given control of the sale process of the Peruvian business. (Debtors' Ex. 2 ¶ 88).

85.    Mr. Brough was an expert in restructuring, had earned a reputation for fairness, was a competent individual and was given the unfettered right to communicate with the Club Lenders upon their request. (Tr. 83:11-25, 84:1-25, 86:1-3).

86.    The initial focus of Mr. Brough was to attempt to obtain working capital from the lenders in an effort to resuscitate the Peruvian fishmeal operations. (Debtors' Ex. 2 ¶ 89; Debtors' Ex. 7).

87.    Mr. Brough raised the possibility of obtaining working capital from the Club Lenders in the middle of February 2016, and stressed that it was critical that the Club Lenders take a constructive approach and attitude to the provision of such working capital. (Debtors' Ex. 2 ¶¶ 89, 98).

88.    In April 2016, after eight (8) weeks of negotiations complicated by various disagreements primarily among the lenders regarding entry into an intercreditor agreement, the Club Lenders and Copeinca entered into short term working capital facility for $25.5 million, guaranteed by each of CFGL, CFG Peru Investment Pte. Ltd. ("CFG Peru Singapore") and NS Hong, of which only $5 million was ultimately provided. (Debtors' Ex. 2 ¶¶ 90, 91-93).

89.    In connection with the negotiations of the working capital facility, the lenders sought entry into certain governance agreements in an effort to give the lenders more control over the Peruvian business. (Debtors' Ex. 2 ¶ 94).

90.    However, despite efforts by the Debtors, the parties were unable to reach an agreement regarding the terms thereof due to differences over the appropriate scope and potential adverse impact of instituting the requested changes. (Debtors' Ex. 2 ¶¶ 94-96; Debtors' Ex. 46; Tr. 168:6-15).

91.    The Independent Non-Executive Directors of the CF Group commented that "they had never experienced such a highly restrictive Governance agreement" and "were of the view that the management needed room to go about their ordinary business without further restriction and the normal course of business." (Debtors' Ex. 11)

92.    Ultimately, the board of directors of CFGL, at a meeting held on June 10, 2016, unanimously voted against the entry into the proposed governance agreement. (Debtors' Ex. 2 ¶ 97).

14

93.     The reluctance of the Club Lender Parties to provide good faith support for refinancing efforts almost brought about the early resignation of Mr. Brough as the chief restructuring officer of the China Fishery Group. (Debtors' Ex. 2 ¶¶ 98).

94.     The China Fishery Group thereafter repaid the amounts advanced under the working capital facility from a refund of the value-added tax incurred from the sale of fishmeal. (Tr. 170:25, 171:1; Debtors' Ex. 2 ¶¶ 97, 101).

95.     Guy Isherwood of SCB complained that he was disappointed that the Club Lenders were repaid because it deprived them of a claim against CFG Peru Singapore which they were keen to use as leverage to take enforcement action against CFG Peru Singapore in the Singapore Courts. (Debtors' Ex. 2 ¶¶ 97, 101; Tr. 86:24-25, 87:1-20).

96.     After five (5) months during which the PwC forensic team was paid approximately $1 million, the PwC forensic team notified the IRCs that they had extracted data with assistance of the Group's finance team, conducted interviews with PAIH's staff to understand prepayment, purchase and sale process, performed computer data preservation, including email server and financial server, conducted testing of samples of the transactions and conducted site visits of certain entities, yet had not commenced any tangible forensic investigation. (Debtors' Ex. 2 ¶ 31).

97.     In addition, PwC refused to commit to any timeframe (or provide any fee estimate) within which the forensic investigation would be completed. (Debtors' Ex. 2 ¶ 32).

98.     Because the pending nature of the forensic investigation prevented Deloitte from issuing audited financial statements, the Pacific Andes Group determined, with the approval and support of the IRCs, to recommend that alternative forensic accountants be hired who could perform the forensic investigation within a definite timeframe and for a fee that the Group could

budget. (Debtors' Ex. 2 ¶ 32; Tr. 146:22-25, 147:1-11).

99.     The IRCs ultimately selected RSM Corporate Advisory (Hong Kong) Limited to replace PwC in their role as forensic accountants. A majority of the Club Loan lenders expressly approved of the change in accountants and the replacement was discussed with and approved by SCB, Rabobank and DBS.   (Debtors' Ex. 2 ¶¶ 32, 132; Press Release attached as Ex. 9 to Movants' Ex. 177).

**G.      The Sale Process**

100.    Mr. Brough led the sale process with the assistance of employees of the Debtors and reported regularly to Ms. Ng and the other directors of CFGL with respect to the progress he was making. (Debtors' Ex. 2 ¶117).

101.    CITIC CLSA Securities ("CITIC CLSA") was engaged as the investment banker with respect to the sale and coordinated with Mr. Brough on a day-to-day basis with respect to the sale. (Debtors' Ex. 2 ¶ 99).

102.    CITIC CLSA commenced work to market the Peruvian fishmeal business in February 2016, and, together with efforts of the Pacific Andes Group, assembled a comprehensive data room, teasers to send out to prospective investors and purchasers, and a detailed information memorandum with the assistance and input of the China Fishery Group under the direction of Mr. Brough. (Debtors' Ex. 2 ¶ 99, Ex. K).  Mr. Brough was the main person to interact with CITIC CLSA. (Debtors' Ex. 2 ¶ 117).

103.    The Pacific Andes Group at all times pursued the sale of the Peruvian fishmeal business in good faith and worked diligently, devoting considerable resources to consummating the sale. (Debtors' Ex. 2 ¶¶ 103, 117; Tr. 163:16-25).

104.    Throughout the sale process, the Pacific Andes Group held the hope that if the sale process did not generate sufficient levels of interest or expressions of interest sufficient to

16

reflect the true value of the business, its lenders would be prepared to consider an alternative restructuring proposal that would be in the interests of all stakeholders of the Pacific Andes Group. (Debtors' Ex. 2 ¶ 106).

105.    In the first week of June 2016, six non-binding expressions of interest were received by Mr. Brough. (Debtors' Ex. 2 ¶ 101).

106.    There was one non-binding expression of interest in the amount of $1.5 billion that came close to reflecting the true value of what management believed the Peruvian fishmeal and fish oil business to be worth. (Debtors' Ex. 2 ¶ 102).

107.    However, that party refused to take the necessary next steps to sign a relatively simply 'process letter' to proceed to the next phase of the sale process. (Debtors' Ex. 2 ¶ 102; Tr. 228:21-25, 229:1-10).

108.    There was no "preferred bidder" as Mr. Isherwood implied. (Movants' Ex. 176 ¶ 66; Tr. 94:16-21).

109.    The remaining non-binding expressions of interests that were received were for much lesser amounts and not an adequate reflection of the true value of the business. (Debtors' Ex. 2 ¶ 102).

110.    Pacific Andes' Group management found the bids to be disappointing, given the $1.04 billion price paid to acquire Copeinca and its 10.7% anchovy harvest quota, the inherent value of the business which had been valued at over $1.7 billion just 2 years prior, and again by CITIC CLSA at the start of the sale process, and considering the likely value that could be realized through a properly timed, comprehensive and measured sale process. (Debtors' Ex. 2 ¶ 102; Tr.217:17-23).

111.    During his time as chief restructuring officer, Mr. Brough acknowledged Ms.

Ng's efforts were not obstructive and advised Ms. Ng not to give in to the lenders unreasonable demands. (Debtors' Ex. 2 ¶ 109, Ex. 20). Indeed, Mr. Brough indicated that the "critical completion issue" with respect to the sale was "a lack of support from the banks." (Debtors' Ex. 16).

112.    PwC, Mr. Wong and Mr. Brough advised Ms. Ng that they supported efforts to discuss a possible restructuring, and Mr. Brough told her that the most appropriate restructuring approach or strategy was a group wide restructuring and that the July 15 deadline for the sale of the Peruvian business was not feasible. (Debtors' Ex. 2 ¶¶ 100, 103; Tr. 144:13-23, Tr. 183:25, 184:1-25, 185:1-4).

113.    The Club Lenders have acknowledged that it was not realistic to expect that a sale could be completed by July 15th, which would have permitted HSBC and BOA to immediately seek the reappointment of the JPL's. (Tr. 93:25, 94:1-15, 98:20-25, 99:1-10).

114.    The Club Lenders had no control over what HSBC or BOA would do if the July 15, 2016 sale date was not met as the Club Lenders and BOA were only interested in pursuing a sale. (Debtors' Ex. 2 ¶ 103, Debtors' Ex. 6, 13, 14, 15, 22, 23, 38; Tr. 114:18-25, 115:1-25, 116:1, 116:21-25, 117:1-19; 339:21-25, 345:1-17).

115.    Any proposal or overture to restructure the indebtedness of the Group was always met with the response that the existing sale process must continue on its existing trajectory with the termination date of July 15, 2016. (Debtors' Ex. 2 ¶ 106).

116.    Mr. Brough informed Ms. Ng that when preliminary overtures were made to HSBC (who, according to Mr. Brough, was in a "threatening mode"), they insisted that if the sale was not consummated by July 15, 2016, they were intent on appointing provisional liquidators to complete the sale as provided for in the January Deed. (Debtors' Ex. 24). Mr. Brough told Ms.

18

Ng on May 31 that "I saw Guy Isherwood briefly this morning too. The banks are now lining up liquidators." (Debtors' Ex. 2 ¶ 101, Debtors' Ex. 21).

117.    On June 22, 2016, during a conversation with Ms. Ng, Mr. Brough confirmed his view that BOA (as with other banks) was preparing to take enforcement action to liquidate the group once a binding offer was obtained and were planning on "handing it to a liquidator to finish off". (Debtors' Ex. 2 ¶ 101, Debtors' Ex. 13).

### H.    Good Faith Performance by Debtors and the Ng Family to Pay Lenders

118.    Contrary to the assertions that the Ng family has no interest in protecting the Debtors' creditors, it is undisputed that during the two years preceding the filing, the Ng family invested significant funds into the business to support its operations and allow for the repayment of substantial amounts of debt to lenders. (Debtors' Ex. 2 ¶ 48).

119.    Significantly, from the period commencing in September 2014 and ending in June 2016, the Pacific Andes Group repaid its financial creditors more than $650 million, of which almost $189 million was advanced by the Ng family by way of capital contributions and/or loans to the Pacific Andes Group. Of this $650 million, the Pacific Andes Group reduced its debt owed to (a) SCB by more than $172 million (b) Rabobank by more than $67 million, (c) DBS by more than $33 million and (d) HSBC by more than $102 million. (Debtors' Ex. 2 ¶ 47, 48).

120.    From July 2015 to June 2016, the Pacific Andes Group paid for all advisors to the lenders, including lawyers, financial advisors, monitoring accountants, chief restructuring officers, amounting to more than $17 million. (Debtors' Ex. 2 ¶ 54).

121.    The China Fishery Group fully complied with their commitment to try to dispose of non-core assets in 2015 to the extent such assets were (a) truly non-core to the business of the Pacific Andes Group and (b) marketable and saleable given the nature of such assets and the circumstances of the group, and diligently worked with Mr. Brough to market and dispose of the

19

assets. (Debtors' Ex. 2 ¶ 104, Debtors' Exs. 17, 18).

**I.    The Decision to File Chapter 11 Cases**

122.    On June 30, 2016, board meetings were convened by each of PAIH, PARD and CFGL with respect to actions needed to protect the value of the Pacific Andes Group. (Debtors' Ex. 2 ¶ 110).

123.    Mr. Brough was present at the CFGL board meeting that started at 9:30 p.m. on June 30 (Debtors' Ex. 2 ¶ 110). At that meeting, Ms. Ng discussed with Mr. Brough the hostility of BOA and the need for protective filings to be undertaken in order to protect the value of the Pacific Andes Group. (Debtors' Ex. 2 ¶ 110).

124.    The Debtors were at risk of HSBC and BOA taking action under the January Deed as of July 15, 2016 to re-appoint liquidators notwithstanding any progress on the sale process. (Tr. 117:10-17).

125.    The Board and management acted in their fiduciary duties to vote to file the chapter 11 cases in order to broaden the restructuring options available to the Pacific Andes Group and protect the Debtors and the entirety of their creditor body from the loss of value that would be incurred through the forced sale process. (Debtors' Ex. 2 ¶ 112, Tr. 201:14-17, 209:22, 210:20-25, 211:1-9).

126.    Every independent non-executive director of each of the listed companies voted in favor of commencing the chapter 11 cases and the other reorganization proceedings globally. (Debtors' Ex. 2 ¶ 114, Tr. 201:14-17).

127.    The filings were not prohibited or restricted by the December 2015 Deed or the January 2016 Deed. (Movants' Exs. 11, 12).

128.    Mr. Brough did not object or vote against the filings to be undertaken by CFGL and, after the meeting, conveyed to Ms. Ng that he understood the rationale for having to

20

undertake such protective filings. (Debtors' Ex. 2 ¶ 110, Ex. 19).

129.    After the filing of the chapter 11 cases, Mr. Brough conveyed that Ted Osborne of PwC had met with BOA late in the day on June 30, 2016 and "it seemed they weren't far behind with a petition". (Debtors' Ex. 2 ¶ 111, Debtors' Ex. 22).

130.    Mr. Brough informed Ms. Ng that he was in regular communications with BOA and was constantly worried that BOA would unilaterally institute a winding up petition without reference to the other creditors or the group. (Debtors' Ex. 2 ¶ 111, Debtors' Ex. 21).

131.    Ms. Ng properly exercised her discretion not to inform Mr. Brough in advance that the board of CFGL and CFIL would be considering a resolution on June 30, 2016 to consider the filing of chapter 11 bankruptcy petitions in that the companies' were at risk of having JPL's immediately re-appointed. (Tr. 159:11-25, 201:11-17).

132.    The IRCs have continued to look into the circumstances giving rise to the appointment of the JPLs and the forensic accountant RSM continues to be in place. (Debtors' Ex. 2 ¶ 132).

133.    The IRCs, together with their advisors, are well along in the investigation and expect to have results by the end of September, 2016. The investigation has been delayed, in part, by the limitations on resources compounded by the burdens caused by the appointment of the JPLs, the chapter 11 and other insolvency proceeding filings, and the litigation concerning the Trustee Motion. (Debtors' Ex. 2 ¶ 35, Tr. 150:13-25, 151:1-25, 152:1-25, 153:1-25, 154:1-16).

134.    The business community, including creditors, vendors and customers, continues to have confidence in management. (Debtors' Ex. 2 ¶ 42).

135.    The Debtors have timely filed their schedules of assets and liabilities, statements

of financial affairs and first monthly operating report. (Movants' Ex. 35-50)

136.    Under the Cash Management Order entered at Docket No. 93, the Debtors have agreed to provide regular financial reporting including with respect to an extensive list of non-debtor affiliates. (Debtors' Ex. 50).

137.    The Debtors have the ability to receive funding for chapter 11 administrative expenses via inter-company transfers from non-Debtors under the terms set forth in the Cash Management Order (Debtors' Ex. 50).

138.    The Debtors have indicated and continue to indicate a willingness to consider hiring a chief restructuring officer to assist them with their restructuring efforts. (Debtors' Ex. 2 ¶¶ 115, 132).

**J.    The Global Filings**

139.    The filings in the United States, Peru, Singapore and the British Virgin Islands were undertaken in good faith and for the benefit of all stakeholders of the Pacific Andes Group. (Debtors' Ex. 2 ¶ 120).

140.    The global nature of the Pacific Andes Group and the complex nature of the capital structure required the participation of a sophisticated jurisdiction such as the United States with a clear ability to deal with complex-cross border restructurings. (Debtors' Ex. 2 ¶ 122).

141.    The filings were made in jurisdictions that are the most appropriate based on advice received from the professional advisors to the Pacific Andes Group. (Debtors' Ex. 2 ¶ 121).

142.    The Peruvian insolvency proceedings commenced against the Peruvian Companies (the "Peruvian Insolvency Proceedings") could only be commenced in Peru based on

applicable provisions in the Peruvian insolvency law.[2] (Debtors' Ex. 40 ¶33; Debtors' Ex. 2 ¶ 121; Debtors' Ex. 41, Articles 2 and 3).

### K.    The Debtors' Management is Trustworthy and Deserving of the Confidence of the Business Community and Creditors

#### i.    Mere Existence of Intercompany Claims Does Not Support the Appointment of a Trustee

143.    Intercompany claims typically emerge in cases of this complexity in several ways, including through cash management, provision of goods and services and capital transactions. (Debtors' Ex. 26 ¶ 44).

144.    Large pre-petition claims exist among the Debtors and their respective affiliates. (Debtors' Ex. 26 ¶ 40).

145.    While the Debtors as a whole have accrued large intercompany balances, such balances have little economic meaning from a value allocation perspective, since only balances running between groups of Debtors with different creditors materially transfer value. (Debtors' Ex. 26 ¶ 41).

146.    Less than $8 million of intercompany claims appears to run between such groups. (Debtors' Ex. 26 ¶ 41).

147.    Creditors in each group generally share in the assets of all group members through extensive co-borrowing and guarantee arrangements. (Debtors' Ex. 26 ¶ 41).

148.    It is highly unlikely that the intercompany claims of the Debtors would result in a shift of value that deviates from the structural priority scheme, i.e., equity holders will not receive payments before third-party creditors are paid in full. (Debtors' Ex. 26 ¶ 41).

149.    The Debtors, along with their professionals, intend to analyze intercompany

---

[2] 26 of the General Law of the Bankruptcy System (Law No. 27809 the "Peruvian Insolvency Law").

claims for their bona fides, nature and origin. (Debtors' Ex. 26 ¶ 45).

### ii.   The Debtors have Provided Transparency to All Stakeholders

150.   The Debtors have agreed to provide their creditors direct visibility into cash movement of non-Debtor affiliates. (Debtors' Ex. 26 ¶ 78; Debtors' Ex. 50 §11).

151.   The Debtors, to date, have complied with their bankruptcy reporting requirements, having already filed their statements of financial affairs, schedules of assets and liabilities, and first monthly operating reports, a significant accomplishment given the complexity of these Chapter 11 cases. (Debtors' Ex. 26 ¶ 79).

152.   The level of transparency provided by the Debtors has been exceptionally high. (Debtors' Ex. 26 ¶ 78).

### iii.   Independent Director, Creditor and Bankruptcy Court Oversight

153.   Currently, the boards of Debtors PAIH and CGFL include active and long-standing independent directors. (Debtors' Ex. 26 ¶ 55).

154.   While these cases were previously litigated in multiple jurisdictions (including on an *ex parte* basis), the focus of activity has now moved to the United States, with the Debtors and their principal creditors each retaining United States-based advisors. (Debtors' Ex. 26 ¶ 18).

155.   There are significant limitations on the Debtors' ability to take major actions without the approval of this Court, the independent directors and/or a shareholder vote. (Debtors' Ex. 26 ¶¶ 86-87).

156.   On August 18, 2016, the Court entered its Order Authorizing the Debtors to (a) Continue their Cash Management System, (b) Honor Certain Prepetition Obligations Related Thereto, and (c) Maintain Existing Bank Accounts (the "Cash Management Order"), under which the Debtors accepted further limitations on their ability to enter into various financial transactions. (Debtors' Ex. 50 §9).

157.    The Cash Management Order also requires significant reporting to the Movants, well above and beyond the statutory requirements. (Debtors' Ex. 50 §§7, 10-11).

158.    As reflected in the Cash Management Order, the Debtors have adequate funding sources and there is no evidence to the contrary.  (Debtors' Ex. 2 ¶ 133; Debtors' Ex. 26 ¶ 76; Cash Management Order §9).

**L.    The Debtors Have Substantial Prospects
for Rehabilitation Under Current Management**

159.    The Peruvian government establishes a total allowable catch ("TAC") for each fishing season.  It regulates the amount of anchovy fishing through an Individual Transferable Quota ("ITQ") system through which individual fishing vessels are assigned a fixed percentage of the TAC.  (Debtors' Ex. 27 ¶ 18).

