**UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| CHINA FISHERY GROUP LIMITED (CAYMAN), *et al.*, | Case No. 16-11895 (JLG) |
| Debtors[1]. | (Jointly Administered) |

**CLUB LENDER PARTIES' AND JOINDER PARTIES' PROPOSED FINDINGS OF
FACT AND CONCLUSIONS OF LAW ON THE MOTION FOR THE
ENTRY OF AN ORDER DIRECTING THE APPOINTMENT OF A
CHAPTER 11 TRUSTEE PURSUANT TO 11 U.S.C. § 1104(a)(2)**

Dated:  September 2, 2016

---

[1] The Debtors are N.S. Hong Investment (BVI) Limited ("NS Hong"), Super Investment Limited (Cayman) ("Super Investment"), Pacific Andes International Holdings Limited (Bermuda) ("PAIH"), China Fishery Group Limited (Cayman) ("CFGL"), Smart Group Limited (Cayman) ("Smart Group"), Protein Trading Limited (Samoa) ("Protein Trading"), South Pacific Shipping Agency Limited (BVI) ("SPSA"), CFG Peru Investments Pte. Limited (Singapore) ("CFG Peru Singapore"), China Fisheries International Limited (Samoa) ("CFIL"), Growing Management Limited (BVI) ("Growing Management"), Chanery Investment Inc. (BVI) ("Chanery"), Champion Maritime Limited (BVI) ("Champion"), Target Shipping Limited (HK) ("Target Shipping"), Fortress Agents Limited (BVI) ("Fortress"), CFGL (Singapore) Private Limited ("CFGLPL") and Ocean Expert International Limited (BVI) ("Ocean Expert") (collectively, the "Debtors").

# TABLE OF CONTENTS

**Page 1**

INTRODUCTION ........................................................................................................ 1

FINDINGS OF FACT .................................................................................................. 3

A.    The Debtors and Their Affiliates ................................................................... 3

B.    The Peruvian Businesses ................................................................................ 4

C.    The Ng Family ................................................................................................ 6

D.    The Lender Parties' Loans ............................................................................. 7

        1.    The Club Lender Loans ...................................................................... 7

        2.    The BANA Facilities .......................................................................... 8

E.    The Joining Parties ......................................................................................... 8

F.    Default Under the Club Lenders Loans and Pre-Undertaking Conduct ........... 9

G.    Default Under the BANA Facilities and Pre-Undertaking Conduct ............... 14

H.    Regulatory Investigations for PAIH, CFGL and PARD ................................ 16

I.    Winding Up Proceedings and Deeds of Undertaking ..................................... 17

        1.    The December 2015 Undertaking ....................................................... 18

        2.    The January 2016 Undertaking ........................................................... 19

J.    The Debtors Responsibilities Pursuant to the Undertakings ............................ 23

K.    The Short Term Working Capital Facility ...................................................... 25

L.    The Sale Process and Independent Fiduciary Oversight .................................. 27

M.    Ms. Ng's Intention to Save the Family Business ............................................ 33

N.    Failure to Dispose of Non-Core Assets .......................................................... 35

O.    Forensic Investigation and Related Matters .................................................... 36

P.    Debtors' Insolvency Filings ........................................................................... 38

        1.    The Chapter 11 Filings and Departure of Independent Oversight ...... 38

        2.    The Peruvian "Involuntary" Filings .................................................. 39

        3.    The Peruvian Insolvency Process ....................................................... 41

        4.    Other Insolvency Filings of Companies Affiliated with the Debtors ....... 46

Q.    Other Transactions and Conduct that have Caused the Club Lender Parties to
        Question the Debtors' Trustworthiness and to Lose Confidence in Present
        Management ................................................................................................... 48

        1.    Gainesville ......................................................................................... 48

        2.    Golden Target ..................................................................................... 48

## TABLE OF CONTENTS
### (continued)

**BASES FOR A TRUSTEE MOTION** .................................................................................. 49

**CONCLUSIONS OF LAW** ................................................................................................ 49

A.    Jurisdiction and Venue ............................................................................................ 49

B.    Appointment of a Chapter 11 Trustee Under Section 1104(a)(2) .................................. 50

    1.    Technical Requirements ...................................................................................... 50

C.    Standard for Appointment Under Section 1104(a)(2) ................................................. 51

    1.    Analysis ........................................................................................................... 54

        a.    Trustworthiness of the Debtor ................................................................. 54

        b.    The Debtors' Prospects (or Lack Thereof) for Rehabilitation
           Support the Appointment of a Chapter 11 Trustee ...................................... 57

        c.    Confidence of Business Community and Creditors ...................................... 62

        d.    Benefits Balanced Against Cost ................................................................ 65

        e.    Equity's Opposition to the Motion Does Not Require Denial ........................ 70

## <u>TABLE OF AUTHORITIES</u>

CASES

**Federal Cases**

*Adams v. Marwil (In re Bayou Grp., LLC)*,
    564 F.3d 541 (2d Cir. 2009)............................................................................................51

*In re Adelphia Commc'ns Corp.*,
    336 B.R. 610, 658 (Bankr. S.D.N.Y. 2006)..............................................................51, 52

*In re Ashley River Consulting, LLC*,
    Case Nos. 14-13406 (MG), 14-13407 (MG),
    2015 WL 1540941 (Bankr. S.D.N.Y. Mar. 31, 2015) .................................................51, 60

*Cajun Elec. Power Coop, Inc. v. Cent. La. Elec. Coop, Inc.*
    *(In re Cajun Elec. Power Coop, Inc.)*, 74 F.3d 599 (5th Cir. 1996) ................................69

*In re Celeritas Tech., LLC*,
    446 B.R. 514 (Bankr. D. Kan. 2011) ...............................................................................52

*In re Euro-Am. Lodging Corp.*,
    365 B.R. 421 (Bankr. S.D.N.Y. 2007)..............................................................................52

*In re Eurospark Industries, Inc.*,
    424 B.R. 621 (Bankr. E.D.N.Y. 2010).........................................................54, 58, 62, 70

*In re H & S Transp. Co., Inc.*,
    55 B.R. 786 (Bankr. M.D. Tenn. 1982) ...........................................................................58

*In re Ionosphere Clubs Inc.*,
    113 B.R. 164 (Bankr. S.D.N.Y. 1990)...................................................................51, 52, 58

*In re Keeley & Grabanski Land Partnership*,
    455 B.R. 153 (B.A.P. 8th Cir. 2011)................................................................................53

*In re L.S. Good & Co.*,
    8 B.R. 312 (Bankr. N.D.W. Va. 1980).......................................................................59, 68

*In re Marvel Entm't Group, Inc.*,
    140 F.3d 463 (3d Cir. 1998)...................................................................51, 54, 62, 69

*In re Nautilus of New Mexico, Inc.*,
    83 B.R. 784 (Bankr. D. N.M. 1988) .................................................................................53

*In re Nicole Energy Servs., Inc.*,
    385 B.R. 201 (Bankr. S.D. Ohio 2008) ...........................................................................66

*In re Parker Grande Development, Inc.*,
    64 B.R. 557 (Bankr. S.D. Ind. 1986) ...............................................................58

*In re Petters Co., Inc.*,
    506 B.R. 784 (Bankr. D. Minn. 2013) ...............................................................65

*In re PRS Ins. Gr., Inc.*,
    274 B.R. 381 (Bankr. D. Del. 2001) ...............................................................58

*In re Ridgemour Meyer Properties, LLC*,
    413 B.R. 101 (Bankr. S.D.N.Y. 2008) ...............................................52, 54, 69, 70

*In re Sharon Steel Corp.*,
    871 F.2d 1217 (3d Cir. 1989)...............................................................

*In re Soundview Elite, Ltd.*,
    503 B.R. 571 (Bankr. S.D.N.Y. 2014) ...............................................................51, 52

*In re Sudano, Inc.*,
    391 B.R. 678 (Bankr. E.D.N.Y. 2008) ...............................................................66

*In re Taub*,
    427 B.R. 208 (E.D.N.Y. Bankr. 2010) ...............................................................65, 69, 70

*Taub v. Adams*,
    No. 10-CV-02600 (CBA), 2010 WL 8961434 (E.D.N.Y. Aug. 31, 2010).......................53

*In re The 1031 Tax Group, LLC*,
    Case No. 07-11448 (MG), 2009 WL 4806199 (Bankr. S.D.N.Y. Dec. 9, 2009) .............69

*In re V. Savino Oil & Heating Co., Inc.*,
    99 B.R. 518 (Bankr. E.D.N.Y. 1989) ...............................................................52

*In re Wings Digital Corp.*,
    No. 05-12117 (ALG), 2005 WL 3789334 (Bankr. S.D.N.Y. May 16, 2005).............53, 67

**Federal Statutes**

11 U.S.C. § 326.......................................................................................................69

11 U.S.C. § 1104.......................................................................................... 49-53, 57, 70

11 U.S.C. § 1106.......................................................................................................65

11 U.S.C. § 1109.......................................................................................................50

**Foreign Law**

Peruvian Insolvency Law Art. 25(d)........................................................................40

2

**Other Authorities**

H.R. Rep. No. 595, 95th Cong., 1st Sess. 232 (1977) ..................................................................52

Coöperatieve Rabobank U.A., Standard Chartered Bank (Hong Kong) Limited, and DBS Bank (Hong Kong), Limited (collectively, the "Club Lender Parties"), by and through their undersigned attorneys, DLA Piper LLP (US), Bank of America, N.A. ("BANA"), by and through their undersigned attorneys, Sidley Austin LLP, Malayan Banking Berhad, Hong Kong Branch ("Maybank", and together with the Club Lender Parties and BANA, the "Lender Parties"), by and through their undersigned attorneys, Mayer Brown, the Senior Noteholder Committee (as defined in ECF No. 62), by and through their undersigned attorneys, Kirkland & Ellis, and the Insolvency Administrator of the Pickenpack Group (as defined therein) (Dkt. No. 65), by and through their attorneys, Curtis, Mallet-Prevost Colt & Mosle LLP, hereby submit the following Proposed Findings of Fact and Conclusions of Law following the evidentiary hearing held on August 29, 2016 and August 30, 2016 on their Motion ("Motion") for the entry of an order directing the appointment of a Chapter 11 trustee in the above-captioned Chapter 11 cases in accordance with sections 105(a) and 1104(a)(2) of title 11 of the United States Code (the "Bankruptcy Code") and Rule 2007.1 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and respectfully state as follows:

## **INTRODUCTION**

1.      The Motion seeks appointment of a Chapter 11 trustee for the Chapter 11 cases of N.S. Hong Investment (BVI) Limited ("NS Hong"), Super Investment Limited (Cayman) ("Super Investment"), Pacific Andes International Holdings Limited (Bermuda) ("PAIH"), China Fishery Group Limited (Cayman) ("CFGL"), Smart Group Limited (Cayman) ("Smart Group"), Protein Trading Limited (Samoa) ("Protein Trading"), South Pacific Shipping Agency Limited (BVI) ("SPSA"), CFG Peru Investments Pte. Limited (Singapore) ("CFG Peru Singapore"),

China Fisheries International Limited (Samoa) ("CFIL"), Growing Management Limited (BVI) ("Growing Management"), Chanery Investment Inc. (BVI) ("Chanery"), Champion Maritime Limited (BVI) ("Champion"), Target Shipping Limited (HK) ("Target Shipping"), Fortress Agents Limited (BVI) ("Fortress"), CFGL (Singapore) Private Limited ("CFGLPL") and Ocean Expert International Limited (BVI) ("Ocean Expert") (collectively, the "Debtors").

2.      Pursuant to the Scheduling Order for the Motion entered August 9, 2016 (Dkt. No. 56), the Motion was filed on August 9, 2016 (Dkt. Nos. 57-60).  On August 10, 2016, the Motion was joined by Malayan Banking Berhad, Hong Kong Branch ("Maybank") (Dkt. No. 61), the Senior Noteholder Committee (as defined therein) (Dkt. No. 62), Bank of America N.A. (Dkt. Nos. 63-64), and the Insolvency Administrator of the Pickenpack Group (as defined therein) (Dkt. No. 65).  On August 23, 2016, the Debtors responded in opposition to the Motion. (Dkt. Nos. 99-102, 104-107.)  Objections to the Motion were filed by Agricultural Bank of China (Dkt. No. 91), Bank of Communications (Dkt. No. 111), China CITIC Bank International Limited (Dkt. No. 97), Huaxia Bank (Dkt. No. 110), Industrial and Commercial Bank of China (Dkt. No. 96), the Informal Steering Committee (as defined therein) (Dkt. No. 98), and the Peruvian Companies (as defined therein) (Dkt. No. 103).

3.      The Court held a two-day evidentiary hearing on the Motion on August 29, 2016 and August 30, 2016.  The Court heard direct testimony by declaration[2] from Guy Isherwood (the head of Group Special Asset Management in Greater China & North Asia at Standard Chartered Bank (Hong Kong) Limited), Amanda McQueen (Director, Special Assets Group, Bank of America Merrill Lynch International Limited), Renzo Agurto (the Club Lender Parties'

---

[2] The Declarations of each witness are referred to by surname (e.g., "Isherwood Decl. ¶ __.").

expert in Peruvian insolvency law), Ng Puay Yee (Jessie) (Managing Director of PAIH, Chief Executive Officer of CFGL and General Manager of CFG Investment S.A.C. ("CFG Investment"), Sustainable Fishing Resources ("Sustainable Fishing"), and Corporation Perquera Inca S.A.C. ("Copeinca" and, together with CFG Investments and Sustainable Fishing, the "Peruvian Entities" or the "Peruvian Debtors")), David W. Prager (the Debtors' financial advisor); Francisco Paniagua (General Manager of CFG Investment and General Manager of Sustainable Fishing), and Gustavo Miro-Quesada Milich (the Debtors' expert in Peruvian insolvency law).  The parties stipulated to the admission of 168 exhibits, which were received into evidence and dispute the admission of 33 additional exhibits into evidence, which disputes have been addressed by separate briefing filed with the Court contemporaneously with these Proposed Findings of Fact and Conclusions of Law.

## FINDINGS OF FACT

### A. The Debtors and Their Affiliates

4.     The Pacific Andes Group began in 1986 when Ng Swee Hong and his sons established a small frozen seafood trading business in Hong Kong's Western District.  (Ng Decl. ¶ 7; MX 60 ¶ 30.)   The family claims to have one of the largest fishing and fish trading businesses in the world.  (Ng Decl. ¶ 7.)

5.     In 1994, PAIH publicly listed on the Hong Kong stock exchange and two years later, Pacific Andes Resource Development Limited ("PARD"), a non-debtor, listed itself on the Singapore stock exchange.  (Ng Decl. ¶ 22.)  China Fishery Group Limited (Cayman) ("CFGL") is also listed on the Singapore Exchange.  (MX 60 ¶ 33.)  Each of the Debtors is an affiliate of PAIH and PARD.

**B.  The Peruvian Businesses**

6.      In 2004, indirect subsidiaries of PAIH bought an interest in certain subsidiary companies it calls the "China Fishery Group."  (MX 60 ¶ 33.)

7.      The China Fishery Group is a very significant element of the Pacific Andes Group.  (Ng Decl. ¶ 9)

8.      Certain of the Debtors are industrial fishing companies that fish in various places around the world, including fishing for mackerel and, after an acquisition in 2013, anchovies in Peru, which it uses to produce fishmeal and fish oil in factories in Peru.  (MX 60 ¶ 33.)

9.      The China Fishery Group now holds the largest quota for the harvest of anchovy in Peru through its indirect wholly owned subsidiaries, CFG Investments, Copeinca and Sustainable Fishing.  (Ng Decl. ¶ 9.)

10.     CFG Investments and Copeinca are the non-chapter 11 companies that operate the fishing business and processing plants in Peru. (MX 60 ¶ 38.)

11.     A large part of the Peruvian fishing operations comes from the Debtors' indirect ownership of Copeinca, which it purchased in August 2013 for around $784 million.  (MX 60 ¶ 53.)

12.     Except for the first fishing season after the purchase of Copeinca, for the next five seasons, the Peruvian Business was bringing in much less fish than had been projected for a normal year, including one season with no catch.  (Tr. 30:3-19.)[3]  This was due to both the weather phenomenon known as El Niño as well as a change of governmental regulation.  (Tr.

_____

[3] The official trial transcript consists of three volumes of transcript over the two days of trial and references to the transcript are identified herein as "Tr. ___:___."

