NOT FOR PUBLICATION

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------- x

| | | |
|---|---|---|
| *In re:* | : | Chapter 11 |
| | : | |
| CHINA FISHERY GROUP LIMITED | : | Case No. 16-11895 (JLG) |
| (CAYMAN), *et al.* | : | |
| | : | (Jointly Administered) |
| *Debtors*[1] | : | |

------------------------------------------------------- x

## MEMORANDUM DECISION AND ORDER GRANTING
## MOTION FOR THE APPOINTMENT OF A CHAPTER 11 TRUSTEE

A P E A R A N C E S :

MEYER, SUOZZI, ENGLISH & KLEIN, PC
990 Stewart Avenue
Garden City, New York 11530
By:    Howard B. Kleinberg, Esq.
       Edward J. LoBello, Esq.
       Jil Mazer-Marino, Esq.
-and-
1350 Broadway, Suite 501
New York, New York 10018
By:    Paul F. Millus, Esq. (argued)
       Thomas R. Slome, Esq.
       Daniel B. Rinali, Esq.

*Counsel to the Debtors*

---

[1]    The Debtors are N.S. Hong Investment (BVI) Limited ("N.S. Hong"), Super Investment Limited (Cayman) ("Super Investment"), Pacific Andes International Holdings Limited (Bermuda) ("PAIH"), China Fishery Group Limited (Cayman) ("CFGL"), Smart Group Limited (Cayman) ("Smart Group"), Protein Trading Limited (Samoa) ("Protein Trading"), South Pacific Shipping Agency Limited (BVI) ("SPSA"), CFG Peru Investments Pte. Limited (Singapore) ("CFG Peru Singapore"), China Fisheries International Limited (Samoa) ("CFIL"), Growing Management Limited (BVI) ("Growing Management"), Chanery Investment Inc. (BVI) ("Chanery"), Champion Maritime Limited (BVI) ("Champion"), Target Shipping Limited (HK) ("Target Shipping"), Fortress Agents Limited (BVI) ("Fortress"), CFGL (Singapore) Private Limited ("CFGLPL") and Ocean Expert International Limited (BVI) ("Ocean Expert") (collectively, the "Debtors").

KELLEY DRYE & WARREN LLP
101 Park Avenue
New York, New York 10178
By:    James S. Carr, Esq.
       Jason R. Adams, Esq.
       William Gyves, Esq. (argued)

*Special Litigation Counsel to CFG Investment, S.A.C.,*
*Corporacion Pesquera Inca S.A.C. and*
*Sustainable Fishing Resources S.A.C.*


LOWENSTEIN SANDLER LLP
1251 Avenue of the Americas
New York, NY 10020
By:    Gerald C. Bender, Esq. (argued)
       Paul Kizel, Esq.
       Keara M. Waldron, Esq.

*Counsel to the Equity Holders of Debtor*
*N.S. Hong Investments (BVI) Limited*


DLA PIPER LLP (US)
1251 Avenue of the Americas
New York, New York 10020
By:    R. Craig Martin, Esq. (argued)
       Mordechai Y. Sutton, Esq.
-and-
203 North LaSalle Street, Suite 1900
Chicago, Illinois 60601
By:    Richard A. Chesley, Esq.
       John K. Lyons, Esq.
       Jeffrey Torosian, Esq. (argued)

*Counsel for the Club Lenders*


SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, NY 10019
By:    Lee S. Attanasio, Esq.
       John G. Hutchinson, Esq. (argued)
       Andrew P. Propps, Esq.

*Counsel for Bank of America, N.A.*

Honorable James L. Garrity, Jr.
United States Bankruptcy Judge

INTRODUCTION[2]

This matter comes before the Court on the Motion (the "Motion") of Coöperatieve

Rabobank U.A. ("Rabobank"), Standard Chartered Bank (Hong Kong) Limited ("Standard

Chartered") and DBS Bank (Hong Kong), Limited ("DBS," and together with Rabobank and

Standard Chartered, the "Club Lender Parties"[3]) seeking the appointment of a Chapter 11 trustee

pursuant to section 1104(a)(2) of the Bankruptcy Code.  The Motion is joined by Bank of

America, N.A. ("BANA," and together with the Club Lender Parties, the "Movants"), Malayan

Banking Berhad, Hong Kong Branch ("Maybank"), the Insolvency Administrator of the

Pickenpack Group, and the Senior Noteholders Committee[4] (collectively, the "Joinder Parties").

---

[2]    The Court conducted a two-day trial and heard testimony from a total of seven witnesses, at the conclusion of which the parties stipulated to the admission of 168 exhibits, which were received into evidence.  The parties disputed the admission of 33 additional exhibits, which were to be addressed by separate, post-trial briefing and submitted along with each side's respective Proposed Findings of Fact and Conclusions of Law.  The witnesses who submitted declarations as direct testimony were: Guy Isherwood (as the head of Group Special Asset Management in Greater China & North Asia at Standard Chartered Bank (Hong Kong) Limited) in support of the Motion [ECF No. 58]; Amanda McQueen (as director of the Special Assets Group of Bank of America Merrill Lynch International Limited) in support of the Motion [ECF No. 64]; Renzo Agurto (the Club Lender Parties' expert on Peruvian insolvency law) in support of the Motion [ECF No. 59]; Jessie Ng (as Managing Director of PAIH, CEO of CFGL, and General Manager of the Peruvian Opcos) in opposition to the Motion [ECF No. 105]; David W. Prager (the Debtors' financial advisor) in opposition to the Motion [ECF No. 101]; Francisco Paniagua (as General Manager of the Peruvian Opcos) in opposition to the Motion [ECF No. 99]; Gustavo Miro-Quesada Milich (the Debtors' expert on Peruvian insolvency law) in opposition to the Motion [ECF No. 104]. The Court's rulings with respect to the admissibility of the 33 additional exhibits will be filed in a separate order.

Citations to "Hr'g Tr." refer to the transcript of the evidentiary hearing held on August 29th and 30th, 2016 [ECF Nos. 155, 159].

[3]    When the Motion was originally filed, China CITIC Bank International Limited ("China CITIC International") was one of the Club Lender Parties, and represented by DLA Piper LLP (US) ("DLA").  However, DLA has since withdrawn as counsel for China CITIC International, who has indicated that it does not support the appointment of a Chapter 11 trustee.  *See* ECF Nos. 76, 138.  In addition, China CITIC, Qingdao Branch has separately submitted, by letter, its objection to the appointment of a Chapter 11 trustee.  *See* ECF No. 97.

[4]    The Pickenpack Group and the Senior Noteholders Committee are identified and discussed in further detail below.

1

*See* ECF Nos. 61, 63, 65.[5]  The Motion is opposed by the Debtors, who are joined by the

Peruvian Opcos (defined below), certain of the equity holders of Debtor N.S. Hong (the "Equity

Holders," and together with the Debtors and Peruvian Opcos, the "Opposing Parties"), an

Informal Steering Committee[6] of bondholders of Pacific Andes Resources Development Limited

("PARD"), a non-Debtor that is subject to its own insolvency proceeding in Singapore, and

certain bank creditors at different levels of the Debtors' capital structure (collectively, the

"Objecting Banks").[7]

 As discussed below, together, the Debtors comprise a small part of the Pacific Andes

Group of companies that collectively constitute the world's twelfth largest fishing company.

Members of the Ng Family (discussed below), through Debtor N.S. Hong, control the group's

operations.  The Debtors consist principally of holding companies and defunct, non-operating

companies.  None have assets in the United States except for their interests in retainers paid to

their United States advisors.  Whatever value they have is derived from their mostly indirect

interests in three Peruvian operating companies – CFG Investments S.A.C. ("CFGI"),

Corporacion Pesquera Inca S.A.C. ("Copeinca"), and Sustainable Fishing Resources S.A.C.

---

[5] All citations herein to "ECF No. ___" refer to Electronic Case Filing documents entered on the docket in the Debtors' jointly administered, main Chapter 11 case, Case No. 16-11895.  Where there is a reference to a document entered on the docket in a different case, the "ECF No. ___" citation will be followed by the applicable case number.

[6] The Informal Steering Committee consists of holders of bonds issued by PARD, dated July 30, 2014, in the aggregate principal amount of $200,000,000 and are due on July 30, 2017, with Hong Kong and Shanghai Banking Corporation Limited serving as trustee.  *See* ECF No. 98.

[7] Specifically, each of the following lender banks filed objections to the Motion: (i) Industrial and Commercial Bank of China [ECF No. 96]; (ii) China CITIC Bank International Limited [ECF No. 97]; (iii) Huaxia Bank [ECF No. 110]; and (iv) Bank of Communications [ECF No. 111].  Additionally, a group of Peruvian Supplier: Fabricaciones y Reparaciones Industriales – FMERM S.R.L., Fibras Marinas S.A., ASAP Consulting Group S.A.C., Paitan S.A.C. and G.I. Industria Peru S.A.C. filed an objection to the Motion on August 25, 2016 [ECF No. 118].

At the evidentiary hearing, the Movants argued that the objections to the Motion by the Objecting Banks, Peruvian Suppliers and the Informal Steering Committee were untimely.  A review of the case docket shows that the only objection that was untimely filed was that of the Peruvian Suppliers.  Although not timely filed, the Court will consider the matters raised in that objection.

("SFR," and together with CFGI and Copeinca, the "Peruvian Opcos").  Those entities operate

the Pacific Andes Group's anchovy fishing business and together control a significant percentage

of the anchovy fishing quotas fixed by the Peruvian government.  They are not Chapter 11

debtors.  However, they are the subject of involuntary insolvency proceedings filed against them

in Peru (the "Peruvian Insolvency Proceedings"), at their behest, by three "friendly" local

creditors.  The putative "foreign representative" of the Peruvian Opcos has filed petitions for

recognition of those proceedings under Chapter 15 of the Bankruptcy Code on their behalves in

this Court.

The Chapter 11 cases, PARD's voluntary insolvency proceeding in Singapore, and the

Peruvian Involuntary Proceedings were commenced simultaneously in violation of certain Deeds

of Undertaking (defined below) entered into pre-petition by, among others, certain of the

Debtors, the Movants and the Hong Kong and Shanghai Banking Corporation ("HSBC"), and,

ultimately, to block an agreed sale of the Peruvian Opcos' business (defined below as the

"Peruvian Business").  The record is clear that that the Debtors have no prospect of rehabilitation

if they cannot realize value from their interests in the Peruvian Opcos.  They contend that they

will not be able to do so, and, as such, that their creditors and shareholders will be prejudiced, if

the agreed upon sale of the Peruvian Business goes forward.  Indeed, for the Debtors, "the

purpose of these chapter 11 cases is simple – to provide the Debtors with a breathing spell in

order to implement a restructuring of their businesses and utilize the automatic stay to prevent

creditors from forcing a fire sale [of the Peruvian Business], which would preclude structurally

subordinated creditors and shareholders [i.e., the Debtors' creditors and shareholders] from

realizing values."  First Day Decl. ¶ 20.  The sale of the Peruvian Business cannot go forward at

this time given the pendency of the Peruvian Insolvency Proceedings.  The Movants seek the

3

appointment of a Chapter 11 trustee for the Debtors under section 1104(a)(2) of the Bankruptcy Code for a variety of reasons, the most pressing of which at this time is to cause the Peruvian Opcos to challenge those insolvency proceedings.  In substance, they contend that the trustee should cause the Peruvian Opcos to contest the involuntary petitions by, among other things, exercising their rights under Peruvian law to satisfy the claims of the petitioning creditors.  The Movants maintain that after those proceedings are dismissed, the trustee should cause the Debtors to sell the Peruvian Business, pay off the creditors of the Peruvian Opcos, and distribute the net proceeds from the sale to the Debtors' creditors and shareholders in accordance with their rights and priorities.  Thus, while the Debtors are advocating a "wait and see" approach, with the value of the Peruvian Opcos to be realized and distributed through the Peruvian Insolvency Proceedings, the Movants, through this Motion, are seeking, among other things, to obtain the benefit of their pre-petition bargain with the Debtors.

Under section 1104(a)(2) of the Bankruptcy Code, a court shall appoint a trustee when that appointment "is in the best interests of creditors, any equity security holders, and other interests of the estate . . ." 11 U.S.C. § 1104(a)(2).  The Court is mindful that the appointment of a Chapter 11 trustee is an extraordinary remedy and is the exception, not the rule.   Nonetheless, based upon its review of the voluminous record made in connection with the Motion, the Court finds that in balancing the advantages and disadvantages to appointing a trustee, the Movants have established by clear and convincing evidence that it is in the best interest of Debtors' estate and creditors that a trustee be appointed, as set forth below.

Accordingly, the Motion is **GRANTED t**o the extent set forth herein.

<u>JURISDICTION AND VENUE</u>

This Court has jurisdiction pursuant to 28 U.S.C. §§ 1334(a) and 157(a) and the

Amended Standing Order of Referral of Cases to Bankruptcy Judges of the United States District

Court for the Southern District of New York (M-431), dated January 31, 2012 (Preska, C.J.).

Venue of this contested matter is proper under 28 U.S.C. §§ 1408 and 1409.  This is a core

proceeding under 28 U.S.C. §157(b)(2)(A) and (O).

The following constitutes the Court's findings of fact and conclusions of law pursuant to

Rule 52(a) of the Federal Rules of Civil Procedure, made applicable herein by Rules 7052 and

9014(c) of the Federal Rules of Bankruptcy Procedure.

