# EXHIBIT B

1

g8u2asiA

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   ASI, INC.,

4                    Plaintiff,              New York, N.Y.

5            v.                              16 MC. 269-P1

6   HSBC BANK (USA), N.A.,

7                    Defendant.

8   ------------------------------x

9                                           August 30, 2016
                                            11:40 a.m.
10
    Before:
11
                        HON. PAUL A. ENGELMAYER,
12
                                            District Judge
13

14                          APPEARANCES
15

16
    WEISBROD, MATTEIS & COPLEY, PLLC
17        Attorneys for Plaintiff
    BY:  SHELLI L. CALLAND
18        STEPHEN A. WEISBROD

19

20   GREENBERG TRAURIG, LLP
         Attorneys for Defendant
21   BY:  LOUIS SMITH
         AARON VAN NOSTRAND
22

23

24

25

2

g8u2asiA

1            (Case called)

2            MS. CALLAND:  Shelli Calland and Stephen Weisbrod,

3    from Weisbrod, Matteis & Copley, for movant, ASI, Inc.

4            THE COURT:  Very good.  Good morning.

5            MS. CALLAND:  Good morning.

6            MR. SMITH:  Good morning, your Honor.  Louis Smith,

7    Greenberg Traurig, appearing on behalf of HSBC Bank U.S.A.,

8    N.A.

9            MR. VAN NOSTRAND:  Aaron Van Nostrand, from Greenberg

10   Traurig, also on behalf of HSBC Bank U.S.A. N.A.

11           THE COURT:  Okay.  Very good.  Good morning to you.

12           I am hearing this case in my capacity as Part I judge.

13   I have carefully read everyone's papers.  I am happy to hear

14   brief argument from each side, beginning with ASI.

15           MS. CALLAND:  Thank you, your Honor.

16           Aviva has presented ample evidence that HSBC U.S.A.

17   has control over documents held by its overseas affiliates:

18           First, HSBC U.S.A. admitted in its deferred

19   prosecution agreement with the federal government that it can

20   procure information in the possession of its foreign affiliates

21   and that it in fact has procured information in the possession

22   of its foreign affiliates.

23           THE COURT:  Wait a minute.  The deferred prosecution

24   agreement is a one-time negotiated agreement.  Just because it

25   was in the broader interests of the HSBC universe to enter into

3

g8u2asiA

1    that agreement with DOJ limited to prosecutions and

2    investigations, why does that mean that one prong of HSBC, in a

3    completely different context, can get at the information that

4    is most directly held by another?  Why are these the same

5    issue?

6           MS. CALLAND:  Well, your Honor, so, first of all,

7    before it even entered into the DPA, it was HSBC U.S.A.

8    specifically, so not HSBC Holdings, the parent company, or the

9    HSBC Group in general, but HSBC U.S.A. that produced over 9

10   million pages of documents to the federal government.

11          THE COURT:  But in the context of a criminal

12   investigation, the incentive structure is completely different,

13   and people may -- an affiliate, for example, may willingly

14   collaborate or cooperate and produce materials ultimately

15   destined for a federal regulator for the reason that any

16   commercial entity has an incentive to cooperate with a criminal

17   investigation, which is to cooperate and avoid indictment.  It

18   is a completely different situation than in the civil.  In

19   other words, the fact of the events involving the production of

20   documents in the DPA say to me that there was an incentive in

21   the context of a criminal case to produce materials.  It

22   doesn't mean that the subpoenaed entity had the power to go and

23   get the materials in the possession of an affiliate.  It is a

24   completely different paradigm.

25          MS. CALLAND:  It is true that it is criminal

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

4

g8u2asiA

1    litigation, rather than civil litigation, but it is still

2    litigation.  And so the Hunter Douglas case, I think, is

3    actually an excellent example here.  This is exactly the

4    situation that the court was referring to in the Hunter Douglas

5    case, when it said that if a company can obtain documents from

6    an affiliate to assist itself in litigation, then it must

7    produce them for discovery purposes.

8            So, in Hunter Douglas, counsel for the subpoenaed U.S.

9    entity stated that if its foreign affiliate -- in that case it

10   was its parent company -- were the subject of a government

11   investigation in the United States and documents were sought

12   here, that the U.S. entity could cause its foreign affiliate to

13   produce the documents under those circumstances.

14           THE COURT:  They have not said that here, though.

15   HSBC hasn't said that.  You have here a different situation,

16   where there was, involving different facts altogether, a DPA,

17   but HSBC has made no such statement in this case.

18           MS. CALLAND:  Well, in Hunter Douglas it was a

19   hypothetical question that was asked in the context of that

20   subpoena.  But here it is not just a hypothetical.  It is an

21   actual situation, where there is a government investigation and

22   HSBC U.S.A. produced documents that were in the possession of

23   its foreign affiliates and promised that it could do so in the

24   future as well.

25           THE COURT:  It said in the DPA it basically committed

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

5

g8u2asiA

1   to making materials available in the event of a prosecution or

2   investigation of officers or employees.  That's not this case.

