**Hearing Date: April 11, 2017 at 10:00 a.m. (prevailing Eastern Time)**
**Objection Deadline: April 4, 2017 at 4:00 p.m. (prevailing Eastern Time)**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Jay M. Goffman
Lisa Laukitis
Four Times Square
New York, New York 10036-6522
Telephone: (212) 735-3000
Fax: (212) 735-2000

-and-

Sarah E. Pierce (admitted *pro hac vice*)
One Rodney Square
P.O. Box 636
Wilmington, Delaware 19899-0636
Telephone: (302) 651-3000
Fax: (302) 651-3001

-and-

Elizabeth M. Downing (admitted *pro hac vice*)
500 Boylston Street
Boston, Massachusetts 02116
Telephone: (617) 573-4800
Fax: (617) 573-4870

*Counsel for William A. Brandt, Jr.*
  *Chapter 11 Trustee*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

| | | |
|---|---|---|
| **In re:** | : | **Chapter 11** |
| **CHINA FISHERY GROUP LIMITED (CAYMAN)** | : | **Case No. 16-11895 (JLG)** |
| *et al.*, | : | |
| **Debtors.**[1] | : | **(Jointly Administered)** |
| | : | |

---

[1] The Debtors are China Fishery Group Limited (Cayman) ("CFGL"), Pacific Andes International Holdings Limited (Bermuda) ("PAIH"), N.S. Hong Investment (BVI) Limited ("NS Hong"), South Pacific Shipping Agency Limited (BVI) ("SPSA"), China Fisheries International Limited (Samoa) ("CFIL"), CFGL (Singapore) Private Limited ("CFGLPL"), Chanery Investment Inc. (BVI) ("Chanery"), Champion Maritime Limited (BVI) ("Champion"), Growing Management Limited (BVI) ("Growing Management"), Target Shipping Limited (HK) ("Target Shipping"), Fortress Agents Limited (BVI) ("Fortress"), Ocean Expert International Limited (BVI) ("Ocean Expert"), Protein Trading Limited (Samoa) ("Protein Trading"), CFG Peru Investments Pte. Limited (Singapore) ("CFG Peru Singapore"), Smart Group Limited (Cayman) ("Smart Group"), Super Investment Limited (Cayman) ("Super Investment") and Pacific Andes Resources Development Ltd. ("PARD").

|                                                            |   |                                 |
|------------------------------------------------------------|---|---------------------------------|
| In re:                                                     | : | **Chapter 11**                  |
|                                                            | : |                                 |
| **CFG Peru Investments Pte. Limited (Singapore),**         | : | **Case No. 16-11914 (JLG)**     |
| **Debtor.**                                                | : |                                 |
|                                                            | : | **(Jointly Administered)**      |
| _____          | : |                                 |

### NOTICE OF CHAPTER 11 TRUSTEE'S MOTION FOR ORDER PURSUANT TO BANKRUPTCY CODE SECTIONS 105(a), 363(b), 541(a)(1), AND 1108, AND BANKRUPTCY RULES 2002, 6004, AND 9006 AUTHORIZING (A) THE PRIVATE SALE OF A NON-DEBTOR VESSEL AND (B)  THE CHAPTER 11 TRUSTEE TO  CONSENT TO AND TAKE ALL CORPORATE ACTIONS DESIRABLE OR <u>NECESSARY IN CONNECTION THEREWITH</u>

**PLEASE TAKE NOTICE** that William A. Brandt, Jr., not individually but solely in his capacity as chapter 11 trustee (the "<u>Trustee</u>" or the "<u>Chapter 11 Trustee</u>") of CFG Peru Investments Pte. Limited (Singapore) ("<u>CFG Peru Singapore</u>" or the "<u>Debtor</u>") in the above-captioned chapter 11 cases, by his attorneys, Skadden, Arps, Slate, Meagher & Flom LLP, hereby files the _Chapter 11 Trustee's Motion for Order Pursuant to Bankruptcy Code Sections 105(a), 363(b), 541(a)(1), and 1108, and Bankruptcy Rules 2002, 6004, and 9006 Authorizing (A) The Private Sale of a Non-Debtor Vessel and (B)  The Chapter 11 Trustee to  Consent to and Take All Corporate Actions Desirable or Necessary in Connection Therewith_ (the "<u>Motion</u>").

**PLEASE TAKE FURTHER NOTICE** that a hearing on the Motion will be held before the Honorable James L. Garrity, United States Bankruptcy Judge for the Southern District of New York, in the United States Bankruptcy Court for the Southern District of New York, One Bowling Green, Courtroom 601, New York, New York 10004 (the "<u>Bankruptcy Court</u>"), on **April 11, 2017 at 10:00 a.m. (prevailing Eastern Time)** (the "<u>Hearing</u>"), or as soon thereafter as counsel may be heard.

**PLEASE TAKE FURTHER NOTICE** that responses or objections to the Motion  and the relief requested therein, if any, must be made in writing and (a) filed with the

Bankruptcy Court no later than **4:00 p.m. (prevailing Eastern Time) on April 4, 2017** (the

"Objection Deadline") and (b) served so as to be actually received by the following parties by the

Objection Deadline:

> (i)    proposed counsel for the Debtors, Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, NY 10153, Attn: Matthew S. Barr, Esq., Marcia Goldstein, Esq., Gabriel A. Morgan, Esq.;

> (i)    the Office of the United States Trustee, U.S. Federal Office Building, 201 Varick Street, Suite 1006, New York, NY 10014, Attn: Susan Golden (susan.golden@usdoj.gov);

> (ii)   counsel for William A. Brandt, Jr., the Chapter 11 Trustee for the bankruptcy estate of CFG Peru Investments Pte. Ltd., Skadden, Arps, Slate, Meagher & Flom LLP, Four Times Square, New York, New York 10036, Attn: Lisa Laukitis (lisa.laukitis@skadden.com), and Skadden, Arps, Slate, Meagher & Flom LLP, 500 Boylston Street, Boston, Massachusetts 02116, Attn: Elizabeth Downing (elizabeth.downing@skadden.com);

> (iii)  the Chapter 11 Trustee, 110 East 42nd Street, Suite 1818, New York, New York 10017 Attn: William A. Brandt, Jr. (bbrandt@dsi.biz); and

> (iv)   counsel to the buyer, Vedder Price LLP, 1633 Broadway, 31st Floor, New York, New York 10019, Attn: John E. Bradley (jbradley@vedderprice.com), Michael L. Schein (mschein@vedderprice.com), and Hill Dickinson LLP, The Broadgate Tower, 20 Primrose Street, London EC2A 2EW, Attn: Malcolm Entwistle (malcolm.entwistle@hilldickinson.com), Mark Walker (mark.walker@hilldickinson.com).

**PLEASE TAKE FURTHER NOTICE** that unless a written objection to the

Motion, with proof of service, is filed with the Bankruptcy Court and a courtesy copy delivered

to the Honorable James L. Garrity's chambers by the Objection Deadline, the Chapter 11 Trustee

may, on or after the Objection Deadline, submit to the Bankruptcy Court an order substantially in

the form of the proposed order attached to the Motion, which order may be entered with no

further notice or opportunity to be heard.

Dated: March 21, 2017
      New York, New York

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

By:  */s/ Lisa Laukitis*
     Jay M. Goffman
     Lisa Laukitis
     Four Times Square
     New York, New York 10036-6522
     Telephone: (212) 735-3000
     Fax: (212) 735-2000

     -and-

     Sarah E. Pierce (admitted *pro hac vice*)
     One Rodney Square
     P.O. Box 636
     Wilmington, Delaware 19899-0636
     Telephone: (302) 651-3000
     Fax: (302) 651-3001

     -and-

     Elizabeth M. Downing (admitted *pro hac vice*)
     500 Boylston Street
     Boston, Massachusetts 02116
     Telephone: (617) 573-4800
     Fax: (617) 573-4870

     *Counsel for William A. Brandt, Jr.*
      *Chapter 11 Trustee*

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Jay M. Goffman
Lisa Laukitis
Four Times Square
New York, New York 10036-6522
Telephone: (212) 735-3000
Fax: (212) 735-2000

-and-

Sarah E. Pierce (admitted *pro hac vice*)
One Rodney Square
P.O. Box 636
Wilmington, Delaware 19899-0636
Telephone: (302) 651-3000
Fax: (302) 651-3001

-and-

Elizabeth M. Downing (admitted *pro hac vice*)
500 Boylston Street
Boston, Massachusetts 02116
Telephone: (617) 573-4800
Fax: (617) 573-4870

*Counsel for William A. Brandt, Jr.,*
  *Chapter 11 Trustee*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| | : | |
| **In re:** | : | **Chapter 11** |
| | : | |
| **CHINA FISHERY GROUP LIMITED (CAYMAN)** | : | **Case No. 16-11895 (JLG)** |
| *et al.*, | : | |
| **Debtors.**[1] | : | **(Jointly Administered)** |
| | : | |

---

[1]    The Debtors are China Fishery Group Limited (Cayman) ("<u>CFGL</u>"), Pacific Andes International Holdings Limited (Bermuda) ("<u>PAIH</u>"), N.S. Hong Investment (BVI) Limited ("<u>NS Hong</u>"), South Pacific Shipping Agency Limited (BVI) ("<u>SPSA</u>"), China Fisheries International Limited (Samoa) ("<u>CFIL</u>"), CFGL (Singapore) Private Limited ("<u>CFGLPL</u>"), Chanery Investment Inc. (BVI) ("<u>Chanery</u>"), Champion Maritime Limited (BVI) ("<u>Champion</u>"), Growing Management Limited (BVI) ("<u>Growing Management</u>"), Target Shipping Limited (HK) ("<u>Target Shipping</u>"), Fortress Agents Limited (BVI) ("<u>Fortress</u>"), Ocean Expert International Limited (BVI) ("<u>Ocean Expert</u>"), Protein Trading Limited (Samoa) ("<u>Protein Trading</u>"), CFG Peru Investments Pte. Limited (Singapore) ("<u>CFG Peru Singapore</u>"), Smart Group Limited (Cayman) ("<u>Smart Group</u>"), Super Investment Limited (Cayman) ("<u>Super Investment</u>") and Pacific Andes Resources Development Ltd. ("<u>PARD</u>").

|  |  |  |
|---|---|---|
| In re: | : | **Chapter 11** |
|  | : |  |
| **CFG Peru Investments Pte. Limited (Singapore),** | : | **Case No. 16-11914 (JLG)** |
| **Debtor.** | : |  |
|  | : | **(Jointly Administered)** |
| _____ | : |  |

## CHAPTER 11 TRUSTEE'S MOTION FOR ORDER PURSUANT TO BANKRUPTCY CODE SECTIONS 105(a), 363(b), 541(a)(1), AND 1108, AND BANKRUPTCY RULES 2002, 6004, AND 9006 AUTHORIZING (A) THE PRIVATE SALE OF A NON-DEBTOR VESSEL AND (B) THE CHAPTER 11 TRUSTEE TO CONSENT TO AND TAKE ALL CORPORATE ACTIONS DESIRABLE OR NECESSARY IN CONNECTION THEREWITH

William A. Brandt, Jr., not individually but solely in his capacity as chapter 11 trustee (the "Trustee" or the "Chapter 11 Trustee") of CFG Peru Investments Pte. Limited (Singapore) ("CFG Peru Singapore" or the "Debtor") in the above-captioned chapter 11 cases, by his attorneys, Skadden, Arps, Slate, Meagher & Flom LLP, hereby moves (the "Motion") before this Court (the "Court") for entry of an order (the "Proposed Order"), substantially in the form attached hereto as Exhibit A, pursuant to sections 105(a), 363(b), 541(a)(1), and 1108 of Title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 6004, and 9006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), Rule 6004-1 of the Local Rules (the "Local Bankruptcy Rules") for the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), and the Amended Guidelines for the Conduct of Asset Sales promulgated by General Order M-383 of the Bankruptcy Court (the "Sale Guidelines") authorizing the Chapter 11 Trustee to take all corporate governance actions including, but not limited to voting stock, passing shareholders' resolutions, directing managers to execute any necessary documentation, paying broker commissions and taxes or other actions that are in the Chapter 11 Trustee's business judgment, desirable or necessary to effectuate the sale of the Pacific Voyager (the "Sale Transaction"), a vessel owned by Sustainable Fishing Resources

2

S.A.C., ("SFR" or the "Seller"), a non-debtor subsidiary of CFG Peru Singapore.  In addition,

although Court approval may not be necessary for the Sale Transaction given that SFR is not a

Debtor before this Court, out of an abundance of caution, and a desire for full transparency with

respect to his actions to sell non-core assets, the Chapter 11 Trustee seeks Court approval of the

Sale Transaction pursuant to the terms of the Sale Agreement (defined below).  In support of the

Motion, the Chapter 11 Trustee relies upon and incorporates by reference the Declaration of

William A. Brandt, Jr., Chapter 11 Trustee and Executive Chairman of Development Specialists,

Inc., filed contemporaneously herewith.   In further support of the Motion, the Chapter 11

Trustee, by and through his undersigned counsel, respectfully represents:

## JURISDICTION AND VENUE

1.    This Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157

and 1334.  This is a core proceeding under 28 U.S.C. § 157(b).  Venue of these cases and this

Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

2.    The legal predicates for the relief requested herein are Bankruptcy Code

sections 105(a), 363(b), 541(a)(1), and 1108, Bankruptcy Rules 2002, 6004, and 9006, Local

Bankruptcy Rule 6004-1, and the Sale Guidelines.

