Frederick D. Hyman
Christine A. Walsh
MAYER BROWN LLP
1221 Avenue of the Americas
New York, New York 10020
Telephone No.:  212-506-2500
Facsimile No.:  212-262-1910

*Attorneys for Malayan Banking Berhad,*
*Hong Kong Branch*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

| | |
|---|---|
| In re: | Chapter 11 |
| **CHINA FISHERY GROUP LIMITED (CAYMAN),** *et al.*, | Case No. 16-11895 (JLG) |
| Debtors.[1] | **(Jointly Administered)** |

---

### OBJECTION OF MAYBANK TO MOTION OF CERTAIN DEBTORS FOR A THIRD ORDER EXTENDING EXCLUSIVE PERIODS DURING WHICH ONLY DEBTORS MAY FILE A CHAPTER 11 PLAN AND SOLICIT ACCEPTANCES THEREOF

Malayan Banking Berhad, Hong Kong Branch ("**Maybank**"), by and through its undersigned counsel, hereby submits this objection ("**Objection**") to the Motion of Certain Debtors For a Third Order Extending Exclusive Periods During Which Only the Debtors May

---

[1]  The Debtors are N.S. Hong Investment (BVI) Limited, Super Investment Limited (Cayman) ("**Super Investment**"), Pacific Andes International Holdings Limited (Bermuda) ("**PAIH**"), China Fishery Group Limited (Cayman) ("**CFGL**"), Smart Group Limited (Cayman), Protein Trading Limited (Samoa), South Pacific Shipping Agency Limited (BVI), CFG Peru Investments Pte. Limited (Singapore) ("**CFG Peru**"), China Fisheries International Limited (Samoa), Growing Management Limited (BVI), Chanery Investment Inc. (BVI), Champion Maritime Limited (BVI), Target Shipping Limited (HK), Fortress Agents Limited (BVI), CFGL (Singapore) Private Limited, Ocean Expert International Limited (BVI), Pacific Andes Resources Development Limited ("**PARD**"), Nouvelle Foods International Ltd. (BVI), Golden Target Pacific Limited (BVI) ("**Golden Target**"), Pacific Andes International Holdings (BVI) Limited ("**PAIH BVI**"), Zhonggang Fisheries Limited ("**Zhonggang Fisheries**"), Admired Agents Limited, Chiksano Management Limited, Clamford Holding Limited, Excel Concept Limited, Gain Star Management Limited, Grand Success Investment (Singapore) Private Limited, Hill Cosmos International Limited, Loyal Mark Holdings Limited, Metro Island International Limited, Mission Excel International Limited, Natprop Investments Limited, Pioneer Logistics Limited, Sea Capital International Limited, Shine Bright Management Limited, Superb Choice International Limited and Toyama Holdings Limited.

File a Chapter 11 Plan and Solicit Acceptances Thereof (the "**Third Exclusivity Motion**")[2]
[Dkt. No. 402] in the above-captioned Chapter 11 cases (the "**Cases**").  Maybank respectfully
states as follows:

## INTRODUCTION

1.      The Debtors' creditors continue to have legitimate cause for concern regarding
the Ng family's ability to exercise sound business judgment and provide the expertise and
oversight that creditors and other interest holders should be able reasonably to expect of a
chapter 11 debtor.  These causes for concern arise from a number of aspects, which Maybank
noted at the outset of these Cases,[3] including among others: (i) the existence of questionable pre-
petition intercompany and third party transactions that have yet to be addressed by the Debtors or
their professionals, (ii) the dismissal and resignation of independent fiduciaries that had been in
place with the agreement of the Debtors prior to the commencement of these Cases, and (iii) the
utter lack of transparency and ordinary course reporting from the Debtors and their non-Debtor
affiliates while under the control of the Ng family, including the inability or unwillingness to
prepare audits.

2.      Notwithstanding the appointment of a Chapter 11 trustee for CFG Peru (the
"**Chapter 11 Trustee**") and the Moving Debtors' repeated promise of a forensic report allegedly

---

[2]      The Third Exclusivity Motion relates to the request for an extension of the exclusivity period for the
Debtors, excluding CFG Peru.  The Debtors, excluding CFG Peru, Nouvelle Foods International Ltd. (BVI), Golden
Target Pacific Limited (BVI), Pacific Andes International Holdings (BVI) Limited, Zhonggang Fisheries Limited,
Admired Agents Limited, Chiksano Management Limited, Clamford Holding Limited, Excel Concept Limited, Gain
Star Management Limited,  Grand Success Investment (Singapore) Private Limited, Hill Cosmos International
Limited, Loyal Mark Holdings Limited, Metro Island International Limited, Mission Excel International Limited,
Natprop Investments Limited,  Pioneer Logistics Limited, Sea Capital International Limited, Shine Bright
Management Limited, Superb Choice International Limited and Toyama Holdings Limited are referred to as the
"**Moving Debtors**".

[3]      *See Joinder in Respect of the Club Lender Parties' Motion for the Entry of an Order Directing the
Appointment of a Chapter 11 Trustee Pursuant to 11 U.S.C. § 1104(a)(2)* [Dkt. No. 61] at p. 2.

being prepared by RSM Corporate Advisory (Hong Kong) Limited ("**RSM Report**"), ten months into these Cases, none of these concerns have been addressed in any meaningful way and Maybank's requests for information and explanation in relation to ongoing concerns have been met with little to no response. *The Ng family has failed to take advantage of the precious opportunity afforded them during the first ten months of these Cases to take steps to repair the damaged relationships with Maybank and many of their other lenders.* They failed to take even a first step and time has now run out.

