DLA PIPER LLP (US)
R. Craig Martin (RM1971)
Mordechai Y. Sutton (MS5781)
1251 Avenue of the Americas
New York, New York 10020
Telephone: (212) 335-4500
Facsimile: (212) 335-4501

DLA PIPER LLP (US)
Richard A. Chesley (admitted *pro hac vice*)
John K. Lyons (admitted *pro hac vice*)
Jeffrey S. Torosian (admitted *pro hac vice*)
444 West Lake Street, Suite 900
Chicago, Illinois 60606
Telephone: (312) 368-4000
Facsimile: (312) 236-7516

*Counsel to the Club Lender Parties*

**UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>CHINA FISHERY GROUP LIMITED (CAYMAN), *et al.*,<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 16-11895 (JLG)<br><br>(Jointly Administered) |

**CLUB LENDER PARTIES' JOINDER TO OBJECTION OF MAYBANK**
**TO THE MOTION OF CERTAIN DEBTORS FOR A THIRD ORDER EXTENDING**
**EXCLUSIVE PERIODS DURING WHICH ONLY THE DEBTORS MAY**
**FILE A CHAPTER 11 PLAN AND SOLICIT ACCEPTANCES THEREOF**

Coöperatieve Rabobank U.A. Hong Kong Branch ("**Rabobank**"), Standard Chartered Bank (Hong Kong) Limited ("**SCB**"), and DBS Bank (Hong Kong), Limited ("**DBS**" and, together with Rabobank and SCB, the "**Club Lender Parties**"), by and through their

---

[1] The Debtors are N.S. Hong Investment (BVI) Limited, Super Investment Limited (Cayman), Pacific Andes International Holdings Limited (Bermuda), China Fishery Group Limited (Cayman), Smart Group Limited (Cayman), Protein Trading Limited (Samoa), South Pacific Shipping Agency Limited (BVI), CFG Peru Investments Pte. Limited (Singapore) ("CFG Peru"), China Fisheries International Limited (Samoa), Growing Management Limited (BVI), Chanery Investment Inc. (BVI), Champion Maritime Limited (BVI), Target Shipping Limited (HK), Fortress Agents Limited (BVI), CFGL (Singapore) Private Limited, Ocean Expert International Limited (BVI) and Pacific Andes Resources Development Limited ("PARD"), Nouvelle Foods International Ltd. (BVI), Golden Target Pacific Limited (BVI), Pacific Andes International Holdings (BVI) Limited, Zhonggang Fisheries Limited, Admired Agents Limited, Chiksano Management Limited, Clamford Holding Limited, Excel Concept Limited, Gain Star Management Limited, Grand Success Investment (Singapore) Private Limited, Hill Cosmos International Limited, Loyal Mark Holdings Limited, Metro Island International Limited, Mission Excel International Limited, Natprop Investments Limited, Pioneer Logistics Limited, Sea Capital International Limited, Shine Bright Management Limited, Superb Choice International Limited and Toyama Holdings Limited.
.

undersigned attorneys, DLA Piper LLP (US), hereby join in the objection (the "**Maybank Objection**") of Malayan Banking Berhad, Hong Kong Branch ("**Maybank**") to the *Motion of Certain Debtors for a Third Order Extending Exclusive Periods During Which Only the Debtors May File a Chapter 11 Plan and Solicit Acceptances Thereof* [Dkt. No. 402] (the "**Third Exclusivity Motion**"),[2] and respectfully state as follows:

## INTRODUCTION

In the Third Exclusivity Motion, the Moving Debtors seek an excessive nine month extension of the Exclusive Periods from the time the Third Exclusivity Motion was filed (and have already gotten six weeks of consensual time of that nine months), notwithstanding that they have not demonstrated any progress over the last ten plus months towards developing any viable plan or even complying with their duties as debtors. Indeed, a key deliverable in these cases—a report being prepared by RSM Corporate Advisory (the "**RSM Report**")—has been long promised but is still nowhere in sight. Even if it were, it likely will leave many unanswered questions and give continued hue and cry to the obvious need for an independent investigation free from the Moving Debtors' influence. Additionally, the Moving Debtors made representations to this Court that certain board members would not be paid salaries, and yet, the Moving Debtors' monthly operating reports reveal significant payments to directors. The Moving Debtors have also previously indicated that they would file a plan term sheet followed by a plan, which was then embodied in a prior Court order on exclusivity; however, they have failed to make this deliverable. These actions and omissions are indicative of why the creditors in these cases simply cannot trust the Moving Debtors and their management.

