**SIDLEY AUSTIN LLP**
787 Seventh Avenue
New York, NY 10019
(212) 839-5300 (tel.)
(212) 839-5599 (fax)
Lee S. Attanasio
John G. Hutchinson
Andrew P. Propps

*Counsel to Bank of America, N.A.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------- x
In re:                                                          :
                                                                :    Chapter 11
**CHINA FISHERY GROUP LIMITED (CAYMAN),** :
  *et. al.*[1]                                                  :    Case No. 16-11895 (JLG)
                                                                :
                    Debtors.                                    :    (Jointly Administered)
---------------------------------------------------------------- x

**OBJECTION OF BANK OF AMERICA, N.A. TO MOTION OF CERTAIN DEBTORS FOR A THIRD ORDER EXTENDING EXCLUSIVE PERIODS DURING WHICH ONLY DEBTORS MAY FILE A CHAPTER 11 PLAN AND SOLICIT ACCEPTANCES THEREOF AND JOINDER TO MAYBANK'S AND CLUB LENDER PARTIES' OBJECTIONS TO MOTION OF CERTAIN DEBTORS FOR A THIRD ORDER EXTENDING EXCLUSIVE PERIODS DURING WHICH ONLY DEBTORS MAY FILE A CHAPTER 11 PLAN AND SOLICIT ACCEPTANCES THEREOF**

TO THE HONORABLE JAMES L. GARRITY, JR.
UNITED STATES BANKRUPTCY JUDGE:

---

[1] The Debtors are China Fishery Group Limited (Cayman) ("CFGL"), Pacific Andes International Holdings Limited (Bermuda) ("PAIH"), N.S. Hong Investment (BVI) Limited, South Pacific Shipping Agency Limited (BVI), China Fisheries International Limited (Samoa), CFGL (Singapore) Private Limited, Chanery Investment Inc. (BVI), Champion Maritime Limited (BVI), Growing Management Limited (BVI), Target Shipping Limited (HK), Fortress Agents Limited (BVI), Ocean Expert International Limited (BVI), Protein Trading Limited (Samoa), CFG Peru Investments Pte. Limited (Singapore) ("CFG Peru Singapore"), Smart Group Limited (Cayman), Super Investment Limited (Cayman), Pacific Andes Resources Development Limited (Bermuda) ("PARD"), Nouvelle Foods International Ltd. (BVI), Golden Target Pacific Limited (BVI), Pacific Andes International Holdings (BVI) Limited, Zhonggang Fisheries Limited (BVI), Admired Agents Limited (BVI), Chiksano Management Limited (BVI), Clamford Holding Limited (BVI), Excel Concept Limited (BVI), Gain Star Management Limited (BVI), Grand Success Investment (Singapore) Private Limited, Hill Cosmos International Limited (BVI), Loyal Mark Holdings Limited (BVI), Metro Island International Limited (BVI), Mission Excel International Limited (BVI), Natprop Investments Limited, Pioneer Logistics Limited (BVI), Sea Capital International Limited (BVI), Shine Bright Management Limited (BVI), Superb Choice International Limited (BVI), and Toyama Holdings Limited (BVI).

Bank of America, N.A. ("BANA"), by and through its undersigned counsel, hereby files this objection (the "Objection") to the Motion of Certain Debtors for a Third Order Extending Exclusive Periods During Which Only Debtors May File a Chapter 11 Plan and Solicit Acceptances Thereof (the "Third Exclusivity Motion") (Dkt. No. 402) and joinder (the "Joinder") to the Objection of Maybank to Motion of Certain Debtors for a Third Order Extending Exclusive Periods During Which Only Debtors May File a Chapter 11 Plan and Solicit Acceptances Thereof [Dkt. No. 505] (the "Maybank Objection") and the Club Lender Parties' Joinder to Objection of Maybank to Motion of Certain Debtors for a Third Order Extending Exclusive Periods During Which Only Debtors May File a Chapter 11 Plan and Solicit Acceptances Thereof [Dkt. No. 507] (the "Club Lender Parties' Objection and Joinder").[2] In support hereof, BANA respectfully represents as follow:

## PRELIMINARY STATEMENT

1.   Ten months into many of these Chapter 11 Cases,[3] the Debtors have made no demonstrable progress toward the formulation, much less the filing or confirmation, of a confirmable chapter 11 plan, but the Moving Debtors seek to retain the privilege of exclusivity for an additional eight months.[4] The Debtors' requested extension is unjustified and should be denied.