160.    Due to the El Niño weather event, the Peruvian government has not allowed a historically standard anchovy catch level in any year since the China Fishery Group acquired Copeinca in 2013.  (Debtors' Ex. 26 ¶ 25; Debtors' Ex. 27 ¶ 24).

161.    The Peruvian Fishmeal Companies hold the largest quota for anchovy in Peru. Through the ITQ, the Peruvian Fishmeal Companies are entitled to harvest 16.9 percent of the TAC in Peru's northern fishing zone and 14.7 percent of the TAC in the southern zone. (Debtors' Ex. 27 ¶ 20).

162.    While the Peruvian Fishmeal Companies' production volume and corresponding revenue have declined from normal levels over the last 30 months, several factors point to a business recovery in the immediate future. (Debtors' Ex. 27 ¶¶ 24, 26, 28-29).

163.    First, Peru's fishing industry historically has rebounded quickly from the effects of an El Niño event.  (Tr. 304:2-4; Debtors' Ex. 27 ¶ 23).

164.    Second, an anticipated expansion of the areas in which the Peruvian Fishmeal

Companies can operate will facilitate these recovery efforts. One effect of an El Niño is that the anchovy move closer to shore to escape the warmer ocean temperatures. In August 2012, the Peruvian government enacted regulations that prevented industrial fishing within 10 miles off the coast. The 10-mile rule had a significant impact on the volume of the Peruvian Fishmeal Companies' anchovy catch during the recent El Niño event. Peru's new Minister of Production has expressed support for ending the 10-mile rule and has stated that Peru will revert to a 5-mile rule. This will allow the Peruvian Fishmeal Companies' vessels to operate closer to shore where the anchovy are more likely to be during a warm water event. (Debtors' Ex. 27 ¶¶ 25-26).

165.    Third, Peru's Marine Institute currently estimates that the size of the anchovy biomass points to more favorable fishing conditions than had been experienced in the last several fishing seasons. (Tr. 132:17-23).

166.    As a result of these developments, the Peruvian Fishmeal Companies anticipate a strong second season in 2016, which is scheduled to commence in the October-November timeframe, and a return to normal anchovy harvesting in 2017. The Peruvian Fishmeal Companies are now positioned to reap substantial benefits from any improvement in Peru's anchovy fishery. (Debtors' Ex. 27 ¶¶ 14, 29).

167.    In normal conditions, the Peruvian Fishmeal Companies historically have produced between 280,000 and 300,000 metric tons of fishmeal and between 40,000 and 50,000 metric tons of fish oil annually. This production, in turn, has generated between $535 million and $585 million in revenue and between $180 and $200 million in EBITDA. (Debtors' Ex. 27 ¶ 22).

i.    **Pre-Petition Attempt to Sell The Peruvian Fishmeal Companies**

168.    While the Debtors and their affiliates marketed the Peruvian Fishmeal Companies pre-petition, the sales process was conducted under an air of exigence and distress at a time when

26

earnings were depressed by cyclical industry conditions. (Debtors' Ex. 26 ¶ 25).

169.   No previously received bid for the Peruvian Fishmeal Companies is currently actionable (i.e., the "bids" received to date are merely preliminary, non-binding indications of interest and lacking even the most basic execution documents). (Debtors' Ex. 26 ¶ 25).

170.   All "expressions" of interest that were received were subject to due diligence and were not binding offers. (Debtors' Ex. 26 ¶ 25).

### ii.   A Consensual Plan Will Provide More Value to All Stakeholders

171.   The Debtors have several paths to a successful reorganization that will pay the Club Lender Parties in full and also permit significant recovery for non-Club Lender Parties, including (i) equitization (with potential debt restructuring or refinancing), (ii) sale of the Peruvian companies (and potentially other major assets) and (iii) spin-off of the Peruvian companies with equitization or sale of other assets. (Debtors' Ex. 26 ¶¶ 21-28).

172.   The Movants represent approximately one-third or less of the capital structure (even excluding ultimate equity). (Debtors' Ex. 26 ¶ 31).

173.   Less than two months into these cases, the Debtors have not been afforded the time to develop a Chapter 11 plan. (Debtors' Ex. 26 ¶ 31).

174.   The claims against the Debtors asserted by the Movants in support of the Motion approximate $700 million. (Debtors' Ex. 26 ¶ 74).

175.   These claims represent only approximately 38% of the total $1.8 billion of funded debt and claims asserted in these cases, substantially all of which are unsecured. (Debtors' Ex. 26 ¶ 74).

176.   The Debtors have received offers that, if fully developed and consummated at current indicative levels, would comfortably pay the China Fishery Group's creditors (including the Movants) in full. (Debtors' Ex. 26 ¶ 34).

177.   The claims at PAIH are more diverse, largely consisting of guarantees or cross-obligations of specific claims with distinct rights. (Debtors' Ex. 26 ¶ 32).

178.   The obligations owed under the Club Loans and US$300 million 9.75% senior notes due 2019 ("Notes") are supported by the assets of the China Fishery Group. (Debtors' Ex. 26 ¶ 33).

179.   Although unsecured, most of the Movants represent the most senior claimants to the value of the Peruvian companies. (Debtors' Ex. 26 ¶ 33).

180.   Most of the Movants, who are structurally senior creditors, have little risk pushing for a sale. (Debtors' Ex. 26 ¶ 34).

181.   Under realistic, value-optimizing conditions and likely plan constructs, creditors of the China Fishery Group, including most of the Movants, are likely to be unimpaired, mitigating many challenges to confirmation of a plan proposed by the Debtors. (Debtors' Ex. 26 ¶ 31).

182.   The Club Loans and the Notes would not stand to profit (or to only minimally profit) from any increase in asset values. (Debtors' Ex. 26 ¶ 34).

183.   As such, most of the Movants' interests militate toward a quick sale to lock in full recovery and expedite recovery for themselves. (Debtors' Ex. 26 ¶ 34).

184.   Conversely, stakeholders in other parts of the capital structure should be differently motivated, and would benefit from a restructuring plan for the Debtors rather than a quick sale of the Peruvian companies. (Debtors' Ex. 26 ¶¶ 29, 35).

### iii.   The Immediate Sale of The Peruvian Fishing Operations Will Not Maximize The Value of Those Assets

185.   The business of the Peruvian Fishing Operations is at a cyclical low and has not yet experienced a complete, normal year as an integrated company.

- o Copeinca, representing approximately 63% of the Peruvian Fishmeal Companies' anchovy quota, was not acquired until 2013.

- o Due to an El *Niño* event, the Peruvian government did not permit a second anchovy season in 2014 and the TAC (and hence the Peru Sub-Group's quota share) in 2015 and the first season of 2016 was unusually low.

(Debtors' Ex. 26 ¶ 64; Debtors' Ex. 27 ¶ 24).

186. The Central Reserve Bank of Peru predicts a 30% growth in the fishing industry in 2017. (Debtors' Ex. 26 ¶ 65).

187. While buyers might make some adjustments to normalize earnings of a cyclical business, they generally undercompensate for normalization. (Debtors' Ex. 26 ¶ 66).

188. The value of Peruvian anchovy fisheries appears to decline during poor performance years and expand during strong performance, having reached cyclical lows during the recent El *Niño* event. (Debtors' Ex. 26 ¶ 66).

189. Junior creditors may well be out-of-the-money were a sale consummated today. (Debtors' Ex. 26 ¶ 35).

190. Indeed, several creditors, including China CITIC Bank International Limited, Agricultural Bank of China, Industrial and Commercial Bank of China, Huaxia Bank and Bank of Communications, have opposed the appointment of a trustee. (Docket Nos. 91, 96, 97, 98, 110, 111 and 118). Indeed, two of the five Club Lenders did not even join, or withdrew from, the Movants' motion to appoint a trustee. (*See* Docket Nos. 57, 76 and 97).

191. The optimal path for maximizing value to all stakeholders is to develop a consensual Chapter 11 plan. (Debtors' Ex. 26 ¶ 29).

### M. The Appointment of a Trustee Would Subject the Debtors' Estates to Greater Costs than Benefits

192. The appointment of a trustee, particularly under these circumstances, would in all likelihood, diminish the value of the Debtors' estates. (Debtors' Ex. 26 ¶ 69).

29

193.    The disruptive effects of the appointment of a trustee are sure to be at least as severe as the JPLs. (Debtors' Ex. 26 ¶ 68).

194.    The appointment of the JPLs had substantial negative implications on the Peru operations. (Debtors' Ex. 26 ¶ 68; Debtors' Ex. 27 ¶ 38).

195.    The JPLs' powers are more limited than those of a Chapter 11 trustee. (Debtors' Ex. 26 ¶ 68).

196.    The appointment of a trustee in these cases will be perceived as a mandate to comply with the Club Lenders' desires for a quick sale. (Debtors' Ex. 26 ¶ 69).

197.    As such, the Trustee will be perceived to be under compulsion to sell and bidders will be unlikely to offer full value for such assets. (Debtors' Ex. 26 ¶ 69).

198.    It is far from clear that a Trustee will be able to operate the Debtors efficiently in the near term. (Debtors' Ex. 26 ¶ 70).

199.    The Debtors' value derives from a multitude of entities incorporated in various jurisdictions, many of which are not wholly-owned. (Debtors' Ex. 26 ¶ 70).

200.    Just as the appointment of the JPLs was not immediately recognized in various jurisdictions, a Trustee may anticipate similar obstacles. (Debtors' Ex. 26 ¶ 70).

201.    The Debtors' and their affiliates' business relationships have been established by management over the course of decades. (Debtors' Ex. 26 ¶ 70).

202.    It is unclear whether those relationships and concomitant value (including the ability to collect receivables) would survive displacement of management. (Debtors' Ex. 26 ¶ 70).

203.    In order to oversee and operate the Debtors and their affiliated businesses throughout the world, a Trustee would likely need to retain an advisory firm to assist him.

(Debtors' Ex. 26 ¶ 71).

204.    Such a firm would almost certainly be significantly more expensive than displaced management and would be incremental to the costs of the Debtors' current professionals. (Debtors' Ex. 26 ¶ 71).

205.    Additional costs would compound, as a trustee would likely be entitled to charge a commission against value distributed, which could easily reach into the multiple tens of millions of dollars. (Debtors' Ex. 26 ¶ 71). For each $1 billion of asset distributions, a trustee would be entitled to commissions of up to $30 million. 11 U.S.C. 326(a).

## II.

## PROPOSED CONCLUSIONS OF LAW

### A.    The Trustee Motion Must be Denied Because the Club Lender Parties Do Not Satisfy Section 1104(a)(2)

#### i.    The High Standard for the Appointment of a Trustee

1.    Section 1104(a)(2) of the Bankruptcy Code provides for the appointment of a Chapter 11 operating trustee only "if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate, without regard to the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor." 11 U.S.C. §1104(a)(2).

2.    The Second Circuit has expressly held that "the standard for § 1104 appointment is very high" and, whether moving under § 1104(a)(1) or (a)(2), a movant "has the burden of showing by clear and convincing evidence that the appointment of a trustee is warranted." *Adams v. Marwil (In re Bayou Group, LLC)*, 564 F.3d 541, 546 (2d Cir. 2009) (internal citations and quotations omitted); *In re Smart World Tech., LLC*, 423 F.3d 166, 176 (2d Cir. 2005). Evidence is "clear and convincing" when:

"[it] produces in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established, evidence so clear, direct and weighty and convincing as to enable [the factfinder] to come to a clear conviction, without hesitancy, of the truth of the precise facts at issue."

*Official Comm. of Asbestos Claimants v. G-I Holdings, Inc. (In re G-I Holdings, Inc.)*, 295 B.R. 502, 508 (D.N.J. 2003) (*quoting In re Jobes*, 108 N.J. 394, 407 (1987)).

3.      Furthermore, it is widely accepted that such appointment "should be the exception, rather than the rule." *In re Adelphia Commc'ns Corp.*, 336 B.R. 610, 655 (Bankr. S.D.N.Y. 2006); *see also In re Sharon Steel, Corp.*, 871 F.2d 1217, 1225 (3d Cir. 1989); *Official Comm. Of Unsecured Creditors of Cybergenics Corp. v. Chinery (In re Cybergenics Corp.)*, 330 F.3d 548, 577 (3d Cir. 2003); *U.S. Bank Nat'l Ass'n v. Wilmington Trust Co. (In re Spansion, Inc.)*, 426 B.R. 114, 128 Bankr. (D. Del. 2010) (*citing In re Sharon Steel Corp.*, 871 F.2d 1217, 1225 (3rd Cir. 1989)); *Official Comm. of Asbestos Pers. Injury Claimants v. Sealed Air Corp. (In re W.R. Grace & Co.)*, 285 B.R. 148, 158, 160 (Bankr. D. Del. 2002).

4.      In the same vein, there is a strong presumption in a Chapter 11 case that the debtor shall remain in possession of the bankruptcy estate, and the appointment of a trustee "must be considered a last resort." *See Official Comm. of Asbestos Claimants v. G-I Holdings, Inc. (In re G-I Holdings Inc.)*, 385 F.3d 313, 316 (3d Cir. 2004); *Cybergenics*, 330 F.3d at 577; *In re W.R. Grace & Co.*, 285 B.R. at 158. This strong presumption finds its basis in the debtor-in-possession's familiarity with the business it has already been managing at the time of the bankruptcy filing "making it the best party to conduct operations during the reorganization." *In re Marvel Ent. Group, Inc.*, 140 F.3d 463, 471 (3d Cir. 1998) (internal citations omitted). The movant bears the burden of rebutting the "strong presumption" that the Chapter 11 debtor should remain in possession. *See, e.g., Ad Hoc Comm. of Bondholders v. Citicorp Venture Capital, Ltd.*

(*In re Fairwood Corp.*), No. 99/3177, 2000 WL 264319, at *2 (S.D.N.Y. Mar. 9, 2000).[3]

5.    Whether a Chapter 11 trustee is warranted is a "fact-driven" analysis in which a

bankruptcy court, exercising its discretion, weighs any relevant factor, *Adelphia*, 336 B.R. at 658

(citing *In re Ionosphere Clubs, Inc.* 113 B.R. 164 (Bankr. S.D.N.Y. 1990)), keeping in mind that,

as noted above, the appointment of a Chapter 11 trustee is an extraordinary remedy, and that the

appointment of a Chapter 11 trustee will cause additional expense to the estate. *See, In re Stein*

*and Day, Inc.*, 87 B.R. 290, 294 (Bankr. S.D.N.Y. 1988); *see also In re North Star Contracting*

*Corp.*, 128 B.R. 66, 70 (Bankr. S.D.N.Y 1991) (denying motion for appointment of an operating

trustee in part due to need for management's knowledge of, and experience in, the business). "In

determining whether a § 1104 appointment is warranted . . . the bankruptcy court must bear in

mind that the appointment of a trustee 'may impose a substantial financial burden on a hard

pressed debtor seeking relief under the Bankruptcy Code,' by incurring the expenditure of

'substantial administrative expenses' caused by further delay in the bankruptcy proceedings."

*Adams*, 564 F.3d at 546-47.

6.    The Movants have failed to carry their heavy burden of demonstrating that the

appointment of a Chapter 11 trustee is warranted under the facts and circumstances of these

cases.

### ii.    The Factors Considered by the Courts

7.    Factors courts consider in determining whether the appointment of a Chapter 11

trustee is appropriate under the circumstances are: (1) trustworthiness of current management;

(2) the debtor's prospects for rehabilitation; (3) confidence of the business community and

---

3 The Movants' heavy burden accords with the well-established principle that management's decision-making is
protected by the business judgment rule. "[T]here can be no doubt that the Bankruptcy Code imposes upon a debtor-
in-possession the duty to conduct the business of the estate in a manner that, at a minimum, preserves the value of
the estate," but a debtor-in-possession should nevertheless be permitted to "operate within the broad parameters of
sound business judgment, and the debtor-in-possession's performance should not be assessed solely with the benefit
of hindsight. Taub v. Taub (In re Taub), 427 B.R. 208, 224 (Bankr. E.D.N.Y. 2010).

creditors in current management; and (4) the benefits flowing from the appointment of a Chapter 11 trustee balanced against the detriments. *See, e.g., Adelphia*, 336 B.R. at 658; *Ionosphere*, 113 B.R. at 168.

8.    Based on the facts and circumstances and the evidence submitted by the parties, each of these four factors as well as other considerations weigh heavily against the appointment of a Chapter 11 trustee in these cases.

### iii.    Trustworthiness Of Management

9.    Speculation, conjecture, and other forms of guesswork are not appropriate bases upon which to appoint a Chapter 11 trustee. *See In re Sletteland*, 260 B.R. 657, 672 (Bankr. S.D.N.Y. 2001) ("The philosophy of chapter 11 is to give the debtor a second chance at business success. Moreover, on a motion for the appointment of a trustee, the focus is on the debtor's current activities, not past misconduct. Speculation that a debtor may do something in the future does not overcome the strong presumption that the debtor should be permitted to remain in possession in a Chapter 11 case or justify the additional costs of a trustee.") (internal citations and quotation marks omitted); *In re University Heights Ass'n, Inc.*, No. 06-12672, 2007 WL 316281, at *3 (Bankr. N.D.N.Y. Jan. 22, 2007) (denying application for appointment of Chapter 11 trustee in part because movant "fails to give the court any facts to support its allegations."). This language from *Sletteland* is directly on point here. The Movants' case for appointment of a trustee is based entirely on conjecture and guesswork, and speculation about what prior events mean and what the Debtors might theoretically do in the future.

10.    The Movants have not shown any facts indicative of current management's inability to carry out its fiduciary duties to the Debtors' estates. In view of the Debtors' prospects for rehabilitation, and the absence of any evidence that the Debtors are a "melting ice cube" in need of an emergency sale, the actions of the Debtors' management to block what

34

would have been an under-valued fire sale by filing these Chapter 11 cases and corresponding Peruvian insolvency proceedings for the Peruvian companies were justified and not indicative of untrustworthiness.

11.    The Movants also argue that the Debtors and their non-debtor affiliates have significant intercompany accounts or investments which create conflicts.  However, the only evidence in the record is that significant intercompany accounts exist that may need to be reconciled which is the norm in large complex bankruptcy proceedings like these. (Debtors' Ex. 26 ¶¶ 40-45).  To the extent litigation may be necessary to resolve any such claims, there is no evidence that the Debtors' management would not pursue such litigation and, in any event, if colorable, such claims could be pursued by creditors. *In re STN Enterprises*, 779 F.2d 901 (2d Cir. 1985); *cf. In re Ribkov Realty Corp*, Index Nos. 99/984, 99/985, 99/987, 1999 WL 529557 at *11 (E.D.N.Y. 1999) ("the reluctance of the debtor to pursue claims against its insider, taken alone, does not justify [a court's] precipitous decision to convert the case and appoint a trustee.").  Moreover if one were to take Movant's concerns to their logical conclusion, trustees would be needed for each debtor in multi-debtor cases. This is not typical.

12.    The Movants have failed to prove that any action taken by management is contrary to the interests of the Debtors' estates and such failure of proof distinguishes these cases from the many decisions where a trustee has been appointed because of management acting in its own self-interest. In fact, the opposite is true. Debtors' management and ultimate equity holders have gone above and beyond in addressing lender concerns and desires, hiring numerous professionals, making investments and loans, and providing personal guarantees.

13.    It was not disputed that management has provided substantial reporting to the Movants, both pre-petition and post-petition. (Debtors' Ex. 2 ¶¶ 28-34, 50-53; Debtors' Ex. 26

35

¶¶ 18-19 and Debtors' Ex. 50 §§ 7, 10-11; Tr. 112:21-23; 145:18-20; 147:16-25; 148:1-3, 12-22).