85:13-23; 130:20-23.)  Mr. Paniagua testified that the current El Niño is "the largest El Niño in the past 15 years," and it is "one of the most important factors" that caused the precipitous decline in the Peruvian Companies' financial condition.  (Paniagua Decl. ¶ 24.)  As a result, the "percentage catch of the [total allowable catch ("TAC")] in the north-central zone was only 66% of the TAC set for the season and the entire second season in both the northern-central and southern zone were canceled."  (*Id.*)  The annual catch volume in a normal year is between 5.1 and 5.8 million metric tons, but the catch volume was only approximately 2 million metric tons in 2014, and 3.8 million metric tons in 2015.  (*Id.*)

13.     The current season has not been very good because the government delayed the beginning of the fishing season.  (Tr. 131:6-12.)  The Peruvian government has in recent years prohibited commercial fishing operations from operating within ten miles of the Peruvian coast, whose waters are rich in anchovy during an El Niño event; this had been five miles until 2012.  (Paniagua Decl. ¶¶ 25-26.)  In addition, the Peruvian government has reduced the TAC year after year.  (*Id.* ¶ 28.)  The Debtors hope that the new Peruvian government will reverse both of these trends.  (*Id.* ¶¶ 26, 28-29.)

14.     In these five seasons, the Peruvian Entities were projected to catch 12.5 million tons of fish, but only in fact harvested 6 million tons, for reasons relating solely to the weather and government regulation.  (Tr. 129:25-130:5.)

15.     Despite the hopes of the Debtors' management, there is no evidence that fishing conditions will normalize in the next two years; "there are always uncertainties."  (Tr. 132:17-133:18.)

16.     The Debtors contend that they have no material operational assets and that the Peruvian Business, which is outside the protection of this Court's Chapter 11 jurisdiction, is the most valuable of the Debtors' assets.  (MX 60 ¶ 74.)

**C.  The Ng Family**

17.     The ultimate, indirect owners of all of the Debtors and the Peruvian Entities is the Ng family. (Ng Decl. ¶56; MX 164.)[4]

18.     Madame Teh Hong Eng is a non-executive director of that company and is the mother of Ng Joo Siang ("J.S. Ng"), Ng Joo Kwee ("J.K. Ng"), Ng Joo Puay, Frank ("J.P. Ng"), Ng Joo Thieng ("J.T. Ng") and Ng Puay Yee, "Jessie" ("Ms. Ng").  (Ng Decl. ¶7; *see also* Doc. No. 2; Ex. G.)

19.     PAIH is the indirect parent of CFGL.  (Ng Decl. ¶1.)

20.     Ms. Ng is also a director of each of the Debtors in these chapter 11 cases.  (Ng Decl.¶ 2.)

21.     Ms. Ng has been an executive director of PAIH since 2001 and was appointed as an executive director of CFGL on January 21, 2016. (Ng Decl. ¶5.)

22.     Ms. Ng has been Managing Director of PAIH and Chief Executive Officer of CFGL since December 14, 2015 and February 26, 2016, respectively.  (Ng Decl. ¶ 5)

23.     Many of the members of the Ng family also hold director and executive positions for the Debtors.  (MX 60, Ex. G.)

---

[4] In this document, evidence submitted from the Joint Trial Exhibit List of Moving and Joinder Parties is referred to as "MX __".  Any exhibits referred to that the Debtors submitted into evidence are referred to as "DX__".

24.     Members of the Ng family also hold executive positions at the Peruvian Entities. (Tr. 275:8-10.)  Both Ms. Ng and J.T. Ng are general managers of the Peruvian Entities (Tr. 136:7-14; 296: 18-20.) Additionally, J.T. Ng and Ms. Ng hold powers of attorney of the Peruvian Entities, which include the unilateral power to dispose of the Peruvian Entities' assets.  (MX 54, 55, 56, 57.)  Although local management, including Messrs. Paniagua and Tirado, coordinate the operation of the fishmeal companies with the Ng family, Messrs. Paniagua and Tirado ultimately answer to the Ng family.  (Tr. 275:18-276:2.)  Messrs. Paniagua and Tirado have no authority over the Ng family with respect to the Peruvian Entities and cannot stop them from disposing of the Peruvian Entities' assets.  (Tr. 280:3-7.)

**D.  The Lender Parties' Loans**

1.  <u>The Club Lender Loans</u>

25.     After the Debtors acquired Copeinca and the related Peruvian fishing businesses, the Club Lender Parties entered into a March 20, 2014 Facility Agreement governed by English law with CFG Investments, CFIL, and Copeinca, and CFGL as borrowers and guarantors (the "<u>Club Facility</u>").  (Isherwood Decl. ¶ 4.)

26.     Loans under the Club Facility are direct joint and several obligations of Debtors CFGL and CFIL and non-debtors CFG Investment and Copeinca.  (Isherwood Decl. ¶ 4.)

27.     The Club Facility was made available to assist with a corporate restructuring of the Peruvian fishing business, to pay off existing debt associated with certain companies that had acquired that business, and to provide revolving credit to pay off other existing facilities, the transaction costs of the Club Facility, and for general corporate purposes of the Peruvian Entities. (Isherwood Decl. ¶ 5.)

2.    The BANA Facilities

28.    Pursuant to a US$35 million facility letter dated August 26, 2014 (the "CF Facility"), BANA is a creditor to Debtors CFIL and SPSA (the "CF Obligors").  (McQueen Decl. ¶ 5.)  CFIL and SPSA are jointly and severally liable under the CF Facility, and the CF Facility has been guaranteed by Debtor CFGL.  (McQueen Decl. ¶ 5.)  Having defaulted on their payment obligations under the CF Facility, the CF Obligors and CFGL, on a joint and several basis, owe BANA US$27,885,690.59, plus interest, fees and expenses.  (McQueen Decl. ¶ 13.)

29.    BANA is the lender under a separate US$15 million facility letter dated August 26, 2014 (the "PAE Facility"), among BANA and Pacific Andes Enterprises (BVI) Limited ("PAE"), Parkmond Group Limited (BVI) ("PGL"), PARD Trade Limited (BVI) ("Trade," and with PAE and PGL, the "PAE Obligors").  (McQueen Decl. ¶ 6.) The PAE Obligors are jointly and severally liable under the PAE Facility, and the PAE Facility has been guaranteed PARD. (McQueen Decl. ¶ 6.)

30.    PARD and the PAE Obligors are indirect subsidiaries and affiliates of the Debtors, and are not themselves debtors in these proceedings.  (McQueen Decl. ¶ 6.)

**E.  The Joining Parties**

31.    The following Debtors have listed the following claims by the Club Lender Parties as identified on the indicated schedule (note that as Rabobank is the agent of the Club Facility, the listing at CFGL and CFIL are likely on account of that facility):

- CFIL has listed two Rabobank entities as unsecured creditors on its Schedule F with claims of $518,500 and $417,663,310.  (MX 43 at 15 of 20.)

- CFGL has listed Rabobank as an unsecured creditor on its Schedule F with a claim of $418,181,810.  (MX 35 at 12 of 19.)

- NS Hong has listed a Rabobank branch as an unsecured creditor on its Schedule F with a claim of $30,645,185.72.  (MX 36 at 9 of 14.)

- PAIH has listed Rabobank entities as unsecured creditors on its Schedule F with three separate claims of $14,004,775.78, $88,484,377.34, and $3,062,759.14.  (*Id.* at 15 of 24.)

- PAIH has listed Rabobank as an unsecured creditor on its Schedule F with a claim of $56,775,025.49.  (MX 38 at 11 of 24)

- PAIH has listed DBS as an unsecured creditor on its Schedule F with three separate claims of $24,910,665.20, $30,233,857.72, and $4,825,979.25.  (*Id.* at 11-12 of 24.)

- PAIH has listed Standard Chartered as an unsecured creditor on its Schedule F with a claim of $8,357,318.32.  (*Id.*)

- CFGL has listed Standard Chartered as an unsecured creditor on its Schedule F with a claim of $1,478,223.81.  (*Id.* at 13 of 19.)

- Champion has listed Standard Charted as an unsecured creditor on its Schedule F with claims of $1,478,223.81.  (MX 46 at 9 of 14.)

32.    BANA, Maybank and certain noteholders at CF Group have joined the Motion and also seek the appointment of a chapter 11 trustee.

33.    CFGL, SPSA, and CFIL have listed BANA as a creditor with a claim of $27,885,960.59 on Schedule F of their Schedules of Assets and Liabilities.  (MX 35 at 10 of 19; MX 41 at 16 of 31; MX 43 at 13 of 20.)

34.    Malayan Banking Berhad, Hong Kong Branch ("Maybank") has joined in the Motion and also seeks the appointment of a chapter 11 trustee.  (Doc. No. 61.)

35.    PAIH has listed Maybank as an unsecured creditor with two claims of $40,000,000 and $95,000,000 on Schedule F of their Schedules of Assets and Liabilities.  (MX 38 at 14 of 24.)

36.     A committee of entities that hold, or act as investment manager or advisor to certain funds, controlled accounts, or other entities that are beneficial owners of, the 9.75% senior notes due 2019 (the "Senior Notes") have joined the motion and seek appointment of a chapter 11 trustee.  (Doc. No. 62.)

37.     CFGL, Smart Group, Protein Trading, SPSA, CFG Peru Singapore, CFIL, Growing Management, Chanery, Champion, Target Shipping, Fortress, CFGLPL, and Ocean Export have listed the Indenture Trustee, TMF Trustee Ltd., for the Senior Notes as a creditor with a claim of $296,000,000 on Schedule F of their Schedules of Assets and Liabilities.  (MX 35 at 13 of 19; MX 39 at 9 of 14; MX 40 9 at 15; MX 41 at 24 of 31; MX 42 at 10 of 15; MX 43 at 16 of 20; MX 44 at 12 of 16; MX 45 at 10 of 15; MX 46 at 10 of 14; MX 47 at 9 of 13; MX 48 at 8 of 13; MX 49 at 8 of 13; MX 50 at 8 of 12.)

38.     Friedrich von Kaltenborn-Stachau, in his capacity as Insolvency Administrator of the Pickenpack Group, has also joined the Motion seeking the appointment of a chapter 11 trustee.  (Doc. No. 65.)

39.     PAIH has listed the Pickenpack Group companies as unsecured creditors with four claims of $14,282,970, $10,986,900, $36,474,798.44, and $16,480,350 on Schedule F of their Schedules of Assets and Liabilities.  (MX 38 at 14 of 24 & 15 of 24 (listing claims, respectively, of Pickenpack entities Pickenpack Europe GmbH, Pickenpack Holding Germany GmbH, Pickenpack Production Luneburg GmbH, and TST The Seafood Traders GmbH).)

40.     Thus, as demonstrated by the Debtors' Schedules of Assets and Liabilities, the moving and joining parties have claims up and down the capital structure of the Debtors.  (DX 42.)  Based on an analysis of their schedules, when intercompany debt is excluded, the moving

parties represent 100% of the scheduled unsecured debtor for Smart Group, Protein Trading, Chanery, Champion Maritime, Target Shipping, CFG Singapore, and CFGL, 98% of scheduled unsecured claims of N.S. Hong, 82% of the scheduled unsecured claims of CFIL, 91% of South Pacific Shipping, 90% of the Scheduled claims of Fortress, 65% of the scheduled claims of PAIH, and 70% of Ocean Expert.  (MX 34.)

41.    Additionally, certain of the Peruvian Debtors are obligated on the Senior Notes and are borrowers under the Club Facility.  (*Id*.)

**F.  Default Under the Club Lenders Loans and Pre-Undertaking Conduct**

42.    Within a month of the Club Facility closing, in April 2014, the Debtors and the Peruvian Debtors began to default as to their payment obligations under the Club Facility and to require eight waivers over the next 19 months.  (MX 60 ¶¶ 100-102; *see also* Isherwood Decl. at ¶¶ 13-24; MX 1-8.)

43.    As the number of waivers increased, the Club Lenders required additional provisions to provide them with some transparency about the Debtors' operations.  (MX 4, 5, 6, 7, and 8.)

44.    For instance, in the Sixth Amendment and Waiver Letter, dated September 30, 2015 (the "Sixth Amendment"), in order to obtain an extension, the borrowers and obligators were required to notify the Agent in writing that, among other actions: (i) CFGL had appointed KPMG as independent financial advisors on behalf of the Club Lenders to review and report on the work undertaken by Deloitte and to assist the Club Lenders with their assessment of the corporate group's financial position; (ii) the corporate group had engaged Deloitte to review management accounts, assist with liquidity management, perform an entity level breakdown of liability and contingent liability, to assist with debt repayment ability analysis, and to perform an

asset disposal analysis; and (iii) it would ensure that the relevant company's directors and employees cooperated fully and punctually with, and provided information to, Deloitte. (Isherwood Decl. ¶ 18; MX 6.)

45.     The Sixth Amendment also included a provision regarding "LSA prepayments." (MX 6.)

46.     LSAs are long-term supply contracts entered into by both Debtors and non-Debtors of the Pacific Andes group.  (Tr. 106:6-23.)

47.     In those LSAs, certain entities within the Pacific Andes family enter into contracts with Russian suppliers on a prepaid basis, sometimes as high as $900 million.  (Tr. 107:2-7.)

48.     The Pacific Andes entities expected to receive refunds from these prepayments, at which time the Club Facility required that those refunds be used to prepay the Club Facility.  (Tr. 107:2-7.)

49.     The fourth prepayment of the Club Facility was due to be paid from these refunds on September 28, 2015.  (Tr. 107:8-9.)

50.     In two of the waiver and amendment letters, including the Sixth Amendment, the Debtors asserted that those funds had not been received by that date and were therefore seeking a waiver.  (Tr. 107:3-13; 108:6-19; 140:11-21; MX 6 at 2 ¶ 3.)

51.     But that was not true:  $31 million of the refund had in fact been received in June 2015.  (Tr. 107:14-17.)

52.     Rather than using that money toward the prepayment as required by the Club Facility, the Debtors instead used those funds to make a regularly scheduled payment and never

advised the banks that they had, in fact, received a substantial portion of the refund. (Tr. 107:14-21; Tr. 109:63.)

53.     In the Eighth Amendment and Extension and Wavier Request Letter, dated November 10, 2015 (the "Eighth Amendment"), the Debtors admitted this deception by acknowledging that prior representations were contrary to the actual facts. (MX 8 at 1-2; *see also* Tr. 109:9-110:15.)

54.     In the Seventh Extension and Waiver Request Letter, dated October 19, 2015, in order to obtain a further extension, CFGL agreed to, among other items, pay certain fees and expenses of the Club Lenders' legal counsel, to produce documents related to the Peruvian Business and to continue to work with KPMG and Deloitte on cash flow, financial analysis, and business planning. (MX 7 § 6 & Schedules 1-3.)

55.     In the Eighth Amendment, CFGL agreed to search for a new Chief Financial Officer, provide a list of bank accounts, and to confer with the Club Lenders regarding the appointment of an investment banker by November 30, 2015 to assist with the sale of the Peruvian Entities, and that any retained investment banker would keep Deloitte informed of the progress of a sale "in order to ensure that the Lenders have transparency on the sale process." (MX 8 at ¶ 6.)

56.     As part of this agreement, CFGL further agreed to create an action and sales plan and to evaluate an existing offer for the sale of the Damanzaihao vessels and associated trawlers. (*Id*. at 4.)

57.     As demonstrated by these amendment letters and requests for waivers and amendments to the Club Facility, the Debtors that are borrowers and obligors under the Club Facility have been under distress and in a negotiated work out for almost a year.

58.     The Club Lenders worked with the Debtors and required professional oversight, financial analysis, and information regarding their businesses and ability to repay the loans.

**G. Default Under the BANA Facilities and Pre-Undertaking Conduct**

59.     In September 2015, the CF Obligors informed BANA that they were unable to make the full amount of a $10 million payment owed under the CF Facility that was due on September 11, 2015.  (McQueen Decl. ¶ 10.)

60.     Unable to make the full payment of drawdowns maturing in October 2015, on October 6, 2015, the CF Obligors and CFGL, as guarantor, requested, and BANA provided, a rollover of the drawdowns that were due, subject to an amortization schedule for repayment, with the first installment of $2 million due on October 9, 2015.  (McQueen Decl. ¶ 11.)

61.     Within three days of the negotiated amortization schedule, the CF Obligors and CFGL defaulted and failed to make the first agreed-upon payment.   (McQueen Decl. ¶ 11.) BANA subsequently learned that the funds that were required to be paid to it had been diverted by the CF Obligors to other lenders.  (McQueen Decl. ¶ 4.).