<u>FACTS</u>

**<u>The Debtors and Related Parties</u>**

<u>*The Chapter 11 Debtors*</u>

On June 30, 2016 (the "Petition Date"), each of the sixteen Debtors herein filed voluntary

petitions under Chapter 11 of the Bankruptcy Code in this Court.  The Office of the United States

Trustee has not appointed an Official Committee of Unsecured Creditors in these cases.  The

Debtors are part of the Pacific Andes Group and consist of four operating companies,[8] six non-

operating companies,[9] and six investment holding companies, including N.S. Hong, the Debtors'

ultimate parent company, and two publicly traded companies—PAIH and CFGL.[10]  The Debtors

---

[8]    The operating companies are: Protein Trading, a fishmeal trading company; SPSA, which provides shipping
agency services; CFGLPL, a property investment company; and CFIL.  *See* Declaration of Ng Puay Yee in Support
of Debtors' First Day Motions ("First Day Decl.") [ECF No. 2] ¶ 14.

[9]    The non-operating companies, which previously were in the business of trading frozen seafood products or
providing freight service, are: Chanery, Champion, Growing Management, Fortress, Ocean Expert and Target
Shipping.  *See id.* at n.2.

[10]    The remaining Debtor holding companies are: Super Investment, Smart Group and CFG Peru Singapore.  *See
id.* at n.1.

5

have no material operational assets. *See* First Day Decl. ¶ 14. None of them are incorporated in

the United States and none have significant assets in the United States. *See id.* ¶¶ 55-70. As of

the Petition Date, other than pre-funded retainers, the Debtors had less than $325,000 on hand.

*See* Debtors' Schedules [Movants' Exs. 35-50] (reporting $322,586.87 in cash on hand).

Currently, the only source of funding for these cases available to the Debtors is the Meridian

Investment Group ("Meridian"), an entity controlled by Ng Joon Chan, a member of the Ng

Family. Meridian funded the retainers to the Debtors' professionals in these cases. *See*

Movants' Exs. 98, 99, 139, 140; Hr'g Tr. 227:11-19. There are over $7 billion in intercompany

claims, all of which have been scheduled as "disputed." *See* Hr'g Tr. 172:4-6; Prager Decl. &

Rpt. [Debtors' Ex. 26] ¶ 41. The Club Facility (defined below) constitutes the Debtors' largest

creditor group, holding over $413 million in principal amount of loans as of the Petition Date.

*See* Debtors' Schedules [Movants' Exs. 35-50].

 The Debtors' value is derived primarily from their direct and indirect interests in the CF

Group (defined below). *See* First Day Decl. ¶ 17. That group's value rests in the assets held by

three non-Debtor Peruvian Opcos. *See* First Day Decl. ¶ 74. Through those entities, the CF

Group holds the largest quota for the harvest of anchovy in Peru, which are used to produce

fishmeal and fish oil in factories in Peru for sale overseas. *See* Declaration of Ng Puay Yee in

Opposition to Motion ("Ng Decl.") [ECF No. 105] ¶ 9. None of the Peruvian Opcos are Chapter

11 Debtors. As discussed below, each is the subject of an involuntary insolvency proceeding

pending in Peru. The purported foreign representative of each of those entities has filed a

petition for recognition under Chapter 15 of the Bankruptcy Code. *See* Chapter 15 Petition (for

each of CFGI, Copeinca and SFR) [ECF No. 1 in Case Nos. 16-11891, 16-11892, 16-11894,

respectively].

*The Pacific Andes Group*

In 1986 Swee Hong Ng and his sons (collectively, with others, the "Ng Family") started a small frozen seafood trading business in the Western District of Hong Kong, which later became known as the Pacific Andes Group. *See* Ng Decl. ¶ 7. Over the past 30 years, under the Ng Family's management, the business has grown into a fully integrated global seafood and fishing enterprise. *See id.* Today, the Pacific Andes Group consists of over 150 operating and non-operating entities and collectively is the twelfth largest seafood company in the world. *See* First Day Decl. ¶ 29. It provides seafood products to leading global wholesalers, processors and food service companies and has operations across the seafood value chain. *Id.*

In the early 1990s, the Pacific Andes Group grew rapidly and today, includes three public companies. *See* Ng Decl. ¶ 22. Debtor PAIH is the holding company of the Pacific Andes Group. *See* First Day Decl. ¶ 31. In 1994, it was publicly listed on the Hong Kong Stock Exchange. *Id.* In 1996, PARD was publicly listed on the Singapore Exchange. *Id.* In 2004, the Pacific Andes Group acquired a strategic stake in the CF Group. *Id.* ¶ 33. Debtor CFGL is the holding company that serves as the direct and indirect parent of companies comprising the CF Group. In 2006, CFGL was listed on the Singapore Exchange. *Id.*

*The Ng Family*

The Ng Family controls the Pacific Andes Group. Since 2013, their interests in the group have been held in Debtor N.S. Hong, the family's investment vehicle. *See* First Day Decl. ¶¶ 56, 70. N.S. Hong holds directly or indirectly majority interests in PAIH and PARD, and a minority interest in CFGL. *See* Chart of Bankruptcy Parties [Movants' Ex. 164, Ex. A to First Day Decl.].

Thus, the ultimate, indirect owners of all of the Debtors and the Peruvian Opcos is N.S. Hong, which is controlled by the Ng Family. *See* Ng Decl. ¶ 56; Chart of Bankruptcy Parties

[Movants' Ex. 164, Ex. A to First Day Decl.].  Madame Teh Hong Eng is a non-executive

director of N.S. Hong and PAIH.  She is the mother of Ng Joo Siang ("J.S. Ng"), Ng Joo Kwee,

Ng Joo Puay, Frank, Ng Joo Thieng ("J.T. Ng") and Ng Puay Yee, "Jessie" ("Jessie Ng").  Ng

Decl. ¶ 7; *see also* List of Debtors' Officers and Directors [Ex. G to First Day Decl.]  Jessie Ng

is a director of each of the Debtors in these Chapter 11 cases.  Ng Decl. ¶ 2.  She has been an

executive director of PAIH since 2001, and was appointed as an executive director of CFGL on

January 21, 2016, and became Chief Executive Officer of CFGL on February 26, 2016.  *Id.* ¶ 5.

Many of the other members of the Ng Family also hold director and executive positions for the

Debtors and the Peruvian Opcos.  *See* Hr'g Tr. 275:8-10; List of Debtors' Officers and Directors

[Ex. G to First Day Decl.]  For example, both Jessie Ng and J.T. Ng are general managers of the

Peruvian Opcos.  *See* Hr'g Tr.136:7-14; 296:18-20.  Additionally, J.T. Ng and Jessie Ng hold

powers of attorney of the Peruvian Opcos, which include the unilateral power to dispose of the

Peruvian Opcos' assets.  *See* Powers of Attorney [Movants' Exs. 54-57].

## The China Fishery Group

The China Fishery Group of companies comprises thirteen of the sixteen Debtors[11] and

miscellaneous non-Debtors (the "CF Group"), including the Peruvian Opcos, which are the most

valuable assets in the group.  The CF Group is operated as a separate business within the Pacific

Andes Group.  First Day Decl. ¶ 17.  CFGL was incorporated by the Pacific Andes Group with

the acquisition of approximately $600 million in Peruvian fishmeal assets.  *See* Ng Decl. ¶ 36.

The CF Group acquired Copeinca (which held a 10.7% quota for the anchovy harvest) in 2013

for an acquisition cost of approximately $1.04 billion.  *See id.*; Paniagua Decl. ¶ 20.  The

---

[11]    The CF Group debtors are: CFGL (the publicly traded holding company), Smart Group, Protein Trading, SPSA,
CFG Peru Singapore, CFIL, Growing Management, Chanery, Champion, Target Shipping, Fortress, CFGLPL, and
Ocean Expert.

acquisition of the CF Group extended the Pacific Andes Group's business into industrial fishing

and included rights to fish in some of the world's most lucrative fisheries, including the anchovy

fishery in Peru. *See* First Day Decl. ¶ 33. The CF Group, primarily through CFGI and

Copeinca, sources, harvests, on board-processes and delivers high-quality fish products to

consumers around the world and engages in fishing, fishmeal and fish oil processing and

production in Peru for worldwide distributions (the "Peruvian Business"). *See* First Day Decl. ¶

38. Anchovy fishing in Peru is regulated through the issuance of ship-specific quotas and the

seasonal adjustment of the total allowable catch ("TAC"). First Day Decl. ¶ 45. The success and

viability of the Peruvian Business is dependent upon its being able to harvest anchovies up to the

quotas fixed by the Peruvian government. Ng Decl. ¶ 68.

Management of the day-to-day operations of the Peruvian Opcos is coordinated through

the local general managers—Francisco Javier Paniagua ("Paniagua") and Jose Miguel Tirado

("Tirado")—who have managed the Peruvian fishmeal operations for the past 10 years. *See* Ng

Decl. ¶ 36; Paniagua Decl. ¶¶ 1, 12. However, Paniagua and Tirado ultimately answer to the Ng

Family (Hr'g Tr. 275:18-276:2), have no authority over the Ng Family with respect to the

Peruvian Opcos, and cannot stop them from disposing of the Peruvian Opcos' assets (Hr'g Tr.

280:3-7).

### The Lender Parties' Loans

#### *The Club Facility*

The Club Lender Parties, together with China CITIC International and HSBC are the

lenders (the "Club Lenders") to Debtor CFIL and non-Debtors CFGI and Copeinca (together

with CFIL, the "Club Borrowers") pursuant to a $650 million unsecured facility agreement dated

March 20, 2014 (as amended from time to time, the ("Club Facility")). *See* Isherwood Decl. ¶¶

4-5.  Among others, Debtors CFGL and N.S. Hong are guarantors under the Club Facility.  *Id.* at

7.  The Club Facility was made available to, *inter alia*, assist with a corporate restructuring of the

Peruvian Business, pay off existing debt associated with the acquisition of the Peruvian

Business, and provide revolving credit to pay off other existing facilities.  *See id.* ¶ 5.  As of the

Petition Date, approximately $413 million in aggregate principal amount was outstanding.[12]  *See*

Debtors' Schedules [Movants' Exs. 35-50].

## Bank of America

BANA is an unsecured creditor to Debtors CFIL and SPSA (together, the "BANA

Obligors") pursuant to a $35 million facility letter dated August 26, 2014 (the "BANA Facility"),

of which approximately $28 million in principal amount was outstanding as of the Petition Date.

*See* McQueen Decl. ¶¶ 5, 13; First Day Decl. ¶ 97.  The obligations under the BANA Facility are

guaranteed by Debtor CFGL.[13]  *See* McQueen Decl. ¶ 5; First Day Decl. ¶ 97.

---

[12]   Certain Debtors have listed claims of the Club Lenders in their schedules, as follows:

- CFIL listed two Rabobank entities as unsecured creditors on its Schedule F of the Schedules of Assets and Liabilities with claims of $518,500 and $417,663,310.
- CFGL listed Rabobank as an unsecured creditor on its Schedule F with a claim of $418,181,810.
- N.S. Hong listed a Rabobank branch as an unsecured creditor on its Schedule F with a claim of $30,645,185.72.
- PAIH listed Rabobank entities as unsecured creditors on its Schedule F with three separate claims of $14,004,775.78, $88,484,377.34, and $3,062,759.14.
- PAIH listed Rabobank as an unsecured creditor on its Schedule F with a claim of $56,775,025.49.
- PAIH listed DBS as an unsecured creditor on its Schedule F with three separate claims of $24,910,665.20, $30,233,857.72, and $4,825,979.25.
- PAIH listed Standard Chartered as an unsecured creditor on its Schedule F with a claim of $8,357,318.32.
- CFGL listed Standard Chartered as an unsecured creditor on its Schedule F with a claim of $1,478,223.81.
- Champion listed Standard Charted as an unsecured creditor on its Schedule F with a claim of $1,478,223.81.

Rabobank is the agent of the Club Facility; the scheduling of Rabobank's claims by CFGL and CFIL are likely on account of the Club Facility.

[13]   Debtors CFGL, SPSA, and CFIL listed BANA as a creditor with a claim of $27,885,960.59 on Schedule F of their Schedules of Assets and Liabilities.

BANA is also the lender under a separate $15 million facility letter dated August 26, 2014 (the "PAE Facility"), among BANA and Pacific Andes Enterprises (BVI) Limited ("PAE"), Parkmond Group Limited (BVI) ("Parkmond"), PARD Trade Limited (BVI) (together with PAE and Parkmond, the "PAE Obligors"). *See* McQueen Decl. ¶ 6. The PAE Obligors are jointly and severally liable under the PAE Facility, and the PAE Facility has been guaranteed by PARD. *Id.* The PAE Obligors are indirect subsidiaries and affiliates of the Debtors, and are not themselves Debtors in these proceedings. *Id.*

*Maybank*

Maybank is one of the largest creditors of the Pacific Andes Group. Maybank Joinder ¶ 7. It is a lender under the following facilities, each of which is in default: (i) a $100,000,000 facility agreement dated March 21, 2014 (as amended, supplemented or otherwise modified from time to time, the "PATM Facility") with Pacific Andes Treasury Management Limited ("PATM"), (ii) a $65,000,000 facility agreement dated August 21, 2014 (as amended, supplemented or otherwise modified from time to time, the "PAE/PGL Facility") with PAE and Parkmond, and (iii) a $70,000,000 facility agreement dated September 30, 2014 (as amended, supplemented or otherwise modified from time to time, the "Europaco Facility"; together with the PATM Facility and the PAE/PGL Facility, the "Maybank Facilities") with Europaco Limited ("Europaco"). *Id.* As of the Petition Date, the aggregate amount outstanding under the Maybank Facilities was in excess of $198 million. *Id.* Debtor PAIH is a guarantor of the obligations under both the PATM Facility and Europaco Facility. *Id.* ¶ 8. PAIH listed Maybank as an unsecured creditor with two claims of $40,000,000 and $95,000,000 on Schedule F of its Schedules of Assets and Liabilities.