3   In other words, the affiliate has agreed to do that and, no

4   doubt, that helped ward off prosecution for HSBC.  But why does

5   that benefit you in unrelated civil litigation?  I am just not

6   following the inference from the DPA.

7        MS. CALLAND:  I think that the idea is, so, it is not

8   like we are trying to stand in the shoes of the federal

9   government or anything like that.  But we are using the DPA as

10   evidence that HSBC U.S.A. under some circumstances can actually

11   obtain documents, it has the practical ability to obtain

12   documents from its foreign affiliates.

13        THE COURT:  But the effect of that would mean that any

14   time an entity that's part of a worldwide umbrella agrees, as

15   part of a DPA, to produce documents outside of its own pod to

16   the government, that's going to come back and slap them in the

17   face in unrelated civil litigation where the argument will be

18   made, ah-ha, there are really no barriers among the different

19   parts of the corporate tree; you, HSBC, need to be treated as

20   having access to everything.  There is an inference in there

21   that is very speculative.

22        MS. CALLAND:  So the question here, right, is whether

23   or not there is a barrier to HSBC U.S.A. obtaining the

24   documents from its foreign affiliates.  The incentives as to

25   why it is --

6

g8u2asiA

```
 1              THE COURT:  No.  The issue is whether there is the

 2    practical ability of HSBC to go and get it.  It is one thing to

 3    say there is a practical ability to go and get it when HSBC

 4    calls up its foreign affiliate and says, We're going to get

 5    indicted unless our foreign affiliates don't snap to.  Under

 6    those circumstances maybe there is a practical ability because

 7    the foreign affiliate has an overwhelming interest in HSBC's

 8    not getting indicted and being put out of business.  No

 9    disrespect to ASI, but you can't threaten prosecution, and

10    there is absolutely no reason to think that the foreign

11    affiliate would come to heel if HSBC were to simply call and

12    say, Please.

13              MS. CALLAND:  In this case, HSBC U.S.A. hasn't even

14    asked its parent company or its affiliate to produce the

15    documents, so we don't know what they would say.  There is no

16    evidence in the declarations that were provided --

17              THE COURT:  But the burden is yours.

18              MS. CALLAND:  It is.  Which is why there is the

19    evidence in the form of the DPA and there is also evidence in

20    the form of the statements on HSBC U.S.A.'s Web site that talk

21    about the seamless international network of HSBC banks that

22    they have created, if I can turn to that for a moment.

23              There are numerous examples that we provided in our

24    reply brief of statements on HSBC U.S.A.'s Web site about how

25    the HSBC U.S.A. and its foreign counterparts have created a
```

g8u2asiA

1   seamless banking system where information flows freely among

2   all of the HSBC banks, and that idea really permeates HSBC

3   U.S.A.'s Web site.  So HSBC U.S.A.'s customers can use one

4   single log-on to access and move funds between all of their

5   HSBC accounts all around the world.

6           THE COURT:  But does that mean that HSBC can gain

7   access to documents held by an affiliate or does it mean that a

8   customer can use a one-stop shop to obtain the customer's own

9   records?

10          MS. CALLAND:  I think that HSBC U.S.A. has been

11  calling this a customer-facing system.  But the reality is

12  that if there is a customer-facing system that there needs to

13  be a part of that system that faces the company or else the

14  company wouldn't be able to assist the customer with that

15  service.

16          THE COURT:  What do you mean by the company, though?

17  Why do we assume that it is HSBC that would be the one that

18  would assist the customer if the customer was, let's say,

19  having technical problems accessing its worldwide records?

20          MS. CALLAND:  It is an HSBC system, so I think it is a

21  service that is provided by HSBC and it is advertised on the

22  HSBC U.S.A. Web site.  In other words, the HSBC -- a customer

23  HSBC U.S. account is linked up with its HSBC Hong Kong account

24  and if that's visible to the customer and available to the

25  customer, it also must be visible and available to HSBC U.S.A.

g8u2asiA

1          THE COURT:  Are you seeking just customer records or

2     something beyond it here?

3          MS. CALLAND:  I think that what we are seeking are

4     documents that would be available to the customer.  So, in

5     particular, we are seeking bank loan documentation.

6          THE COURT:  For what customers?  Have you identified

7     the customers?

8          MS. CALLAND:  We have identified the customers.  We

9     have identified the particular customers and identifying

10    information about the customers to help HSBC know who it is

11    that we are talking about.

12         THE COURT:  Are you seeking any records that are not

13    properly described as customer records?

14         MS. CALLAND:  I don't believe so.  I think these are

15    all records that would be the customer records.  So the

16    underlying bank loan documents, the collateral that was

17    provided for the loans and the loan documents themselves.

18         THE COURT:  Have you subpoenaed the customers?

19         MS. CALLAND:  Yes.  So, the -- in the underlying

20    bankruptcy case, we have made extensive efforts to obtain the

21    documents from the liquidators of Manley Toys Limited.  That's

22    the customer that we are talking about.  That's the debtor.  We

23    have made extensive efforts to obtain the documents from the

24    liquidators.  And the liquidators, what they say is that they

25    don't have the documents.  The bankruptcy court has ordered the

9

g8u2asiA

1   liquidators to produce what they have.