## BACKGROUND

3.    On June 30, 2016 (the "Petition Date"), each of the debtors in the above-

captioned cases (the "Debtors"), except PARD, filed voluntary petitions under Chapter 11 of the

Bankruptcy Code in this Court.  On September 29, 2016, PARD filed its Chapter 11 bankruptcy

case (collectively with the other Debtors' Chapter 11 cases, the "Chapter 11 Cases").

4.    To date, no creditors' committee has been appointed in these Chapter 11

Cases by the Office of the United States Trustee for the Southern District of New York (the

"U.S. Trustee").

3

5.      The Debtors constitute a small part of a group of companies that collectively constitute the world's twelfth largest fishing company.  The Debtors consist principally of holding companies and defunct, non-operating companies.  Their value is derived largely from their indirect or direct interests in three Peruvian operating companies which are non-Debtor subsidiaries – CFG Investments S.A.C. ("CFGI"), Corporacion Pesquera Inca S.A.C. ("Copeinca"), and SFR (collectively, the "Peruvian OpCos").  CFGI and Copeinca operate the Pacific Andes Group's anchovy fishing business and together control a significant percentage of the anchovy fishing quotas fixed by the Peruvian government.  SFR owns a fleet of fishing vessels used to catch blue water fish for human consumption, consisting primarily of mackerel and jack mackerel.  The fleet includes the largest factory vessel in the world, the Damanzaihao, and also the Pacific Voyager, an ancillary "catcher" vessel, which is the subject of this Motion.

6.      On November 10, 2016, the U.S. Trustee sought approval of William A. Brandt, Jr., as the Chapter 11 Trustee of CFG Peru Singapore [Dkt. No. 218].  On that same date, the Court entered an order approving the selection of Mr. Brandt as the Chapter 11 Trustee [Dkt. No. 219].

**RELIEF REQUESTED**

7.      By this Motion, the Chapter 11 Trustee seeks entry of the Proposed Order, pursuant to Bankruptcy Code sections 105(a), 363(b), 541(a)(1), and 1108, Bankruptcy Rules 2002, 6004, and 9006, Local Bankruptcy Rule 6004-1, and the Sale Guidelines authorizing the Chapter 11 Trustee to take all corporate governance actions desirable or necessary to effectuate the Sale Transaction, including, but not limited to voting stock, passing shareholders' resolutions, directing managers to execute any necessary documentation, paying broker commissions and taxes or other actions that are in the Chapter 11 Trustee's business judgment, are desirable or necessary to sell the Pacific Voyager.  In addition, although Court approval may

not be necessary for the Sale Transaction given that SFR is not a Debtor before this Court, out of

an abundance of caution, and a desire for full transparency with respect to his actions to sell non-

core assets, the Chapter 11 Trustee seeks Court approval of the Sale Transaction pursuant to the

terms of the Sale Agreement (defined below).

8.      For the reasons set forth herein, the Chapter 11 Trustee submits that the

relief requested herein is in the best interest of the Debtors, their estates, creditors, stakeholders,

and other parties in interest and therefore should be granted.

### PRELIMINARY STATEMENT

9.      As mentioned above, the Debtors' estates, including CFG Peru

Singapore's bankruptcy estate, are comprised almost entirely of their interests in the Peruvian

OpCos, which are non-Debtor subsidiaries.    The Peruvian OpCos have repeatedly been

acknowledged to be the "crown jewels" of these Chapter 11 Cases and are likely to be the prime

source of creditors' recoveries across all Debtor entities.

10.      The Chapter 11 Trustee controls CFG Peru Singapore.    Given that CFG

Peru Singapore is the 100% (or close to 100%) owner of the Peruvian OpCos, which includes

SFR, the Trustee also effectively controls these entities.    Specifically, the Chapter 11 Trustee

controls 195,691,073 shares in SFR.    The only other shareholder of SFR is J. Wiludi &

Asociados S.A.C., who holds one (1) share in SFR.    Given his status as controlling shareholder

of SFR, the Chapter 11 Trustee may adopt any decision with respect to this company including

but not limited to: authorizing issuance of proxies; delegating his powers to any manager, officer,

or other representative for purposes of participating at a shareholders' meeting; and ultimately,

execution of the documents constituting the Sale Agreement.

11.      As such, the Chapter 11 Trustee seeks entry of an order (i) authorizing the

Chapter 11 Trustee to take all corporate governance actions desirable or necessary to effectuate

the private sale of the Pacific Voyager (or the "Asset") pursuant to a Memorandum of

Agreement ("MoA") and Letter Agreement Regarding Pacific Voyager ("Side Letter," together

with the MoA, the "Sale Agreement") by and between SFR and Arctic Raven Pelagic A/S or its

nominee ("Arctic Raven" or the "Buyer") attached hereto as Exhibit B and Exhibit C,

respectively; and (ii) approving the Sale Transaction pursuant to the terms of the Sale

Agreement.  The sale of the Pacific Voyager will provide the Peruvian OpCos and the Debtor's

estate with additional necessary liquidity.  Moreover, entry of an Order approving the Chapter 11

Trustee's proposed actions provides finality and security to Arctic Raven as buyer of the Pacific

Voyager.

12.     For reasons set forth below, the Buyer requests that the Sale Transaction

be consummated expeditiously.  However, for future sales of assets belonging to non-Debtor

subsidiaries of CFG Peru, including the Peruvian OpCos, the Chapter 11 Trustee intends to file a

separate motion for an order authorizing and approving notice and sale procedures enabling the

Chapter 11 Trustee to sell or transfer non-core assets of non-Debtor subsidiaries as well as

certain surplus, obsolete, or burdensome non-Debtor Assets without further need for Court

approval.

**BASIS FOR RELIEF**

13.     The Chapter 11 Trustee requests authorization from the Court for the

Chapter 11 Trustee to take all corporate governance actions desirable or necessary to effectuate

the Sale Transaction, including, but not limited to voting stock, passing shareholders'

resolutions, directing managers to execute any necessary documentation, paying broker

commissions and taxes or other actions that are, in the Chapter 11 Trustee's business judgment,

desirable or necessary to sell the Pacific Voyager.  In addition, although Court approval may not

be necessary for the Sale Transaction given that SFR is not a Debtor before this Court, out of an abundance of caution, and a desire for transparency, the Chapter 11 Trustee seeks Court approval of the Sale Transaction pursuant to the terms of the Sale Agreement.  The Chapter 11 Trustee's request for the relief set forth herein is consistent with the Court's mandate to assess the highest and best use of the assets of the Peruvian OpCos given the fact that CFG Peru Singapore derives most, if not all of its value from its interests in the Peruvian OpCos.

## A.    The Pacific Voyager

14.    As set forth above, SFR owns a fleet of fishing vessels ("SFR Vessels") used to catch blue water fish for human consumption.  The SFR Vessels, which includes the Damanzaihao and the Pacific Voyager, are sophisticated oceangoing vessels.  Specifically, the Pacific Voyager was built in 1997 in Norway, registered under the Peruvian flag, and served as one of the Damanzaihao's "catcher" vessels, which would catch fish and deliver them to the Damanzaihao for processing.  SFR and the SFR Vessels have not operated since October 2014. The Peruvian OpCos business is largely focused on harvesting anchovies pursuant to a valuable quota and the production of fishmeal and fish oil from its anchovy harvest.  The SFR Vessels are not equipped to fish for anchovies.  Accordingly, because the SFR Vessels are not utilized in the Peruvian OpCos' core anchovy business, they are non-core, dispensable assets.

15.    The Chapter 11 Trustee has determined, in his business judgment, that the sale of the non-operational SFR Vessels, including Pacific Voyager, will bring additional, necessary liquidity to the Debtor's estate and to the Peruvian OpCos.  The proceeds from the Sale Transaction will be used to repay Copeinca for intercompany loans totaling approximately $2,000,000 USD for various expenses including but not limited to regulatory fees, taxes, customs, inspection and maintenance fees of the SFR Vessels, legal fees, and rental property

fees; as well as to potentially pay administrative costs such as U.S. Trustee quarterly fees and fees and expenses for professionals who have not yet received any payment in these cases.

**B.      Marketing and Sale Efforts**

16.      The Chapter 11 Trustee initiated the marketing process for all vessels in February 2017.  The Trustee has utilized the services of Atlantic Shipping A/S (the "<u>Broker</u>").  Specifically, the Broker served as a point of contact for interested parties to discuss the purchase of the SFR Vessels.  The market for large scale pelagic vessels is limited.  The Broker is the leading broker in the world for large scale pelagic trawlers and has extensive industry knowledge and contacts with most—if not all— major fishing companies, which has enabled the Broker to canvas almost the entire market extremely quickly and efficiently.  The Broker published a separate advertisement for the sale of the SFR vessels on its website and sent written notice of the offer to over 500 contacts.  The offer from Arctic Raven has been the only serious offer for the vessel on an individual basis.  There has also been serious interest in other SFR Vessels.  The Broker has also received a few inquiries regarding the sale of all of the catcher vessels together but there have been no serious offers for the sale of all the vessels to date, and the Broker does not believe that the sale of the vessels together is likely to result in a higher aggregate value being paid for the vessels.

17.      On or around February 20, 2017, a representative from Arctic Raven contacted the Chapter 11 Trustee expressing interest in the Pacific Voyager. On or around February 23, 2017, representatives from Arctic Raven toured the SFR Vessels, including the Pacific Voyager.  The Chapter 11 Trustee subsequently engaged in negotiations with Arctic Raven for the Pacific Voyager, and Arctic Raven made its $4 million indicative offer for the Pacific Voyager on February 27, 2017 at a meeting with the Seller in Lima, Peru.  Given the lack

8

of any other interested buyers, the Chapter 11 Trustee seeks to enter into the Sale Agreement with respect to the Pacific Voyager, subject to this Court's approval.

18.    The Buyer has requested that the Sale Transaction be consummated expeditiously as possible  as it is aware that the naval shipyard in Callao, Peru, has a limited availability to drydock the Asset.  Additionally, the Buyer needs to complete the purchase of the Asset and flag it in Greenland as a matter of urgency in order to qualify as a Greenland flagged vessel for a mackerel license without which the Buyer would incur much higher tax charges and would not have access to the herring market.  Furthermore, the Buyer has limited time to get the vessel fully upgraded, repaired, and repositioned in the north Atlantic by the beginning of the fishing season in early June.  The Buyer has estimated that the repairs and upgrades could take up to two months plus an additional four weeks for the ship to be repositioned in the north Atlantic.  In the event the Sale Transaction is not approved by the Court or is otherwise not consummated, the Buyer will then need to start the process over with finding another vessel.

**C.    Summary of Certain Terms of the Sale Agreement**

19.    Pursuant to the Sale Agreement, SFR will sell the Pacific Voyager according to the following terms:[2]

Seller: Sustainable Fishing Resources S.A.C.

Buyer: Arctic Raven Pelagic A/S or nominee

Purchase Price: $4,000,000

Releases: None

Other:

---

[2]    The following summary is qualified in its entirety by reference to the provisions of the Sale Agreement.  In the event of any inconsistencies between the provisions of the Sale Agreement and the terms herein, the terms of the Sale Agreement shall govern.  Capitalized terms used in this section of the motion and not otherwise defined shall have the meanings ascribed to them in the Sale Agreement.