3.      For all of the reasons set forth herein, a further extension of exclusivity is not warranted.

## STATEMENT

Debtors' Disregard of Interests of Creditors Above Peru

4.      On January 11, 2017, this Court entered an order extending the Moving Debtors' exclusive periods to file Chapter 11 plans through March 31, 2017 [Dkt. No. 306]. While there were no objections to such extensions of exclusivity in light of activities of the then-newly appointed Chapter 11 Trustee, Maybank filed a statement expressing its ongoing concerns with the lack of progress in the Moving Debtors' Cases.[3] Maybank acknowledged then, and continues to recognize, that the appointment of the Chapter 11 Trustee at CFG Peru is a benefit to all interested parties in these Cases. The imposition of the Chapter 11 Trustee has eliminated interference by Ng family members with, and led to the normalization of, the Peruvian fishing

---

[3]      *See Statement Of Maybank In Response To (I) Debtors' Second Motion For An Order Extending The Exclusive Periods During Which Only The Debtors May File A Chapter 11 Plan And Solicit Acceptances Thereof And (II) Motion Of Debtor Pacific Andes Resources Development Limited For An Order Extending The Exclusive Periods During Which Only The Debtor May File A Chapter 11 Plan And Solicit Acceptances Thereof* [Dkt. No. 296].

operations.[4]   Accordingly, Maybank has no interest in interrupting the progress that has been

made in Peru and supports the ongoing efforts to maximize the value of those operations for the

benefit of their creditors.

5.      Maybank, however, is not a creditor of CFG Peru or its subsidiaries and focused

its statement on the complete failure of the Moving Debtors to provide adequate information and

investigate transactions that might lead to recoveries for those similarly situated creditors whose

claims rest above CFG Peru in the corporate structure of the Pacific Andes Group.  Four  months

later, Maybank's concerns are more pronounced as another deadline for exclusivity approaches.[5]

The Moving Debtors now brazenly seek an extension of the exclusivity periods for filing and

solicitation through December 30, 2017 and February 28, 2018, respectively, in the Third

Exclusivity Motion.

6.      Understandably, given the limits of his mandate, the Chapter 11 Trustee filed a

statement in support of the Third Exclusivity Motion.[6]  The Chapter 11 Trustee oversees the

operations and disposition of the "crown jewels" of the Pacific Andes Group which are likely a

primary source from which structurally senior creditors may see recovery.  The Chapter 11

Trustee's responsibility is to maximize the opportunities for the Peruvian operations, not to

address the interests and concerns of creditors, like Maybank, that are structurally subordinated

---

[4]      Illustrative of the Ng family's lack of oversight and proper discharge of their management duties was the Ng family's utter failure to properly deal with judicial filings against crucial operational subsidiaries in Peru, which raised the prospect of severe detriment to the "crown jewels" of the Pacific Andes Group in the event that INDECOPI, the Peruvian bankruptcy court, accepted the filings. The appointment of the Trustee enabled decisive and stabilizing action to be taken such that the filings are now withdrawn.

[5]      It is worth reiterating that CFG Peru, the Debtor for which the Chapter 11 Trustee was appointed, is only one of thirty-seven Debtors in these Cases.  The Chapter 11 Trustee does not, and has no authority to, oversee operations or investigate past transactions, among many other things, involving the Moving Debtors.

[6]      *See Chapter 11 Trustee's Statement in Support of Motion of Certain Debtors for a Third Order Extending Exclusive Periods During Which Only the Debtors May File a Chapter 11 Plan and Solicit Acceptances Thereof* [Dkt. No. 435] (the "**Trustee's Statement**").

by virtue of their claims at more senior entities in the Pacific Andes Group.  Accordingly, if an extension of exclusivity for the entire group could theoretically preserve value by minimizing "background noise" as the Chapter 11 Trustee pursues alternatives, his support for exclusivity is sensible.  But it ignores two crucial points.

7.     First, there is no evidence whatsoever that a "hands off" approach to the Moving Debtors and their non-Debtor subsidiaries is necessary to enhance the value of the Peruvian operations.  In fact the opposite is the case.

8.     Second, the interests of structurally subordinated creditors.  In the event that any proceeds are available from a capital transaction at Peru after payment of the massive claims of all creditors of CFGL and its subsidiaries, as little as 70% of such remaining amounts may be available to creditors of its direct parent, Super Investment (after payments to third-party equity holders).  Before ever reaching creditors of PARD, proceeds may be needed to pay creditors of intermediate holding companies, Richtown Development Ltd. (now in provisional liquidation in the BVI), and newly filed Debtors Golden Target and Zhonggang Fisheries.  In the very unlikely event that any proceeds are available after payment of PARD's creditors, as little as 66.45% of such amounts would be available for creditors of PAIH due to further leakage to third-party equity holders.  *The likelihood of recovery is bleak given the lack of any material operations above those in Peru and without the exploration of alternative sources of recovery.*  Another four months have been wasted.