---

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Maybank Objection.

In short, nothing has changed since the late-August trial on the Club Lender Parties' trustee motion, and the Moving Debtors continue to place more debtors with little (or absolutely no) assets or connections to the United States in bankruptcy. These filings appear to be a tactical use of chapter 11 to thwart creditor scrutiny and to ensure that an independent investigation into intercompany claims and transfers of cash never occur, all in the face of efforts by court-appointed officials in jurisdictions where these Debtors are domiciled to conduct necessary investigations. It is time for the Moving Debtors' use of chapter 11 as a sword rather than a shield to end. Of the available remedies and options (*e.g.*, further appointment of trustees, an examiner, or lifting the stay; each of which may be appropriate at some point), termination of exclusivity will ensure creditor balance in these cases in an efficient way with the least need for litigation.

The creditors in these cases should be given the chance to formulate a plan should they elect to do so because they have proven capable of working together to accomplish more in these cases than the Debtors. Terminating exclusivity will give creditors the option, should they elect to exercise it, to begin plan discussions that likely would lead to a rather straightforward plan that respects the priorities of the Bankruptcy Code, creates a trust to pool the Debtors' remaining assets (including causes of action, many likely against insiders that remain in control of the Debtors), and create a mechanism for the monetization of these assets for distribution to creditors.

The Debtors could have and should have proposed such a plan long ago (indeed a prior order extending exclusivity required it). The Moving Debtors have proven unable and unwilling to formulate and propose a plan in a timely fashion. The chapter 11 trustee is focused on maximizing the value of the Peruvian assets, and should remain focused on those efforts rather

than engaging in upstream plan discussions or commencing upstream forensic investigations, which capable and competent court-appointed officials in the British Virgin Islands can perform. As such, the Trustee should not at this time be the party to take on a plan formulation role. This leaves the creditors as the most appropriate party to be given the chance to put together the straightforward plan for which these cases cry out. The creditors are capable of crafting and proposing a sensible plan long before nine months pass should they elect to do so. Of course, should they elect not to do so, the Moving Debtors will not be prejudiced by the termination of exclusivity as they will continue to have the right to file a plan—just not the exclusive right.

This result should follow naturally from the facts and circumstances of these cases as plan exclusivity is not an unfettered right or some *per se* debtor entitlement to be granted as and when asked for. Rather, as reflected in the legislative history and governing case law, it is a privilege that must be earned by a debtor based on, among other things, good faith progress towards a confirmable chapter 11 plan, dutiful compliance with responsibilities and fiduciary duties to creditors and the estates, and a realistic prospect for a confirmable plan under the circumstances of the cases.

The record of these cases demonstrates that the Moving Debtors have not earned any further extension of exclusivity. The Moving Debtors' and their ultimate equity owners'[3] actions and practices before and since the commencement of these cases have been characterized by broken promises, questionable and suspicious intercompany and third party transactions, and lack of transparency with creditor constituencies. The Moving Debtors have failed in their duties to this Court and creditors and, through actions and inaction, have stalled and appear to be using

---

[3] The Ng family owns the ultimate equity stake by virtue of an equity interest in Debtor N.S. Hong Investment (BVI) Limited ("**N.S. Hong**"). Equity is woefully out of the money, however, which further mitigates against continued exclusivity.

chapter 11 to impede legitimate investigations by court-appointed officials in the British Virgin Islands.

The Moving Debtors have not earned the privilege of extended exclusivity and should not be rewarded with an extension by this Court. Accordingly, the Club Lender Parties oppose the relief requested in the Third Exclusivity Motion, and hereby join in the Maybank Objection on the same grounds as set forth therein and incorporate by reference herein the arguments and legal support set forth in the Maybank Objection.