2.   The Moving Debtors have had the benefit of the full periods of exclusivity specified in section 1121(c) of the Bankruptcy Code, plus as much as six additional months by

---

[2] Capitalized terms not defined herein shall have the meanings ascribed to them in the Third Exclusivity Motion; as in the Third Exclusivity Motion, the term "Debtors" shall not include CFG Peru Singapore unless otherwise stated.

[3] The exceptions are PARD's Chapter 11 Case, which is seven months old, and the 20 Chapter 11 Cases commenced since the filing of the Third Exclusivity Motion in an apparent response to the attempts by the court-appointed liquidators of affiliates in the British Virgin Islands (the "BVI") to carry out their statutory mandates.

[4] The Exclusive Periods are expiring only as to those Debtors that filed petitions on June 30, 2016 (the "Original Debtors") and PARD (together with the Original Debtors, with the exception of CFG Peru Singapore, the "Moving Debtors").

2

virtue of this Court's prior extensions of those periods. Nevertheless, the Debtors seek in one fell swoop to extend their Exclusive Periods by approximately eight months (excluding the extensions to the Exclusive Filing Period included in the Bridge Order and later agreed to by BANA and other creditors to facilitate negotiations), to the full extent permitted by statute, notwithstanding that they point to no meaningful progress toward a restructuring, nor do they give any real assurance of their prospects for filing a viable chapter 11 plan. Instead, they fall back on their usual "wait and see" approach: the Debtors need to wait for the report of their forensic accountant (which elusive report purportedly has been imminent since September 2016), for the Trustee's report (which was filed in late April 2017 and, while substantial, does not change the restructuring calculus), and for the determination of the future of the Peruvian Fishmeal Operating Companies (which originally were to have been sold by July 15, 2016, and for which Debtors' management received multiple offers). Since this Court decided the Trustee Motion (as defined below), all that the Moving Debtors have done of substance is switch counsel midstream and, as yet another tactical use of the United States bankruptcy process, add 20 new Debtors to these cases, with the attendant costs and potential delay.

3. The Debtors are following their familiar pattern of promising to work with their creditors or a court, deciding they do not like the direction things are going, and then commencing a wave of insolvency filings or backtracking on promises to creditors' detriment. This pattern created much of the mistrust of management that led the creditors to file their motion for appointment of a chapter 11 trustee (the "Trustee Motion"). Similarly, throughout these Chapter 11 Cases (and before), creditors repeatedly have demanded transparency; the Debtors repeatedly have promised that transparency; and this Court repeatedly has encouraged that transparency – and the Debtors have not followed through. Like Godot, the arrival of the

3

long-promised RSM Report (defined below) has been elusive. Although creditors have little confidence that the ultimate RSM Report will be reliable or objective, it has been used by the Debtors as a shield against any objective, third-party investigation of the activities of the Debtors' management and directors (and in particular the Ng family), and as a sword for obtaining more and more time to achieve nothing at all. Indeed, the only independent investigation being performed of the Debtors' business, by members of FTI Consulting as the court-appointed liquidators of certain of the Debtors' affiliates (the "Liquidators"), is being thwarted intentionally by the Debtors and their management.