14.    The Movants' major allegation is quite simple — that their effort to use the leverage they obtained (through the appointment of JPLs by one of the Club Lenders) to force an expedited sale that would benefit only those few lenders, was thwarted by bankruptcy filings. The Movants contend, incorrectly, that management's decision to seek relief in this Court (after having entered into an agreement with the Club Lenders to pursue a sale of certain assets and having failed, for reasons completely out of their control, to be able to consummate such sales by the by the drop dead date provided for in such agreement) evinces a lack of trustworthiness and, hence, constitutes proper grounds for displacing management.    If a failure to live up to an executory agreement and the filing for bankruptcy to invoke the automatic stay were grounds for appointment of a trustee, the concept of a debtors-in-possession would be vitiated. *See, e.g., In re Soundview Elite, Ltd.*, 503 B.R. 571, 580 (Bankr. S.D.N.Y. 2014) (filing chapter 11 petition to take advantage of the automatic stay without more is not evidence of bad faith).    The reality is that debtors typically file for bankruptcy after defaulting under loan agreements and chapter 11 affords a forum to restructure and repay such loans.

15.    The Movants further claim that management should have forewarned them (and the CROs they put in place to sell the business) of the filing, even though management reasonably believed (and the evidence has subsequently confirmed) that there was a material risk that certain creditors were prepared to seek drastic remedies that would have severely harmed the Debtors' businesses. (Debtors' Ex. 2 ¶ 101; Debtors' Ex. 13; Debtors' Ex. 21).    The evidence here is clear that management acted in good faith to protect and preserve its valuable assets for the benefit of all stakeholders.

16.    The Movants have failed to present any evidence that (i) management improperly used any of their protective filings to advance their own interests, (ii) their filings of the Peruvian proceedings were an improper exercise of management's duty to protect these Debtors, or (iii) such proceedings provide insufficient protections for creditors.    Accordingly, the Movants' baseless allegations that management is using the Peruvian insolvency proceedings to advance the interests of equity, as opposed to the Debtors, is purely speculative and largely controverted.

17.    As discussed in detail below in Section II.B, the Peruvian Insolvency Proceedings comport with basic notions of fundamental fairness and due process, and should be respected by this Court and not be considered as a reason to appoint a trustee.    The Peruvian Insolvency Proceedings afford all creditors a full and fair opportunity to be heard and, indeed, to vote on the core issue of whether the Peruvian Companies should be liquidated or restructured and how so. The appointment of a Chapter 11 operating trustee is not an appropriate vehicle for the Movants to gain additional influence over, or dismissal of, in the Peruvian Insolvency Proceedings over and above the significant rights afforded to them in such proceedings.

18.    In this Court's unreported decision, *In re Fairwood Corp.*, Case No. 96 B 40016 (JLG) (Bankr. S.D.N.Y., Feb. 22, 1999) [Dkt. No. 152] (a true and correct copy of which is annexed to these Proposed Findings of Fact and Conclusions of Law as Appendix 1), *aff'd.*, *In re Fairwood Corp.*, No. 99/3177, 2000 WL 264319, at *2 (S.D.N.Y. Mar. 9, 2000), this Court denied a motion for appointment of a trustee under the "best interest of creditors" test where the movants sought a trustee in order to compel two non-debtor subsidiaries to file Chapter 11 cases and pursue certain litigation. *Id.* at 54-56. This Court observed that seeking a trustee to put subsidiaries of the debtor into bankruptcy was unprecedented and that the movants should pursue their own remedies in the appropriate court. The adequacy or inadequacy of such remedies was

not a proper ground for relief under Section 1104(a) of the Bankruptcy Code. Id.

19.    The relief the Movants seek here, which effectively seeks to have this Court appoint a Chapter 11 trustee to ostensibly control the Peruvian insolvency proceedings, is likewise unprecedented. Given the protections afforded them under Peruvian law, the Movants should seek to protect their rights with respect to such proceedings before INDECOPI, except to the extent their rights may be affected in the Chapter 15 cases of the Peruvian Companies in which case they may protect their rights before this Court.

20.    The Movants rely on several decisions in which courts have appointed trustees (and some where they have not, such as *Adelphia*) where management's actions demonstrate untrustworthiness in the face of potential conflicts, but all such decisions are distinguishable for a variety of reasons, including that there was clear evidence of management taking actions in its own self-interest.  No case holds that the mere fact that debtor's management overlaps with equity holders presents a conflict of interest requiring the appointment of a trustee. *See In re Eurospark Indus., Inc.*, 424 B.R. 621, 632 (Bankr. E.D.N.Y. 2010) ("The [U.S. Trustee] has not taken the position, nor does this Court hold, that a [C]hapter 11 trustee is always warranted where the debtor-in-possession is managed by its sole shareholder. Rather, the determination whether to appoint a trustee turns on the particular circumstances of each case.").  It is also important to note that the Debtors include three public companies with thousands of public shareholders and boards with independent directors.

21.    Presumably because of the cross border parallels, the Movants place great reliance on Judge Gerber's decision in *In re Soundview Elite, Ltd.*, 503 B.R. 571 (Bankr. S.D.N.Y. 2014). The parallels do not, however, extend much beyond the fact that both cases involve proceedings pending in different countries.

22.    In *Soundview*, when the debtors commenced their Chapter 11 cases, they were already the subject of liquidation proceedings in the Cayman Islands in which joint provisional liquidators had been appointed by a court. Those very same entities then filed Chapter 11 (i.e., reorganization) proceedings in the United States. *In re Soundview Elite*, 503 B.R. at 576.

23.    In the instant cases, however, the Debtors are subject to proceedings only in the United States, with affiliates subject to Peruvian and other insolvency proceedings, which proceedings expressly contemplate management staying in control, subject to creditor and tribunal oversight. (Debtors' Ex. 40 ¶¶ 68-70, 80-82). Unlike in *Soundview*, where Judge Gerber found "in some respects conflicting jurisdiction of the U.S. and Cayman courts." *Id.* at 577. There, there are no conflicting jurisdictional issues.

24.    *Soundview* involved one court (the Cayman Islands) exercising jurisdiction over a liquidation proceeding supported by the Cayman Islands Monetary Authority, in which court-appointed liquidators had displaced management, and another court (the United States) exercising jurisdiction over a reorganization proceeding, with debtors in possession. *Id.* at 576-77.

25.    In *Soundview*, Judge Gerber observed that one way the Cayman and U.S. proceedings could have been coordinated would have been for the U.S. proceedings to be Chapter 15 cases in support of the foreign proceedings. *Id.* at 594-95. Here, the Peruvian Debtors filed corresponding Chapter 15 cases for the Peruvian insolvency proceedings and satisfied the concerns articulated by Judge Gerber in *Soundview*. Also, unlike in *Soundview* where Judge Gerber also took into consideration the view expressed by another court (the Cayman court) that a fiduciary should take the place of the debtors' management, *id.* at 576, no such view of a foreign court exists here. Rather, the view of the Hong Kong Court (the only court

39

to rule on appointment of a fiduciary) was just the opposite - - that the JPLs should be discharged. (Debtors' Ex. 2 ¶¶ 79-80).

26.     *Soundview* is not only distinguishable from these cases, it actually supports the Debtors' opposition to this motion. Like Movants, some of the movants in *Soundview* contended that it was bad faith where "the Debtors admittedly filed their chapter 11 petitions to take advantage of the automatic stay, and that the petitions were filed at the 'eleventh hour' to block the imminent appointment of liquidators in the Cayman Islands." *Id.* at 580. Judge Gerber found this purpose to be insufficient to find either bad faith or cause to dismiss the cases, observing: "(i) Indeed, if I or any other U.S. court were to consider a desire to invoke the stay to be sufficient, a very significant portion of perfectly unobjectionable chapter 11 cases could never be filed." *Id.*

27.     Furthermore, *Soundview* is distinguishable in that Judge Gerber found "cause" under 11 U.S.C. §1104(a)(1) in light of management's clear and disclosed self-dealing, *id.* at 581-82 (in addition, the motion was filed by the U.S. Trustee, not creditors with parochial interests and the debtor had ceased operating). To the contrary, the Debtors' cases involve a valuable world-wide group of companies with substantial operating value, seeking a coordinated restructuring (whether through a sale or otherwise) and there is no allegation of any of the Debtors' principals acting in their best interest.

28.     The other management/owner and similar conflict-related cases that the Movants cite do not require a contrary conclusion and are readily distinguishable.[4]

---

[4] In *In re Eurospark Indus., Inc.*, 424 B.R. 621, 627-30 (Bankr. E.D.N.Y. 2010), the court found, unlike here, that management had demonstrated, and even admitted, its inability to fulfill its fiduciary duty because it was taking positions contrary to the interests of the estate. Further, in that case, the motion was brought by the U.S. Trustee, joined in by many creditors and opposed by none, the business was not operating, and appointment of a trustee would cause no harm. *Id.* Here, there is no evidence of management's demonstrated ability to fulfill its fiduciary duties and the Debtors have complied with, and even exceeded, their statutory reporting duties since the Petition Date.

29.    The Movants have presented no evidence of any mismanagement or self-dealing

to warrant the appointment of a trustee.    As such, there is no compelling basis to deny the

Debtors the typical deference that is generally afforded to existing management.  *See In re G-I*

*Holdings*, 385 F.3d at 313, 316.  For example, *see In re Adelphia* and *In re G-1 Holding*s, cases

in which a trustee was not appointed despite allegations far more egregious than those presented

here.  *Adelphia*, 336 B.R. 610 (declining to appoint trustee in face of allegations of failure to

litigate billions of dollars of inter-debtor claims); *In re G-1 Holdings, Inc.*, 385 F.3d 313

(declining to appoint trustee despite allegations that debtor siphoned off billions of dollars of

value to affiliated non-debtor entity as a fraudulent conveyance and existence of contentious

---

In *In re Ridgemour Meyer Props., LLC*, 413 B.R. 101, 112 (Bankr. S.D.N.Y. 2008), the court ordered the appointment of a trustee because, unlike here, management violated an arbitrator's order and the court found, based on specific conduct of management, that management was dishonest.

In *Petit v. New England Mort. Servs. Inc.*, 182 B.R. 64, 70 (D. Me. 1995), the court specifically found debtor's management to be "obstructionist" and "evasive," including about substantial proceeds of a settlement that were unaccounted for and that the debtor failed to maintain any books or records, or even bank accounts.

In *In re Sharon Steel Corp.*, 871 F.2d 1217, 1226-28 (3d Cir. 1989), the court found management to be careless and prone to self-dealing and to have made improper payments on the eve of bankruptcy. Further, there were no countervailing considerations such as good prospects for rehabilitation or harm from appointment of a trustee. *Id.*

In *In re McCorhill Publ'n., Inc.*, 73 B.R. 1013, 1017 (Bankr. S.D.N.Y. 1987), the court found that the debtor was paying post-petition expenses of non-debtors and the debtor had no business records relating to the transactions. As in *Sharon Steel*, the debtor had poor prospects for rehabilitation and there was no prospect of harm from a trustee appointment. *Id.*

In *In re BLX Group, Inc.*, 419 B.R. 457, 472 (Bankr. D. Mont. 2009), the primary reason the court appointed a trustee was because management did not have the experience to properly run a golf course, and a trustee was beneficial as he or she would hire the appropriate business professionals to rehabilitate it for an eventual sale. Moreover, the *BLX Group* court appointed a trustee to prevent senior creditors from being the only ones to benefit: A trustee would "be able to manage the [debtor] to benefit all legitimate creditors rather than permit the property to be given at a bargain 'fire sale' price to a first mortgagee." *Id.*  Here the facts are exactly the opposite – the senior creditors are the only stakeholders that would benefit from the appointment of a trustee.

In *In re L. S. Good & Co.*, 8 B.R. 312, 314 (Bankr. N.D. W. Va. 1980), the court found that the debtors' prospects for rehabilitation were remote, the debtor was generating no income, and assets were being depleted (*i.e.*, the "melting ice cube" we do not have here). The court also found no harm associated with the appointment of a trustee. *Id.*

Other decisions the Movants cite in which the court appointed a trustee are easily distinguishable as well. *See In re Colorado-Ute Elec. Ass'n, Inc.*, 120 B.R. 164, 176-77 (Bankr. D. Colo. 1990) (large operating losses, incapable management); *In re Euro-American Lodging Corp.*, 365 B.R. 421, 427 (Bankr. S.D.N.Y. 2007) (gross mismanagement, failure to pay taxes); *Taub v. Adams Nos.* 10/2600, 10/2611, 2010 WL 8961434, at *4-11 (continuing losses, accumulation of unpaid administrative expenses); *In re Ionosphere Clubs, Inc.*, 113 B.R. 164, 167-71 (Bankr. S.D.N.Y. 1990) (incompetent management, substantial operating losses in many months since date of filing).

41

litigation).

30.     In *Fairwood*, this Court did not appoint a trustee based upon a conflict of interest regarding potential litigation against purported insiders because there was no evidence that the debtor was refusing to pursue any claims it had against them. *See Fairwood*, Case No. 96-40016 (JLG), at \*50-51.   Here, there is no evidence that the Debtors would refuse to bring appropriate litigation to resolve intercompany claims between the Debtors and certain non-Debtor affiliates, if such claims cannot be consensually reconciled or otherwise resolved through a plan process. (Debtors' Ex. 26 ¶¶ 40-45).

31.     The Court therefore concludes that the Movants' allegations of untrustworthiness in connection with the filings of these Chapter 11 cases and the Peruvian insolvency proceedings are unfounded and this factor weighs heavily against the appointment of a trustee.

### iv.     <u>The Debtors' Prospects for Rehabilitation are Strong</u>

32.     The Debtors' prospects for rehabilitation are sound for a number of reasons and the Movants have no objective basis for the skepticism and distrust that would prevent them from working with the Debtors toward a plan of reorganization.

33.     First, it was not disputed that the Debtors have many workable reorganization options available to them. They include equitization (with potential refinancing), the controlled sale of the Debtors' Peruvian operating companies and/or other major assets, and the spinning off of Debtors' Peruvian operating companies combined with equitization or the sale of other assets. (Debtors' Ex. 26 ¶¶ 21-32).   The typical and proper method for addressing competing claims on value and case direction is through plan negotiation.

34.     Second, the value of the Debtors' Peruvian operating companies are stable and likely appreciating.   The Peruvian operations were historically very profitable, but are at a cyclical low due to a particularly adverse El Niño event, which resulted in, among other

42

deleterious effects on the business, the Peruvian government cancelling a second anchovy fishing season in 2014 and reducing the total allowable catch in the 2015 fishing seasons and the first fishing season of 2016. Climate conditions are expected to moderate and, based on scientific and political realities, the coming anchovy harvest is likely to be significantly better than last year's. (Debtors' Ex. 27 ¶¶ 23-29; Debtors' Ex. 26 ¶¶ 64-67).

35.    Third, one of the Debtors' Peruvian operating companies—Copeinca—was only recently acquired. The Peruvian operating companies have never experienced a complete, normal year as an integrated operation. Such a normal year will help the Peruvian operating companies to stabilize their operations and finances. (Debtors' Ex. 27 ¶¶ 19-22; Debtors' Ex. 26 ¶ 64).

36.    Fourth, the Debtors have managed their assets and finances properly under difficult conditions. The Peruvian companies are adequately funded for their current operations and the Debtors have no immediate need for debtor-in-possession financing. The Movants' assertions that the Debtors have "no articulated path forward" and "no cash to operate" (Motion at 47) are therefore unfounded. (Debtors' Ex. 26 ¶ 76-84; Debtors' Ex. 2 ¶ 132.).  Moreover, as testified to by Ms. Ng, it is likely that the Debtors will obtain necessary financing from non-debtor affiliates.  (Debtors' Ex. 2 ¶ 133; Debtors' Ex. 26 ¶76; Debtors' Ex. 50 § 9).

37.    In *In re General Oil Distributors, Inc.*, 42 B.R. 402 (Bankr. E.D.N.Y. 1984) and *In re The 1031 Tax Group., LLC*, 374 B.R. 78 (Bankr. S.D.N.Y. 2007), the courts denied motions for the appointment of a Chapter 11 trustee in part because the debtors' prospects for rehabilitation were good.[5]

---

5 Decisions ordering the appointment of a chapter 11 trustee on rehabilitation grounds involve facts substantially different from those present here. *See, e.g., Eurospark*, 424 B.R. at 631-32 (granting motion to appoint chapter 11 trustee in part because the bankruptcy proceedings had been pending for twelve years and the debtor had not been in operation for five of those years); *In re Keeley & Grabowski Land P'ship*, 455 B.R. 153, 165 (granting motion to appoint chapter 11 trustee in part because the debtor's "past performance casts serious doubt on its prospects of reorganization."); *L. S. Good*, 8 B.R. at 315 (granting motion to appoint chapter 11 trustee in part because debtor

38.    The Court therefore concludes that this factor weighs heavily, and undisputedly, against the appointment of a trustee.

### v.    The Debtors Have and are Deserving of The Confidence of Their Business Community

39.    Like any other fact relevant to whether a Chapter 11 trustee is warranted under the circumstances, lack of confidence must be supported with clear and convincing evidence. *See, e.g., Adams,* 564 F.3d at 546; cf. *In re Patman Drilling Int'l, Inc.,* No. 07-34622, 2008 WL 724086 (Bankr. N.D. Tex. March 14, 2008) (finding creditors lacked confidence due to management's inability to stem continuing post-petition losses). And although *Colorado-Ute,* 120 B.R. at 177, and *In re Microwave Products of America, Inc.,* 102 B.R. 666, 676 (Bankr. W.D. Tenn. 1989), may be read to suggest that declining confidence in the debtor may engender litigation, which in turn may increase the estate's legal expenses, neither decision stands for the proposition that a creditor's conclusory, self-serving statements will suffice to demonstrate lack of confidence.

40.    Creditors with parochial interests, even substantial ones, should not be allowed to replace management with a Chapter 11 trustee simply because they disagree with management's business judgment which is designed to protect the estate. This is particularly apt where, as here, the relevant asset is likely to appreciate, and most of the complaining creditors' structural priority likely assures them of full payment under any scenario. On the contrary, the appointment of a Chapter 11 trustee will most likely harm all other creditors.

41.    The Movants' other argument—that a Chapter 11 trustee is warranted on account of the acrimony between the Movants and the Debtors—must be based on objective evidence of which there is none. The Movants' own case law demonstrates that the appointment

---

required "an infusion of fresh capital in a sum approximating five million dollars . . . to undergo a successful reorganization.").

44

of a Chapter 11 trustee is reserved for situations where, unlike here, the acrimony is unusually hostile or crippling and is coming from both sides. For instance, in Colorado-Ute, 120 B.R. at 176, the court ordered the appointment of a Chapter 11 trustee in part because the debtor's own management could not agree on a way forward.

42.      Lastly, many other creditors have expressed confidence in the Debtors. First, the Movants represent substantially less than all of the debt of these Debtors and, based on the Debtors' schedules, only a tiny fraction of the number of creditors of these estates. (See Debtors' Ex. 26 ¶ 74). Second, other large creditors have either withdrawn from the Motion or oppose it. CITIC Bank International Limited, one of the Club Lenders, which was initially listed as a Movant, withdrew its support for the Motion, citing less drastic approaches offered by the Debtors. [Dkt. No. 76-1]

43.      In addition, numerous other creditors oppose the Motion, stating that such an appointment could cause irreparable harm to good will and operations, and thus destroy value. [Dkt. Nos. 91, 96, 97,98, 110, 111 and 118.]

vi.    **The Interests of Other Constituents**
       **Weigh Against the Appointment of a Trustee**

44.      The Movants have not carried their burden of demonstrating how the appointment of a Chapter 11 trustee would be in the best interests of the Debtors, their equity holders or other parties in interest, such as the Chapter 15 Debtors. *In re Sletteland*, 260 B.R. at 672 (creditor's motion to appoint a Chapter 11 trustee denied in part because it did not demonstrate how the appointment of a Chapter 11 trustee would benefit all parties with a stake in the estate including the debtor: "a creditor group, no matter how dominant, cannot justify the appointment of a trustee . . . simply by alleging that it would be in its interests"). *See also In re LHC LLC*, 497 B.R. 281, 310-11 (Bankr. N.D. Ill. 2013) ("the appointment of a trustee must be in the interests

45

of equity security holders as well as creditors").