62.     The CF Obligors currently owe BANA the principal sum of US$27,885,960.59, plus accrued interest and fees and expenses (including legal fees).  (McQueen Decl. ¶ 12.)

63.     A demand letter for the amounts owed was sent to the CF Obligors on November 23, 2015.  (McQueen Decl. ¶13; MX 92.)

64.    As no payment was forthcoming from the CF Obligors, a demand letter was sent to CFGL on November 24, 2015 with respect to the same outstanding amounts.  (McQueen Decl. ¶13; MX 93.)

65.    No payments have been made to BANA by either the CF Obligors or CFGL pursuant to the demand letters relating to the CF Facility Letter.  (McQueen Decl. ¶13.)

66. The PARD and PAE Obligors – non-Debtors in these cases – also defaulted on their obligations under the PAE Facility in November 2015.  (MX 94; MX 95; McQueen Decl. ¶¶ 4, 15.)

67.    BANA is owed the principal sum of US$14,853,576.41, plus accrued interest and fees and expenses (including legal fees) under the PAE Facility.  (McQueen Decl. ¶ 14.)

68.    A demand letter for such amounts was sent to PAE, PGL, and Trade on November 23, 2015.  (McQueen Decl. ¶15; MX 94.)

69.    As no payment was forthcoming from PAE, PGL, or Trade, a demand letter was sent to PARD on November 24, 2015, with respect to the same outstanding amounts.  (McQueen Decl. ¶ 15.)

70.    No payments have been made to BANA by the PAE Obligors or PARD pursuant to the demand letters relating to the PAE Facility.  (McQueen Decl. ¶ 15.)

71.    That PAE facility was not subject to either of the deeds of undertaking, and as such, BANA has at all times been free to exercise its rights against those borrowers.  (*See* MX 10, MX 11.)

72.     Despite its ability to exercise its rights against PARD and the PAE Obligors in connection with the defaults under the PAE Facility, including the right to put the companies into liquidation, BANA has exercised no remedies under the PAE Facility.  (*See* Tr. 342:23-343:1.)

73.     Rather, BANA continued working with the CF Obligors to the CF Facility in the hopes of resolving both the default under the CF Facility and the PAE Facility.  (McQueen Decl. ¶ 20.)

**H.  Regulatory Investigations for PAIH, CFGL and PARD.**

74.     On August 18, 2015, Debtor PAIH received two notices from the Hong Kong Securities and Futures Commission (the "SFC") to produce records and documents in connection with an investigation.  (Tr. 173:6-13.)

75.     On August 18, 2015, CFGL and PARD received separate notices from the Secondary Markets Conduct and Enforcement Division, Market Conduct Department, Monetary Authority of Singapore ("MAS") and the Singapore Commercial Affairs Department ("CAD"). (Tr. 173:14-21.)

76.     Those notices stated that MAS and CAD were investigating an offense under the Singapore Securities and Futures Act (Cap. 289) and required CFGL and PARD to provide to MAS and CAD certain information and documents.  (MX 60 ¶ 110; MX 115 ¶¶ 18-20; Tr. 155:4-12.)

77.     These regulatory investigations are confidential but the relevant regulatory agencies have jurisdiction to investigate material financing misstatements, including fraud.  (Tr. 154:23-155:12.)

78.     The following day, on August 19, 2015, the Hong Kong and Singapore stock exchanges suspended trading in the shares of PAIH, PARD, and CFGL.  (MX 60 ¶ 111; Tr. 174:11-16.)

79.     Each of these investigations is still pending.  (Tr. 174:17-19.)

**I.   Winding Up Proceedings and Deeds of Undertaking**

80.     On November 25, 2015, Hong Kong and Shanghai Banking Corporation Limited ("HSBC"), a participant in the Club Facility, but acting on its own account, which it was entitled to do under the Club Facility, filed a winding up petition and related application for the appointment of provisional liquidators in Hong Kong against CFGL.  (MX 60 ¶ 114.)

81.     The Hong Kong Court granted the winding up petition on an interim basis and appointed three individuals from KPMG as joint provisional liquidators (the "JPLs") of CFGL. (*Id.*, ¶ 115.)

82.     The Club Lenders were not aware that HSBC planned to file the winding up petition in the Hong Kong Court and did not support the appointment of the JPLs, but instead supported their removal if a suitable arrangement for oversight and a sale could be made.  (Tr. 95:1-12; 138:6-9.)

83.     HSBC presented a winding up petition in respect of CFGL in the Cayman Islands on November 27, 2015, and sought the appointment of JPLs.  (Isherwood Decl. ¶ 27.)

84.     The Grand Court of the Cayman Islands appointed JPLs, also from KPMG, over CFGL.  (Isherwood Decl. ¶ 28; MX 10 ¶ D.)

1.   The December 2015 Undertaking

85.     In exchange for commitments made in a deed of undertaking, the Club Lender Parties opposed the Hong Kong winding up petition and offered evidence in support of a

dismissal of the proceedings in the Cayman Islands so that the Peruvian Business could be sold by a CRO outside of any insolvency proceeding.  (Isherwood Decl. ¶¶ 33-37.)

86.    As a condition of supporting the Debtors in their opposition to the winding up petitions, in late December 2015, PAIH and PARD signed a deed of undertaking with the Club Lender Parties – except HSBC – and the High Court of the Hong Kong Special Administrative Region (the "December 2015 Undertaking").  (Isherwood Decl. ¶ 33; MX 10.)

87.    In the December 2015 Undertaking, which was signed by Ms. Ng, "[a]ll parties agree that a sale of CF Group's Peruvian business and/or assets ("Peruvian Business") must now be pursued in order to address CF Group's financial issues however the parties are concerned to ensure that this sales process is conducted in a transparent way which [maximizes] value for all creditors concerned and the stakeholders."  (MX 10 ¶ F.)

88.    In connection with their undertakings and in exchange for the Club Lender Parties' support, PAIH and PARD agreed to, *inter alia*:  (i) appoint PwC as independent reporting accountant (with full access to the affairs of PAIH and PARD and reporting directly to the Club Lender Parties); (ii) extend the appointment of PwC as independent reporting accountant to the Debtors upon the discharge of the provisional liquidators; and (iii) to appoint a Chief Restructuring Officer.  (MX 10; Tr. 141:10-19; Isherwood Decl. ¶ 34.)

89.    A different team at PwC separately was engaged as a forensic accountant to investigate suspicious accounting transactions with respect to PAIH and PARD.  (Tr. 142:5-14; Isherwood Decl. ¶¶ 34 & 36.)

90.    Based on the commitments made by PAIH and PARD, pursuant to the December 2015 Undertaking, the Club Lender Parties (not including HSBC) agreed to support CFGL and

CFIL in their position that the JPLs should be dismissed to allow the Debtor to sell the Peruvian

Business, provided that these protective measures were implemented.  (MX 10 cl. 3.1; Tr. 140:7-

141:9.)

91.    The Hong Kong Court noted that the December 2015 Undertaking had sufficient

protective mechanisms, and the Court was satisfied that the undertakings contained therein were

sufficient to protect the Club Lenders.  (Ng Decl. ¶ 82.)  Thus, on February 1, 2016, the Hong

Kong Court entered an order dismissing the winding up petition.  (Ng. Decl. ¶ 80.)

### 2. The January 2016 Undertaking

92.    In exchange for agreeing to the withdrawal of the JPLs appointed over CFGL in

the Cayman Islands, on January 20, 2016, CFGL, CFIL and HSBC entered into a separate

consensual Deed of Undertaking (to which the Club Lender Parties were not a party) that was

provided to both the Hong Kong and Cayman Islands courts (the "January 2016 Undertaking"

and collectively, with the December 2015 Undertaking, the "Undertakings").  (Isherwood Decl. ¶

38; MX 11; Tr. 180:2-4.)  The January 2016 Undertaking was also made for the benefit of

BANA. (MX 11 § 8; Tr. 180:5-7.)

93.    HSBC agreed not to take any action or steps to enforce payment of the debt (or

any part of it) owed to HSBC before the termination of the January 2016 Undertaking.  (*See* MX

11 § 3.2.)

94.    Ms. Ng was involved in negotiating the document and approved and voted for the

agreements made in the January 2016 Undertaking on behalf of CFGL and CFIL.  (Tr. 178:11-

24.)

95.    In the January 2016 Undertaking, CFGL and CFIL agreed that the Peruvian

Business must be sold: "All parties agree that a sale of the Peruvian business and/or their assets

[defined as Peruvian business] of CFGL and its subsidiaries [CF Group] must now be pursued in order to address CF Group's financial issues . . . ."  (MX 11; Tr. 179:11-180:1.)

96.    In the January 2016 Undertaking, CFGL and CFIL agreed that the sale of the Peruvian Business was to take place by July 15, 2016. (Tr. 180:10-15.)

97.    During negotiations of the January 2016 Undertaking, the date originally proposed for the completion of the sale of the Peruvian business was February 1, 2016.  (MX 174 at 2.)

98.    That initial February 1, 2016 deadline was negotiated and counsel for CFGL proposed a date of July 15, 2016, stating that "[g]iven the date at which this deed is likely to be signed, a 6-month period is fair and reasonable as a proposed timeline for the sale to be consummated and the debt to be repaid (as opposed to a June 30, 2016 deadline)."  (MX 113 at 4; Tr. 196:15-197:25.)  The proposal was made within CFGL by Ms. Ng, in response to a June sale date counter-proposed by HSBC.  (Tr. 196:22-25.)

99.    In the January 2016 Undertaking, CFGL and CFIL agreed that if the sale did not occur by July 15, 2016, and the parties had not otherwise agreed to extend the sale date, the January 2016 Undertaking would terminate.  (MX 11; Tr. 180:10-20.)

100.    CFGL and CFIL agreed that if the January 2016 Undertaking terminated, HSBC and BANA would have remedies, including that either HSBC or BANA would "be at liberty to apply to the Cayman Court for the immediate re-appointment of the JPLs or the appointment of any other qualified individuals as joint and several provisional liquidators."  (MX 11 § 4; Tr. 180:21-25; *see also* Tr. 231:4-6 ("THE COURT: It did say that if it didn't get sold, the JPLs

would come back in. THE WITNESS: Yes, unfortunately, yes.").)  CFGL and CFIL also agreed to consent to such re-appointment or appointment.  (MX 11 § 4.)

101.    In the January 2016 Undertaking, CFGL and CFIL also agreed to appoint Paul Brough as an independent chief restructuring officer, to appoint an independent reporting accountant, Grant Thornton Recovery & Reorganization Limited, Hong Kong ("Grant Thornton"), and to conduct a sale process for the Peruvian Business, which the CF Group confirmed they needed six months to achieve.  (Isherwood Decl. ¶¶ 39-43; Ng Decl. ¶ 86; Tr. 197:1-198:12; MX 113.)

102.    In exchange for these assurances of independent fiduciary oversight and compliance with other obligations and milestones, including a July 15, 2016 outside termination date whereupon HSBC or BANA could re-appoint or appoint JPLs at CFGL, HSBC agreed in the January 2016 Undertaking to seek an order terminating the appointment of the Cayman JPLs, which it did, to apply for the dismissal of the Cayman petition and the Hong Kong petition, and to remove and terminate an appeal of the Hong Kong order discharging the Hong Kong JPLs. (Isherwood Decl. ¶ 44; Ng Decl. ¶ 82; Tr. 180:10-25.)

103.    Ms. Ng confirmed that the Undertakings (MX 10, MX 11) required the CEO, Ms. Ng's brother, J.S. Ng, and the CFO Dennis Chan to relinquish all of his management positions. (Tr. 134:15-22.)

104.    J.S. Ng remains as an "advisor" to the Group, drawing the same salary he had previously been taking while he was CEO.  (Tr. 134:15-22.)

105.    Dennis Chan continued to be copied on emails to the companies, and J.S. Ng and Mr. Chan both assisted in preparing Ms. Ng's First Day Declaration in these cases. (Tr. 160:22-161:15.)

106.    Ms. Ng understood that the January 2016 Undertaking was a legally binding document (Tr. 179:10-12), and she read the document very carefully and had her lawyer explain it to her before voting for it. (Tr. 179:3-9.)  She also understood that none of CFGL's or CFIL's obligations under the January 2016 Undertaking was contingent on them obtaining more money from any of the lenders.  (Tr. 181:5-9.)

107.    In early 2016, BANA also learned that PARD and PAE had been making interest payments to some creditors, but not to BANA. (McQueen Decl. ¶ 21.)  BANA inquired as to PARD and PAE's reason for discriminating against BANA in making payments, and demanded that payments going forward be made on a *pari passu* basis.  (McQueen Decl. ¶ 21.)  Neither PARD nor PAE provided a satisfactory response, nor did they later make any payments to BANA.  (McQueen Decl. ¶ 21.)  Ms. Ng admitted that in March 2016, despite being insolvent, PARD and PAE made interest payments to selective creditors, but not all creditors, and not BANA.  (Tr. 227:21-228:2.)

108.    In light of the prior defaults and breaches, Ms. Ng also well understood that if there would ever be trust again between the banks and the Debtors, the Debtors would have to comply with all of their obligations under the Undertakings.

> Q.    And when you entered into the undertaking, you thought that it was critical if – that if there would ever be trust again between the banks[] you were entering into the undertaking with and CFGL, the company would have to fulfill all of its promises in the undertaking, correct?
>
> A.    Yes.

(Tr. 181:10-15.)

## J.   The Debtors' Responsibilities Pursuant to the Undertakings

109.   Thus, after almost twenty months of working with the Debtors over their financial distress through eight amendments and waivers of defaults under the Club Facility, and rollovers, defaults, and creditor demands, creditors were provided with the following protections, which have been eliminated due to the Debtors' filing of these cases.  (Tr. 181:10-182:7.)

- On January 22, 2016, PAIH and PARD engaged Patrick Wong to serve as Chief Restructuring officer of those entities to provide advisory services in connection with the sale.  (Tr. 143:11-17; Isherwood Decl. ¶ 37; *see also* Ng Decl. ¶ 86.)  Mr. Wong resigned after these cases were filed in July 2016.  (Tr. 145:9-16.)

- PAIH and PARD also engaged PwC to act as Independent Reporting Accountant. (Ng Decl. ¶ 86.)  Ms. Ng fired PwC as Independent Reporting Accountant on July 1, 2016.  (Tr. 145:21-22.)

- CFGL and CFIL engaged Blue Willow as of January 21, 2016, to provide Chief Restructuring Officer services to CFGL and CFIL in connection with their sale of the Peruvian Business.  (*See* Isherwood Decl. ¶ 41.)  Paul Brough of Blue Willow provided services in consultation and close collaboration with the executive management of CFGL and CFIL debt and equity capital, including securing working capital for the Peruvian Business.  (*Id.*; Ng Decl. ¶ 88.)  Mr. Brough resigned his position within minutes of the end of the June 30, 2016 CFGL board meeting approving the chapter 11 bankruptcy filing (Tr. 158:11-159:1), because he could no longer achieve the sale he was hired to oversee.  (Tr. 181:20-24.)

- CFGL engaged Grant Thornton to undertake an independent business review of CFGL and its subsidiaries and to take the role of "monitoring accounting" for the companies.   (Isherwood Decl. ¶ 40.)   Ms. Ng terminated Grant Thornton's engagement the day after the bankruptcy filings.  (Tr. 162:8-14.)

- On April 28, 2016, CFGL announced that it had engaged an investment bank, CITIC CLSA Securities ("CITIC"), to advise and assist in the sale process with respect to the Peruvian Business.  (Isherwood Decl. ¶ 47.)  The announcement indicated that CITIC completed an Investment Overview and a comprehensive Information Memorandum to distribute to potential purchasers.  (*Id.*)   CITIC provided CFGL with both strategic and financial investors that might be interested in purchasing the Peruvian Business.  (*Id.*)  The company also engaged consultants who assisted in the assembling of a detailed data room to enable a small number of selected investors to conduct due diligence in an efficient and timely manner.  (*Id.*)  CFGL's public announcement about engaging CITIC stated that the current timeline provides for due diligence, submission of binding offers and commencement of negotiations with respect to a sale and purchase agreement that would take place over the coming months.  (*Id.*)   As a result of the bankruptcy and insolvency filings, the entire sales process was suspended.  (Tr. 189:17-19.)