_Senior Noteholders Committee_

The Senior Noteholder Committee consists of a group of entities that hold, or act as

investment manager or advisor to certain funds, controlled accounts or other entities that are

beneficial owners or holders of certain 9.75% senior notes due 2019 (the "Senior Notes") issued

by CFGI under the Indenture dated July 30, 2012.  _See_ Statement Regarding the Motion [ECF

No. 62] ¶ 1.  TMF Trustee Ltd. is the Indenture Trustee for the Senior Notes.  _Id._  Each of CFGL,

Smart Group, Protein Trading, SPSA, CFG Peru Singapore, CFIL, Growing Management,

Chanery, Champion, Target Shipping, Fortress, CFGLPL, and Ocean Export have listed the

Indenture Trustee for the Senior Notes—TMF Trustee Ltd.—as a creditor with a claim of

$296,000,000 on Schedule F of their Schedules of Assets and Liabilities.

_The Pickenpack Group_

The "Pickenpack Group" are affiliates of the Debtors that are in insolvency proceedings

pending in Germany.[14]  _See_ Joinder of the Pickenpack Group to the Club Lender Parties' Motion

[ECF No. 65].  They consist of Pickenpack Production Lüneburg GmbH ("Pickenpack

Production"), Pickenpack Europe GmbH ("Pickenpack Europe"), Pickenpack Holding Germany

GmbH ("Pickenpack Holding") and TST The Seafood Traders GmbH ("TST").  _Id._  Friedrich

von Kaltenborn-Stachau ("Kaltenborn-Stachau") is the appointed Insolvency Administrator of

the Pickenpack Group debtors.  _Id_.  The Pacific Andes Group holds a 19% equity interest in the

Pickenpack Group.  _See_ First Day Decl. ¶ 35.  PAIH listed the Pickenpack Group companies as

unsecured creditors with four claims of $14,282,970, $10,986,900, $36,474,798.44, and

---

[14]   After the Motion was fully submitted and on September 22, 2016, each of the Pickenpack Group entities, by
their appointed administrator, Kaltenborn-Stachau, filed a petition for in this Court under Chapter 15 of the
Bankruptcy Code for recognition of the German insolvency proceedings as a foreign main proceeding, or in the
alternative foreign non-main proceeding.  The Chapter 15 cases of the Pickenpack Group are jointly administered
under Case No. 16-12681.  _See_ Pickenpack Holding Verified Petition (ECF No. 1 [in Case No. 16-12681]).  The
commencement of the Chapter 15 cases does not impact the Court's analysis of the Motion.

$16,480,350 on Schedule F of its Schedules of Assets and Liabilities (listing claims,

respectively, of Pickenpack entities Pickenpack Europe GmbH, Pickenpack Holding Germany

GmbH, Pickenpack Production Luneburg GmbH, and TST The Seafood Traders GmbH).

### Pre-petition Defaults by the Debtors

*Default Under the BANA Facility*

In September 2015, the BANA Obligors advised BANA that they were unable to make

the full amount of a $10 million payment due on September 11, 2015.  McQueen Decl. ¶ 10.

The BANA Obligors and CFGL, as guarantor, requested, and BANA provided, a rollover of the

drawdowns that were due, subject to an amortized repayment schedule, with the first installment

of $2 million due on October 9, 2015.  *Id.* ¶ 11.  However, the BANA Obligors and CFGL failed

to make that payment, or any others.  *Id.*  The BANA Obligors currently owe BANA the

principal sum of $27,885,960.59, plus accrued interest and fees and expenses (including legal

fees).  *Id.* ¶ 12.  In November 2015, BANA sent demand letters with respect to the amounts due

and outstanding under the BANA Facility.  *Id.* ¶ 13.  No payments have been made to BANA by

either the BANA Obligors or CFGL pursuant to the demand letters relating to the CF Facility

Letter.  *Id.*

*Default Under the Club Facility*

In Peru, there are two anchovy fishing seasons per year.  Shortly after the CF Group

acquired Copeinca, the weather phenomenon known as El Niño occurred and dominated the

weather pattern from 2014 through early 2016, disrupting two consecutive fishing seasons and

causing damage to anchovy fishing.  *See* Ng Decl. ¶¶ 43-44; Paniagua Decl. ¶ 24; Hr'g Tr.

85:13-25, 86:1-23.  In the first season of 2014, the percentage catch of the TAC in the northern

central zone was only 66% of the TAC set for the season, and the entire second season in both

the northern-central and southern zones were cancelled.  Paniagua Decl. ¶ 24.  Although the first

season of 2015 showed improvements, the second northern-central zone season of 2015 and the

first northern-central zone season of 2016 were poor and the TAC was much lower than normal

seasons.  *Id.*  At the same time that the Peruvian Opcos were experiencing operational challenges

and falling revenues, the public companies were facing their own regulatory problems.  On

August 18, 2015, Debtor PAIH received two notices from the Hong Kong Securities and Futures

Commission to produce records and documents in connection with an investigation.  *See* Hr'g

Tr. 173:6-13; First Day Decl. ¶ 110.  On August 18, 2015, CFGL and PARD received separate

notices from the Secondary Markets Conduct and Enforcement Division, Market Conduct

Department, Monetary Authority of Singapore ("MAS") and the Singapore Commercial Affairs

Department ("CAD").  *See* Hr'g Tr. 173:14-21.  Those notices stated that MAS and CAD were

investigating an offense under the Singapore Securities and Futures Act (Cap. 289) and required

CFGL and PARD to provide to MAS and CAD certain information and documents.  *See* First

Day Decl. ¶ 110; Ng First Aff. (Singapore) [Movants' Ex. 115] ¶¶ 18-20.  These regulatory

investigations are confidential but the relevant regulatory agencies have jurisdiction to

investigate material financing misstatements, including fraud.  Hr'g Tr. 154:23-155:12.  The

following day, on August 19, 2015, the Hong Kong and Singapore stock exchanges suspended

trading in the shares of PAIH, PARD, and CFGL.  *See* First Day Decl. ¶ 111; Hr'g Tr. 174:11-

16.  Each of these investigations is still pending.  *See* Hr'g Tr. 174:17-19.

Largely as a result of the factors affecting the anchovy harvest discussed above, and the

associated loss of revenue from the CF Group, the Pacific Andes Group began to experience

liquidity problems.  *See* Ng Decl. ¶ 45.  Consequently, within a month of the closing of the Club

Facility, the Debtors and the Peruvian Opcos began to seek waivers and amendments of their

14

obligations under that facility. *See Isherwood Decl.* ¶¶ 13-24.[15] Over the next year and a half,

the Debtors and Peruvian Opcos entered into a total of eight Amendment and Waiver Letters. *Id.*

Three such letters addressed issues related to the redemption of certain senior notes of CFGL and

two addressed issues related to a rights offering by CFGL. *Id.* ¶ 13. Serious financial issues

arose in September 2015, when the Club Borrowers began to experience payment defaults. *Id.* ¶

15. In the face of those defaults, and beginning in September 2015, the Club Lenders sought

transparency with regard to matters relating to the Club Borrowers' finances and operations.

Accordingly, the Debtors engaged Deloitte & Touche Financial Advisory Services Limited

("Deloitte") to perform a limited financial analysis of CFGL, PARD and PAIH. *Id.* Through

Deloitte, the Debtors sought to provide the Club Lenders with full access to their books and

records in an effort to provide the Club Lenders with the transparency they sought. *See Ng Decl.*

¶ 50. On September 10 and 11, 2015, Deloitte held a number of meetings with the Club Lenders.

Isherwood Decl. ¶ 16. By this time, CFGL had agreed to dispose of certain non-core assets.[16]

On September 25, 2015, Deloitte updated the Club Lenders on, among other things, the financial

position of CFGL, PARD and PAIH, cash flow forecasts, a tentative timetable for a

---

[15] To assure the Club Lenders that the Ng Family and management were personally committed to revitalizing the resuscitating the business during this period of financial turmoil, J.S. Ng (in his personal capacity) and The Hong Eng Investment Limited (an Ng Family owned investment vehicle) provided guaranties in respect of certain repayment obligations. *See Ng Decl.* ¶ 56. Additionally, N.S. Hong, the Ng Family's personal investment vehicle through which the Ng Family holds its shares in PAIH, provided a guaranty in respect of certain repayment obligations in an amount up to $241,645,185.72. *Id.* From September 2014 to June 2016, the Pacific Andes Group repaid more than $650 million to its creditors, including to reduce the debt of the Club Lenders, as follows: to (i) Standard Chartered by more than $172 million, (ii) Rabobank by more than $67 million, (iii) DBS by more than $33 million, and (iv) more than $102 million to HSBC. Ng Decl. ¶¶ 47-48.

[16] Those non-core assets included, among other things, two properties at 11-01 and 11-02, 143 Cecil Street, Singapore (the "Singapore Properties"), and five catcher vessels and the Damanzaihao, a factory vessel owned by SFR, which were valued in a broad range of approximately $19 million to $200 million. *See Isherwood Decl.* ¶¶ 24, 70. However, during the 2015 financial year, the disposals were minimal and mainly comprised of the sale of the vessel "Yu Fu" for $1.5 million. *See id.* ¶ 26. And although bids were received for the Singapore Properties, no sale was completed, and no progress appeared to have been made as to the sale of the Damanzaihao. *See id.* ¶ 70.

restructuring, the proposed asset sales, a site visit to Peru and a valuation of the fishing quota, factories and vessels (at a sum of $1.69 billion). *See id.*; Ng Decl. ¶ 51.

The Club Facility called for the Club Borrowers to make scheduled prepayments of the underlying indebtedness out of refunds that they were scheduled to receive from counterparties under certain long-term supply contracts or LSAs.[17]  *See* Hr'g Tr. 107:2-7.  The fourth such prepayment (of not less than $50 million) was due to be paid from anticipated LSA refunds on September 28, 2015.  *See* Hr'g Tr. 107:8-9.  The Club Borrowers failed to make that payment. *See* Isherwood Decl. ¶ 17.  To avert a payment default, the Club Facility agent issued the Sixth Extension and Waiver Letter dated September 30, 2015 (the "Sixth Extension"), extending the Club Borrowers' time to make the prepayment to October 12, 2015.  *See id.* ¶ 18; Sixth Extension [Movants' Ex. 6].  In seeking this waiver, the Club Borrowers represented to the Club Lenders that they had not received the LSA refund by that date and were therefore seeking a waiver.  *See* Hr'g Tr. 107:3-13; 108:6-19; Sixth Extension ¶ 3.

Notwithstanding the retention of Deloitte, the Club Lenders sought to have greater transparency into the Debtors' and Peruvian Opcos' operations and finances and to ensure that there was adequate professional oversight on those operations.  As such, in the Sixth Extension, the Club Lenders required the Club Borrowers to (i) appoint KPMG as independent financial advisors on behalf of the Club Lenders to review and report on the work undertaken by Deloitte and conduct other work as is reasonably considered necessary by the Club Lenders for the purpose of assisting them with their assessment of the CF Group's financial positon and any

---

[17]    LSAs are long-term supply contracts entered into by both Debtors and non-Debtors of the Pacific Andes Group. *See* Hr'g Tr. 106:6-23.  In those LSAs, certain entities within the Pacific Andes family enter into contracts with Russian suppliers on a prepaid basis, sometimes as high as $900 million.  *See* Hr'g Tr. 107:2-7.

rescheduling arrangements proposed by the CF Group,[18] (ii) provide a list of the CF Group's

findings in respect of their business operations, certain liquidity issues and banking

indebtedness,[19] (iii) direct Deloitte to review management accounts, assist with liquidity

management, perform and entity level breakdown of liability and contingent liability, to assist

with debt repayment ability analysis and to perform an asset disposal analysis, and (iv) ensure

that the relevant company's directors and employees cooperate fully and punctually with, and to

provide information to, Deloitte.  *See* Sixth Extension ¶ 5.  Following the engagement of KPMG,

the Club Borrowers and the Club Lenders continued their discussions with a view to putting in

place a mechanism to provide for more detailed financial information, cash monitoring, cash

reconciliation and financial controls together with an analysis of the vessels and fishing quotas

owned by the Peruvian Opcos.  *See* Isherwood Decl. ¶ 19.  In late September 2015, Deloitte

opened a data room to provide KPMG with access to certain financial information to facilitate

their review and also allow the Club Lenders' lawyers to verify important information about the

fishing quotas.  *Id.* ¶ 22.

However, as of October 12, 2015, the Club Borrowers still represented that they were

unable to make the scheduled prepayment.  Thus, at the Club Borrowers' request, the Club

---

[18]   KPMG's appointment was considered necessary by certain of the lenders at the time to have independent financial analysis which the lenders could rely upon.  This was particularly so given the fact that Deloitte was also the auditor for the entire PAIH group and therefore there were heightened concerns about their independence.  *See* Isherwood Decl. ¶ 18.