2        THE COURT:  If the liquidators, meaning the people who

3   stand in the shoes of Manley, have access through HSBC to their

4   worldwide records, why can't you simply go to the bankruptcy

5   court and say you are being sold a bill of goods, these people

6   have an account at HSBC, its customer-facing system allows them

7   as a customer to access their own records.  Let's look behind

8   the label here.

9        MS. CALLAND:  I believe that the accounts have been

10  closed.

11       THE COURT:  Closed or open, if I have a bank account

12  at Citibank and I close the account, I can still get my

13  records.  I still was a former customer and I am entitled to my

14  records from my tenure there.

15       MS. CALLAND:  Yes, and the liquidators actually have

16  requested the documents from HSBC U.S.A.'s affiliates in Hong

17  Kong, but they have refused to turn over the documents without

18  the consent of all borrowers on the loans.  So they have sought

19  the documents both from the people who used to control Manley

20  and from the banks and say that they have not been able to get

21  them.

22       THE COURT:  I'm sorry.  I am not following this.  In

23  other words, you are saying that Manley has a right to its own

24  records, but Manley is refusing in bankruptcy court to produce

25  its own records because those records implicate the interests

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

g8u2asiA

1   or transactions with borrowers.

2          MS. CALLAND:  Not exactly.  I'm sorry.  I don't think

3   I was clear.  The liquidators who stand in the shoes of Manley,

4   they have made requests of the people who used to control

5   Manley and have Manley's documents to ask for the bank loan

6   documents.

7          THE COURT:  Right.

8          MS. CALLAND:  They have not gotten them that way.

9          The liquidators also have gone to the banks to ask for

10   the documents, and the banks have refused to turn them over.

11   Because what we believe is that the bank loans in issue are not

12   just -- Manley is not the only borrower on those loans.  There

13   are Manley affiliates who are also borrowers on those loans.

14   That's what we believe.  We don't have the documents.

15          THE COURT:  Wait a minute.  The liquidators stand in

16   Manley's shoes.

17          MS. CALLAND:  Yes.

18          THE COURT:  You have gone to the liquidators and said,

19   Get us Manley's documents.  The liquidators sound like they are

20   trying, but that when they go to the bank, the bank is saying,

21   in effect, because these same documents of Manley's also

22   implicate the interests of Manley affiliates who are not part

23   of the bankruptcy, it is not as simple as all that.  There are

24   confidentiality or other interests of nonparties implicated.

25          MS. CALLAND:  Yes, essentially.  I don't think that

11

g8u2asiA

1    they have elaborated as to their reasons but...

2         THE COURT:  So if that's the case, why isn't this just

3    an end run around that?  In other words, if in fact there are

4    interests implicated of those nonparties, why isn't the right

5    answer for you and the liquidators to litigate that point to

6    conclusion rather than saying, We don't care about your claims

7    of third-party interests, we are just going to get the

8    documents by going in Part I against HSBC?  In other words, it

9    seems to me that the banks may have a point in that proceeding

10   that there are third-party interests that need to be taken into

11   account.  I can't evaluate whether that's right or not.  But

12   you have actually made some progress isolating that as the

13   stumbling block.  Why isn't the answer to keep trying to get

14   that court or its higher court to agree with you on that point

15   rather than effectively starting a different proceeding here

16   claiming that HSBC can go and get materials held by an HSBC

17   affiliate and end running, if you will, these objections that

18   have been made that you have not overcome in that other

19   proceeding?

20        MS. CALLAND:  So the liquidators have told us that

21   they are not inclined to litigate the issue in Hong Kong, and

22   our position is that we shouldn't have to go to the burden and

23   expense of litigating it in Hong Kong when HSBC U.S.A. has

24   control over the documents and we haven't heard from HSBC

25   U.S.A. any of these objections about confidentiality.

g8u2asiA

1         THE COURT:  So, in other words, your point is,

2    supposing you get past this -- supposing I ruled for that you

3    HSBC had practical access, HSBC could then at that point

4    interpose more specific objections relating to the interests of

5    the third parties.

6         MS. CALLAND:  Yes, if they haven't waived those

7    objections, sure.

8         THE COURT:  Thank you.

9         Let me hear briefly from HSBC.  That is Mr. Smith?

10        MR. SMITH:  Yes, your Honor.  Thank you, your Honor.

11        Your Honor, HSBC Bank U.S.A. just litigated a nearly

12   identical motion in the District of New Jersey where this

13   underlying proceeding is currently pending, and there the

14   federal judge found --

15        THE COURT:  Magistrate judge?

16        MR. SMITH:  Yes, Magistrate Judge Hammer found that

17   HSBC Bank U.S.A. did not have possession, custody, or control

18   over customer documents of its Hong Kong affiliate.  So, just

19   like in this case, we have confirmed in this hearing this

20   morning that all this concerns is customer documents and the

21   affiliate, again, is a Hong Kong affiliate.

22        THE COURT:  Is that literally the same proceeding

23   that -- did the magistrate judge's ruling arise out of the same

24   lawsuit?