- Expense Reimbursement: To the extent that (i) the Seller receives a binding overbid of USD $4,400,000 or more (or USD $400,000 or more over the purchase price under the Memorandum of Agreement) in cash (the "Overbid") prior to the objection deadline set forth in this Motion, and (ii) the Buyer does not come forward with a bid in excess of the Overbid prior to the hearing to consider the Proposed Order (the "Sale Hearing"), the Trustee shall seek approval from the Bankruptcy Court at the Sale Hearing for the reimbursement of reasonable and documented expenses of the Buyer in respect of reasonable shipyard and repair expenses documented through third party invoices, up to an aggregate maximum amount of USD $350,000 (the "Expense Reimbursement"), provided, however, that absent the Bankruptcy Court approving a provision providing for such Expense Reimbursement, the Buyer shall not be entitled to such Expense Reimbursement.  Further, the Expense Reimbursement is only due and payable upon the consummation of the alternate transaction that results from either the Overbid or the sale of the Asset with such repairs to a purchaser other than the Buyer.

- Indemnity: Subsequent to the delivery of the Asset, the Sellers shall indemnify and hold the Buyers harmless from and against any liability, loss, cost, expense, taxes or reasonable attorneys' fees asserted by the Buyers or any other third parties for up to $400,000 paid from an escrow account for the first  ninety (90) days following the delivery of the Asset and for up to $1,000,000 for claims asserted within one (1) year of the delivery of the Asset.  The Sellers have the right to defend and settle any claim asserted by a third party.

**D.    Extraordinary Provisions Under the Sale Guidelines**

20.    As required by the Sale Guidelines, this Motion, the Sale Agreement, and/or the Order contain the following extraordinary provisions:

- Private Sale/No Competitive Bidding: The Sale Transaction of the Asset pursuant to the Sale Agreement does not contemplate an auction or other further competitive bidding process.  As described in more detail herein, the Chapter 11 Trustee believes that an expedited sale of the Asset to the Buyer provides the best opportunity to maximize value.  The Chapter 11 Trustee believes that any delay resulting from an auction or further bidding process risks losing the committed Buyer.  Moreover, given the marketing process already undertaken, any further marketing would be largely duplicative and any material corresponding benefit is unlikely since there were no additional serious bids for the Asset.

- <u>Relief from Bankruptcy Rules 6004(h) and 6006(d)</u>: The Debtors seek relief from the fourteen-day stay imposed by Bankruptcy Rule 6004(h).

## <u>APPLICABLE AUTHORITY</u>

**A.    The Sale Transaction Is Within the Chapter 11 Trustee's Sound Business Judgment.**

21.    Bankruptcy Code section 105(a) provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).  As noted above, the Chapter 11 Trustee submits that Court approval may not be required in order for SFR to sell or transfer the Pacific Voyager.  However, because the interests in the Peruvian OpCos and assets held by the Peruvian OpCos constitute almost all of the value of CFG Peru Singapore, Court approval of the sale of the Pacific Voyager and the Chapter 11 Trustee's actions to cause the sale of the Pacific Voyager is in the best interest of the Debtor's estate.  The Chapter 11 Trustee submits that the Court may grant such relief pursuant to section 105(a) using the same principles and standards that the Court would use to approve a transaction outside of the ordinary course of a debtor's business under Bankruptcy Code section 363(b).

22.    Specifically, Bankruptcy Code section 363(b)(1) provides, in relevant part, that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).  The use, sale, or lease of property of the estate, other than in the ordinary course of business, is authorized when there is an "articulated business justification" for the action to be taken.  <u>See</u> <u>Fulton State Bank v. Schipper (In re Schipper)</u>, 933 F.2d 513, 515 (7th Cir. 1991) (citation omitted); <u>accord</u> <u>Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)</u>, 722 F.2d 1063, 1070-71 (2d Cir. 1983).  When a valid business justification exists, the law vests the debtor's decision to use property out of the ordinary course of business with a strong presumption that "'in making a business decision

the directors of a corporation acted on an informed basis, in good faith and in the honest belief

that the action taken was in the best interests of the company.'" Official Comm. of Subordinated

Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.), 147 B.R. 650, 656 (S.D.N.Y.

1992) (citation omitted).

23.    Here, the Chapter 11 Trustee has a clear business justification for the sale

of the Pacific Voyager, which is that such sale will provide additional liquidity to repay

intercompany loans to Copeinca and to pay necessary administrative costs.    This potential

liquidity easily outweighs the value of the Pacific Voyager to the estate, given that the Pacific

Voyager, like all SFR Vessels, have been dormant for two years, their operations have no impact

on the core anchovy business of the Peruvian OpCos, and in fact, the SFR Vessels may create the

potential for liability for the Peruvian OpCos instead.    Since the Chapter 11 Trustee's highest

priority is to maximize the value of the Peruvian OpCos, pursuing a sale of the Pacific Voyager,

and the marketing and sale of the other vessels, is a sound business decision.    To that end, the

Chapter 11 Trustee has secured, after good-faith, arm's-length negotiations, an offer from the

Buyer for the Pacific Voyager.    In addition, the Chapter 11 Trustee, his advisors, and SFR's

managers engaged in negotiations with the Buyer in the formulation of the Sale Agreement.

Thus, the Chapter 11 Trustee entered into the Sale Agreement after a deliberate effort to market

the Pacific Voyager and is confident that the Sale Transaction is fair and reasonable.

24.    The Chapter 11 Trustee, aided by his advisors and the managers of SFR,

and the Buyer have the relevant industry experience to competently and proficiently engage in a

fair and arm's-length negotiation of the Sale Agreement.    In addition, based on relevant industry

knowledge and as advised by the Broker, it is the Chapter 11 Trustee's belief that there is no

better use for the Pacific Voyager than the Sale Transaction to the Buyer pursuant to the Sale

Agreement.  Accordingly, it is a valid exercise of the Chapter 11 Trustee's business judgment to seek the relief requested by this motion.

**B.    A Private Sale of the Pacific Voyager Is Warranted Under the Circumstances**

25.    Moreover, Bankruptcy Rule 6004(f)(1) explicitly permits a debtor to enter into transactions outside of the ordinary course of business through private sales.  As discussed above, the Sale Transaction provides the best opportunity to maximize the sale price of the Pacific Voyager.  Furthermore, the Chapter 11 Trustee believes that an auction is not warranted on account of the cost and time to conduct an auction process for the Pacific Voyager as compared to its value.

26.    Courts in this District, including the Court in these Chapter 11 Cases, have previously approved private sales in accordance with the Sale Guidelines where the benefit of the private sale outweighs the delay and expense of conducting a public auction.  See In re China Fishery Grp. Ltd., Case No. 16-11895 (JLG) (Bankr. S.D.N.Y. Nov. 15, 2016);  In re SunEdison, Inc., Case No. 16-10992 (SMB) (Bankr. S.D.N.Y. Sept. 20, 2016);  In re SunEdison, Inc., Case No. 16-10992 (SMB) (Bankr. S.D.N.Y. Aug. 18, 2016);  In re Hawker Beechcraft, Inc., Case No. 12-11873 (SMB) (Bankr. S.D.N.Y. Nov. 29, 2012) (authorizing private sale under Rule 6004(f)(1) where public auction would require estate to incur substantial additional costs, but would result in no additional value to the estate);  In re Dewey & Lebouef LLP, 2012 Bankr. LEXIS 5116 at *17-18 (Bankr. S.D.N.Y. Nov. 1, 2012) (finding good business reason to sell assets pursuant to private sale where public sale would be more costly);  In re Chemtura Corp., Case No. 09-11233 (REG), 2010 Bankr. LEXIS 5349 (Bankr. S.D.N.Y. July 23, 2010) (approving private sale of debtor's business pursuant to asset purchase agreement where prior purchase right would stifle third-party interest in the business and purchaser was uniquely positioned to operate the business);  In re Sonix Med. Res. Inc., Case No. 09-77781 (DTE), 2010

Bankr. LEXIS 5471 (Bankr. E.D.N.Y. March 19, 2010) (authorizing private sale of debtors' assets and approving asset purchase agreement where there was substantial risk that value of assets would deteriorate if sale was not consummated and where purchase agreement was best opportunity to realize value of assets on going-concern basis and avoid decline and devaluation of debtors' business); see also In re Wieboldt Stores, Inc., 92 B.R. 309, 312 (N.D. Ill. 1988) ("Section 363(b) is not limited to sales involving competitive bidding.  Bankruptcy Rule 6004, which sets forth procedures for Section 363(b) transfers, expressly provides for private sales."); Palermo v. Pritam Realty, Inc. (In re Pritam Realty, Inc.), 233 B.R. 619, 621-24 (D.P.R. 1999) (upholding bankruptcy court order approving private sale by debtor).

27.      Here, the Chapter 11 Trustee, through the Broker, has already sought higher and better offers, and no such offers were forthcoming.  Moreover, a public auction would require the incurrence of substantial additional costs but would be unlikely to result in additional value, especially relative to the value of the vessel.  In addition, the Buyer indicated that the Sale Agreement must be executed promptly so as to enable it to flag the Pacific Voyager in Greenland, make the necessary repairs and upgrades, and to transfer the Pacific Voyager to Greenland all before the fishing season begins in early June.  The time associated with a public auction would likely render the Buyer's ability to complete these tasks impossible and would result in a loss of interest on the part of the Buyer, or at a minimum, a substantially reduced purchase price.  Accordingly, the Sale Transaction is in the best interests of all of the Debtors' estates and creditors.

## C.      The Purchase Price Constitutes Reasonably Equivalent Value for the Asset

28.      A debtor receives reasonably equivalent consideration when "the debtor's net worth has been preserved" following a transfer of its assets.  Harrison v. N.J. Cmty. Bank (In re Jesup & Lamont, Inc.), 507 B.R. 452, 471-72 (Bankr. S.D.N.Y. 2014); see also Mellon Bank,

14

N.A. v. Metro Commc'ns, Inc., 945 F.2d 635, 647 (3d Cir. 1991) ("The touchstone is whether the transaction conferred realizable commercial value on the debtor reasonably equivalent to the realizable commercial value of the assets transferred."). A finding of reasonably equivalent value does not require an exact equivalent exchange of consideration, but the benefits that a debtor receives from the transfer should approximate its costs. See Jesup & Lamont, 507 B.R. at 472 ("[I]f [the] value [received] approximates the value of what the debtor transferred, there will be reasonably equivalent value."). Further, transactions between a debtor and a third-party on an arm's-length basis are presumptively for reasonably equivalent value. See Mishkin v. Ensminger (In re Adler, Coleman Clearing Corp.), 247 B.R. 51, 109 (Bankr. S.D.N.Y. 1999) ("[W]hen there is an arm's-length transaction by parties that have equal knowledge, a court should not substitute its own view of a fair market price." (citing Cooper v. Ashley Commc'ns, Inc. (In re Morris Commc'ns NC, Inc.), 914 F.2d 458, 465, 474-75 (4th Cir. 1990)).

29.    Here, the sale of the Pacific Voyager constitutes an arm's-length transaction with an unaffiliated third party. Based on discussions with management of the Peruvian OpCos and the Broker, and based on bids received for other similar vessels, the Chapter 11 Trustee believes that the Sale Transaction price of $4,000,000 represents reasonably equivalent value for the Pacific Voyager.

**D.    Authorizing the Chapter 11 Trustee to Take Desirable or Necessary Corporate Governance Actions with Respect to the Sale Transaction Is Appropriate**

30.    In addition, the Chapter 11 Trustee hereby seeks authorization to provide any consents and to take any other corporate governance actions that he determines are desirable or reasonably necessary to cause the Sale Transaction to be consummated. Consistent with the Court's Memorandum Decision and Order Granting Motion for the Appointment of a Chapter 11 Trustee, the Chapter 11 Trustee controls CFG Peru Singapore. [Dkt. No. 203]. Given that CFG

Peru Singapore is the 100% (or close to 100%) owner of the Peruvian OpCos, the Trustee effectively controls these entities. [Dkt. No. 203]. In order to effectuate the Sale Transaction, the Chapter 11 Trustee requests permission to convene shareholders' meetings; vote CFG Peru Singapore's shares; pass shareholders' resolutions; direct the managers of SFR to execute any necessary documentation and to pay any necessary broker commissions and taxes; and to take any other actions that he determines desirable or reasonably necessary and within the parameters of the corporate governance documents of SFR and CFG Peru. Such actions are consistent with the Court's mandate that the Chapter 11 Trustee "assess the highest and best value of those assets and the means for Debtors to realize maximum benefits from those assets." [Dkt. 203 at 49]. Accordingly, the Chapter 11 Trustee seeks entry of the Proposed Order authorizing the Chapter 11 Trustee to use his corporate governance authority to effectuate the Sale Transaction.