9.     Of course, the duty to investigate the plethora of confusing and questionable intercompany and third party arrangements above CFG Peru does not fall on the Chapter 11 Trustee.  Despite his support for exclusivity, the Chapter 11 Trustee acknowledges the need for investigations in the *Status Report of the Chapter 11 Trustee* [Dkt. No. 481] (the "**Trustee's**

Report"").  The Trustee's Report identifies a troubling transaction relating to the sale of fishmeal to an entity identified as Qingdao Deep-Sea Fishing and the related outstanding receivable of $18.8 million.  *See* Trustee's Report at pp. 33-35.  The Chapter 11 Trustee notes that he found "no evidence, whatsoever, that the actual purchaser of this fishmeal was this entity and that, further, no evidence could be discerned that any entity resembling Qingdao Deep-Sea Fishing actually took delivery of this fishmeal".  *Id*. at p. 34.  The Chapter 11 Trustee explains that he "simply cannot shake the belief that this transaction was a construct in order to pull funds out of the Peruvian operations for the purposes of funding needs in Hong Kong, such as the retention of professionals and others in connection with the ongoing liquidity situation that the Pacific Andes entities then faced".  *Id*. at p. 35.

<u>Absence of Progress</u>

10.     Ten months into these Cases, the Moving Debtors are no closer to a restructuring than they were on the Petition Date, much less since the last extension of exclusivity.  They say that they used the most recent period to "regroup, take a step back, and again try to assess the best way to achieve a comprehensive restructuring through a chapter 11 plan. . . ."  Third Exclusivity Motion at ¶ 2.  Rather, they continue to wait for the Chapter 11 Trustee to rescue the Peruvian fishing operations and shield additional affiliates from investigation with new chapter 11 filings.  The Debtors have no other operations.  PARD, for example, is an investment holding company that provides corporate management services to the group.  Formerly, PARD allegedly operated a frozen fish supply chain management division comprising Pacific Andes Enterprises (BVI) Limited ("**PAE BVI**"), Parkmond Group Limited ("**Parkmond**") and Pacific Andes Food (Hong Kong) Company Limited.  This unit is defunct, with PAE BVI and Parkmond in liquidation.

11.     The Moving Debtors' misplaced reliance on the Chapter 11 Trustee ignores their responsibilities to their estates above CFGL.  In a desperate attempt to buy more time in these poorly conceived Cases, the Moving Debtors have now resorted to replacing their law firm with new bankruptcy counsel, Weil, Gotshal & Manges LLP ("**WG&M**").[7]  Although a well-respected firm, the retention of WG&M is a blatant effort by the Moving Debtors to further forestall performance of their obligations and responsibilities to their many creditors.  Unfortunately, WG&M is beholden to the same clients as prior counsel, led by senior management teams that have shown disregard for the interests of their creditors and are hopelessly conflicted with their interests throughout a web of more than 150 non-Debtor affiliated companies.

12.     As noted below, the Moving Debtors generate virtually no revenue.  It becomes incumbent on those Moving Debtors, including PARD and PAIH, in seeking an extension of exclusivity, to clearly articulate to the Court that there is an underlying business capable of restructuring.  Despite ten months having elapsed, they have failed to do so, including providing virtually no information regarding the China operations ultimately owned by PAIH.

RSM Report is Now Seven Months Late

13.     Since the June 30, 2016 petition date (the "**Petition Date**"), Maybank and the Moving Debtors' many other creditors have been asked to remain patient.  Maybank, in particular, has adjourned its Motion to Dismiss for months despite its repeated urgings for some critical review and analysis of the questionable transactions engaged in by PARD and its subsidiaries.  Rather than authorize an investigation conducted by the Moving Debtors'

---

[7]     These efforts were in motion shortly after the last extension, no later than February 14, 2017, although Maybank was not made aware of it until an announcement at the March 8, 2017 hearing regarding a discovery dispute between the Chapter 11 Trustee and HSBC.

professionals who have regularly appeared before this Court, the Moving Debtors cling to their promises of the delivery of the RSM Report for the so-called "independent committees" of PAIH and PARD and hired by the law firm of a former member of the board of directors.[8]  Ms. Jessie Ng originally indicated that the RSM Report was estimated to be completed by the end of September 2016.[9]  Later, this Court entered its Order Extending the Exclusive Periods During Which Certain Debtors May File a Chapter 11 Plan and Solicit Acceptances Thereof [Dkt. No. 256] which contemplated that the RSM Report would be delivered before the end of the first extension period, January 6, 2017.  And still the interested parties wait without any evidence that the Moving Debtors or their professionals have even commenced their own investigation into potential claims and causes of action or are willing to do so.

14.    Maybank anticipates that the Moving Debtors will again promise the delivery of the RSM Report shortly in hopes of yet another extension of exclusivity.  However, they will be doing so without any certainty regarding the scope and detail of any such report.  Moreover, even if the RSM Report is presented all these months later, this Court has already noted that it was prepared for ". . . hopelessly conflicted advisors to the Independent Review Committee charged with investigating those suspicious prepayments".[10]

---

[8]     The report is not just important to the lenders, but the Debtors themselves as expressed by Ms. Jessie Ng. She explained that "the forensic examination was and is important and the Pacific Andes Group wants it completed as quickly as possible." *Declaration of Ng Puay Yee In opposition to the Lenders' Motion for the Entry of an Order Directing the Appointment of a Chapter 11 Trustee Pursuant to 11 U.S.C. § 1104(A)(2)* filed on August 23, 2016 (the "**8/23/16 Ng Declaration**") [Dkt. No. 105]; at ¶ 33.  Moreover, the "completion of the forensic review is crucial in order to confirm that no improper conduct or activity took place, in order to allow business operations throughout the Group to return to normal." *Id*. at ¶ 35.  Given the ongoing review, Deloitte has been unable to provide an audit opinion for the fiscal year ended September 2015. *See Id*. at ¶¶ 32, 33.