## RELEVANT BACKGROUND

A.    **Prior Exclusivity Extension Requests.**

1.    On June 30, 2016, each of the Moving Debtors, other than PARD, filed with this Court voluntary petitions for relief under chapter 11 of the Bankruptcy Code. PARD filed a voluntary petition for relief on September 29, 2016.

2.    On October 7, 2016, the Moving Debtors filed their first motion requesting an extension of the Exclusive Periods by an additional 150 days. *See* Dkt. No. 166.

3.    Following a hearing, the Court entered an order extending the Exclusive Periods through January 6, 2017 and March 9, 2017, respectively. *See* Dkt. No. 256 (the "**First Exclusivity Order**"). The First Exclusivity Order required the Moving Debtors to deliver to various creditor constituencies, on or before December 16, 2016, a plan term sheet along with an accompanying business plan. *See* First Exclusivity Order at ¶ 7. This deadline has long since passed, and the Moving Debtors have yet to provide creditors with any plan term sheet or business plan.

4.    The First Exclusivity Order also required the Moving Debtors to deliver to various creditors, including the Club Lender Parties, the final RSM Report being prepared by

EAST\141512114.3                                    5

RSM Corporate Advisory for the independent review committees of PAIH and PARD. Again, more than four months later, the Club Lender Parties have yet to receive any version of the RSM Report or sufficient updates required by the First Exclusivity Order regarding the status of that report.

5. On December 16, 2016, the Moving Debtors filed their second motion requesting an extension of the Exclusive Periods through March 31, 2017 and May 31, 2017, respectively. *See* Dkt. No. 281. An order was entered on January 11, 2017, granting the requested extensions. *See* Dkt. No. 306.

6. On March 24, 2017, the Moving Debtors filed the Third Exclusivity Motion requesting a further extension of the Exclusive Periods through December 30, 2017 and February 28, 2018, respectively. *See* Dkt. No. 402.

B.   **Trustee Report and Certain Intercompany and Third Party Transactions.**

7. On April 24, 2017, the chapter 11 trustee (the "**Trustee**") for CFG Peru Investments Pte. Limited (Singapore) ("**CFG Peru**") filed a status report (the "**Trustee Report**") detailing, among other things, his efforts to date with respect to the Peruvian Opcos (as defined in the Trustee Report) and potential means for monetizing and/or maximizing value therefrom.

8. The Trustee also describes various "troubling" transactions and findings with respect to the Debtors' and their non-Debtor affiliates' operations and recordkeeping. For example, the Trustee discusses an $18.8 million receivable from Qingdao Deep-Sea Fishing ("**Qingdao**") in connection with a purported delivery of fishmeal. *See* Trustee Report at 33–34. The Trustee, however, was unable to find any evidence that Qingdao actually purchased or received delivery of the fishmeal, and "cannot shake the belief that this transaction was a construct in order to pull funds out of the Peruvian Opcos for the purposes of funding needs in

Hong Kong, such as the retention of professionals and others in connection with the ongoing liquidity situation that the Pacific Andes entities then faced." *Id.* at 34–35.

9. In addition, the Trustee discusses reports prepared and issued by Nicholas Gronow, Joshua Taylor, and Ian Morton of FTI Consulting (the "**BVI Liquidators**"), who were appointed by the BVI Court to serve as liquidators over several Pacific Andes group entities. The Trustee notes that the reports reveal "intimations and indications of fraud on the part of [several entities for which the BVI Liquidators serve by court appointment] with respect to the procuring of trade finance." *Id.* at 40.

10. Other troubling actions by the Debtors include the continued payment of excessive fees to the Debtors' directors, notwithstanding that Debtors' counsel represented to this Court at the outset of these cases that "the directors are not going to be receiving compensation." July 11, 2016 Hearing Tr. at 38:9–10; *see also id.* at 56:10–11 (Court confirming with Debtors' counsel that "the directors aren't going to get paid anything"). As detailed in the Maybank Objection and in the various monthly operating reports filed in these cases, more than $1 million has been paid to directors since July 2016.