4.      Meanwhile, the chapter 11 trustee appointed by this Court (the "Trustee") is proceeding apace in maximizing the value of the principal known assets of the Debtors' corporate group, the Peruvian Fishmeal Operating Companies. The Trustee has filed his initial report (Dkt. No. 481) (the "Trustee's Report"), in which he recounts his substantial progress in stabilizing the Peruvian Fishmeal Operating Companies and preparing them for their ultimate disposition. He has undertaken negotiations with potential purchasers and has sought this Court's approval to set up a data room to facilitate a sale or other monetization of those entities. A complex plan of reorganization is not necessary on top of the Trustee's efforts, which BANA does not intend to jeopardize no matter the outcome of the Third Exclusivity Motion – all a plan will need to do is to distribute the value obtained from the sale of the Peruvian Fishmeal Operating Companies and any of the Debtors' causes of actions. There is simply no excuse for delaying the formulation of a plan in this case.

5.      The Debtors have not established that cause exists to grant their request for an extension of the Exclusive Periods, much less by an additional eight months. If this Court finds it appropriate to grant an extension, any extension should be modest (no more than 60 days) and

4

should depend on the Debtors' meeting the milestones and conditions described below to move these Chapter 11 Cases toward resolution.

## OBJECTION

6.    A debtor has the burden of proof to make "a clear showing" that cause exists in order to support an extension of the exclusivity period. *See In re Curry Corp.*, 148 B.R. 754, 756 (Bankr. S.D.N.Y. 1992) (denying initial motion to extend exclusivity); *see also In re Borders Grp., Inc.*, 460 B.R. 818, 821 (Bankr. S.D.N.Y. 2011). Although "cause" is not defined in the Bankruptcy Code, bankruptcy courts have "great latitude" and flexibility in determining whether a debtor has satisfied its burden to demonstrate cause for an exclusivity extension, and may refuse to extend the exclusivity period even if there is a showing of cause. *See In re Sharon Steel Corp.*, 78 B.R. 762, 763 (Bankr. W.D. Pa. 1987) (denying motion to extend exclusivity). In making such a determination, bankruptcy courts typically evaluate a non-exhaustive list of factors, including the existence of good faith progress towards developing a plan of reorganization, whether the debtor has demonstrated reasonable prospects for filing a viable plan, and whether the debtor has made progress in negotiations with its creditors. *See In re GMG Capital Partners III, L.P.*, 503 B.R. 596, 600-01 (Bankr. S.D.N.Y. 2014) (denying motion to extend exclusivity); *In re Adelphia Commc'ns Corp.*, 352 B.R. 578, 587 (Bankr. S.D.N.Y. 2006). While the complexity of a case is considered by courts in determining whether to extend exclusivity, "size and complexity alone cannot suffice as 'cause'" to warrant a debtor's request for an extension of exclusivity – "size and complexity must be accompanied by other factors . . . to justify extension of plan exclusivity." *In re Pub. Serv. Co. of N.H.*, 88 B.R. 521, 537 (Bankr. D.N.H. 1988).

7.  Bankruptcy courts treat a debtor's request for an exclusivity extension as a "serious matter" that should be granted neither "routinely nor cavalierly." *See In re All Seasons Indus.*, 121 B.R. 1002, 1004 (Bankr. N.D. Ind. 1990) (denying motion to extend exclusivity) (internal citations omitted). In determining whether to grant a motion to extend exclusivity, a court should bear in mind that "Section 1121 was designed, and should be faithfully interpreted, to limit the delay that makes creditors the hostages of Chapter 11 debtors." *United Savs. Assoc. of Tex. v. Timbers of Inwood Forest Assocs., Ltd. (In re Timbers of Inwood Forest Assocs., Ltd.)*, 808 F.2d 363, 372 (5th Cir. 1987). Exclusivity is a "privilege," and an "extension should be based on a showing of some promise of probable success." S. REP. No. 95-989, at 118 (1978), *as reprinted in* 1978 U.S.C.C.A.N. 5787, 5904. While a chapter 11 debtor is given the first opportunity to propose a plan, and is permitted to do so to the exclusion of other parties in interest, that exclusion requires the debtor to make progress toward an exit from bankruptcy without causing undue harm or delay to its creditors – exclusivity is not permitted to be abused by a debtor to hold its creditors hostage to an unacceptable process. The Moving Debtors have not justified any extension, much less by an additional eight months. The extension of the Exclusive Periods in this case is particularly inappropriate given the lack of progress, the continuing failure of management to provide transparency or to pursue long-needed investigations, and the reality that a plan framework need not wait any more than it already has.