### vii.    The Burdens of Appointing a Trustee Greatly Outweigh the Benefits

45.    The substantial costs of the appointment of a trustee, both in cash outlay, deterioration of asset value and unwarranted upending of a management team with unequaled experience in running the businesses of the Debtors has been well-established and is uncontroverted. By contrast, no evidence has been offered suggesting any clear benefits from the appointment of a trustee. Accordingly, the cost-benefit analysis courts use in deciding whether to appoint a trustee weighs heavily against the appointment of a trustee in these cases. *See, e.g.*, *In re North Star Contracting Corp.*, 128 B.R. at 70 ("in weighing the expense and delay associated with the appointment of a Chapter 11 trustee against the potential benefits to the estate, it is clear that a trustee would not benefit any interests in this case. The costs of a trustee will only burden this estate with additional administrative expenses and will not be in the best interests of creditors.") (citations omitted).

46.    The only evidence in the record shows that the appointment of a Chapter 11 trustee would have an effect similar to the appointment of the JPLs in November 2015. Like the JPLs, a Chapter 11 trustee will be viewed as a badge of economic distress, thus lowering the sale value of the Debtors' assets. The business relationships cultivated by Debtors' management, particularly in emerging markets such as China and Peru, would likely not survive the replacement of the Debtors' management with a Chapter 11 trustee who would be a stranger to many of the Debtors' long-term customers and suppliers.[6] (Debtors' Ex. 27 ¶¶ 49-54; Debtors' Ex. 2 ¶ 78; Debtors' Ex. 26 ¶¶ 68-73). *See In re North Star Contracting*, 128 B.R. at 70 (denying a creditor's motion to appoint a Chapter 11 trustee in part because the debtor's

---

[6] Mr. Paniagua testified that 70% of the Peruvian fishmeal inventory is sold to China through the marketing efforts of the Ng family. (Tr. 296:6-9).

management's "experience and knowledge" were "essential" for the purposes of continuing to operate the debtor's business)[7]; *In re General Oil Distrib., Inc.*, 42 B.R. 402, 408 (Bankr. E.D.N.Y. 1984) ("the appointment of a trustee . . . would not be received very well within the oil community, and could cause [the debtor] difficulty in its ability to obtain customers and sources of supply.").

47.     The financial cost of a Chapter 11 trustee in these cases would be substantial. Pursuant to the commission scheme set forth in Section 326 of the Bankruptcy Code, a trustee could receive commissions of up to three percent of distributions which could very well aggregate at least $1 billion approximately, possibly greater, based on the range of initial bids received under the HSBC Deed sale process. 11 U.S.C. § 326(a).  (Debtors' Ex. 26 ¶ 34.)

48.     The maximum commission on $1 billion would be $30 million.  The fees of the trustee's professionals in attempting to replicate the experience and expertise of management, and to attempt to overcome the lack of customer and vendor relationships, could likewise be that much more substantial. *See Adams*, 564 F.3d at 546-47.

**B.     The Cross-Border Nature of These Proceedings
Does Not Warrant the Appointment of a Trustee**

49.     The appointment by this Court of a trustee to address the Club Lender Parties' concern regarding the theoretical manipulation of the pending Peruvian Insolvency Proceedings is not warranted.  The evidence presented demonstrates that any rights the Club Lender Parties may have with regard to the Peruvian Companies would be adequately protected by Peruvian Insolvency Law.

---

7 Like the JPLs, a Chapter 11 trustee may also experience difficulties navigating the regulatory obstacles associated with an enterprise comprised of dozens of entities incorporated and/or doing business in a variety of jurisdictions around the world. In other words, there is just no telling whether a chapter 11 trustee will be recognized in all the jurisdictions in which he/she will need to be recognized in order to perform his/her functions as efficiently and as effectively as possible. (Debtors' Ex. 26 ¶ 68-73.)

50.     Peruvian Insolvency Law is derived, in part, from the bankruptcy laws of the United States.  As a result, Peruvian Insolvency Law reflects many of the same fundamental concepts incorporated in the bankruptcy laws of the United States for the protection of creditors. Similarly, Peruvian Insolvency Law is designed to advance many of the same objectives as the bankruptcy laws of the United States. (Debtors' Ex. 40, ¶ 33).  Moreover, Peruvian Insolvency Law comports with fundamental notions of fairness and due process with respect to rights of creditors, debtors and other stakeholders in the insolvency process.   (Tr. at 239:24-240:16; Debtors' Ex. 40, ¶ 32).8

### i.    The Policies Advanced by Peruvian Insolvency Law

51.     Insolvency proceedings in Peru are governed by the Peruvian Insolvency Law. (Debtors' Ex. 41; Debtors' Ex. 40, ¶ 8, Ex. A).

52.     The stated purpose of the Peruvian Insolvency Law is to enhance credit recovery through the maximization of the debtor's estate and orderly bankruptcy proceedings. (Debtors' Ex. 41, Preliminary Title, Article I; Debtors' Ex. 40, ¶ 34; Tr. at 238:13-17).

53.     The Peruvian Insolvency Law provides an appropriate forum for the creditors of a Peruvian debtor to decide whether that debtor should be submitted to a capital restructuring or, alternatively, a dissolution and liquidation process. (Movants' Ex. 178, ¶ 6; Debtors' Ex. 40, ¶ 61; Tr. at 238:3-9).

---

8 Peruvian insolvency proceedings have been recognized under principles of comity by numerous courts, including the United States Court of Appeals for the Second Circuit and the United States District Court for the Southern District of New York. *See CEPSA v. Pepsi Cola Co.,* 114 Fed. Appx. 423, 425-26 (2d Cir. 2004) (quoting *Finanz AG Zurich v. Banco Economico S.A.,* 192 F.3d 240, 246 (2d Cir. 1999)) (Second Circuit has "'repeatedly noted the importance of extending comity to foreign bankruptcy proceedings.'"); *CEPSA v. Pepsi Cola Co.,* 650 F. Supp. 2d 314, 326 (S.D.N.Y. 2009) (citing *CEPSA,* 114 Fed. Appx. at 425-26) (agreeing with "the Second Circuit expressly defer[ring] to Peruvian liquidation procedures [and] declining to substitute its judgment for that of creditors in Peru."); *Pravin Banker Assocs. v. Banco Popular del Peru,* 165 B.R. 379, 386 (S.D.N.Y. 1994), (internal citations and quotations omitted) ("The Peruvian bankruptcy procedures appear to share the central premise of the United States Bankruptcy Code, which is to seek equality of distribution of assets among creditors . . . and correlatively avoid preference to some."). (citations omitted)

54.     Peruvian insolvency proceedings are designed to promote the efficient allocation of resources to achieve the maximum value of the debtor's equity. (Debtors' Ex. 41, Preliminary Title, Article I; Debtors' Ex. 40, ¶ 35; Tr. at 238:21-239:1).

55.     Further, Peruvian insolvency proceedings are intended to promote a suitable environment for negotiations between creditors and insolvent debtors to allow them to reach a restructuring agreement or, alternatively, arrange for the debtor's orderly exit from the market under reduced transaction costs. (Debtors' Ex. 41, Article II; Debtors' Ex. 40, ¶ 36; Tr. at 239: 5-9, 14-20).

56.     Bankruptcy proceedings under the Peruvian Insolvency Law seek the participation of all creditors affected by the debtor's insolvency to obtain the greatest benefit for all creditors. (Debtors' Ex. 41, Preliminary Title Article V; Debtors' Ex. 40, ¶ 37).

57.     Peruvian insolvency proceedings seek to promote and protect the collective interests of creditors rather than the individual interest of each creditor. (Debtors' Ex. 41, Preliminary Title Article V; Debtors' Ex. 40, ¶ 37).

58.     As a general rule under Peruvian Insolvency Law, creditors participate proportionately in the economic outcome of a bankruptcy proceeding. (Debtors' Ex. 41, Preliminary Title Article VI; Debtors' Ex. 40, ¶ 38).

59.     The rules applicable to proceedings under the Peruvian Insolvency Law promote truthfulness, honesty, loyalty and good faith. Conversely, recklessness, bad faith and other forms of misconduct are subject to sanction. (Debtors' Ex. 41, Preliminary Title Article VIII; Debtors' Ex. 40, ¶ 39).

60.     Through INDECOPI, the administrative agency responsible for overseeing the Peruvian insolvency process, the Peruvian government is committed to facilitating and

49

promoting negotiations between not only a particular group of creditors but all creditors and debtors. (Debtors' Ex. 41, Preliminary Title Article X; Debtors' Ex. 40, ¶ 40).

### ii.   Initiation of Insolvency Proceedings

61.     The rules and procedures incorporated into the Peruvian Insolvency Law are designed to ensure that all stakeholders, including creditors, are afforded adequate notice and an opportunity to be heard with respect to each phase of the insolvency process.

62.     The initial step in the Peruvian insolvency process is the filing with INDECOPI of a request to initiate bankruptcy proceedings. The request can be made either by a debtor, or one or more of its creditors. (Debtors' Ex. 41, Article 23; Debtors' Ex. 40, ¶ 41).

63.     To initiate an involuntary proceeding, the Peruvian Insolvency Law only requires that a creditor hold a credit in excess of approximately US $61,000 (50 UITs) which is due and payable by the debtor but has remained unpaid for at least thirty days. In its request, the creditor must submit documentation establishing the credit. (Debtors' Ex. 41, Article 26; Debtors' Ex. 40, ¶ 42).

64.     There are no other restrictions upon a creditor's right to make an application to INDECOPI. (Debtors' Ex. 40, ¶ 43).

65.     After verifying a creditor's claim, INDECOPI notifies the debtor that a creditor has requested the initiation of insolvency proceedings. The debtor must appear in the proceeding within ten working days to respond to the creditor's request. (Debtors' Ex. 41, Article 27; Debtors' Ex. 40, ¶ 45).

66.     In response to the creditor's request to INDECOPI, the debtor can elect to pay the claim in full. If the debtor elects to do so, INDECOPI will reject the creditor's request and declare the proceeding terminated. (Debtors' Ex. 41, Articles 28.1(a), 28.2; Debtors' Ex. 40, ¶ 46).

50

67.     Alternatively, the debtor can challenge the claim.  If the challenge is sustained, INDECOPI will deny the creditor's request and declare the proceeding concluded.  (Debtors' Ex. 41, Article 28.1(c), 28.5; Debtors' Ex. 40, ¶ 47).

68.     If the debtor refuses to pay the claim, or if the debtor's opposition to the request is rejected, INDECOPI formally opens the insolvency proceeding to every other creditor. (Debtors' Ex. 41, Article 28.3; Debtors' Ex. 40, ¶ 48).

### iii.     Publication of Proceedings

69.     After it has determined that the claim on which the creditor has instituted the proceedings meets the threshold requirements noted above, INDECOPI issues a decision and later publishes a public notice advising that the debtor is the subject of a bankruptcy proceeding under the Peruvian Insolvency Law (the "Publication").  (Debtors' Ex. 41, Article 32.1; Debtors' Ex. 40, ¶ 49).

70.     The Publication requires the debtor's creditors to request recognition of their credits if they wish to participate in the creditors' meeting that will decide the debtor's fate. (Debtors' Ex. 41, Article 32.2; Debtors' Ex. 40, ¶ 50).

71.     There is no automatic stay prior to Publication.  (Tr. at 321:18-323:2).

72.     However, from the date of Publication, the enforceability of all obligations that the debtor had accrued is suspended.  The suspension remains in place until a restructuring, global refinancing or liquidation agreement is agreed to.  (Debtors' Ex. 41, Article 17; Debtors' Ex. 40, ¶ 51; Tr. at 323:3-7).

73.     Further, during the same period no order enjoining the debtor's assets may issue. (Debtors' Ex. 41, Article 18; Debtors' Ex. 40, ¶ 52).

### iv.     Debtor's Post-Publication Disclosure Obligations

74.     The Peruvian Insolvency Law imposes substantial post-Publication disclosure

51

obligations on a debtor. A debtor who fails to comply with those disclosure requirements is subject to fines of up to approximately US $120,000.00 (100 UITs). (Debtors' Ex. 41, Article 31; Debtors' Ex. 40, ¶ 54).

75.     The information a debtor is required to disclose following Publication includes:

    a.     financial statements for the past two years;

    b.     income statements for the past two years;

    c.     cash flow statements for the past two years;

    d.     information regarding sources of financing to which the debtor has had access during the last two years;

    e.     a list of outstanding obligations, identifying each creditor and the amount owed;

    f.     a list of movable and fixed property;

    g.     a list of receivables reflecting the likelihood of recovery on each; and

    h.     an affidavit addressing whether any creditor is related to the debtor.

(Debtors' Ex. 41, Articles 31, 25; Debtors' Ex. 40, ¶ 55).

**v.     Recognition of Credits**

76.     Creditors have thirty days from the date of Publication to submit their proofs of claim to INDECOPI. (Debtors' Ex. 41, Articles 32 and 34; Debtors' Ex. 40, ¶ 56).

77.     Creditors seeking recognition of their claims are required to submit supporting information to INDECOPI. (Debtors' Ex. 41, Articles 37.1 and 39; Debtors' Ex. 40, ¶ 56).

78.     Creditors also must submit a sworn statement addressing the existence or non-existence of any "relevant proximity of interests" between the debtor and creditor. (Debtors' Ex. 41, Articles 37.2, 12; Debtors' Ex. 40, ¶ 56).

79.     INDECOPI reviews the claim documentation submitted by creditors to ensure the creditor meets the threshold requirements noted above. (Debtors' Ex. 40, ¶ 57).

80.    For creditors unrelated to the debtor -- i.e., creditors with no financial or familial ties to, or shared management with, the debtor -- this review is fairly cursory. Certain supporting documentation, such as deeds of title and letters of credit, are presumed to be legitimate for the purpose of assessing the propriety of the claim. (Debtors' Ex. 40, ¶ 57).

81.    An entirely different standard is applied to claims filed by related creditors - - creditors who do have financial or family ties to, or shared management with, the debtor. To protect the interest of all creditors, INDECOPI subjects claims made by related creditors to heightened scrutiny. (Id., ¶58; Tr. at 242:11-20).

82.    Documentation a related creditor submits in support of its claims is not afforded any presumption of legitimacy. (Debtors' Ex. 40, ¶ 58).

83.    The documentation and all information submitted in support of a related creditor's claim is subject to an aggressive and thorough review in which INDECOPI's accounting staff participates. (Debtors' Ex. 41, Articles 38.5 and 38.6; Debtors' Ex. 40, ¶ 58).

84.    INDECOPI's review of a related creditor's claim consumes substantially more time than the review of a non-related creditor's claim. (Debtors' Ex. 40, ¶ 58).

85.    Even after the credits are recognized by INDECOPI, any other creditor may challenge such recognition (even those credits that were used for the involuntary petitions). (Debtors' Ex. 41, Article 38.4; Debtors' Ex. 40, ¶ 59).

### vi.    Fate of the Debtor

86.    Once INDECOPI completes its review and recognition of the submitted claims, it convenes a meeting of the debtors' creditors. (Debtors' Ex. 41, Article 43; Debtors' Ex. 40, ¶ 60).

87.    At the creditors meeting, the Peruvian Insolvency Law empowers the creditors with sole authority to make a series of crucial decisions affecting the debtor. Among other

things, the creditors are authorized to decide the debtor's fate by choosing between either the commencement of a debt/equity restructuring or, alternatively, the debtor's dissolution and/or liquidation. (Debtors' Ex. 41, Article 51.1; Debtors' Ex. 40, ¶ 61).

88.    The creditors are also authorized to supervise the debtor's compliance with the agreements executed to effect either the reorganization or liquidation.  Further, they are empowered to request the preparation and filing of any necessary financial reports.  (Movants' Ex. 178, ¶ 10).

89.    In a reorganization, it is the creditors who determine whether the debtor's management should remain in place.  They are authorized to replace current management with an administrator registered with INDECOPI.  They also are empowered to decide if the debtor should be jointly administered by existing management and an appointed administrator.  (Id.; Tr. at 326:23-329:3).

90.    As a general rule, a restructuring plan, liquidation agreement or global refinancing agreement typically is adopted on a first call of the creditors meeting if it secures the support of creditors representing credits amounting to more than 66.6 percent of the total amount of credits recognized by INDECOPI.  At a second call, the agreement is adopted with the favorable vote of creditors representing an amount greater than 66.6 percent of the total credits who are present or represented at the meeting.  (Debtors' Ex. 41, Article 53.1; Debtors' Ex. 40, ¶ 62).

91.    To protect the interests of non-related creditors, the Peruvian Insolvency Law provides for special voting requirements to approve the fate of a debtor when its related creditors represent more than 50 percent of the total credits recognized by INDECOPI.  (Debtors' Ex. 41, Article 59; Debtors' Ex. 40, ¶ 63).

92.    In this scenario, a restructuring plan, liquidation agreement or global refinancing

agreement requires, on first call, a favorable vote of more than 66.6 percent of the class of related creditors as well as 66.6 percent of the class of non-related creditors. At a second call, those agreements must gain the approval of more than 66.6 percent of all the creditors of each class represented at the meeting. (Debtors' Ex. 40, ¶ 64).

93.     These special voting requirements safeguard the interests of non-related creditors because even if related creditors account for a majority of credits they will still require the approval of non-related creditors in order for their preferred plan to be approved. (Debtors' Ex. 40, ¶ 65).

94.     If the creditors are unable to agree on the debtor's fate within the requisite timeframe, the Peruvian Insolvency Law requires INDECOPI to arrange for the winding up and liquidation of the debtor. (Debtors' Ex. 41, Article 96.1; Debtors' Ex. 40, ¶ 66).

95.     In this scenario, INDECOPI is required to convene an extraordinary creditors meeting for the sole purpose of appointing a liquidator and approving a liquidation agreement. (Debtors' Ex. 41, Article 97.1; Debtors' Ex. 40, ¶ 66).

96.     The liquidator appointed in this manner is required to liquidate all of the debtor's assets. (Debtors' Ex. 41, Article 97.5; Debtors' Ex. 40, ¶ 67).

97.     Any liquidator appointed by INDECOPI is independent, selected from a court approved panel and has the ability to take actions similar in some respects to a trustee in the United States, such as hiring professionals. (Debtors' Ex. 41, Articles 82 and 83; Debtors' Ex. 40, ¶ 67).

### vii.    Restrictions on the Debtor's Management

98.     During the period after an involuntary insolvency proceeding is commenced but prior to the creditors meeting, when creditors take control of the debtor, creditors are protected by significant restrictions imposed on how the debtor's management operates the business.

(Debtors' Ex. 40, ¶ 68).

99.     The Peruvian Insolvency Law sets forth a list of acts that will be declared "ineffective and, therefore, unenforceable against creditors" during this period.   These acts include:

    a.     any advance payment for obligations not yet due;

    b.     all payments made in a manner not consistent with the controlling contract, such as pre-payment;

    c.     acts on contracts that do not relate to the debtor's normal course of business;

    d.     offsetting for mutual obligations between the debtor and creditors;

    e.     encumbrances and transfers charged against the debtor's property;

    f.     guarantees granted on the debtor's assets to ensure payment of obligations; and

    g.     mergers, takeovers or spin-offs involving a capital expense.

(Debtors' Ex. 41, Article 19.3; Debtors' Ex. 40, ¶ 69).

100.    These restrictions are intended to protect the interests of creditors.  If a debtor's management exceeds these restrictions, they are subject to administrative and criminal liability. (Debtors' Ex. 40, ¶ 70).

101.    During this period, if a creditor believes that management has taken one of the acts prohibited by Article 19.3, that creditor can go to the judiciary and seek an injunction with a presumption that management's act was inappropriate.  (Debtors' Ex. 40 ¶ 81; Tr. 362:2-15)

### viii.     The Appointment of a Trustee Is Not Warranted

102.    The Court concludes that Peruvian Insolvency Law affords the Club Lender Parties due process, adequate protections and an opportunity to assert whatever rights they may have with respect to the Peruvian Companies.  The appointment of a trustee in these proceedings therefore is unnecessary and unwarranted.