- Ms. Ng was quoted in a July 1, 2016 Press Release, stating that the appointment of the chief restructuring officers and the pursuit of the sale process was a demonstration of management's sincerity and a means for providing the best

possible outcome for creditors.  (Tr. 206:22-207:16; MX 112.)  But all of these
supposed acts of sincerity ended at, or soon after, the time of the bankruptcy
filings.  (Tr. 207:20-208:7.)  All of these professionals that the Debtors agreed to
hire under the Undertakings pursuant to appointment by the banks are now gone.
(Tr. 181:25-182:7.)

**K.  The Short Term Working Capital Facility**

110.    During this process, without any legal obligation to do so, the Club Lender Parties
agreed to provide up to $25.55 million in short term working capital to the Peruvian Business
("Short Term Working Capital"); however, this full amount was not drawn due to Ms. Ng's
subsequent refusal to implement the governance changes expressly agreed to in the Short Term
Working Capital Facility Letter.  (Isherwood Decl. ¶ 62; Tr. 164:13-22.)

111.    The governance changes solely sought to prevent representatives of the Peruvian
Business, namely members of the Ng family, from being able to invoke their powers of attorney
to effect a sale, transfer or disposal of the Peruvian Business without the knowledge of the Club
Lender Parties.  (Isherwood Decl. ¶ 52.)

112.    Ms. Ng admitted that these proposed governance changes would not have posed a
problem for the day-to-day management of the company.  (Tr. 167:19-168:2.)

113.    When management initially indicated that it would not honor the governance
changes previously agreed in the Short Term Working Capital Facility Letter, the Club Lender
Parties attempted to agree to alternative arrangements which, in the spirit of trying to facilitate a
consensual agreement given the apparent urgent liquidity needs of the business, were considered
to be more amenable to management.  (Isherwood Decl. ¶ 58.)

114.    Management subsequently refused to accept any changes to its governance practices to provide the Club Lender Parties with any comfort that assets would not be dissipated inappropriately and without their knowledge.  (Isherwood Decl. ¶ 62.)

115.    Management instead chose to obtain funding locally in Peru from a non-bank lender, in breach of the January 2016 Undertaking, at the exorbitant interest rate of 29.3% whereas the Club Lenders' offered Short Term Working Facility at an interest rate of less than 4%.  (Isherwood Decl. ¶ 56; Tr. 171:2-13.)

116.    Copeinca entered into this loan despite the restrictions in the January 2016 Undertaking that prohibits Copeinca from taking a loan from an entity that was not a bank or financial institution established for the purposes of making loans.  (MX 11 at § 2.4.9.)

117.    In addition to being a breach of the January 2016 Undertaking, this loan was commercially unreasonable:  Copeinca obtained this loan even though it was able to draw from a US$25.55 million facility from Rabobank and other participants as long as it entered into the governance arrangements as agreed in the Short Term Working Facility.  (Isherwood Decl. ¶ 56; Tr. 171:2-13.)

## L.  The Sale Process and Independent Fiduciary Oversight

118.    After Mr. Brough's appointment in January 2016, there was still a delay of several weeks in starting the sale process.  (Tr. 93:17-20.)

119.    In April 2016, an information memorandum for the sale of the Peruvian fishing businesses was sent to target purchasers.  (Isherwood Decl.  ¶ 47.)

120.    By June 1, 2016, seven non-binding expressions of interest had been received.  (Isherwood Decl. ¶ 63.)

121.    More than half of the bids were considered to be worth progressing to phase 2 of the sales process, which involved those bidders having access to a data room to conduct due diligence, and making binding bids in July.  (Isherwood Decl.  ¶ 63; MX 61.)

122.    Ms. Ng testified that four of the bids that had progressed to the second round of bidding were sufficiently high that all of the creditors at the CFGL and CFIL level would have been paid in full.  (Tr. 217:12-218:2.)  One of the bids progressing to the next level was for $1.5 billion, which would have paid all of the CFGL and CFIL creditors in full and provided substantial recoveries to creditors at the PARD entity. (Tr. 218:4-18.)

123.    In light of these bids, Ms. Ng's testimony at the hearing that the bidding process was a "fire sale" (Tr. 219:16-23), or the bids were "just not great" (Tr. 163:13-25), is not credible.  Indeed, Ms. Ng's testimony in Singapore that the first round bidding numbers were a "surprising and optimistic development for the Pacific Andes Group" is far more accurate.  (Tr. 216:3-217:3, MX 115, ¶ 77.)

124.    It is clear from the evidence that by early June 2016, Ms. Ng began actively deceiving the lenders, Mr. Brough, the Chief Restructuring Officer of the companies, who sat and worked in the same building as Ms. Ng (*see, e.g.*, McQueen Decl. ¶ 24; Tr. 160:9-11; Tr. 159:2-160:8; Tr. 160:16-21), as well as the Debtors' Board of Directors, as to the Ng family's plans with respect to the Peruvian Business and their willingness to complete the sales process that had been discussed for almost 6 months.

125.    For example, on June 20, 2016, BANA wrote to CFIL, CFGL, Ms. Ng, and Mr. Brough seeking information about the progress of the sale of the Peruvian Businesses.  (MX 138.)

126.     Mr. Brough presented BANA's letter to the CFGL Board of Directors (Tr. 185:13-21), and replied on its behalf stating, among other things, that: "The Board is fully supporting the sale process."  (MX 142.)

127.     In her testimony, Ms. Ng admitted that Mr. Brough was instructed to tell BANA that the board supported the sale process, even though, at that time, she did not intend to go through with the sale process and planned to file bankruptcy and insolvency proceedings in various jurisdictions in the coming days.  Ms. Ng testified as follows:

> Q   And including other board members, this is what he was told on June 27th by you, right?
>
> A   Yes, as a board decision, yes.
>
> Q   Right. ***Even though you knew that you no longer did intend to follow the sale process, you intended to file bankruptcy three days later, correct?***
>
> A   ***Correct.***[5]

(Tr. 187:10-16 (emphasis added).)

128.     Indeed, the CFGL Board reviewed and approved the contents of Mr. Brough's June 27 letter to BANA, which Ms. Ng knew to be entirely false with respect to her intentions. (Tr.187:17-188:3.)  Ms. Ng also admitted that she intentionally misled Mr. Brough and the Board of Directors as to the Debtors' plans to file for bankruptcy protection.  (Tr. 159:5-22.)

---

[5] Although the CFGL Board was undoubtedly deceived about Ms. Ng's plans until June 30, 2016 (Tr. 182:10-18), it is troubling that the CFGL Board would have instructed its CRO to advise BANA that it fully supported the sales process on June 27, only to vote for a Chapter 11 filing and the termination of the sales process three days later on June 30.  This indicates that the Board does not provide any meaningful level of oversight with respect to Ms. Ng's actions. The CFGL Board apparently voted to file for bankruptcy because it had the view that since PAIH and PARD had voted earlier in the day to file for bankruptcy, it was required to do so as well.  (Tr. 212:19-21.)

129.    For weeks, Ms. Ng had been planning the multiple bankruptcy filings and to terminate the sale process, and she made a conscious decision to withhold that information from Mr. Brough while telling him that the Ng family shareholders were still on board with the sale. (Tr. 160:16-21; Tr. 182:10-14 (Ms. Ng's testimony that she had been planning for weeks to terminate the sales process and file for bankruptcy); Tr. 159:2-160:8 (explaining that Ms. Ng intentionally did not inform Mr. Brough of her plans to file for bankruptcy); Tr. 182:17-19 (admitting that Ms. Ng never told the board she was terminating the sales process and filing for Chapter 11).)

130.    Ms. Ng acknowledged that she misled Mr. Brough as to her plans in order to ensure that the creditors did not know of the breach of the Undertakings and were not able to exercise their rights under them.  (Tr. 159:11-22 ("I did consider telling him, but it would be too dangerous, because he's appointed by the bank . . .And under the [deed] of undertaking, you know, it would allow HSBC to put in a PL immediately and then that would be the end of our entire group, so, yes, I didn't tell him [Mr. Brough].").)

131.    Ms. Ng withheld this information knowing that Mr. Brough was communicating to the lenders that the sale was going forward.  (*Cf.* MX 61 ¶¶ 1, 4 (June 29, 2016 report from Mr. Brough to the Board of CFGL, reporting that "[t]he sale process is continuing" and "CF Group is doing its utmost to execute a sale."); McQueen Decl. ¶ 24; MX 142.)

132.    Ms. Ng attempted to actively deceive her own Chief Restructuring Officer and Board of Directors as well as her lenders.  (Tr. 187:10-16; McQueen Decl. ¶ 24.)

133.    Ms. Ng clearly understood that under the January 2016 Undertaking, CFGL and CFIL had expressly given the CRO an unfettered right to communicate with the banks about the

sales process and the affairs of the CF Group, but because of that right, she elected to deceive the CRO about those matters. (Tr. 159:2-25; Tr. 188:4-19.)

134.   Ms. Ng also concealed her intentions to file bankruptcy from PwC, Mr. Wong, who was the CRO for the PAE entities, Grant Thornton, and all other professionals that the banks had involved in the sales process. (Tr. 145:2-8; Tr. 183:14-184:19.)

135.   Several weeks before the Debtors in this action filed their Chapter 11 petition, Ms. Ng had ceased any meaningful pursuit of the sale of the Peruvian Businesses, and instead begun to take steps to protect her family's interest—*i.e.*, the equity interest—in the Debtor companies, at the expense of, and despite her legal commitments to, the lenders. (Tr. 160:16-162:7; Tr. 208:25-209:14; Tr. 219:1-15.)

136.   Both Ms. McQueen and Mr. Isherwood believed in June that, given the state of the sale process, there would be a need for an extension of the sale deadline beyond July 15, 2016. (Tr. 98:21-99:10; Tr. 343:23-344:2.)

137.   Immediately prior to the commencement of these Chapter 11 cases, at a meeting held in Hong Kong on June 30, 2016 (June 29, 2016 in New York), PwC and Mr. Wong informed attending lenders that the Debtors wished to put forward an alternative restructuring proposal on behalf of management. (Isherwood Decl. at ¶ 65; Tr. 144:13-15; Tr. 341:16-23.) This meeting, which diverted Mr. Wong, PARD's CRO, from the Board meetings he normally attended, was plainly a sham, because any discussion was irrelevant as none of the participants in the meeting knew that the Debtors had been planning for weeks bankruptcy and insolvency filings to be made later that day. (Tr. 202:21-203:10.)

138.    Mr. Wong had attended all board meetings except for the one on June 30, 2016, where the board decided to file the Chapter 11 petition.  (Tr. 177:6-25.)

139.    Ms. Ng testified that "nobody told Mr. Wong that the Board was separately voting on a Chapter 11 petition."  (Tr. 144:24-145:1.)  In fact, Ms. Ng testified that Mr. Wong only learned about the filing in the news.  (Tr. 145:5-8.)  Not long thereafter, in July 2016, Mr. Wong resigned his position as PARD CRO.  (Tr. 145:12-16.)

140.    Ms. Ng provided numerous reasons for the decision to suspend the sales process and not to seek an extension of the sales process, and her testimony on this point cannot be reconciled with the record evidence.  Ms. Ng claimed that Mr. Brough instructed her not to seek an extension.  (Tr. 203:20-22.)  The contemporaneous communications, however, reveal that he planned on June 29 to ask for an extension of the repayment obligation or a standstill of the sales process from the lenders, and that BANA was willing to consider an extension.  (MX 61 ¶ 4 (Mr. Brough's June 29, 2016 report to Board of CFGL, noting that the CF Group would seek an extension of the deed of understanding); Tr. 192:5-18 (Ms. Ng's testimony that Mr. Brough suggested seeking a standstill from the lenders rather than filing for bankruptcy in order to obtain more time to finalize the sale); MX 141 (June 30, 2016 communication from counsel for BANA, which shows BANA's willingness to agree to a standstill and extend the sale process).)

141.    In fact, Ms. Ng acknowledges that she "never made any investigation or inquiry of whether or not BANA or any of the other banks had indicated a willingness to consent to an extension" of the sale date.  (Tr. 205:10-15.)  She did not do so, because she freely acknowledges she knew that Mr. Brough's announced intention to seek an extension on June 29 would never occur, because the bankruptcy filings were about to be made.  (Tr. 205:6-9.)

142.    In short, the Debtors were working with restructuring counsel to consider and pursue a restructuring, but they elected not to discuss that with the Chief Restructuring Officer, and instead actively worked to hide it from him.  (Tr. 162:1-4 ("Q So, your restructuring counsel was not speaking with your chief restricting officer during June about restructuring or fillings right? A About these matters, no.").)

143.    The Debtors have made accusations that BANA has been needlessly aggressive in protecting its interests.  (Tr.185:2-4.)  To the contrary, when it became apparent that the sale process would not be completed by the July 15 deadline, BANA was engaged with Mr. Brough and the other lenders in discussing negotiated options that might extend the protections in the Undertakings for the benefit of all parties.  (Tr. 343:23-334:2; MX 141.)

144.    The fact that BANA was concerned about "execution risk," *i.e.*, the risk that a sale of the Peruvian Businesses would not be approved by the Ng family as ultimate shareholder, and the concomitant need for a contingency plan to protect the lender's interest should the sale not be consummated (Tr. 344:21-345:16), is entirely reasonable and expected. (*See also* MX 151 (Mr. Brough noting execution risks of sale).)

145.    In fact, the risk anticipated by BANA ultimately did come to fruition.  As Ms. Ng admits, the Debtors filed the Chapter 11 Petitions to shut down the sales process and have not been engaged in any such process since June 30, 2016.  (*See* Tr. 159:17-18 (Ms. Ng's testimony that "if we tell him [Mr. Brough] that we're going to file for Chapter 11, obviously, he would not be able to fulfill his mandate," *i.e.*, the sale of the Peruvian Business); Tr. 189:17-19; *see also* Tr. 217:8-11 (since Chapter 11 filing, "not one iota of work has been done to engage those potential purchasers").)

**M. Ms. Ng's Intention to Save the Family Business**

146.    The Ng family never intended to follow through with the contractually obligated sale of the Peruvian business, but viewed that business as the essential part of the "family business" that they were determined to preserve.  (Tr. 208:25-210:22; 218:19-219:17; Ng Decl. ¶ 12.)

147.    Ms. Ng's testimony reflecting on the "deeper understanding of the strategic options" for the company is particularly revealing:

> Q  And you felt that deeper understanding that you now had entitled you to breach the undertaking as a necessary step to take, correct?
>
> A  The deeper understanding to me, when I was drafting this [*i.e.*, MX 112], was that I can have other options, rather than to sell the business as the fire sale price, yes.
>
> Q  And that revelation entitled you to breach the undertaking as a necessary step to fulfill that deeper understanding, correct?
>
> A  *As a consequence of pursuing that deeper understanding I had, those other options, one of them would be to suspend the sale process, yes.*

(Tr. 208:25-209:11 (emphasis added); *see also* MX 112 (July 1, 2016 PARD press release).)

148.    Tellingly, Ms. Ng testified that "[i]f a sale of the Peruvian fishmeal business occurs on an accelerated basis, as some lenders appear adamant on achieving, is indeed consummated, our family business would be destroyed with no prospect of recovery or rehabilitation."  (Ng Decl. ¶ 12.)  Ms. Ng continued:

> Q  If your family business is sold, that means there's no prospects of recovery because you no longer own the business, correct? That's what a sale is; can we agree on that?
>
> A  Yes.

Q   You're not going to recover a business you sold, right?

A   Yes.

(Tr. 219:12-17.)

149.    Clearly, Ms. Ng did not intend to sell the Peruvian Businesses, but rather agreed to the sales process as a mechanism to prevent the lenders from enforcing their contractual rights in late 2015 and early 2016, and to give herself time to figure out a better plan to buy even more time to keep the "family business."

150.    Based on the behavior of management, the lenders lost all confidence in management. (*See, e.g.*, McQueen Decl. ¶ 27; Tr. 190:4-15 (Ng testimony regarding Brough's understanding that banks had lost confidence); Tr. 191:9-23 (same); Tr. 100:16-102:1 (Isherwood testimony regarding loss of confidence in Debtors); Dkt. No. 61 ¶ 11 (explaining Maybank's loss of confidence in Debtors).)

**N.  Failure to Dispose of Non-Core Assets**

151.    In September 2015, CFGL agreed to dispose of its non-core assets, including: (1) properties at 11-01 and 11-02, 143 Cecil Street, Singapore ("Singapore Properties"); (2) the Francisco Grana property at La Victoria, Lima, Peru; (3) 33 idle Purse Seiners (4) a minority investment in Aproferrol S.A. (*i.e.* $6 million); (5) a property at 3312-14 Hong Kong Plaza, Hong Kong; (6) inventory, plants and equipment; (7) trade and other receivables; (8) idle production plants and vessels with no quota license; and (9) five catcher vessels and the Damanzaihao, a factory vessel owned by Sustainable Fishing S.A.C., one of the Chapter 15 debtors. (*See* Isherwood Decl. ¶ 24.)