[19]   Specifically, the Sixth Extension called for a list of the initial findings in respect of the CF Group's:

   (A)  business operation overview;
   (B)  liquidity issues, including (i) a 13-week rolling cash-flow forecast and (ii) full details of bank account
        locations and balances and advice on the extent to which such cash is 'trapped';
   (C)  most recent management accounts beyond the last interim reports.  If full profit and loss/balance sheets are
        not available, then such initial findings to focus on key profit and loss/balance sheet items;
   (D)  banking indebtedness, including an overview of contingent liabilities and an up to date organizational chart
        illustrating the location of all major indebtedness together with any guarantee structures in place.

Sixth Extension ¶ 5 (a)(iv).

Lenders granted a further extension of the loan maturity from October 12 to October 30, 2015 in

the Seventh Extension and Waiver Request Letter dated October 19, 2015 (the "Seventh

Extension").  *See id.* ¶ 20; Seventh Extension [Movants' Ex. 7].  In exchange, CFGL agreed to,

among other items, pay certain fees and expenses of the Club Lenders' legal counsel, produce

documents related to the Peruvian Business and continue to work with KPMG and Deloitte on

cash flow, financial analysis, and business planning.  *See id.* ¶ 20; Seventh Extension § 6 & sch.

1-3.

After executing that agreement, and following Deloitte's review of the Club Borrowers'

financial records, the Club Lenders learned that contrary to the representations made by the Club

Borrowers in the Sixth Extension and the Seventh Extension, the Club Borrowers had received

an LSA refund in the sum of $31 million in June 2015.  Rather than applying those funds

towards the prepayment obligation as required by the Club Facility, the Club Borrowers used

those funds to make a regularly scheduled payment and never advised the Club Lenders that they

had, in fact, received a substantial portion of the refund.  *See* Hr'g Tr. 107:14-21, 109:63;

Isherwood Decl. ¶ 20.  As a consequence of that default, and to avert a payment default under the

Club Facility, the Club Lenders issued a further amendment, extension and waiver letter on

November 10, 2015 (the "Eighth Amendment"), in which the Club Borrowers and guarantors,

among other things, acknowledged that prior representations regarding the LSA refunds were

contrary to the actual facts, again noted their ongoing discussions with their creditors, sought an

extension of the maturity date for an installment payment from October 30, 2015 to November

16, 2015, and sought a temporary waiver of those events of default.  *See* Eighth Amendment

[Movants' Ex. 8]; *see also* Hr'g Tr. 109:9-110:15); Isherwood Decl. ¶¶ 22-24.  To obtain such

waiver, CFGL agreed to search for a Chief Restructuring Officer ("CRO"), provide a list of bank

accounts, and to confer with the Club Lenders regarding the appointment of an investment

banker by November 30, 2015 to assist with the sale of the Peruvian Business, and that any

retained investment banker would keep Deloitte informed of the progress of a sale "in order to

ensure that the Club Lenders have transparency on the sale process." *See* Eighth Amendment at

3. CFGL further agreed to create an action and sales plan and to evaluate an existing offer for

the sale of certain vessels and associated trawlers. *See id*. at 4.

## Appointment of Joint Provisional Liquidators and Agreement to Deeds of Undertaking

Shortly after the expiration of the extension in the Eighth Amendment, on November 25,

2015—just days before the commencement of the second fishing season of 2015—HSBC, as a

Club Lender acting on its own account, filed winding-up petitions and related applications for

the appointment of provisional liquidators in Hong Kong and the Cayman Islands on November

25 and 27, 2015, respectively, against CFGL and CFIL. *See* Isherwood ¶ 27. Over the objection

of CFGL and CFIL, both the Hong Kong and Cayman Islands courts ultimately granted the

winding-up petitions on an interim basis, and appointed three individuals from KPMG as joint

provisional liquidators (the "JPLs"). *See* Isherwood ¶ 28; Ng Decl. ¶ 64.

The Debtors assert that the appointment of the JPLs had a severely negative impact on

the Peruvian Business. *See* Ng Decl. ¶¶ 67-72 & Ex. C; Hr'g Tr. 96:16-25, 97:1-21; 5/16/16

Correspondence with Jessie Ng [Debtors' Ex. 27] ¶¶ 30-37. In that regard, the Debtors maintain

that although the JPLs were appointed for the sole purpose of preserving CFGL and CFIL's

assets, they overstepped their bounds by taking control of the Peruvian Business. *See* Ng Decl.

¶¶ 67, 72; 5/16/16 Correspondence with Jessie Ng ¶¶ 31, 34. Among other things, the JPLs

contacted potential bidders for the Peruvian Opcos' assets and certain of the Peruvian Opcos'

banks and employees in Peru. Ng Decl. ¶¶ 67, 72. The actions taken by the JPLs allegedly

resulted in (a) the continued refusal by the local Peruvian banks to restore the inventory

financing needed by the Peruvian fishmeal companies to resume normal operations, and (b) the

unwillingness of suppliers and trade counterparties to deal with the CF Group, and in particular,

the Peruvian Opcos.  *See* Ng Decl. ¶ 85; Paniagua Decl. ¶ 34.[20]  The Debtors assert that due to

this lack of funding, the Peruvian Business had reduced fishmeal production in December 2015.

*See* Ng Decl. ¶ 70.  The Debtors also contend that after the JPLs visited the Peruvian operations,

warehouse companies were no longer willing to do business with the Peruvian Opcos and that

the loss of access to the warehouse facilities effectively shut down the CF Group's operations

thereby terminating its revenue flow.  *Id.* ¶ 72.  The loss of access to the warehouse facilities

meant that the CF Group's operations were shut down and its flow of revenue was terminated.

*Id.*  The Debtors maintain that the JPLs caused severe damage to the Peruvian Business, from

which the CF Group is still recovering today.  *See id.* ¶ 73; Paniagua Decl. ¶ 38.

HSBC's appointment of the JPLs came as a "surprise" to the Club Lenders who

considered it a "drastic" move that was "premature."  Hr'g Tr. 95:1-25, 96:1-11.  Accordingly,

on December 4, 2015, the Club Lenders proposed an "alternative solution" to the appointment of

JPLs at CFGL and CFIL which they believed would protect the Club Lenders and other

stakeholders by providing a means to monitor CFGL's operations, while simultaneously

reducing the risk of destruction to the value of the Peruvian Business and promoting the sale

process.  *See* Isherwood ¶¶ 30, 33.  The proposal focused on PAIH and PARD and was intended

---

[20]    The Peruvian Opcos fund operations through local working capital and inventory financing.  Their largest
inventory lender has been Banco de Credito del Peru, which provided inventory financing of up to $100 million plus
an additional $15 million in short-term working capital.  The Peruvian Opcos also received local financing from
BBVA Continental ("BBVA") and Scotia Bank.  The inventory financing is used to fund operations during the
harvesting seasons, including payments to suppliers and employees, and is repaid when the Peruvian Opcos sell their
fishmeal and fish oil following the seasons.  Short term working capital financing is also used during the off-season.
*See* Paniagua Decl. ¶ 17.  The Debtors contend that when BBVA and Scotia Bank learned of the appointment of the
JPLs, both suspended all financing to the Peruvian Opcos, and Banco de Crédito del Perú reduced the amount of
available financing from $100 million to $8 million.  *See* Ng Decl. ¶ 68; Paniagua Decl. ¶ 34.

to provide independent oversight and transparency of PAIH and PARD, and thereby its

substantial shareholding in CFGL.  *Id.* ¶ 30.  Discussions and negotiations among the parties

ultimately resulted in an undertaking being executed on December 28, 2015 (the "December

2015 Deed") by PAIH and PARD in favor of and for the benefit of three of the Club Lenders—

Standard Chartered, Rabobank and DBS (the "Deed Lenders")—and the High Court of the Hong

Kong Special Administrative Region (the "HK Court").  *Id.* ¶ 33.[21]  That undertaking provided

the following protective measures and key terms:

> (i)      appointing PricewaterhouseCoopers Ltd. ("PwC") as an independent reporting
> accountant to provide periodic updates to the Deed Lenders (with full access to the affairs
> of PAIH and PARD and reporting directly to the Deed Lenders);

> (ii)     extending the appointment of PwC as an independent reporting accountant to the
> Debtors;

> (iii)    engagement of a different group at PwC to undertake an independent forensic
> review of matters raised as suspicious by FTI Consulting Inc. ("FTI")[22] and to provide
> periodic reports to the Deed Lenders;

> (iv)     appointing a CRO by PAIH and PARD;

> (v)      providing board observer rights of the CRO and entitlement to receive the same
> information and documents provided to the members of the board of directors of PAIH
> and PARD; and

> (vi)     providing weekly updates to the Deed Lenders on the sales process for the
> Peruvian Business.

*Id.* ¶ 34 & Ex. 8.  In consideration for PAIH and PARD agreeing to these arrangements, the Deed

Lenders agreed to support CFGL and CFIL in seeking dismissal of the JPLs in both the Hong

---

[21]    As a term of the December 2015 Deed, PAIH and PARD were obligated to provide a written undertaking in identical terms to the December 2015 Deed to the HK Court.  Isherwood Decl. ¶ 33.  The purpose of the HK Court being brought into the terms of the December 2015 Deed was to allow other interested parties—in particular, HSBC—to enforce the terms of the December 2015 Deed.  *Id.*

[22]    In September or October of 2014, when the relationship between HSBC and the Pacific Andes Group first began to deteriorate, HSBC instructed FTI to examine certain activities of the Debtors' businesses without notice to the Debtors.  First Day Decl. ¶ 103.

Kong and the Cayman Islands proceedings.  In December 2015, the Deed Lenders opposed the

Hong Kong winding up petition and offered evidence in support of the dismissal of the

proceedings in the Cayman Islands.  *See* Isherwood ¶ 37.  In compliance with the December

2015 Deed, PwC was engaged as forensic accountants to conduct a forensic investigation with

respect to the lender's concerns.  *See* Ng Decl. ¶ 30; Hr'g Tr. 112:15-17.  In addition, Patrick

Wong ("Wong") was appointed as chief restructuring officer for PAIH and PARD with the Deed

Lenders' consent.  *See* Hr'g Tr. 112:12-14.  On January 5, 2016, following a hearing, the HK

Court dismissed HSBC's winding up petition (the "Hong Kong Decision").  *See* Ng Decl. ¶¶ 63,

79.

HSBC advised the Club Borrowers that it intended to appeal the Hong Kong Decision

and, separately, proceed with the winding up petition before the Grand Court of the Cayman

Islands (the "Cayman Court").  *See id.* ¶ 80.  With the threat of continued litigation, and the

potential reappointment of JPLs if the appeal was successful (and the concern that such

reappointment would again cause irreparable damage to the Debtors' business), management

agreed to a Deed of Undertaking with HSBC dated January 20, 2016 (the "January 2016 Deed,"

and together with the December 2015 Deed, the "Deeds of Undertaking") pursuant to which,

among other things, HSBC agreed not to appeal the Hong Kong Decision and to withdraw the

Cayman Islands petition and dismiss the JPLs.  *See id.* ¶ 82.  In turn, CFGL and CFIL agreed to

pursue a sale of the Peruvian Business to be completed by July 15, 2016,[23] appoint a CRO to

---

[23]   In part, the January 2016 Deed states, as follows:

> All parties agree that a sale of the Peruvian business and/or assets ("Peruvian Business") of CFGL
> and its subsidiaries ("CF Group") must now be pursued in order to address CGF Group's financial
> issues but the parties are concerned to ensure that the sales process is conducted in a transparent
> way which maximizes value for all creditors concerned and other stakeholders.  It is acknowledged
> that the sale of the Peruvian Business will be subject to relevant regulatory processes and approvals
> including those required under Peruvian laws and the listing rules of [the Hong Kong and Singapore
> stock exchanges].

oversee the process, and make changes in management.[24]  *See id.*; January 2016 Deed [Movants'

Ex. 11].  The Debtors contend that "with a gun to [their] head," they had no choice but to agree

to a fixed date for the consummation of the sale (without which HSBC and BANA would

proceed with the winding-up petition in the Cayman Islands), and the best date that they could

negotiate was July 15, 2016.  *See* Ng Decl. ¶ 82; Hr'g Tr. 195:1-25, 196:1-25.

Significantly, the January 2016 Deed provided, among other things, that it would

terminate upon (a) a breach by the Debtors of clause 2.3 therein;[25] (b) seven (7) days after receipt

of a non-compliance notice by failure to comply with demands made by HSBC or BANA that

remained unresolved; (c) that date upon which the debt was paid in full; or (d) July 15, 2016 or

such later date that HSBC and BANA[26] may agree in writing.  *See* January 2016 Deed, Clauses

---

January 2016 Deed ¶ (E).

[24]   Among other things, in the January 2016 Deed:

- CFGL agreed to retain Grant Thornton to undertake an independent reporting accountant role in respect of the CF Group reporting to BANA and the Club Lenders, as creditors of CF Group;

- CFGL and CFIL agreed to appoint Paul Brough as CRO;

- CFGL and CFIL agreed that the CRO would be appointed as a director of CFGL and that the board of CFGL would pass a resolution providing the CRO shall participate fully in the sale process; and

- Ng Joo Siang and Mr. Chan Tax Hei agreed to relinquish all board and management positions within the CF Group, and the board and management positions vacated by Ng Joo Siang shall be taken up by Jessie Ng.

January 2016 Deed, Clause 2.2.