25        MR. SMITH:  It arose out of -- that was a securities

13
g8u2asiA

1    case where a subpoena was issued, but it was a motion to

2    compel.

3         THE COURT:  I am going to deal with this fresh.  I am

4    going to make my own call.

5         But tell me, focus on the customer-facing point.  If I

6    am a customer in New York, but I have got accounts at HSBC

7    affiliates around the world, just factually is it correct that

8    I can access them from HSBC in New York?

9         MR. SMITH:  You cannot.  What HSBC Bank U.S.A. can do

10   for its customers is facilitate that customer's access to

11   accounts that that customer may have with foreign affiliates.

12   So it is a facilitation role.  It does not provide HSBC Bank

13   U.S.A. with access to account records for foreign affiliates

14   and, likewise, it does not provide the foreign affiliate with

15   the ability to access HSBC Bank U.S.A. customer records.

16        THE COURT:  So if I were to march into HSBC in New

17   York right now and give truth serum to everyone who worked

18   there and say, Can you get Engelmayer's bank records from the

19   Hong Kong affiliate and they had to answer truthfully, you are

20   telling me they would all say we literally -- there is nothing

21   we can, do beyond making a -- importuning, beyond making a

22   request, there is nothing we can do on our own steam to access

23   those records.  Is that correct?

24        MR. SMITH:  What the record shows is they can help you

25   facilitate your own access to your affiliates, your

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

14

g8u2asiA

1    relationship with an overseas affiliate, but they cannot

2    themselves go in and say, We are going to pull up on our screen

3    separate databases, separate systems.  They cannot go in and

4    access your records from the New York operation.

5         THE COURT:  So having run this to ground, you are

6    representing to me that the people in HSBC U.S. literally

7    cannot, without securing the voluntary consent of HSBC

8    employees at the affiliates, access banking records of those

9    affiliates.

10        MR. SMITH:  That's correct.  And, your Honor, it is

11   declarations that we have put in the record that make the

12   statement and indicate the limitations, the separate databases,

13   the separate systems.

14        THE COURT:  But I take it, as a practical matter, what

15   the marketing materials are indicating is that HSBC not in the

16   business of making life difficult for its customers or you

17   wouldn't have too many of them.  As a practical matter, if I am

18   an HSBC customer in New York and I have got money in Asia and

19   every other territory on the Risk board, you are going to be

20   able to accommodate my request to gain access to that.

21        MR. SMITH:  We can help facilitate your interaction

22   with that foreign affiliate so that you can access your own

23   records.  But, again, you would be leaving -- if you are doing

24   anything online, you have got to leave HSBC Bank U.S.A.'s

25   network, Web site, and then you would have to go and access the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

15

g8u2asiA

1   foreign affiliate's.  So, again, it is facilitating the

2   interaction.  It is not giving the personnel in the U.S., their

3   employees of Bank U.S.A., access to or the ability to look at

4   those underlying foreign affiliates' records.

5           THE COURT:  Tell me how the DPA came about.

6           MR. SMITH:  The?

7           THE COURT:  Deferred prosecution agreement.

8           MR. SMITH:  The circumstances?

9           THE COURT:  Yes.  What is that investigation about?

10          MR. SMITH:  The heart of the DPA concerns money

11  laundering issues.

12          THE COURT:  Can you represent to me what the

13  circumstances were under which HSBC effectively commits to get

14  documents that go beyond those held just by HSBC U.S. to the

15  Department of Justice?

16          MR. SMITH:  When you look at the documents -- and the

17  DPA is part of the record in this case -- HSBC Bank U.S.A. is a

18  party to it, but the other party to the deferred prosecution

19  agreement is HSBC Holdings PLC.  That is the ultimate parent

20  company of all of the HSBC entities.  You will see, just from

21  the text of the agreement, we are a party to the DPA and

22  counsel, in reply, pointed to paragraph 24 of the DPA, and I

23  will just quickly read this:

24          "To the extent that HSBC Holdings PLC's" --

25          THE COURT:  Slow down.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

g8u2asiA

1          MR. SMITH:  Sorry, your Honor.

2          -- "compliance with this agreement requires that

3     HSBC Holdings PLC agrees to ensure that its wholly owned

4     subsidiaries, and any successors and assigns, comply with the

5     requirements and obligations set forth in this agreement to the

6     full extent permissible under locally applicable laws and

7     regulations and the instructions of the local regulatory

8     agencies."

9          THE COURT:  That may mean, then, that the parent

10    either on its own has the authority to compel compliance by the

11    subs or has received their consent such that contractually the

12    subs are bound, in the event that the DOJ requests, to fork

13    over that information.

14         MR. SMITH:  Correct, your Honor.  And the law

15    recognizes that there are instances when you are talking about

16    control, when you look at the parent looking at information

17    from a subsidiary, it looks at an instance where you could seek

18    control in those circumstance on occasion.  But we do not have

19    that here.  We have Holdings PLC is not before your Honor.  It

20    is just HSBC Bank U.S.A. that is before your Honor.  That is a

21    United States banking association.  And what they are seeking

22    is documents from a foreign affiliate bank in Hong Kong.  So

23    they are looking at this DPA and what went on there, and we

24    agree that it really has nothing to do -- this is a completely

25    different scenario.

g8u2asiA

1          THE COURT:  Supposing we had the same facts here

2     except that the HSBC entity that had been the subject of this

3     Part I motion was the parent, same result?  You seem to be

4     saying that the parent may have an access right that the U.S.