31.    Courts have entered orders authorizing a debtor to cause its non-debtor affiliates to enter into transactions for the benefit of a debtor's estate. See, e.g., In re Abeinsa Holding Inc., Case No. 16-10790 (KJC) (Bankr. D. Del. May 25 2016) (authorizing debtor to sell substantially all assets of non-debtor subsidiaries); In re Haggen Holdings, LLC, Case No. 15-11874 (KG) (Bankr. D. Del. Apr. 26, 2016) (authorizing debtor to monetize assets of non-debtor affiliates); In re Variant Holding Co., Case No. 14-12021 (BLS) (Bankr. D. Del. June 5, 2015) (authorizing debtor to sell assets of non-debtor subsidiaries pursuant to purchase agreement); In re Savient Pharms., Inc., Case No. 13-12680 (MFW) (Bankr. D. Del. Nov. 4, 2013) (authorizing debtors to dissolve foreign non-debtor subsidiaries); In re Arcapita Bank B.S.C.(c), Case No. 12-11076 (SHL) (Bankr. S.D.N.Y. Dec. 18, 2012) (authorizing debtor to grant consents and approvals in connection with sale by non-debtor subsidiary pursuant to purchase agreement); In re Tribune Company, Case No. 08-13141 (KJC) (Bankr. D. Del. Feb. 25, 2011) (authorizing

debtor to cause non-debtor affiliate to make capital contribution in another entity); In re Calpine

Corp., Case No. 05-60200 (BRL) (Bankr. S.D.N.Y. Mar. 1, 2006) (authorizing and approving

sale procedures for non-debtor subsidiaries).

32.    Accordingly, the Trustee respectfully requests that the Court approve the

relief sought herein.

## WAIVER OF STAY UNDER BANKRUPTCY RULE 6004(h)

33.    The Chapter 11 Trustee also requests that the Court waive the stay

imposed by Bankruptcy Rule 6004(h), which provides that "[a]n order authorizing the use, sale,

or lease of property other than cash collateral is stayed until the expiration of 14 days after entry

of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h). As described above,

the relief that the Chapter 11 Trustee seeks in this Motion is necessary to preserve value for its

estate. Accordingly, the Chapter 11 Trustee respectfully requests that the Court waive the

fourteen-day stay imposed by Bankruptcy Rule 6004(h), as the exigent nature of the relief sought

herein justifies immediate relief.

## RESERVATION OF RIGHTS

34.    Nothing contained herein is or should be construed as: (a) an admission as

to the validity of any claim against the Debtors; (b) a waiver of the Trustee's rights to dispute

any claim on any grounds or to seek information through other means; or (c) a promise to pay

any claim.

## NOTICE

35.    The Trustee will provide notice of this Motion to the following parties, or,

in lieu thereof, their counsel: (a) the Office of the United States Trustee for the Southern District

of New York (the "U.S. Trustee"); (b) creditors holding the fifty largest claims as set forth in the

consolidated list filed with the Debtors' petitions; (c) U.S. counsel to Standard Chartered Bank

(Hong Kong) Limited, Cooperatieve Rabobank, U.A., and DBS Bank (Hong Kong) Limited; (d) U.S. counsel to China CITIC Bank International Limited; (e) U.S. counsel to the ad hoc noteholders committee; (f) U.S. counsel for Bank of America N.A.; (g) U.S. counsel to Malayan Banking Berhad, Hong Kong Branch; (h) U.S. counsel to Fredrich von Kaltenborn-Stachue, the insolvency administrator for the Pickenpack companies; (i) U.S. counsel for the Debtors; (j) the United States Attorney's Office for the Southern District of New York; (k) the Internal Revenue Service; (m) the United States Securities and Exchange Commission; and (l) any party that has requested notice pursuant to Bankruptcy Rule 2002.  A copy of this Motion is also available on the Court's website.  The Trustee submits that no other or further notice need be provided.

## NO PRIOR REQUEST

36.    No previous request for the relief sought herein has been made to this Court or any other court.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

## CONCLUSION

WHEREFORE, the Trustee  respectfully request that the Court enter an order,

substantially in the forms annexed hereto, granting the relief requested in the Motion and such

other and further relief as may be just and proper.

Dated: March 21, 2017
      New York, New York

                    SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

                    By: */s/ Lisa Laukitis*
                            Jay M. Goffman
                            Lisa Laukitis
                            Four Times Square
                            New York, New York 10036-6522
                            Telephone: (212) 735-3000
                            Fax: (212) 735-2000

                            -and-

                            Sarah E. Pierce (admitted *pro hac vice*)
                            One Rodney Square
                            P.O. Box 636
                            Wilmington, Delaware 19899-0636
                            Telephone: (302) 651-3000
                            Fax: (302) 651-3001

                            -and-

                            Elizabeth M. Downing (admitted *pro hac vice*)
                            500 Boylston Street
                            Boston, Massachusetts 02116
                            Telephone: (617) 573-4800
                            Fax: (617) 573-4870

                          *Counsel for William A. Brandt, Jr.*
                          *Chapter 11 Trustee*

**<u>EXHIBIT A</u>**

**Proposed Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

_____

| | : | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| **CHINA FISHERY GROUP LIMITED (CAYMAN)** | : | **Case No. 16-11895 (JLG)** |
| *et al.*, | : | |
| Debtors.[1] | : | **(Jointly Administered)** |
| | : | |

_____

| | : | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| **CFG Peru Investments Pte. Limited (Singapore),** | : | **Case No. 16-11914 (JLG)** |
| Debtor. | : | |
| | : | **(Jointly Administered)** |
| | : | |

_____

**ORDER GRANTING CHAPTER 11 TRUSTEE'S MOTION FOR ORDER PURSUANT TO BANKRUPTCY CODE SECTIONS 105(a), 363(b), 541(a)(1), AND 1108, AND BANKRUPTCY RULES 2002, 6004, AND 9006 AUTHORIZING (A) THE PRIVATE SALE OF A NON-DEBTOR VESSEL AND (B) THE CHAPTER 11 TRUSTEE TO CONSENT TO AND TAKE ALL CORPORATE ACTIONS DESIRABLE OR NECESSARY IN CONNECTION THEREWITH**

Upon the motion (the "Motion"),[2] dated March 21, 2017, by William A. Brandt,

Jr., not individually but solely in his capacity as Chapter 11 Trustee of CFG Peru Singapore, for

an order (this "Order") pursuant to sections 105(a), 363(b), 541(a)(1), and 1108 of title 11 of the

United States Code (the "Bankruptcy Code"), Rules 2002, 6004, and 9006 of the Federal Rules

---

[1]    The Debtors are China Fishery Group Limited (Cayman) ("CFGL"), Pacific Andes International Holdings Limited (Bermuda) ("PAIH"), N.S. Hong Investment (BVI) Limited ("NS Hong"), South Pacific Shipping Agency Limited (BVI) ("SPSA"), China Fisheries International Limited (Samoa) ("CFIL"), CFGL (Singapore) Private Limited ("CFGLPL"), Chanery Investment Inc. (BVI) ("Chanery"), Champion Maritime Limited (BVI) ("Champion"), Growing Management Limited (BVI) ("Growing Management"), Target Shipping Limited (HK) ("Target Shipping"), Fortress Agents Limited (BVI) ("Fortress"), Ocean Expert International Limited (BVI) ("Ocean Expert"), Protein Trading Limited (Samoa) ("Protein Trading"), CFG Peru Investments Pte. Limited (Singapore) ("CFG Peru Singapore"), Smart Group Limited (Cayman) ("Smart Group"), Super Investment Limited (Cayman) ("Super Investment") and Pacific Andes Resources Development Ltd. ("PARD").

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

of Bankruptcy Procedure (the "Bankruptcy Rules"), Rule 6004-1 of the Local Rules (the "Local Bankruptcy Rules") for the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") and the Amended Guidelines for the Conduct of Asset Sales promulgated by General Order M-383 of the Bankruptcy Court (the "Sale Guidelines") (i) authorizing the Chapter 11 Trustee to take all corporate actions including, but not limited to voting stock, passing shareholders' resolutions, directing managers to execute any necessary documentation, paying broker commissions and taxes or other actions that are in the Chapter 11 Trustee's business judgment, desirable or necessary to effectuate the sale of the Pacific Voyager (the "Sale Transaction"), a vessel owned by Sustainable Fishing Resources S.A.C., ("SFR" or the "Seller"), a non-debtor subsidiary of CFG Peru Singapore; and (ii) although Court approval may not be necessary for the Sale Transaction given that SFR is not a Debtor before this Court, out of an abundance of caution, and a desire for full transparency with respect to his actions to sell non-core assets, approving of the Sale Transaction, all as more fully set forth in the Motion; and due and sufficient notice of the Motion having been given under the particular circumstances and in accordance with the Order to Show Cause; and it appearing that no other or further notice need be provided; and the appearance of all interested parties and all responses and objections, if any, to the Motion having been duly noted in the record of the hearing on the Motion; and it appearing that the relief requested by the Motion is in the best interests of the Debtors, their estates, their creditors, their stakeholders, and other parties in interest; and after due deliberation thereon, and sufficient cause appearing therefor, it is hereby

**ORDERED, ADJUDGED, AND DECREED that**:

1.    The Motion is GRANTED as set forth herein.

2.      The Sale Agreement, consisting of the Memorandum of Agreement attached to the Motion as <u>Exhibit B</u> and the Side Letter attached to the Motion as <u>Exhibit C</u>, and all of the terms and conditions thereof, are hereby approved.

3.      The consideration provided by the Buyer under the Sale Agreement provides fair consideration and reasonably equivalent value to the Debtor.  The Sale represents the best opportunity to maximize and realize the value of the Asset for the Debtor.

4.      Approval of the Motion and the Sale Agreement and the consummation of the transactions contemplated thereby are in the best interests of the Debtor, its creditors, and other parties in interest.

5.      The terms of the Sale Agreement contemplated therein are fair and reasonable, reflect the Chapter 11 Trustee's exercise of prudent business judgment consistent with his fiduciary duties, and are the best available to the Chapter 11 Trustee under the circumstances.

6.      The purchase of the Pacific Voyager pursuant to the Sale Agreement was the result of good-faith, arm's length negotiations by and among the Chapter 11 Trustee, the Seller, and the Buyer, an unaffiliated third party.

7.      As the controlling shareholder of SFR, the Chapter 11 Trustee may adopt any decision with respect to SFR including but not limited to: authorizing issuance of proxies; delegating his powers to any manager, officer, or other representative for purposes of participating at a shareholders' meeting; and ultimately, execution of the documents constituting the Sale Agreement.

8.      The Chapter 11 Trustee is thereby authorized to take all corporate governance actions including but not limited to convening shareholders' meetings; voting CFG

3

Peru Singapore's shares; passing shareholders' resolutions; directing the managers of SFR to execute any necessary documentation and to pay any necessary broker commissions and taxes; and taking any other actions that he determines, in his business judgment, desirable or reasonably necessary or advisable to consummate the Sale Transaction.

9.      The terms of the Sale Agreement may be modified, amended or supplemented by the agreement of SFR and the Buyer in accordance with the terms of the Sale Agreement and without further notice or order of this Court; provided that any such modification, amendment, or supplement are not material changes.

10.      Notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion and the requirements of Bankruptcy Rule 6004(a) and the Local Bankruptcy Rules are satisfied by such notice.  A fair and reasonable opportunity to object or be heard with respect to the Motion and the relief requested therein has been afforded to all interested persons and entities.  All objections to the Sale Motion or the relief requested therein that have not been adjourned, withdrawn, waived, or settled, and all reservations of rights included therein, are overruled on the merits and denied with prejudice.

11.      Nothing contained herein shall prejudice the rights of the Chapter 11 Trustee to seek authorization for the sale of any asset under 11 U.S.C. § 363.

12.      Notwithstanding Bankruptcy Rule 6004(h), this Order shall be effective and enforceable immediately upon entry hereof.

13.      The requirements set forth in Local Bankruptcy Rule 9013-1(b) are satisfied by the contents of the Motion.

14.    The Chapter 11 Trustee is authorized and empowered to take all actions

necessary to implement the relief granted in this Order.