[9]     *See Id*. at ¶ 35.

[10]    *Memorandum Decision and Order Granting Motion for the Appointment of a Chapter 11 Trustee* [Dkt. No. 203] at p. 39.

Payments to Insider Directors

15.    Notwithstanding the continued lack of any hint of any operations, the Moving

Debtors have since the outset of these Cases made exorbitant monthly payments to the members

of the boards of directors of PAIH, CFGL and PARD.  *Incredibly, these amounts have been paid*

*notwithstanding the statement of Moving Debtors' counsel on the record during the first day*

*hearing confirming to the Court that directors would not be receiving compensation.*[11]  As of

June 30, 2016, (a) the directors of PAIH[12] included Jessie Ng, Teng Hong Eng, Ng Joo Kwee

and Frank Ng Joo Puay, and (b) the directors of CFGL[13] included Jessie Ng, Ng Joo Kwee and

Sung Yu Ching.  As of September 29, 2016, the directors of PARD included Jessie Ng, Ng Joo

Kwee and Frank Ng Joo Puay.[14]  Not less than $1,087,599.00 in post-petition payments have

been made to directors through February 2017 over the course of less than eight months.[15]  As an

example of a typical month since filing, during February 2017, monthly payments in the

---

[11]    During the first day hearing, Debtors' counsel took the opportunity to direct the Court to Exhibit H of the *Declaration of Ng Puay Yee Pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York and In Support of Debtors' First Day Motions and Applications* filed on June 30, 2016 [Dkt. No. 2] ("**6/30/16 Ng Declaration**").  Exhibit H of the 6/30/16 Ng Declaration identifies the following projected monthly salaries for "employees" of PAIH:  (i) $26,641.03 to Teh Hong Eng, (ii) $19,230.77 to Jessie Ng, (iii) $25,641.03 to Ng Joo Kwee, and (iv) $20,512.82 to Ng Joo Puay, among others.

> "MR. KLEINBERG: I should mention that -- well, Pacific Andes International Holdings has listed employees who are directors. So we listed the employees – the directors as employees for the sake of disclosure. But –
> THE COURT: Are you saying that the –
> MR. KLEINBERG: *But the directors are not going to be receiving compensation.*" [emphasis added].

> July 11, 2016 Hrg. Trans.; p. 38, lines 4-10.

[12]    *See* 6/30/16 Ng Declaration at Exhibit G; PAIH petition [Case No. 16-11890; Dkt. No. 1].

[13]    *See* 6/30/16 Ng Declaration at Exhibit G; CFGL petition [Case No. 16-11895; Dkt. No. 1].

[14]    *Declaration of Ng Puay Yee Pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York and In Support of Debtor's First Day Motions and Applications* filed on October 10, 2016 [Case No. 16-12739, Dkt. No. 13] ("**10/10/16 Ng Declaration**") at Ex. G.

[15]    The post-petition period of July 2016 to March 2017 for PAIH and CFGL and the post-petition period of October 2016 to February 2017 for PARD is captured by the monthly operating reports filed, to date, in these Cases.

aggregate amount of $117,265.00 were made to members of the boards as follows: (i) $62,564.00 to the directors of PAIH, (ii) $29,393.00 to the directors of CFGL and (iii) 25,385.00 to the directors of PARD.  *See* Monthly Operating Report for the period ended February 28, 2017 ("**February MOR**"), pp. 42-43 [Dkt. No. 386].  In March 2017, the Moving Debtors actually increased the payment to the directors of PARD to $132,589.00.  *See* Monthly Operating Report for the period ended March 31, 2017 ("**March MOR**"), p. 29 [Dkt. No. 465].

16.     A review of the Moving Debtors' Monthly Operating Reports filed during these Cases reflects that these payments to directors have been made consistently each month during the course of these Cases.  While many of the creditors of the Moving Debtors' estates have received no payments on account of principal, interest, fees or costs, whether from the Moving Debtors or the non-Debtor borrowers, the directors, led by members of the Ng family, have seemingly managed to siphon more than $1 million to date on account of post-petition directors fees and salaries during the first nine months of these Cases.[16]  The Moving Debtors will no doubt respond explaining that payments were disclosed in monthly operating reports.  The mere fact that a single line item for "Directors Salaries" was included in monthly operating reports cannot excuse the undeniable fact that counsel stated on the record that such amounts would not be paid.

17.     The Moving Debtors may seek shelter by arguing that these amounts are instead salaries for payment in consideration of services they provide for  PAIH, PARD and CFGL.  A detailed explanation of the monthly activities that these individuals actually performed for PAIH, PARD and CFGL -- each a holding company -- would be welcome.  In her first day declaration for PARD, Jessie Ng summarized the responsibilities of Ng Joo Kwee, explaining that he

---

[16]     Of course, we cannot know how much more these same members of the Ng family have received from those more than 150 non-Debtor affiliates that are within their control.

"oversees sourcing, marketing activities of the Group" and Ng Joo Puay as being "responsible for overall general administration, human resources matters of the Group". *See* 10/10/16 Declaration at Ex. G. Such services seem particularly unnecessary for a holding company with no operations.