## JOINDER AND OBJECTION

11. The Moving Debtors have taken no action in these cases demonstrating to the Court or other parties that they are willing and able to work in earnest and in good faith towards a restructuring or other resolution of these cases. Yet, the Moving Debtors seek an excessive nine month extension of the Exclusive Periods—which would place them at the absolute outer limit of possible Exclusive Periods under section 1121(d) of the Bankruptcy Code.

12. It should come as no surprise that the Moving Debtors cite no precedent for a debtor obtaining an extension of exclusivity after failing to comply with the terms of prior Court

orders extending exclusivity or adhere to promises made on the record, not taking any reasonable steps towards a restructuring, and failing to conduct or facilitate a proper investigation into potential claims and causes of action.

13. The Moving Debtors bear the burden of showing that sufficient "cause" exists to extend the exclusivity periods. *See In re Gibson & Cushman Dredging Corp.*, 101 B.R. 405, 409 (E.D.N.Y. 1989) ("The party seeking the change in the statutory time period bears the burden of establishing that the requisite cause exists . . . [A] finding of cause should be premised upon some promise of probable success[.]"); *see also In re S.W. Oil Co. of Jourdanton*, 84 B.R. 448, 450 (Bankr. W.D. Tex. 1987) (requests for extensions of exclusivity should not be "routinely grant[ed]").

14. Congress gave courts the power to reduce or terminate the exclusivity periods in order to (a) democratize the plan process, and (b) prevent a debtor from monopolizing the plan process. *See In re Timbers of Inwood Forest Assoc.*, 808 F.2d 363, 372 (5th Cir. 1987) (*en banc*) (courts assessing "whether 'cause' exists should be mindful of the legislative goal behind § 1121 . . . [it] must avoid reinstituting the imbalance between the debtor and its creditors that characterized proceedings under the old Chapter XI," which gave the debtor "undue bargaining leverage, because by delay he c[ould] force a settlement out of otherwise unwilling creditors.") (internal citations and quotations omitted), *aff'd*, 484 U.S. 365 (1988). Indeed, one of the fundamental purposes of section 1121 of the Bankruptcy Code is "to limit the delay that makes creditors the hostages of Chapter 11 debtors." *Id.*

15. Congress explicitly emphasized the Bankruptcy Code's recognition of "the legitimate interests of creditors, whose money is in the enterprise as much as the debtor's, to have a say in the future of the company." *See Timbers*, at 372 n.15 (internal citation omitted).

Accordingly, a court must balance the potential harm to creditors, and limit delays that constrain creditors. *See Official Comm. of Unsecured Creditors of Mirant Americas Generation, L.L.C. v. Mirant Corp. (In re Mirant Corp.)*, 2004 WL 2250986 at *2 (N.D. Tex. Sept. 30, 2004) (citations omitted).

16.     While courts generally rely on a number of factors, they also caution that "when a court considers a laundry list of factors in the course of deciding a matter, it is not limited to the elementary task of counting the factors . . . . A better way to look at this additional issue is to draw back from the narrow focus on individual factors and scan the big picture." *In re Dow Corning Corp.*, 208 B.R. 661, 669–70 (Bankr. E.D. Mich. 1997); *see also In re Adelphia Commc'ns Corp.*, 352 B.R. 578, 590 (Bankr. S.D.N.Y. 2006) (The "test is better expressed as determining whether terminating exclusivity would move the case forward materially, to a degree that wouldn't otherwise be the case.").

17.     A consideration of the big picture here, based on an understanding of the relevant facts and the circumstances of these cases, supports denial of a further extension of the Exclusive Periods. Ten months into these cases, the Moving Debtors have shown no viable prospects of reorganization or that they will have creditor support for any plan they propose. The Moving Debtors have no material assets or operations, a paltry amount of cash on hand when compared to the Moving Debtors' total indebtedness, and no foreseeably available source of financing to construct and propose any potentially confirmable chapter 11 plan.