8.  <u>First</u>, in the last ten months, the Debtors have made no measurable progress toward proposing a plan, while burning through their and their non-debtor subsidiaries' assets. The Moving Debtors have stated generically that their advisors are working together to "develop alternative plan structures and analyze their viability under the present circumstances," Mot. ¶ 25, a mantra that echoes unconvincingly the statements the Debtors and their advisors have

6

made since August 2016. *See, e.g.*, Report of David W. Prager dated Aug. 23, 2016 (Dkt. No. 101) ¶ 21 ("The Debtors are considering several forms of Chapter 11 plans, including (i) equitization (with potential debt restructuring or refinancing), (ii) sale of the Peru Sub-Group (and potentially other major assets) and (iii) spin-off of the Peru Sub-Group with equitization or sale of other assets."). The Debtors also represent that their new counsel has had initial discussions to gauge creditors' interest and willingness to participate in a consensual plan. This is true, and creditors never have suggested that they would be disinterested or unwilling to so participate, but have continued to focus on a process by which assets (including the Peruvian Fishmeal Operating Companies and causes of action) are maximized, costs limited, and a plan process put into place – actions the Moving Debtors and their management simply have not advanced. Engaging creditors in discussions about whether the Debtors should do exactly what chapter 11 is intended for, and what the Trustee is already well on the path toward achieving, is "progress toward reorganization" in only the most generic sense.

9. All other, more substantive, progress toward reorganization has been held in suspense. Since the appointment of the Trustee more than six months ago, the operations of the Peruvian Fishmeal Operating Companies have improved, which is to the benefit of all stakeholders here. But the Debtors' "wait and see" approach has resulted in ten months having passed in these Chapter 11 Cases (not to mention nearly two years of discussions with many of their creditors since the Debtors' first payment defaults) without meaningful progress toward laying the groundwork for a restructuring around value – whatever it may be – in Peru, including providing an analysis of intercompany claims. Indeed, the Moving Debtors have filed no substantive motions since their September 30, 2016 motion for approval of the sale of golf

7

course memberships; all of the substantive action has been undertaken by the Trustee.[5] Creditors have no reason to believe that the next eight months will be anything other than another eight months of delay.

10. This lack of progress has come at a high price to the Debtors' estates. The Debtors have incurred massive professional fees and expenses during these Chapter 11 Cases, totaling over $3.5 million through March 31, 2017. *See* Dkt. Nos. 247, 469 (Meyer, Suozzi, English & Klein, P.C. fees); Dkt. Nos. 248, 420, 475 (Goldin Associates, LLC fees); Dkt. Nos. 380, 497 (Klestadt Winters Jureller Southard & Stevens, LLP fees); Dkt. No. 468 (RSR Consulting, LLC fees).[6] Furthermore, the Debtors' monthly operating reports disclose that since their respective filings, CFGL, PAIH, and PARD have paid more than $1 million to their directors, and PARD has recently *increased* the amounts being paid to its directors. *See* Dkt. Nos. 81, 158, 193, 227, 278, 312, 355, 386, 465.[7] These payments to the directors are being made notwithstanding representations during the first-day hearing by the Debtors' original counsel that directors would not be compensated by the Debtors. *See* Hr'g Tr. Jul. 11, 2016, at 38:4-10. No matter the merits (if any) of the payments to the directors, the economic cost of further delay *while no progress is being made in the Moving Debtors' Chapter 11 Cases* is extreme and serves no purpose.

---

[5] The Debtors have, however, changed their advisor team by replacing their counsel, and they have filed an additional 20 Debtors in the last six weeks, inserting additional and unnecessary complexity and hamstringing the Liquidators.