56

## III.

## CONCLUSION

103.    Having considered and weighed all the evidence, the Court concludes that the

Movants have not carried their heavy burden of proving by clear and convincing evidence that

the appointment of a trustee is warranted.  The Motion is denied in light of (a) the likely harm

from the appointment of a trustee and the associated high costs, (b) management's demonstrated

desire and ability to operate and rehabilitate the Debtors' business for the benefit of all

stakeholders, (c) management's exercise of its fiduciary duties thus far in these cases in a manner

that seeks to protect the estate and maximize its value for all of the Debtors' creditors, as

demonstrated by these filings and the Peruvian filings and the Debtors' fulfillment of both

statutory and voluntary reporting requirements, (d) Movants' failure to show, in any clear and

convincing way, that the Movants' stated lack of confidence in and distrust of management is

based on anything more than their parochial desires to get paid quickly without consideration of

the interests of other creditors and stakeholders, and (e) the degree to which the Peruvian

Insolvency Law comports with fundamental notions of fairness and due process with respect to

the rights of creditors.

Dated: New York, New York
          September _____, 2016

_____
James L. Garrity, Jr.
United States Bankruptcy Judge

57

1136584

# APPENDIX

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------x
                                :       **NOT FOR PUBLICATION**
In re                           :
                                :
FAIRWOOD CORPORATION,           :       Chapter 11
                                :       Case No. 96 B 40016 (JLG)
            Debtor.             :
                                :
--------------------------------x


### MEMORANDUM DECISION ON
### FAIRWOOD BONDHOLDERS' MOTION FOR
### APPOINTMENT OF CHAPTER 11 TRUSTEE


APPEARANCES:

        ANDERSON KILL & OLICK, P.C.
        1251 Avenue of the Americas
        New York, New York 10020-1182
        Attorneys for Ad Hoc Bondholders' Committee

        LeBOEUF, LAMB, GREENE & McRAE, L.L.P.
        125 West 55th Street
        New York, New York 10019-5389
        Attorneys for Bankers Trust Company

        SHEARMAN & STERLING
        599 Lexington Avenue
        New York, New York 10022
        Attorneys for Citicorp et al.

        KAYE, SCHOLER, FIERMAN, HAYS & HANDLER, LLP
        425 Park Avenue
        New York, New York 10022-3598
        Attorneys for Fairwood Corporation



DOCKETED
FEB 22 1999


BEFORE:

                    JAMES L. GARRITY, JR.

                        UNITED STATES BANKRUPTCY JUDGE



In or about May 1997, certain holders of Bonds[1] issued

by Fairwood Corporation ("Fairwood" or "debtor") filed this

motion for an order pursuant to § 1112(b) of the Bankruptcy Code

converting debtor's chapter 11 case to one under chapter 7 of the

Bankruptcy Code or, alternatively, pursuant to § 1104(a) of the

Bankruptcy Code for the appointment of a chapter 11 trustee.

Bankers joins in the motion.  As grounds for that relief, they

argue that debtor has unjustifiably refused to cause its first

and second tier subsidiaries, Consolidated[2] and Futorian

Furniture, Inc., f/k/a Furniture Comfort Corp. ("Futorian"),

respectively, to file chapter 11 petitions for reorganization

(although there is no evidence that either requires such relief)

---

[1]   The bondholders are Richard Fels on behalf of Maiorana,
Michael Vols, William A. Drager, I. Ladd Weinberg, Richard
Pareti, Richard M. Fels, Mark Horowitz, Albert Cohen, Albert
Cohen Partners, L.P., J.A. Glynn Co., Gould Trading Co., Fred
Stein, OTA Limited Partnership, Triage Capital Management, Harbor
Finance Partners, Charles Mahar, George Hust, FINCA
International, Inc., Harry L. Summit, Allan L. Lange, Furman Selz
LLC, Gruntal & Co., and Mesirow Financial.  They purport to act
derivatively of debtor, its subsidiary Consolidated Furniture
Corp. ("Consolidated") and Consolidated's subsidiary Futorian
Furnishings, Inc., f/k/a Furniture Comfort Corp., on their own
behalf and on behalf of all others similarly situated.  We refer
to these parties collectively as the "Bondholders".  They hold in
aggregate approximately $30 million of the more than $69 million
in 16⅞% subordinated pay-in-kind debentures due 2004 (the
"Bonds") issued by MHS Holdings Corporation ("MHS
Holdings"), debtor's predecessor-in-interest, pursuant to an
indenture (the "Indenture") dated August 15, 1989 between MHS
Holdings and Bankers Trust Company, as indenture trustee
("Bankers").

[2]   Prior to the leverage buy-out that we describe below,
Consolidated was known as Mohasco.

2

and then sue Citicorp and certain of its affiliates, officers, directors and employees (as defined herein, "Citicorp")[3] in bankruptcy court to avoid certain allegedly fraudulent conveyances, recharacterize Citicorp's claims against Fairwood and the subsidiaries as equity and then, as necessary, equitably subordinate those interests. Fairwood is in default under the Bonds. Thus, the Bondholders' goal is to leave Consolidated and Futorian debt free (net of current operating debt) and in doing so, give value to the Bonds. The Bondholders put Fairwood into bankruptcy as the first step in pursuing the Citicorp litigation. They cannot put either Futorian or Consolidated into bankruptcy because they are not among the creditors of those entities. Thus, they require Fairwood, as shareholder, to do so, and then pursue the alleged claims against Citicorp. Debtor and Citicorp object to the motion. We deny it.[4]

## **Facts**

The relevant facts are not in dispute. Fairwood is a holding company whose sole asset is 100% of the stock of

---

[3]    "Citicorp" refers to Citicorp North America, Inc., Citicorp Venture Capital Ltd., Court Square Capital Limited and any of their respective subsidiaries, affiliates or related companies.

[4]    During the initial hearing on this motion, we denied the Bondholders' request that we convert this case to one under chapter 7 of the Bankruptcy Code. We supplement that determination herein.

3



Consolidated, a non-operating holding company whose sole asset is 100% of the stock of Futorian.  With its two operating divisions, Stratford Company and Barcalounger Company, Futorian manufactures various brands of upholstered furniture.

Fairwood is the product of a 1988-89 leveraged buy-out transaction pursuant to which (i) on May 9, 1988, Mohasco and MHS Holdings, which was owned and controlled by Citicorp, executed a merger agreement, (ii) in May and June of 1988, MHS Acquisition, another Citicorp owned entity, offered to purchase up to 93% of the stock of Mohasco for $36.50 per share, (iii) after the tender offer was oversubscribed and terminated, on July 12, 1988, MHS Acquisition purchased 93.15% of Mohasco's stock for $455.8 million, Citicorp infused $5.9 million in equity into MHS holdings and Citicorp loaned MHS Holdings and MHS Acquisition $459.6 million to finance the acquisition, (iv) on December 31, 1988, Mohasco sold its subsidiary Cort Furniture Rental Co. ("Cort") to a Citicorp entity for $151 million, of which $147.5 million was paid in the form of promissory notes, and sold its subsidiary Mohawk Carpet Corp. ("Mohawk") to a Citicorp entity for $106.2 million in cash and assumed debt,[5] and (v) on September 22, 1989, Mohasco and MHS Holdings merged, the holders of the remaining 6.85% of Mohasco's equity received $33.5 million

---

[5]     $69 million of those proceeds was used to pay down the Citicorp bridge financing on January 4, 1989.

in face amount of the Bonds, Citicorp.made a $24.1 million
capital contribution to MHS Holdings,[6] and Mohasco and MHS
Holdings assumed the obligation to repay $441.1 of the bridge
financing provided by Citicorp.

On December 13, 1989, Cort paid Mohasco $21.5 million
on its December 31, 1988 promissory note.  Mohasco used those
funds to pay down Citicorp's bridge financing.  Citicorp's debt
was further reduced with $131.2 million paid by Cort on January
17, 1990 when it refinanced the remainder of its debt to Mohasco.

In the fall of 1989, former shareholders of Mohasco
filed seven lawsuits against Mohasco, MHS Acquisition,
Consolidated, certain principals of those entities, MHS Merger
and certain officers of Citicorp, which ultimately were
consolidated into one lawsuit.  The amended complaint in that
action alleged eleven counts of material misrepresentations in
the public filings of Mohasco and Consolidated and two counts of
breach of fiduciary duties.  Eight of the eleven
misrepresentation counts were grounded on Rule 10b-5 and various
provisions of the Securities Act of 1933 and the Securities and
Exchange Act of 1934 and the remaining three were grounded on
state law.  The plaintiffs' principal allegation was that the
defendants' documents falsely stated that the Bonds to be

---

[6]    This capital contribution involved Citicorp's
forgiveness of interest accrued on the acquisition financing.

5

exchanged for shares outstanding after the tender offer would have a market value of $36.50.  The district court dismissed all of the misrepresentation counts, finding that the documents, as quoted by the plaintiffs in their amended complaint, did not contain a guarantee of a $36.50 market value.[7]  It also dismissed the fiduciary duty counts finding that the claims omitted certain mandatory allegations, were barred by the exclusivity of an appraisal remedy, and were derivative claims that the shareholders lacked standing to pursue.[8]

On appeal the Second Circuit affirmed, finding that the plaintiffs had not stated a cause of action for securities fraud because the documents in which the alleged guarantee was contained referred only to the advisors' opinion regarding expected value, and thus they could not prove fraud.[9]  The court also held that the district court correctly dismissed the fiduciary duty claims because those claims could only be asserted derivatively on behalf of the corporation, and following the merger, the plaintiffs' lacked standing to assert the derivative

---

[7]    See Mohasco Corporation Securities Litigation, No. 89 Civ. 5875, slip op. at 2 (S.D.N.Y. July 6, 1990) (endorsed memorandum).

[8]    Id. at 3.

[9]    Friedman et al. v. Mohasco Corporation, 929 F.2d 77, 78 (2d Cir. 1991).



claims.[10]

In response to dissenting shareholders' demands, Mohasco filed a proceeding in New York State Supreme Court to appraise the value of their shares.[11]  On June 21, 1991, the New York State Supreme Court fixed the appraisal value of dissenting shareholders' stock at $19.75 per share.[12]  On January 17, 1990, Cort Acquisition refinanced its capital structure and paid the $152.7 million in Mohasco's debt that it had assumed in December of 1988.  Mohasco in turn used those funds to pay down its debt to Citicorp.  On April 23, 1992, Chromcraft Revington, Inc. ("Chromcraft Revington"), an entity controlled by Citicorp, completed an initial public offering for $27.5 million and purchased Mohasco subsidiaries Chromcraft and Peters-Revington for $49.8 million in cash and $32.6 million in forgiveness of Mohasco's debt to Citicorp.  On July 29, 1994, Fairwood, as the post merger entity, sold its Super Sagless division to an entity unrelated to Citicorp for $40 million, the proceeds of which were applied to Mohasco's debt to Citicorp.  On April 1, 1994, Fairwood was obligated to begin making cash payments on the Bonds, which in accordance with the Indenture had been paid in

---

[10]     Id. at 79.

[11]     In re Mohasco Corp., No. 25366/89 (N.Y. Sup. Ct.) (the "Appraisal Action").

[12]     See In re Mohasco Corp., No. 25366/89, slip op. (N.Y. Sup. Ct. Jun. 21, 1991).

7

kind since their issuance in 1989.  It was unable to do so.

Since January 1, 1996, the capital/debt structure of debtor and its affiliates has been as follows.  Citicorp owns or effectively controls a majority of Fairwood's voting securities and holds $100 million of Fairwood's $18 Junior Redeemable Preferred Stock.  In addition to the Bonds, which are secured by a junior pledge of Consolidated's stock, Fairwood issued $126.4 million in 15½% Senior Subordinated P-I-K Debentures (the "Senior Bonds"), which are secured by a first pledge of Consolidated's stock.  Citicorp holds all of the Senior Bonds.  Fairwood holds 100% of the common stock of Consolidated.  As of that date, Consolidated was indebted to Citicorp in the amount of $171.4 million, pursuant to a senior revolving loan (the "Senior Revolver") secured by all of the assets of Consolidated and its subsidiaries, and in the amount of $80 million, representing Consolidated's 18% Increasing Rate Senior Subordinated Debentures.  Futorian is co-obligor on the Senior Revolver and, as of January 1, 1996, had approximately $3.7 million in trade debt.

On January 3, 1996, certain of the Bondholders (Furman Selz LLC, Albert B. Cohen Partners, L.P. and OTA Limited Partnership) filed an involuntary petition for relief under chapter 7 of the Bankruptcy Code against Fairwood pursuant to § 303(b) of the Bankruptcy Code.  On March 6, 1996, Bankers joined

8

the involuntary petition pursuant to § 303(c) of the Bankruptcy Code.

The Bondholders are not creditors of either Consolidated or Futorian. However, they maintain that those entities have substantial claims against Citicorp, which if successfully litigated, will leave those entities debt free (net of current operating debt), enhance Fairwood's value, and necessarily, the value of their presently worthless Bonds. Those alleged claims primarily relate to the leveraged buyout of Mohasco by MHS Holdings. The petitioning creditors' stated purpose in filing the involuntary petition against debtor was to cause a trustee to be appointed for Fairwood who would file bankruptcy petitions for Consolidated and Futorian in order to permit a fiduciary for either or both of them to pursue that litigation.

On or about April 22, 1996, debtor, Consolidated and Citicorp filed a joint motion pursuant to § 305 of the Bankruptcy Code to dismiss the involuntary petition. In support of that motion, they contended, among other things, that the Bondholders were seeking to relitigate matters that were decidedly adversely to them by the district and circuit courts in Friedman, that the case was really an inter-creditor dispute that could be best resolved in a non-bankruptcy forum, that the Bondholders had an improper ulterior motive in commencing the case and were abusing

9

the bankruptcy process, and that the continuation of the
proceedings was not in the best interest of the creditors or the
estate.  Without passing on the validity of the Bondholders'
claims, we denied the motion.  See In re Fairwood Corp., 96 B
40016 (Bankr. S.D.N.Y. Nov. 27, 1996) (unpublished decision).
Thereafter, debtor consented to the entry of an order for relief
and converted its involuntary chapter 7 case to one under chapter
11 of the Bankruptcy Code.

　　　The Bondholders maintain that we should remove the
debtor from possession either by converting this case to one
under chapter 7 or by appointing a chapter 11 trustee, and in
doing so, permit either the chapter 7 or chapter 11 trustee to
put Consolidated and Futorian into bankruptcy and sue Citicorp.
Debtor and Citicorp deny that debtor, Futorian or Consolidated
hold claims against Citicorp, and debtor advises that it will not
cause Consolidated and/or Futorian to file bankruptcy petitions
or otherwise take steps to pursue litigation against Citicorp.

　　　During the initial argument of this motion, the
Bondholders contended, among other things, that if they were
allowed to conduct discovery, they could adduce evidence to
support their legal theories regarding Consolidated and
Futorian's alleged claims against Citicorp, and in doing so,
persuade us to grant their motion.  At debtor's suggestion, we
determined that in the context of this motion, we would convene a

10

hearing akin to that described by our court of appeals in
Unsecured Creditors Committee v. Noyes (In re STN Enterprises),
779 F.2d 901 (2d Cir. 1985), to assist us in determining whether
debtor's refusal to cause its subsidiaries to file bankruptcy
petitions and then sue Citicorp is grounds for granting this
motion.

In the many months that have passed since that
determination, the Bondholders have conducted document discovery,
but have not taken any depositions.  At Citicorp's request we
stayed deposition discovery and directed the Bondholders to
submit a statement of the claims that they want Consolidated and
Futorian to assert against Citicorp.  They filed such a statement
("the Statement") on or about September 28, 1998.  By agreement,
Citicorp responded to the Statement by filing a document
detailing why, in its view, the Statement fails to establish that
either entity has valid claims against it, and the Bondholders
replied to Citicorp's response.  In submitting that response,
Citicorp has assumed the truth of its allegations, and is
challenging the legal sufficiency of the claims asserted therein.
Although Citicorp's response has the trappings of a motion under
Fed. R. Civ. P. 12(b)(6), Citicorp does not seek an order
"dismissing" the Statement.  Rather, Citicorp has submitted its
response as further opposition to the Bondholders' motion and we

11

consider it as such.[13]

## Discussion

We have subject matter jurisdiction of this contested matter pursuant to 28 U.S.C. §§ 1334(b) and 157(a) and the "Standing Order of Referral of Cases to Bankruptcy Judges" of the United States District Court for the Southern District of New York, dated July 10, 1984 (Ward, Acting C.J.). This is a core proceeding. See 28 U.S.C. § 157(b)(2)(A) and (O).

In STN Enterprises, the official creditors' committee sought leave of the district court to sue the probate estate of the debtor's sole shareholder or his wife (a director) individually for alleged waste, mismanagement and to recover alleged fraudulent and preferential transfers. The district

---

[13]    After Citicorp responded to the Statement, and on or about December 22, 1998, with Citicorp's consent, we authorized the Bondholders to file an adversary complaint against Citicorp. See Richard Fels on behalf of Maiorana et al. v. Citicorp, N.A. et al. (In re Fairwood Corp.), Adv. Proc. No. 98/9455A (Bankr. S.D.N.Y.). It is substantially identical to the Statement. We did so to respond to the Bondholders' concern that the statutes of limitations governing the claims alleged in the complaint will expire before we rule on this motion. Citicorp's consent is without prejudice to its right to raise any defenses to the complaint, including, without limitation, that it is barred by the relevant statutes of limitations. Citicorp correctly notes that while the claims articulated in the complaint are substantially similar to those set forth in the Statement, they are not identical. Nevertheless, to avoid any waste of time and resources attendant to any subsequent request by the Bondholders to amend or supplement the Statement, Citicorp agreed that we should assess the Statement as if it incorporated the allegations and claims of the complaint.

12

court denied the motion.  779 F.2d at 903.  On appeal, the court
addressed the rights of a creditors' committee to sue
derivatively of a debtor.  It held that §§ 1103(c)(5) and 1109(b)
of the Bankruptcy Code imply a qualified right for a creditors'
committee to do so when the trustee or debtor in possession
unjustifiably fails to bring suit.  _Id._  The court held that to
demonstrate such an unjustified refusal a committee must present
a colorable claim or claims for relief that on appropriate proof
would support recovery and establish, on affidavit or other
submission, by evidentiary hearing or otherwise, that an action
asserting the claims is likely to benefit the reorganized estate.
_Id._

The Bondholders contend that because they have
established that Futorian and Consolidated have colorable claims
against Citicorp we should either dispense with an evidentiary
hearing on this motion and grant it or, at a minimum, permit them
to conduct their depositions and complete their discovery so that
they can submit the appropriate proof of those claims.  They
contend that if they do so, and debtor nonetheless refuses to
place Consolidated and Futorian under bankruptcy jurisdiction and
bring actions consistent with the Statement, we must grant their
motion.  Although we previously determined that in considering
whether to grant the Bondholders' the extraordinary relief they
request we would be assisted by additional information regarding

13

the nature and viability of the Bondholders' claims, this is not an <u>STN</u> hearing.  Whether the Bondholders can show that their claims are "colorable" is relevant to, but not dispositive, of this motion.  Rather, as we explain below, we apply the settled standards governing motions under §§ 1112(b) and 1104(a) of the Bankruptcy Code in assessing the merits of this motion.  In that light, we review the Statement.

The Statement contains 26 claims (each, a "Claim"), as follows:

<u>Claim I -- Recharacterization and Equitable Subordination</u>.  Equitable subordination of Citicorp's claims against Fairwood, Mohasco and Futorian and the recharacterization of those subordinated claims as equity interests in Fairwood, as a consequence of Citicorp's improper and/or fraudulent conduct in connection with the leveraged acquisition of Mohasco, the stripping of Mohasco's valuable assets in an effort to recover funds loaned by Citicorp and the issuance of the Bonds.