152.    The carrying value of the Damanzaihao and the five catcher vessels were considered to be valued in a broad range of approximately US$19 million (scrap value) to $200 million.  (Isherwood Decl. ¶ 24.)

153.    During the 2015 financial year, the disposals were minimal and mainly comprised of the sale of the vessel "Yu Fu" for US$1.5 million.  (Isherwood Decl. ¶ 26.)

154.    Although some bids were also to have been received for the Singapore Properties and the CRO met with one of the bidders on June 24, 2016, the sale of the Singapore Properties was not completed and is believed to have been blocked by Ng family members, and there appears to be no progress with the sale of the Damanzaihao.  (Isherwood Decl. ¶ 70.)

155.    Therefore, at least nine months after making promises prior to and in September 2015, CFGL and CFIL have still failed to make any significant progress in the disposal of its non-core assets.  (Isherwood Decl. ¶ 71.)

156.    The Club Lender Parties rightfully have no confidence or trust that existing management will do anything to honor these promises or that the Ng family will approve such dispositions now that they have filed Chapter 11 cases.  (Isherwood Decl. ¶ 71; Tr. 130:18-23; Tr. 135:7-137:4.)

**O. Forensic Investigation and Related Matters**

157.    The Independent Review Committee ("IRC") of PAIH announced that the forensic review commenced on March 17, 2016 to investigate the suspicious prepayments made to Russian suppliers identified in the FTI Report.  (MX 85 at 4-5.)

158.    The so-called IRC hired a small law firm, Kwok Yih and Chan, to advise it in this investigation.  (Tr. 148:12-18.)

159.    The first named partner in that law firm, Larry Kwok, was an independent non-executive director of Debtor PAIH from 1994-2016. He stepped down from the board to avoid a "conflict" so that his firm could provide seemingly independent advice to the IRC about transactions that occurred during the time while he was actually a member of the board.  (Tr. 148:23-149:17.)

160.    Over three months later, and after a change in the forensic expert retained to undertake the review, no conclusions have been made known to creditors.  (Isherwood Decl. ¶ 46.)

161.    Management of the Pacific Andes Group is unable to provide any commitments regarding the precise timing by when the forensic review will be completed.  (Ng Decl. ¶ 35.)

162.    On August 16, 2016, RSM, the new forensic accountant, informed the IRC that its work would not be completed until at least the end of September 2016, citing numerous difficulties it was having obtaining information from the Debtors and affiliated non-Debtors. (MX 64.)

163.    Despite these important claims by RSM, Ms. Ng, the CEO, was not aware of the issues raised by RSM until her deposition in this case.  (MX 64; Tr. 150:20-151:2; 152:19-154:19.)

164.    At the request of PAIH, trading in PAIH shares on the Hong Kong stock exchange was halted on November 26, 2015.  (MX 83, 84, 96.)

165.    PAIH has since issued a press release stating that finalization of the 2015 Annual Results and the 2015 Annual Report is dependent on completion of RSM's forensic review. (MX 96; Tr. 150:3-12.)

166.    In addition, the announcement of the full year results of each of PARD and CFGL, which have to be consolidated into the 2015 Annual Results, has been delayed and according to recent press releases issued by the relevant companies, there is no firm time frame for the issuance of the 2015 financial data.  (*See, e.g.,* MX 85 at 4; Ng Decl. ¶ 35.)

167.    The company claims that it is impossible to provide audited financials in the midst of the forensic accountant investigation and has provided no timetable for when the audited financials may be completed.  (Ng Decl. ¶ 34-35.)

### P.  Debtors' Insolvency Filings

#### 1.  The Chapter 11 Filings and Departure of Independent Oversight

168.    On June 30, 2016, each of the 16 debtors in these cases (collectively, the "Debtors") filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code with this Court.  The Office of the United States Trustee has not appointed an official committee of unsecured creditors in these cases.

169.    The Club Facility constitutes the largest creditor group of the Debtors holding over $413 million in principal amount of loans.  (DX 42.)

170.    Apart from a small number of local creditors in Peru, loans under the Club Facility constitute the significant debt of Copeinca and, together with roughly $300 million in Senior Notes due 2019, the only significant debt of CFG Investments. (DX 42.)

171.    Sustainable Fishing is a guarantor of the Senior Notes.  (DX 42.)

172.    As of the Petition date, the Debtors had reported that, other than prefunded retainers, they only have less than $325,000 on hand.  (*See* Schedule B at MX 35-50, reporting $322,586.87 in cash on hand.)

173.    Currently, the only source of funding of these cases available to the Debtors is through Ms. Ng's brother's company, Meridian.  (Tr. 227:2-19.)

174.    The Debtors' schedules of assets and liabilities and statements of financial affairs show extensive intercompany debt between Debtors.  (MX 33.)

175.    There are over $7 <u>billion</u> in intercompany claims that Ms. Ng could not explain at trial.  (Tr. 178:20-32; DX 26.)

176.    All of these claims have been scheduled as disputed, creating a conflict or "dual role" for Ms. Ng that she acknowledged.  (Tr. 172:7-15.)

177.    Ms. Ng testified that she and her family cannot be expected to investigate and challenge the many related-party transactions that make up this $7 billion, and she provided no plan to do so other than to ask her financial advisors and CFO, who are on both sides of the transactions.  (Tr. 171:19-172:19.)

178.    Neither the Debtors nor the Peruvian Debtors have disclosed the amount and identity of "related" party claims owed by the Peruvian Debtors.  The Chapter 11 debtors have scheduled certain amounts due from the Peruvian Debtors, which amounts are, as a whole, not consistent with what the Peruvian Debtors show on their balance sheets.  (*Compare* MX 33 *with* MX 73, 74, and 75.)

### 2.    The Peruvian "Involuntary" Filings

179.    On June 30, 2016, Francisco Paniagua, on behalf of the Peruvian Debtors, filed petitions seeking, among other relief, recognition of putative foreign proceedings pending in the Republic of Peru with respect to the Peruvian Debtors.

180.    The chapter 15 petitions were based on involuntary filings with an administrative body in Peru, The National Institute of Defense of Competence and Protection of Intellectual

Property (*El Instituto Nacional de defense de la Competencia y de la Protection de la Propiedad Intelectual*) ("INDECOPI"), which has oversight of Peruvian insolvency cases.  (Tr. 242:1-4.)[6] These involuntary filings were filed when the Peruvian Debtors colluded with the filing creditors.  (MX 60 ¶ 144; Miró-Quesada Decl. ¶ 44.)  The Peruvian Debtors have agreed to pay, and are paying, the legal fees of the creditors.  (Tr. 294:2-5.)

181.    The Peruvian Debtors were not able to commence their own voluntary filing in Peru because they do not have audited financials due to a pending forensic investigation by RSM into allegations of financial impropriety identified previously by another accounting firm. (Peruvian Insolvency Law ("PIL"), Art. 25(d); Tr. 150:9-12; Tr. 125:15-126:7.)

182.    Ms. Ng and J.T. Ng have powers of attorney for the Peruvian Debtors and do not need Mr. Paniagua's approval to dispose of any of the Peruvian Debtors' assets, and Mr. Paniagua cannot stop the Ng family from using those powers of attorney to dispose of the Peruvian Debtors' assets.  (Tr. 276:3-24; *see also* 278:11-279:7.)

183.    With respect to Copeinca's Peruvian insolvency filing, it was filed by Coremasa. (Tr. 293:5-7.)

184.    Jose Miguel Tirado is a shareholder and director of Coremasa.  (Tr. 293:16-18.)

185.    Mr. Tirado is also the general manager of Copeinca.  (Tr. 275:4-7.)

186.    The Chapter 11 Debtors have listed on their Schedules receivables owed to several of the Chapter 11 Debtors by CFG Investments totaling $496,886,528.51 and owed to the

---

[6] While INDECOPI has administrative oversight, a typical Peruvian insolvency may never proceed into the court system.  (Tr. 326:16-17.)

Chapter 11 Debtors by Sustainable Fishing totaling $139,829,679.65.  (MX 33; MX 168 at p. 10 of 20; MX 73; MX 169 at p. 7 of 15; MX 172 at p. 7 of 31; Tr. 282:1-4.)[7]

187.    The accounts payable by Copeinca to related entities totals $284,687,953.  (Tr. 282:6-12; MX 74.)  Mr. Paniagua is the only employee of Sustainable Fishing and he lacked knowledge of at least $95 million of the claims owed by Sustainable Fishing to a related company.  (Tr. 292:5-14.)

3.    The Peruvian Insolvency Process

188.    When a creditor files an involuntary proceeding against a debtor in Peru, INDECOPI first verifies the claim on which the filing is based and then notifies the debtor of the filing.  (Miró-Quesada Decl. ¶ 45; DX 41 Art. 27.)

189.    After receiving the notice, the debtor has ten business days to respond to the creditor's request.  (Miró-Quesada Decl. ¶ 45.)

190.    The Debtor can respond in one of three ways.  First, the debtor can elect to pay the claim in full, which will result in INDECOPI rejecting the creditor's request and declaring the proceeding terminated or extinguished.  (Agurto Decl.¶ 8; Miró-Quesada Decl. ¶ 46.)

191.    Second, the debtor could also oppose the claims, and if that opposition is well founded, the request for initiating the insolvency proceeding is denied and the proceeding declared concluded.  (Agurto Decl. ¶ 8; Miró-Quesada Decl. ¶ 47.)  Finally, the debtor can

---

[7] Mr. Paniagua testified that he did not participate in the preparation of the Debtors' schedules because apparently the information is at "headquarters" in Hong Kong where J.T. Ng is the one who directs the strategy of the Peruvian Debtors' sales to the important Asian market, (Tr. 296:13-20); however, Mr. Paniagua prepared and provided to Mr. Prager balances of Related Parties at June 30, 2016.  (*Compare*  DX 26 at p. 38 (Document 36) *with* Tr. 294:20-295.)  Either Mr. Paniagua provided the Debtors' consultant with the intercompany balances that were used to populate the schedules and he did not testify accurately, or he lacks knowledge of hundreds of millions of dollars of the Peruvian Debtors' financial obligations because they are managed by the Ng family, either of which demonstrates a lack of trustworthiness.  Ms. Ng testified that she is in the dark as to the intercompany claims, expressing surprise that those claims total US$7 billion.  (Tr. 172:20-24.)

acquiesce to the creditor's application in which case INDECOPI will declare the opening of the insolvency proceeding and publish notice of the opening of ordinary insolvency proceedings and publish the date by which creditors must file claims (the "Bar Date Notice").  (Agurto Decl. ¶ 8; Tr. 249:6-10; Miró-Quesada Decl. ¶¶ 49-50.)

192.    The Peruvian Insolvency Law obligates INDECOPI to resolve the petition within 90 business days[8] after it is filed.  (Agurto Decl. ¶ 7.)[9]

193.    As of the date of this submission, the Peruvian Debtors' insolvency has not been published.[10]

194.    Creditors who wish to participate in the creditors' meetings in Peru must request recognition of their credits within 30 business days after the publication of the Bar Date Notice. (Agurto Decl. ¶ 8; Miró-Quesada Decl. ¶¶ 50, 56; DX 41 Art. 34.1; Tr.  253:1-4.)

195.    Prior to or after the publication of the Bar Date Notice, there is no limitation on the right of shareholders of the Peruvian Debtors to change their boards or to govern themselves in accordance with local law.  (Tr. 326:23-327:5.)

196.    However, when the creditors meeting is held, the creditors will *de facto* replace the shareholders' meeting.  (Tr. 327:7-8.)

---

[8] As Mr. Agurto testified, Peruvian Insolvency Law provides that a "day" is actually a "business day" and thus does not include weekends and holidays established under Peruvian law.  (Tr. 253:5-11.)

[9] The Debtors contend that the Club Lenders have sought to delay the Peruvian Debtors' proceedings (even though they are actually cooperating creditors' proceedings and not the Peruvian Debtors').  (Miró-Quesada Decl. ¶¶ 93-98.)  These allegations are not only irrelevant to the issues presented but were fully rebutted at trial.  (Tr. 249:11-252:23.)

[10] Under paragraph 8 of the *Scheduling Order for Lenders' Motion for Entry of an Order Directing the Appointment of a Chapter 11 Trustee Under Section 1104(A)(2) of the Bankruptcy Code* [ECF No. 56], the Debtors are obligated to file the summons to respond to the involuntary proceedings within 24 hours of receipt thereof.  The Debtors have not filed any notice as of the date hereof.

197.     It is not uncommon for it to take more than 14 months after the publication of the

Bar Date to impanel a creditors meeting.  (Agurto Decl. ¶ 9.)[11]   During this time, the current

management of a Peruvian debtor continues in management of the debtor's operations.  (*Id.* ¶

9.)[12]

198.     At the meetings of creditors, the creditors may vote on several items: (a) election

of its officers, (b) decision on the fate of the debtor, (c) approval of the administration (*e.g.*,

corporate governance) of the debtor, (d) approval of the Restructuring Plan or Liquidation

Agreement, if applicable, or (e) appointment of a committee of the board of creditors and

delegation of powers.  (Agurto Decl ¶ 10; Miró-Quesada Decl. ¶ 64; DX 41 Art. 50.4.)

199.     The decisions other than those related to the fate of the debtor (*e.g.*, restructuring

versus liquidation) and approval or rejection of a Restructuring Agreement are subject to

approval by a majority voting standard; however, for the decision regarding the fate of the debtor

and approval of the Restructuring Agreement, a supermajority is required.  (Agurto Decl. ¶ 11;

Miró-Quesada Decl. ¶ 62; DX 41 Art. 53.)

200.     Thus, if recognized related claims total more than 50% of all recognized claims,

the holders of those related claims, acting together, can vote to keep the current administration in

place.  (DX 41 Art. 61.1(a).)  If the creditors choose to keep the same administration system in

place, the existing directors and managers may remain in place until the conclusion of the

restructuring.  (*Id.*, Art. 61.2.)

---

[11] The Debtors have criticized this testimony not by alleging it is incorrect but by instead contending that the Doe
Run case in Peru is more complex than in the present situation.  (Miró-Quesada Decl. ¶¶ 84-85.)  This claim fails
under scrutiny.  (Tr. 253:12-255:5.)

[12] The parties' experts are in agreement that Peruvian law provides that certain actions of the Peruvian Debtors'
management will be valid unless challenged in a Peruvian Court and declared invalid in court.  (*Compare* Miró-
Quesada Decl. ¶ 64 *with* Tr. 255:12-256:17.)  A challenge of this nature can take up to four years.  (Tr. 256:2-3.)

201.    Creditors' meetings are called and subject to an agenda.  (Tr. 320:18-21.)  The notice of creditors' meeting provides notice of a first meeting of creditors and, if there is an insufficient quorum to permit approval of the items on the agenda at the first called meeting, notice of a second creditors' meeting is given.  (Tr. 313:25-314:2.)

202.    If the related claims are less than 50% of all claims recognized by INDECOPI, the creditors' meeting decides the fate of the debtor or the approval of a restructuring agreement at a first called meeting with the vote of creditors representing greater than 66.6% of the total amount of all creditors recognized by INDECOPI (including related claims).  (Tr. 308:15-21; DX 41 Art. 53.1.)

203.    If there is a sufficient quorum at the first meeting, the second meeting is not needed.  (Tr. 310:1-4.)

204.    If there is an insufficient quorum to conduct a vote at the first meeting, there is a second meeting.  (Tr. 309:11-16.)

205.    At the second called meeting, the creditors approve the fate of the debtor or a restructuring agreement with the vote of creditors representing 66.6% of the total amount of all recognized credits in attendance at the second meeting.  (Tr. 316:13-16; DX 41 Art. 53.1.)

206.    When the recognized creditors identified as "related" are greater than 50% of all recognized claims, the creditors' meeting decides the fate of the debtor or the approval of a restructuring agreement with two separate voting acts, one by the related creditors and one by unrelated creditors.  (Agurto Decl. ¶ 12; Miró-Quesada Decl. ¶ 64; Tr. 318:17-22.)