[25]   Clause 2.3 of the January 2016 Deed states:  "The CF Group Parties hereby, jointly and severally, irrevocably and unconditionally undertake and covenant in favour of HSBC that the CF Group parties shall procure:

within 21 days of the date of this Deed, the sum of $3,100,000 (the "Interim Payment") be paid to KPMG on account of the costs and expenses (including legal costs) of the JPLs provided that KPMG has undertaken to seek approval of such costs and expenses from the Cayman Court and the HK Court failing agreement with the CF Group Parties with respect to such fees and expenses and further to repay to the CF Group Parties any amount by which the Interim Payment exceeds the aggregate amount which is payable under this Clause 2.3."

[26]   Even though BANA was not a signatory to the January 2016 Deed, Clause 8 of that undertaking provided that it was entered into "for the benefit of (a) the parties specifically named at the beginning of this Deed; and (b) [BANA]."  *See* McQueen Decl. ¶ 18; *see also* January 2016 Deed.  Under the January 2016 Deed, BANA, along

6.1-6.5.  The January 2016 Deed further provided that if the Deed was terminated as set forth above, HSBC or BANA would "individually be at liberty to apply to the Cayman Court for the immediate  reappointment of the JPL's . . .  and the CF Parties hereby consent to such reappointment . . ." (emphasis added).  January 2016 Deed, Clause 4.

### The Asset Sale Process

In accordance with the January 2016 Deed, Paul Brough ("Brough") was appointed as chief restructuring officer for CFGL.[27]  Ng Decl. ¶ 86; Hr'g Tr. 83:5-8.  In addition, PwC and Grant Thornton were also engaged as monitoring accountants with respect to the finances of the Pacific Andes Group.  *See* Ng Decl. ¶ 86.  These professionals were hand-picked by the lenders and assigned specific mandates.  *See* Hr'g Tr. 83:1-25, 84:1-3, 112:5-25.  Pursuant to the Deeds of Undertaking, each of the hired professionals was required to provide, and did provide, regular updates to the lenders, including the provision of bi-weekly reports to the lenders.  *See* Ng Decl. ¶¶ 86-87; PAIH Update [Debtors' Ex. 31]; CFGL Update [Debtors' Ex. 32].

Pursuant to the January 2016 Deed, Brough was given control of the sale of the Peruvian Business.  *See* Ng Decl. ¶ 88.  Brough initially focused on attempting to obtain working capital from the Club Lenders in an effort to resuscitate the Peruvian Business.  *See id.* ¶ 89.  In April 2016, after eight weeks of negotiations, the Club Lenders agreed to provide up to $25.5 million in short term working capital (the "Short Term Working Capital Facility"), subject to certain conditions being met.[28]  Isherwood ¶ 48.  CFGI and Copeinca do not have a board of directors.

---

with HSBC, had certain monitoring and approval rights, and BANA, along with HSBC, had the power to cause the termination of the January 2016 Deed or to agree to its extension.  McQueen Decl. ¶ 18.

[27]   In accordance with the January 2016 Deed, J.S. Ng, who was the CEO of China Fishery Group at the time, also resigned from his position, and effective February 26, 2016, Jessie Ng took over as CEO.  *See* Ng Decl. ¶¶ 5, 59, 117.  However, J.S. Ng continued to act as a corporate advisor to the Debtors.  *See* Hr'g Tr. 134:9-24.

[28]   The Short Term Working Capital Facility was guaranteed by each of CFGL, CFG Peru Singapore and N.S. Hong.

Instead management is granted authority to make decisions on behalf of the companies under their respective powers of attorney. *See* Isherwood Decl. ¶¶ 50-51. Under these regimes, members of the Ng Family, who are Class A representatives of CFG, have powers to individually dispose of CFG's assets without limit; and acting jointly with the general manager, have powers to dispose of Copeinca's assets of up to $10 million. *Id.* The Short Term Working Capital Facility letter required certain governance changes to be made which, in substance, sought to prevent representatives of CFG and Copeinca—meaning, members of the Ng Family— from being able to sell, transfer or disposal of the Peruvian Business without the knowledge of the Club Lenders. *See id.* ¶ 49.[29] Although Copeinca had not fulfilled all its obligations under the Short Term Working Capital Facility, the Club Lenders authorized an initial draw down of $5 million. *See id.* ¶ 56. However, despite efforts by the Debtors, the parties were unable to reach an agreement regarding the terms thereof due to differences over the appropriate scope and potential adverse impact of instituting the requested governance changes.[30] *See* Ng Decl. ¶¶ 93-

---

[29]    The Club Lenders' agreement to provide Short Term Working Capital was conditioned on the execution of so-called 'governance agreements' by May 5, 2016, which would include the following terms:

(i)      the powers of attorney regime of CFG and Copeinca would be amended so that their representatives may not sell the Peruvian Business, the fishing quotas, the shares or assets of CFG and Copeinca without the prior approval of Rabobank, as agent of the Club Facility, prior to July 20, 2016;

(ii)     restrictions on passing any shareholders resolution by CFG and Copeinca to approve the sale of the Peruvian Business or grant any power of attorney to do so;

(iii)    requirement to record the restrictions in the stock ledger, share certificates and shareholders meeting minutes ledger; and

(iv)     requirement to file the changes to the powers of attorney regime at the Peruvian Public Registries.

Isherwood Decl. ¶ 52.

[30]    The Debtors also contend that by the time the Short Term Working Capital funds (of $5 million) were made available, the fishing season "was over or close to being over and there was little utility or necessity for the standby letters of credit or other elements of the working capital facility." Ng Decl. ¶ 93.

96; Draft Governance Agmt. [Debtors' Ex. 46]; Hr'g Tr. 168:6-15.  Ultimately, at a meeting held

on June 10, 2016, CFGL's board unanimously voted to reject the proposed governance

agreement.  *See* Ng Decl. ¶ 97.  The CF Group thereafter repaid the amounts advanced under the

Short Term Working Capital Facility from a refund of the value-added tax incurred from the sale

of fishmeal.  *See* Hr'g Tr. 170:25-171:1; Ng Decl. ¶ 97.

Brough led the sale process with the assistance of the Debtors' employees and reported

regularly to Jessie Ng and the other directors of CFGL on the progress he was making.  *See* Ng

Decl. ¶ 117.  CITIC CLSA Securities ("CITIC CLSA") was engaged as the investment banker

and coordinated with Brough on a day-to-day basis with respect to the sale.  *Id.* ¶ 99.  CITIC

CLSA started marketing the Peruvian Business in February 2016, and, together with efforts of

the Pacific Andes Group, assembled a comprehensive data room, teasers to send out to

prospective investors and purchasers, and a detailed information memorandum with the

assistance and input of the CF Group under the direction of Brough.  *See id.* & Ex. K.  Brough

was the main person to interact with CITIC CLSA.  *See* Ng Decl. ¶ 117.  In April 2016, an

information memorandum for the sale of the Peruvian Business was sent to target purchasers.

*See* Isherwood Decl. ¶ 47.

By June 1, 2016, seven non-binding expressions of interest had been received for the

Peruvian Business.  *Id.* ¶ 63.  More than half of the bids were considered to be worth progressing

to the second round of the sale process, which involved those bidders having access to a data

room to conduct due diligence, and making binding bids in July.  *See id.*; *see also* June 29, 2016

Update from Brough to the Board [Movants' Ex. 61].  Four of the bids that had progressed to the

second round of bidding were sufficiently high that all of the creditors at the CFGL and CFIL

level would have been paid in full.  *See* Hr'g Tr. 217:12-218:2.  One of the non-binding

expressions of interest was for $1.5 billion, which would have paid all of the CFGL and CFIL

creditors in full and provided substantial recoveries to creditors at the PARD level.  *See* Hr'g Tr.

218:4-18.  However, that bidding party refused to take the necessary next steps to sign a 'process

letter' to proceed to the next round of the sale process.[31]  *See* Ng Decl. ¶ 102; Hr'g Tr. 228:21-

25, 229:1-10.  The remaining non-binding expressions of interests that were received were for

much lesser amounts and, in management's eyes, not an adequate reflection of the true value of

the business.  *See* Ng Decl. ¶ 102.  Management found the bids to be disappointing given the

$1.04 billion price paid to acquire Copeinca and its 10.7% anchovy harvest quota, the Peruvian

Business had been valued at over $1.7 billion just 2 years prior and again by CITIC CLSA at the

start of the sale process, and considering the likely value that could be realized through a

properly timed, comprehensive and measured sale process.  *See id.*; Hr'g Tr. 217:17-23.

However, the sale process terminated upon the commencement of these Chapter 11 cases and the

Debtors have not sought to re-engage it.

### Events Leading Up to Commencement of the
### Chapter 11 Cases and Other Insolvency Proceedings

The Movants contend that the Ng Family never intended to follow through with the

contractually obligated sale of the Peruvian Business because they viewed the business as the

essential part their family business that they were determine to preserve.  *See* Hr'g Tr. 208:25-

210:22, 218:19-219:17; Ng. Dec. ¶ 12.  They assert that the only reason Jessie Ng agreed to the

Deeds of Undertakings was to prevent the Deed Lenders from enforcing their contractual rights

in late 2015 and early 2016 and to give herself time to figure out a better plan to buy more time

---

[31]    In light of these bids, Jessie Ng's testimony at the hearing that the bidding process was a "fire sale" (Hr'g
Tr. 219:16-23), or that the bids were "just not great" (Hr'g Tr. 163:13-25), is not credible.  Indeed, her
testimony in Singapore that the first round bidding numbers were a  "surprising and optimistic development for
the Pacific Andes Group" is far more accurate.  Hr'g Tr. 216:3-217:3; Ng First Aff. (Singapore) ¶ 77.

to keep the "family business."  The Movants maintain that by the beginning of June 2016, Jessie

Ng had already determined that the best course of action for the Ng Family to prevent the sale of

the Peruvian Business and simultaneously thwart BANA and HSBC from exercising their rights

under the Deeds of Undertakings was to cause the Debtors, the Peruvian Opcos, PAIH and

PARD to commence bankruptcy/insolvency proceedings.  They say that when she reached that

decision, she (i) engaged professionals to assist her in filing the insolvency proceedings, and (ii)

began to actively mislead the Deed Lenders, Brough, and the CFGL Board of Directors as to the

Ng Family's plans for the Peruvian Opcos and their willingness to complete the sale.  Towards

that end, in early to mid-June, the Debtors sought advice from counsel on a strategy of

coordinated global filings for bankruptcy protection, and had begun preparing the petitions and

documents in support of those petitions.  *See* Hr'g Tr. 160:16-21.  The Debtors' preparations and

bankruptcy planning were not communicated to the CROs or the independent reporting

accountants.  *See* Hr'g Tr. 158:11-160:18, 182:10-14.  It is undisputed that on June 20, 2016,

BANA wrote to CFIL, CFGL, Jessie Ng and Brough, seeking information regarding the sale of

the Peruvian Business.  *See* BANA Letter to CFGL dated 6/20/16 [Movants' Ex. 138].  Brough

presented the letter to the CFGL Board (Hr'g Tr. 188:13-21) and, on behalf of the Board, replied,

stating, among other things, that: "The Board is fully supporting the sale process."  CFGL Letter

to BANA [Movants' Ex. 142].  However, Jessie Ng admits that at that time, she did not intend to

go forward with the sale and planned to file bankruptcy and insolvency proceedings shortly.  *See*

Hr'g Tr. 187:10-16.  She acknowledged that she knew that Brough was advising the Deed

Lenders that the sale was going forward but that she mislead him as to her plan so that the Deed

Lenders would not know of the impending breach of the Deeds of Undertakings.  *See* Hr'g Tr.

159:11-22 ("I did consider telling him but it would be too dangerous, because he's appointed by

the bank . . . And under the [deed] of undertaking, you know, it would allow HSBC to put in a

JPL immediately, and then that would be the end of our entire group; so yes, I didn't tell him

[Mr. Brough].")  The Movants further contend that Jessie Ng concealed her intentions to file the

bankruptcy/insolvency proceedings from PwC, Mr. Wong, PARD's CRO, Grant Thornton and

the other professionals that the banks had involved in the sale process.  *See* Hr'g Tr. 145:2-8,

183:14-184:19.

　　　　Management did not advise the board members that they were considering filing

bankruptcy petitions for the Pacific Andes Group entities until the day of the June 30, 2015

board meeting.  *See* Hr'g Tr. 182:17-19.  At that meeting, the directors for each of PAIH, PARD

and CFGL voted in favor of filing petitions for bankruptcy protection.  Ng Decl. ¶ 110.  Almost

immediately following the board meetings, both CROs—Brough and Wong—resigned from

their respective positions since the sale of the Peruvian Business could no longer be achieved.

*See* Hr'g Tr. 145:9-16, 158:11-159:1, 181:20-24.  Further, on July 1, 2016, Jessie Ng terminated

both PwC[32] and Grant Thornton as the independent reporting accountants.  *See* Hr'g Tr. 145:21-

22, 162:8-14.