5     HSBC entity does not have.

6          MR. SMITH:  That has not been fully fleshed out on

7     this record, but I can tell you on the law and based on what's

8     been cited, the legal analysis is going to look at things

9     differently.  Because they do, when you have the parent in

10    front of the court, as opposed to just a sister affiliated

11    company, it is viewed differently.

12         But we would still maintain, your Honor, in this case

13    this deferred prosecution agreement has absolutely nothing to

14    do with the party in civil litigation trying to force a U.S.

15    based entity to obtain documents over in Hong Kong.  They

16    haven't cited any cases where a deferred prosecution agreement

17    has been used like this.  We cited to your Honor an instance

18    where a litigant tried to use a deferred prosecution agreement

19    to establish personal jurisdiction over holdings in the United

20    States, and the bankruptcy court in that case, federal

21    bankruptcy judge, called the application and argument

22    frivolous.  So there has really been no --

23         THE COURT:  Does the DPA -- supposing the DOJ, under

24    the DPA, asked you for documents that had nothing to do with

25    money laundering but had to do with something else altogether,

18

g8u2asiA

1    different time span.  Let's call it private banking tax evasive

2    bank account, some other ostensible violation of law, but

3    something outside the scope of the investigation that led to

4    the money laundering DPA.  Would the DPA even apply?  In other

5    words, is the commitment there any documents or is it only

6    documents effectively arising out of the investigation and

7    prosecution that catalyzed the DPA?

8            MR. SMITH:  There is an obligation to cooperate.  And

9    I would refer to the terms of the agreement, and the specific

10   language will define the scope.  But there is an obligation on

11   the part of the parties to the agreement to continue to

12   cooperate, and they would do that.

13           THE COURT:  So the DPA is not limited just to money

14   laundering related documents.

15           MR. SMITH:  I would really have to look more closely

16   specifically at the language in the cooperation aspect.

17   Certainly whatever falls within the rubric of the agreement,

18   that's what the entities would certainly do.

19           THE COURT:  I thought your main argument on the DPA

20   ultimately was that the DPA doesn't reflect a practical ability

21   by HSBC U.S. to get documents in the ordinary course.  It

22   reflects, frankly, the unique circumstance of a criminal

23   investigation and the coercive pressures and incentives

24   generated thereby that might have incented the other aspects of

25   the HSBC universe to sign on.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

g8u2asiA

1          MR. SMITH:  That is correct.  We agree.  And that's a

2     view that we are talking about fundamentally different

3     situations, and we agree with that.

4          The additional point that we raised in the papers and

5     I have raised here is that the DPA has got to be viewed in the

6     context of having the ultimate parent company also as a party

7     also with obligations to provide information, and that's

8     different than the situation before your Honor.

9          THE COURT:  All right.  Thank you.

10         Ms. Calland, I am prepared to rule, but if there is

11    something further you want to say in rebuttal, I will certainly

12    give you a brief opportunity.

13         MS. CALLAND:  Yes, please, your Honor.

14         I will start with the DPA.

15         The question under Second Circuit law is not whether

16    the affiliate wants to cooperate in a particular case or

17    whether it has an incentive to cooperate in a particular case.

18    It is cooperation in any case suffices, cooperation in any

19    litigation, which is what the DPA proves, that in fact HSBC

20    U.S.A. has the practical ability to obtain documents in

21    response to a request from its foreign affiliates and it did

22    so.  Not only it produced 9 million pages of documents,

23    specifically HSBC U.S.A. -- that's what it says in the DPA --

24    it also produced HSBC Group employees from around the world for

25    interviews as well.

g8u2asiA

1           I will also add that there are no declarations or

2    evidence in the record about the DPA.  They didn't address that

3    at all in their declarations.

4           In addition, the law in the Second Circuit is that it

5    doesn't matter whether it is a parent affiliate or sister

6    affiliate that's involved; the law is the same.  That's clear

7    in the case law.  The test is the same.  That's why there is a

8    practical ability to obtain documents.

9           With respect to the HSBC U.S.A. promotional materials,

10   we have been talking a lot about this linkage of accounts

11   internationally, but it is more than that that's talked about

12   by HSBC U.S.A.  There is also the fact that they have portable

13   HSBC credit histories that can be transferred to and from all

14   HSBC locations.

15          THE COURT:  What do you do when we have got squared

16   declarations that say, We can't, here in the U.S., access the

17   foreign account records?  It is a Sherman-like statement that

18   is being made in these declarations, and you have got marketing

19   materials that don't squarely refute it.  What can you point to

20   that says that's a lie?