Dated:  New York, New York
       _____, 2017


       _____
       HON. JAMES L. GARRITY
       UNITED STATES BANKRUPTCY JUDGE

5

# **EXHIBIT B**

**Memorandum of Agreement**

## MEMORANDUM OF AGREEMENT

Dated: _____ **2017**

**SUSTAINABLE FISHING RESOURCES S.A.C.,** a Peruvian company with company number 11862982 of the Public Registry of Lima, Cal. Francisco Grana 155, La Victoria, Lima, Peru, hereinafter called the "**Sellers**" have agreed to sell, and

**ARTIC RAVEN PELAGIC A/S,** a Greenland company with company number A/S 601141, Amanduusip Aqq. 109 B, 3913 Tasiilaq, Greenland, or its nominee, hereinafter called the "**Buyers**", have agreed to buy:

Name of vessel: **PACIFIC VOYAGER**

IMO Number: **9167904**

Classification Society: **Det Norske Veritas Germanischer Lloyd** ("**DNV GL**")

Class Notation: **Maltese Cross 1A1Fishing vessel Ice(C)**

Year of Build: **1997** Builder/Yard: **Flekkefjord Slipp & Maskinfabrikk AS, Norway**

Flag: **Peru** Place of Registration: **Callao** GT/NT: **2.205 / 662**
hereinafter called the "**Vessel**", on the following terms and conditions:

### <u>Definitions</u>

"**Banking days**" are days on which banks are open both in the country of the currency stipulated for the Purchase Price in Clause 1 (Purchase Price) and in the place of closing stipulated in Clause 8 (Documentation), London, England and New York, and in Peru.

"**Buyers' Nominated Flag State**" means, at Buyers' discretion, **Greenland** via Danish International Register of Shipping, or **Belize**, via International Merchant Marine Registry.

"**Class**" means the class notation referred to above.

"**Classification Society**" means the Classification Society referred to above.

"**Deposit**" means an amount equal to ten percent (10%) of the Purchase Price.

"**Delivery Port**" means the port of Callao, Peru.

"**Escrow Agent**" means Development Specialists, Inc. which shall hold and release the Deposit in accordance with this Agreement.

"**Escrow Agreement**" means the escrow agreement dated March 21, 2017 between the Sellers, the Buyers and the Escrow Agent setting out the terms and conditions for payment and release of

the Deposit. Such escrow agreement being signed by the Sellers, the Buyers and the Escrow Agent, Development Specialists, Inc..

"**Holdback Period**" means a period of ninety (90) days from the Delivery Date.

"**Holdback Amount**" is equal to the Deposit Amount.

"**IUU**" means illegal, unreported and unregulated fishing.

"**Parties**" means the Sellers and the Buyers.

"**Purchase Price**" means the price for the Vessel as stated in Clause 1 (*Purchase Price*).

"**Sellers Account**" means **an account to be named** at the Sellers' Bank.

"**Sellers' Bank**" means the bank notified by the Sellers to the Buyers for receipt of the balance of the Purchase Price.

"**In writing**" or "**written**" means a letter handed over from the Sellers to the Buyers or vice versa, a registered letter or e-mail.

1. <u>**Purchase Price**</u>

   The purchase Price for the Vessel and all spares, bunkers, appurtenances and all equipment set forth herein, is Four Million United States Dollars (U.S. $4,000,000.00).

2. <u>**Deposit**</u>

   As security for the correct fulfilment of this Agreement the Buyers shall remit (or shall procure the remittance of) the Deposit to the Escrow Agent, for deposit by the Escrow Agent in an interest bearing account (if any interest obtainable) established for the Parties, within three (3) Banking Days after the later of the date that:

   (a)   this Agreement has been signed by the Buyers and provided in original or by e-mail to the Sellers; and

   (b)   the Escrow Agreement is signed by the Parties in original or by email and the Escrow Agent has confirmed in writing to the Parties that the account has been opened.

   The Deposit on placing with the Escrow Agent shall be held by the Escrow Agent in accordance with the Escrow Agreement and shall be released in accordance with the terms of the Escrow Agreement.

   Interest on the Deposit, if any, shall be credited to the Buyers. Any fee charged for holding and releasing the Deposit shall be borne equally by the Parties. The Parties shall provide to the Escrow Agent all necessary documentation to open and maintain the account without delay.

Notwithstanding anything to the contrary contained herein, if the Buyers do not accept the Vessel after dry docking pursuant to Clause 19, or the Buyers reject the Vessel pursuant to Clause 19(d), the Parties shall cause the Escrow Agent to immediately return the Deposit to the Buyers, together with any accrued interest, in accordance with the terms of the Escrow Agreement.

**3.**   **Payment**

On delivery of the Vessel, but not later than three (3) Banking Days after the date that Notice of Readiness has been given in accordance with Clause 5 (*Time and place of delivery and notices*), the Buyers shall pay the balance of the Purchase Price (i.e., the Purchase Price minus the Deposit) to the Sellers' Account, together with any other sums payable upon delivery, such payment to be made in full and free of bank charges.  The Deposit shall be retained by the Escrow Agent for the entirety of the Holdback Period. Upon expiration of the Holdback Period, and in fulfilment of the Buyers' payment obligations hereunder, the Parties shall cause the Deposit to be paid to the Sellers' Account, less any and all amounts paid to the Buyers or third parties pursuant to Clause 9 (*Encumbrances*), such payment to be made by means of the Buyers and Sellers providing a signed copy of the letter of instruction in the form of **Appendix A** to the Escrow Agreement jointly instructing the Escrow Agent to release the Deposit or any remaining balance (following the release of any amounts to the Buyers as aforesaid) to the Sellers. Each Party shall provide the other Party with bank transfer documents confirming that the relevant payments have been made/required.

**4.**   **Inspection**

The Buyers have inspected and accepted the Vessel's classification records. The Buyers have also superficially inspected the Vessel at/in **Chimbote** on or around **23rd February 2017** and have accepted the Vessel following this inspection and the sale is outright and definite, subject only to the terms and conditions of this Agreement and in particular to the provisions of Clauses 5(c) and 19 below.

**5.**   **Time and place of delivery and notices**

**(a)**   The Vessel shall be delivered and taken over safely afloat at a safe and accessible berth within the Delivery Port in the Sellers' option.

**(b)**   The Sellers shall keep the Buyers well informed of the Vessel's itinerary and shall provide the Buyers with three (3) days' notice of the date the Sellers intend to tender Notice of Readiness and of the intended berth at the Delivery Port.  When the Vessel is at the Delivery Port and physically ready for delivery in accordance with this Agreement, the Sellers shall give the Buyers a written Notice of Readiness for delivery.  The Notice of Readiness shall not be tendered by the Sellers before April 11, 2017.

**(c)**   The agreed Cancelling Date is April 13, 2017.  If the Sellers anticipate that, notwithstanding the exercise of due diligence by them, the Vessel will not be ready for delivery by the Cancelling Date they may notify the Buyers in writing

3

stating the date when they anticipate that the Vessel will be ready for delivery and proposing a new Cancelling Date. Upon receipt of such notification the Buyers shall have the option of either cancelling this Agreement in accordance with Clause 14 (*Sellers' Default*) within three (3) Banking Days of receipt of the notice or of accepting the new date as the new Cancelling Date. If the Buyers have not declared their option within three (3) Banking Days of receipt of the Sellers' notification or if the Buyers accept the new date, the date proposed in the Sellers' notification shall be deemed to be the new Cancelling Date and shall be substituted for the Cancelling Date stipulated in Clause 5(a).  If this Agreement is maintained with the new Cancelling Date, all other terms and conditions hereof including those contained in Clauses 5(b) and 5(d) shall remain unaltered and in full force and effect.

**(d)**    Cancellation, failure to cancel or acceptance of the new Cancelling Date shall be entirely without prejudice to any claim for damages the Buyers may have under Clause 14 (*Sellers' Default*) for the Vessel not being ready by the original Cancelling Date.

**(e)**    Should the Vessel become an actual, constructive or compromised total loss before delivery, the Deposit shall be released immediately to the Buyers, together with any and all interest thereon, and both Parties shall confirm such loss to the Escrow Agent in writing and shall cause the Escrow Agent to release the Deposit to the Buyers, whereupon this Agreement shall be null and void.

## 6.    Divers Inspection / Drydocking

The Sellers shall, at the Buyers' expense, place the Vessel in drydock at the Delivery Port for inspection by the Buyers and the Classification Society of the Vessel's underwater parts below the deepest load line, the extent of the inspection being in accordance with the Classification Society's rules.

## 7.    Spares, bunkers and other items

**(a)**    The Sellers shall deliver the Vessel to the Buyers with everything belonging to her on board and on shore. All spare parts and spare equipment including spare tail-end shaft(s) and/or spare propeller(s)/propeller blade(s), if any, belonging to the Vessel at the time of inspection used or unused, whether on board or not, shall become the Buyers' property.  Forwarding charges, if any, shall be for the Buyers' account. The Sellers are not required to replace spare parts including spare tail-end shaft(s) and spare propeller(s)/propeller blade(s) which are taken out of spare and used as replacement prior to delivery, but the replaced items shall be the property of the Buyers. Unused stores and provisions shall be included in the Purchase Price and be taken over by the Buyers without extra payment. Library and forms exclusively for use in the Sellers' vessel(s) and captain's, officers' and crew's personal belongings including the slop chest are excluded from the sale without compensation.

    (b)     The Buyers shall take over remaining bunkers and unused lubricating and hydraulic oils and greases in storage tanks and unopened drums at no cost as the same are included in the Purchase Price.  Certain equipment presently stored on the vessel "Damanzaihao," as set forth in **Appendix A** to this Agreement, shall be sold and transferred to the Buyers and included in the Purchase Price.

## 8.   <u>Documentation</u>

The place of closing: **New York, New York**

    (a)     In exchange for payment of the Purchase Price the Sellers shall provide the Buyers with the following delivery documents:

        (i)     Legal Bill(s) of Sale in a form recordable in the Buyers' Nominated Flag State, transferring title of the Vessel and stating that the Vessel is free from all mortgages, encumbrances and maritime liens or any other debts whatsoever, duly notarised and apostilled or legalised (as appropriate), as required by the Buyers' Nominated Flag State;

        (ii)    Evidence that all necessary corporate, shareholder and other action has been taken by the Sellers to authorise the execution, delivery and performance of this Agreement;

        (iii)   Evidence of good standing, duly notarised and legalised or apostilled (as appropriate);

        (iv)   A Power of Attorney of the Sellers appointing one or more representatives to act on behalf of the Sellers in the performance of this Agreement, duly notarised and apostilled or legalised (as appropriate);

        (v)    Certified Copy of Certificate or Transcript of Registry (*Copia Literal de Partida*) issued by the competent authorities of the flag state evidencing the Sellers' ownership of the Vessel and that the Vessel is free from registered encumbrances and mortgages, to be delivered as of the date of delivery. Within ten (10) days of delivery, the Sellers shall furnish to the Buyers a *Certificado Negativo de Gravamenes* issued by competent flag state authorities which re-confirms that the Vessel was free from registered encumbrances and mortgages as of the date of delivery;

        (vi)   Declaration of Class or (depending on the Classification Society) a Class Maintenance Certificate issued within three (3) Banking Days prior to delivery confirming that the Vessel is free of condition/recommendation other than those specifically set forth in the DNV GL Class Status Report dated 2017-02-22;

        (vii)  Commercial Invoice for the Vessel;

<div style="margin-left: 2em;">

**(viii)**   A copy of the Sellers' letter to their satellite communication provider cancelling the Vessel's communications contract which is to be sent immediately after delivery of the Vessel;

**(ix)**   Any additional documents as may reasonably be required by the competent authorities of the Buyers' Nominated Flag State for the purpose of registering the Vessel, provided the Buyers notify the Sellers of any such documents as soon as possible after the date of this Agreement;

**(x)**   The Sellers' letter of confirmation that to the best of their knowledge, the Vessel is not black listed by any nation or international organisation, and an undertaking that the Sellers will take reasonably necessary steps to effect deletion from the Vessel's registry forthwith and will provide a certificate or other official evidence of deletion to the Buyers promptly following delivery of the Vessel and at the latest by May 15, 2017; and

**(xi)**   Any other document or formality required by local authorities in order to transfer the Vessel.

</div>

**(b)**   At the time of delivery the Buyers shall provide the Sellers with:

<div style="margin-left: 2em;">

**(i)**   Evidence that all necessary corporate, shareholder and other action has been taken by the Buyers to authorise the execution, delivery and performance of this Agreement;

**(ii)**   Evidence of good standing, duly notarised and legalised or apostilled (as appropriate);

**(iii)**   Power of Attorney of the Buyers appointing one or more representatives to act on behalf of the Buyers in the performance of this Agreement, duly notarised and legalised or apostilled (as appropriate); and

**(iv)**   Any other document or formality required of the Buyers by Peruvian authorities in order to cancel the inscription of the Vessel registered in the Electronic Entry 12505582 of the Vessel Public Registry of Lima.

</div>

**(c)**   If any of the documents listed in Sub-clauses (a) and (b) above are not in the English and Spanish languages, they shall be accompanied by an English and/or Spanish translation by an authorised translator or certified by a lawyer qualified to practice in the country of the translated language.