<u>Reliance of Non-Debtor Revenue</u>

18. Payments to directors are made despite the fact the Moving Debtors *generate virtually no revenue and began March 2017 with almost no cash to fund any ongoing expenses. See* March MOR, p. 6. During the month of March 2017 the Moving Debtors generated a total of $12,054.00 (of which $10,937.00 constitutes "rental income"). *Id.* Instead, substantially all cash needed to support the Moving Debtors' non-existent operations and pay ongoing directors' fees and salaries is generated by non-Debtor entities outside the jurisdiction and review of this Court. Despite repeated requests during the course of these Cases, the Debtors have only provided very limited information regarding the source of funds to these non-Debtor affiliates.

19. As a result, these Cases proceed on a month-to-month basis, with no assurance that funds will be made available from Ng family-managed non-Debtors to cover expenses for the following month. As they do, the claims against the Moving Debtors grow, further impairing the already dim prospects for recovery for creditors of their estates.

<u>Operations in China are Irrelevant</u>

20. In order to deflect attention from the lack of any true operating business, the Moving Debtors note that management has been busy taking steps to re-engineer the processing and sales segments of the business and site to "significant processing operations in China." *See* Third Exclusivity Motion at ¶ 7; Declaration of Geoffrey A. Walsh in Support of the Joint Motion Pursuant to 11 U.S.C. 1121(D) For Third Extension of Exclusive Periods (the "**Walsh**

Declaration") at ¶ 7.  Presumably the Moving Debtors and Mr. Walsh[17] are referring to the

business of Pacific Andes Food (BVI) Limited ("**PAF BVI**") and its subsidiaries, Qingdao

Pacific Andes Intl. Trading Co. Ltd. ("**Qingdao**") and Pacific Andes Food Limited (PRC) ("**PAF**

**PRC**").  PAF BVI along with Pacific Andes Treasury Management Ltd (BVI) ("**PATM**") are

subsidiaries of PAIH BVI, a more recent Debtor.  PATM is the borrower under a $100 million

credit facility with Maybank ("**Maybank PATM Facility**") which is secured by share pledges

covering the equity of PAF BVI and PAF PRC.  PAF PRC and Qingdao are also borrowers

under a various credit facilities with banks from mainland China (the "**PRC Banks**") in an

aggregate principal amount outstanding as of the Petition Date of not less than $174 million and

which are now allegedly secured by the Qingdao factory (notwithstanding that original title for

which was delivered to Maybank).[18]  Presumably, the borrowers remain in compliance with their

payment obligations to the PRC Banks under these facilities, while Maybank has not paid debt

service since approximately July 2016.

21.    It is inconceivable that these operations will ever generate meaningful value for

the Moving Debtors given their significant debts and proven inability to pay interest on the

Maybank PATM Facility (and perhaps others).  Unfortunately this cannot be tested because

operating and financial information regarding these entities, like all other non-Debtor affiliates,

---

[17]    According to the Walsh Declaration, Mr. Walsh is the Group Director of Public Affairs and
Communications for the Debtors.

[18]    As of the Petition Date, PAF PRC was the borrower under (i) one of the "ABC Facilities" in the
outstanding principal amount of approximately $29,183,307, (ii) the "Huaxia Bank Facilities" in the outstanding
principal amount of approximately $16,706,923, (iii) the "China Minsheng Loan" in the outstanding principal
amount of approximately $29,230,769, (iv) one of the "CITIC Bank Facilities" in the outstanding principal amount
of approximately $7,692,307, (v) the "Bank of Communications Facilities" in the outstanding principal amount of
approximately $27,071,759, and (vi) the "ICBC Facilities" in the outstanding principal amount of approximately
$24,675,731.  *See* 6/30/16 Ng Declaration at ¶¶ 88-93.  Moreover, as of the Petition Date, Qingdao was the borrower
under (i) one of the "ABC Facilities" in the outstanding principal amount of approximately $11,846,153, (ii) one of
the "ICBC Facilities" in the outstanding principal amount of approximately $5,935,840, and (iii) one of the "CITIC
Bank Facilities" in the outstanding principal amount of approximately $22,153,846.  *See* 6/30/16 Ng Declaration at
¶¶ 88-91.  Each of these facilities, with the sole exception of the Maybank facility, are secured by the Qingdao
factory.  *See* 6/30/16 Ng Declaration at ¶¶ 88-93.

remains outside the reach of this Court and these creditors. There has been and remains no transparency from the Moving Debtors as to the function or value of these "significant processing operations," including how their debt profile or intercompany arrangements may affect the interests of creditors

22.    Any assertion that re-energized efforts of management on behalf of PAF BVI and its subsidiaries should be considered in connection with the Third Exclusivity Motion is absurd.