18.     In addition, the BVI Liquidators have raised serious concerns regarding various intercompany and other transactions that warrant a thorough investigation into potential claims and causes of action, which could be valuable sources of recovery for creditors in these cases and no doubt would need to be included as part of any chapter 11 plan. The BVI Liquidators have

sought to perform an investigation, but rather than embracing that by engaging the BVI Liquidators and entering into a protocol so all estates and creditors can have an understanding of "what happened here" with regard to the circular flow of cash and potential misuse of trade financing, the Moving Debtors are instead litigating with the BVI Liquidators (which is wasting more money and further delaying these cases) and are unwilling to conduct any proper investigation of their own.[4] The Moving Debtors, who have a fiduciary duty to conduct an investigation into pre-petition conduct, have not cooperated with the BVI Liquidators in their investigation and—in an effort to shield themselves from scrutiny and impede further investigation by the BVI Liquidators—continue placing foreign entities with no assets and minimal to no connection to the U.S. into chapter 11 cases.

19.   It is incumbent on the Moving Debtors and their management team—as it is on all chapter 11 debtors and their respective management—to (a) take such actions as necessary to maximize value of the estates for the benefit of creditors, (b) be cooperative and honest in the disclosure of the Moving Debtors' operations, finances, and condition, (c) negotiate in good faith with creditors, (d) investigate prior acts and conduct and analyze potential claims and recoveries, and (e) refrain from acting in a manner that could damage the estates or hinder a restructuring.

20.   The Moving Debtors have not satisfied these duties. The Moving Debtors remain unchanged from when these cases filed, with the exception of a Chief Operating Officer and a new law firm who seem to be taking instruction from the same Ms. Ng who has orchestrated these cases from the start. The present tactics mirror those the Moving Debtors employed when

---

[4] The Court should also note that at the inception of these cases, the Moving Debtors orchestrated a friendly filing of one BVI entity, Richtown Development Ltd. ("**Richtown**"), in a BVI proceeding when it was to their tactical advantage. *See Declaration of Ng Puay Yee in Opposition to the Lenders' Motion for the Entry of an Order Directing the Appointment of a Chapter 11 Trustee Pursuant to 11 U.S.C. §1104(a)(2)*, Dkt. No. 105 at ¶ 123. But, now that a legitimate, independent third party has put Richtown into provisional liquidation, the Moving Debtors contend that such BVI proceeding is harmful to them. It really is time for the Moving Debtors' tactics to end.

they refused to dismiss the Peruvian insolvency cases filed by related parties and when they entered into and ultimately breached the deeds of undertaking. Creditors have simply lost confidence in the Moving Debtors' motivation and wherewithal to fulfill their obligations to the estates and creditors and progress these cases towards an acceptable resolution.

21. If creditors "los[e] faith in the capability and perhaps the integrity of debtor's management," such loss of confidence "is a factor the court should and must consider in its determination" as to whether the debtor should be granted an extension of its exclusivity period. *See In re All Seasons Indus., Inc.*, 121 B.R. 1002, 1005 (Bankr. N.D. Ill. 1990) (denying a debtor's request for an exclusivity extension because the debtor's major creditors lost confidence in the capability and integrity of debtor's management and, thus, the debtors and such creditors were unable to find common ground upon which to build a plan of reorganization).

22. Given the Moving Debtors' track record of delays, broken commitments, failure to comply with prior exclusivity extension orders, and lack of transparency thus far in these cases and in the months prior to commencement of these cases, the Club Lender Parties are doubtful as to whether any acceptable "global restructuring plan" is achievable if led by the Moving Debtors. The Moving Debtors have done nothing to indicate that they will be able to come anywhere near the estimated $2 billion or more in asset value necessary to return any money to equity of Debtor N.S. Hong or that they are willing to investigate claims against themselves or the equity owners. Thus, the family interest behind these filings is out of the money and hopelessly conflicted and should not be allowed to retain the exclusive right to restructure assets now effectively owned by the creditors. It is time for the privilege of chapter 11 exclusivity to be taken away and for the playing field regarding a restructuring plan to be shared among the Moving Debtors' true financial beneficiaries. *See* S. REP. NO. 95-989, 95th Cong., 2d Sess. 118 (1978) (exclusivity is a

"privilege" given to debtors, and any extension "should be based on a showing of some promise of probable success.").