[6] While the Debtors likely will counter that the Trustee Motion caused a significant portion of their professional costs, over $2.4 million of those costs either were incurred after the Trustee Motion had been fully litigated or were incurred in connection with other matters in these Chapter 11 Cases. *See* Dkt. No. 247 ¶¶ 49-50 (removing Trustee Motion fees from aggregate amount of Meyer, Suozzi, English & Klein, P.C. fees); Dkt. No. 248 Ex. C-D (removing Litigation/Causes of Action – work code generally used for Trustee Motion – from aggregate amount of Goldin Associates, LLC fees).

[7] The monthly operating report for the month ended March 31, 2017 [Dkt. No. 465] shows a payment to PARD's directors of $132,589, an increase from the five previous months' payments of $25,385 per month.

8

11.     Second, the Moving Debtors' pattern of obstructive behavior and lack of transparency that led the creditors to file and prosecute the Trustee Motion – and that led the Court to grant the Trustee Motion, see Memorandum Decision and Order Granting Motion for the Appointment of a Chapter 11 Trustee [Dkt. No. 203] (the "Trustee Motion Opinion") at 37-40 – is still on display.  Because of this behavior, creditors continue to have no confidence in management, which further counsels against granting an extension of the Exclusive Periods. See, e.g., All Seasons Indus., 121 B.R. at 1005 (denying extension of exclusivity where creditors had "lost faith in the capability and perhaps the integrity of debtor's management"). Management responded to creditor-initiated filings in December 2015 in Hong Kong and the Cayman Islands by agreeing to two Deeds of Undertaking (including a promise to sell their Peruvian assets and repay creditors) and then abandoning those promises and commencing (or colluding with friendly creditors to commence) the Original Debtors' Chapter 11 Cases and proceedings in Peru, Singapore, and the BVI in June 2016.[8]  Management followed the same pattern in September 2016, when it withdrew PARD's proceeding in Singapore and then filed a chapter 11 petition on PARD's behalf in this Court to forestall creditors' exercise of statutory rights in Bermuda.  And yet again, management followed the same pattern after the Trustee's appointment when management apparently caused additional filings to be commenced in Peru by friendly creditors.  In the weeks following the Moving Debtors' filing of the Third Exclusivity Motion, BANA and other creditors have engaged in negotiations regarding a consensual arrangement with the Debtors.  In the meantime, however, an additional 20 affiliates of the

---

[8] The June 2016 filings included a filing by a friendly creditor against Richtown Development Limited ("Richtown") in the BVI, which was later withdrawn.  The Liquidators recently filed a petition against Richtown in the BVI in their role as liquidators of other affiliates of the Debtors, and BANA understands that the Debtors and their management are arguing that such filing is harmful to the Debtors – although the June 2016 filing orchestrated by management apparently was not.  This rank hypocrisy on the Debtors' part also reflects their pattern of abusing various insolvency regimes for their own benefit.

9

Original Debtors have filed chapter 11 petitions in this Court in an apparent effort to impede the Liquidators' fulfilment of their duties as liquidators of certain of their affiliates.

12. Furthermore, the Debtors continually have promised transparency to their creditors and continually have backpedaled on providing it. For example, the Debtors have long promised the delivery of the report being prepared by RSM Corporate Advisory (Hong Kong) Limited ("<u>RSM</u>"), the forensic accountants retained by certain of the Debtors (the "<u>RSM Report</u>"). That report, according to Ms. Ng in her declaration in opposition to the Trustee Motion, was expected "by the end of September 2016." Decl. of Ng Puay Yee, dated Aug. 23, 2016 (Dkt. No. 105), ¶ 35. That expected completion date was approximately seven months ago and only one month after it was promised in a sworn declaration, and the RSM Report is still (purportedly) in progress. The Debtors repeatedly have dangled the RSM Report in front of the creditors as an upcoming significant deliverable. Whether the RSM Report actually includes a diligent and independent review of the Debtors' affairs (including potentially valuable causes of action the Debtors' estates may have against equity holders, affiliates, or third parties) or is mere window-dressing misses the point. The RSM Report is long overdue and should not be relied upon by the Debtors as a reason for which exclusivity should be extended, or a real third-party investigation delayed another moment.[9]