<u>Claims II through V</u> -- <u>Fraudulent Transfer</u>.  An order vacating and annulling all liens, security interests and pledges held by Citicorp on the assets of Fairwood, Mohasco and Futorian, on the grounds that the granting of such liens, security interests and pledges was a fraudulent conveyance under §§ 273-76 of the New York Debtor and Creditor Law.

<u>Claims VI through IX</u> -- <u>Fraudulent Transfer</u>.  Damages against Cort, Cort Acquisition Corp. and Court Holdings Corp., the Citicorp entities created to acquire Cort, equal to Cort's value when still a Mohasco subsidiary, or an order directing the return of Cort to Mohasco on the grounds that the transfer of Cort was a fraudulent transfer under §§ 273-76 of the New York Debtor and Creditor Law.

<u>Claims X through XIII</u> -- <u>Fraudulent Transfer</u>.  Damages

14

against Mohawk Industries, Inc., the Citicorp entity
created to acquire Mohawk, equal to Mohawk's value when
still a Mohasco subsidiary, or an order directing
Mohawk Industries, Inc. to return Mohawk to Mohasco on
the grounds that the transfer of Mohawk was a
fraudulent transfer under § 276 of the New York Debtor
and Creditor Law.

<u>Claims XIV through XVII</u> -- <u>Fraudulent Transfer</u>.
Damages against Chromcraft Revington equal to the value
of Mohasco's former subsidiaries Peters Revington and
Chromcraft, or an order directing Chromcraft Revington
to return Peters Revington and Chromcraft to Mohasco on
the grounds that the transfer of Peters Revington and
Chromcraft was a fraudulent transfer under §§ 273-76 of
the New York Debtor and Creditor Law.

<u>Claims XVIII through XXI</u> -- <u>Fraudulent Transfer</u>.
Damages against Citicorp in an amount equal to the
amounts paid by Consolidated to Citicorp in the form of
loan interest and principal and all fees and expenses
that were paid in connection with the acquisition,
loans and merger financing, with interest, on the
grounds that those payments were fraudulent transfers
under §§ 273-76 of the New York Debtor and Creditor
Law.

<u>Claims XXII through XIV</u> -- <u>Breach of Fiduciary Duty</u>.
Damages against Bruce Bruckman, William Comfort, Thomas
C. Foley, Anthony C. Howkins, Thomas E. Craemer (with
the exception of Comfort, former directors of Mohasco)
and Citicorp in an amount equal to the value of Cort,
Mohawk, Chromcraft, Peters Revington and Super Sagless,
with interest, on the grounds that (i) authorizing
and/or acquiescing to the sale of Cort, Mohawk,
Chromcraft, Peters Revington and Super Sagless, (ii)
burdening Mohasco with the merger debt for no
consideration thereby destroying Mohasco's enterprise
value, and (iii) authorizing and or acquiescing in the
merger, the issuance of the Bonds at the merger and the
issuance of Bonds thereafter in lieu of payment of cash
interest when they knew that it was unlikely or
impossible that the Bonds would be paid constituted a
breach of fiduciary duty.

<u>Claim XXV</u> -- <u>Aiding and Abetting Breach of Fiduciary
Duty</u>.  Damages against Citicorp in the amount of the
current value of the transferred subsidiaries, and the

15

enterprise value of Mohasco prior to the merger less
the current enterprise value, and the Bonds
outstanding, on the grounds that Citicorp aided and
abetted the breach of fiduciary duty described in
Counts XXII through XIV, and the fraudulent transfers
described in Counts II through XXI.

Claim XXVI -- Class Certification.  Pursuant to Fed. R.
Civ. P. 7023, class certification of all bondholders,
and on behalf of this class, an award against Citicorp
in the amount of the outstanding Bonds, with interest,
on the grounds that Citicorp aided and abetted the
breach of fiduciary duty described above.

We group Citicorp's challenge to the Claims into two

parts.  First, Citicorp interposes general objections founded

upon the Bondholders' alleged inability to obtain the relief they

seek due to, among other things, their previous knowledge of all

of the events in question, their agreement to be contractually

subordinated to Citicorp and the futility of the causes of action

they articulate to effect the remedy they seek -- namely, the

creation of value for the Fairwood estate to which they have

recourse.  Secondly, Citicorp argues that each of the Claims

individually must fail as a matter of law for a variety of

reasons.  We address these in turn.


## General Objections

**Futility of Claims to Result
in Value to Fairwood's Estate**

Citicorp contends that even if we grant all of the

relief that the Bondholders seek in the Statement by, among other

things, equitably subordinating Citicorp's claims and

16



recharacterizing those claims as equity, they will not recover anything in respect of the Bonds. According to Citicorp, before there is any possibility of a recovery on the Bonds, the Bondholders must substantively consolidate the assets and liabilities of Fairwood, Consolidated and Futorian. They also contend that the Statement does not seek that relief. However, as we understand the claims articulated in the Statement, if those claims are successfully prosecuted, the Citicorp indebtedness of Consolidated and Futorian would be recharacterized as equity in those companies. Thus, the enterprise value of both would increase commensurate with the reduction of liabilities to Citicorp. Next, Citicorp's newly recharacterized equity in Consolidated and Futorian would be equitably subordinated to existing equity interests in those companies under 11 U.S.C. § 510(c). Thus, Citicorp's equity in Futorian would be subordinate to the equity held by Consolidated, and Citicorp's stock interest in Consolidated would be subordinate to Fairwood's equity in that company. Assuming Citicorp's claims against Fairwood are then equitably subordinated to the Bondholders' claims, the latter would have first recourse to any assets of Fairwood's estate -- <u>i.e.</u> the Consolidated stock -- in accordance with the terms of any plan of reorganization or liquidation of Fairwood's assets under chapter 7. Citicorp makes much of the fact that the Bondholders'

17

theories of recovery are fraught with ifs, ands and buts. Indeed, at the January 5, 1999 hearing on this motion the Bondholders' counsel observed that "this whole procedure that I'm talking about [is] a complicated creation of, I hope, the facile minds of lawyers". <u>See</u> Transcript of January 5, 1999 Hearing (the "Tr.") 70:18-20. We recognize that the Bondholders have not completed their discovery. As we will discuss, it appears that, arguably, it is theoretically possible that the Bondholders' claims could, if proved, create some value for the Fairwood estate, notwithstanding the existence of a host of unresolved contingencies. However, as we will explain, that possibility is not a basis for granting this motion, or even for permitting the Bondholders to conduct additional discovery in connection with the motion.

Citicorp argues that Claim I, Claims II through XIII and most of Claims XVIII through XXVI, which relate to the way in which the leveraged acquisition of Mohasco was structured, the merger of Mohasco and MHS Holdings, the sales of Cort and Mohawk and the role of Fairwood, must fail as a matter of law because all of the foregoing was known to the public before the Bonds were issued. According to Citicorp, armed with this knowledge, the Bondholders could have avoided becoming Bondholders by (i) accepting cash for 97% of their Mohasco stock, (ii) selling their stock on the open market either before the sale of Mohawk and

18

Cort, or afterward but prior to the issuance of the Bonds, or
(iii) opting for cash instead of bonds by invoking their
appraisal rights.   Having failed to do so, Citicorp contends, the
Bondholders are now estopped from claiming that they were injured
by transactions that were fully disclosed to them before the
Bonds were even issued.

The Bondholders argue that they are entitled to bring
an action against Citicorp notwithstanding the fact that some
events incorporated in the Statement occurred prior to the time
the Bonds were issued.   Under New York law, a transaction
effected with actual intent to defraud may be avoided by present
or future creditors.   See N.Y. DEBT. & CRED. L. § 276;[14] State of
New York v. First Investors Corp., 156 Misc. 2d 209, 219 (N.Y.
Sup. Ct. 1992) (finding that dividend was made with actual intent
to hinder, delay or defraud future creditors and must be set
aside pursuant to §§ 276 and 279).   However, Claims IV, VIII,
XII, XVI, XX and XXI seek relief under N.Y. DEBT. & CRED. L. § 274,
which provides as follows:

> Every conveyance made without fair
> consideration when the person making it is
> engaged or is about to engage in a business
> or transaction for which the property

---

[14]   Section 276 is entitled "Conveyance made with intent to
defraud", and provides that "[e]very conveyance made and every
obligation incurred with actual intent, as distinguished from
intent presumed in law, to hinder, delay, or defraud either
present or future creditors, is fraudulent as to both present and
future creditors.   N.Y. DEBT. & CRED. L. § 276.

> remaining in his hands after the conveyance
> is an unreasonably small capital, is
> fraudulent as to creditors and as to other
> persons who become creditors during the
> continuance of such business or transaction
> without regard to his actual intent.

N.Y. DEBT. & CRED. L. § 274.  The Bondholders rely on a number of

cases in discussing the interplay between §§ 274 and 276 in this

context.  In <u>Ferraro v. Barclays Bus. Credit, Inc. (In re Morse</u>

<u>Tool, Inc.)</u>, 108 B.R. 389 (Bankr. D. Mass. 1989), the court held

that under §§ 5 and 7 of the Massachusetts version of the Uniform

Fraudulent Conveyance Act, which are identical to §§ 274 and 276,

future creditors may have standing to avoid a security interest

granted to a lender in a leveraged buyout:

> [Section 5 and 7] expressly extend their
> benefits to future creditors.  They do not
> distinguish between future creditors who
> extend credit with knowledge of the
> fraudulent conveyance and those that extend
> credit without knowledge of it.  Nor do they
> distinguish between fraudulent conveyances
> that occur in the context of a leveraged buy-
> out and those that do not.  Rather, they
> apply to all future creditors and to all
> conveyances that satisfy their definitions of
> fraudulent.  And in doing so, they do not
> produce such absurd results as to warrant the
> recognition of an implied exception for
> future creditors who extended credit with
> knowledge of the fraudulent conveyance, where
> the conveyance occurred in the context of an
> LBO.

108 B.R. at 390 (citations omitted).  A contrary view regarding

standing under California's version of § 274 was expressed in

<u>Credit Managers Association of Southern California v. Federal</u>

20

Co., 629 F. Supp. 175 (C.D. Cal. 1985), and Kupetz v. Wolf, 845
F.2d 842 (9th Cir. 1988).  In both cases, the courts held that
California's version of § 274 does not confer standing upon
creditors whose claims arose after an allegedly fraudulent
leveraged buyout.  That view was recently criticized in Zahn v.
Yucaipa Capital Fund, 218 B.R. 656, 669 (Bankr. D.R.I. 1998),
where, in the context of a choice of law discussion, the
bankruptcy court opined that neither the California Supreme Court
nor the courts of Rhode Island were likely to adopt the rationale
articulated in Creditor Managers and Kupetz.  Apparently, no New
York state court has addressed the standing of future creditors
to maintain an action under § 274.  According to the Bondholders,
whether or not future creditors can do so is irrelevant.  In
connection with each of the claims stated under § 274, they
allege that at least one general unsecured creditor exists that
holds an allowable claim and which has the power under New York
law to void the foregoing transfers.  Moreover, they claim that
the Bondholder group includes at least five creditors who were
originally issued the Bonds in July of 1989.  However, the
allegedly fraudulent transactions described in Claims VIII and
XII (sales of Cort and Mohawk) occurred on December 31, 1988 --
at least eight months prior to the issuance of the Bonds.  If we
were to adopt the view expressed in Credit Managers and Kupetz,
the Bondholders would be precluded from maintaining an action

21

under § 274.   Even if we did, we apparently would not foreclose the Bondholders' claims because some of the allegedly fraudulent transactions set forth in the Statement occurred after issuance of the Bonds and, as alleged in the Statement, there may be creditors with standing to bring an action under § 274 even in accordance with the restrictive view espoused by Credit Managers and Kupetz.

In the Statement, the Bondholders allege, among other things, that the sale of Cort, Mohawk, Chromcraft and Peters-Revington, Futorian's assumption of the acquisition debt, and the payment of fees, interest and principal to Citicorp were both constructively and actually fraudulent under §§ 270 et seq.  They contend that Citicorp is liable for constructive fraud because the sale of Mohasco's subsidiaries (other than Super Sagless) was not made for fair consideration, which, under New York law, requires an exchange of equivalent value and good faith.  They argue that, as a matter of law, Citicorp did not sell the Mohasco subsidiaries in good faith, because the sale of subsidiaries to dominant shareholders is per se violative of the good faith requirement of § 272 regardless of whether an exchange of equivalent value is provided.  Moreover, the Bondholders contend that, as a matter of law, Citicorp did not provide fair consideration for the subsidiaries, because the sale to Citicorp was intended as a repayment of antecedent debt by a financially

22

troubled company.  According to the Bondholders, Citicorp's bad faith is further evidenced by the fact that (i) it was on both sides of the conveyances, i.e. it controlled the seller and constituted the buyer, (ii) the sales of the four subsidiaries were executed without the safeguards of commercial reasonableness, such as a public sale or other Article 9 protections, and (iii) the value of the subsidiaries proved to be significantly greater than the purchase price.

The Bondholders argue that even if Citicorp can prove that the sale of the subsidiaries was executed in good faith, Citicorp still has the burden of proving that it paid a "fair equivalent" for the transfers, and Citicorp cannot meet this burden.  They contend that the pricing mechanism for the transfer of Mohasco's subsidiaries (other than Super Sagless) was not fair or adequate.  The also assert that the sales were fraudulent because the proceeds were utilized to pay down an unenforceable debt, the transfers were made in bad faith, and the transfers were made by an insolvent transferor.

The Bondholders also allege that Citicorp transferred the assets of Mohasco with actual intent to defraud creditors.  They argue that the sale of Mohasco's four subsidiaries to Citicorp entities was fraudulent because it constituted an attempt to "hinder, delay or defraud either present or future creditors".  According to the Bondholders, Citicorp's fraudulent

23

intent is evidenced by the fact that: (i) it knew the Bondholders would, in all likelihood, not be paid; (ii) it failed to disclose to Merrill Lynch that it believed its debt would not be paid in full; (iii) it caused Mohasco to assume a $365 million acquisition debt without providing Mohasco with any consideration, which caused Mohasco to become insolvent and unable to service its debt; (iv) it transferred to itself four Mohasco subsidiaries, pursuant to transactions that were not arms-length, not in good faith and not for fair consideration; (v) it caused Cort to loan $10 million to Fairwood, although Fairwood was not capable of supporting any additional debt, so that Fairwood would repay Citicorp; and (vi) it continued to issue bonds, in lieu of interest payments, notwithstanding the fact that Citicorp knew the Bondholders would not be paid. The Bondholders also contend that because Citicorp dominated Fairwood and Mohasco, Citicorp's intent to hinder, delay and defraud creditors can be imputed to Fairwood and Mohasco so as to render fraudulent the transfer of Mohasco's subsidiaries.

According to the Bondholders, assumption of the acquisition debt by Consolidated and Futorian was both constructively and actually fraudulent because neither Consolidated nor Futorian was given any consideration, and both entities were insolvent at the time of the assumption. They maintain that the assumption of these loans should be avoided,

24

and all payments on those loans should be returned.

Under New York law, any transfer which is made without fair consideration is constructively fraudulent, regardless of the parties' intent, if at the time of or as a result of the transfer the debtor (i) is insolvent or is rendered insolvent as a result of the transfer, see N.Y. DEBT. & CRED. L. § 273, (ii) is engaged in or is about to engage in a business or transaction for which the property remaining after the conveyance is unreasonably small capital, see N.Y. DEBT. & CRED. L. § 274, or (iii) intends to or believes that it will incur debts in excess of its ability to pay as they mature.  See N.Y. DEBT. & CRED. L. § 275.[15]

A conveyance is made for fair consideration only if there is both an exchange of equivalent value and good faith. See N.Y. DEBT. & CRED. L. § 272;[16] see, e.g., Interpool Ltd. v

_____

[15]   That section provides that "[e]very conveyance made and every obligation incurred without fair consideration when the person making the conveyance or entering into the obligation intends or believes that he will incur debts beyond his ability to pay as they mature, is fraudulent as to both present and future creditors."  N.Y. DEBT. & CRED. L. § 275.

[16]   Entitled "Fair consideration", § 272 provides as follows:

Fair consideration is given for property, or obligation,

a. When in exchange for such property, or obligation, as a fair equivalent therefor, and in good faith, property is conveyed or an antecedent debt is satisfied, or

b. When such property, or obligation is

25

Patterson, 890 F. Supp. 259, 266 (S.D.N.Y. 1995).  A transfer is not made in good faith under § 272 where the parties: (i) do not have an honest belief in the propriety of the activities in question; (ii) intend to take unconscionable advantage of others; or (iii) intend to, or have knowledge of the fact that the activities in question will, hinder, delay or defraud others.  Id (citations omitted).

As noted previously, N.Y. DEBT. & CRED. L. § 276 is New York's actual fraud statute.  It provides that "[e]very conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors."  N.Y. DEBT. & CRED. L. § 276  Because actual intent is rarely susceptible to proof, it is most often inferred from facts, circumstances and conduct amounting to "badges" or hallmarks of fraud.  Wieboldt Stores, Inc. v. Schottenstein, 94 B.R. 488, 504 (N.D. Ill. 1988); Cost Controls, Inc. v. American Preferred Prescription, Inc. (In re American Preferred Prescription, Inc.), Adv. No. 895-8419-346 (FGC), 1997 WL 158401,*18 (Bankr. E.D.N.Y. Mar. 21, 1997).

---

received in good faith to secure a present advance or antecedent debt in amount not disproportionately small as compared with the value of the property, or obligation obtained.

N.Y. DEBT & CRED. L. § 272.

26

Based upon the foregoing, we find that assuming the truth of the allegations in the Statement, there may be some merit to Claim I, Claims II through XIII and most of Claims XVIII through XXVI, and that those Claims arguably are not barred as a matter of law because the Bondholders were aware of, among other things, the events that took place in connection with the merger, the sales of Cort and Mohawk and the (re)payments to Citicorp prior to the issuance of the Bonds.

## Disallowance of Claims Absent Disgorgement under Section 502(d)

Citicorp next contends that § 502(d) of the Bankruptcy Code[17] requires those Bondholders who exchanged 93% of their shares of stock for $36.50 in cash to return the cash before they can receive any payment. The Bondholders argue that Citicorp is incorrect because (i) there is no evidence that the shareholders

---

[17]     That section provides as follows:

Notwithstanding subsections (a) and (b) of this section, the court shall disallow any claim of any entity from which property is recoverable under section 542, 543, 550, or 553 of this title or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of this title, unless such entity or transferee has paid the amount, or turned over any such property, for which such entity or transferee is liable under section 522(i), 542, 543, 550, or 553 of this title.

11 U.S.C. § 502(d).

27

who accepted the tender offer were overpaid; or even if they were
overpaid, there is no evidence that the overpaid shareholders and
the Bondholders who are now asserting this derivative action are
one and the same, (ii) the New York state court previously ruled
that the 7% shareholders, who became Bondholders, did not receive
a cash tender offer, (iii) generally, innocent public
shareholders in a failed LBO are insulated from fraudulent
transfer liability where the shareholders do not know of the
fraud, and in this case the Mohasco shareholders had no knowledge
of the fraud, and (iv) even if Citicorp alleged that the
Bondholders should not be insulated from fraudulent transfer
liability because they knew of the fraud, which they did not,
such issue would be factual in nature and would not constitute a
reason for dismissing the Bondholders' claims at this stage in
the litigation.  After trial, we might determine in accordance
with § 502(d) that Bondholders who were formerly Mohasco
shareholders must disgorge payments they received as part of the
leveraged buyout.  While that possibility does not detract from
the adequacy of the allegations in the Statement, it certainly is
a contingency that is relevant to our determination of whether to
grant the Bondholders relief under §§ 1104 or 1112 of the
Bankruptcy Code.