207.    The voting construct at the first meeting is that the vote of creditors of the class representing related creditors must be greater than 66.6% of the total amount of related creditors

recognized by INDECOPI and the vote of creditors of the class representing unrelated credits must also be greater than 66.6% of the total amount of unrelated claims recognized by INDECOPI in order for a decision to be made.  (Agurto Decl. ¶ 12; Tr. 318:17-22; Miró-Quesada Decl. ¶ 64; DX 41 Art. 59.)

208.    At the second meeting, in order to determine the fate of the debtor or approve a restructuring agreement, the favorable vote of more than 66.6% of creditors attending in both classes of related and unrelated creditors shall be required.  (Agurto Decl. ¶ 12; Miró-Quesada Decl. ¶ 64; Tr. 318:23-319:6; DX 41 Art. 59.)

209.    Based on these voting requirements, if the recognized related claims are less than 50% of all claims recognized by INDECOPI, but more than 33.4% of all recognized claims, the holders of related claims could prevent the approval of a restructuring agreement.  (Tr. 260:3-11 & 320:11-17; Agurto Decl. ¶ 12.)

210.    Similarly, if the related claims are greater than 50%, the class of holders of related claims has the ability to prevent approval of the restructuring agreement.  (Tr. 259:20-260:2.)

211.    As a matter of Peruvian insolvency law, the intercompany claims of the Chapter 11 Debtors may be recognized as "related claims" in the Peruvian Debtors' Peruvian insolvency proceedings, which would permit the Chapter 11 Debtors to vote as creditors in the Peruvian Debtors' Peruvian insolvency proceedings.  (Agurto Decl. ¶ 10; DX 41 Art. 12; Tr. 257:8-13.)

212.    Thus, if the related companies of the Peruvian debtors upstream within the corporate family (either the Chapter 11 Debtors or other non-Debtor Pacific Andes corporations) file large claims in the separate insolvency proceedings, they may have the power to block a

restructuring plan even if the other unrelated recognized creditors fully support such a plan. (Agurto Decl. ¶ 12.)

4.    Other Insolvency Filings of Companies Affiliated with the Debtors.

213.    On June 30, 2016, Sahara Investment Group Private Limited ("Sahara"), a creditor of PARD and its subsidiary, Richtown Development Limited ("Richtown"), applied for the consensual appointment of a provisional liquidator over Richtown in the British Virgin Islands. (Tr. 224:17-226-13.)

214.    Sahara was set up by a former employee of PAIH, Oleg Sizov, who co-owns another fishing business, Greenland Foods, with J.T. Ng's company, Meridian. (Tr. 222:25-223:16.) Meridian funded the retainers to the Debtors' professionals in these cases. (MX 98, 99, 139, 140.)

215.    A Joint Provisional Liquidator has been appointed over Richtown by a court in the British Virgin Islands. (Tr. 224:17-226:3.)

216.    Richtown is a corporate entity between the Peruvian Business and PAIH and thus could serve to block the flow of funds upstreamed to Chapter 11 Debtors PAIH and N.S. Hong or at least carve off some of that money before it goes further upstream, meaning that creditors of those entities may have their potential recoveries affected by this BVI filing. (DX 42.)

217.    At her deposition, Ms. Ng testified, based on a register of directors of Richtown (MX 150), that she was a director of Richtown. At trial, however, she testified that she is not, in fact, a director of Richtown. (Tr. 135:25; 176:15-178:6.) She based her changed testimony on an indication in the register that she became a director on a date *after* the appointment of a provisional liquidator and stated that apparently the corporate record is inaccurate. (Tr. 177:19-178:6.) This calls into question the reliability of all of the Debtors' records.

218.    On July 1, 2016, PARD, an indirect non-wholly owned subsidiary of PAIH and whose shares are listed on Singapore Exchange Securities Trading Limited, voluntarily made an application under section 210(10) of the Singapore Companies Act, Chapter 50 of the Laws of the Republic of Singapore, to stay all actions and legal proceedings against PARD, Pacific Andes Enterprises (BVI) Limited, Parkmond Group Limited and Pacific Andes Food (Hong Kong) Limited.  (Ng Decl. ¶¶ 122 & 125; Tr. 126:8-10.)

219.    The Singapore Affidavit also had a section titled "PARD'S CONTINUED GOOD FAITH RESTRUCTURING EFFORTS" that reported that the company had in place accountants, a CRO that was increasing communications with stakeholders, and that it was conducting an investigation into the forensic issues raised in a prior report. (MX 115, ¶ 42.)

220.    As acknowledged by the Debtors, the PARD CRO and reporting accountants have since departed.  (Tr. 164:4-9.)

221.    The filings in Singapore and the BVI are not coordinated with these proceedings, and the Debtors have not filed any type of protocol to seek to coordinate the proceedings.  The Debtors purport to be preventing a "fire sale" to protect the equity value of the CF Group for creditors that rely on that equity value.  (Ng. Decl. ¶ 41.)  Looking at who those creditors might be based on the chart that the Debtors offered at the first day hearing in the Chapter 11 Cases shows that the equity value of the "CF Group" are creditors above Super Investment Limited, which are creditors of Richtown and two of its subsidiaries, which then funnel up to the ultimate parent, NS Hong.  (DX 42.)  In order for the shareholders to obtain a recovery, Mr. Prager testified that approximately $2.8 billion in value needs to be generated to create a return for the

NS Hong shareholders.  (DX 26 ¶ 75.)  This means that equity, namely the Ng family, are more than a billion dollars out of the money.

### Q. Other Transactions and Conduct that have Caused the Lender Parties to Question the Debtors' Trustworthiness and to Lose Confidence in Present Management.

1. <u>Gainesville</u>

222.    In around October or November 2015, the ownership of an office building and two parcels of land in Peru, known as the Gainesville property, was transferred from one of the borrowers under the Club Facility to a third party.  (Tr. 111:4-12.)

223.    While the third party ultimately was an entity within the Pacific Andes group, the mere fact that the Debtors had moved assets and not advised the banks is deeply concerning. (Tr. 111:4-12.)

224.    The Short Term Working Facility required that the Gainesville transaction be unwound.  (Tr. 111:13-16.)

2. <u>Golden Target</u>

225.    Golden Target Pacific Limited ("<u>Golden Target</u>"), a Singapore company which is one of the non-Debtor affiliates, entered into a loan agreement with another Singapore company, Sahara.  (MX 23 & 24.)

226.    This first loan agreement was for an amount of US$2 million (MX 23 at 1), later increased to US$4 million (MX 24), with a subsequent loan agreement on December 10, 2015 for a further US$5 million.  (MX 25.)  The amount drawn down under these agreements is approximately US$7 million, at a rate of 4%.  (MX 26.)

227.    These loans are repayable on demand and are guaranteed by, among other companies, Golden Target's indirect parent, PARD.  (MX 24.)

228.    The terms of the US$4 million loan entitle the lender to convert its debt into up to 8% of the shares of Golden.  (MX 24.)

229.    The Debtors have failed to explain why these loans were entered into without the knowledge of the Club Lender Parties or BANA, in circumstances where the effect of such loans is to structurally subordinate the claims of all creditors at or above the PARD level without their knowledge.

## BASES FOR A TRUSTEE MOTION

230.    Based on this history, much of which shows significant support and cooperation by the Club Lenders, the Club Lender Parties have now lost confidence in the current management of the Chapter 11 debtors.  (Tr. 101:9-102:1; 104:17-105:1.)

231.    The other joining parties, from other parts of the Debtors' capital structure have joined in the Club Lenders' motion, because they too have lost confidence in the Debtors.  (*See generally* Doc. Nos. 61, 62, 63, and 65; McQueen Decl. ¶ 27.)

232.    The moving and joining parties seek a Trustee in order to provide sufficient visibility and transparency in light of the failed efforts to receive this in full in the past.  (Tr. 99:25-101:7.)

## CONCLUSIONS OF LAW

### A. Jurisdiction and Venue.

1.    This Court has jurisdiction to consider the Motion and Joinders under 28 U.S.C. §§ 157 and 1334 and the Standing Order of Reference in this District.  Venue of this contested matter is proper under 28 U.S.C. §§ 1408 and 1409.  This contested matter is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (O).

**B.  Appointment of a Chapter 11 Trustee Under Section 1104(a)(2).[13]**

2.      The Movants seek appointment of a chapter 11 trustee pursuant to Section 1104(a)(2).[14]  That section provides that:

> [a]t any time after the commencement of the case but before confirmation of a plan, on request of a party in interest or the United States trustee, and after notice and a hearing, the court shall order the appointment of a trustee . . . if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate, without regard to the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor.

1.  Technical Requirements

3.      The Chapter 11 Cases commenced on June 30, 2016; the Motion was filed on August 9, 2016, and the Joinders were filed on August 10, 2016.  No plan has been proposed by the Debtors or any other party in interest, much less confirmed.  The Motion is timely.

4.      Although the Bankruptcy Code does not define "party in interest," a creditor is undoubtedly a party in interest.  *See, e.g.*, 11 U.S.C. § 1109(b) ("[a] party in interest, including . . . a creditor").  Each of the Movants is a creditor, by its own uncontested assertion and by Ms. Ng's admission and/or the Debtors' schedules.  (*See, e.g.*, MX 60 ¶¶ 78, 82, 84-85, 87, 95-98; MJP Ex. 38 (PAIH Schs. of Assets and Liabilities [Case No. 16-11890 (JLG), ECF No. 15]),

---

[13] All references to a "Section" shall be to that section of the Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.*, unless otherwise specified or required by the context.

[14] Certain of the Movants originally submitted a motion seeking appointment of a chapter 11 trustee pursuant to Section 1104(a)(1) and (2) (the "Original Motion"), along with a motion for leave to file under seal, to the Court for review.  The Court, the Movants, and the Opposing Parties agreed that those Movants would withdraw the Original Motion and file the instant Motion; by limiting the scope of the Motion, discovery and trial could be expedited, and the Movants would reserve the right to seek appointment of a chapter 11 trustee pursuant to Section 1104(a)(1) in the event of denial of the Motion and Joinders.  Although such a motion would no longer appear to be necessary, in light of the Court's ruling on the Motion and Joinders, the Court offers no opinion on the merits of  a motion under Section 1104(a)(1).

Sch. E/F lines 3.9-3.12, 3.26-3.30, 3.32-3.34, 3.36, 3.38.)  Therefore, each Movant is a party in interest with standing to seek appointment of a chapter 11 trustee.

5.      On August 8, 2016, the Court entered a Scheduling Order [Case No. 16-11895 (JLG), ECF No. 56] related to the Motion.  Pursuant to the Scheduling Order, on August 9, 2016, notice of the Motion was provided and is adequate.  An evidentiary hearing on the Motion was held on August 29 and 30, 2016.

6.      The Court need not decide the issue of whether the Peruvian Debtors, the PARD Bondholders, and the Peruvian Suppliers have standing to object to the Motion because their arguments are considered and rejected below.

### C.  Standard for Appointment Under Section 1104(a)(2)

7.      A decision whether to appoint a chapter 11 trustee under Section 1104(a)(2) is a "fact-driven analysis," using the Bankruptcy Court's broad equity powers.  *In re Soundview Elite, Ltd.*, 503 B.R. 571, 582 (Bankr. S.D.N.Y. 2014) (*quoting In re Adelphia Commc'ns Corp.*, 336 B.R. 610, 658 (Bankr. S.D.N.Y. 2006)).  A movant "has the burden of showing by 'clear and convincing evidence' that the appointment of a trustee is warranted."  *Adams v. Marwil (In re Bayou Grp., LLC)*, 564 F.3d 541, 546 (2d Cir. 2009) (*quoting Adelphia Commc'ns Corp.*, 363 B.R. at 656).

8.      Section 1104(a)(2) "creates a flexible standard," *In re Sharon Steel Corp.*, 871 F.2d 1217, 1226 (3d Cir. 1989), and "'gives the . . . court discretion to appoint a trustee when to do so would serve the parties' and estate's interests.'"  *In re Ashley River Consulting, LLC*, Nos. 14-13406 (MG) and 14-13407(MG), 2015 WL 1540941, at *11 (Bankr. S.D.N.Y. Mar. 31, 2015) (*quoting In re Marvel Entm't Grp., Inc.*, 140 F.3d 463, 474 (3d Cir. 1998)); *see also In re Ionosphere Clubs Inc.*, 113 B.R. 164, 168 (Bankr. S.D.N.Y. 1990) (holding that section

1104(a)(2) "creates a flexible standard"); *In re Ridgemour Meyer Props., LLC*, 413 B.R. 101,

112 (Bankr. S.D.N.Y. 2008) (same).   A court may consider a number of factors useful in

determining whether this "flexible standard" is met, including:   "(i) the trustworthiness of the

debtor; (ii) the debtor in possession's past and present performance and prospects for the debtor's

rehabilitation; (iii) the confidence – or lack thereof – of the business community and of creditors

in present management; and (iv) the benefits derived by the appointment of a trustee, balanced

against the cost of the appointment." *Soundview*, 503 B.R. at 583 (*quoting Adelphia Commc'ns*,

336 B.R. at 658); *In re Celeritas Techs., LLC*, 446 B.R. 514, 520-21 (Bankr. D. Kan. 2011); *In re

Euro-Am. Lodging Corp.*, 365 B.R. 421, 427 (Bankr. S.D.N.Y. 2007) (*quoting In re Ionosphere

Clubs*, 113 B.R. at 168).

9.      Even though this list of factors is a useful guide for approaching the question of

whether the appointment of a chapter 11 trustee is appropriate, "the factors constituting a basis

for appointing a trustee under § 1104(a)(2) are amorphous, diverse, and necessarily involve a

great deal of judicial discretion." *In re V. Savino Oil & Heating Co., Inc.*, 99 B.R. 518, 527 n.11

(Bankr. E.D.N.Y. 1989).   Such judicial discretion serves the "twin goals of the standard for

appointment of a trustee," which are "protection of the public interest and the interests of

creditors . . . and facilitation of a reorganization that will benefit both the creditors and the

debtors . . . ." *Ionosphere*, 113 B.R. at 168 (*quoting* H.R. Rep. No. 95-595, at 232 (1977)).

10.     Improper conduct by a debtor's management, while not rising to the level of

"cause" required in subsection (a)(1), nonetheless mandates appointment of a trustee to protect

creditors' interests. *Euro-Am. Lodging*, 365 B.R. at 428.   Conduct resembling that supporting a

finding of cause is not necessary for appointment of a chapter 11 trustee under Section

1104(a)(2); otherwise, Section 1104(a)(2) would be rendered superfluous as a duplication of Section 1104(a)(1).   The appointment of a trustee under Section 1104(a)(2) "is a lesser standard than that under § 1104(a)(1)" and affords the court with more discretion.   *In re Wings Digital Corp.*, No. 05-12117 (ALG), 2005 WL 3789334, at *5 (Bankr. S.D.N.Y. May 16, 2005); *Taub v. Adams*, No. 10-CV-02600 (CBA), 2010 WL 8961434, at *4 (E.D.N.Y. Aug. 31, 2010) ("A bankruptcy court's decision to appoint a Chapter 11 trustee pursuant to 11 U.S.C. § 1104(a)(2) is discretionary.").

11.     Here, Movants are creditors with claims at 14 different entities in the Debtors' corporate structure.   (DX 42.)   The Debtors' refrain that the Motion reflects solely a desire of structurally senior creditors to be paid in full at the expense of other creditors (*see, e.g.*, Debtors' Opp. at 1) has no support in the record.   Even if one were to give credence to the Chinese Banks' Objections, and even taking into account the filing by the PARD Bondholders, creditors need not be united in support of a motion for appointment of a trustee for the court to find that appointment to be in the interest of creditors.   *See, e.g.*, *In re Keeley & Grabanski Land P'ship*, 455 B.R. 153, 165 (B.A.P. 8th Cir. 2011) (appointment of chapter 11 trustee in the interests of creditors and the estate even though some creditors opposed in favor of other remedies); *In re Nautilus of N.M., Inc.*, 83 B.R. 784, 789 (Bankr. D.N.M. 1988) (court granted motion to appoint trustee over objection of bank that was potentially liable for preferential transfers).