---

[32]    A different team at PwC, which had been separately retained as a forensic accountant to investigate certain
suspicious accounting transactions in respect of PAIH and PARD in accordance with the December 2015 Deed, had
already been terminated weeks before, and replaced by RSM Corporate Advisory (Hong Kong) Limited ("RSM").
*See* McQueen Decl. ¶ 24 & Ex. 9. According to the Debtors, the PwC forensic team had been paid approximately
$1 million for five months of work, during which they had extracted data with assistance of the Pacific Andes
Group's finance team, conducted interviews with PAIH's staff to understand prepayment, purchase and sale process,
performed computer data preservation, including email server and financial server, conducted testing of samples of
the transactions and conducted site visits of certain entities, yet had not commenced any tangible forensic
investigation and refused to commit to any timeframe (or fee estimate) within which the forensic investigation
would be completed.  Ng Decl. ¶ 32.  Because the pending forensic investigation prevented Deloitte from issuing
audited financial statements, the Pacific Andes Group determined, with the approval and support of the Independent
Review Committee (a committee established to review the alleged accounting improprieties), to retain alternative
forensic accountants who could perform the investigation within a definite timeframe and for a fee that the Pacific
Andes Group could budget.  *See* Ng Decl. ¶ 32; Hr'g Tr. 146:22-25, 147:1-11.  A majority of the Club Lenders
expressly approved this change and the replacement of PwC by RSM was discussed with and approved by Standard
Chartered, Rabobank and DBS.  *See* Ng Decl. ¶¶ 32, 132.

**The Insolvency Proceedings**

As noted, on June 30, 2016, the Debtors filed their voluntary Chapter 11 petitions in this Court. The next day, PARD voluntarily made an application under section 210(1) of the Singapore Companies Act, Chapter 50 of the Laws of the Republic of Singapore, to stay all actions against PARD, PAE, Richmond and Pacific Andes Food (Hong Kong). Ng Decl. ¶¶ 122, 125; Hr'g Tr. 126:8-10. The High Court of the Republic of Singapore granted the stay.[33]

On June 30, 2016, the Peruvian Insolvency Proceedings were commenced under the Peruvian General Law of Bankruptcy System (Law No. 278909) (the "Peruvian Insolvency Law") with respect to each of the Peruvian Opcos. *See* Milich Decl. ¶ 2. Those proceedings, which are essentially involuntary proceedings, are pending before El Institute de Defensa de la Propriedad Intelectual (the National Institute of the Defense of Competence and Protection of Intellectual Property, or "INDECOPI"), which is a specialized public agency attached to Peru's Office of the Prime Minister. *Id.* INDECOPI is the administrative body responsible for overseeing the Peruvian insolvency process. *Id.* The Peruvian Opcos were not eligible to file voluntary petitions because they do not have audited financials due to a pending forensic investigation by RSM into allegations of financial improprieties identified previously by another accounting firm. *See* Hr'g Tr. 125:15-126:7, 150:9-12. Accordingly, the Debtors approached three "friendly" creditors in Peru and arranged with them to file involuntary petitions against the Peruvian Opcos.[34] *See* Hr'g Tr. 125:21-126:7; First Day Decl. ¶ 144. Collectively, the three

---

[33] After the Motion was fully submitted, and on or about September 26, 2016, Maybank initiated an involuntary insolvency proceeding against PARD in the Supreme Court of Bermuda. On September 29, 2016, PARD filed a voluntary Chapter 11 case in this Court. *See* PARD voluntary petition (ECF No. 1 [in Case No. 16-12739]). That same day, PARD filed an application before the High Court to withdraw its petition under the Companies Act. PARD's Chapter 11 case is not subject to this Motion and has no impact on the analysis herein.

[34] Those creditors are:

(1) Fishman S.A.C., which filed the petition against CFGI (*see* ECF No. 1 [Case No. 16-11891]);

petitioning creditors hold claims aggregating $1,111,848.34 (as of the Petition Date) against the

Peruvian Opcos. *See* Chapter 15 Petition (for each of CFGI, Copeinca and SFR) [ECF No. 1 in

Case Nos. 16-11891, 16-11892, 16-11894, respectively]. The Peruvian Opcos have agreed to

pay, and are paying, the legal fees of the petitioning creditors. *See* Hr'g Tr. 294:2-5. On June

30, 2016, immediately after the commencement of the Peruvian Insolvency Proceedings,

Paniagua, on behalf of the Peruvian Opcos, filed petitions in this Court pursuant to Chapter 15 of

the Bankruptcy Code seeking, among other things, recognition of the Peruvian Insolvency

Proceedings as a foreign main proceeding. *See* Chapter 15 Petition (for each of CFGI, Copeinca

and SFR) [ECF No. 1 in Case Nos. 16-11891, 16-11892, 16-11894, respectively].

DISCUSSION

## Applicable Standards

Section 1104(a)(2) of the Bankruptcy Code provides for the appointment of a Chapter 11

trustee "if such appointment is in the interests of creditors, any equity security holders, and other

interests of the estate…." 11 U.S.C. § 1104(a)(2). There are no hard and fast rules governing

the application of this provision, except that unlike under subsection (a)(1), "it is not necessary to

find fault on the part of the debtor" to appoint a Chapter 11 trustee pursuant to subsection (a)(2).

*In re Eurospark Indus., Inc.*, 424 B.R 621, 627 (Bankr. E.D.N.Y. 2010); *see also In re*

*Ridgemour Meyer Props., LLC*, 413 B.R. 101, 113 (Bankr. S.D.N.Y. 2008) (noting that the court

may appoint a trustee under section 1104(a)(2) even if no "cause" exists (citations omitted)).

Rather, section 1104(a)(2) contemplates application of a "flexible" standard. *In re Sharon Steel*

---

(2)  Marines Forces S.A.C., which filed the petition against SFR (*see* ECF No. 1 [Case No. 16-11894]); and

(3)  Construcciones y Reparaciones Marinas S.A.C. – Coremasa S.A.C., which filed the petition against
Copeinca (*see* ECF No. 1 [Case No. 16-11892]).

Tirado, Copeinca's general manager, is also a shareholder and director of creditor Construcciones y Reparaciones
Marinas S.A.C. *See* Hr'g Tr. 275:4-7, 293:16-18.

*Corp.*, 871 F.2d 1217, 1226 (3d Cir. 1989).  For that reason, in assessing the merits of a motion

under (a)(2), courts "eschew rigid absolutes and look[] to the practical realities and necessities"

of the case.  *In re Ionosphere Clubs, Inc.*, 113 B.R. 164, 168 (Bankr. S.D.N.Y. 1990) (quoting *In*

*re Hotel Assocs., Inc.*, 3 B.R. 343, 345 (Bankr. E.D. Pa. 1980)).  The parties are correct that

factors that courts consider in assessing the merits of a motion under §1104(a)(2) include: (i) the

trustworthiness of the debtor; (ii) the debtor's past and present performance and prospects for the

debtor's rehabilitation; (iii) the confidence, or lack thereof, of the business community and

creditors in present management; and (iv) the benefits derived by the appointment of a trustee,

balanced against the cost of the appointment.  *See, e.g.*, *In re Soundview Elite, Ltd.*, 503 B.R.

571, 583 (Bankr. S.D.N.Y. 2014) (citing *In re Adelphia Comm'ns Corp.*, 336 B.R. 610, 658

(Bankr. S.D.N.Y. 2006)).  While the Court will consider those factors in reviewing this Motion,

in the final analysis, the decision to appoint a trustee rests in the court's discretion.  *See Taub v.*

*Adams*, No. 10-CV-02600, 2010 WL 8961434, at *4 (E.D.N.Y. Aug. 31, 2010).  *See also In re*

*V. Savino Oil & Heating Co., Inc.*, 99 B.R. 518, 527 n.11 (Bankr. E.D.N.Y. 1989) (noting that

the "factors constituting a basis for appointing a trustee under § 1104(a)(2) are amorphous,

diverse, and necessarily involve a great deal of judicial discretion").  In exercising that

discretion, this Court will "resort to [its] broad equity powers" and engage "in a fact driven

analysis, principally balancing the advantages and disadvantages of [appointing a trustee]."  *In re*

*Adelphia Comm'ns Corp.*, 336 B.R. at 658 (citations and footnote omitted).

     As a preliminary matter, the Court considers the Equity Holders' opposition to the

Motion.  By the plain terms of the statute, the "best interests" test under section 1104(a)(2)

accounts for the interests of "any equity security holders' of the Debtors.  *See* 11 U.S. C. §

11104(a)(2).  The Pacific Andes Group is controlled and managed by and for the benefit of the

Ng Family.  The Ng Family is the ultimate indirect owner of all the Debtors and the Peruvian

Opcos.  N.S. Hong is the family's investment vehicle.  Members of the Ng Family hold

executive and/or director positons, or are otherwise serving as advisors throughout different

levels of the Debtors' (and non-debtor affiliates) capital structure.[35]  Further, as noted, the Ng

Family has made substantial financial commitments to the Pacific Andes Group in the forms of

guarantees and/or capital contributions by family owned investment vehicles and by individual

family members.  As such, the Equity Holders are not merely investors seeking to protect the

value of their investments.  They are the Debtors' managers and directors responsible for

operating the business who have personal and financial stakes in the successful operation of that

business.  The Debtors' financial advisor testified that approximately $2.8 billion in value needs

to be generated to create a return for the benefit of the Equity Holders.  *See* Prager Decl. & Rpt. ¶

75.  This means that if the Peruvian Business were to be sold in the amount of the highest bid

received in connection with the proposed sale under the January 2016 Deed, the equity holders

would still be "out of the money" by at least $1 billion.  It is not clear that the sale of the

Peruvian Business is in the best interests of the Debtors' estates and creditors.  However, the Ng

Family, as managers of the Debtors with personal and financial stakes in their continued

operations, are plainly disincentivized from selling the Peruvian Business, even at a purchase

price that reflects the current company valuation, because (i) there will be no return for the

benefit of their equity positions, (ii) the sale will gut the Pacific Andes Group, and the family's

business, its most valuable assets, and (iii) the sale may impact the financial accommodations

made by the family.  It is fundamental that a debtor in possession owes the same fiduciary duties

---

[35]   Although PAIH, PARD, and CFGL are publicly traded, it is unconverted that the Ng Family ultimately holds
controlling ownership percentages in these entities.

to creditors and the estate as a trustee. *Commodity Futures Trading Comm'n v. Weintraub*, 471

U.S. 343, 355 (1985) (citing *Wolf v. Weinstein*, 372 U.S. 633, 649-52 (1963)).  Likewise, it is

settled that the officers and managing employees who conduct the affairs of the debtor in

possession are bound by those same duties.  *Id.* at 355-56.  Those duties include a duty of care, a

duty of loyalty and a duty of impartiality.  *In re Bowman*, 181 B.R. 836, 843 (Bankr. D. Md.

1995) (citations omitted).  The Debtors should not be forced into a "fire sale" of the Peruvian

Business to satisfy the interests of a few creditors.  However, a debtor that is committed to

pursuing restructuring plans or sales processes that could yield direct or indirect benefits to the

its managers, at the expense of its creditors, runs afoul of its fiduciary responsibilities.  The

evidence is clear that, at this time, the Debtors' managers are predisposed against the sale of the

Peruvian Business.  *See* Hr'g Tr. 208:25-210:22, 218:19-219:17; Ng Decl. ¶ 12.  That

predisposition against the sale of the Peruvian Business does not merely undermine the weight to

be given to the Equity Holders' objection to the Motion; it lends support to the Motion.  *See*

*generally In re Euro-American Lodging Corp.*, 365 B.R. 421, 428 (Bankr. S.D.N.Y. 2007)

(noting that "[w]here [management] suffer from material conflicts of interest, an independent

trustee should be appointed under § 1104(a)(2)." (citations omitted)); *Centennial Textiles, Inc. v.*

*Pennsylvania Textile Corp., Inc. (In re Centennial Textiles, Inc.)*, 227 B.R. 606, 612 (Bankr.

S.D.N.Y. 1998) (noting that "the willingness to leave the debtor in possession of its assets rests

upon the assurance that its managers will carry out [their] fiduciary responsibilities.").  *See, e.g.*,

*In re Eurospark Indus, Inc.*, 424 B.R. at 628-29 (finding appointment of a chapter 11 trustee

warranted where debtor's principal would decline to settle claims against insurance companies

that would result in meaningful distributions to secured creditor and administrative claimants in

order pursue long-shot litigation that, if fully successful, could result in some recovery by
principal).

The Court now considers the factors cited by the parties as relevant to the resolution of
the Motion.  In doing so, the Court notes that there is "a strong presumption that the debtor
should be permitted to remain in possession absent a showing of need for the appointment of a
trustee." *In re Ionosphere Clubs, Inc.*, 113 B.R. at 167 (citations omitted).  *See also Smart World
Techs. LLC v. Juno Online Servs., Inc. (In re Smart World Technologies, LLC)*, 423 F.3d 166,
176 (2d Cir. 2005) (noting that "standard for §1104 appointment is very high.").  Thus, the
"appointment of a trustee should be the exception, rather than the rule." *In re Sharon Steel,
Corp.*, 871 F.2d at 1225 (citations omitted).[36]  The burden of proof lies with the movant to
demonstrate the need for a trustee by clear and convincing evidence.  *See, e.g.*, *In re Euro-
American Lodging Corp.*, 365 B.R. at 426; *In re Colorado-UTE Elec. Assoc., Inc.*, 120 B.R. 164,
173 (Bankr. D. Colo. 1990).