21          MS. CALLAND:  So I don't think --

22          THE COURT:  You are saying it is a lie.

23          MS. CALLAND:  Well, I am not saying that it is a lie,

24   that sort of a banker sitting in a HSBC U.S.A. branch in

25   Manhattan can't go on his or her computer and access the Hong

g8u2asiA

1    Kong records.  But that's not the issue.  The issue is not

2    direct access.  The issue is whether they have the practical

3    ability to obtain the documents.  So that doesn't speak to

4    whether or not the HSBC U.S.A. legal department can give a call

5    to its Hong Kong counterparts to get the documents or, for that

6    matter, whether the banker sitting in Manhattan can call up his

7    counterparts in Hong Kong and request and obtain the documents

8    that way.

9            THE COURT:  Right.  But, look, we do recognize the

10   distinctions between corporate affiliates.  Just because an

11   affiliate may choose to be cooperative or collaborative under

12   some circumstances doesn't mean that the requesting affiliate

13   is always going to prevail.

14           MS. CALLAND:  That's true.  But the question is

15   whether there is a practical ability to obtain documents in the

16   ordinary course of business.  So if, in the ordinary course of

17   business, a lawyer or a banker at HSBC U.S.A. can obtain the

18   documents from its affiliate, that's enough to establish

19   control under Second Circuit law.

20           THE COURT:  Thank you.  One moment.

21           (Pause)

22           THE COURT:  I'm about to read a brief bench opinion

23   resolving the pending motion.  I will not be issuing a written

24   decision on this point.  Rather, a simple bottom-line order

25   will issue that recites the bottom line today.  So if anything

g8u2asiA

1    that I say, if any aspect of the analysis here is of importance

2    to you, you will need to order the transcript.

3             Before the court, sitting in Part I, is a motion by

4    ASI, Inc., which I will refer to as "ASI."  ASI moves to compel

5    nonparty respondent HSBC Bank U.S.A., N.A., the United States

6    arm of HSBC, which I will refer to here as "HSBC," to comply

7    with a subpoena duces tecum.  That subpoena was issued June 17,

8    2016.  It arises out of a matter pending in United States

9    Bankruptcy Court for the District of New Jersey, In re: Manley

10   Toys Limited, No. 1:16-bk-15374(JNP)(Bankr. D.N.J.).  With the

11   subpoena, ASI seeks account information from two HSBC

12   affiliates in Hong Kong.  These are (1) the Hong Kong and

13   Shanghai Banking Corporation Limited, which I will refer to as

14   "HSBC HK," and (2) Hang Seng Bank Limited, which I will refer

15   to as "Hang Seng Bank."  ASI seeks loan documents, payment

16   information, and information about collateral backing loans

17   that HSBC and its affiliates extended to Manley Toys Limited.

18   In addition to the proceeding in the District of New Jersey,

19   Manley Toys Limited is currently also undergoing a bankruptcy

20   proceeding -- or a so-called liquidation proceeding -- in Hong

21   Kong.  ASI represents that the documents that it seeks are

22   relevant to, and for use in, the bankruptcy proceeding in the

23   District of New Jersey.

24            Opposing the motion, HSBC represents that, as for

25   itself, it has no responsive documents.  And it argues, while

g8u2asiA

1   the documents sought by ASI may be held by its affiliates, they

2   are not within HSBC's "possession, custody, or control" within

3   the meaning of Federal Rule of Civil Procedure

4   45(a)(1)(A)(iii).  Therefore, HSBC asserts, it is in compliance

5   with the subpoena.  Independent of this argument on which HSBC

6   principally relies, HSBC argues that ASI must first seek the

7   documents from the debtor in the underlying bankruptcy

8   proceeding; and that ASI should pursue other means for

9   obtaining the discovery.

10          The court turns first to HSBC's argument to the effect

11   that the subpoenaed documents are not in its "possession,

12   custody, or control" under Rule 45.  If HSBC is correct on this

13   point, the analysis ends, and the court must deny ASI's motion

14   to compel without considering HSBC's alternative arguments.

15          The court first reviews the governing legal

16   principles.

17          Rule 45 permits a party to command, via subpoena, the

18   production of documents that are in the "possession, custody,

19   or control" of a nonparty, citing Fed.R.Civ.P.45(a)(1)(A)(iii).

20   The documents do not need to be in the physical possession of

21   the nonparty from whom discovery is sought.  See SEC v. Credit

22   Bancorp, Ltd., 194 F.R.D. 469, 471 (S.D.N.Y. 2000).  Rather,

23   "control" is construed broadly so as to permit discovery from a

24   nonparty with the "legal right, authority, or practical ability

25   to obtain the material sought upon demand."  Id.  To be sure,

g8u2asiA

1    as the Second Circuit has held, a party is not required to

2    produce, at risk of sanctions, documents that it does not

3    possess or cannot obtain, citing Shcherbakovskiy -- spelled the

4    usual way -- v. Da Capo Al Fine, Ltd., 490 F.3d 130, 138 (2d

5    Cir. 2007).  But the circuit has held, "If a party has access

6    and the practical ability to possess documents not available to

7    the party seeking them, production may be required."  Id.   As

8    various courts have held, this test governs in the situation

9    here -- when discovery is sought from one corporation about

10   materials that are in the physical possession of another,

11   affiliated corporation.  See, e.g., Dietrich v. Bauer, No.