**(d)**   The Parties shall to the extent possible exchange copies, drafts or samples of the documents listed in Sub-clause (a) and Sub-clause (b) above for review and comment by the other party not later than three (3) days prior to the Vessel's intended date of readiness for delivery as notified by the Sellers pursuant to Clause 5(b) of this Agreement.

6

**(e)**    Concurrent with the exchange of documents in Sub-clause (a) and Sub-clause (b) above the Sellers shall also hand to the Buyers the classification certificate(s), international tonnage certificate(s),  as well as all plans drawings and manuals, (excluding ISM/ISPS manuals), whether on board the Vessel or on shore. Other certificates which are on board the Vessel or on shore shall also be handed over to the Buyers unless the Sellers are required to retain same, in which case the Buyers have the right to take copies.

**(f)**    Other technical documentation which may be in the Sellers' possession shall promptly after delivery be forwarded to the Buyers at their expense, if they so request. The Sellers may keep the Vessel's log books but the Buyers have the right to take copies of same.

**(g)**    The Parties shall sign and deliver to each other a Protocol of Delivery and Acceptance confirming the date and time of delivery of the Vessel from the Sellers to the Buyers.

**9.**    <u>**Encumbrances**</u>

**(a)**    The Sellers hereby represent and warrant that the Vessel, at the time of delivery, is free from any and all charters, encumbrances, mortgages, maritime claims and maritime liens or any other debts whatsoever, and is not subject to Port State or other administrative detentions or fines or penalties including under the relevant IUU regulations, and any costs associated with the Vessel being laid up, have been paid in full up to the time of delivery.

**(b)**    Subsequent to the delivery of the Vessel, the Sellers shall indemnify and hold the Buyers harmless from and against any claim, demand, action, proceeding, judgment, award, fine, liability, loss, cost, tax and expense, including reasonable attorneys' fees (collectively, "**Losses**" and individually, a "**Loss**") that is made or brought against the Buyers or the Vessel, or that the Buyers or the Vessel suffer as a result of (x) any breach or inaccuracy of the representations and warranties in Clause 9(a) and (y) any liability or loss in connection with any other claims or maritime liens that arose or accrued prior to delivery of the Vessel that are asserted against the Vessel, <u>provided</u> <u>that</u>, the Sellers are only obligated to indemnify the Buyers for Losses that are asserted within one (1) year of delivery of the Vessel up to a maximum amount of USD $1,000,000.  For the avoidance of doubt, any such claim of Loss that is first asserted within one (1) year of delivery shall be subject to indemnity under this Clause 9 regardless of whether it is liquidated thereafter.

**(i)**    In the event that the Buyers intend to make a claim under Clause 9(b)(x) to be indemnified by the Sellers hereunder that does not involve a Third Party Claim (as defined below), the Buyers shall promptly send to the Sellers a written notice specifying the nature of such claim or demand, to the extent it is known, and the amount or estimated amount (which estimate shall not be conclusive of the final amount of such claim and

7

demand) of such claim or demand, together with copies of the relevant documents in their possession (a "**Claim Notice**"), provided, however, that any failure to furnish such Claim Notice shall not relieve the Sellers from any liability or obligation hereunder.

(ii)     In the event of a Claim Notice, the amount of which (x) is undisputed by the Buyers, (y) was disputed but as to which (A) a final nonappealable decision has been rendered or (B) an agreement has been reached between the Buyers and the Sellers, such amount shall, subject to the terms and conditions of this Clause 9, conclusively be deemed a liability of the Sellers hereunder.

(c)    The obligations and liabilities of the Buyers with respect to Losses resulting from the assertion of liability by third parties (each such obligation and liability, a "**Third Party Claim**") shall be subject to the following terms and conditions:

(i)     The Buyers shall promptly give written notice to the Sellers of any Third Party Claim that might give rise to any Loss by the Buyers, stating the nature and basis of such Third Party Claim, and the amount thereof to the extent known. Such notice shall be accompanied by copies of all relevant material documentation in the possession of the Buyers with respect to such Third Party Claim, including any summons, complaint or other pleading that may have been served, any written demand or any other material document or instrument, provided, however, that any failure to furnish notice of such Third Party Claim shall not relieve the Sellers from any liability or obligation hereunder.

(ii)     From and after receipt of notice of a Third Party Claim pursuant to Clause 9(c)(i), the Sellers shall have the right to assume and conduct, at the Sellers' own expense, the defense against the Third Party Claim in the Sellers' own name or in the name of the Buyers with counsel reasonably acceptable to the Buyers. Buyers shall have the right to employ separate counsel in any such Third Party Claim or to participate in the defense thereof, but the fees and expenses of such counsel shall not be included as part of any Loss incurred by the Buyers and shall not be payable by the Sellers; provided, however, that if the representation of the Buyers by the same counsel as the Sellers would be inappropriate under applicable standards of professional conduct, the Buyers shall be entitled to appoint one separate counsel for such claims and defenses, at the reasonable cost and expense of the Sellers. The party or parties conducting the defense of any Third Party Claim shall keep the other parties apprised of all significant developments with respect thereto and shall not enter into any settlement, compromise or consent to judgment with respect to such Third Party Claim without the prior consent of the other parties thereto, such consent not to be unreasonably withheld, delayed or conditioned; provided, however, that the Sellers shall be entitled to settle, compromise or consent to a judgment without the consent of the Buyers with respect to

8

a Third Party Claim that only imposes monetary obligations and in circumstances where the Buyers and the Vessel are furnished a full and unconditional release. The Buyers shall make available all information and assistance for the defense of the Third Party Claim as the Sellers may reasonably request and shall cooperate reasonably with the Sellers in such defense.

**(d)**   Except in connection with Third Party Claims, the Buyers waive any right to recover indirect, consequential, special, exemplary or punitive damages and the Buyers agree that such damages are not included in the definition of "Losses".

**(e)**   The Buyers shall use commercially reasonable efforts to mitigate all Losses upon becoming aware of any event or circumstance that could reasonably be expected to give rise to any Losses that are indemnifiable under this Clause 9.

**(f)**   Without limiting the Sellers' indemnity obligations hereunder, it is hereby agreed that the Escrow Agent shall continue to hold and maintain the Deposit for the Holdback Period as security for such indemnity obligations hereunder.  If no claims have been asserted during the Holdback Period, the Deposit shall be released to the Sellers upon expiration thereof.  If any claims are asserted (as aforesaid) during the Holdback Period, the amount claimed shall be released by the Escrow Agent to the Buyers to enable payment, reimbursement or settlement of the same.  The balance of the Holdback Amount, less any amounts released to the Buyers as aforesaid, shall be released by the Escrow Agent to the Sellers upon expiration of the Holdback Period.  Further, if any monies released to the Buyers to cover any claims are not required to meet those claims then such monies shall be paid by the Buyers to the Sellers as soon as it is clear they are not required. The Buyers and Sellers hereby irrevocably and unconditionally agree to sign and deliver to the Escrow Agent any joint instruction letters as may be required to give effect to the provisions of this clause.

**10.**   **Taxes, fees and expenses**

Any taxes, fees and expenses in connection with the purchase and registration in the Buyers' Nominated Flag State shall be for the Buyers' account, whereas similar charges in connection with the closing of the Sellers' register shall be for the Sellers' account.

**11.**   **Condition on delivery**

The Vessel with everything belonging to her shall be at the Sellers' risk and expense until she is delivered to the Buyers, but subject to the terms and conditions of this Agreement, she shall be delivered and taken over as she was at the time of inspection, fair wear and tear excepted. The Vessel shall be delivered free of cargo and free of stowaways with her Class maintained, and valid "inspection" in this Clause 11, shall mean the date of this Agreement.

12.    **Name/markings**

Upon delivery the Buyers undertake to change the name of the Vessel and alter funnel markings.

13.    **Buyers' default**

Should the Deposit not be lodged in accordance with Clause 2 (*Deposit*), the Sellers have the right to cancel this Agreement, and they shall be entitled to claim compensation for their losses and for all expenses incurred together with interest. Should the Purchase Price not be paid in accordance with Clause 3 (*Payment*), the Sellers have the right to cancel the Agreement, in which case the Deposit together with interest earned, if any, shall be released to the Sellers. If the Deposit does not cover their loss, the Sellers shall be entitled to claim further compensation for their proven losses and for all expenses incurred together with interest.

14.    **Sellers' default**

    **(a)**    Should the Sellers fail to give Notice of Readiness in accordance with Clause 5(b) or fail to be ready to validly complete a legal transfer by the Cancelling Date or if Notice of Readiness is given and the Sellers are not in a position to deliver within three (3) Banking Days of such Notice of Readiness including the documentation required in Clause 8 from the Seller, the Buyers shall have the option of cancelling this Agreement. If after Notice of Readiness has been given but before the Buyers have taken delivery, the Vessel ceases to be physically ready for delivery and is not made physically ready again by the Cancelling Date and new Notice of Readiness given, the Buyers shall retain their option to cancel. In the event that the Buyers elect to cancel this Agreement, the Deposit together with interest earned, if any, shall be released to them immediately.

    **(b)**    Should the Sellers fail to give Notice of Readiness by the Cancelling Date or if having given Notice of Readiness are not in the position to comply with the terms of this Agreement or fail to be ready to validly complete a legal transfer as aforesaid they shall make due compensation to the Buyers for their reasonably documented expenses together with interest if their failure is due to proven negligence and whether or not the Buyers cancel this Agreement.

15.    **Buyers' representatives**

After this Agreement has been signed by the Parties and the Deposit has been lodged, the Buyers have the right to place two (2) representatives on board the Vessel at their sole risk and expense. These representatives are on board for the purpose of familiarisation and in the capacity of observers only, and they shall not interfere in any respect with the operation of the Vessel. The Buyers and the Buyers' representatives shall sign the Sellers' P&I Club's standard letter of indemnity prior to their embarkation.

10

16. <u>**Law**</u>

This Agreement and any non-contractual obligations arising out of or in connection with it is governed by and construed in accordance with New York law.

Any dispute arising out of or in connection with this Agreement shall be referred to three (3) persons in New York, one to be appointed by each of the parties hereto, and the third by the two so chosen; their decision or that of any two of them shall be final, and for the purposes of enforcing any award, judgment may be entered on an award by any court of competent jurisdiction.  The proceedings shall be conducted in accordance with the rules of the Society of Maritime Arbitrators, Inc.

In cases where neither the claim nor any counterclaim exceeds the sum of US$100,000 the arbitration shall be conducted in accordance with the Shortened Arbitration Procedure of the Society of Maritime Arbitrators, Inc.

The cost of the arbitration proceeding and any proceeding in court to confirm or to vacate any arbitration award, as applicable (including, without limitation, reasonable attorneys' fees and costs), shall be borne by the unsuccessful party, as determined by the arbitrators, and shall be awarded as part of the arbitrator's award.

17. <u>**Notices**</u>

All notices to be provided under this Agreement shall be in writing.

Contact details for recipients of notices are as follows:

For the Buyers: **Sebastian Marr – email: SAM@marsea.co.uk**

For the Sellers: **Francisco Paniagua – email: fpaniagua@copeinca.com.pe**

18. <u>**Entire Agreement**</u>

The written terms of this Agreement including those under Clause 19 through 21 hereunder and any appendices hereto comprise the entire agreement between the Buyers and the Sellers in relation to the sale and purchase of the Vessel and supersede all previous agreements whether oral or written between the Parties in relation thereto.  This Agreement can be amended, modified or supplemented only in a writing executed by duly authorized representatives of the Buyers and Sellers, respectively.

Each of the Parties acknowledges that in entering into this Agreement it has not relied on and shall have no right or remedy in respect of any statement, representation, assurance or warranty (whether or not made negligently) other than as is expressly set out in this Agreement. Any terms implied into this Agreement by any applicable statute or law are hereby excluded to the extent that such exclusion can legally be made. Nothing in this Clause shall limit or exclude any liability for fraud.

*Clauses 19 through Clause 21 form an integrated part of this Memorandum of Agreement.*

**19.   Conditions**

(a)   Notwithstanding anything to the contrary contained in this Agreement, the purchase of the Vessel by the Buyers hereunder is conditional upon the Buyers' acceptance of the Vessel after having inspected it in drydock in the Delivery Port (and which will occur once the provisions of Clauses 6 and 21 have been effected), provided, that, the Buyers may not reject the Vessel if the representative of the Classification Society does not observe any damage to the Vessel's underwater hull, rudder, propeller or other underwater parts under the deepest load line, which would lead to a condition/recommendation of Class.

(b)   The condition set forth in Clause 19(a) must be lifted within forty-eight (48) hours after the later of the date (i) the Vessel is surveyed in drydock by the Buyers and the representative of the Classification Society and (ii) the Buyer's receipt of the written report from the representative of the Classification Society confirming that the survey has been fully completed and there are no class conditions/recommendations related to the underwater parts of the Vessel.