<u>Continued Down-streaming of Payments</u>

23.    Of great concern, the boards of directors of non-Debtor affiliates, presumably constituted with Ng family members, opt to downstream monies to the Moving Debtors for the primary purpose of paying director fees and to a much lesser extent, certain costs. The Moving Debtors explain that the payments by non-Debtor Pacific Andes Enterprises (HK) Limited ("**PAE HK**") are recorded in their books and records as amounts paid on behalf of PAE BVI and reflected as payables owing from the Debtors to PAE BVI. *See* February MOR at p. 4. Regardless, the directors of PAE BVI, upon receipt of a dividend from PAE HK, allowed the transfer of monies to the Moving Debtors for payment of directors' fees while its direct subsidiary PATM, remains in default under its credit facility with Maybank. This has been repeated month after month during these Cases.[19]

24.    These concerns have caused Maybank to make various informal inquiries of the Moving Debtors during these Cases, including with respect to the pre-petition payment histories behind the array of intercompany transactions. The Moving Debtors' inability and/or unwillingness to provide material responses to many inquiries is striking. The Monthly

---

[19]    In addition to directors' fees and salaries, PAE HK and other non-Debtor affiliates have made cross-stream and down-stream payments for such liabilities as staff salaries, electricity bills and building management fees on behalf of the Moving Debtors. Despite inquiry from Maybank, no explanation or rationalization for such payments has been provided by the Moving Debtors or their advisors.

Operating Reports for October, November and December 2016[20] evidence payments by PARD of $18,245, $10,962 and $11,410, respectively, for "[b]ondholders and corporate communication". *See* October MOR at p. 44; November MOR at p. 44; and December MOR at p. 43. Later, the description of the line item in the February MOR was changed to "[c]orporate communication" and the amount only $451. *See* February MOR at p. 43. This change suggests that post-petition payments, whether for interest or fees, were made to or for the benefit of PARD's bondholders during these Cases without authorization, perhaps in an effort to ensure their cooperation. This Court, the Office of the United States Trustee and the lenders are entitled to an answer to Maybank's straightforward inquiry from February.

Liquidators' Investigations

25.    It seems that the only progress that has been made with respect to these Moving Debtors has been by Nicholas James Gronow, Ian Morton and Joshua Taylor, each of FTI Consulting, as joint and several liquidators appointed by the BVI Court (the "**Liquidators**") with respect to PAE BVI, Parkmond, PARD Trade Limited, Solar Fish Trading Limited ("**Solar Fish**") and Europaco Limited (BVI). In their role, the Liquidators have conducted a thorough investigation into certain intercompany transfers and transactions made by certain entities within the Pacific Andes Group, including significant payments to PAE HK.

26.    As a creditor of certain of the Pacific Andes group entities in liquidation in the BVI, Maybank has received copies of the reports issued by the Liquidators as part of their obligations in that office. One such report of the Liquidators dated February 13, 2017 indicates that PAE HK, one of the non-Debtor entities through whom payments are channeled as outlined above, has received millions of dollars from entities the subject of the Liquidators' investigations and parties to the suspicious transactions giving rise to material concerns.

---

[20]    These are the first three months for which the monthly operating reports included PARD.

27.    These investigations have also formed the basis of a series of proofs of claim filed in these Cases to preserve rights of the creditors of those entities in liquidation (the "**Liquidators' POCs**").  *See e.g.* Liquidators Proof of Claim; Case No. 16-11985; Claim No. 107.  The addenda to the Liquidators' POCs are striking, briefly summarizing their findings as of their filing date based on the limited books and records then in their possession, and of great concern to Maybank and certain other creditors actively involved in these Cases.

28.    The allegations made in the Liquidators' reports and the Liquidators' POCs are also troubling to the Chapter 11 Trustee.  The Chapter 11 Trustee and his staff have reviewed more than 300 pages of materials and exhibits which present potentially fraudulent activity on the part of several entities with respect to the procuring of trade finance.  *See* Trustee's Report at pp. 37-40.  Maybank extended trade finance to PAE BVI, guaranteed by Parkmond and PARD. That trade facility remains unpaid.  Banks, such as Maybank, in providing trade finance facilities, do so under pledge and trust arrangements.  This is standard practice in providing trade finance facilities.  PAE (BVI) would request remittance of payment to a third party, such as Solar Fish, declaring that the underlying trade transactions are genuine.  The trust receipt executed on behalf of PAE (BVI) would state that the relevant fish, the subject of the purchase order, between PAE (BVI), as buyer, and Solar Fish, as seller, has been "hypothecated to the Bank as collateral security for the due acceptance and payment of the undermentioned draft drawn upon [PAE (BVI)]."  Accordingly, Maybank becomes the owner of the cargo (in this case fish) and the proceeds of any sale of the fish are owned by Maybank.  PAE (BVI) agrees to sell the fish as Maybank's agent, and to hold the proceeds as Trustee for Maybank and account to Maybank in that regard.  To date Maybank has trust receipts of approximately $47.8 million in principal owing.  No explanation has been given to Maybank as to the whereabouts of the fish or proceeds

derived from the sale of fish supposedly acquired through its trade finance. The Chapter 11 Trustee has been in communication with David Sutherland and others who have led him to believe that the RSM report will address these allegations and "hopefully counter them in their entirety." *See* Trustee's Report at p. 40. Based solely on the sheer volume of material produced by the Liquidators to date, it is highly doubtful that an RSM Report, if delivered, can vindicate the Pacific Andes Group and will more likely represent an attempt to whitewash the many suspicious transactions related to Russian prepayments, trade finance fraud and other matters.

## OBJECTION

29.     Section 1121(d)(1) of the Bankruptcy Code gives the Court discretion to extend the exclusivity period *for cause*. *See* 11 U.S.C. § 1121(d)(1). Requests to extend exclusivity should be granted neither routinely nor cavalierly, particularly where such requests are opposed by major constituents. *See In re Curry Corp.*, 148 B.R. 754, 756 (Bankr. S.D.N.Y. 1992) ("This court will not routinely extend the exclusivity period absent a showing of 'cause' when creditors object to such requests for extensions. In the face of such an objection, a debtor must establish more than that it is still in the process of preparing financial projections.").