23. Accordingly, for the reasons set forth herein and in the Maybank Objection, the Moving Debtors' request for a further extension of the Exclusive Periods should be denied. It is clear that terminating exclusivity and allowing creditors to work together on a chapter 11 plan—one that is reasonable, confirmable, and which would strike a fair balance between the interests of the various parties—is the only way to materially advance these cases.

24. In the event, however, that the Court is inclined to grant an extension, such an extension should be short (limited to no more than sixty days) and should be granted only if the Moving Debtors (a) adhere to strict deadlines to deliver to the Club Lender Parties and other applicable creditors the past due information required under the First Exclusivity Order, including a final RSM Report, a business plan, and a plan restructuring term sheet that includes proposed distributions and treatment of intercompany claims and a process for identifying and prosecuting causes of action against appropriate parties (including any insiders or equity owners), (b) agree to negotiate in good faith a cross-border protocol that involves the Moving Debtors' reasonable cooperation with the BVI Liquidators to ensure that the intercompany claim issues on which Moving Debtors are hopelessly conflicted are adequately investigated by the BVI Liquidators,[5] and (c) make a good faith effort to timely furnish to creditors all additional documents and information reasonably requested by them, such as, by way of example and not limitation, updated financials for the collective PAIH and PARD groups that is equal to the type of information provided in the Trustee Report, and all other specific items described in paragraph __ of the Maybank Objection.

---

[5] Allowing the BVI Liquidators to continue their investigation will save sufficient costs and resources as they have already long started investigating, and bringing a new firm in will only delay the process and result in greater costs.

## **RESERVATION OF RIGHTS**

25. The Club Lender Parties reserve the right to amend, modify, or supplement this joinder prior to the conclusion of any hearing on the Third Exclusivity Motion, including any adjourned hearing, and further reserve the right to assert additional objections at such hearing or to join in any objections made by other parties in interest to these cases.

26. As noted above, the Club Lender Parties recognize the ongoing efforts of the Trustee with respect to CFG Peru and the Peruvian assets and businesses, and believe that the issue of plan exclusivity with respect to the other Debtors in these cases will not impact operations at the Peruvian subsidiary levels. While the Trustee has indicated his support for the extension of exclusivity, that support is premised on preserving value. Because the Trustee's estate has already lost exclusivity and the value of the Peruvian assets has increased under his management according to his Trustee Report, a termination of the Moving Debtors' Exclusive Periods should not impact the Peruvian businesses because the automatic stay will remain in place and the Trustee will remain in close and careful management of the Peruvian Opcos.

[*Text Continues on the Next Page*]

## CONCLUSION

WHEREFORE, for the reasons set forth in the Maybank Objection and herein, the Club Lender Parties respectfully request that this Court enter an order (i) denying the Moving Debtors' request for an extension of the Exclusive Periods or (ii) if the Court is inclined to grant an extension, limiting such extension to no more than an additional sixty days, and requiring the Moving Debtors to comply with the information delivery and other requirements described in paragraph 24 above.

Dated: New York, New York
       May 5, 2017

Respectfully submitted,

**DLA PIPER LLP (US)**

By: /s/ *R. Craig Martin*
R. Craig Martin (RM1971)
Mordechai Y. Sutton (MS5781)
1251 Avenue of the Americas
New York, New York 10020
Telephone: (212) 335-4500
Facsimile: (212) 335-4501

Richard A. Chesley (admitted *pro hac vice*)
John K. Lyons (admitted *pro hac vice*)
Jeffrey S. Torosian (admitted *pro hac vice*)
444 West Lake Street, Suite 900
Chicago, Illinois 60606
Telephone: (312) 368-4000
Facsimile: (312) 236-7516

*Counsel to the Club Lender Parties*