13. At the same time, the Debtors and their management actively are thwarting – among other things, through the latest chapter 11 filings – the Liquidators, who are the only persons actually commissioned by a court to engage in an investigation of the Debtors' corporate

---

[9] As this Court is aware, it is far from clear whether the RSM Report will be the impartial report needed to shed light on the Debtors' affairs. *See* Hr'g Tr. Aug. 29, 2016, at 147:23-150:2 (RSM's work is being overseen by a firm with a name partner who was a director of certain of the Debtors from 1996 until 2016, when he stepped down upon the appointment of RSM); Notice of Filing of Ordinary Course Professional Declaration of Disinterestedness and Retention Questionnaire for Messrs. Kwok Yih & Chan (Dkt. No. 437) (same).

10

group.[10] As part of their statutory mandate as court-appointed liquidator of certain affiliates (and certain perceived agents of the Debtors and their affiliates, *see* Trustee's Rept. at 38) in liquidation proceedings in the BVI, the Liquidators are conducting investigations of the group's affairs and appears to be uncovering troubling details. The Liquidators called a meeting with the Trustee on a recent trip by the Trustee to Singapore, where the Trustee was "given a preview of [the Liquidators'] perspective on this matter, a perspective which is more than troubling." Trustee's Rept. at 37.[11] The Liquidators have provided the Trustee "well over 300 pages of material and exhibits . . . [that] seem to indicate that there are intimations and indications of fraud on the part of several" of the entities over which the Liquidators have been appointed. *Id.* at 40. Among the Liquidators' tentative conclusions is "that funds raised by way of *potential trade finance fraud* . . . were *highly likely the source of funds* used to help fund the acquisition of Copeinca by the larger Pacific Andes group in August 2013." *Id.* (emphasis added). The Trustee has "review[ed] the detailed reports produced by [the Liquidators] and again suggest[s] to this Court that they are troubling." *Id.* The Liquidators' investigation apparently is revealing a number of issues with the Debtors' corporate group that have needed to be exposed for some time, issues that may not have been fully revealed but for the Liquidators.

14. With the overlapping management and ownership of the Debtors and their affiliates, this investigation may provide significant information regarding the Debtors, and

---

[10] To the extent that the Debtors may be concerned that the Liquidators will take actions or make information public that will endanger the sale process with regard to the Peruvian Fishmeal Operating Companies or the Debtors' efforts to restructure, those concerns can be alleviated. This Court and the courts overseeing the liquidations of those affiliates can approve protocols of cooperation. *See, e.g.*, *In re Soundview Elite Ltd.*, Case No. 13-13098 (MKV), Dkt. No. 502 (Bankr. S.D.N.Y. Dec. 30, 2014) (order approving cross-border insolvency protocol between the bankruptcy court and the Grand Court of the Cayman Islands). BANA also understands that the Liquidators are willing to undertake to keep their work confidential so as to avoid any impact the Peruvian Fishmeal Operating Companies.

[11] The Trustee uses the adjective "troubling" at least seven times in describing the events being investigated by the Liquidators.

actions taken by or at the direction of management, including controlling family members. It is therefore critical that the Debtors and management not interfere. However, the 20 recent additional filings appear to be aimed at interfering with the Liquidators' efforts to complete its investigation and to fulfill its other statutory obligations. *See, e.g.*, Decl. of Ng Puay Yee, dated March 27, 2017 (Case No. 17-10734 (JLG), Dkt. No. 2), at ¶¶ 16-17 (filings of two new entities on March 27, 2017, were in response to demands or requests for payment from the Liquidators); *id.* at ¶¶ 15, 18-23 (management intends to file additional entities that in the future receive the attention of the Liquidators). A lengthy extension of the Exclusive Periods simply provides the Debtors' equity holders additional time to stall a meaningful reorganization path, take actions behind the scenes to obstruct creditors' avenues of recovery, and cover up any wrongdoing they may have perpetrated or of which they may have knowledge.