28

## Contractual Subordination

According to Citicorp, any recovery in respect of the Bonds is precluded because the Bondholders, by contract, agreed that their claims were to be contractually subordinated to Citicorp's claims in the Indenture, and contractual subordination agreements are enforceable in bankruptcy pursuant to § 510(a) of the Bankruptcy Code.[18] The Bondholders argue that Citicorp's conduct permits us to hold the subordination agreement unenforceable. That conduct is detailed throughout the Statement in connection with, among other things, the Bondholders' equitable subordination, fraudulent conveyance and breach of fiduciary duty claims. However, there is authority for the proposition that the existence of a contractual subordination clause does not preclude us from subordinating Citicorp's claims upon an appropriate showing of fraud or misconduct. See FDIC v. U.S. National Bank, 685 F.2d 270, 273 (9th Cir. 1982) (where FDIC, as receiver of Franklin National Bank, claimed that FNB had been fraudulently induced to lend money and subordinate its loan to U.S. National Bank, stating that "[a]ssuming as we must by virtue of the parties' stipulation that [FNB's] subordinated position was the product of fraud, then its entitlement to status

---

[18] That section provides that "[a] subordination agreement is enforceable in a case under this title to the same extent that such agreement is enforceable under applicable nonbankruptcy law." 11 U.S.C. § 510(a).

29

as a general creditor is fully supported by the Supreme Court's decision in Oppenheimer v. Harriman National Bank & Trust Co., 301 U.S. 206, 57 S. Ct. 719, 81 L. Ed. 1042 (1937)"). We cannot say that the subordination agreement defeats the Bondholders' equitable subordination argument as a matter of law. However, it is another unresolved issue that bears on our analysis under §§ 1104 and 1112 of the Bankruptcy Code.

## Objections Directed
## to Individual Claims

### Equitable Subordination
### and Recharacterization

A claim for equitable subordination under § 510(c) of the Bankruptcy Code requires a showing that:

> (a) the claimant engaged in some type of inequitable conduct;

> (b) the misconduct resulted in injury to the creditors of the debtor or conferred an unfair advantage on the claimant; and

> (c) equitable subordination is not inconsistent with other provisions of the Bankruptcy Code.

See Sure-Snap Corp. v. State Street Bank & Trust Co., 948 F.2d 869, 876 (2d Cir. 1991); In re Mobile Steel Co., 563 F.2d 692, 700 (5th Cir. 1977); Liberty Mutual Insur. Co. v. Leroy Holding Co., Inc. (In re Fort Ann Express, Inc.), 226 B.R. 746, 755 (N.D.N.Y. 1998). The inequitable conduct need not necessarily relate to the particular claim being asserted. 9281 Shore Road

30

_Owners Corp. v. Seminole Realty Co. (In re 9281 Shore Road Owners
Corp.)_, 187 B.R. 837, 852-53 (Bankr. E.D.N.Y. 1995).  With
respect to the first prong of the test, court recognize three
varieties of inequitable conduct:

> (1) fraud, illegality and breach of fiduciary duty;

> (2) substitution of debt for capital when a company
> is undercapitalized; and

> (3) the claimant's use of the debtor as its alter ego
> or instrumentality.

_Fort Ann Express_, 226 B.R. at 755 (citing _In re Granite Partners,
L.P._, 210 B.R. 508, 514-15 (Bankr. S.D.N.Y. 1997)).

The Bondholders argue that after we recharacterize
Citicorp's claims against Fairwood, Consolidated and Futorian as
equity (see discussion below), we should equitably subordinate
those interests to existing equity.  They maintain that equitable
subordination is appropriate because Citicorp engaged in
inequitable conduct that gave it an unfair advantage at the
unsecured creditors' expense, and equitable subordination would
be consistent with federal bankruptcy law.

According to the Bondholders, Citicorp is an insider
and fiduciary of Fairwood, Consolidated and Futorian because it
is Fairwood's sole shareholder, its employees control the boards
of Fairwood and Consolidated and it is the largest creditor of
all three companies.  They contend that the assumption of the
merger debt by Mohasco and Futorian was fraudulent because

31

neither Mohasco nor Futorian received any benefit from assuming that debt, Citicorp knew that Mohasco would be rendered insolvent thereby, and Mohasco was in fact rendered insolvent when it assumed the debt. They also assert that Citicorp breached its fiduciary duty and committed actual fraud when it directed Mohasco to sell Cort, Mohawk Carpet, Chromcraft and Peters Revington, Mohasco's most valuable subsidiaries, to Citicorp controlled entities for less than the subsidiaries' true value, and then caused the proceeds to be utilized to pay down its debt.

The Bondholders allege that Citicorp's conduct was inequitable because it left Fairwood and Mohasco undercapitalized, and that it improperly infused capital into the companies in the form of debt rather than equity. They also allege that Citicorp's conduct harmed unsecured creditors and conferred an unfair advantage upon Citicorp because Citicorp (i) withheld material information from Merrill Lynch, which led to an incorrect trading value for the Bonds, (ii) forced certain shareholders to take valueless subordinated Bonds in exchange for the valuable shares they previously held, (iii) issued additional worthless Bonds in lieu of cash interest payments, (iv) prevented Bondholders from gaining access to any cash flow of Fairwood by selling Mohasco's four most valuable subsidiaries, (v) sold Mohasco's four most valuable subsidiaries to itself for less than the subsidiaries' true value, pursuant to a less than arms length

32

transaction, and (vi) caused Mohasco and Futorian to assume the acquisition debt, without providing either of these entities with any consideration.

Finally, the Bondholders contend that equitable subordination is not inconsistent with bankruptcy law because the subordination agreement in the Indenture was procured by fraud and is not enforceable. They argue that Citicorp fraudulently procured the subordination agreement by (i) making a $24 million capital "contribution" in the form of debt forgiveness rather than additional cash, as was required by Merrill Lynch attendant to issuance of the Bonds, and (ii) causing Bonds to be issued that they knew would in all likelihood not be paid, because Citicorp knew that its senior claims would not be paid in full.

Claim I also seeks recharacterization of Citicorp's claims against Fairwood, Consolidated and Futorian as equity in those corporations. Courts consider a variety of factors when determining whether insider loans should be treated as capital contributions. In Herzog v. Leighton Holdings Ltd. (In re Kids Creek Partners, L.P.), 212 B.R. 898 (Bankr. N.D. Ill. 1997), for example, the court considered, among other things: (i) the adequacy of contributions to capital; (ii) the ratio of shareholder loans to capital; (iii) the degree of shareholder control; (iv) the availability of similar loans from outside lenders; and (v) certain other relevant questions such as (a)

33

whether the ultimate financial failure was caused by
under-capitalization; (b) whether the note included payment
provisions and a fixed maturity date; (c) whether a note or other
debt document was executed; (d) whether advances were used to
acquire capital assets; and (e) how the debt was treated in the
business records.  Id. at 931 (citing In re Union Meeting
Partners, 160 B.R. 757, 774 (Bankr. E.D. Pa. 1993)); accord
Blasbalg v. Tarro (In re Hyperion Enterprises, Inc.), 158 B.R.
555, 561 (D.R.I. 1993); see also Montclair, Inc. v. Commissioner
of Internal Revenue, 318 F.2d 38, 40 (5th Cir. 1963) (considering
(1) names given to the certificates evidencing the indebtedness;
(2) presence or absence of maturity date; (3) source of payments;
(4) right to enforce payment of principal and interest; (5)
participation in management; (6) status equal to or inferior to
that of regular corporate creditors; (7) intent of the parties;
(8) thin or adequate capitalization; (9) identity of interest
between creditor and stockholder; (10) payment of interest only
out of "dividend" money; and (11) ability of corporation to
obtain loans from outside lending institutions) (citing O.H.
Kruse Grain & Milling Co. v. Commissioner of Internal Revenue,
279 F.2d 123, 125 (9th Cir. 1960)).

The Bondholders allege that Citicorp's claims against
Fairwood, Consolidated and Futorian should be reclassified as
capital contributions to an almost uncapitalized corporation (1/4

34

of 1% ratio of equity to debt) by the sole shareholder at a time when no other disinterested financial institution was willing to extend credit.  Citicorp contends that the Bondholders' recharacterization claim must fail because it is not possible as a matter of law to recharacterize claims against one company as the equity of another company.  That may be so, but we do not read Claim I as seeking to recharacterize Citicorp's claims at the Consolidated and Futorian levels as Fairwood equity.  Rather, the Bondholders seek either (i) to recharacterize Citicorp's debt as equity in all three companies, and then subordinate those interests to existing equity, or (ii) to consolidate the companies by collapsing the transaction or disregarding corporate formalities, capitalize Citicorp's debt and then subordinate Citicorp's resulting equity.

The Statement apparently pleads causes of action against Citicorp for recharacterization and equitable subordination, and that Claim I may have some merit assuming the truth of allegations set forth in the Statement.  However, there are a host of factual issues that bear on the validity of that claim.


**Fraudulent Conveyance Claims**

Citicorp contends that the Bondholders' fraudulent conveyance claims (20 of the 26 Claims) must fail because even if

35

we were to conclude that its liens were avoidable (Claims II
through V), any distributions from the various estates would
remain unchanged since Citicorp would remain an unsecured
creditor of Futorian and Consolidated, and nothing would be
available for the creditors of Fairwood.  However, in addition to
avoiding the liens, the Bondholders seek to recharacterize
Citicorp's claims as equity, and then subordinate that equity to
existing interests.

Irrespective of whether the Statement sets forth
colorable claims under the New York Debtor and Creditor Law,
Citicorp argues that the Bondholders are barred by the statute of
limitations from asserting Claims VI through XIII, which involve
the alleged fraudulent conveyance of Cort and Mohawk, because
actions brought under the New York Debtor and Creditor Law are
governed by a six year statute of limitations, and those
transactions took place more than 6 years prior to the
commencement of this bankruptcy case.  Fraudulent conveyance
actions under N.Y. DEBT. & CRED. L. §§ 273-76 are subject to a six
year statute of limitations.  See, e.g., Orr v. Kinderhill Corp.,
991 F.2d 31, 35 (2d Cir. 1993) (six year limitations period of
N.Y.C.P.L.R. § 213(1) applies to actions brought under § 273-a);
Leone v. Sabbatino, 652 N.Y.S.2d 628, 628 (N.Y.A.D. 1997)
(applying § 213(1) six year statute of limitations to claim
brought under § 276); Schwonke v. Banister, 443 N.Y.S.2d 513, 515

36

(N.Y.A.D. 1981) (applying § 213(1) six year statute to action brought under § 273).   Under C.P.L.R. § 213(1), a plaintiff must commence his action within either six years from the date the fraud was committed, or within two years from the date he discovered it.   N.Y.C.P.L.R. § 213(1) (McKinney 1998).   Mohawk and Cort were sold on December 31, 1988.   The involuntary petition was filed against debtor on January 3, 1996 -- more than seven years later.   Thus, any claims against the purchasers of Mohawk and Cort may be time-barred.[19]

Citicorp next contends that the Bondholders cannot allege fraud of unfair consideration respecting the sales of Chromcraft and Peters-Revington because those transactions were executed simultaneously with an independent market valuation. According to Citicorp, the public financial markets valued the Chromcraft and Peters-Revington businesses in the initial public offering, and Mohasco received consideration equal to values set by the public market, which pricing mechanism assured that Mohasco received an arm's-length price.   However, as discussed previously, the Bondholders allege that Citicorp caused its subsidiaries to be sold in bad faith.   Thus, they maintain, whether the purchase price otherwise reflected fair value is irrelevant under New York law because its cannot constitute "fair

---

[19]   This is not the case with Citicorp, which entered into a tolling agreement with the Bondholders.

37

consideration" within the meaning of N.Y. Debt. & Cred. L. § 272.
The court in American Preferred held that the sufficiency of
consideration alone does not foreclose examination of a transfer
under New York law.  See 1997 WL 158401, at *18 ("Even if some
fair consideration is alleged in exchange for the transfer of an
asset, if that transfer is not made in good faith, it is settled
that such transfers are fraudulent conveyances which render the
transferee liable to creditors").

     According to Citicorp, it is futile for the Bondholders
to assert fraudulent conveyance claims respecting payments to
Citicorp of principal, interest and fees (Claims XVIII through
XXI) because even if they successfully assert them, they will not
alter the ultimate distributions from Fairwood and its
subsidiaries because if Citicorp is forced to disgorge those
payments, corresponding claims will be created against the
companies and the Bondholders have not sought to avoid those
obligations.  In Claim I, the Bondholders seek to equitably
subordinate and recharacterize as equity all of Citicorp's claims
against Fairwood and its subsidiaries.  Any claims created by
virtue of forcing Citicorp to disgorge payments would appear to
fall within that designation.

     For the most part, the Statement seems to plead causes
of action for fraudulent conveyance under the New York Debtor and
Creditor law.

38

## Breach of Fiduciary Duty

According to Citicorp, Claims XXII through XXIV against the individual defendants for alleged breach of fiduciary duty are time barred, except to the extent that Claim XXII pertains to the sale of Super Sagless.  It contends that breach of fiduciary duty claims seeking money damages are subject to a three year statute of limitations while those seeking equitable relief are subject to a six year limitations period.  They argue that in Claims XIV, XXII and XXIII, the Bondholders seek money damages for alleged breaches of Citicorp's fiduciary duty which took place more than three years before the Bondholders filed their involuntary petition against Fairwood.  Moreover, it contends, even if the six year statute of limitations period applies, Claims XIV, XXIII and all of XXII prior to the sale of Chromcraft and Peters-Revington, would be time barred.  Finally, Citicorp asserts that notwithstanding the fact that it and the Bondholders agreed to toll certain statutes of limitation, Claims XIV, XXII (to the extent that it deals with the merger) and XXIII are time barred insofar as they seek relief against it and Fairwood.

The Bondholders deny that they are time barred from asserting those Claims, which they must do derivatively because the Claims are property of debtor's estate.  They contend that causes of action based upon breach of fiduciary duty, and specifically causes of action based upon N.Y. Bus. Corp. L. §

39

720,[20] are subject to a six year statute of limitations, and that

---

[20]    Entitled "Action against directors and officers for misconduct", that section provides as follows:

(a) An action may be brought against one or more directors or officers of a corporation to procure a judgment for the following relief:

(1) Subject to any provision of the certificate of incorporation authorized pursuant to paragraph (b) of section 402, to compel the defendant to account for his official conduct in the following cases:

(A) The neglect of, or failure to perform, or other violation of his duties in the management and disposition of corporate assets committed to his charge.

(B) The acquisition by himself, transfer to others, loss or waste of corporate assets due to any neglect of, or failure to perform, or other violation of his duties.

(2) To set aside an unlawful conveyance, assignment or transfer of corporate assets, where the transferee knew of its unlawfulness.

(3) To enjoin a proposed unlawful conveyance, assignment or transfer of corporate assets, where there is sufficient evidence that it will be made.

(b) An action may be brought for the relief provided in this section, and in paragraph (a) of section 719 (Liability of directors in certain cases) by a corporation, or a receiver, trustee in bankruptcy, officer, director or judgment creditor thereof, or, under section 626 (Shareholders' derivative action brought in the right of the corporation to procure a judgment in its favor), by a shareholder, voting trust certificate holder, or the owner of a beneficial interest in shares thereof.

(c) This section shall not affect any liability otherwise imposed by law upon any director or officer.

N.Y. BUS. CORP. L. § 720.

such period has not run because Citicorp agreed to toll the statute as to those claims in 1995. They reject any assertion by Citicorp that would imply that the tolling agreement did not apply to breach of fiduciary claims.

Generally, courts applying New York law to claims for breach of fiduciary duty distinguish between actions seeking monetary relief and those seeking equitable relief. A claim for breach of fiduciary duty is governed by a three-year limitations period if the action seeks monetary relief but by a six-year period if the action seeks equitable relief. Meridien International Bank Limited v. Government of Republic of Liberia, 23 F. Supp. 2d 439, 451 (S.D.N.Y. 1998); Vasile v. Dean Witter Reynolds Inc., 20 F. Supp. 2d 465, 485 (E.D.N.Y. 1998); Geren v. Quantum Chemical Corp., 832 F. Supp. 728, 735 (S.D.N.Y. 1993), aff'd, 99 F.3d 401 (2d Cir. 1995); Loengard v. Santa Fe Industries, Inc., 70 N.Y.2d 262, 266-67 (N.Y. 1987); see also Cooper v. Parsky, 140 F.3d 433, 440 (2d Cir. 1998) (noting distinction).

However, N.Y.C.P.L.R. § 213(7) provides that "an action by or on behalf of a corporation against a present or former director, officer or stockholder for an accounting, or to procure a judgment on the ground of fraud, or to enforce a liability, penalty or forfeiture, or to recover damages for waste or for an injury to property or for an accounting in conjunction therewith"

41

must be commenced within six years. Most courts have accordingly held that actions against officers, directors or stockholders for breach of fiduciary duty are subject to a six year statute of limitations. See Dolmetta v. Uintah National Corp., 712 F.2d 15, 19 (2d Cir. 1983); Whitney Holdings, Ltd. v. Givotovsky, 988 F. Supp. 732, 741-42 (S.D.N.Y. 1997); Zola v. Gordon, 685 F. Supp. 354, 373 (S.D.N.Y. 1988); Public Service Co. v. Chase Manhattan Bank, N.A., 577 F. Supp. 92, 102 (S.D.N.Y. 1983); Pereira v. Central Corp. (In re Argo Communications Corp.), 134 B.R. 776, 786-88 (Bankr. S.D.N.Y. 1991). In Purves v. ICM Artists, Ltd., 119 B.R. 407 (S.D.N.Y. 1990), the court held that an action brought by a bankruptcy trustee under § 720 is governed by a three year statute of limitations because the action is "created or imposed by statute" and therefore falls under the three-year limitations period provided in N.Y.C.P.L.R. § 213(7). Argo Communications criticized Purves and found to the contrary because (i) § 213(7) is not limited to shareholder derivative actions, but can be fairly construed to include actions brought by a bankruptcy trustee, and (ii) caselaw construing § 214(2) indicates that only new statutory causes of action fall within its limits, while § 720 did not "make" fraudulent practices unlawful, but merely codified common law. Argo Communications, 134 B.R. at 788. As expressed by that court, given the uncertain state of the law, we too would be reluctant to preclude the

42

Claims on that basis at this juncture:

> We choose to err, if at all, on the side of
> caution in deference to a full hearing and
> trial on the issues presented.  We agree with
> other circuits that uncertainty regarding the
> applicability of a statute of limitations
> should be settled in favor of the longer
> limitations period.

Id. at 788 (citations omitted).  The tolling agreement could be
construed to preserve the Claims.  The express language of that
agreement tolls the statute with respect to all claims the
Bondholders "can bring", not simply claims they can prosecute in
their individual capacities.  It could be interpreted to
encompass claims that the Bondholders can bring derivatively of
Fairwood and its subsidiaries.

Citicorp claims that Claim XXII has no merit because as
a matter of law the sales of Cort, Mohawk, Chromcraft, Peters-
Revington and Super Sagless, which were executed in order to pay
down Mohasco's valid and binding debt, cannot constitute a breach
of fiduciary duty.  It also maintains that Claim XXIII is
meritless because executing the merger, which was approved by an
independent board of directors, and pursuant to which 97% of the
shareholders tendered their shares, cannot constitute a breach of
fiduciary duty.  Moreover, it asserts that the exclusive remedy
for the Bondholders was to have their Mohasco shares appraised by
a court.  It submits that because the plaintiffs in the 1990
district court action failed to exercise this exclusive remedy,

43

Judge Owen dismissed the securities fraud class action.  In addition, Citicorp submits that as part of the Appraisal Action, Judge Lebedeff rejected allegations that it was a breach of fiduciary duty for the Mohasco directors to require Mohasco to assume the merger debt.

Citicorp argues that Claim XXIV lacks merit because the issuance of the merger debentures and payment of the merger debentures, according to the terms of the indenture, cannot constitute a breach of fiduciary duty.  Finally, Citicorp asserts Claims XXV and XXVI must fail because the Bondholders have failed to assert a cause of action for breach of fiduciary duty, and therefore cannot make out a cause of action for aiding and abetting a breach of fiduciary duty.