   1.   Analysis

      a.   ***Trustworthiness of the Debtor***

12.     The Movants here have demonstrated overwhelmingly, and certainly by clear and convincing evidence, that the Debtors' management, and especially Ms. Ng, have not been trustworthy in their dealing with creditors, including the Movants, their professional advisors

hired under the Undertakings and their own Board of Directors.   This stunning and far-reaching

lack of candor, forthrightness and adherence to contractual, court-sanctioned commitments, by

itself, satisfies the statutory standard for the appointment of a Chapter 11 trustee.  *See, e.g.*, *In re*

*Eurospark Indus., Inc.*, 424 B.R. 621, 630 (Bankr. E.D.N.Y. 2010) ("acrimony between the

creditors and the debtor's management, standing alone, has been found to be a basis to appoint a

chapter 11 trustee under § 1104(a)(2)" (*citing Marvel Entm't Grp., Inc.*, 140 F.3d at  474));  *see*

*also Soundview*, 503 B.R. at 583 (appointment of chapter 11 trustee under Section 1104(a)(2)

appropriate where, among other things, debtor accused of self-dealing filed chapter 11 petitions

in this District after winding-up petitions were filed in Cayman Islands and just before a hearing

in Cayman Islands to appoint joint provisional liquidators); *Ridgemour Meyer*, 413 B.R. at 113

(debtor's principal had demonstrated through pre-filing machinations that he "is not a

trustworthy fiduciary.   In addition to his participation in the transfer of the Property and

subsequent cover-up . . . his response [that negotiations with the creditor after an arbitration

award and everything else that followed were "irrelevant"] signaled an unwillingness or inability

to understand proceedings or abide by court orders with which he disagrees.").

13.    The facts underlying the Debtors' lack of trustworthiness are set forth in detail in

the Findings of Fact, but lack of trustworthiness is easily demonstrated by the following critical

facts surrounding the breach of the court-sanctioned Undertakings and the filing of these chapter

11 cases:[15]

---

[15] The Court's focus is on the approximately seven month period leading up to the filing of these chapter 11 cases;
however, the record is replete with many additional, pre-Undertaking facts that support the lack of trust in
management, including admitted misrepresentations regarding the receipt of $31 million LSA termination
repayments (Tr. 108:6-109:8), regulatory investigations (Tr. 173:6-174:19), suspect transactions, allegedly
representing prepayments that ballooned over time to more than $900,000,000 (Isherwood Decl. ¶¶ 17-20), inter-

a.   the evidence demonstrates that the Debtors, even at the time the Undertakings were entered into, did not intend to sell the Peruvian business that they committed to sell, but viewed that business as the essential part of the "family business" that they were determined to preserve  (Tr. 218:19-219:17; DX 2, ¶ 12);

b.   on June 30, 2016, the Debtors deliberately breached all aspects of the Undertakings by commencing this Chapter 11 case and numerous foreign insolvency proceedings, and terminating or causing the resignations of all of the professionals hired under the Undertakings for the express purpose of providing lenders with independent oversight over management and the agreed sale process (MX 10; MX 11; Tr. 224:21-225:2);

c.   on June 30, 2016, the Debtors deliberately breached all aspects of the Undertakings by suspending the sales process (MX 10; MX 11);

d.   on June 30, 2016, the Debtors breached the January 2016 Undertaking by preventing HSBC and BANA from exercising their agreed upon remedy to reappoint a provisional liquidator in the Cayman Islands with the consent of the Debtors, which remedy could be exercised upon termination of the January 2016 Undertaking (MX 11, § 4.);

e.   Ms. Ng both concealed her true intentions to commence the bankruptcy filing of the Debtors on June 30, 2016,  from all of the professionals hired under the

---

company claims of $7 billion, an amount totally disproportionate to the operations of the companies (Prager Rpt. ¶ 41), the Sahara loan to Golden Target from an entity owned by a former Pacific Andes employee, whose terms allow for that loan to be equitized to the detriment of unrelated creditors of entities that are structurally junior to Golden Target (MX 24; Tr. 222:12-233:16), and misdirected  payments away from creditors mere days after the Debtors had agreed to make those payments. (McQueen Decl. ¶ 11; MX 161.)

Undertakings, the creditors and the CFGL board of directors, and she actively misled Mr. Brough, Mr. Wong, BANA and her own Board about those intentions (MX 138 and 142,Tr. 182:10-19, Tr. 186:11-188:3);

f.   Dennis Chan and J.S. Ng, whom the January 2016 Undertaking explicitly required to step down from their roles in management of the China Fisheries Group (MX 11, cl. 2.2.4), were retained by the Pacific Andes Group "as advisors" (with J.S. Ng being paid his former CEO salary), and have been advising the Debtors on their restructuring plans (Tr. 135:5-22; Tr. 152:19-153:3; Tr. 160:22-161:15); and

g.   despite having reaffirmed in writing on June 27, 2016 that the Board of CFGL was completely committed to a sale of the Peruvian business, just three days later, that same board voted to file Chapter 11 proceedings, solely because the PARD and PAIH boards each had voted on the same day to file a moratorium proceeding and Chapter 11 proceeding, respectively (Tr. 212:19-21).

14.   The Debtors themselves, through the testimony of Ms. Ng, recognized that in light of the prior mistrust that existed between the Debtors and the Club Lenders and BANA, which led to HSBC's applications to appoint provisional liquidators in Hong Kong and the Cayman Islands, a breach of the Undertakings would irreparably sever any possible future trust in management by the bank creditors:

> Q   And when you entered into the undertaking, you thought that it was critical if – that if there would ever be trust again between the banks [] you were entering into the undertaking with and CFGL, the company would have to fulfill all of its promises in the undertaking, correct?
>
> A   Yes.

(Tr. 181:10-15.)

15.     The Debtors' insinuation that the action of any of the Movants in any way

justifies the Debtors' untrustworthy conduct is not persuasive.  The Debtors' suggestion that

HSBC and BANA had refused or would refuse to grant extensions of the July 15 sale date of the

Peruvian Business is contradicted by the clear testimony that no formal request for an extension

had ever been made of those banks, and that Mr. Brough did not seek or obtain permission from

the CFGL board to seek such an extension until June 29, 2016 (Tr. 203:20-204:22; MX 61).  By

that date, Ms. Ng knew the extension request would never be made because bankruptcy filings

would be made the following day (Tr. 205:6-9).  Similarly, any discussion the banks had of

potential remedies was an effort to protect against the Ng family ultimately failing to provide the

necessary shareholder approvals for a sale (a prescient concern).  (Tr. 344:25-345:16.)  As such,

BANA had discussions with Mr. Brough around developing a lesser remedy than seeking the

reappointment of provisional liquidators, as they were permitted to do under the January 2016

Undertaking, such as the filing of a petition against PARD that would then be stayed.  (Tr.

342:11-343:1; McQueen Dec. ¶ 20.)

### b.   *The Debtors' Prospects (or Lack Thereof) for Rehabilitation Support the Appointment of a Chapter 11 Trustee*

16.     Where a debtor has little prospect for rehabilitation under current management,

appointment of a chapter 11 trustee is appropriate under Section 1104(a)(2).  *See, e.g.*,

*Ionosphere*, 113 B.R. at 170 (appointment of a trustee where reorganization is not feasible,

notwithstanding that "a substantial part of the Debtors' defense has revolved around its

assertions that this is an extraordinary bankruptcy case and that Eastern's management has had to

rebuild operations in the most adverse of circumstances in the context of an intense labor

conflict"); *In re Parker Grande Dev., Inc.*, 64 B.R. 557, 561 (Bankr. S.D. Ind. 1986) (presumptions in favor of leaving the debtor in possession are relevant only in a case where "a reorganization of the debtor into a viable and profitable business venture or enterprise" is possible).

17.     The evidence presented at the hearing clearly and convincingly shows that the Debtors are unlikely to reorganize successfully under current management.  They are, with few exceptions and by the Debtors' own admissions, holding companies or dormant operating companies (MX 60 ¶ 14); the Debtors have given no indication they expect any of these holding companies or dormant operating companies to become active; most of the Debtors have no employees (MX 60, Ex. H (listing only 5 non-executive employees at one Debtor)); and with limited exceptions, the Debtors have few assets other than intercompany receivables, investments in subsidiaries, potential avoidance actions, and the retainers paid to professionals, such that the Debtors have no meaningful business to reorganize. (MX 35-50); *Eurospark Indus.*, 424 B.R. at 631-32 (appointing chapter 11 trustee where debtor "sold its building, merchandise, and equipment long ago, does not have any bank accounts or employees, and has not operated for at least five years"); *In re PRS Ins. Gr., Inc.*, 274 B.R. 381, 389 (Bankr. D. Del. 2001) (appointment of trustee appropriate where causes of action against insiders are a significant asset of estate and there are no business operations requiring current management); *In re H & S Transp. Co., Inc.*, 55 B.R. 786, 790 (Bankr. M.D. Tenn. 1982) (appointing a trustee because, among other reasons, the testimony was uncontradicted that the debtors "have essentially ceased operations").

18.     The Debtors also lack the financial wherewithal to reorganize.  *In re L.S. Good & Co.*, 8 B.R. 312, 315 (Bankr. N.D.W. Va. 1980) (appointing chapter 11 trustee where "an infusion of fresh capital in a sum approximating five million dollars is required for Knapp to undergo a successful reorganization," which infusion the court saw as unlikely).  Here, the Debtors filed these Chapter 11 cases with only approximately $300,000 in available cash.  (*See ¶* 172, *supra*, MX 60, Ex. I.) The Debtors expect that only minimal income will be received in the ordinary course of business in the near term because, among other things, the China Fishery Group Debtors rely on the Peruvian Debtors for substantially all of their income and any income from the Peruvian Debtors is speculative and may not occur anytime soon due to the filing of the involuntary petitions against the Peruvian Debtors in Peru.  (MX60 ¶¶ 146-47; MX60, Ex. I.) The Debtors have no prospect for further infusion of cash other than through borrowings from Ng Joo Chuan's (one of Ms. Ng's brothers) Meridian Investment Group (Tr. 227:11-19), the entity that provided the funds for retainers for the Debtors' professionals (MX 32 § 3.4, 99 ¶¶ 29-31), but which has no current commitment to provide further funding.

19.     The Debtors' reorganization strategy is similarly unformed.  The Debtors have put forth no coherent concept of a reorganization other than to wait and see what happens in Peru based on speculation about future meteorological and climate conditions, and decisions by creditors in insolvency proceedings that technically have not even commenced yet.  (Paniagua Decl. ¶¶ 23-24.)  The Debtors have taken no actions in these chapter 11 cases to further their reorganization efforts other than filing their petitions, certain required schedules and statements, retention applications, a few rudimentary first-day filings, and their response to the Motion.  *In re Ashley River Consulting,* 2015 WL 1540941, *11 ("the Debtors have not done much of

anything in their bankruptcies since they filed their petitions other than file their schedules

(which had to be amended in Emerald's case because it did not properly disclose all of its assets),

applications to approve their retention of their attorneys, and respond to the motions of other

parties in interest, including the UST, who seek relief to move these cases along").

20.     The Opposition Parties' arguments do not support any contrary conclusion.  In the

Debtors' opposition, and in reliance on a portion of the Prager Report that is "conjectural" and

"lacking support" (Tr. 29:20-25), the Debtors state that they

> have many workable reorganization options available to them.
> Although these Chapter 11 proceedings were commenced only
> recently, the Debtors are considering several kinds of Chapter 11
> reorganization plans.  They include equitization (with potential
> refinancing), the controlled sale of the Debtors' Peruvian operating
> companies and/or other major assets, and the spinning off of
> Debtors' Peruvian operating companies combined with
> equitization or the sale of other assets.

(Debtors' Opp. at 27; *see also* Equity Opp. ¶ 30.)

21.     This provides no specificity whatsoever as to any potential reorganization, and

instead merely recites all possible outcomes of any chapter 11 case.  The Debtors fail to mention

any possible partners or buyers, any potential funding, or any putative time frame.  Although the

Debtors were in a position to proceed to binding second round bids, with a "final bidder" to be

selected by July 20, 2016 (MX 61 ¶¶ 1-2), and although first round bidding had, by Ms. Ng's

admission, produced numbers that were a "surprising and optimistic development for the Pacific

Andes Group" (Tr. 216:3-217:3; MX 115 ¶77), since the Chapter 11 filing, "not one iota of work

has been done to engage these potential purchasers." (Tr. 217:8-11.)

22.     The Debtors provide a number of reasons as to why the Peruvian Business may be

given a low valuation at the moment (El Niño, Peruvian government restrictions on the fishing

seasons, total allowable catch, and the assertion that the Peruvian Business has "never experienced a complete, normal season" since Copeinca's acquisition by the Debtors), but provide no concrete basis for any higher valuation. Instead, they rely on the expected "moderat[ion]" of climate conditions, which "likely" will result in a "significantly better" anchovy harvest. (Debtors' Opp. at 28; *see also* Equity Opp. ¶ 36; OpCo Opp. ¶¶ 52-53.)

23.    The Debtors' key testimony at trial on the basis of a reorganization came from Ms. Ng:

> A   [T]here is a great deal of hope in this business, if you will.
>
> Q   And prayers, right?  I think you said prayers in your deposition.
>
> A   Yes, and prayers, because fishing very much depends on the weather.
>
> Q   Okay. So there could be unexpected risks in the next two years; for instance, weather patterns may not be as positive as you believe they could be, right?
>
> A   There are always uncertainties.

(Tr. 133:10-18.)

24.    Similar testimony was given by Mr. Paniagua:

> As a result of these positive changes [ending of the 10-mile rule and the Minister of Production's stated intention to support the commercial anchovy fishing industry] and the end of the El Niño, the Fishmeal Companies and the Peruvian fishing industry are expecting a strong second season in 2016 and a return to normal anchovy harvesting in 2017.

(Paniagua Decl. ¶ 29.)

25.    The evidence clearly reflects a desire by equity to retain its interests in the business at the risk of its creditors. The equity holders of N.S. Hong are out of the money by at

least $1 billion even if the Peruvian Business were to be sold in the amount of the highest bid received under the January 2016 Undertaking (Prager Decl. ¶ 75), such that the Ng family is disincentivized from selling the Peruvian Business, even at a proposed purchase price that reflects the current company valuation.   This too supports the appointment of a chapter 11 trustee.  *Eurospark*, 424 B.R. at 626, 628-29 (appointment of a chapter 11 trustee warranted where debtor's principal would decline to settle claims against insurance companies that would result in meaningful distributions to secured creditor and administrative claimants in order pursue long-shot litigation that, if fully successful, could result in some recovery by principal).

### c.  *Confidence of Business Community and Creditors*

26.    The appointment of a Chapter 11 trustee is appropriate where the business community and the debtor's creditors lack confidence in management.  Such lack of confidence may be demonstrated by, among other things, credible evidence of extreme acrimony or inferred from conflicts of interest.  *See, e.g.*, *Marvel Entm't*, 140 F.3d at 474 ("The level of acrimony found to exist in this case certainly makes the appointment of a trustee in the best interests of the parties and the estate."); *Eurospark*, 424 B.R. at 630 (recognizing that "acrimony between the creditors and the debtor's management, *standing alone*, has been found to be a basis to appoint a chapter 11 trustee under § 1104(a)(2).") (emphasis added).

27.    The Moving Parties presented clear and convincing evidence demonstrating that the vast majority of the Debtors' creditors have lost all confidence in the Debtors' management for a multitude of reasons, including: the deliberate and premeditated breach of the Undertakings (*e.g.* Tr. 208:25-209:12), the surreptitious planning of global bankruptcy and insolvency filings (Tr. 158:11-162:7), the attempt to protect real estate holdings by transferring them to related parties (Tr. 166:5-22.), several billion dollars of unexplained intercompany transactions (Prager

Rpt., ¶41; Tr. 172: 20-24), hundreds of millions of unexplained purported prepayments to Russian entities (Tr. 106:16-107:22; Isherwood Decl. ¶¶ 17-20), hopelessly conflicted advisors to the Independent Review Committee charged with investigating those suspicious prepayments (Tr. 148:9-150:5), admitted misrepresentation regarding the receipt of $31 million of LSA termination repayments (Tr. 108:6–109:8), the removal of all agreed-to oversight by independent third parties (Tr. 145:9-16; Tr. 145:21-22; Tr. 158:11-159:1; Tr. 162:8-14; Tr. 181:25-192:7; Tr. 207:20-208:7), conflicts of interest of management (Isherwood Decl. ¶ 74), management's large investments in the Debtors that have motivated management to oppose a sale of the Peruvian Business (DX 2 ¶¶ 12, 56-57), management's ties to outsiders reaching into lower levels of the Debtors and their affiliates (Tr. 221:10-223:16), and the intrigue surrounding the Ng family's ability to control the Peruvian Business.  (Isherwood Decl. ¶¶ 48-62; MX 54-59; Tr. 167:2-170:22).  The Court concludes that the foregoing evidence supports the appointment of a chapter 11 trustee.