*Trustworthiness of Debtors*

To be sure, the Movants have good reason to question the trustworthiness of the Debtors,
especially in light of the events surrounding the breach of the Deeds of Undertaking.  In that
regard, the testimony adduced from the evidentiary hearing establishes:

    a.    that the Debtors, even at the time the Deeds of Undertaking were entered into, did
not intend to sell the Peruvian business that they committed to sell, but viewed
that business as the essential part of the "family business" that they were
determined to preserve (*see* Hr'g Tr. 218:19-219:17; Ng Decl. ¶ 12);

---

[36]   "[T]he basis for this strong presumption against appointing an outside trustee is that there is often no need for
one: 'The debtor-in-possession is a fiduciary of the creditors and, as a result, has an obligation to refrain from acting
in a manner which could damage the estate, or hinder a successful reorganization.'" *In re Marvel Entm't Grp., Inc.*,
140 F.3d 463, 471 (3d Cir. 1988) (quoting *Petit v. New England Mort. Servs.*, 182 B.R. 64, 69 (D. Me. 1995)); *see
also In re Ionosphere Clubs, Inc.*, 113 B.R. at 169 ("A debtor-in-possession has all the duties of a trustee in a
Chapter 11 case, including the duty to protect and conserve property in its possession for the benefit of creditors."
(citations omitted)).

    b.       on June 30, 2016, the Debtors deliberately breached all aspects of the Deeds of Undertakings by commencing these Chapter 11 cases and numerous foreign insolvency proceedings, and terminating or causing the resignations of all of the professionals hired under the Deeds of Undertakings for the express purpose of providing lenders with independent oversight over management and the agreed sale process (*see* December 2015 Deed [Movants' Ex. 10]; January 2016 Deed; Hr'g Tr. 224:21-225:2);

    c.       on June 30, 2016, the Debtors deliberately breached all aspects of the Deeds of Undertaking by suspending the sales process (*see* December 2015 Deed; January 2016 Deed);

    d.       on June 30, 2016, the Debtors breached the January 2016 Deed by preventing HSBC and BANA from exercising their agreed upon remedy to reappoint a provisional liquidator in the Cayman Islands with the consent of the Debtors, which remedy could be exercised upon termination of the January 2016 Deed (*see* January 2016 Deed § 4.);

    e.       Dennis Chan and J.S. Ng, who the January 2016 Deed explicitly required to step down from their roles in management of the China Fisheries Group (*see* January 2016 Deed, cl. 2.2.4), were retained by the Pacific Andes Group "as advisors" (with J.S. Ng being paid his former CEO salary), and have been advising the Debtors on their restructuring plans (*see* Hr'g Tr. 135:5-22, 152:19-153:3, 160:22-161:15); and

    f.       despite having reaffirmed in writing on June 27, 2016 that the Board of CFGL was completely committed to a sale of the Peruvian business, just three days later, that same board voted to file Chapter 11 proceedings, solely because the PARD and PAIH boards each had voted on the same day to file a moratorium proceeding and Chapter 11 proceeding, respectively (*see* Hr'g Tr. 212:19-21).

Moreover, the Court is concerned about the misrepresentations regarding the status of the LSA payments made by the Debtors in the Amendment and Waiver letters. Still, based on a review of the entire record, the Court does not find that management's actions "signal[] an unwillingness or inability to understand proceedings or abide by court orders with which [they] disagree." *In re Ridgemour Meyer Props. , LLC*, 423 B.R. at 113. Thus, the Court finds that the Movants failed to establish that existing management is not trustworthy.

*Creditors' Lack of Confidence in Current Management*

The Movants contend that given the lack of transparency and unanswered questions regarding the Debtors, even if the Debtors devised a Chapter 11 plan, the creditors would have no confidence that the plan was formulated with their best interests in mind.  Motion at ¶ 70. They say that after the last eight months of dealing with the Ng Family, and in light of the Debtors' strategy to employ chapter 11 for foreign corporations with no operational assets in the United States, if anywhere, the Debtors should not be accorded the deference debtors usually are accorded in chapter 11 cases.  *Id.*  They maintain that the appointment of a trustee is justified based not only based on their lack of confidence in management, but also on the basis of the acrimony between the parties.  *Id.*

The Debtors contend that the Movants' purported lack of confidence in is "unfounded," and that "management has at all times acted in a way that was not only justified under the circumstances but in the best interests of all of the Debtors' creditors."  Debtors' Opp'n at 30-32. They maintain that the Movants have "parochial interests" and that the Movants should not be allowed to replace management with a Chapter 11 trustee simply because they disagree with management's business judgment designed to protect the estate.  *Id.*  This is particularly so here, they argue, where the relevant assets (i.e., the Peruvian Business) is appreciating in value and most of the complaining creditors hold claims that are structurally superior to other creditors. The Debtors say that since the Movants' claims will be paid in full in any event, the Court should accord little weight to their complaints about the timing of that payment, since the appointment of a Chapter 11 trustee will harm other creditors if not the Movants themselves.  *Id.*  Finally, the Debtors contend that the Movants' argument that the appointment of a trustee is warranted based on the acrimony between the parties "is also meritless, if not contrived."  *Id.*  The Debtors say that they are ready, willing and able to engage in restructuring talks after this Motion is resolved.

*Id.* The Debtors also argue that the Movants represent substantially less than all creditors and note that China CITIC International, initially one of the Club Lender Parties, withdrew its support for the Motion, and other creditors oppose the Motion on the grounds that the appointment of a trustee could cause irreparable harm to the Peruvian Opcos' business operations. *Id.*

Although the Movants do not speak for all the creditors, their interests in these cases are significant. It is undisputed that (based on an analysis of the Debtors' schedules) when intercompany debt is excluded, the Movants represent 100% of the scheduled unsecured debtor for Smart Group, Protein Trading, Chanery, Champion Maritime, Target Shipping, CFG Singapore, and CFGL; 98% of scheduled unsecured claims of N.S. Hong; 82% of the scheduled unsecured claims of CFIL; 91% of South Pacific Shipping; 90% of the Scheduled claims of Fortress; 65% of the scheduled claims of PAIH; and 70% of Ocean Expert. *See* Debt Percentage Chart [Movants' Ex. 34]. Additionally, certain of the Peruvian Opcos are obligated under the Senior Notes and are borrowers under the Club Facility. *Id.*[37] Further, China CITIC International's withdrawal from the Motion is hardly an expression of its confidence and trust in

---

[37] The Objecting Banks hold claims against PAIH, as guarantor of a certain undisclosed obligations. Their claims aggregate approximately $205,000,000. Their "objections" to the Motion are contained in identical form letters which state, in part, as follows:

> Specifically, the Lender wishes to confirm that it expressly does not support the Trustee Motion or any other attempt to appoint a chapter 11 trustee in these proceedings. Any appointment of a chapter 11 trustee in these proceedings will destroy value in the enterprise, in particular, with respect to Pacific Andes International Holdings Limited and its subsidiaries. The appointment of a trustee at Pacific Andes International Holdings Limited could result in irreparable harm being caused to the goodwill and operations of the Pacific Andes group's business and operation in the People's Republic of China.

The Court accords no weight to those unsupported, conclusory allegations. Nor does the Court find force in CAP III-A Limited's letter objection to the Motion. *See* ECF No. 153. CAP III-A Limited identifies itself as a 6.2% shareholder of CFGL that "considers that there continues to be equity value in the business of the China Fishery Group." It speculates that "[t]he appointment of a chapter 11 trustee would likely destroy value in the enterprise due to the damage that would, as we understand it, be caused to the Peruvian fishmeal and fish oil business."

the Debtors and their management.  In its letter advising the Court of its opposition to the

Motion, China CITIC International requested, as an alternative to the appointment of a Chapter

11 trustee, the appointment of an independent Chief Restructuring Officer for the Debtors.  *See*

ECF No. 76-1.

Instead, the Court finds that the Movants have shown that they have lost all confidence in

the Debtors' management for a number of good reasons, including:

- management's deliberate and premeditated breach of the Deeds of Undertakings (*see* Hr'g Tr. 208:25-209:12);

- management's surreptitious planning of global bankruptcy and insolvency filings (*see* Hr'g Tr. 158:11-162:7);

- management's attempt to protect real estate holdings by transferring them to related parties (*see* Hr'g Tr. 166:5-22.);

- several billion dollars of unexplained intercompany transactions (*see* Prager Decl. & Rpt. ¶ 41; Hr'g Tr. 172:20-24);

- hundreds of millions of unexplained purported prepayments to Russian entities (*see* Hr'g Tr. 106:16-107:22; Isherwood Decl. ¶¶ 17-20);

- hopelessly conflicted advisors to the Independent Review Committee charged with investigating those suspicious prepayments (*see* Hr'g Tr. 148:9-150:5);

- admitted misrepresentation regarding the receipt of $31 million of LSA termination repayments (*see* Hr'g Tr. 108:6-109:8);

- the removal of all agreed-to oversight by independent third parties (*see* Hr'g Tr. 145:9-16, 145:21-22, 158:11-159:1, 162:8-14, 181:25-192:7, 207:20-208:7);

- conflicts of interest of management (*see* Isherwood Decl. ¶ 74);

- management's large investments in the Debtors that have motivated management to oppose a sale of the Peruvian Business (*see* Ng Decl. ¶¶ 12, 56-57);

- management's ties to outsiders reaching into lower levels of the Debtors and their affiliates (*see* Hr'g Tr. 221:10-223:16); and

- the uncertainty surrounding the Ng Family's ability to control the Peruvian Business (*see* Isherwood Decl. ¶¶ 48-62; Movants' Exs. 54-59; Hr'g Tr. 167:2-170:22).

Based on the foregoing, the Movants' lack of confidence in management is both justified and understandable.  Thus, this factor weighs in favor of the appointment of a Chapter 11 trustee in these cases.  *See, e.g.*, *Marvel Entm't*, 140 F.3d at 474 ("The level of acrimony found to exist in this case certainly makes the appointment of a trustee in the best interests of the parties and the estate."); *In re Eurospark*, 424 B.R at 630 (recognizing that "acrimony between the creditors and the debtor's management, standing alone, has been found to be a basis to appoint a chapter 11 trustee under § 1104(a)(2)") (citation omitted); *see also Taub v. Taub (In re Taub)*, 427 B.R. 208, 229 (Bankr. E.D.N.Y. 2010) (finding, that "acrimony and conflicts between the Debtor and her creditors and parties in interest extend well beyond the healthy conflicts that always exist between debtor and creditor" and that "Debtors' most active creditors lack confidence in her ability to manage the case and propose a confirmable plan" are bases that warranted the appointment of a trustee).

## *Prospects for the Debtors' Rehabilitation*

The Movants assert that the Debtors have little prospect of rehabilitation under current management; that although Debtors filed the cases to "buy time" and get some "breathing room," they have failed to demonstrate how either will benefit creditors in a manner that the agreed upon sale process could not accomplish.  Motion ¶ 68.  In any event, the Movants say that the Debtors have not articulated a path forward for these cases and cannot do so since the Debtors are either defunct or holding companies and none have cash to operate or access to debtor in possession financing.  *Id.*

The Debtors dispute those assertions and contend that their prospects for rehabilitation are good for a number of reasons.  They say that they have "many workable reorganization options available to them," and that they are considering "several kinds of Chapter 11

reorganization plans" including equitization (with potential refinancing), the controlled sale of

the Debtors' Peruvian operating companies and/or other major assets, and the spinning off of

Debtors' Peruvian operating companies combined with equitization or the sale of other assets."

Debtors' Opp'n at 27.  Further, the Debtors maintain that the Peruvian Opcos are "an

appreciating asset—and certainly stabilizing" with significant potential for increasing value.

They say that the Peruvian Business is at a cyclical low due to the adverse effects of El Niño, and

the Peruvian government's refusal to permit a second anchovy fishing season in 2014 and

reduction of the TAC for the 2015 fishing seasons and the first fishing season of 2016, but will

improve because climate conditions are expected to moderate and, as a result, the coming

anchovy harvest is likely to be significantly better than last year's.  *Id.* at 28.  Next, they contend

that since Copeinca was only recently acquired, the Peruvian Opcos have never experienced a

complete, normal fishing season as an integrated operation.  *Id.*  Finally, the Debtors assert that

they have managed their assets and finances properly under difficult conditions and, as such, the

Peruvian Opcos are adequately funded for their current operations and the Debtors have no

immediate need for debtor-in-possession financing.  *Id.*

The Court recognizes that these cases were recently filed and that, as a practical matter

(and aside from the Bankruptcy Code's exclusivity provisions, *see* 11 U.S.C. § 1121), debtors

customarily enjoy a "breathing period" immediately following the commencement of their cases

to work with their professionals, organize their affairs and reach out to their creditors in an effort

to begin to formulate restructuring plans.  However, these are not typical cases.  These cases

were filed after extended, albeit unsuccessful, efforts to address the defaults under the Club

Facility out of court, and thereafter, the commencement and resolution of winding up

proceedings commenced against CFGL and CFIL in their home states.  Pursuant to the Deeds of

Undertaking, the parties agreed to sell the Peruvian Business, and further, that if it was not sold

by July 15, 2015, that the Debtors would consent to the reinstatement of the Cayman Islands

winding-up proceedings where the parties' rights and liabilities would be resolved.  The Court is

aware that Debtors contend that they consented to the January 2016 Deed reluctantly and

maintain that the course they are pursuing is in the best interests of all their stakeholders.

However, having elected to breach the Deeds of Undertaking and to embark on a course

completely at odds with their previous agreements, in a "foreign" jurisdiction with which they

have no meaningful contacts, in responding to the Motion it is incumbent upon them to articulate

a cogent and viable reorganization strategy.  They have failed to do so.  In his report, the

Debtors' financial advisor merely recites possible reorganization outcomes that would befit any

chapter 11 case, and no details underlie any of the possible suggested reorganization outcomes.