12   95 Civ. 7051(RWS), 2000 WL 1171132, at *3 (S.D.N.Y. Aug. 16,

13   2000).

14          The burden is on the party seeking discovery to make a

15   showing that the other party has control over the matters

16   sought, citing Credit Bancorp, 194 F.R.D. at 472.  Therefore,

17   when the discovery is sought from an entity for documents that

18   are in the physical possession of another affiliated entity,

19   then it is the discovering party's burden, i.e., here ASI's, to

20   show that the requested entity has either the legal right or

21   the practical ability to obtain the documents in question from

22   their custodian.  Citing In re Nortel Networks Corp. Sec.

23   Litig., No. 01 Civ. 1855(RMB)(MHD), 2004 WL 2149111, at *2

24   (S.D.N.Y. Sept. 23, 2004).

25          Applying these principles to ASI's claim that HSBC has

g8u2asiA

1   control over the subpoenaed documents within the meaning of

2   Rule 45, ASI relies exclusively on the claim that HSBC has the

3   practical ability to obtain the documents.  ASI has not claimed

4   that HSBC has the legal right to obtain the discovery from the

5   Hong Kong HSBC entities.  As such, the court confines its

6   analysis to whether, based upon the present record, HSBC has

7   the "practical ability" to obtain the documents in the custody

8   of its affiliates.

9            ASI makes two distinct arguments to this effect.

10           First, it argues that HSBC's promotional materials,

11  such as those it uses for marketing and advertising, reveal

12  that HSBC can obtain information from foreign affiliates

13  because those materials advertise HSBC's ability to provide its

14  customers with global access to their accounts across its

15  affiliates.

16           In considering this claim, the court is mindful that,

17  under the case law, the inquiry whether an entity has the

18  "practical ability" to obtain documents from another entity

19  turns on several factors.  These include the relationship

20  between the targeted entity and the custodian of the documents;

21  the manner in which the custodian has handled the documents at

22  issue and similar categories of documents in the ordinary

23  course of business; and any business or other interests that

24  may impact the willingness of the custodian to share the

25  documents with the subpoenaed entity in the current

g8u2asiA

1    circumstances.  See, e.g., In re Nortel, 2004 WL 2149111, at

2    *3.

3        Applying these standards to the present record, ASI

4    has not shown that there is an arrangement or mechanism that

5    gives respondent, meaning HSBC, the practical ability to access

6    documents controlled by HSBC foreign affiliates.  See In re

7    Vitamin C Antitrust Litig., No. 06 MD 1738(BMC), 2012 WL

8    5879140, at *8 (E.D.N.Y Nov. 21, 2012).  ASI has not shown that

9    HSBC has access to these sorts of documents in the ordinary

10   course of business, see Credit Bancorp, 194 F.R.D. at 472, or

11   that these documents flow freely among the entities, see Hunter

12   Douglas, Inc., v. Comfortex Corp., No. 8 Misc. 85(WHP), 1999 WL

13   14007, at *3 (S.D.N.Y. Jan. 11, 1999).  Instead, ASI seizes on

14   statements HSBC makes in marketing that the HSBC entities share

15   information and promise customers a global banking experience,

16   such as, for example, that HSBC customers can access their

17   worldwide HSBC deposit accounts with a single log on, citing

18   Reply at 5; and the Calland Declaration, Exhibit A, at page 4,

19   or that an HSBC banking customer can "seamlessly transfer your

20   HSBC credit history to an HSBC branch" in another country,

21   citing the Calland Declaration, Exhibit A, at page 3.

22       These statements, however, reference a wholly

23   different context involving a customer's practical ability to

24   gain access to its own records across the HSBC universe.  HSBC,

25   however, has flatly represented that, for itself, it lacks the

27

g8u2asiA

1    practical ability to obtain these documents.  It explains that

2    the systems that permit a seamless customer experience do not

3    similarly permit one affiliate to transfer information from

4    another in the manner that ASI's appears to imagine.  Citing

5    Arlow Declaration at 3.  As HSBC explains, its systems are

6    "customer facing" and HSBC's employees do not have access to

7    them.  Citing the Braithwaite Declaration at 2.  The systems

8    that permit portable credit history and international

9    relocation services for "premier" HSBC customers do not permit

10   employees of HSBC to access the account information of a

11   customer who banks with a foreign affiliate and they do not

12   permit a foreign affiliate to access the customer or account

13   information of HSBC U.S.'s customers.  Id.  ASI has no factual

14   counter to these credible representations.

15        Significantly, too, HSBC, the respondent here, is not

16   a branch of any foreign HSBC Bank or entity.  It is a domestic

17   and wholly separate entity.  In contrast, HSBC HK and Hang Seng

18   Bank, the entities which purportedly have immediate custody of

19   the documents, are incorporated and headquartered in Hong Kong.