(c)   The sale as agreed in this Agreement is subject to, including the obligations of the Seller conditioned on this Agreement, Sellers' approval to be agreed on at a shareholders meeting upon which the MOA shall be signed by the Sellers.  This condition must be lifted soonest possible, but no later than April 12, 2017, unless otherwise agreed to by the Parties.   Upon their signing of the MOA, the Sellers shall make prompt application to the relevant governmental authorities for the issuance of a Certificate of Deletion for the Vessel.

(d)   Notwithstanding any other provision of this Agreement, the Buyers shall be entitled to reject the Vessel at any time prior to delivery if she is discovered to have been involved in any illegal, unreported and unregulated fishing activity or is in contravention of CCAMLR, NEFAC, NAFO, FAO, ICCAT, IOTC, NASCO or similar regulations in respect of the same.

**20.   Class Certificates**

(a)   The Buyers are aware of the Vessel's class status as being laid up, and that the Vessel's class certificate is valid till 2017-09-30.

(b)   The Buyers have been given a class status report and are aware of other class surveys being due or overdue.

**21.   Towage**

The Buyers, in conjunction with the Sellers, will arrange for the Vessel to be towed to Callao as soon as practical after this Agreement has been signed by the Buyers and the Deposit placed with the Escrow Agent,  to have the dry-docking provided in Clauses 6 and 19 carried out.

12

## Appendix A

1 off  Trawl Net  (lying on Starboard side of DMZ forward of the three sets of trawl doors)

2 off Red Trawl Doors

1 off Coil of Dynema Rope

2 off Liferafts

1 off Fish Pump

2 off Wooden Drums of Trawl Wires

2 off Drums of Net Sounder Cable

2 off Net Transducers

4 off Simrad Net Sensors

2 off Scanmar Sensors

Spare paint of colors appropriate to the Pacific Voyager that are stored on the DMZ

Signatures:

_____

_____

Buyers                                    Sellers

## **EXHIBIT C**

**Side Letter**

SUSTAINABLE FISHING RESOURCES S.A.C.
Cal. Francisco Grana 155
La Victoria, Lima, Peru

March 21, 2017

Arctic Raven Pelagic A/S
3913 Tasiilaq, Greenland
Attention: Mr. Sebastian Marr

Re:   Letter Agreement regarding Pacific Voyager

Reference is made to that certain *Memorandum of Agreement* (the "Memorandum of Agreement"), attached hereto as Exhibit A, with respect to the sale of the Pacific Voyager (the "Sale") by Sustainable Fishing Resources S.A.C. (the "Seller") to Arctic Raven Pelagic A/S or its nominee (the "Buyer").  CFG Peru Investments Pte. Ltd. ("CFG Peru"), the indirect owner and majority shareholder of the Seller, is a debtor in the U.S. Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court").  Capitalized terms used but not defined herein (this "Letter Agreement") shall have the meanings given them in the Memorandum of Agreement.

**NOW**, **THEREFORE**, in consideration of mutual promises and agreements and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto intending to be legally bound agree as follows:

1.  Approval of Sale.  Upon execution of this Letter Agreement, Mr. William A. Brandt, Jr., Chapter 11 Trustee of CFG Peru (the "Trustee"), shall promptly convene a meeting of the shareholders of the Seller for the purpose of reviewing the Memorandum of Agreement, approving the Sale, and directing the Seller to execute the Memorandum of Agreement and consummate all transactions contemplated thereby, such approval and direction to be subject only to the entry of the Bankruptcy Court Order (as hereinafter defined) authorizing the Trustee to exercise his corporate governance authority to direct the Seller to enter into the Memorandum of Agreement and cause the Sale of the Pacific Voyager to the Buyer pursuant to the terms thereof.  Such meeting shall be held as soon as practicable and in no event later than April 11, 2017.

2.  Bankruptcy Court Approval.  The Trustee shall seek (i) authorization from the Bankruptcy Court to exercise his corporate governance authority to direct the Seller to enter into the Memorandum of Agreement and cause the Sale of the Pacific Voyager to the Buyer pursuant to the terms thereof, and (ii) out of an abundance of caution, approval of the Sale by the Bankruptcy Court pursuant to the terms of the Memorandum of Agreement.  Absent entry of an order of the Bankruptcy Court authorizing the Trustee to exercise his corporate governance authority to direct the Seller to enter into the Memorandum of Agreement and approving the Sale pursuant to the terms of the Memorandum of Agreement (the "Bankruptcy Court Order"), the Memorandum of Agreement shall be null and void; provided, however, that if the Bankruptcy Court finds

that its jurisdiction does not extend to approving such Sale, the Memorandum of Agreement shall continue in full force and effect.

3.  <u>Expense Reimbursement</u>.  To the extent that (i) the Seller receives a binding overbid of USD $4,400,000 or more (or USD $400,000 or more over the purchase price under the Memorandum of Agreement) in cash (the "<u>Overbid</u>") prior to the objection deadline set forth in the motion to approve the Bankruptcy Court Order, and (ii) the Buyer does not come forward with a bid in excess of the Overbid prior to the hearing to consider the Bankruptcy Court Order (the "<u>Sale Hearing</u>"), the Trustee shall seek approval from the Bankruptcy Court at the Sale Hearing for the reimbursement of reasonable and documented expenses of the Buyer in respect of reasonable shipyard and repair expenses documented through third party invoices, up to an aggregate maximum amount of USD $350,000 (the "<u>Expense Reimbursement</u>"), <u>provided</u>, <u>however</u>, that absent the Bankruptcy Court approving a provision providing for such Expense Reimbursement, the Buyer shall not be entitled to such Expense Reimbursement.  Further, the Expense Reimbursement is only due and payable upon the consummation of the alternate transaction that results from either the Overbid or the sale of the Pacific Voyager with such repairs to a purchaser other than the Buyer.

4.  <u>Bankruptcy Court Hearing</u>.    Notwithstanding anything contained in this Letter Agreement or the Memorandum of Agreement to the contrary, the parties hereby acknowledge and agree that, in the event that the Trustee is unable to schedule a Bankruptcy Court hearing on or before April 11, 2017, with respect to the matters contemplated by paragraph 2 of this Letter Agreement, the Buyer shall not be obligated to remit the Deposit to the Escrow Agent and any failure to do so shall not be deemed a Buyers' default under Clause 13 of the Memorandum of Agreement.

5.  <u>Entire Agreement; No Third Party Beneficiaries</u>.  This Letter Agreement constitutes the entire understanding of the parties hereto and supersedes all prior understandings between such parties with respect to the matters covered herein; <u>provided</u> <u>that</u> this Letter Agreement can be amended, modified or supplemented only in a writing executed by duly authorized representatives of the Buyer and Seller, respectively.

6.  <u>Governing Law</u>.  THIS LETTER AGREEMENT, AND ALL CLAIMS ARISING OUT OF OR RELATING THERETO, WILL BE GOVERNED AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF NEW YORK. THE PARTIES HEREBY IRREVOCABLY SUBMIT TO THE JURISDICTION OF, AND VENUE IN, THE UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK AND WAIVE ANY OBJECTION BASED ON FORUM NON CONVENIENS.

7.  <u>Counterparts</u>.  This Letter Agreement may be executed in one or more counterparts (including by facsimile or electronic transmission), each of which will be deemed an original and all of which together will be considered one and the same agreement.

*[Signature Pages Follow]*

**IN WITNESS WHEREOF**, the parties hereto, intending to be legally bound, have caused their duly authorized representatives to execute and deliver this Letter Agreement as of the date first set forth above.

**SUSTAINABLE FISHING RESOURCES S.A.C.**

By: _____

Name: _FRANCISCO  PANIAGUA_

Title: _GENERAL  MANAGER_

**CFG PERU INVESTMENTS PTE. LTD.**

By: _____

Name: _____

Title: _____

**ARCTIC RAVEN PELAGIC A/S**

By: _____

Name: _____

Title: _____

By: _____

Name: _____

Title: _____

[Signature Page to Letter Agreement re: Pacific Voyager]

**IN WITNESS WHEREOF**, the parties hereto, intending to be legally bound, have caused their duly authorized representatives to execute and deliver this Letter Agreement as of the date first set forth above.

**SUSTAINABLE FISHING RESOURCES S.A.C.**

By: _____

Name: _____

Title: _____

**CFG PERU INVESTMENTS PTE. LTD.**

By: _____

Name: WILLIAM A. BRANDT, JR.

Title: CHAPTER 11 TRUSTEE

**ARCTIC RAVEN PELAGIC A/S**

By: _____

Name: _____

Title: _____


By: _____

Name: _____

Title: _____

**IN WITNESS WHEREOF**, the parties hereto, intending to be legally bound, have caused their duly authorized representatives to execute and deliver this Letter Agreement as of the date first set forth above.

**SUSTAINABLE   FISHING   RESOURCES S.A.C.**

By: _____

Name: _____

Title: _____

**CFG PERU INVESTMENTS PTE. LTD.**

By: _____

Name: _____

Title: _____

**ARCTIC RAVEN PELAGIC A/S**

By: _____

Name:   SEBASTAN MARR

Title:   DIRECTOR

By: _____

Name:   ANDREW W REGAN

Title:   DIRECTOR

## **EXHIBIT D**

**Escrow Agreement**

<div align="center">

## This **ESCROW AGREEMENT** is dated 21st **March 2017** and made between:

</div>

**Sustainable Fishing Resources S.A.C.**
**Cal Francisco Grana 155, La Victoria, Lima, Peru**

referred to as the "**Sellers**",

and

**Arctic Raven Pelagic A/S**
**3913 Tasiilaq, Greenland**

(or its nominee) referred to as the "**Buyers**";

and

**Development Specialists, Inc.**
**70 W Madison St #2300**
**Chicago, IL 60602**

(the "**Escrow Agent**")

---

## BACKGROUND:

(A)     The Sellers have agreed to sell and deliver to the Buyers and the Buyers have agreed to buy and take delivery from the Sellers of the fishing vessel "**Pacific Voyager**" (the "**Vessel**"), presently registered under the Peruvian Flag and classed by Det norske Veritas GL (the "**Classification Society**"),

(B)     The Buyers have signed a Memorandum of Agreement setting out the terms applicable to the sale and purchase of the Vessel and a Letter of Agreement (together the "**MoA**") and whilst the terms of the MoA have also been agreed to by the Seller, as its parent company is currently subject to Chapter 11 Insolvency proceedings in the US Bankruptcy Court for the Southern District of New York (the "**Court**"), it will only countersign the MoA once the Court has approved the Sale and/or authorised William A. Brandt, Jr. as Chapter 11 Trustee (the "**Chapter 11 Trustee**") of the Seller's parent company to exercise his corporate governance authority to direct the Sellers to enter into the MoA.

<div align="center">

1

</div>

(C)    In anticipation of the MoA being countersigned by the Sellers and pursuant to the terms thereof, the Sellers and the Buyers have agreed to appoint the Escrow Agent to hold the Deposit in accordance with the MoA, and the Escrow Agent is willing to act in that capacity.

**NOW THEREFORE IT IS AGREED AS FOLLOWS**:-

1.    **Definitions and Interpretation**

1.1    If any instructions to the Escrow Agent by any of the other parties to this Agreement are inconsistent with the provisions of this Agreement, the provisions of this Agreement will prevail.

1.2    In this Agreement:

**"Deposit"** shall mean the sum of **USD 400,000 (United States Dollars Four Hundred Thousand 00/00)**; and

"**Escrow Account**" shall mean the following USD bank account held in the name of the Escrow Agent:

Account # 7813634201
FIRST AMERICAN BANK
ABA # 071922777

FIRST AMERICAN BANK - ELK GROVE VILLAGE
700 BUSSE RD
ELK GROVE VILLAGE, IL 60007-0000

1.3    Unless a contrary indication appears, or is otherwise defined in this Agreement, a term defined in the MoA has the same meaning when used in this Agreement.

2

2.    **Appointment**

2.1    The Buyers and the Sellers hereby appoint and designate the Escrow Agent as the escrow agent for the purpose of holding the Deposit in the Escrow Account as specified in this Agreement, and the Escrow Agent accepts such appointment and designation.

2.2    The Sellers appoint Francisco Paniagua individually (the **"Sellers' Representative**") to give all instructions to the Escrow Agent on their behalf pursuant to this Agreement and the specimen signatures of the Sellers' Representative is set out in Appendix B.