30.     Factors to be considered when determining if cause exists include: (a) size and complexity of the case, (b) necessity of sufficient time to negotiate and prepare adequate information, (c) existence of good faith progress towards reorganization, (d) whether the debtor is paying its debts as they become due, (e) whether the debtor has demonstrated reasonable prospects for filing a viable plan, (f) whether the debtor has made progress in negotiating with its creditors, (g) the amount of time which has elapsed in the case, (h) whether the debtor is seeking an extension to pressure creditors and (i) whether or not unresolved contingencies exist. *See In re Adelphia Commc'ns Corp.*, 352 B.R. 578, 587 (Bankr. S.D.N.Y. 2006). Considering these

factors, the circumstances of the Moving Debtors' Cases do not merit a further extension of exclusivity.

**A.      No Good Faith Progress Has Been Made To Date.**

31.      The Moving Debtors argue that they are making good faith progress toward a plan of reorganization. *See* Third Exclusivity Motion at ¶ 25. They point to the retention of WG&M and continued retention of RSR Consulting, LLC and Goldin Associates and note that the professionals have been working "to develop alternative plan structures and analyze their viability under the present circumstances . . . ." *Id*. Further, they explain that RSR has assisted the Moving Debtors in connection with their reporting requirements under the Cash Collateral Order. *Id*. Absent any investigation into questionable transactions, in light of the ongoing payments to directors of the Moving Debtors despite declarations that they would not do so and the absence of any meaningful business or operations that can be restructured, the Moving Debtors' assertion of good faith progress is made without support.

32.      The Moving Debtors have made virtually no progress to date and have not shown that they will use any additional time to effectively reorganize. *See, e.g., In re McLean Indus., Inc.*, 87 B.R. 830, 834 (Bankr. S.D.N.Y. 1987) ("[W]here a debtor is wasting its opportunity, or is incapable of formulating a plan, exclusivity will be shortened."); *see also In re Amko Plastics, Inc.*, 197 B.R. 74, 77 (Bankr. S.D. Ohio 1996) (in considering an extension of a debtor's exclusivity period, courts often assess a debtor's progress towards rehabilitation and development of a consensual plan).

33.      "In virtually every case where an extension has been granted, the debtor has shown substantial progress has been made in formulating a plan during the first 120 days." *In re Southwest Oil Co. of Jourdanton, Inc.,* 84 B.R. 448, 451 (Bankr. W.D. Tex. 1987). Indeed, the

legislative history to Section 1121(d) of the Bankruptcy Code indicates that the granting of an exclusivity extension would be based "on a showing of some promise of probable success [for reorganization]."  H.R. Rep. No. 95–595, 95th Cong., 1st Sess. 406 (1977); S. Rep. No. 95–989, 95th Cong., 2d Sess. 118 (1978), reprinted in 1978 U.S.C.C.A.N., 5787, 5904.

**B.      Size and Complexity Is Not a Defense To Failing To Begin Working.**

34.      It is customary in large, complex cases for an extension of exclusivity to be given as it may be unrealistic that the plan formulation and negotiation process be completed in the first 120 days of the case.  But the whole intention of this statutory milestone is to encourage (if not require) substantive progress be underway and demonstrable when seeking an extension. Needing more time is different than having not begun and the size and complexity of these Cases has not changed dramatically since the Petition Date.  Size and complexity alone are not a basis for an extension without a showing of progress.

**C.      There Exists No Reasonable Prospect For a Viable Plan.**

35.      The Moving Debtors state that the prospects for viable chapter 11 plans have now presented themselves with the passing of El Nino and the normalization of operations in Peru. *See* Third Exclusivity Motion at ¶ 32.  It is clear from this simple assertion that the Moving Debtors have no interest in pursuing any other avenues of recovery.  Instead, they are content to wait and formulate a hypothetical plan that allocates uncertain value from Peru to creditors throughout the many levels capital structure.  Such a proposed plan, which cannot provide payment in full to all creditors above Peru and which will no doubt seek broad releases and exculpation for Ng family members, has no reasonable likelihood for success.

**D.    The Request is Directed at Pressuring Creditors
        to Submit to the Moving Debtors' Demands.**

36.    With each day that these Cases continue in their current state, the Moving
Debtors' creditors must continue to fund the costs and expenses of their own professionals, hired
from across the world to protect their interests in a venue in which many of them have little
experience.  Each passing day is also another day that the Moving Debtors and their non-Debtor
affiliates ignore their payment, reporting and other affirmative obligations owing to creditors of
the Moving Debtors (although perhaps not their other creditors with no exposure to the Moving
Debtors).

37.    The Moving Debtors would have this Court believe that they sought an extension
in order to "reset their footing with creditors that may have doubts . . ." and that they are not
"seeking . . . to hold creditors hostage to an unsatisfactory plan proposal."  Third Exclusivity
Motion at ¶ 33.  Were that true, they would have requested a brief extension for 60-days to allow
their new counsel to finalize a proposal.  Instead, the Moving Debtors sought an extension for
nine months that is intended to test their creditors' ongoing resolve to meaningfully participate in
these Cases.