15.     Third, as all parties acknowledge, the bulk of the value of the Debtors is in the Peruvian Fishmeal Operating Companies; the only other sizeable reservoir of value may be the causes of action the Debtors have against each other, their equity holders, non-debtor affiliates, and friendly third parties. Any plan, therefore, will have two goals: monetize these assets and distribute the value to the appropriate stakeholders. This is not a difficult plan to formulate, and there is no reason that it cannot be formulated now, rather than in eight months.

16.     The Trustee is actively working to monetize the Peruvian Fishmeal Operating Companies. In his report, the Trustee explains the steps he and his team have taken to date to "stabiliz[e] and routiniz[e]" the operations of those companies, including actions to become familiar with their business, strengthen their liquidity, and firm up ties to their vendors, customers, and communities, as well as to strengthen financial reporting so as to provide transparency into their operations and status. *See generally* Trustee's Rept. at 27-32. The

Trustee also has taken steps to divest the Peruvian Fishmeal Operating Companies of burdensome noncore assets, which this Court has approved. *See, e.g.*, *id.* at 28 (sale of the *Pacific Voyager*). The Peruvian Fishmeal Operating Companies are now generally self-sufficient, and the Trustee believes it "fairly likely" to be able to reach the end of the cases with minimal or no need for outside financing. *Id.* at 46-47. BANA does not intend to interrupt or disturb the operations of the Peruvian Fishmeal Operating Companies, and intends to continue to support the Trustee's efforts to protect and maximize those businesses.

17.   The Trustee is exploring three different options for the Peruvian Fishmeal Operating Companies, each of which would provide recovery to the Debtors' creditors. The first is a refinancing backed by the Debtors' equity holders, which the Trustee will neither oppose nor support. Trustee's Rept. at 22. The second is a "friendly sale", bringing in fresh capital and leaving the Peruvian Fishmeal Operating Companies' management and operations essentially untouched. *Id.* at 22-23. The third is an "outright sale to a third party." *Id.* at 23. The Trustee is currently in contact with dozens of potential purchasers. *Id.* In connection with the two sale options, the Trustee has sought authorization from this Court to retain a vendor to provide and maintain a secure data room for the sharing of information. *See* Dkt. No. 487. BANA understands that the Trustee expects to have this secure data room ready for interested parties and to commence the sale process with regard to the Peruvian Fishmeal Operating Companies' operations no later than September 2017. Further, in his report, the Trustee sets a goal of closing any sale in mid-January 2018, Trustee's Rept. at 25, and BANA understands that this process may be accelerated depending on the level of interest among potential purchasers. The Trustee has provided rough preliminary valuations of the Peruvian Fishmeal Operating Companies of approximately $950 million to $1.7 billion. Trustee's Rept. at 58-60. This is consistent with

many of the offers and valuations the Debtors had received in late 2015 and early 2016. *See, e.g.*, Trustee Mot. Op. at 18 (Deloitte provided valuation of $1.69 billion), 26-27 (bid in the amount of $1.04 billion and expression of interest in the amount of $1.5 billion). The Trustee appears well on his way to monetizing the Peruvian Fishmeal Operating Companies so that value can be provided to their creditors and other stakeholders, which will provide funding for recoveries of the Debtors' creditors.

18. With regard to the various potential causes of action, as is common in chapter 11 plans, a litigation trust can be established to investigate (either on its own or in conjunction with the Liquidators), prosecute, and recover those causes of action and distribute proceeds to the relevant creditor bodies (or to continue such investigation, prosecution, and recovery). Debtors' management and professionals need not be directly involved, if at all. In fact, the causes of action need not be fully developed at confirmation, and this process may be passed from the Debtors to the trust upon confirmation of a plan.