The Bondholders argue that the same facts that underlie the alleged fraudulent transfer of Mohasco's subsidiaries and the fraudulent issuance of the Bonds provide grounds for a finding that Citicorp and the Fairwood/Mohasco officers and directors breached their fiduciary duty under § 720.  As discussed previously in connection with the Bondholders' fraudulent conveyance, equitable subordination and recharacterization claims, whether or not Mohasco received adequate value for its assets or the obligations it incurred -- issues vigorously contested by the Bondholders -- the transactions in question may have been fraudulent under New York law or Citicorp's conduct may

44

justify equitable subordination or recharacterization of its claims. To the extent that Citicorp and the individual defendants facilitated any such fraudulent transfer or inadequately capitalized Consolidated, they may have breached their fiduciary obligations.

The Bondholders maintain that appraisal is not their only remedy. They contend that they are bringing these causes of action derivatively, and therefore § 623 of New York's Business Corporation Law,[21] which governs appraisal rights, is not applicable. They also contend that appraisal is not an exclusive remedy, and that the shareholders, or their successors in this case (the Bondholders) are entitled to assert an "appropriate action", which is defined as an action seeking equitable relief

---

[21]    N.Y. BUS. CORP. L. § 623(e) provides that "[u]pon consummation of the corporate action, the shareholder shall cease to have any of the rights of a shareholder except the right to be paid the fair value of his shares and any other rights under this section." Section 623(k) provides that:

> The enforcement by a shareholder of his right to receive payment for his shares in the manner provided herein shall exclude the enforcement by such shareholder of any other right to which he might otherwise be entitled by virtue of share ownership, except as provided in paragraph (e), and except that this section shall not exclude the right of such shareholder to bring or maintain an appropriate action to obtain relief on the ground that such corporate action will be or is unlawful or fraudulent as to him.

N.Y. BUS. CORP. L. § 623(k).

or incidental money damages.   Finally, they contend that a

significant amount of Citicorp's alleged misconduct occurred

after the merger, such that an appraisal remedy would be for the

most part worthless.

The Claims set forth in the Statement derive from

Fairwood, Consolidated and Futorian, rather than the Bondholders,

as former Mohasco shareholders.   Moreover, an "appropriate

action" within the meaning of § 623(k) is one seeking equitable

relief -- money damages, if available, must be incidental.   See

Burke v. Jacoby, 981 F.2d 1372, 1380 (2d Cir. 1992); Breed v.

Barton, 54 N.Y.2d 82, 86 (N.Y. 1981).   Here, the remedies sought

by the Bondholders derivatively of Fairwood sound both in law and

equity.   However, since they bring those claims derivatively, if

at all, we cannot conclude that § 623 bars any action commenced

on behalf of Fairwood estate and, perhaps, the estates of

Consolidated and Futorian.

### Conversion to Chapter 7
### and Appointment of a Trustee

Under § 1112(b) of the Bankruptcy Code, we can dismiss

a chapter 11 case or convert it to one under chapter 7 of the

Bankruptcy Code "for cause".   See 11 U.S.C. § 1112(b).   The

statute lists ten non-exclusive bases for relief.   Id.[22]   While a

---

[22]   In relevant part, the statute provides that

after notice and a hearing, the bankruptcy
court may convert a case under [chapter 11]

46

movant must prove by a preponderance of the evidence that cause

for relief exists under § 1112(b), we have broad equitable

---

> to a case under chapter 7 of this title or
> may dismiss a case under [chapter 11],
> whichever is in the best interests of
> creditors and the estate, for cause,
> including --
>
> (1) continuing loss to or diminution of the
> estate and absence of a reasonable likelihood
> of rehabilitation;
>
> (2) inability to effectuate a plan;
>
> (3) unreasonable delay by the debtor that is
> prejudicial to creditors;
>
> (4) failure to propose a plan under section 1121
> of this title within any time fixed by the court;
>
> (5) denial of confirmation of every proposed
> plan and denial of a request made for
> additional time for filing another plan or a
> modification of a plan;
>
> (6) revocation of an order of confirmation
> under section 1144 of this title, and denial
> of confirmation of another plan or a modified
> plan under section 1129 of this title;
>
> (7) inability to effectuate substantial
> consummation of a confirmed plan;
>
> (8) material default by the debtor with
> respect to a confirmed plan;
>
> (9) termination of a plan by reason of the
> occurrence of a condition specified in the
> plan; or
>
> (10) nonpayment of any fees or charges
> required under chapter 123 of title 28.

11 U.S.C. § 1112(b).

discretion to grant relief under this section, based upon the particular facts and circumstances of a case. See <u>C-TC 9th Ave.</u> <u>Partnership v. Norton Co. (In re C-TC 9th Ave. Partnership)</u>, 113 F.3d 1304, 1311 & n.5 (2d Cir. 1997).

Section 1104 of the Bankruptcy Code authorizes us to appoint a chapter 11 trustee for "cause" or if the appointment is in the best interests of creditors. See 11 U.S.C. § 1104(a).[23] There is a presumption that a chapter 11 debtor will remain in possession and control of its assets during the pendency of the case. See <u>In re Garland Corp.</u>, 6 B.R. 456, 460 (B.A.P. 1st Cir.

---

[23]   Section 1104 states in relevant part, as follows:

(a) At any time after the commencement of the case but before confirmation of a plan, on request of a party in interest or the United States trustee, and after notice and a hearing, the court shall order the appointment of a trustee-

(1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause, but not including the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor; or

(2) if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate, without regard to the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor.

11 U.S.C. §§ 1104(a).

48

1980); In re Ionosphere Clubs, Inc., 113 B.R. 164, 167 (Bankr. S.D.N.Y. 1990); In re Deena Packaging Indus., Inc., 29 B.R. 705, 706 (Bankr. S.D.N.Y. 1983); see also 7 COLLIER ON BANKRUPTCY ¶ 1101.01[2] at p. 1101-3 (15th ed. rev. 1998) ("Upon the commencement of a chapter 11 case, the debtor automatically becomes the debtor-in-possession. . . . Trustees in chapter 11 cases are the exception rather than the rule"). Accordingly, courts grant relief under § 1104(a) only in extraordinary cases. See In re Sharon Steel Corp., 871 F.2d 1217, 1225 (3rd Cir. 1989) ("It is well settled that appointment of trustee should be the exception, rather than the rule"); Ionosphere, 113 B.R. at 167 ("Appointment of trustee in chapter 11 case is an extraordinary remedy"). The burden is on the movant to establish by clear and convincing evidence that "cause" exists. See In re Tahkenitch Tree Farm Partnership, 156 B.R. 525, 527-28 (Bankr. E.D. La. 1993); Ionosphere, 113 B.R. at 170-71.

As noted, the Bondholders and Bankers maintain that because they have demonstrated that the Statement contains claims that are at least "colorable", debtor's refusal to accede to their demands and file chapter 11 cases on behalf of Futorian and Consolidated, and then cause each to sue Citicorp, an insider, on those claims, proves that it has a conflict of interest that prevents it from acting for the estate's benefit, and which mandates that we grant this motion. Alternatively, and at a

49

minimum, they contend that we should permit them additional discovery in support of this motion.[24]

We respectfully reject both contentions because under the facts of this case, debtor's refusal to pursue the litigation against Citicorp is not grounds for relief under §§ 1112(b) or 1104(a) of the Bankruptcy Code.  The Bondholders and Bankers cite several decisions in support of their motion.  In some of them, the courts granted relief under §§ 1112(b) and/or 1104(a) after the movants proved that the debtors unjustifiably refused to pursue meritorious claims that they held against insiders which, if prosecuted, would benefit their estates.  None of those cases

---

[24]   At the hearing on this motion, the Bondholders' counsel argued in relevant part as follows:

> In order to deny this motion now, you would have to find that there-that whatever proof is available to sustain the existence of the causes of action described in our brief is not appropriate, or saying it differently, is insufficient to establish the merit of those causes of action, and I don't think you can do that.  Not only do I think you can't do it on this record, I don't think you can do it after you see all of the evidence, and that's why I think Your Honor should permit-direct [Citicorp's counsel] and I to do a discovery schedule for taking of depositions, and we should come back and report to Your Honor how we would like to present the STN hearing to Your Honor, and hear from you as to how you would like to hear it, or grant the appointment of a Trustee at this time.

Tr. 102:19-103:11.

is controlling or relevant because none applied   the STN

standard in granting relief and because Fairwood has not refused

to pursue claims that it holds against Citicorp, or any other

purported insider.[25]

_____

25    The Bondholders and Bankers cite In re Fiesta Homes of
Georgia, Inc., 125 B.R. 321 (Bankr. S.D. Ga. 1990), in support of
their § 1112(b) argument.  In that case, the bankruptcy court
sustained a secured creditor's objection to a debtor's
liquidating chapter 11 plan and then converted the case to one
under chapter 7 of the Bankruptcy Code. In part, the proposed
plan provided that the reorganized debtor would prosecute
preference claims if it determined that it was cost effective to
do so.  See id. at 323.  The debtor's counsel represented that
there were at least $179,000 worth of transfers to the debtor's
insiders that were likely to be recoverable under § 547 of the
Bankruptcy Code.  The bankruptcy court denied confirmation of the
plan, finding that:

          [t]he plan proposes implementation by current
          management.  However, since the only actions
          left to be taken to implement the plan are
          the recovery of preferences, and since the
          holders of the bulk of the alleged
          preferences are either the Debtor's
          management or are close family members of the
          Debtor's management, and since no action to
          recover any preferences has been commenced in
          over a year since the filing of the case, I
          cannot conclude that there are adequate means
          for implementation of this plan.

Id. at 325.  In support of their request for relief under §
1104(a), they rely on In re Oklahoma Refining Co., 838 F.2d 1133
(9th Cir. 1988), In re Tel-Net Hawaii, Inc., 105 B.R. 594 (Bankr.
D. Haw. 1989), In re Microwave Products of America, Inc., 102
B.R. 666 (Bankr. W.D. Tenn. 1989), In re William H. Vaughan &
Co., Inc., 40 B.R. 524 (E.D. Penn. 1984), and In re L.S. Good &
Co., 8 B.R. 312 (Bankr. N.D.W. Va. 1980).  In Tel-Net, the court
directed that a trustee be appointed to pursue preference
litigation against the debtor's controlling shareholder, who the
court found was effectively the debtor-in-possession, where it
was undisputed that the debtor had paid certain liabilities
guaranteed by the shareholder within one year of its chapter 11

51

filing, and the controlling shareholder had taken no action to recover those preferential transfers from itself, and where debtor was looking to the controlling shareholder to assist it in formulating a plan of reorganization. See 105 B.R. at 594-95. In Microwave Products, the court appointed a trustee where the debtor had failed or refused to pursue a potential claim totaling $5 million against its controlling shareholders or companies wholly owned by its controlling shareholders, and failed to attempt to collect as much as $1.4 million in dormant receivables from its parent. See 102 B.R. at 676. Likewise, in Oklahoma Refining, the court found cause existed to appoint a trustee and that the appointment was in the best interest of creditors and the estate where, among other things, there was clear evidence that the debtor had failed to collect millions in accounts receivables from affiliates, the court found that the debtor transferred $687,000 to another bank to preclude its secured creditor from exercising a set-off, the debtor failed to adequately mothball its refinery pursuant to court order, and failed to file timely and complete monthly reports. 838 F.2d at 1136. In William Vaughan, the court directed that a trustee be appointed where the debtor, within 90 days of filing for bankruptcy, had transferred $300,000 to its president and his wife in repayment of funds previously paid by them as sureties, yet failed to commence an action to avoid those transfers as preferences. 40 B.R. at 525. Finally, in L.S. Good, the court appointed a trustee where there were "at least one-million intercompany transactions", a "strong possibility that [the debtor] possesse[d] claims adverse to the interests of the parent and the other subsidiaries" and "grave potential conflicts of interest" rendering existing management incapable of impartially evaluating and pursuing intercompany claims. See 8 B.R. at 315. They misplace their reliance on these cases. The fiduciary infractions or potential disabling conflicts of interest present in these cases were, if not proven, more readily apparent and susceptible to proof than that alleged here.

The Bondholders and Bankers also rely on In re Hi-Toc Dev. Corp., 159 B.R. 691 (Bankr. S.D.N.Y. 1993), In re Sal Caruso Cheese, Inc., 107 B.R. 808 (Bankr. N.D.N.Y. 1989), and In re Graf Brothers, Inc., 19 B.R. 269 (Bankr. D. Me. 1982), in support of their §§ 1112(b) argument, In re Cardinal Indus., Inc., 109 B.R. 755 (Bankr. S.D. Ohio 1990), and In re Vischschoonmaker, Ossendryver Galleries Int'l, 35 B.R. 816 (Bankr. D. Haw. 1983), in support of their § 1104(a)(1) argument, and In re Lowenschuss, 202 B.R. 305 (Bankr. D. Nev. 1996), in support of their § 1104(a)(2) argument. As we explain below, they are all readily

distinguishable because in each case, the court found that the debtor's pre or post petition conduct rendered it incapable of administering the estate for the benefit of its creditors. We do not find that to be the case here.

In Hi-Toc Dev., the district court affirmed a bankruptcy court order converting a single asset real estate case to chapter 7 where, among other things, the debtor lacked equity in the property, failed to file a reorganization plan, failed to file operating reports, and failed to pay U.S. Trustee fees and post petition real estate taxes. See 159 B.R. at 693. In Graf Brothers, the court granted a motion by the creditors' committee to converted the case and rejected the debtor's request that it be permitted to wind down its business and liquidate its assets in chapter 11 where, among other things, undisputed evidence demonstrated that the debtor was proposing to sell certain of its assets to insiders and that its dealings with certain entities might be tainted by conflicts of interest. See 19 B.R. at 270. In Sal Caruso Cheese, the bankruptcy court granted the U.S. Trustee's § 1112(b) motion and converted the debtor's case to one under chapter 7 after finding that the debtor: (i) made substantial preferential transfers to insiders and its counsel, among others, (ii) made unauthorized post-petition payments to secured creditors, (iii) filed only one operating report (and it was incomplete and misleading), (iv) failed to make a bona fide attempt to rehabilitate, (v) exhibited an inability to effectuate a plan of reorganization, (vi) unreasonably delayed its case to the prejudice of its creditors, and (vii) failed to pay the fees of the U.S. Trustee. See 107 B.R. at 817-821. The court relied upon the totality of the circumstances in granting the motion, noting that standing alone, each event that it cited probably would not constitute "cause" for relief under § 1112(b). See id. at 821.

In Cardinal Indus., the court held that cause existed to appoint a trustee pursuant to § 1104(a) after finding that the debtor's actions pre- and post-petition created a loss of confidence by the creditors in the debtor's ability to manage its properties and protect their interests. See 109 B.R. at 766. Among the items that the court cited were (i) pre-petition business decisions that led to millions in losses and defaults on mortgages held by affiliated partnerships, (ii) commingling of renters' security deposits with other cash receipts, which created potential liabilities for millions in damages, (iii) the debtor's failure to respond to post-petition information requests or to file cash flow reports, (iv) the debtor's continuing

53

During argument of the motion, the Bondholders' counsel
attempted to minimize the unprecedented nature of the relief that
the Bondholders are seeking by likening this motion to one
brought by creditors to compel a debtor to sell or lease an asset
with a readily ascertainable value when a debtor unjustifiably
refuses to do so.[26]  None of the cases that the Bondholders and

---

failure to maintain complete financial records or corporate
books, (v) continuing substantial losses, (vi) the debtor's
failure to sell assets or reject executory contracts and leases
in a timely fashion, (vi) the existence of a serious conflict of
interest between the debtor and its president, who had personally
guaranteed loans in excess of $120 million and who would benefit
by retaining affiliated partnership property until he obtained a
release, and (vii) the debtor's dismissal of counsel and payment
of a retainer to replacement counsel when other professionals had
not been paid. See id. at 755-64.  In Vischschoonmaker, the
court found cause existed to appoint a trustee and that the
appointment was in the best interest of the creditors where (i)
there were preferential transfers among insiders when they knew
debtor to be insolvent, (ii) the debtor failed to cooperate in
the orderly marshaling of assets by the court-appointed trustee,
and (iii) the debtor's funds were commingled with those of
insiders so that a disinterested third-party was required to
review the debtor's operations to determine its assets and the
validity of claims asserted by both insiders and arms-length
creditors. See 35 B.R. at 820.  Finally, in Lowenschuss the
court appointed a chapter 11 trustee pursuant to 11 U.S.C. §
1104(a)(1) and (a)(2) to oversee the debtor's pension plan, which
was its major asset and over which the debtor had exclusive
control to terminate or transfer all its assets at any time,
because the debtor had a 15-year history of evading or ignoring
court orders, transferring and hiding funds to avoid paying to
creditors, fleeing the jurisdiction to avoid bench warrants and
doing or saying whatever it took to avoid his creditor
obligations. See 202 B.R. at 314.

[26]   The Bondholders' counsel stated in relevant part as
follows:

   Now I'm saying to Your Honor, Fairwood
   owns some assets.  If Fairwood in Bankruptcy

54

Bankers cite fits that pattern.   In any event, that is plainly not what is at issue herein.   The alleged "assets" (i.e., the lawsuits) do not belong to debtor; their value is in sharp dispute, and cannot benefit Fairwood's estate (if at all) without putting two subsidiaries that do not otherwise require bankruptcy relief into chapter 11, and successfully litigating two lawsuits involving complex legal and factual issues.

The Bondholders make much of the fact that they cannot litigate the Claims against Citicorp directly and that equitable subordination and recharacterization of claims lies exclusively

---

owned some real estate, if they owned a leasehold someplace or had inventory, and I didn't think, as a Creditor of Fairwood, they were putting it to good use, I would come into Court, and I would say, Your Honor, I'm making a motion to ask Your Honor to order Fairwood, the debtor-in-possession, to sell those assets and bring those assets into this estate . . . .

That's what I'm asking you to do, I'm asking you to say Fairwood . . . your subsidiaries [Futorian and Consolidated] . . . have claims against Citicorp.  If you pursue those claims, they're going to increase the value of this estate, Fairwood's estate, the estate before you in Bankruptcy.

         *       *       *

It's perfectly -- no, it's not perfectly, it's routine to do that if it was a piece of real estate or a leasehold or inventory, so why not a cause of action.

Tr. 91:12-93:3.

55

within our jurisdiction, that pursuant to § 544 of the Bankruptcy Code, only a trustee or creditors can sue under state fraudulent transfer law, that breach of fiduciary claims can only be asserted derivatively on behalf of a corporation and that only a trustee can preserve the Claims.  However, the Bondholders are not creditors of either Consolidated or Futorian and the leveraged buy-out disclosed that fact.  We will not permit them to put those entities into bankruptcy.  Moreover, at the heart of the Claims is the Bondholders' assertion that Citicorp defrauded or otherwise damaged them when, among other things, it issued the Bonds and later, when it caused Mohasco to engage in the asset sales.  The Bondholders have their own remedies against Citicorp to redress the alleged fraud.  Although they have concluded that those remedies are inadequate (or may be barred by relevant statutes of limitation), the fact of those remedies furthers our determination that there is no cause for relief under either § 1112(b) or § 1104(a) of the Bankruptcy Code.

When this matter was first presented to us, we found that we would be assisted by additional information regarding the nature and merit of the alleged claims against Citicorp.  We have obtained sufficient information.  Although we likened that inquiry to that undertaken in an STN hearing, we did not find that the STN standards would govern this motion.  The standards relevant to this motion differ from those governing an STN

56

hearing.    Although most of the Claims are "colorable" and likely would survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), it does not follow that we should grant this motion.    Rather, applying the standards applicable under §§ 1112 and 1104 of the Bankruptcy Code, we find that there is no cause either to convert this case or appoint a chapter 11 trustee.

### Conclusion

We deny the Bondholders' motion in its entirety.

SETTLE ORDER

Dated:    New York, New York
February 22, 1999

James F. Garrity, Jr.
UNITED STATES BANKRUPTCY JUDGE

57