28.     The assertions of the Debtors and the Peruvian Suppliers that the appointment of a trustee would only serve to further erode the confidence of the Peruvian Entities' local creditors and suppliers and exacerbate the precarious financial condition of the Peruvian Debtors are not credible.  (Debtors' Opp. at ¶ 34; Peruvian Suppliers' Opposition ¶¶ 3, 4.)  While the Debtors presented self-serving testimony that the appointment of the JPLs negatively impacted the Peruvian Debtors' ability to finance their operations, the Debtors failed to present any evidence that the appointment of a Chapter 11 trustee would have a similar impact on the Peruvian Companies aside from the conclusory assertions of management.

29.     The evidence adduced at the hearing overwhelmingly demonstrates that the Peruvian Companies suffered significant financial hardship over the course of the past several years for reasons wholly unrelated to the appointment of the JPLs.  First, Mr. Paniagua testified that "one of the most important factors" that caused the precipitous decline in the Peruvian Companies' financial condition was the presence of " the largest El Niño in the past 15 years". Paniagua Dec. ¶ 24.  As a result of the El Niño, "the percentage catch of the TAC in the northern-central zone was only 66% of the TAC set for the season and the entire second season in both the northern-central and southern zone were canceled." (*Id.*)  In 2015 and 2016, the annual catch volume was down approximately 60% in 2014 and 30% in 2015.  (*Id.*)

30.     The calamitous impact of the El Niño was compounded by Peruvian governmental regulations.  In particular, the evidence presented by the Debtors indicates that the Peruvian government prohibited commercial fishing operations, such as the Peruvian Entities, from operating within ten miles of the Peruvian coast, which is rich in anchovy during an El Niño event.  (Paniagua Decl. ¶ 25-26.)  Additionally, the Peruvian government reduced the TAC year after year over the past several years.  (*Id.* ¶ 28.)

31.     Each of these factors had a profound and negative impact on the Peruvian Companies' production levels, and in turn their financial condition, and are wholly unrelated to the appointment of the JPLs.  What is more, each of the foregoing factors has negatively impacted the Peruvian Businesses for several years, while the JPLs were incumbent for a mere matter of months.

d.  ***Benefits Balanced Against Cost***

32.     Also relevant to the determination of whether to appoint a trustee "is the benefit to be derived by the estate from the appointment of a trustee, balanced against the costs of

appointment." *In re Taub*, 427 B.R. 208, 229-30 (E.D.N.Y. Bankr. 2010).  Fundamentally, a trustee is an independent third-party whose role is to represent the estate for the benefit of all creditors and equity in interest.  11 U.S.C. § 1106; *see also*, *In re Petters Co., Inc.*, 506 B.R. 784, 794 (Bankr. D. Minn. 2013) (chapter 11 trustee has statutory duty [under Section 1106(a)] to investigate the financial affairs of the debtors, to ascertain and account for the assets that are the property of the estates of the debtors, and to determine the amount, validity, and status in bankruptcy of claims against the estates.").  The Moving Parties focus on the possibility that a trustee could halt the insolvency proceedings pending in Peru which, the Moving Parties argue, will prolong, if not preclude, a sale of the Peruvian Business.[16]  Both the Moving Parties and the Opposition Parties submitted expert declarations on Peruvian law and, in particular, on the Peruvian insolvency process as conducted before INDECOPI.  Both experts agree that, as a matter of process, once the insolvency proceedings are "published", the proceedings will move toward either rehabilitation or liquidation (Agurto Decl. ¶ 10; Miró-Quesada Decl. ¶ 51), a process that may well take more than a year.  (Agurto Decl. ¶ 9.)

33.    A trustee's ability to take immediate action to stop the Peruvian proceedings from being "published" is a significant benefit to the Moving Parties.  Because there is a limited window to take such actions, there is substantial urgency to the requested appointment.  The Moving Parties suggest that this could be done by having the trustee exercise his or her authority at CFG Peru Investments Pte. Ltd., the 100% direct owner of Peruvian Debtors CFG Investment and Sustainable Fishing Resources (as well as chapter 11 debtor Protein Trading Limited), to

---

[16] Indeed, Ms. Ng testified that the Debtors had no plan to sell the Peruvian Business for at least one to two years. (Tr. 132:17-133:5.)

replace the boards of those entities such that the Trustee could take action on their behalf. Similarly, once installed at CFG Investment, the indirect parent of Copeinca, the third Peruvian Debtor, the trustee would take similar actions there, effectively working his way down the corporate chain to obtain control over each of the Peruvian Debtors. Upon obtaining the power to act for such entities, the trustee could (i) contest the insolvency proceedings, or (ii) pay the petitioning creditors such that INDECOPI would declare the proceedings terminated. (Agurto Decl. ¶ 8.) In either event, the harms attendant to a drawn out Peruvian insolvency would be avoided, a clear benefit to the creditors.

34.     Further, a trustee will be able to make an independent judgment as to whether or not a sale of the Peruvian Business at this time is warranted.[17] *In re Sudano, Inc.*, 391 B.R. 678, 683-85 (Bankr. E.D.N.Y. 2008) (trustee fulfilled duties under section 1106(a) by filing plan and disclosure statement following the trustee's sale of certain debtor properties); *In re Nicole Energy Servs., Inc.*, 385 B.R. 201 (Bankr. S.D. Ohio 2008) (approving proposed sale by chapter 11 trustee). Given the "surprising and optimistic" (MX 115 ¶ 77) expressions of interest received as part of the pre-petition sale process, continuing that process, or at the very least exploring the possibility of continuing the process with bidders, is of critical import to creditors. *See, e.g.*, *Wings Digital*, 2005 WL 3789334, at *6 ("a trustee could determine whether a sale is in the best interests of the estate and perhaps make the showing of business justification required under *Lionel* . . . there is no reason to assume that a Chapter 11 trustee could not formulate a plan

---

17 The PARD Bondholders appear to argue that the Motion is about nothing other than a quick sale now for the benefit of the Club Lender Parties. (PARD Bondholder Opp. ¶¶ 17, 21.) This argument is unpersuasive. First, an appointed trustee will make an independent judgment regarding the propriety of the sale process. Second, the record is clear that the sale process has the potential to provide benefit to creditors other than the Club Lender Parties, as evidenced most easily by the fact that the Moving Parties include lenders with debt throughout the capital structure.

or (if appropriate) obtain a higher and better offer for the assets to be sold."). It is clear that the Debtors have not made any follow up efforts on a sale since the filing of the Chapter 11 cases. (Tr. 217:8-11.)

35.     The Opposition Parties and Mr. Miró-Quesada tout the substantial protections available to creditors in the Peruvian insolvency proceedings (*e.g.* OpCo Opp. ¶ 63; Miró-Quesada Decl. ¶¶ 58, 63, 69-70, & 90.), but those protections do not outweigh the substantial detriments associated with the delay in reaching any resolution of the Peruvian proceedings.[18] And while the Opposition Parties tout the need for additional time in order to obtain the benefits of "normalized" fishing seasons (Debtors' Opp. at 20; OpCo Opp. ¶ 7; Equity Opp. ¶ 45), Ms. Ng acknowledged that there is no guarantee that the requisite conditions – change in government regulations on coastal fishing limits, quota levels and the ability to fish a full quota – will be achieved. (Tr. 133:10-18.)

36.     The trustee would be available to act as an independent liaison between the Chapter 11 Debtors and the entities subject to Peruvian insolvency proceedings, as well as the proceedings in Singapore and the British Virgin Islands.[19] The Opposition Parties acknowledge that "protocols" among the governing court proceedings, would be welcome. (Debtors' Opp. at

---

[18] Although there are different views expressed by each of the experts on Peruvian law as to the scope of protections available to creditors, there is no need to reach any conclusion on those nuances; it is enough to conclude that the disadvantages of having the Debtors' most valuable asset tied up in a protracted proceeding far outweigh any protections available to creditors. Similarly, the argument of the Peruvian Suppliers that Peru is the only appropriate forum to address the rights of the Peruvian Suppliers (Peruvian Suppliers' Opp. ¶ 6) is entirely misplaced, because, regardless of whether a trustee is or is not appointed here, these chapter 11 cases will not determine the rights of the Peruvian Suppliers.

[19] The argument (Debtors' Opp. ¶ 2; PARD Bondholders Opp. ¶¶23-24) that the Debtors' outside professionals can provide the necessary independence and that a trustee is not warranted misses the point. Outside professionals ultimately take direction from their clients; a trustee is required here to ensure that operational and strategic decisions are themselves determined independently and in the interest of all creditors.

14; Equity Opp. ¶ 52.)  Here, any such protocol should be conducted by an independent party, such that there is benefit to having a trustee in place to address issues in such proceeding if it does move forward.

37.     In any event, a trustee provides benefits separate from those associated with the Peruvian insolvency proceedings.  Most critically, a trustee would provide an independent voice in restructuring negotiations – whatever form those might take.   While there are limited operations and assets within these Debtors, there is substantial indebtedness, much of it owing to the Moving Parties, who have expressed an unwillingness to deal with existing management. (Isherwood Decl. ¶ 73-74; McQueen Decl. ¶ 27.)    A trustee would provide an untarnished representative to evaluate plan alternatives and ultimately negotiate with creditors.  In addition, a trustee can address claim issues that owner/managers cannot, such as prosecuting intercompany claims (*see In re L.S. Good & Co.*, 8 B.R. 312, 315 (N.D.W. Va. Bankr. 1980) (existence of extensive intercompany claims counseled in favor of appointing trustee who could neutrally investigate such claims)), or enlarging the estate by pursuing potential claims against related parties (*see Ridgemour Meyer*, 413 B.R. at 114 ("an independent trustee better serves the interests of the constituencies that come ahead of equity")).  Finally, the appointment of a trustee will benefit the estate through the avoidance of contentious litigation between the debtors and creditors.  *See Taub*, 427 B.R. at 230 ("a trustee can manage the estate's property without the constraints that result from the contentions litigation pending in this Court and elsewhere"); *see also In re Marvel Enter. Grp. Inc.*, 140 F.3d 463, 473 (3d Cir. 1998) (appointing trustee because "'this is a large and messy bankruptcy that promises to get worse without a disinterested administrator at the helm'") (quoting *Cajun Elec. Power Coop, Inc. v. Cent. La. Elec. Coop, Inc.*

*(In re Cajun Elec. Power Coop, Inc.)*, 74 F.3d 599, 600 (5thCir. 1996).  There is little doubt that these Chapter 11 cases will be marked with litigation, given the lack of trust established by the Moving Parties.

38.    By contrast, the Opposition Parties have provided no evidence to support their claims as to the magnitude of the potential trustee fees here.  Debtors' Opp. at 35; Equity Opp. ¶ 46.   While Section 326 permits a trustee to recover up to certain set percentages, such percentages are a cap, and any fees must be reasonable.  *See* 11 U.S.C. § 326(a) ("[i]n a case under chapter . . . 11, the court may allow *reasonable* compensation under section 330 of this title of the trustee for the trustee's services" (emphasis added)); *In re The 1031 Tax Group, LLC*, Case No. 07-11448 (MG), 2009 WL 4806199, *1 (Bankr. S.D.N.Y. Dec. 9, 2009) ("While Bankruptcy Code § 326(a) sets a maximum limit on the compensation that may be awarded to a trustee, § 330 still operates to limit the compensation of trustees *to a reasonable amount*." (emphasis added)).  As to professionals for a trustee, once again, the Opposition Parties provide no support for their suggestion that such fees could run as high as $30 million. (Debtors' Opp. at 35.)  In this case, no creditors' committee has been appointed, saving costs that otherwise would have been incurred by outside counsel, and the Debtors' existing professionals should be able to work with a trustee's counsel to ensure a smooth transition and avoid duplication.  In addition, any sales process likely would involve an outside professional – a chapter 11 trustee choosing to market the Peruvian Business (or any other of the Debtors' assets) would incur the same professional fees on that process as would the Debtors.  The benefits to a trustee in this case far outweigh the potential costs.  *See Taub*, 427 B.R. at 229-30 (weighing costs of trustee's familiarization with debtor, its professional fees, and the cost of its investigation against benefits

of "survey[ing] the estate free from the complex, familial, reflexive, and often acrimonious relationship among the Debtor and the parties in interest," and finding that balance favored appointment of trustee).

### e. *Equity's Opposition to the Motion Does Not Require Denial*

39.     Section 1104(a)(2) requires that the appointment of a chapter 11 trustee be "in the interest of creditors, any equity security holders, and other interests of" the Debtors' estates.  11 U.S.C. § 1104(a)(2).  Here, the equity security holders objecting to the Motion *are* management, and their actions are the very actions that have eroded the creditors' trust.  The objecting equity security holders are acting for their own self-interest rather than the interests of the estate as a whole, or even of all equity security holders.  *See, e.g.*, *Eurospark*, 424 B.R. at 630-33 (trustee appointed over objection of sole equity holder where that equity holder's interests lay in pursuing long-shot strategy to the likely detriment of the estate and where group of creditors with greatest economic stake lacked trust in the equity holder); *Ridgemour Meyer*, 413 B.R. at 114 (Equity's "preference is understandable since they . . . may be the target of a trustee's investigation.  Nevertheless, [principal] has proven himself untrustworthy, and an independent trustee better serves the interests of the constituencies that come ahead of equity.").

40.     Moreover, the evidence supports the fact that a trustee would benefit non-management equity.  Two of the Debtors, PAIH and CFGL, have significant portions of their equity traded on public stock exchanges:  as much as 46% in the case of PAIH, and as much as 30% in the case of CFGL.  (MX 60 ¶ 154(f); DX 42.)  Trading in these shares has been subject to suspension due to investigations by the relevant securities authorities. (Tr. 173:6-174:19.)  These holders, like the moving creditors here, have been subject to the self-interested actions of management, including the abandonment of a committed sale process pursuant to which the

offers received in the first bidding round would have been sufficient, if progressed to a sale, to pay creditors of CFGL and its subsidiaries in full, with significant potential recoveries to the public shareholders of CFGL (as well as creditors of PARD). (Tr. 218:15-18.) The allegations that have led to the securities investigations harm the public shareholders, and removing any possible taint on those securities would also benefit equity security holders.

41. For the reasons stated herein, the appointment of a chapter 11 trustee is in the interest of creditors, equity security holders, and other interests of the Debtors' estates.

Dated: New York, New York
          September 2, 2016

Respectfully submitted,

**DLA PIPER LLP (US)**

By: _/s/ R. Craig Martin_
R. Craig Martin (RM1971)
Mordechai Y. Sutton (MS5781)
DLA Piper LLP (US)
1251 Avenue of the Americas
New York, New York 10020
Telephone: (212) 335-4500
Facsimile: (212) 335-4501

Richard A. Chesley
John K. Lyons
Jeffrey S. Torosian
DLA Piper LLP (US)
203 North LaSalle Street, Suite 1900
Chicago, Illinois 60601
Telephone: (312) 368-4000
Facsimile: (312) 236-7516

*Counsel to the Club Lender Parties*

**SIDLEY AUSTIN LLP**

By: /s/ Lee S. Attanasio
Lee S. Attanasio
Andrew P. Propps
787 Seventh Avenue
New York, New York 10019
Telephone: (212 839-5300
Facsimile: (212) 839-5599
Email: Lattanasio@sidley.com
         apropps@sidley.com

*Attorneys for Bank of America, N.A.*

**Kirkland & Ellis LLP**

By: /s/ Gregory F. Pesce
James H.M. Sprayregen, P.C.
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

Gregory F. Pesce (admitted *pro hac vice*)
300 North LaSalle
Chicago, Illinois 60654
Telephone: (312) 862-2000
Fascimile: (312) 862-2200
Email: gregory.pesce@kirkland.com

*Counsel to the Senior Noteholder
Committee*

**MAYER BROWN LLP**

By: /s/ Frederick D. Hyman
Frederick D. Hyman (FH7832
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 506-2500
Facsimile: (212) 262-1910
Email: fhyman@mayerbrown.com

*Counsel for Malayan Banking Berhad, Hong
Kong Branch*

**CURTIS, MALLET-PREVOST
COLT & MOSLE LLP**

By: /s/ L.P. Harrison 3rd
L.P. Harrison 3rd
Turner P. Smith
Peter J. Buenger
101 Park Avenue
New York, New York 10178-0061
Telephone: (212) 696-6000
Facsimile: (212) 697-1559
Email: lharrison@curtis.com
         tsmith@curtis.com
         pbuenger@curtis.com

*Counsel for the Pickenpack Group*