*See* Prager Decl. & Rpt.  Instead, the Debtors are advocating a "wait and see" approach based on

the hopeful and uncertain turnaround of the Peruvian Business.  *See* Paniagua Decl. ¶¶ 23-24, 29;

Hr'g Tr. 133:10-18.  The Debtors have not articulated any course of action, any time frame for

implementing a reorganization strategy, or any back-up plans if the Peruvian Business does not

improve.  Indeed, the Debtors have done little in these Chapter 11 cases to further their

reorganization efforts other than filing their petitions, certain required schedules and statements,

retention applications, a few rudimentary first-day filings, and their response to the Motion.

Particularly troubling is that the Debtors fail to address the fact that they lack assets and

operations to reorganize and, in any event, have no funding to do so.  As noted previously, the

Debtors are, with few exceptions, holding companies or dormant operating companies (*see* First

Day Decl. ¶ 14) with no meaningful businesses to reorganize.  *See* Debtors' Schedules [Movants'

Exs. 35-50].  The Debtors have given no indication they expect any of these entities to become

active and most of them have no employees.  *See* First Day Decl. & Rpt., Ex. H (listing only 5

non-executive employees at one Debtor).  The Debtors only have approximately $300,000 in

available cash (*see id.*, Ex. I.) and no U.S. assets, save for the professional retainers.  Further,

only minimal income is expected to be received in the ordinary course of business in the near

term because, among other things, the CF Group debtors rely on the Peruvian Opcos for

substantially all of their income, and any income from the Peruvian Opcos is speculative and

may not occur anytime soon due to the involuntary petitions against the Peruvian Opcos in Peru.

*See* First Day Decl. ¶¶ 146-47 & Ex. I.  Based upon the record of this Motion, it is clear that the

Debtors' prospects for rehabilitation are problematic, if not dim.  This factor supports the

appointment of a Chapter 11 trustee.  *See generally In re Ashley River Consulting*, No. 14-13406,

2015 WL 1540941, at *11 (Bankr. S.D.N.Y. Mar. 31, 2015) (granting motion to appoint a trustee

and noting that "the Debtors have not done much of anything in their bankruptcies since they

filed their petitions other than file their schedules[], applications to approve their retention of

their attorneys, and respond to the motions of other parties in interest, including the U.S. Trustee,

who seek relief to move these cases along").  *See also In re H & S Transp. Co.*, 55 B.R. 786,

790-91 (Bankr. M.D. Tenn. 1982) (concluding that appointment of a trustee was warranted

where, among other reasons, the debtors essentially ceased operations, did not possess sufficient

assets to successfully reorganize, and no plan of reorganization has been submitted in the case).

*Costs and Benefits of Appointing a Trustee*

The Movants assert that the estates will realize significant benefits through the

appointment of a trustee.  They note that although the Debtors have retained U.S.-based

professionals to advise them on U.S. restructuring matters, they have effected none of the

corporate governance changes needed to give creditors confidence that these Debtors will act in a

way that is most beneficial to the Debtors' estates and their creditors.  *See* Motion ¶ 72.  Thus,

they contend that the appointment of a Chapter 11 trustee is necessary to provide oversight and

to develop a strategy for the financial rehabilitation of the Debtors.  *Id.*  Moreover, they contend

that since these cases are still relatively new, and little has been accomplished in them, a trustee

promptly appointed will be able to quickly gain the requisite knowledge of the case, and, as such,

will not be an unduly burdensome expense.  *Id.* at ¶ 73.  The Movants also reason that because an

official committee of unsecured creditors has not been formed, the cost of a Chapter 11 trustee

and one set of legal professionals is not outside of what otherwise likely would accrue if a

committee were appointed.  *Id.*[38]  They maintain that an "untarnished" Chapter 11 trustee would

be able to act as an independent liaison between the Debtors and the Peruvian Opcos, help to

avoid contentious litigation between the parties and negotiate a plan, as well as review and

address the intercompany claims.  *Id.*

The Debtors reject the notion that the costs and benefits of the appointment of a trustee

weigh in Movants' favor.  They argue that there are either no benefits to the appointment of a

Chapter 11 trustee in this case or that such appointment is needlessly prophylactic at best.  They

say that under these conditions, a Chapter 11 trustee would be an additional needless expense to

"an enterprise in the process of righting its ship."  Debtors' Opp'n at 33-35.  Moreover, they

contend that there would be "real and considerable" harm stemming from the appointment of a

trustee.  *Id.*  Towards that end, the Debtors maintain that the appointment of a trustee would

likely diminish the value of their estates, because the disruptive effects of the appointment of a

trustee will be at least as severe as the appointment of the JPLs since the JPLs powers are more

---

[38]     The Movants speculate that if a Chapter 11 trustee is not appointed, unsecured creditors—who as of today have
expressed no interest in forming a committee—may petition the U.S. Trustee for the formation of a committee to
protect their interests, and the costs may be incurred in any event.  The Court gives no weight to that argument.

limited than those of a Chapter 11 trustee. *See* Paniagua Decl. ¶¶ 31, 34, 38; Ng Decl. ¶¶ 67, 72.

Moreover, the Debtors contend that it is far from clear that a Trustee will be able to operate the

Debtors efficiently in the near term since an appointed trustee may not be recognized as an estate

fiduciary in other jurisdictions. *See* Prager Decl. & Rpt. ¶ 70.[39]  Finally, the Debtors maintain

that separate and apart from the substantial damage a trustee could cause to these businesses, the

costs—in monetary terms—of a Chapter 11 trustee in these cases could be staggering. *Id.*  They

note that commissions awardable under section 326 of the Bankruptcy Code could aggregate in

excess of $30 million and contend that the trustee's professionals' fees could equal another $30

million. *Id.*

In reviewing the record of this Motion, the Court finds that the Debtors, their estates,

creditors and equity holders will substantially benefit from the appointment of a trustee.

Contrary to Debtors' contention, such an appointment is not merely prophylactic.  Rather, in

light of Debtors' management's disabling conflicts described above, the appointment is essential

to facilitate the Debtors' reorganization.   Although the Court is mindful of the potential expense

associated with the appointment of a trustee, it finds that the benefits of to be realized by the

Debtors, their estates, creditors and equity holders from the appointment of a trustee will outstrip

the costs associated with it.  Although section 326 of the Bankruptcy Code provides a formula

for calculating trustee fees, that formula sets the cap on the fee.  Ultimately, the Court determines

that fee. *See* 11 U.S.C. § 326(a) ("[i]n a case under chapter . . . 11, the court may allow

---

[39]    As noted above, the Peruvian Suppliers joined in opposing the Motion.  They argue against the appointment of a
trustee for the following two additional reasons:  (i) like the JPLs, a trustee will result in an interruption or the
complete cessation of the Peruvian Opcos' operations, and the possible displacement of management, with the
concomitant loss of revenue for the Peruvian Suppliers; and (ii) under Peruvian Insolvency Law, INDECOPI and the
bankruptcy process should be the exclusive forum for creditors of Peruvian debtors to obtain payment of their debts.
*See* Peruvian Suppliers' Opp'n at 3-5.  The Court finds no merit to those assertions.  The suppliers' concern about
the appointment of a trustee for the Chapter 11 debtors is speculative, at best.  Moreover, the appointment of a
trustee would impact these cases, not the Peruvian Insolvency Proceedings.

reasonable compensation under section 330 of this title of the trustee for the trustee's services");
*see also In re The 1031 Tax Group, LLC*, No. 07-11448, 2009 WL 4806199, at *1 (Bankr.
S.D.N.Y. Dec. 9, 2009) ("While Bankruptcy Code § 326(a) sets a maximum limit on the
compensation that may be awarded to a trustee, § 330 still operates to limit the compensation of
trustees to a reasonable amount.").  Moreover, there is simply no support for Debtors' assertions
that the fees of the trustee's retained professionals could run as high as $30 million.  In any
event, having purposefully availed themselves of the benefits afforded under the Bankruptcy
Code, the Debtors cannot be heard to complain about the costs associated with that election.

Nor does the Court find any merit to the Debtors' claim that "the appointment of a
Chapter 11 trustee would have an effect similar to the "appointment of the JPLs… [because] a
Chapter 11 trustee will be viewed as a badge of economic distress, thus lowering the sale value
of the Debtors' assets [and that the] business relationships cultivated by Debtors' management…
would likely not survive the replacement of Debtors' management with a Chapter 11 trustee who
would be a stranger to many of the Debtors' long term customers and suppliers."  Debtors'
Opp'n at 34.  The Pacific Andes Group has made it known to the business community that
segments of its business are in economic distress by causing bankruptcy/insolvency/ancillary
proceedings to be commenced on behalf of the Debtors, PARD and the Peruvian Opcos, among
others.  Moreover, although an appointed trustee may be empowered under the Bankruptcy Code
to operate the Debtors' business, most are either not operating or are holding companies without
employees, customers or suppliers.  Further, the Debtors have adduced no evidence to support
their assertion that creditors and other interested parties will refuse to deal with a Chapter 11
trustee, and the Court gives no weight to the Debtors' speculation.  Although the Court
understands that the Debtors maintain that the JPLs' actions adversely impacted the Peruvian

Opcos' operations, it also notes that those businesses were experiencing substantial problems unrelated to the actions of the JPLs.  Specifically, Paniagua confirmed that "one of the most important factors" in the precipitous decline of the Peruvian Opcos' financial condition was the presence of "the largest El Niño in the past 15 years."  Paniagua Decl. ¶ 24.  As a result of El Niño, "the percentage catch of the TAC in the northern-central zone was only 66% of the TAC set for the season and the entire second season in both the northern-central and southern zone were canceled."  *Id.*  In 2015 and 2016, the annual catch volume was down approximately 60% in 2014 and 30% in 2015.  Id.  Paniagua was also clear that for the past several years the government has reduced the TAC and that the devastating impact of El Niño was compounded by the Peruvian government's ban on commercial fishing operations during El Niño events, within the anchovy-rich ten mile radius of the Peruvian coast.  *Id.* ¶¶ 25-28.   Thus, based on the record of this Motion, the Court finds that, on balance, the benefits associated with the appointment of a trustee far outweigh the potential costs of such an appointment.  *See, e.g.*, *In re Taub*, 427 B.R. at 229-30 (weighing costs of trustee's familiarity with debtor, its professional fees, and the cost of its investigation against benefits of "survey[ing] the estate free from the complex, familial, reflexive, and often acrimonious relationship among the Debtor and the parties in interest," and finding that balance favored appointment of trustee).

### Appointment of a Chapter 11 Trustee

The Court finds that the Movants have established grounds for the appointment of a trustee under § 1104(a)(2) by clear and convincing evidence.  To be sure, a trustee will be able to review and address the Debtors' multi-billion intercompany balances and investigate any alleged accounting irregularities, without the conflicts of interest that plague current management.  Moreover, a trustee can facilitate between hostile parties in the proposal, review and/or negotiation of a reorganization strategy.  Most importantly, however, is that a trustee is in the

best position to evaluate the optimal way to maximize the value of the Peruvian Business and to determine how to realize that value for the benefit of the Debtors' estates and creditors.

There are sixteen Debtors in these Chapter 11 cases. As noted, most of them are dormant, non-operating companies and a few are holding companies to other operating, non-debtor affiliates and businesses. It makes little practical or economic sense to appoint a trustee for each Debtor in these cases. That is particularly so where, as here, among other things, it is uncertain what impact such an appointment would have on (i) the Debtors' other businesses and affiliates (including non-debtor operating subsidiaries) and their creditors and constituents, and (ii) the corporate governance of the affected Debtor and non-debtor entities in foreign jurisdictions (including the publicly traded companies). Moreover, it is not clear whether an appointed Chapter 11 trustee will be recognized under applicable foreign law as the authorized representative of the Debtors.

CFG Peru Singapore, is the 100% direct and indirect owner of the Peruvian Opcos. In the course of any restructuring (standalone or otherwise), that Debtor must, among other things, assess the value of its interests in the Peruvian Opcos and determine how to apply that value in furtherance of the restructuring. Thus, the appointment of a trustee for CFG Peru (Singapore) is particularly appropriate. Moreover, it presents limited corporate governance and recognition issues, if they are to be raised. Accordingly, the Court directs that a trustee be appointed for Debtor CFG Peru Singapore and, at this time, for no other Debtor. To be clear, in reaching this conclusion, the Court rejects the Movants' contention that they are entitled to the benefit of their prepetition bargain with the Debtors and that the trustee should work towards causing the Peruvian Opcos to dismiss the Peruvian Insolvency Proceedings in favor of the sale of the Peruvian Business. It will be incumbent upon the appointed trustee, in furtherance of his or her

fiduciary duties, without limitation, to assess the highest and best use of those assets in the context of the resolution of these Chapter 11 cases and the means for the Debtors to realize maximum benefits from those assets.

CONCLUSION

Based on the foregoing, the Motion is **GRANTED** as set forth herein. The United States Trustee is directed to appoint a Chapter 11 trustee for Debtor CFG Peru Singapore pursuant to section 1104(d)(2) of the Bankruptcy Code, and seek approval of such appointment in accordance with Rule 2007.1 of the Federal Rules of Bankruptcy Procedure.[40]

SO ORDERED.

Dated: New York, New York
      October 28, 2016

                                    /s/ *James L. Garrity, Jr.*
                                    Honorable James L. Garrity, Jr.
                                    United States Bankruptcy Judge

---

[40]   Rule 2007.1 governs the appointment of trustees in chapter 11 cases, and provides in relevant part: "An order approving the appointment of a trustee or an examiner under § 1104(d) of the Code shall be made on application of the United States Trustee." Fed. R. Bankr. P. 2007.1(c).