20   Citing Arlow Declaration at 3.  HSBC represents that it cannot

21   access records held by such foreign affiliates and that it

22   maintains its own computer systems and databases that are

23   separate from any systems or databases of the Hong Kong

24   affiliates.  It further represents that if HSBC were to request

25   this information, the foreign affiliate would not provide it to

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

g8u2asiA

1    HSBC.  Id. at 3-4.  These declarations are not factually

2    controverted.  On the present record, whatever integration

3    customers might experience, as suggested by HSBC's marketing

4    materials, it does not follow that a domestic HSBC entity has

5    the practical ability to access information held by a

6    different, and foreign-sited, HSBC affiliate.

7         ASI's second argument with respect to HSBC's

8    ostensible practical ability to access such information is

9    based on a deferred prosecution agreement, or "DPA," that HSBC

10   and various affiliates entered into with the United States

11   Department of Justice.  The DPA obliges HSBC entities to

12   provide the Department of Justice with documents from

13   throughout the HSBC family of entities.  Because HSBC must,

14   under the DPA, obtain documents from other affiliates when the

15   Department of Justice so requests, ASI argues that it must have

16   the practical ability to obtain them for ASI.  See Reply at

17   2-7.  ASI also argues that because the DPA commits HSBC and its

18   parent company to provide any information held in the

19   possession, custody, or control of any HSBC affiliate, wherever

20   located, to the Department of Justice, it follows that HSBC has

21   the practical ability to obtain these documents from the Hong

22   Kong entities.

23        This argument is quite unpersuasive.  In the context

24   of entering into a DPA to resolve a criminal investigation and

25   avoid a criminal prosecution, HSBC and its affiliates, within

29

g8u2asiA

1    the broad HSBC empire, made certain commitments to the

2    Department of Justice.  By their terms, however, these

3    commitments do not run to the benefit of private parties such

4    as ASI.  Indeed, the fact that a DPA was apparently necessary

5    to secure the Department of Justice's ability to access from

6    HSBC documents held within the worldwide HSBC universe may

7    negatively imply that HSBC otherwise had the ability on its own

8    to reach and access documents held by foreign affiliates.  It

9    may or may not be that a foreign affiliate would similarly

10   agree on its own to produce documents to HSBC in response to a

11   private party's request, but the DPA does not, at all, signify

12   that, absent such voluntary consent by the affiliate, HSBC

13   itself could access documents in the affiliate's custody.

14           Significantly, too, the terms of the DPA do not avail

15   ASI.  The DPA, reproduced at Sugimura Declaration, Exhibit H,

16   does not, in paragraph 6(b), for example, say anything that

17   suggests that HSBC henceforth would have access as a general

18   matter to affiliates' records.  It does not specify particular

19   ways in which HSBC entities are to share information in

20   response to a Department of Justice demand.  Nor does it

21   provide that particular systems must be created to streamline

22   or enable such access.  The DPA merely commits the various HSBC

23   entities as effectively part of the consent-decree-like

24   contract, to comply with a Department of Justice request, and

25   it applies only in the context of a DOJ request made "in

g8u2asiA

1    connection with the investigation or prosecution of any current

2    or former officers, directors, employees, agents, or

3    consultants."  See DPA, paragraph 6(b).  This is not such a

4    case.

5         The situation here is a far cry from that in SEC v.

6    Strauss, No. 09 Civ. 4150, 2009 WL 3459204, at *7-8 (S.D.N.Y.

7    Oct. 28, 2009).  The court there found practical ability

8    sufficient for control where the SEC had obtained remote access

9    to a company's database through an investigative subpoena and

10   had, via an arrangement with the company, complete and

11   immediate access to the database via an Internet portal such

12   that a motion to compel the SEC to produce the company's

13   documents could have been enforced, id. at *8, although in the

14   particular case it was not.  In contrast, here, there is

15   nothing in the record to indicate that the Department of

16   Justice has required such access for itself or otherwise

17   required that similar systems be put in place to comply with

18   the DPA.  Rather, the HSBC entities, in what appears to be a

19   singular context, have agreed to comply with Department of

20   Justice requests.  That agreement does not sweep beyond its

21   specific contexts.  ASI's reliance on it does not show, and

22   indeed HSBC flatly denies, that the Hong Kong entities, if

23   asked to relinquish the subpoenaed documents by HSBC, would do

24   so.  Arlow Declaration at 3-4.

25        For the foregoing reasons, the court denies ASI's

31

g8u2asiA

1    motion to compel.  The court emphasizes, however, that this

2    decision is a product of the present record.  The court's

3    denial of relief to ASI does not preclude ASI, if it is able to

4    build a more convincing record, to seek such enforcement of a

5    similar subpoena.  The court does not, and has no basis to,

6    opine on whether there are facts that, if properly established,

7    would enable ASI to make the required showing.  Nor does the

8    court have occasion to opine on whether a subpoena directed,

9    not at HSBC U.S.A., but at HSBC's ultimate parent would be

10   analyzed differently or whether such an ultimate parent would

11   have access to foreign affiliate documents.

12            Therein ends the ruling.

13            Is there anything further from the plaintiff?

14            MS. CALLAND:  No, your Honor.

15            THE COURT:  Anything further from the defense?

16            MR. SMITH:  No, your Honor.

17            THE COURT:  We stand adjourned.  Thank you, counsel.

18                         - - -

19

20

21

22

23

24

25