2.3    The Buyers appoint Sebastian Marr individually (the "**Buyers' Representatives**") to give all instructions to the Escrow Agent on their behalf pursuant to this Agreement and the specimen signatures of the Buyers' Representative is set out in Appendix B.

2.4    The Sellers and the Buyers irrevocably agree that any act or omission by their respective Representative(s) in relation to this Agreement shall be binding on the Sellers or the Buyers (as the case may be) and that party shall be liable for such act or omission as if it was carried out by that party.

2.5    the Escrow Agent will be entitled to deduct from the Deposit any withholding taxes or other deductions required by the law of New York, as well as any bank charges of the Escrow Agent's bank and any reasonable charges for acting as escrow agents which will not exceed the sum of US$ 1000) and to deliver the Deposit to the Sellers or Buyers (as the case may be) in accordance with the instructions in this Agreement, net of any such deductions. Such deductions shall be borne equally by the Sellers and the Buyers and shall be notified and accounted to both the Buyers and the Sellers before any funds are disbursed to either party, in accordance with the terms of this Agreement.

3

3.    **Deposit**

3.1    Pursuant to the terms of the MoA, the Buyers shall pay the Deposit to the Escrow Account in accordance with the provisions of Clause 2 of the MoA and on the understanding between the parties hereto that notwithstanding anything to the contrary contained in the MoA in the event a Bankruptcy Court hearing in respect of giving the Chapter 11 Trustee authority to sign the MoA is not scheduled on or before 11th April 2017 by the Chapter 11 Trustee, the Buyers shall not be obligated to remit the Deposit to the Escrow Account.

3.2    The Escrow Agent shall confirm in writing to the Sellers and the Buyers when the Deposit is received in the Escrow Account, and hereby agrees to hold the Deposit in escrow on the basis set out in this Agreement.

3.3    The Deposit shall be retained by the Escrow Agent in the Escrow Account and shall be released only:

(a)    upon the receipt by the Escrow Agent of joint instructions purporting to be signed by a Sellers' Representative(s) and a Buyers' Representative in the form set out in Appendix A to this Agreement; or

(b)    upon the receipt by the Escrow Agent of a certified copy of an order (not capable of further appeal or in respect of which any time limit for appeal has expired) issued pursuant to clause 16 of the MoA directing the Deposit and any accrued interest to be paid to the Buyers or the Sellers as the order may direct; or

(c)    upon the receipt by the Escrow Agent of notification from either the Buyers or the Sellers that the Vessel has become a total loss together with other independent evidence of such loss in which case the Deposit and any accrued interest shall be returned to the Buyers pursuant to Clause 5(e) of the MoA; or

(d)     If the Sellers do not deliver to the Escrow Agent, with a copy to the Buyers, a countersigned copy (by email) of the MoA by 12th April 2017 in which case the deposit and any accrued interest shall be returned to the Buyers.

4

**4.**     **Notices and Instructions**

4.1     Any notice or instruction required or permitted under this Agreement shall be in writing and signed on behalf of the person giving it. Notices and instructions shall be valid and can be sent by email with the signed notice attached to the email. Notice sent by email shall be deemed to be given at the time of sending.

4.2     Any notice or instruction under this Agreement to the parties shall be delivered or sent to
If to the Sellers:
Mr. Francisco Paniagua
Email: fpaniagua@copeinca.com.pe

If to the Buyers:
Mr. Sebastian Marr
E mail: SAM@marsea.co.uk

If to the Escrow Agent:
Attn: Patrick J. O'Malley
E-mail: Pomalley@dsi.biz

**5.**     **Liability**

5.1     The Escrow Agent shall not be liable in any manner to the Sellers and/or the Buyers for any action taken or omitted to be taken in good faith by the Escrow Agent under or in connection with this Agreement, except for damages arising from wilful misconduct, Gross Negligence or fraud of the Escrow Agent.

5.2     Without prejudice to the generality of the foregoing, the Buyers and the Sellers each accept that the Escrow Agent shall be under no liability to either the Buyers or the Sellers for any failure to comply or delay in compliance, with its obligations under this Agreement or for any loss that either of the Buyers or Sellers may incur as a result of (a) the Escrow Agent's compliance with the terms of any

5

arbitration award, court order or judgment relating to the Deposit, or the MoA or (b) the liquidation, appointment of a receiver or administrator of, or any analogous proceedings relating to the Escrow Agent's bank.

5.3     The parties agree that the Escrow Agent shall be entitled to rely conclusively upon and shall be fully protected in acting upon any notice, letter, order, instruction or other document in original, copy, e-mailed or PDF form furnished to it in connection with this Agreement on behalf of the Sellers by the Sellers' Representative and on behalf of the Buyers by the Buyers' Representative.

5.3     The Buyers and the Sellers confirm that they will accept as final a statement by the Escrow Agent as to the interest earned on the Deposit and that there is no obligation on the Escrow Agent to obtain any particular rate of interest or indeed any interest at all.

5.4     The Escrow Agent shall be under no liability to either the Buyers or the Sellers for any loss that may be incurred by reason of any delay or other occurrence attributable to Escrow Agent's bank or any requirement imposed by them.

5.5     The Sellers and the Buyers, jointly and severally, covenant and agree that they will indemnify and hold harmless the Escrow Agent from and against any and all damages, losses, costs and expenses of any kind incurred by the Escrow Agent by reason of any action taken and/or any document executed by the Escrow Agent (without bad faith on their part acting in their capacity as Escrow Agent, except for the damages arising from Gross Negligence, wilful misconduct or fraud of the Escrow Agent) and each of the Sellers and the Buyers  waives, to the fullest extent permitted by law, all of its rights to bring any action or make any claim against the Escrow Agent for any action taken or document executed by the Escrow Agent (without bad faith on its part acting in its capacity as Escrow Agent and except for the damages arising from wilful misconduct, Gross Negligence or fraud of the Escrow Agent).

**6.**    **Primacy of the MoA as between the Sellers and the Buyers**

6.1    This Agreement regulates the relations of the Escrow Agent to the Sellers and
the Buyers in relation to the Deposit. As between the Sellers and the Buyers,
their rights and obligations shall be governed by the MoA in priority over the
terms of this Agreement.

**7.**    **Changes to the Agreement**

7.1    This Agreement may be amended only with the prior written consent of the
Sellers and the Buyers. No attempted amendment will otherwise be valid. If the
Sellers and/or the Buyers attempt to change this Agreement in a manner which
the Escrow Agent, in its sole discretion, deems undesirable, the Escrow Agent
may resign by notifying both the Buyers and the Sellers in writing, otherwise the
Escrow Agent may resign at any time upon 30 days' prior written notice to both
the Buyers and the Sellers. The Buyers and the Sellers may remove the Escrow
Agent at any time upon 30 days' prior written notice signed by the Buyers and the
Sellers jointly. In the event that the Escrow Agent resigns its position as escrow
agent, it will arrange the transfer of the Deposit to such account as the Buyers
and Sellers shall jointly direct.

**8.**    **Counterparts/Formal Validity**

8.1    This Agreement may be executed in any number of counterparts and by the
different parties on separate counterparts, each of which when so executed and
delivered shall be an original, but all the counterparts shall together constitute
one and the same instrument. In any event, the entering into this Agreement by
any party shall occur on the signing and transmission by e-mail of the Agreement
by that party, without prejudice to any other valid means of entering into this
Agreement.

7

**9.**    **Third Party Rights**

9.1    A person who is not a party to this Agreement has no right under the Contracts (Rights of Third Parties) to enforce or enjoy the benefit of any term of this Agreement.

**10.**    **Law and Jurisdiction**

10.1    This Agreement and any non-contractual obligations arising out of or in connection with it is governed by and construed in accordance with New York law.

10.2    Any dispute arising out of or in connection with this Agreement shall be referred to three (3) persons in New York, one to be appointed by each of the parties hereto, and the third by the two so chosen; their decision or that of any two of them shall be final, and for the purposes of enforcing any award, judgment may be entered on an award by any court of competent jurisdiction.  The proceedings shall be conducted in accordance with the rules of the Society of Maritime Arbitrators, Inc.

In cases where neither the claim nor any counterclaim exceeds the sum of US$100,000 the arbitration shall be conducted in accordance with the Shortened Arbitration Procedure of the Society of Maritime Arbitrators, Inc.

The cost of the arbitration proceeding and any proceeding in court to confirm or to vacate any arbitration award, as applicable (including, without limitation, reasonable attorneys' fees and costs), shall be borne by the unsuccessful party, as determined by the arbitrators, and shall be awarded as part of the arbitrator's award.

This Agreement has been executed by the Parties as a deed on the date stated at the beginning of this Agreement.

[*Signature Page Follows*]

8

**Executed as a deed by the <u>Sellers</u> acting by:**

Name: FRANCISCO PANIAGUA

Position: GENERAL MANAGER

Witness .................................

Name: JOSE MIGUEL TIRADO

Address: AV. FRANCISCO GRAÑA 155 LA VICTORIA LIMA-PERU.

**Executed as a deed by the <u>Buyers</u> acting by:**

Name:

Position: _____

Witness .................................

Name: .................................

Address .................................

.................................

Witness .................................

Name: .................................

Address .................................

.................................

Name:

Position: _____

**Executed as a deed by the <u>Escrow Agent</u> acting by:**

.................................

Name:

Position: _____

Witness .................................

Name: .................................

Address .................................

.................................

**Executed as a deed by the <u>Sellers</u> acting by:**

Witness ...................................

Name...................................

Name:

Address ...................................

Position: _____

...................................

**Executed as a deed by the <u>Buyers</u> acting by:**

Witness .... Stefania Oliva ....

Name: SEBASTIAN MARE

Name.... STEFANIA OLIVA ....

Position: DIRECTOR

Address .. 59 STURBRIDGE ST

LONDON SW6 3SL UK

...................................

Name: ANDREW W REGAN

Witness .... Paul M Farrar ....

Name.... PAUL FARRAR ....

Position: DIRECTOR

Address 6B South Ella Way

HU10 7LS

...................................

**Executed as a deed by the <u>Escrow Agent</u> acting by:**

Witness ...................................

...................................

Name...................................

Name:

Address ...................................

Position:

...................................

**Executed as a deed by the <u>Sellers</u> acting by:**

Witness ……………………………..

Name………………………………

Name:

Address ……………………………..

……………………………………….

Position: _____

**Executed as a deed by the <u>Buyers</u> acting by:**

Witness ……………………………..

Name………………………………

Name:

Address ……………………………..

……………………………………….

Position: _____

……………………………………….

Witness ……………………………..

Name………………………………

Name:

Address ……………………………..

Position: _____

……………………………………….

**Executed as a deed by the <u>Escrow Agent</u> acting by:**

Witness *LiVaz*

Name: *Patrick J OMalley*

Name… *Lisa Vazquez*

Address… *70 West Madison*
*Suite 2300*
*Chicago, IL 60602*

Position: *Chief Financial Officer*

……………………………………….

## <u>APPENDIX A</u>

## <u>JOINT WRITTEN INSTRUCTION TO THE ESCROW AGENT</u>

Agent:

-

-

-

-

Dear Sirs,

**Instructions under Clause 3.3 of the Escrow Agreement dated _____ 2017 ("the Escrow Agreement") relating to the sale and purchase of m.s. "Pacific Voyager" pursuant to the Memorandum of Agreement dated _____ 2017 ("the MoA")**

Terms defined in the MoA and the Escrow Agreement shall have the same meaning in this letter.

We hereby instruct you to:-

a)      release the Deposit to the [Sellers] **OR** [Buyers] *(delete as appropriate)* to the account nominated by the [Sellers] **OR** [Buyers] *(delete as appropriate)*; and

b)      credit any interest accrued on the Deposit to the account nominated by the Buyers.

Please confirm to us when the instructions have been implemented.

Yours faithfully

**<u>SELLERS' REPRESENTATIVE</u>**             **<u>BUYERS' REPRESENTATIVE</u>**


…………………………………………             ………………………………………..

Name: _____             Name:_____


Position: _____             Position: _____

**APPENDIX B**

**Seller's Signatory:**

| Name | Office Held | Signature |
|------|-------------|-----------|
| Francisco Paniagua | [Manager] | ......................... |

**Buyer's Signatory:**

| Name | Office Held | Signature |
|------|-------------|-----------|
| Sebastian Marr | [          ] | ........................... |

**APPENDIX B**

**Seller's Signatory:**

| Name | Office Held | Signature |
|------|-------------|-----------|
| Francisco Paniagua | [Manager] | ............................ |

**Buyer's Signatory:**

| Name | Office Held | Signature |
|------|-------------|-----------|
| Sebastian Marr | [ *Director* ] | ............................ |