**E.    Existence of Issues to Be Resolved is Not a Sufficient Basis to Extend Exclusivity.**

38.    The Moving Debtors continue to hide behind the uncertain outcomes associated
with (i) the Chapter 11 Trustee's efforts in Peru, (ii) the issuance of the Chapter 11 Trustee's
report, (iii) the issuance of the RSM Report, (iv) analyzing intercompany and third party claims
and (v) "formulating, negotiating, and implementing a restructuring plan. . . ."  Third Exclusivity
Motion at ¶ 35.  The Moving Debtors offer no explanation as to how these events or work
streams justify an extension of exclusivity.  Of course they recognize that the elusive RSM
Report and the analysis of intercompany and third party claims (many of which they have long

19

been aware of) could not possibly represent "unresolved contingencies" that justify a further extension of exclusivity.  The Moving Debtors only express an opinion that the Peruvian fishing operations are seemingly doing well and note that the Chapter 11 Trustee's report will assist in "evaluating the best path for the Peruvian Fishmeal Operating Companies and, as a result, the rest of the Debtors."  Third Exclusivity Motion at ¶ 37.

39.    The actions (and inaction) of the Moving Debtors and their non-debtor affiliates have served to thwart the reasonable expectations of foreign lenders and creditors in the exercise of their contractual and statutory rights under indisputable foreign law.  The existence of work streams does not alone do not justify "cause" to extend exclusivity.  The Moving Debtors have not indicated, as would be expected, certain road blocks or positions of the parties, that may be taking longer to overcome than the current exclusive period allows for.  Instead, the Moving Debtors have literally not even begun, for no apparent reason, responding to, working with, or formulating a plan for the Moving Debtors.  This is simply not a justification to buy more time.

## **ALTERNATIVE RELIEF**

40.    In the event that the Court is inclined to grant the Moving Debtors an extension of exclusivity over Maybank's objection, Maybank submits that exclusivity should be granted for no longer than 60 days from the hearing on the Third Exclusivity Motion and that such extension be conditioned on the following:

(a)  The Debtors and their non-Debtor affiliates shall be directed to cooperate with the Liquidators in a manner that will permit them to complete their investigations in a timely manner, including, without limitation,  (i) providing written authority to obtain documents from banks in relation to all Pacific Andes Group companies and, where required by any bank, consent to a court order allowing them access to obtain such

banking documents, (ii) providing copies of documents and records that have been (and may be) provided to RSM and other professionals that have investigated the Pacific Andes Group's operations (together with the RSM Report and related back-up to the extent delivered), (iii) lists of bank accounts and copies of bank statements of members of the Pacific Andes Group as may be requested by the Liquidators, (iv) providing copies of documents evidencing any purchases or sales of fish by or from members of the Pacific Andes Group and related payments, (v) providing aged receivables trial balance for PAE and Parkmond for specified periods, and (vi) providing documents detailing prepayments and refunds involving Solar Fish and others for specified periods; and in the event that the Debtors or their non-Debtor affiliates fail to cooperate, the Liquidator or other interested party shall be entitled to seek and expedited hearing to compel production of information.

(b)  Neither the Debtors nor their non-Debtor affiliates shall pay any fees to members of the boards of directors of any Debtor; provided, however, that the Debtors shall be permitted to pay reasonable salaries for services actually rendered (which shall be supported by specific descriptions of the activities of any member receiving payments and a certification by David Sutherland that such payments are reasonable in light of the services rendered); and each member of the Ng family that has received fees and salaries since the Petition Date shall return all such fees and salaries to the Debtors.

(c)  David Sutherland shall conduct monthly conference calls with the lenders to provide an update of his activities for the Pacific Andes Group and will also make himself available upon reasonable request.

(d)  No later than May 26, 2017, the Debtors shall provide the lenders with a detailed overview of the business and operations of the PAF BVI, PAF PRC, Qingdao, and other Pacific Andes Group entities operating in China, including responses to the information request delivered by Maybank to the Moving Debtors on April 18, 2017.

(e)  No later than May 26, 2017, the Debtors shall deliver to the lenders a schedule showing the current and former members of the board of directors of each of the Debtors and their non-Debtor affiliates.

(f)  The provisions of paragraphs 3-5 of the Order Extending the Exclusive Period During Which Certain Debtors May File a Chapter 11 Plan and Solicit Acceptances Thereof [Dkt. No. 256] shall remain binding.

(g)  No later than June 30, 2017, the Debtors shall deliver to the lenders a detailed term sheet with respect to a plan of reorganization for the Debtors which shall demonstrate the mechanism for delivering the proceeds or value of the operations in Peru and China, and which shall include proposed treatment of intercompany and affiliate claims.

## CONCLUSION

WHEREFORE, Maybank respectfully requests that the Court enter an order (i) denying the Third Exclusivity Motion in its entirety, (ii) alternatively, limiting any extension to 60 days from the date of the hearing on the Third Exclusivity Motion and conditioning such extension on the items detailed in paragraph 40 above, and (iii) granting such further relief as may be just and necessary under the circumstances.


Dated:  May 5, 2017
      New York, New York


               **MAYER BROWN LLP**

      By:    /s/  Frederick D. Hyman
               Frederick D. Hyman (FH7832)
               Christine A. Walsh (CW9533)
               MAYER BROWN LLP
               1221 Avenue of the Americas
               New York, New York 10020
               Telephone No.:  212 506-2500
               Facsimile No.:  212 262-1910


               *Attorneys for Malayan Banking Berhad,*
               *Hong Kong Branch*