19. The Moving Debtors consist primarily of holding companies or dormant operating companies (*see* Decl. of Ng Puay Yee, dated June 30, 2016 (Dkt. No. 2) ¶ 14; Decl. of Ng Puay Yee, dated Oct. 10, 2016 (Case No. 16-12739 (JLG), Dkt. No. 13)), entities that require no substantive restructuring.[12] With the two primary sources of creditors' recovery in these Chapter 11 Cases either being in the process of being monetized by the Trustee or capable of being monetized by the Liquidators and/or a litigation trust, there is no need for a lengthy extension of the Exclusive Periods in order to formulate a plan to distribute that value in accordance with

---

[12] Many of the newly filed entities occupy similar places on the corporate chart as dormant companies among the Original Debtors and are likely also dormant. However, because no first-day affidavit has been filed as to these entities, nor are the new Debtors' schedules and statements of financial affairs available, BANA has not been able to verify this.

14

statutory, contractual, and structural priorities. Indeed, the Moving Debtors have no excuse for not being able to propose such a plan now.

20.     If the Moving Debtors are not prepared to step up with a proposed plan in the short term, their creditors are prepared to do so.[13] Alternatively, if this Court is inclined to extend the Exclusive Periods, it should put the Debtors on a short leash and require them to take the steps that are necessary for development of a plan, to cooperate in investigations of their affiliates, and to provide as much information to creditors as possible – steps that the Debtors should have been taking over the last ten months. These include:

- The Debtors immediately should be required to cooperate fully with the liquidators appointed over their affiliates in other jurisdictions, including by providing responses to all outstanding information requests by May 31, 2017.

- By May 31, 2017, the Debtors must ensure that the RSM Report is finalized and (together with details of the agreed scope of work are) shared with creditors and this Court, along with details regarding all assumptions, disclaimers, and caveats, as well as all supporting information that RSM was provided.

- By June 15, 2017, the Debtors must provide details and documentation of any significant intercompany claims, and the Debtors' assessment – even if preliminary – of the validity and priority of such claims.

- By June 15, 2017, the Debtors must propose a plan term sheet that addresses the proceeds or the value of the Peruvian Fishmeal Operating Companies (including the proposed distribution of such proceeds or value), treatment of intercompany

---

[13] To the extent that the Original Debtors' Exclusive Periods are not extended or are terminated by separate order of this Court, BANA expects that it will seek termination of the Exclusive Periods as to those Debtors that filed chapter 11 petitions in April 2017 or later in order to avoid proposing and confirming a plan that does not address the assets and liabilities of all of the Debtors simultaneously.

15

and affiliate claims against any of those companies, and distribution of excess value.

## RESERVATION OF RIGHTS

21. BANA respectfully reserves all rights with regard to the Third Exclusivity Motion, including the right to advance additional arguments before or during, or to present evidence at, any hearing on the Third Exclusivity Motion, and to pursue any remedies with regard to the Debtors or their affiliates.

## JOINDER

22. BANA respectfully joins the Maybank Objection and the Club Lender Parties' Joinder and Objection for the reasons stated therein and above.

## CONCLUSION

23. No meaningful progress is being made in these Chapter 11 Cases, the Debtors and their management are not attempting in good faith to work with their creditors to make such progress, and the Debtors do not need a lengthy extension of the Exclusive Periods to propose a confirmable plan. For the foregoing reasons, the Debtors' request to extend exclusivity should be denied, or granted for only a limited period and subject to the Debtors' meeting certain milestones.

| | |
|---|---|
| Dated: New York, New York<br>May 5, 2017 | SIDLEY AUSTIN LLP<br><br>By: */s/ Lee S. Attanasio*<br>Lee S. Attanasio<br>(lattanasio@sidley.com)<br>John G. Hutchinson<br>(jhutchinson@sidley.com)<br>Andrew P. Propps<br>(apropps@sidley.com)<br>787 Seventh Avenue<br>New York, New York 10019<br>Telephone: (212) 839-5300<br>Facsimile: (212) 839-5599<br><br>*Counsel to Bank of America, N.A.* |