**UNITED STATES BANKRUPTCY COURT**                    **NOT FOR PUBLICATION**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------ x

| | |
|---|---|
| *In re:* | Chapter 11 |
| CHINA FISHERY GROUP LIMITED (CAYMAN), *et al.* | Case No. 16-11895 (JLG) |
| *Debtors.*[1] | (Jointly Administered) |

------------------------------------------------------------ x

| | |
|---|---|
| *In re:* | Chapter 11 |
| CFG PERU INVESTMENTS PTE. LIMITED (SINGAPORE) | Case No. 16-11914 (JLG) |
| *Debtor.* | (Jointly Administered) |

------------------------------------------------------------ x

**MEMORANDUM DECISION AND ORDER RESOLVING FIRST AND FINAL FEE APPLICATION OF FORMER CHAPTER 11 TRUSTEE WILLIAM A. BRANDT, JR., FOR COMPENSATION FOR SERVICES RENDERED AS CHAPTER 11 TRUSTEE FOR THE PERIOD FROM NOVEMBER 10, 2016 THROUGH AND INCLUDING JUNE 24, 2021, AND SECOND AND FINAL APPLICATION OF FORMER CHAPTER 11 TRUSTEE WILLIAM A. BRANDT, JR., FOR REIMBURSEMENT OF EXPENSES FOR THE PERIOD <u>MARCH 1, 2020 THROUGH AND INCLUDING JUNE 24, 2021</u>**

<u>A P P E A R A N C E S</u> :

BAKER & HOSTETLER LLP
*Counsel for William A. Brandt, Jr. former Chapter 11 Trustee*
600 Montgomery Street, Suite 3100
San Francisco, California 94111
By:    Robert A. Julian, Esq. (admitted *pro hac vice*)
       David J. Richardson, Esq. (admitted *pro hac vice*)

---

[1]    The Debtors are China Fishery Group Limited (Cayman), Pacific Andes International Holdings Limited (Bermuda), N.S. Hong Investment (BVI) Limited, South Pacific Shipping Agency Limited (BVI), China Fisheries International Limited (Samoa), CFGL (Singapore) Private Limited, Chanery Investment Inc. (BVI), Champion Maritime Limited (BVI), Growing Management Limited (BVI), Target Shipping Limited (HK), Fortress Agents Limited (BVI), Ocean Expert International Limited (BVI), Protein Trading Limited (Samoa), CFG Peru Investments Pte. Limited (Singapore), Smart Group Limited (Cayman), Super Investment Limited (Cayman), Pacific Andes Resources Development Limited (Bermuda), Nouvelle Foods International Ltd., Golden Target Pacific Limited, Pacific Andes International Holdings (BVI) Limited, Zhonggang Fisheries Limited, Admired Agents Limited, Chiksano Management Limited, Clamford Holding Limited, Excel Concept Limited, Gain Star Management Limited, Grand Success Investment (Singapore) Private Limited, Hill Cosmos International Limited, Loyal Mark Holdings Limited, Metro Island International Limited, Mission Excel International Limited, Natprop Investments Limited, Pioneer Logistics Limited, Sea Capital International Limited, Shine Bright Management Limited, Superb Choice International Limited, Toyama Holdings Limited (BVI), and Pacific Andes Enterprises (Hong Kong) Limited.

WHITE & CASE LLP
*Counsel to the Creditor Plan Proponents*
111 South Wacker Drive, Suite 5100
Chicago, Illinois  60654
By:      Gregory F. Pesce, Esq. (admitted *pro hac vice*)

200 South Biscayne Boulevard, Suite 4900
Miami, Florida 33131
By:      Evan Goldenberg, Esq. (admitted *pro hac vice*)
          Varoon Sachdev, Esq. (admitted *pro hac vice*)

1221 Avenue of the Americas
New York, New York 10020
By:      J. Christopher Shore, Esq.
          Barrett Lingle, Esq. (admitted *pro hac vice*)

<u>**HON. JAMES L. GARRITY, JR.**</u>
<u>**U.S. BANKRUPTCY JUDGE**</u>

## INTRODUCTION[2]

On June 30, 2016 (the "Petition Date"), CFG Peru Investments Pte. Limited (Singapore)

("CFG Peru") and fifteen affiliated entities filed voluntary petitions for relief under chapter 11 of

title 11 of the United States Code (the "Bankruptcy Code") in this Court. Those debtors were part

of the "Pacific Andes Group" of companies controlled by members of the Ng Family and were

comprised primarily of investment holding companies and non-operating companies that had been

in the business of trading frozen seafood products and providing freight service.

CFG Peru is a non-operating holding company incorporated in Singapore whose principal

assets include its direct interest in CFG Investment S.A.C., a Peruvian entity ("CFG Investment"),

---

[2]    Capitalized terms not defined in the Introduction shall have the meanings ascribed to them below. References to
"ECF No. __" are to filings entered on the docket in the main chapter 11 case, No. 16-11895. References to filings
entered on the docket in adversary proceedings will be to "[*Name of Document*], [AP No. ___], ECF No. ___."

and its indirect interest in Corporacion Pesquera Inca, S.A.C., a Peruvian entity ("Copeinca" and, together with CFG Investment, the "Peruvian Opcos"). The Peruvian Opcos were the "crown jewels" of the Pacific Andes Group. Together with Sustainable Fishing Resources S.A.C. ("Sustainable Fishing Resources"), a Peruvian entity that is a direct subsidiary of CFG Peru, and other entities, the Opcos operate an anchovy fishing and processing business in Peru (the "Peruvian Business"). Peruvian Opcos and Sustainable Fishing Resources are not Debtors in the Chapter 11 Cases, and the Peruvian Opcos are not eligible to be debtors under the Bankruptcy Code.

As of the Petition Date, the Club Lenders and Senior Noteholders were the Peruvian Opcos' largest creditors, holding unsecured claims of $650 million and $300 million, respectively. In an effort to protect the value of the Peruvian Opcos and to wrest control of the Peruvian Opcos from the Ng Family, shortly after the Petition Date, they moved for the appointment of a chapter 11 trustee for the Initial Debtors—with the expectation that any such trustee would assume control over the non-debtor Opcos. The Court granted the motion and appointed William A. Brandt, Jr. ("Mr. Brandt" or the "Trustee") as chapter 11 trustee, but solely for CFG Peru. The Court's mandate in appointing the Trustee was that he maximize the value of the Peruvian Opcos while attempting to distribute value to the Debtors. For more than five years, Mr. Brandt oversaw the operations of the Peruvian Opcos. During that time the equity value in the Peruvian Opcos significantly increased. On June 10, 2021, the Creditor Plan Proponents[3]—who hold significant interests in the Club Loan and Senior Notes, all of which they acquired after the Petition Date—not Mr. Brandt, confirmed a chapter 11 plan for CFG Peru (the "CFG Peru Plan").[4] As relevant,

---

[3]    The Creditor Plan Proponents consist of Burlington Loan Management DAC and Monarch Alternative Capital LP, solely on behalf of certain advisory clients and related entities that hold claims. *See* CFG Peru Plan art. I.A.49.

[4]    *Creditor Plan Proponents' Chapter 11 Plan for CFG Peru Investments Pte. Ltd. (Singapore)*, ECF No. 2564 (as amended, supplemented, or modified from time to time).

under that plan the Club Lenders and Senior Noteholders equitized their claims and now effectively hold the stock of the Peruvian Opcos.

The matter before the Court is the Trustee's (i) first and final application seeking compensation for services rendered during the period from November 10, 2016, through and including June 24, 2021 (the "Fee Application Period"),[5] and (ii) second and final application seeking reimbursement of expenses (collectively, the "Fee Application"), pursuant to sections 326, 330, 331 and 503 of title 11 of the United States Code (the "Bankruptcy Code"), Rule 2016 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), Rule 2016-1 of the Local Bankruptcy Rules for the Southern District of New York (the "Local Bankruptcy Rules"), the Amended Guidelines for Fees and Disbursements for Professionals in Southern District of New York Bankruptcy Cases ("General Order M-447"), promulgated pursuant to Local Bankruptcy Rule 2016-1(a) (the "Local Guidelines"), and the United States Trustee's Guidelines for Reviewing Applications for Compensation and Reimbursement of Expenses Filed Under 11 U.S.C. § 330 by Attorneys in Larger Chapter 11 Cases, effective as of November 1, 2013 (the "U.S. Trustee Guidelines," and, together with the Local Guidelines, the "Fee Guidelines"), to the extent applicable, for the period from March 1, 2020, through and including June 24, 2021, plus his costs for preparation of this Fee Application (the "Final Expense Period"), as well as final approval of expenses already paid on an interim basis.[6]

---

[5]    June 24, 2021, is the date of transition to the Plan Administrator's term under the CFC Peru Plan. Consistent with statements made to the Court, the Trustee has not sought fees for time spent in the Chapter 11 Cases after June 10, 2021.

[6]    *First and Final Fee Application of Former Chapter 11 Trustee William A. Brandt, Jr., for Compensation for Services Rendered as Chapter 11 Trustee for the Period from November 10, 2016 Through and Including June 24, 2021, and Second and Final Application of Former Chapter 11 Trustee William A. Brandt, Jr., for Reimbursement of Expenses for the Period March 1, 2020 Through and Including June 24, 2021*, ECF No. 2712 ("Application"). In support of the Fee Application, the Trustee submitted the *Declaration of William A. Brandt, Jr. in Support of First and Final Fee Application of Former Chapter 11 Trustee William A. Brandt, Jr., for Compensation for Services*

The Trustee contends that where a chapter 11 trustee is appointed for a parent company and oversees the operations of the overall enterprise, the calculation of the cap on commissions payable to the trustee under section 326(a) of the Bankruptcy Code (the "Statutory Cap") includes disbursements of all subsidiaries (both debtors and non-debtors) and all the value that a chapter 11 trustee's estate distributes to creditors under a plan, whether the distribution is accomplished directly by the trustee or by a subsequent plan administrator or plan trustee. Consistent with that position, the Trustee contends that the Statutory Cap on commissions payable to him for his service as chapter 11 trustee totals approximately $88.6 million (i.e., 3% of $2.95 billion). By this Fee Application, the Trustee requests allowance and payment of a commission in the form of (i) a lodestar of $11,958,625.00 arising from the Trustee's time spent on the case through to June 10, 2021, all billed at his hourly rate in effect in 2021 (the "Trustee's Lodestar"); (ii) a fee enhancement in the form of a 2.09 multiplier applied to the Trustee's Lodestar, for a total requested commission of $25 million; (iii) final approval of $355,051.93 in interim expenses previously allowed and paid; and (iv) approval and payment of allowable expenses in the amount of $409,382.02 incurred in the period from March 1, 2020, through June 24, 2021 (including his expenses for preparation of this Fee Application). The Office of the United States Trustee (the "U.S. Trustee") did not take a position on the Fee Application. However, Mr. Brandt reports that, at the U.S. Trustee's request, he forwarded a draft of the Fee Application to the U.S. Trustee for review and comment. In that draft, the Trustee sought approval of the Trustee's Lodestar enhanced

---

*Rendered as Chapter 11 Trustee for the Period from November 10, 2016 Through and Including June 24, 2021, and Second and Final Application of Former Chapter 11 Trustee William A. Brandt, Jr., for Reimbursement of Expenses for the Period March 1, 2020 Through and Including June 24, 2021*, ECF No. 2713 (the "Brandt Decl." or "Brandt Declaration") and the *Declaration of Patrick J. O'Malley in Support of First and Final Fee Application of Former Chapter 11 Trustee William A. Brandt, Jr., for Compensation for Services Rendered as Chapter 11 Trustee for the Period from November 10, 2016 Through and Including June 24, 2021, and Second and Final Application of Former Chapter 11 Trustee William A. Brandt, Jr., for Reimbursement of Expenses for the Period March 1, 2020 Through and Including June 24, 2021*, ECF No. 2714 (the "O'Malley Decl.").

by a 2.5 multiplier, for a total commission of approximately $29.9 million. He advises that, after discussions with the U.S. Trustee, he reduced his requested commission to $25,000,000. Fee Application at 2.

The Creditor Plan Proponents filed the only objection to the Fee Application (the "Objection" or "Obj.").[7] Briefly, they challenge the Trustee's calculation of the Statutory Cap, contending that the cap does not include the disbursements by the Peruvian Opcos or the equity distributed to the Club Lenders and Senior Noteholders under the CFG Peru Plan. They assert that the Statutory Cap does not exceed the sum of $2,967,938.43 (i.e., 3% of approximately $100 million). They request that the Court either (a) deny the Fee Application to the extent it seeks a commission in excess of $2,967,938.43, plus reasonable expenses, or (b) to the extent that the Court finds that the Statutory Cap is in excess of the Trustee's Lodestar, deny Mr. Brandt's request for any multiplier or other fee enhancement, limit his hourly rate to the rate in existence at the time the hours were recorded, and establish a process by which the Court may objectively assess the reasonableness of the hours that the Trustee charged in this case. Obj. ¶ 14. The Trustee filed a reply in further support of the Fee Application (the "Reply").[8] The Plan Administrator appointed

---

[7]    *The Creditor Plan Proponents' Objection to the First and Final Fee Application of Former Chapter 11 Trustee William A. Brandt, Jr., for Compensation for Services Rendered as Chapter 11 Trustee for the Period from November 10, 2016 Through and Including June 24, 2021, and Second and Final Application of Former Chapter 11 Trustee William A. Brandt, Jr., for Reimbursement of Expenses for the Period March 1, 2020 Through and Including June 24, 2021*, ECF No. 2813. In support of the Objection, the Creditor Plan Proponents filed the *Declaration of Bradley Jordan in Support of The Creditor Plan Proponents' Objection to the First and Final Fee Application of Former Chapter 11 Trustee William A. Brandt, Jr., for Compensation for Services Rendered as Chapter 11 Trustee for the Period from November 10, 2016 Through and Including June 24, 2021, and Second and Final Application of Former Chapter 11 Trustee William A. Brandt, Jr., for Reimbursement of Expenses for the Period of March 1, 2020 Through and Including June 24, 2021*, ECF No. 2814 (the "Jordan Declaration").

[8]    *Reply Brief in Support of First and Final Fee Application of Former Chapter 11 Trustee William A. Brandt, Jr., for Compensation for Services Rendered as Chapter 11 Trustee for the Period from November 10, 2016 Through and Including June 24, 2021, and Second and Final Application of Former Chapter 11 Trustee William A. Brandt, Jr., for Reimbursement of Expenses for the Period March 1, 2020 Through and Including June 24, 2021*, ECF No. 2829 (the "Reply").

under the CFG Peru Plan submitted a statement (the "Plan Administrator Statement")[9] regarding the Fee Application, the Objection and the Reply.

The Court reviewed the Fee Application, the Objection, the Reply, the Plan Administrator Statement, and all filings submitted with or in support of those documents. The Court conducted a hearing on the Fee Application. The Court finds that the Fee Application, together with the attachments thereto, substantially complies in all material respects with the Bankruptcy Rules, Local Bankruptcy Rules, and the Fee Guidelines. For the reasons stated herein, the Court awards the Trustee a commission in the form of (i) an adjusted lodestar of $10,905,914.00 arising from the Trustee's 13,667 hours of time spent on this case at the hourly rates charged when he recorded the hours, (ii) a fee enhancement in the form of a 1.5 multiplier applied to the Lodestar for a total commission of $16,358,871.00, and (iii) expenses in the amount of $326,622.52 incurred in the Final Expense Period, and directs the parties identified in the CFG Peru Plan as being responsible for payment of the Trustee's commission and expenses to pay the commission and expenses. The Court approves, on a final basis, the $355,051.93 in interim expenses previously allowed and paid.

---

[9]    *The Plan Administrator's Statement Regarding: (I) the First and Final Fee Application of Mr. William A. Brandt, Jr., for Compensation for Services Rendered as Chapter 11 Trustee for the Period from November 10, 2016 Through and Including June 24, 2021; (II) the Creditor Plan Proponents' Objection Thereto; and (III) the Reply in Support of First and Final Fee Application of Mr. William A. Brandt, Jr. as Chapter 11 Trustee*, ECF No. 2842 (the "Plan Proponent Statement").

In the Plan Proponent Statement, the Plan Administrator takes no position on the Fee Application, but he asks the Court to "disregard any statements made by Mr. Brandt with respect to the state of [CFG Peru and the Peruvian Opcos] as of and after the Confirmation Date . . . ." *Id.* at 17. The Court has done so.

## JURISDICTION

The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the Amended Standing Order of Reference dated January 31, 2012 (Preska, C.J.). This is a core proceeding pursuant to 28 U.S.C. § 157(b).

## BACKGROUND[10]

<u>The Chapter 11 Cases</u>

On the Petition Date, CFG Peru and fifteen affiliated entities (the "Initial Debtors")[11] filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in this Court. Those debtors were comprised primarily of investment holding companies and non-operating companies that had been in the business of trading frozen seafood products and providing freight services. Over the next eleven months, a total of twenty-one affiliates of the Initial Debtors (the "Affiliated Debtors" and, together with the Initial Debtors, the "Debtors") filed voluntary chapter 11 petitions, commencing their chapter 11 cases herein (collectively, the "Chapter 11 Cases").[12] With the

---

[10]    Except as stated, the Background facts are not in dispute. In setting forth these facts, the Court relies on the Brandt and Jordan Declarations, the *Declaration of Ng Puay Yee Pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York and in Support of Debtors' First Day Motions and Applications*, ECF No. 2 (the "First Day Decl." or "First Day Declaration"), and the *Memorandum Decision and Order Granting Motion for the Appointment of A Chapter 11 Trustee*, ECF No. 203 (the "Trustee Decision and Order"). The Court takes judicial notice of the First Day Declaration and the Trustee Decision and Order. *See Little Hearts Fam. II LP v. Carter (In re 305 East 61st Street Grp.)*, 644 B.R. 75, 80 n.6 (Bankr. S.D.N.Y. 2022) ("The Court is permitted to take judicial notice of public filings on its own docket in a bankruptcy case." (citing Fed. R. Evid. 201)); *see also Teamsters Nat'l Freight Indus. Negotiating Comm. v. Howard's Express, Inc. (In re Howard's Express, Inc.)*, 151 F. App'x. 46, 48 (2d Cir. 2005) (summary order) (stating that courts are empowered to take judicial notice of public filings, including a court's docket).

[11]    The Initial Debtors consist of: China Fishery Group Limited (Cayman), Pacific Andes International Holdings Limited (Bermuda), N.S. Hong Investment (BVI) Limited, South Pacific Shipping Agency Ltd. (BVI), China Fisheries International Limited (Samoa), CFGL (Singapore) Private Limited, Chanery Investment Inc. (BVI), Champion Maritime Ltd (BVI), Growing Management Limited (BVI), Target Shipping Limited (Hong Kong), Fortress Agents Limited (BVI), Ocean Expert International Limited (BVI), Protein Trading Limited (Samoa), CFG Peru Investments Pte, Ltd. (Singapore), Smart Group Limited (Cayman) and Super Investment Limited (Cayman).

[12]    The Affiliated Debtors filed their voluntary chapter 11 petitions, as follows:

<u>September 29, 2016</u>: Pacific Andes Resources Development Ltd. (Bermuda).
<u>March 27, 2017</u>: Golden Target Pacific Limited (BVI) and Nouvelle Foods International Ltd. (BVI).

exception of CFG Peru, the Debtors remained in possession and control of their business and assets as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. As discussed below, by order dated November 10, 2016, the Court appointed Mr. Brandt as the chapter 11 trustee of CFG Peru. He served in that capacity until June 24, 2021.

The Structure of CFG Peru, Its Affiliates, and Their Creditors

The Debtors comprise a portion of the Pacific Andes Group of companies that, as of the Petition Date, collectively constituted the world's twelfth-largest fishing company. First Day Decl. ¶ 29. Members of the Ng family (the "Ng Family") controlled the group's operations. *See* Brandt Decl. ¶ 15. CFG Peru is a holding company incorporated in Singapore whose principal assets include its direct interest in CFG Investment, a Peruvian entity, and its indirect interest in Copeinca, also a Peruvian entity, which together comprise the Peruvian Opcos. CFG Peru is an indirect subsidiary of Pacific Andes International Holdings Limited ("PAIH") and Pacific Andes Resources Development Limited ("PARD"). As of the Petition Date, PAIH and PARD were listed on the main board of the Stock Exchange of Hong Kong Limited (the "HK Stock Exchange"), and the main board of the Singapore Exchange Securities Trading Limited (the "Singapore Exchange"), respectively. First Day Decl. ¶ 31. Together with Sustainable Fishing Resources (a Peruvian entity that is a direct subsidiary of CFG Peru) and other entities, the Peruvian Opcos operate the anchovy fishing and processing business that constitutes the Peruvian Business. The Peruvian Opcos and Sustainable Fishing Resources are not Debtors in the Chapter 11 Cases.

_____

April 17, 2017: Pacific Andes International Holdings (BVI) Limited and Zhonggang Fisheries Limited (BVI).

May 2, 2017: Admired Agents Limited (BVI), Chiksano Management Limited (BVI), Clamford Holding Limited (BVI), Excel Concept Limited (BVI), Gain Star Management Limited (BVI), Grand Success Investment (Singapore) Private Limited, Hill Cosmos International Limited (BVI), Loyal Mark Holdings Limited (BVI), Metro Island International Limited (BVI), Mission Excel International Limited (BVI), Natprop Investments Limited (Cook Islands), Pioneer Logistics Limited (BVI), Sea Capital International Limited (BVI), Shine Bright Management Limited (BVI), Superb Choice International Limited (BVI), and Toyama Holdings Limited (BVI).

9

As of the Petition Date, the Peruvian Opcos comprised the main operating entities of the Peruvian Business. *Id*. ¶ 38. Together, they hold the largest quota for the harvest of anchovy in Peru and, together with their affiliates, are among the world's largest producers of fish meal and fish oil. *Id*. ¶ 37. The operating assets of the Peruvian Business include ten plants located in eight towns and villages in Peru and sixty-six vessels ranging in size from 197 to 807 tons. *Id.* ¶ 37. The business employs approximately 2,800 people, of which 2,400 employees are based in Peru, including crew on the vessels, who are retained by a crewing agent and not directly employed by the Peruvian Opcos. *Id.* ¶ 52. Sustainable Fishing Resources owned a fleet of seven fishing vessels used to catch blue-water fish for human consumption, such as mackerel. *Id.* ¶ 49. As of the Petition Date, Sustainable Fishing Resources had not operated for approximately two years. *Id.* ¶ 50.

The two creditor groups holding the largest claims against the Peruvian Opcos are (i) the Club Lenders (comprised of the Club Lender Parties[13] and the Hongkong and Shanghai Banking Corporation ("HSBC-HK")) and (ii) the Senior Noteholders. Brandt Decl. ¶ 21. The Senior Noteholders' claims arise under certain 9.75% senior notes in the principal amount of $300 million that were due in 2019 (the "Senior Notes"), issued under that certain indenture dated as of July 30, 2012 (the "Senior Notes Indenture"), by and among CFG Investment, as issuer, the Senior Notes trustee, and various guarantors, including CFG Peru and Sustainable Fishing Resources. Trustee Decision and Order at 12; Brandt Decl. ¶ 21.

The Club Lenders' claims arise under an unsecured facility agreement dated March 20, 2014 (as amended from time to time, the "Club Facility"), which provided Debtor China Fisheries International Limited (Samoa) ("CFIL") and the Peruvian Opcos (collectively, the "Club

---

[13]    The Club Lender Parties consist of: Coöperatieve Rabobank U.A. ("Rabobank"), Standard Chartered Bank (Hong Kong) Limited ("Standard Chartered Bank"), China CITIC Bank International ("China CITIC") and DBS Bank (Hong Kong).

Borrowers") with $650,000,000 in financing. Brandt Decl. ¶ 22. China Fishery Group Limited (Cayman) ("CFGL") guaranteed the Club Facility. Trustee Decision and Order at 9-10. The Club Lenders are not creditors of CFG Peru.

Events Leading to the Filing of the Chapter 11 Cases

Within a month of the closing of the Club Facility, the Club Borrowers began to seek amendments and waivers of their obligations under the facility. *Id.* at 14-15. Over the next eighteen months, the Club Lenders entered into eight Amendment and Waiver Agreements with the Club Borrowers. *Id.* at 15. The Club Borrowers breached each such agreement. To obtain the Eighth Amendment and Waiver, the Club Borrowers agreed, in part, to retain an investment banker to assist them with the sale of the Peruvian Opcos. *Id.* at 18-19. On November 25, 2015, shortly after the expiration of the Eighth Amendment and Waiver Agreement, HSBC-HK, as a Club Lender acting on its own account, filed winding up petitions and related applications for the appointment of joint provisional liquidators against CFGL and CFIL in Hong Kong. *Id.* at 19. On November 27, 2015, HSBC-HK filed winding up petitions and related applications for the appointment of provisional liquidators against each of those entities in the Cayman Islands. *Id.* Each of the Hong Kong and Cayman Courts granted the winding up petitions on an interim basis and appointed the same three individuals from KPMG as joint provisional liquidators (the "KPMG JPLs"). *Id.*

The Club Lender Parties opposed HSBC-HK's commencement of the winding up proceedings. In December 2015, they entered into a Deed of Undertaking with PAIH, PARD, and the Hong Kong Court, pursuant to which the Club Lender Parties agreed to support efforts to dismiss the winding up petitions filed against CFGL and CFIL, in consideration for PAIH and PARD agreeing to provide greater transparency into the operations of the Peruvian Business, and to move forward with a sale process for the Peruvian Opcos. *Id.* at 21-22. With the Club Lender

11

Parties' support, CFGL and CFIL successfully petitioned the Hong Kong Court for an order dismissing the winding up petitions against them (the "Hong Kong Order"). *Id.* Thereafter, HSBC-HK advised the Club Lender Parties that it intended to appeal the Hong Kong Order and to proceed with the winding up proceedings against CFGL and CFIL in the Cayman Islands. *Id.* To resolve those matters, in January 2016, CFGL and CFIL entered into a Deed of Undertaking with HSBC-HK (the "2019 Deed of Undertaking"). Without limitation, and in substance, under that deed, HSBC-HK agreed (i) not to appeal the Hong Kong Order, (ii) to withdraw the Cayman Islands winding up petitions, and (iii) to dismiss the KPMG JPLs in Hong Kong and the Cayman Islands, in consideration for the companies' agreements to implement a sale process for the Peruvian Opcos that called for the Opcos to be sold by July 15, 2016. *Id.* at 22-23. CFGL and CFIL also consented to the immediate reappointment of the KPMG JPLs by the Cayman Court if they failed to sell the Peruvian Opcos by July 15, 2016. *Id.* at 24.

<u>The Commencement of the Chapter 11 Cases and Related Proceedings</u>

On June 30, 2016, less than two weeks before the July 15 deadline for selling the Peruvian Opcos under the 2019 Deed of Undertaking, the Initial Debtors, including CFGL and CFIL, filed their voluntary chapter 11 petitions herein. *Id.* at 30. The commencement of those cases violated the 2019 Deed of Undertaking and terminated the sale process called for thereunder. The next day, PARD voluntarily filed an application under section 210(1) of the Singapore Companies Act, Chapter 50 of the Laws of the Republic of Singapore, to stay all actions against it and certain of its affiliates (the "Singapore Proceedings"). *Id.* The High Court of the Republic of Singapore granted the stay. *Id.* After PARD failed to persuade the High Court to extend the stay beyond Singapore's borders, PARD voluntarily discontinued the Singapore Proceedings. On September 29, 2016, it filed a voluntary petition under chapter 11 in this Court. *Id.* at 30 n.33.

The National Institute for the Defense of Competition and Protection of Intellectual Property ("INDECOPI") is the Peruvian administrative and regulatory authority that adjudicates and supervises the restructuring and liquidation of Peruvian companies that are subject to proceedings under Peruvian insolvency law. As of the Petition Date, the Peruvian Opcos were not eligible under Peruvian law to commence voluntary insolvency proceedings because those entities did not have audited financial statements. Prior to the Petition Date, management of the Peruvian Opcos approached three "friendly" creditors in Peru and arranged with them to file involuntary petitions against each of the Peruvian Opcos and against Sustainable Fishing Resources. *Id*. at 30-31. On the Petition Date, the creditors commenced those proceedings (the "Peruvian Insolvency Proceedings"). The Peruvian Opcos and Sustainable Fishing Resources did not file chapter 11 petitions. However, on the Petition Date, the putative "foreign representatives" of those entities filed petitions for recognition of the Peruvian Insolvency Proceedings under chapter 15 of the Bankruptcy Code (the "Recognition Petitions").[14] *See id.* at 31.

Other Insolvency Proceedings Affecting the Pacific Andes Group

CFG Peru's affiliates span the globe. As of the Petition Date, certain of those entities faced insolvency proceedings, as follows:

The German Insolvency Proceedings

In December of 2015, a group of companies commonly referred to as the "Pickenpack Group" requested that the Local Court of Lüneberg, Germany, open an insolvency proceeding

---

[14]    *Verified Petition of Francisco Paniagua as Foreign Representative of the Above Captioned Debtors in a Foreign Proceeding, for (I) Recognition of a Foreign Main Proceeding pursuant to 11 U.S.C. §§ 1515 and 1517, and (II) Relief Pursuant to 11 U.S.C. 1520 and 1521*, No. 16-11891, ECF No. 4; *Verified Petition of Francisco Paniagua as Foreign Representative of the Above Captioned Debtors in a Foreign Proceeding, for (I) Recognition of a Foreign Main Proceeding pursuant to 11 U.S.C. §§ 1515 and 1517, and (II) Relief Pursuant to 11 U.S.C. 1520 and 1521*, No. 16-11892, ECF No. 4; *Verified Petition of Francisco Paniagua as Foreign Representative of the Above Captioned Debtors in a Foreign Proceeding, for (I) Recognition of a Foreign Main Proceeding pursuant to 11 U.S.C. §§ 1515 and 1517, and (II) Relief Pursuant to 11 U.S.C. 1520 and 1521*, No. 16-11893, ECF No. 4.

under the German Insolvency Act. Brandt Decl. ¶ 44. Based largely on a report by the preliminary

insolvency administrator, the German Court found the Pickenpack Group to be insolvent and

over-indebted and appointed a preliminary insolvency administrator over the Pickenpack Group

assets (the "Pickenpack Administrator"). *Id.*

       <u>The BVI Liquidation Proceedings</u>

       Both before and after the Petition Date, a series of applications was filed before the High

Court of Justice of the British Virgin Islands (the "BVI Court"), requesting the appointment of

provisional liquidators for a number of companies in the Pacific Andes Group. *Id.* ¶ 33. As relevant

to the Fee Application, the most significant of these proceedings began on September 26, 2016,

when Bank of America, N.A. ("Bank of America") applied for the appointment of provisional

liquidators for Pacific Andes Enterprises (BVI) ("PAE (BVI)"), Parkmond Group Limited (BVI)

("Parkmond") and PARD Trade Limited (BVI) ("PARD Trade"), each a non-Debtor affiliate of

PAIH and PARD. *Id.* A month later, Rabobank and Standard Chartered Bank sought similar relief

with respect to PAE (BVI). *Id.* In December 2016 and January 2017, respectively, a trade creditor

and Malayan Banking Berhad, Hong Kong Branch ("Maybank") each filed an application for the

appointment of provisional liquidators for Europaco Limited (BVI) ("Europaco"), also a non-

Debtor affiliate of PAIH and PARD. *Id.*

       The BVI Court appointed three individuals affiliated with FTI Consulting Inc. as

liquidators for PAE (BVI), Europaco, Parkmond, and PARD Trade (the "FTI Liquidators").[15]

*Id.* ¶ 34. Through liquidation applications to the BVI Court in the names of entities already within

---

[15]    Although the joint provisional liquidators were affiliated with FTI Consulting, Inc., the consulting company had no involvement in the BVI Liquidation Proceedings or the later affiliated proceedings in Hong Kong. *See* Brandt Decl. ¶ 34 n.7. The use of "FTI" is for convenience in identification of the liquidators and proceedings related to them and has been used throughout the CFG Peru case, including in Court filings.

their control, the FTI Liquidators subsequently were appointed to serve in the same capacity for Richtown Developments Ltd. ("Richtown") and Metro Win, Inc., Ltd. (Hong Kong), and for five additional entities that were outside the Pacific Andes Group,[16] and alleged to be controlled by members of the Ng Family (together with PAE (BVI), Europaco, Parkmond, and PARD Trade, the "FTI Liquidation Entities"). *Id.* All such entities were purported to be participants in trade finance fraud. *Id.* Additionally, the FTI Liquidators replaced the directors of certain Pacific Andes Group entities—which were wholly owned subsidiaries of some of the FTI Liquidation Entities— with FTI Director Services, an affiliate of FTI Consulting, Inc. *Id.* ¶ 34.[17]

The Appointment of a Chapter 11 Trustee

The Club Lender Parties Seek the Appointment of a Chapter 11 Trustee

As of the Petition Date, members of the Ng Family owned most of the Debtors' equity interests, and through those interests they controlled CFG Peru and the Peruvian Opcos. Shortly after the Petition Date, the Club Lender Parties made clear their lack of confidence in the Ng Family's control of the Debtors, and particularly of the Peruvian Opcos. In their initial filing in the Chapter 11 Cases, the Club Lender Parties informed this Court that they

> intend[ed] to file a motion seeking the appointment of a trustee in these Chapter 11 cases to ensure independent fiduciary oversight to preserve the estates' equity stakes in a lucrative fishery business and processing plants in Peru operated by certain non-Debtor affiliates (the "Peruvian Business"). The Debtors' equity stakes in the Peruvian Business—which is operated by certain affiliates whose only connections to the United States are professional retainers and a New York bond indenture, and are the subject to [the] coordinated [Peruvian Insolvency Proceedings]—comprise the single

---

[16]    The non-Pacific Andes Group entities, sometimes referred to as "Agent Companies," are Solar Fish Trading Ltd. ("Solar Fish"), Palanga Ltd. ("Palanga"), Zolotaya Orda Ltd. ("Zolotaya"), Alatir Ltd. and Perun, Ltd. *See id.* ¶ 34 n.8.

[17]    The Pacific Andes Group entities to which FTI Director Services was appointed include Europaco (AP) Limited (BVI), Europaco (BP) Limited (BVI), Europaco (EP) Limited (BVI), Europaco (GP) Limited (BVI), New Millennium Group Holdings, Ltd. (BVI), Pacos Processing Ltd. (Cayman) and Pacos Trading Ltd. (Cayman). *See id.* ¶ 34 n.9.

> most valuable asset of the Debtors' estates, the proceeds of which will dictate
> recoveries in these chapter 11 cases.

Club Lender Parties' Statement at 5.[18] The Club Lender Parties advised that they and other significant creditors remained "very concerned that the valuable Peruvian Business is outside the Chapter 11 estates and that local management may take precipitous action to destroy the value under the direction of the Debtors' sponsors." *Id.* at 11.

On August 9, 2016, the Club Lender Parties filed the Trustee Motion.[19] The motion enjoyed support among the largest creditors in the Chapter 11 Cases, as the Senior Noteholders,[20] Maybank,[21] Bank of America,[22] and the Pickenpack Administrator[23] all filed statements with the Court in support of the motion. Those opposing the Trustee Motion included the Peruvian Opcos and Sustainable Fishing Resources,[24] whose objection was supported by Francisco Paniagua (the

---

[18]  *Club Lender Parties' Statement, Limited Objection and Reservation of Rights to the Debtors' First Day Motions, and Request for a Scheduling Conference*, ECF No. 13 (the "Club Lender Parties' Statement").

[19]  *Club Lender Parties' Motion for the Entry of an Order Directing the Appointment of a Chapter 11 Trustee Pursuant to 11 U.S.C. § 1104(a)(2)*, ECF No. 57 (the "Trustee Motion").

[20]  *Statement of Senior Noteholder Committee Regarding Club Lender Parties' Motion for Entry of an Order Directing the Appointment of a Chapter 11 Trustee Pursuant to 11 U.S.C. Section 1104(a)(2)*, ECF No. 62.

[21]  *Maybank's Joinder in Respect of the Club Lender Parties' Motion for the Entry of an Order Directing the Appointment of a Chapter 11 Trustee Pursuant to 11 U.S.C. Section 1104(a)(2)*, ECF No. 61.

[22]  *Joinder to the Club Lender Parties' Motion for Entry of an Order Directing the Appointment of a Chapter 11 Trustee*, ECF No. 63.

[23]  *Joinder of the Insolvency Administrator of the Pickenpack Group to the Club Lender Parties' Motion for the Entry of an Order Directing the Appointment of a Chapter 11 Trustee Pursuant to 11 U.S.C. § 1104(a)(2)*, ECF No. 65.

[24]  *Objection to the Club Lender Parties' Motion for the Entry of an Order Directing the Appointment of a Chapter 11 Trustee*, ECF No. 103.

general manager of the Peruvian Opcos),[25] Gustavo Miró-Quesada Milich (the Peruvian Opcos'

legal advisor),[26] and the Ng Family.[27]

In connection with the commencement of the Chapter 11 Cases, Ng Puay Yee (then-CEO

of CFGL) submitted a supportive declaration. First Day Decl. ¶ 1. Ms. Ng maintained that "the

purpose of these chapter 11 cases is simple—to provide the Debtors with a breathing spell in order

to implement a restructuring of their businesses and utilize the automatic stay to prevent creditors

from forcing a fire sale [of the Peruvian Opcos], which would preclude structurally subordinated

creditors and shareholders [i.e., the Initial Debtors' creditors and shareholders] from realizing

values." *Id.* ¶ 20. The Club Lender Parties had other plans for the Debtors. They sought the

appointment of a chapter 11 trustee: (i) to cause the Peruvian Opcos to contest and dismiss the

Peruvian Insolvency Proceedings, and thereafter (ii) to cause the Debtors to sell the Peruvian

Opcos, pay off the creditors of the Peruvian Opcos, and distribute the net proceeds from the sale

to the Debtors' creditors and shareholders in accordance with their rights and priorities. *See* Trustee

Motion ¶¶ 1-2.

In granting the Trustee Motion, the Court found that the Club Lender Parties established

grounds for the appointment of a chapter 11 trustee under section 1104(a)(2) by clear and

convincing evidence. Trustee Decision and Order at 47. In reaching that conclusion, and in

considering the "prospects for the Debtors' rehabilitation," the Court noted that

> only minimal income is expected to be received in the ordinary course of
> business in the near term because, among other things, the CF Group debtors
> rely on the Peruvian Opcos for substantially all of their income, and any

---

[25]   *Declaration Of Francisco Paniagua*, ECF No. 99.

[26]   *Declaration of Gustavo Miró-Quesada Milich*, ECF No. 104.

[27]   *Declaration of Ng Puay Yee in Opposition to the Lenders' Motion for the Entry of an Order Directing the
Appointment of a Chapter 11 Trustee Pursuant to 11 U.S.C. § 1104(a)(2)*, ECF No. 105.

> income from the Peruvian Opcos is speculative and may not occur anytime
> soon due to the involuntary petitions against the Peruvian Opcos in Peru.

*Id.* at 43. In appointing a chapter 11 trustee for CFG Peru, the Court noted that CFG Peru "is the 100% direct and indirect owner of the Peruvian Opcos" and that "[i]n the course of any restructuring (standalone or otherwise), that Debtor must, among other things, assess the value of its interests in the Peruvian Opcos and determine how to apply that value in furtherance of the restructuring." The Court's mandate for the chapter 11 trustee was: "to evaluate the optimal way to maximize the value of the Peruvian Business and to determine how to realize that value for the benefit of the Debtors' estates and creditors." *Id.* at 47-48. In so ruling, the Court

> reject[ed] the [Club Lender Parties'] contention that they are entitled to the benefit
> of their prepetition bargain with the Debtors and that the trustee should work
> towards causing the Peruvian Opcos to dismiss the Peruvian Insolvency
> Proceedings in favor of the sale of the Peruvian Business.

*Id*. Moreover, consistent with its mandate, the Court directed the trustee "in furtherance of his or her fiduciary duties, without limitation, to assess the highest and best use of those assets in the context of the resolution of these Chapter 11 cases and the means for the Debtors to realize maximum benefits from those assets." *Id.* at 48-49.

<u>The Appointment of Mr. Brandt as the Chapter 11 Trustee</u>

On November 10, 2016, the U.S. Trustee sought approval of Mr. Brandt as the chapter 11 trustee of CFG Peru.[28] On that same date, the Court entered an order approving the selection of Mr. Brandt as the trustee.[29] At that time, Mr. Brandt was the Executive Chairman and founder of Development Specialists, Inc. ("DSI"), a restructuring and financial advisory firm that specializes

---

[28] *Application for Order Approving the Appointment of a Chapter 11 Trustee in Debtor CFG Peru Singapore*, ECF No. 218.

[29] *Order Approving the Appointment of Chapter 11 Trustee*, ECF No. 219.

in interim management, turnaround consulting, operational due diligence, creditor advisory services, and financial and operational restructuring. Brandt Decl. ¶ 2. By order dated April 28, 2017, the Court granted the Trustee's application to retain DSI as accountant to the Trustee, *nunc pro tunc* to November 10, 2016.[30] For services rendered during the case, CFG Peru paid DSI approximately $8.2 million in fees.[31]

There are two additional items to note in connection with Mr. Brandt's retention as Trustee in this case. First, at the U.S. Trustee's request, he agreed to forego seeking interim compensation during his tenure as Trustee, and to seek compensation only in his final fee application. *See* Fee Application at 53. Mr. Brandt has not received any interim compensation awards in this case.[32] Second, in what he describes as being "in aid of a transparent process," Mr. Brandt explains that, at the U.S. Trustee's request, during his tenure, he filed Monthly Operating Reports ("MORs") for the CFG Peru debtor that disclosed the disbursements by CFG Peru to its creditors, as well as the disbursements by the Peruvian Opcos to their creditors (the "MOR Disbursements"). Fee Application at 31. He explains that an MOR that covered only the disbursements by CFG Peru would have provided no useful information to creditors, the U.S. Trustee, or this Court, as such an MOR would disclose only administrative payments by CFG Peru such as professional fees and

---

[30]    *Order Granting Chapter 11 Trustee's Application for Entry of an Order Authorizing Retention of Development Specialists, Inc. as Accountant to the Trustee Nunc Pro Tunc to November 10, 2016*, ECF No. 491.

[31]    *Thirteenth Interim and Final Fee Application of Development Specialists, Inc. for Compensation for Services Rendered and Reimbursement of Expenses as Accountant to the Chapter 11 Trustee for (I) the Thirteenth Interim Period from November 1, 2020 through and Including June 10, 2021 and (II) the Entire Case Period from November 10, 2016 through and Including June 10, 2021*, ECF No. 2663.

[32]    However, on November 20, 2020, the Trustee, with the consent of the U.S. Trustee, requested an interim payment for reimbursement of out-of-pocket expenses for the interim period from November 10, 2016 through February 29, 2020 in the amount of $ 355,051.93. *See First Interim Application of the Chapter 11 Trustee, William A. Brandt, Jr., for Reimbursement of Expenses for the Period from November 10, 2016 Through and Including February 29, 2020*, ECF No. 2231. On December 20, 2020, the Court granted this interim application. *See Order Granting Application for Reimbursement of Expenses*, ECF No. 2272

quarterly U.S. Trustee fees. *Id.* Instead, the MORs that the Trustee filed accounted for the operations and financial transactions carried out by both CFG Peru and the Peruvian Opcos—the entities that hold the value in the CFG Peru enterprise—the same value the Trustee had been appointed to protect, preserve and enhance. *Id.* CFG Peru paid quarterly fees to the U.S. Trustee based on the entire CFG Peru enterprise, as reflected in the MOR Disbursements. That was consistent with the Trustee's view of the calculation of the Statutory Cap on his commission. [33]

<u>The Trustee Embraces the Court's Mandate and Promptly Resolves the CFG Peru Financial Crisis</u>

The Court directed the Trustee "to evaluate the optimal way to maximize the value of the Peruvian Business and to determine how to realize that value for the benefit of the Debtors' estates and creditors." Trustee Order and Decision at 47-48. The Trustee fully embraced that mandate and quickly addressed a "gating issue," the resolution of which was critically important to the Trustee's successful operation of CFG Peru and its assets.

The Trustee inherited a financial crisis at CFG Peru and the Peruvian Opcos that he had to resolve quickly in order to have any opportunity to preserve, if not maximize, the value of the Peruvian Opcos for the benefit of the Debtors' estates. CFG Peru is a holding company that has no material assets other than its equity interests in the Peruvian Opcos. As of the Petition Date,

---

[33]    As the Trustee explained early in these cases:

> The issue is what applies under 326. The bookies might say, if you were at a racetrack, that 326 is the handle; in other words, all monies turned over, disbursed by the estate, which includes, not just sale proceeds, but all of the obvious revenue and distributions by the subsidiary companies. The number here will be impossibly large. And no one in their right mind . . . would ever think of awarding it that way. But there has to be some measure along the continuum, from the bottom to the top, of asking for some enhancement, if necessary, of the lodestar, or simply the awarding of the lodestar, including myself and the other members of my firm. But yes, Your Honor, for the purposes of the Code, if you read it literally, it would include the . . . handle, which is not just the sums derived from a sale, but all other sums that flow upward or are disbursed. And indeed, as we've sat down with the U.S. Trustee and prepared the monthly operating reports, that was the request they made of us, that we provide a roll-up for transparency for the creditors.

*Transcript Regarding Hearing Held on April 12, 2017*, ECF No. 474 ("April 12, 2017 Hr'g Tr.") at 81:10-82:6.

CFG Peru had no income of its own to satisfy even the most basic financial demands on a chapter 11 debtor, such as the payment of quarterly U.S. Trustee fees or the fees of professionals engaged in the case, and the Peruvian Opcos (the principal source of that income) were mired in the Peruvian Insolvency Proceedings. *See* Brandt Decl. ¶ 56. The Peruvian Opcos did not have access to financing because their $125 million line of credit had been revoked in the wake of the prepetition interim appointment of the KPMG JPLs for CFGL and CFIL in Hong Kong and Cayman, and the commencement of the Peruvian Insolvency Proceedings against the Peruvian Opcos. *Id.* The Peruvian Opcos could not commence a fishing season without financing as their business typically was financed by a line of credit that was repaid when the catch was processed and sold. *Id.* Thus, when the Trustee arrived on the scene, the Peruvian Opcos did not have access to the financing they needed to operate their business or access to the cash they needed to resolve the claims of the petitioning creditors in the Peruvian Insolvency Proceedings. *See id.*

The Trustee quickly determined that litigating the involuntary insolvency petitions against the Peruvian Opcos and Sustainable Fishing Resource before INDECOPI in Peru and the Recognition Petitions in this Court would be both expensive and detrimental to his fledgling relationship with local management and creditors of the Peruvian Opcos, and with Peruvian civic leaders. *See id.* ¶ 38. In an effort to facilitate a consensual resolution of the Peruvian Insolvency Proceedings, the Trustee reached out to the Peruvian Opcos' management, and their legal and financial advisors, and consulted with political contacts and civic leaders with whom he is acquainted. *See id.* ¶¶ 38-39. At the same time, the Trustee sought financing for the Peruvian Business. To obtain such financing, the Trustee, with the assistance of his DSI professionals, turned first to the Peruvian Opcos' traditional lenders, as well as to the lenders under the Club Facility, certain large institutional lenders, and smaller local lenders in Peru. Those efforts were

21

unsuccessful, as none of those entities would extend credit to CFG Peru. *See id.* Thereafter, the
Trustee successfully reached out to the Peruvian Opcos' longstanding customers in Japan and
China to obtain financing in anticipation of their future purchases. *See id.* ¶ 57. Significantly, that
financing agreement evolved into a long-term financing commitment. The Trustee's negotiations
with the customers were successful enough to permit the Peruvian Opcos to continue operations
and to begin accumulating cash that ultimately permitted them to operate their businesses without
any third-party financing. The Trustee managed to operate a billion-dollar business for more than
four years without traditional outside financing. *See id.*

With access to the negotiated financing, and with the cooperation and assistance of the
Peruvian Opcos' management and the local petitioning creditors, the Trustee quickly and
successfully resolved the issues connected with the Peruvian Insolvency Proceedings. Pursuant to
a stipulation dated on or about November 23, 2016,[34] in exchange for the satisfaction of the
petitioning creditors' debts, and the Trustee's and management's commitment to work
collaboratively toward their shared goals of restoring and preserving the health and viability of the
Peruvian Opcos, the petitioning creditors dismissed the Peruvian Insolvency Proceedings, and the
respective foreign representatives of Sustainable Fishing Resources and the Peruvian Opcos
withdrew the Recognition Petitions.[35] In an effort to protect CFG Peru's interests in the Peruvian

---

[34]    *Stipulation By and Among the Chapter 11 Trustee, CFG Investment S.A.C., Corporacion Pesquera Inca S.A.C.,
and Sustainable Fishing Resources S.A.C.*, ECF No. 244.

[35]    Complete resolution of the Peruvian Insolvency Proceedings required further action by the Trustee, as one of the
Club Lender Parties, China CITIC, without notice to other parties, had filed a further involuntary proceeding with
INDECOPI against the Peruvian Opcos in September 2016, prior to the Trustee's appointment. The Trustee filed a
motion against China CITIC to enforce the automatic stay and to have the bank's filing declared void ab initio, upon
which China CITIC withdrew the remaining INDECOPI proceedings. *See Chapter 11 Trustee's Motion for the Entry
of an Order Pursuant to Sections 105(a) and 362 of the Bankruptcy Code to Enforce the Automatic Stay,* ECF No.
268; *Notice of Withdrawal of Chapter 11 Trustee's Motion for the Entry of an Order Pursuant to Sections 105(a) and
362 of the Bankruptcy Code to Enforce the Automatic Stay Scheduled for December 21, 2016 at 11:00 a.m.*, ECF No.
279.

Opcos, the Trustee moved this Court for an order confirming that the automatic stay applied to any

collection actions pursued in Peru by holders of claims under the Club Facility and holders of the

Senior Notes, and by CFG Peru's affiliate, CFIL.[36] The Court granted the Trustee's request.[37]

After the Trustee obtained financing for the Peruvian Opcos, he was able to address CFG

Peru's financing needs. The Trustee negotiated an intercompany loan agreement with CFG

Investment, a Peruvian Opco, pursuant to section 364(c)(1) of the Bankruptcy Code (the

"Superpriority Loan"),[38] that was funded, in part, by proceeds of sales of Sustainable Fishing

Resources' assets, primarily fishing vessels (described below). The Trustee received Court

approval of the Superpriority Loan.[39]

<u>Trustee Adopts a Plan for Maximizing the Value of CFG Peru's Assets</u>

After addressing the Peruvian Opcos' financial problems and securing the dismissal of the

Peruvian Insolvency Proceedings, the Trustee focused on the challenge of how to maximize the

value of CFG Peru and to realize that value for the benefit of the Debtors' estates and creditors.

As a holding company, CFG Peru had no material assets other than its equity interests in the

Peruvian Opcos. The Trustee determined that the only feasible way to comprehensively maximize

and monetize the value of CFG Peru was to maximize the value of the Opcos and sell the equity

---

[36]   *Motion of William A. Brandt, Jr., Chapter 11 Trustee for CFG Peru Investments Pte. Ltd. (Singapore), Pursuant to 11 U.S.C. §§ 105(a), 362(a), and 541(a)(1), for Entry of an Order Confirming Applicability of Automatic Stay to Any Collection Actions Pursued in Peru by Holders of Club Facility and Senior Notes Claims and by Debtor CFIL against Peruvian Operating Companies*, ECF No. 743.

[37]   *Order Granting Motion of William A. Brandt, Jr., Chapter 11 Trustee for CFG Peru Investments Pte. Ltd. (Singapore), Pursuant to 11 U.S.C. §§ 105(a), 362(a), and 541(a)(1), for Entry of an Order Confirming Applicability of Automatic Stay to Any Collection Actions Pursued in Peru by Holders of Club Facility and Senior Notes Claims and by Debtor CFIL against Peruvian Operating Companies*, ECF No. 809.

[38]   *Motion for an Order (I) Authorizing the Chapter 11 Trustee to Obtain Intercompany Postpetition Financing on a Superpriority Administrative Claim Basis, and (II) Granting Related Relief*, ECF No. 548.

[39]   *Order (I) Authorizing the Chapter 11 Trustee to Obtain Intercompany Postpetition Financing on a Superpriority Administrative Claim Basis, and (II) Granting Related Relief*, ECF No. 585.

of CFG Investment (the "CFGI Equity Interests"). Brandt Decl. ¶ 61. A purchaser of the CFGI

Equity Interests would acquire the stock, and with it, the assets and liabilities of the Peruvian

Opcos. Thus, the proceeds from the sale of the CFGI Equity Interests necessarily would first be

applied to satisfy the debts of the Peruvian Opcos, including the obligations under the Senior Notes

and Club Facility, in full in cash. Only the remaining proceeds could be used to pay creditors of

CFG Peru and the other Debtors.

In broad strokes, in formulating his plan to market and sell the CFGI Equity Interests, the

Trustee determined that a prospective purchaser of these interests would need to be comfortable

with the quality and value of the Peruvian Opcos' operations and have certainty regarding the

extent of their liabilities. *See id.* Accordingly, after obtaining the financing necessary to put CFG

Peru and the Peruvian Opcos on firm financial grounds, and in furtherance of the sale process, the

Trustee essentially simultaneously focused his attention on three things: (i) restoring and

strengthening the value of the Peruvian Opcos, (ii) managing/reducing the liabilities of CFG Peru

and the Peruvian Opcos, and (iii) marketing the CFGI Equity Interests. The Court considers those

matters below.

Restoring and Strengthening the Value of the Peruvian Opcos

Restructuring the Peruvian Opcos' Business Operations

Throughout his tenure, the Trustee spent the time and resources necessary for him to

acquire an understanding of applicable international and maritime laws and become a near-expert

on the highly regulated fishing industry in Peru, the fish meal and fish oil production process, and

the global market for the Peruvian Opcos' products. Brandt Decl. ¶ 52. In the thirty months

preceding the Petition Date, the financial condition of the Peruvian Opcos had deteriorated largely

because of the predominating El Niño weather pattern between 2014 to 2016, which negatively

impacted the anchovy fishing industry. First Day Decl. ¶ 99. With the assistance of DSI, the Trustee conducted an in-depth review of the Peruvian Opcos' books and records, audit reports, industry reports, and myriad other sources to understand underlying issues with the Peruvian Opcos' operations that were exacerbated by the effects of El Niño. On the strength of those efforts, the Trustee was able to take steps to rationalize and restructure the assets of the Peruvian Opcos in a manner that would stabilize the businesses and restore their profitability. *See* Brandt Decl. ¶¶ 52-53. For example, as of the Petition Date, audits for the Peruvian Opcos had not been finished for 2015, 2016, and 2017. The Trustee worked with Deloitte in Peru to resurrect the audit practice, obtain prompt audits for the open years, and ensure annual compliance thereafter. *Id.* ¶ 49. Moreover, the Trustee oversaw the establishment of a computer system for the Peruvian Opcos that was separate and independent from operations of the other Ng Family-owned Pacific Andes Group entities in Hong Kong to preserve the integrity of the data. The establishment of a separate computer system in Peru ensured control over data entry and certainty over data such as receivables and payables, ensuring the integrity of financial information shared with this Court, with creditors, and with prospective purchasers. *See id.* ¶ 55.

At the outset of his tenure, the Trustee correctly recognized that his relationships with creditors, and with the Ng Family that owned most of the Debtors' equity interests, would be critical to a successful restructuring of the Peruvian Opcos, particularly given the complex web of guarantees and intercompany debts among the various Debtors and affiliated entities. *Id.* ¶ 15. Those same guarantees meant that some creditors of the Peruvian Opcos were also creditors of the CFG Peru estate, and that any of the Trustee's restructuring efforts that benefited the Peruvian Opcos would also provide direct benefits to the estate of CFG Peru. *Id.* Accordingly, Mr. Brandt addressed the issues relating to the operations of the Peruvian Opco while conducting regular

25

meetings with creditors and equity holders in Hong Kong, Singapore, New York, and the United Kingdom, roughly at intervals of every six weeks prior to the COVID-19 shutdown, and elsewhere as required. *Id.* In doing so, he provided transparency to all stakeholders, particularly those that might be less familiar with the chapter 11 process or less able to have their voices heard in this Court. *Id.*

Sale of Non-Core Assets

In the course of his review of the Peruvian Business operations, the Trustee learned that the CFG Peru subsidiaries owned assets that they did not need to operate CFG Peru's core Peruvian anchovy fishing and processing business, and which the Trustee determined should be sold (the "Non-Core Assets"). Brandt Decl. ¶ 64. Those assets included residential real property and commercial real property, and a number of fishing vessels owned/controlled by Sustainable Fishing Resources. *Id.* ¶ 65. When the Trustee sold the first of the Non-Core Assets, he developed procedures that would permit the Non-Core Assets to be sold on a notice-only basis, with an opportunity for interested parties to object, which relieved the estate from the expense of preparing and filing a motion for each Non-Core Asset sale and eliminated the need for hearings on the sales, while safeguarding the rights of interested parties, including creditors, and ensuring continued transparency. *Id.* ¶ 64. The Trustee obtained the Court's approval of those protocols within six months of his appointment.[40]

---

[40] *See Order Granting Chapter 11 Trustee's Motion for Order Pursuant to Bankruptcy Code Sections 105(a), 363(b), 541(a)(1), and 1108 and Bankruptcy Rules 2002, 6004, and 9006 Authorizing and Approving Procedures for (A) the Sale or Transfer of Certain Non-Debtor Assets and (B) Taking All Desirable or Necessary Corporate Governance Actions in Connection Therewith*, ECF No. 482; *Order Granting Chapter 11 Trustee's Motion for Order Pursuant to Bankruptcy Code Sections 105(a) and 1108 and Bankruptcy Rule 2002 Authorizing and Approving Procedures for (A) the Sale or Transfer of Certain Additional Non-Debtor Assets and (B) Taking All Desirable or Necessary Corporate Governance Actions in Connection Therewith*, ECF No. 584.

The $47 million aggregate proceeds from the sale of the Non-Core Assets provided much-needed cash to fund the administrative expenses of CFG Peru, released the Peruvian Opcos and other CFG Peru subsidiaries from the ongoing operating expenses of (in some cases) out-of-use assets and, in turn, provided the groundwork for returning the Peruvian Opcos to profitability. *See id.* ¶ 69. The Trustee's management and sale of Non-Core Assets was instrumental to the improved health of the Peruvian Opcos and to the administration of the CFG Peru estate. Indeed, within two years of his appointment as Trustee, the Peruvian Opcos transformed from bleeding cash to accumulating cash—as a self-funding business free from third-party financing. *See id.* ¶ 70.

In part due to these efforts, during the period beginning with the Trustee's appointment through the entry of the Confirmation Order, CFG Peru's equity value improved significantly. A summary of CFG Peru's balance sheets in a 2021 declaration filed by the Plan Administrator demonstrates that CFG Peru had negative $9,123,000 in total equity as of December 2016.[41] That same declaration states that CFG Peru had positive total equity of $26,951,000 as of May 31, 2021. *Id.*

<u>Trustee Pursues Claims for the Benefit of the Peruvian Opcos</u>

HSBC-HK's appointment of the KPMG JPLs in Hong Kong and the Cayman Islands, described above, came as a "surprise" to the Club Lenders, who considered it a "premature" and "drastic" move. Trustee Decision and Order at 20. The Club Lender Parties and CFGL acknowledged that HSBC-HK's efforts had a negative impact on the Peruvian Opcos due to actions taken in Peru by the KPMG JPLs upon their appointment.[42] Shortly after his appointment,

---

[41] Brandt Declaration, Exhibit H (Affidavit of Michael Foreman), ¶ 36.

[42] For example, the Club Lender Parties stated: As a consequence of the protective measures in the December 2015 Undertaking having been implemented, thereby ensuring transparency, management scrutiny and independent oversight, the Club Lenders agreed to support the dismissal of the JPLs in both Hong Kong and the Cayman Islands. The intention being to remove the obvious stigma of an insolvency process depressing the value of the business.

the Trustee sought Bankruptcy Rule 2004 discovery from HSBC-HK, which the Court approved

over HSBC-HK's objection.[43] The Trustee obtained his requested discovery from HSBC-HK, and

subsequently commenced an adversary proceeding against HSBC-HK alleging, among other

things, tortious interference with the Peruvian Opcos' business and equitable subordination, or

disallowance of HSBC-HK's claims under the Club Facility (the "HSBC-HK/Trustee Litigation").

*See* Complaint ¶ 9.[44]

<u>Managing/Reducing the Liabilities of the Peruvian Opcos</u>

<u>The Netting Agreement</u>

As of the Petition Date, the Debtors' business enterprise was burdened by a complex web

of more than $7 billion in intercompany claims—approximately $650 million of which flowed

through CFG Peru and its subsidiaries, including the Peruvian Opcos and their subsidiaries. Brandt

Decl. ¶ 71. Chief among that category was a single $459 million claim asserted by CFIL, a Debtor,

---

*Declaration of Guy Isherwood in Support of the Club Lender Parties' Motion for the Entry of an Order Directing the Appointment of a Chapter 11 Trustee Pursuant to 11 U.S.C. § 1104(a)(2)*, ECF No. 58 ¶ 37.

CFGL further explained how the consequences of HSBC-HK's actions far exceeded an "obvious stigma" that was "depressing the value" of the Peruvian Opcos, in a filing before this Court:

> The appointment of the JPLs had an adverse impact on the Prepetition Sale Process and further exacerbated financial difficulties already being experienced by the CFGL Group by deterring key participants from collaborating with the Peruvian Business. Parties integral to the success of the Peruvian Business, including, among others, local banks, suppliers, employees, and crew, declined to continue doing business with the Peruvian Opcos in light of the JPLs' appointment. Moreover, potential investors in the Peruvian Business conveyed to the Pacific Andes Group's management team that they were no longer interested in purchasing the Peruvian Business in light of the JPLs' appointment and/or their interest was conditioned upon the JPLs being dismissed.

*Disclosure Statement for Joint Chapter 11 Plan of Reorganization of China Fishery Group Limited (Cayman), Pacific Andes Resources Development Limited (Bermuda), and Certain of Their Affiliated Debtors*, ECF No. 800 at 24.

[43]    *Memorandum Decision and Order Granting Trustee's Motion for Order Authorizing Issuance of Subpoenas to Hongkong Shanghai Banking Corporation Limited*, ECF No. 634.

[44]    *Complaint*, Adv. Pro. No. 18-01575, ECF No. 1 (the "Complaint").

against CFG Investment—CFG Peru's wholly owned non-debtor Peruvian Opco (the "$459m Intercompany Claim"). *Id.*

Under Peruvian law, insider claims are not subordinate to the claims of other creditors. Further, because CFG Investment was not a Debtor in the Chapter 11 Cases, the $459m Intercompany Claim could neither be discharged nor judicially subordinated, meaning that it stood *pari passu* with the claims of the Senior Noteholders. The equal footing meant that any sale of CFGI Equity Interests (or a creditor-led restructuring of the Debtors) would require a sale price sufficient to satisfy all claims—i.e., those of the Senior Noteholders, Club Lenders, the $459m Intercompany Claim, other intercompany claims, and all other claims. *Id.* ¶ 72. That is so because any sale that could not cover these liabilities would leave the buyer exposed to any unpaid amounts.

Through extended and complex negotiations beginning in early 2018, the Trustee reached a settlement with the various affected corporate entities and creditors to remove CFG Investment's intercompany debt from its balance sheet and to remove other intercompany claims from CFG Investment's balance sheet (the "Netting Agreement"). *Id.* ¶ 73. The Netting Agreement consolidated intercompany claims owed by subsidiaries of CFG Peru into one claim owed by CFG Peru to CFIL. The effect of the agreement was to structurally subordinate intercompany claims. The agreement facilitated either a sale of the CFGI Equity Interests or a restructuring and ensured that the Peruvian Opcos would not be susceptible to further involuntary insolvency proceedings in Peru by removing the blocking position that large insider claims could hold in such a proceeding. *See id.* ¶¶ 72-73. In sum, the Netting Agreement cleared an obstacle to the sale of the CFGI Equity Interests, simplified the intercompany claims, and channeled liabilities of the Peruvian Opcos to CFG Peru. *Id.* ¶ 74. It helped to pave the way for the Debtors to be restructured or sold by protecting

29

the interests of other creditors. *Id*. ¶ 73. The Trustee filed a joint motion for approval of the Netting Agreement with the other Debtors.[45] The Netting Motion drew initial objections from the Senior Noteholders and Bank of America.[46] The Trustee resolved these objections, and on April 26, 2018, the Court entered its order approving the Netting Agreement.[47]

The FTI Liquidators' Claims

The FTI Liquidators and FTI Director Services filed more than 200 proofs of claim totaling some $4.2 billion in the Chapter 11 Cases, including against CFG Peru. Nearly all of these claims rested on the same foundation: allegations of a massive trade finance fraud scheme. Brandt Decl. ¶ 35. The FTI Claimants[48] (under the FTI Liquidators' control) asserted that PAE (BVI) and Europaco obtained approximately $5.57 billion in trade finance facilities from various financial institutions between September 2010 and August 2015. *Id.* They contended that instead of using those funds to supply fish (as represented), PAE (BVI) and Europaco allegedly circulated the funds through various companies within the Pacific Andes Group and among so-called "Agent Companies" allegedly controlled by the Ng Family, and then recirculated them back to PAE (BVI) and Europaco. *Id.*

---

[45]    *Joint Motion for an Order Approving the Settlement Agreement Netting Intercompany Claims Among and Between CFG Peru Singapore, the Other Debtors, and the Nondebtor Affiliates, Including the CFG Peru Singapore Subsidiaries*, ECF No. 993 (the "Netting Motion").

[46]    *Senior Noteholder Committee's Limited Objection to Chapter 11 Trustee and the Other Debtors' Joint Motion for an Order Approving the Settlement Agreement Netting Intercompany Claims Among and Between CFG Peru Singapore, the Other Debtors, and the Nondebtor Affiliates, Including the CFG Peru Singapore Subsidiaries*, ECF No. 1020; *Objection of Bank of America, N.A. to the Chapter 11 Trustee and the Other Debtors' Joint Motion for an Order Approving the Settlement Agreement Netting Intercompany Claims Among and Between CFG Peru Singapore, the Other Debtors, and the Non-Debtor Affiliates, Including the CFG Peru Singapore Subsidiaries*, ECF No. 1021.

[47]    *Order Approving the Settlement Agreement Netting Intercompany Claims Among and Between CFG Peru Singapore, the Other Debtors, and the Non-Debtor Affiliates, Including the CFG Peru Singapore Subsidiaries, and Approving Stipulation with Bank of America, N.A.*, ECF No. 1112.

[48]    The "FTI Claimants" are PAE (BVI), Solar Fish and Parkmond.

In March 2019, the Trustee objected to the original proofs of claim filed against CFG Peru by the FTI Claimants. The Trustee sought to expunge the claims on the merits, but in response to that objection, the FTI Claimants withdrew the claims with prejudice.[49] The withdrawal of the claims did not end the matter, as the FTI Liquidators pursued the $152 million claim directly against CFG Investment in Hong Kong via an action filed in the names of five of the FTI Liquidation Entities (the "FTI Hong Kong Litigation").[50] In that action, the claimants alleged the same factual circumstances and legal theories set forth in the FTI Claimants' proofs of claim against CFG Peru. The FTI Liquidators had already commenced an action in Hong Kong, in the names of certain FTI Liquidation Entities,[51] against certain members of the Ng Family and various companies alleged to be controlled by them. In the summer of 2020, the two litigation matters were consolidated. As described below, pursuant to the Trustee's motion, the Court referred the FTI Hong Kong Litigation to mediation and the Trustee reached a mediated settlement of the litigation with the FTI Liquidators.

---

[49]    *See* Letter dated July 16, 2019, from Clifford Chance to the Hon. James L. Garrity, Jr., ECF No. 1650.

[50]    The plaintiffs in the FTI Hong Kong Litigation (Action No. 2019-836) are PAE (BVI), Solar Fish, Europaco, Palanga, and Zolotaya.

[51]    The Plaintiffs in the earlier FTI litigation (Action No. 2019-688) are PAE (BVI), Solar Fish, Richtown, Parkmond, and Europaco.

The Pickenpack Administrator's Claims

The Pickenpack Administrator filed numerous proofs of claim in these Chapter 11 Cases, including claims against CFG Peru that totaled $283 million. Upon review of the claims, the Trustee engaged in discussions with the Pickenpack Administrator's New York counsel to address his concerns about the claims. Ultimately the Pickenpack Administrator voluntarily withdrew $283 million in claims.[52]

Miscellaneous Claims

The Trustee also worked with his professionals to clean up CFG Peru's claims register, as follows:

> The Trustee disallowed and expunged claims asserted against CFG Peru by holders of PARD's 8.5% bonds due in 2017, on which CFG Peru is not an obligor. *See Order Granting the Chapter 11 Trustee's First Omnibus Objection to No Liability Claims (PARD Bonds)*, ECF No. 1420.

> The Trustee negotiated and coordinated with counsel to the other Debtors to clean up their respective claims registers, which culminated in the Trustee and the other Debtors entering into the *Stipulation By and Between Certain Debtors and Chapter 11 Trustee Withdrawing Proofs of Claim Nos. 145, 171, 350, 371, 1517, 1527, 1528, 1771, and 1773 and Withdrawing PAIH Debtors' Objection to Such Claims,* ECF No. 1336.

> At the time of his appointment, there were two criminal investigations pending against the Peruvian Opcos in Peru. The Trustee resolved those matters without any charges ever being filed against the Peruvian Opcos or any of their management. *See* Brandt Decl. ¶ 79.

> The only proof of claim remaining against CFG Peru, other than its guarantee of the Senior Notes and its obligations for intercompany claims, was a $1.1 million claim by Rabobank. *Id.* ¶ 80.

---

[52]   *Withdrawal of Claim*, ECF No. 1498 at 1-16.

Instituting a Sale Process for the CFGI Equity Interests

Promptly upon his appointment, the Trustee began to formulate a process for marketing the CFGI Equity Interests. Elements of the process included the acquisition and review of due diligence information, completion of a preliminary analysis of the market, identification of potential buyers, consideration of alternative means for selling the Peruvian Opcos, establishment of a virtual data room ("VDR"), and the allocation of responsibilities for implementation of the sale process. Brandt Decl. ¶ 59. The Trustee tasked his DSI professionals with key components of this effort to alleviate the financial burden on the estate while ensuring that the process reflected the Trustee's vision. *Id*. At the Trustee's direction, DSI professionals facilitated the sale process by:

- Traveling to Peru to inspect each of the processing plants owned by CFG Investment and Copeinca and, to the extent possible, their fishing vessels. DSI professionals met with onsite management teams to review processing plant financials, operations, assets, inventory, and production, and worked closely with the production managers and senior management on review of production. DSI staff also monitored daily fishing and production reports produced in the ordinary course;

- Developing a start-to-finish collection of sale and marketing materials, including marketing literature designed to introduce prospective purchasers to the CFGI Equity Interests and CFG Investment and Copeinca more generally; a comprehensive confidential information memorandum that provided essential information on the CFGI Equity Interests like company background, operations and performance data, accompanied by appropriate nondisclosure agreements that would protect the estate; and presentation materials with even more detailed information for use during in-person meetings in Lima, Peru, with prospective purchasers;

- Creating and maintaining the VDR to ensure prospective purchasers received the most current information possible; and

- Facilitating prospective purchasers' tours of the Peruvian Opcos' vessels and processing plants, which were located along nearly the whole of the Peruvian coastline.

*Id.* ¶ 60. Further, the Trustee tasked his legal advisors to draft a purchase and sale agreement, including seller disclosure schedules, that would serve as the baseline for negotiations with potential buyers. *Id.* ¶ 61. Because two of CFG Peru's indirect parents—PAIH and PARD—are publicly listed companies, a sale of an Opco, or a Non-Core Asset, required consents from the HK Stock Exchange and Singapore Exchange. The Trustee obtained such consents. *Id.* ¶ 62. Finally, the Trustee sought approval of bid procedures in advance of a sale by filing his Bid Procedures Motion.[53] The Trustee revised the proposed procedures to address objections to the motion. On October 21, 2020, the Trustee withdrew the Bid Procedures Motion at the Court's request due to the passage of time and the fact that portions of it had been superseded by other events.[54]

Through that process and, pursuant to his discussions with prospective purchasers of the CFGI Equity Interests, the Trustee identified two "gating" issues relating to the sale of the equity. First, the Peruvian Opcos' books and records reflected amounts due and owing to the Opcos by certain of their affiliates. Prospective purchasers sought confirmation of those amounts. Over a twelve-month period, the Trustee and his professionals produced audited financial statements addressing the issue. Brandt Decl. ¶ 59. Prospective buyers also sought comfort regarding potential tax liabilities associated with their acquisition of the CFGI Equity Interests. The Trustee and the Peruvian Opcos' tax counsel worked with the Peruvian regulators to develop a tax structure for the transaction that they believed was acceptable to Peruvian tax authorities. *See id.*

---

[53] *Chapter 11 Trustee's Motion for an Order (I) Approving Bidding Procedures, (II) Approving the Form and Manner of Notice Thereof, and (III) Granting Related Relief* on July 26, 2017, ECF No. 646 (the "Bid Procedures Motion").

[54] *Notice of Withdrawal of Chapter 11 Trustee's Motion for an Order (I) Approving Bidding Procedures, (II) Approving the Form and Manner of Notice Thereof, and (III) Granting Related Relief* on July 26, 2017, ECF No. 2200.

The Trustee Fails to Locate a Buyer

Notwithstanding his efforts, Mr. Brandt did not locate a buyer for the CFGI Equity Interests. No bidder emerged that was willing and able to provide sufficient cash to pay off, inter alia, the Peruvian Opcos' third-party debt.

The Creditors Explore Other Exit Strategies

At the outset of the Chapter 11 Cases, an unofficial "Senior Noteholder Committee" appeared in these cases.[55] Members of the committee held or acted as investment manager of or advisor to certain funds, controlled accounts, and/or other entities that held or were beneficial owners of the Senior Notes. Over time, membership of that committee expanded (the "Ad Hoc Group") to include entities that held or that acted as investment manager of or advisor to certain funds, controlled accounts, and/or other entities that hold or are beneficial owners of the Senior Notes and the holders of claims under the Club Facility.

The Creditor Plan Proponents explain that while the Ad Hoc Group and other creditors supported the approval of the bidding procedures in August 2017, in the fall of 2018, after more than a year of sale efforts and repeated assurances from Mr. Brandt that a sale of the Peruvian Opcos was on track and forthcoming, the Creditor Plan Proponents began to have real concerns with the lack of demonstrable progress and determined that a course correction was warranted. *See* Jordan Decl. ¶ 10. The Ad Hoc Group as constituted at that time sought greater involvement with the sale process and began to develop a self-supported, self-funded backstop transaction. *See id.* ¶ 11. As part of those efforts, the Ad Hoc Group expanded its ranks to include Alternative Capital LP (including certain affiliated funds), a significant holder under both the Senior Notes and Club

---

[55]    *See Verified Statement of the Senior Noteholder Committee Pursuant to Bankruptcy Rule 2019*, ECF No. 80.

Facility.[56] To facilitate those efforts, in 2018, the expanded Ad Hoc Group—which included the Creditor Plan Proponents—engaged Houlihan Lokey ("Houlihan") to assist in the creditors' review of potential restructuring alternatives. *See id.*

In November 2018, the Ad Hoc Group presented a proposal to the Trustee pursuant to which the Ad Hoc Group and certain other creditors of the Debtors would act as the "stalking horse bidder" in a sale of the CFGI Equity Interests, subject to a competitive sale process under section 363 of the Bankruptcy Code and overseen by the Trustee. *See id.* The Trustee rejected the proposal. The Creditor Plan Proponents understand that the Trustee did not accept the proposal because: (a) the Ad Hoc Group, as then constituted, was not large enough; (b) the proposal contemplated resolution of the Intercreditor Dispute (as defined below)—which was not then resolved; and (c) Club Lender HSBC-HK did not support the proposal. *See id.*

The Creditor Plan Proponents assert that the Ad Hoc Group worked to address the Trustee's stated concerns and further develop a potential creditor-backed proposal that could lead to a transaction and resolve CFG Peru's restructuring. *See id.* ¶ 12. They say that the creditors focused on (i) seeking to resolve the Intercreditor Dispute, and (ii) developing other aspects of a potential creditor-led solution, including providing for necessary financing to complete a transaction. *See id.* By late 2020, the Ad Hoc Group had garnered support for a revised reorganization proposal (including a $150-million committed exit facility) from creditors holding 56% of the principal amount of the Senior Notes and 71% of the principal amount of the Club Facility. Accordingly, the Ad Hoc Group once again sought the engagement of Mr. Brandt to seek his support for that transaction. *See id.* ¶ 13.

---

[56] *See Amended Verified Statement of the Ad Hoc Group Pursuant to Bankruptcy Rule 2019,* ECF No. 2380.

In December 2020, the Ad Hoc Group presented a proposed restructuring support agreement to the Trustee that contemplated the provision of a new money financing facility to the CF Group and an exchange of the Club Facility and Senior Notes for new notes and equity in CFG Investment. This proposal also was not accepted by the Trustee. *Id.*

<u>Interim Distributions to Peruvian Opco's Creditors</u>

By early 2019, on the strength of the Trustee's management of the Peruvian Opcos, there was excess cash in the Peruvian Opcos' accounts (the "Excess Cash"). The Trustee determined that interim distributions of some of the Excess Cash to the Club Lenders and the Senior Noteholders would benefit CFG Peru and the Debtors by reducing the amounts of those claims and the interest that was accruing thereon. Brandt Decl. ¶ 81. On February 15, 2019, the Trustee filed a motion to effectuate such distributions.[57] The Interim Cash Distribution Motion called for the Peruvian Opcos—CFG Investment and Copeinca—to distribute their allocated portions of Excess Cash to their respective financial creditors. The Club Lenders and Senior Noteholders were third-party financial creditors at CFG Investment. Under the Trustee's proposal, they would receive pro rata distributions of the Excess Cash allocated to CFG Investment, based on the size of the claims. The Club Lenders were the only third-party financial creditors at Copeinca. Thus, under the proposal, the Club Lenders would receive 100% of the Excess Cash allocated to Copeinca.

---

[57]   *Chapter 11 Trustee's Motion for an Order Pursuant to Bankruptcy Code Sections 105(a) and 363(b) and Bankruptcy Rules 2002 and 6004 Authorizing Taking Corporate Governance Actions to Enable an Interim Distribution of Excess Cash to Certain Creditors by Non-Debtor CFG Investment S.A.C.,* ECF No. 1490 (the "Interim Cash Distribution Motion").

Bank of America and certain Senior Noteholders (who came to be known in Court filings as the Kasowitz Noteholders)[58] raised informal objections to the motion, with the latter indicating that they intended to file a formal objection to the motion. The core of the Kasowitz Noteholders' objection (the "Intercreditor Dispute") centered on language in the Senior Notes Indenture that the Kasowitz Noteholders said required Copeinca to execute a guarantee of the Senior Notes (the "Copeinca Guarantee"), which, as of the Petition Date, had not been done. Without the Copeinca Guarantee, the Senior Noteholders would not receive any distribution from Copeinca; their recovery under the Senior Notes would come solely from CFG Investment. The Kasowitz Noteholders acknowledged that the Senior Noteholders did not hold a guarantee from Copeinca, but asserted that Copeinca should have executed the Copeinca Guarantee and, in any event, that the absence of the Copeinca Guarantee was not relevant because CFG Investment and Copeinca were de facto substantively consolidated. Brandt Decl. ¶ 82. For his part, the Trustee was neutral before the Court with respect to the Intercreditor Dispute.

On June 10, 2019, the Trustee withdrew his motion.[59] On August 27, 2019, he filed his Renewed Motion[60] for authorization to make an interim distribution, believing the Intercreditor Dispute was not only ripe for the Court's determination, but also presented a gating issue that would impede progress in the case if not addressed. The Kasowitz Noteholders objected to the

---

[58]    The term "Kasowitz Noteholders" developed organically as a means of distinguishing the objecting Senior Noteholders from the group as a whole and is distinguished by the name of the group's counsel, Kasowitz Benson & Torres LLP.

[59]    *Notice of Withdrawal of Chapter 11 Trustee's Motion for an Order Pursuant to Bankruptcy Code Sections 105(a) and 363(b) and Bankruptcy Rules 2002 and 6004 Authorizing Taking Corporate Governance Actions to Enable an Interim Distribution of Excess Cash to Certain Creditors by Non-Debtor CFG Investment S.A.C.*, ECF No. 1613.

[60]    *Chapter 11 Trustee's Renewed Motion for Order Pursuant to Bankruptcy Code Sections 105(a) and 363(b) and Bankruptcy Rules 2002 and 6004 Authorizing Taking Corporate Governance Actions Necessary to Enable an Interim Distribution of Excess Cash to Certain Creditors by Non-Debtor CFG Investment S.A.C.*, ECF No. 1710 (the "Renewed Motion").

Renewed Motion. In the end, the Court authorized an interim distribution to the Senior Noteholders

from CFG Investment, but not Copeinca.[61] Ultimately, the Trustee did not make that distribution,

as news of COVID-19 began to emerge. Shortly thereafter, the nascent epidemic had transitioned

to a global pandemic, severely impacting Peru. The Trustee determined that the ability of the

Peruvian OpCos to continue normal operations was in doubt, making an expenditure of the excess

cash imprudent. *Id.* ¶ 83.

Mediated Settlements of the Intercreditor Dispute and FTI Hong Kong Litigation

The Intercreditor Dispute and the FTI Hong Kong Litigation were plainly barriers to CFG

Peru's exit from its chapter 11 case. In December 2019, the Trustee filed his Mediation Motion,[62]

pursuant to which he sought to compel the mediation of the Intercreditor Dispute and the FTI Hong

Kong Litigation. In support of his motion, the Trustee explained that

> Despite his best efforts, the Chapter 11 Trustee has not been able to bring the
> relevant parties to the table to resolve these issues. Instead, the parties have moved
> farther apart, with the FTI Liquidators now preparing for protracted litigation in
> Hong Kong, and certain of the Objecting Noteholders laying the groundwork for
> protracted discovery against the Chapter 11 Trustee through the 2004 Motion.
> These strategies will hinder the Debtor's prospects for exiting chapter 11 while
> resulting in the incurrence of significant costs. By this Motion, the Chapter 11
> Trustee seeks the Court's help to avoid protracted litigation by compelling the
> relevant parties to negotiate and resolve the [FTI Hong Kong Litigation] and the
> [Intercreditor Dispute] before a mediator . . . to carve a path forward in this case.

Mediation Motion ¶ 2. TMF Trustee Limited, as successor trustee under the Senior Notes Indenture

(the "Indenture Trustee"), "strongly support[ed] the Motion by the Chapter 11 Trustee," noting

---

[61]   *Order Pursuant to Bankruptcy Code Sections 105(a) and 363(b) and Bankruptcy Rules 2002 and 6004
Authorizing Taking Corporate Governance Actions Necessary to Enable an Interim Distribution of Excess Cash to
Certain Creditors by Non-Debtor CFG Investment S.A.C.*, ECF No. 1939.

[62]   *Chapter 11 Trustee's Emergency Motion for Entry of an Order (A) Appointing a Mediator, (B) Directing the
Proposed Mediation Parties to Participate in Mediation, and (C) Authorizing Taking Corporate Governance Actions
Necessary to Enable Non-Debtor CFG Investment S.A.C. to Participate in Mediation*, ECF No. 1859 (the "Mediation
Motion").

that "[m]ediation in this case is necessary and appropriate, and is the best (if not the only) path to a value-maximizing exit for stakeholders collectively." Indenture Trustee's Response ¶ 1.[63] The Indenture Trustee observed that

> Despite exceptional and diligent efforts by the Chapter 11 Trustee, large intercreditor disputes in the case are unresolved, and will remain unresolved, unless all key creditor constituencies work together to resolve them. The impasse described in the Motion reduces the prospects for a successful exit from chapter 11 without massive litigation costs. In the Motion, the Chapter 11 Trustee seeks the Court's help to avoid expensive and protracted litigation by compelling the relevant parties to participate in mediation. This is the best chance of achieving the best creditor outcome in this case.

*Id.* ¶ 2.

The Court granted the motion over the objection of the Kasowitz Noteholders and the FTI Liquidators, and on February 12, 2020, the Court appointed the Honorable Robert D. Drain to conduct the mediation (the "Drain Mediation").[64] Through the mediation, the Trustee reached a settlement with the FTI Liquidators over the FTI Hong Kong Litigation.[65] The plaintiffs in that case agreed to dismiss the action with prejudice in exchange for, inter alia, a single, $12 million cash payment from CFG Investment. The Drain Mediation also successfully resolved the Intercreditor Dispute.

The Restructuring Support Agreement

---

[63]    *TMF Trustee Limited's Response in Support of Chapter 11 Trustee's Emergency Motion for Entry of an Order (A) Appointing a Mediator, (B) Directing the Proposed Mediation Parties to Participate in Mediation, and (C) Authorizing Taking Corporate Governance Actions Necessary to Enable Non-Debtor CFG Investment S.A.C. to Participate in Mediation,* ECF No. 1867 (the "Indenture Trustee Response").

[64]    *Order Appointing a Mediator*, ECF No. 1957.

[65]    *Motion of Chapter 11 Trustee Pursuant to 11 U.S.C. §§ 105(A) and 363 and Fed. R. Bankr. P. 9019 for Order (I) Approving Settlement Agreement Resolving Hong Kong Action with Certain Liquidation Companies HCA 836/2019, (II) Authorizing Corporate Governance Actions, and (III) Granting Related Relief,* ECF No. 2352.

Following several months of discussions regarding potential restructuring transactions, and in the wake of the successful mediation of the Intercreditor Dispute, on March 1, 2021, members of the Ad Hoc Group, then comprised of holders of 56% of the principal amount of the Senior Notes and 71% of the principal amount of the Club Facility (the "Consenting Creditors"), executed the Restructuring Support Agreement. Obj. ¶ 23.[66] That agreement contemplated a comprehensive restructuring and recapitalization for certain of the Debtors and the Peruvian Opcos. On March 16, 2021, the Creditor Plan Proponents—on behalf of the parties to the Restructuring Support Agreement—filed a chapter 11 plan for CFG Peru and Smart Group Limited (Cayman)[67] which, in broad strokes, gave effect to the Restructuring Support Agreement. To facilitate the confirmation process, the Creditor Plan Proponents engaged Epiq Corporate Restructuring, LLC as claims and noticing agent for purposes of the solicitation process and filed a motion to approve the adequacy of the Disclosure Statement and establish a confirmation schedule.[68]

After filing the chapter 11 plan, in March 2021, the Creditor Plan Proponents engaged with HSBC-HK—the largest single Club Lender—to obtain its support for the Restructuring Support Agreement. *See* Jordan Decl. ¶ 15. On May 6, 2021, those discussions resulted in HSBC-HK's entry into the Restructuring Support Agreement, subject to certain limited, non-material

---

[66] *See, e.g.*, *Declaration of Andrew J. Herenstein [of Monarch Alternative Capital LP] in Support of the Creditor Plan Proponents' Chapter 11 Plan for CFG Peru Investments Pte. Ltd. (Singapore)*, ECF No. 2541 ¶¶ 8-9 (describing the mediation as successful and noting that the restructuring support agreement was built on the momentum of that success); *see also Creditor Plan Proponents' Brief in Support of Confirmation of the Creditor Plan Proponents' Chapter 11 Plan for CFG Peru Investments Pte. Ltd. (Singapore)*, ECF No. 2557 ¶ 55 ("Intercreditor Mediation and Mediated Intercreditor Settlement were critical to the development of the Restructuring Support Agreement and the consensus achieved on the Plan.").

[67] *Creditor Plan Proponents' Chapter 11 Plan for CFG Peru Investment Pte., Ltd. (Singapore) and Smart Group Limited (Cayman)*, ECF No. 2382.

[68] *Order Authorizing Epiq Bankruptcy Solutions, LLC to Solicit Acceptances of the Creditor Plan Proponents' Chapter 11 Plan For CFG Peru Investment Pte., Ltd. (Singapore) and Smart Group Limited (Cayman)*, ECF No. 2442.

modifications. At that point, Consenting Creditors holding approximately 88% of the principal amount of the Senior Notes and approximately 94% of the principal amount of the Club Facility had executed the Restructuring Support Agreement. The amended Restructuring Support Agreement did not resolve the HSBC-HK/Trustee Litigation. In April 2021, the Trustee and HSBC-HK agreed to mediate their disputes with the Honorable Sean H. Lane acting as mediator.[69] On June 8, 2022, the Trustee and HSBC-HK entered into a settlement of the HSBC-HK/Trustee Litigation, which the Court approved on June 10, 2021.[70] Pursuant to that settlement, the Trustee agreed to withdraw the adversary proceeding and the claims submitted therein with prejudice, in exchange for HSBC-HK's agreement to waive $11.3 million of expense claims and $13.5 million of Club Facility claims, and to limit the portion of its fees paid in cash to $5.5 million.

The terms of the stipulation were included in the final version of the CFG Peru Plan. In broad strokes, and as relevant to this discussion, the CFG Peru Plan, as finally amended and modified, called for:

- A change in ownership of the Peruvian Opcos through a transfer of the equity in CFG Investment to NewCo;

- The recapitalization of the Peruvian Opcos through the provision of the committed $150 million New Money Facility to fund working capital and transaction costs;

- The exchange of the Club Facility and Senior Notes for $300 million of New Notes; and

- The distribution of the equity interests in NewCo and the New Notes between Holders of Senior Notes Claims and Club Lenders in accordance with their agreement under the Restructuring Support Agreement.

---

[69]   *Stipulation and Order (A) Referring Matters to Mediation and (B) Governing the Disclosure of Confidential Documents*, AP No. 18-1575, ECF No. 58.

[70]   *Stipulation and Consent Order (A) Dismissing Adversary Proceeding With Prejudice Pursuant to Fed. R. Civ. P. 7041(a)(2) and Fed. R. Bankr. P. 7041 and (B) Reflecting Settlement By and Among William A. Brandt, Jr., Chapter 11 Trustee, and the Hong Kong and Shanghai Banking Corporation Limited,* AP No. 18-1575, ECF No. 61.

CFG Peru Plan, art. IV.

On June 10, 2021, the Court confirmed the CFG Peru Plan.[71] Between June 10, 2021, and June 24, 2021, Mr. Brandt transitioned control of CFG Peru and its assets (including its bank accounts and CFGI Equity Interests) to Mr. Foreman. Mr. Brandt is clear that these transfers are the disbursements for which he seeks to be compensated for under the Fee Application. *See* Brandt Dep. 72:11-73:22. Post-confirmation, the Plan Administrator has worked with the Creditor Plan Proponents and their advisors to effectuate the CFG Peru Plan.

## THE FEE APPLICATION

In the Fee Application, the Trustee is seeking the payment of the $25 million commission under section 326(a) of the Bankruptcy Code (the "Proposed Commission"), for the services he provided during his tenure as Trustee. He is also seeking final approval of $355,051.93 in interim expenses previously allowed and paid, and approval and payment of allowable expenses in the amount of $409,382.02 incurred in the period from March 1, 2020, through June 24, 2021 (including his expenses for preparation of this Fee Application).

The Trustee bases his Proposed Commission on a lodestar of $11,958,625.00 arising from the Trustee's 13,667 hours spent on the case through to June 10, 2021, all billed at his hourly rate in effect in 2021 (the "Trustee's Lodestar"), and a fee enhancement in the form of a 2.09 multiplier applied to the Trustee's Lodestar. In addition to the out-of-pocket expenses for which chapter 11 trustees are typically reimbursed (e.g., airfare, lodging, travel meals and expenses, photocopies, postage), the Trustee is seeking payment of the attorney's fees he incurred in connection with the Fee Application. The three components to those charges are: (i) the Trustee's engagement of Baker & Hostetler, LLP ("Baker Hostetler") to prepare the Fee Application; (ii) the involvement of DSI's

---

[71] *Order Confirming Creditor Plan Proponents' Chapter 11 Plan For CFG Peru Investments Pte. Ltd. (Singapore)*, ECF No. 2569.

in-house counsel in preparation of the Fee Application; and (iii) the costs of a document review service that has reviewed Mr. Brandt's time records to remove information subject to privilege and, with respect to potential buyers of the CFGI Equity Interests, subject to confidentiality agreements.

The Court reviews the Fee Application below.

## ANALYSIS

"Bankruptcy courts enjoy wide discretion in determining reasonable fee awards." *In re Cenargo Int'l, PLC*, 294 B.R. 571, 596 (Bankr. S.D.N.Y. 2003); *see also Zeisler & Zeisler, P.C. v. Prudential Ins. Co. of Am. (In re JLM, Inc.)*, 210 B.R. 19, 23 (B.A.P. 2d Cir. 1997) ("Bankruptcy courts enjoy wide discretion in determining reasonable fee awards, which discretion will not be disturbed by an appellate court absent a showing that it was abused." (citing *Dickinson Indus. Site v. Cowan*, 309 U.S. 382, 389 (1940))). The Trustee bears the burden of demonstrating his request for compensation is reasonable under section 330(a) of the Bankruptcy Code. *See, e.g.*, *Howard & Zukin Cap. v. High River Ltd. P'ship*, 369 B.R. 111, 115, (S.D.N.Y. Apr. 24, 2007); *In re JLM, Inc.*, 210 B.R. 19, 24 (B.A.P. 2d Cir. 1997); *In re Keene Corp.*, 205 B.R. 690, 695 (Bankr. S.D.N.Y. 1997).

The Lodestar Calculation

Section 330(a)(1) of the Bankruptcy Code regulates court awards of professional fees. *See In re MACCO Properties, Inc.*, 540 B.R. 793, 845 (Bankr. W.D. Okla. 2015) ("Section 330(a)(1) is the general provision governing the process of compensating estate professionals."). As relevant, this section states the general rule that "[a]fter notice . . . and a hearing, and subject to section[] 326 . . . the court may award to a trustee . . . reasonable compensation for actual, necessary services rendered by the trustee . . . and reimbursement for actual, necessary expenses." 11 U.S.C. § 330(a)(1). Section 326(a) caps the compensation payable to trustees appointed under chapters 7

and 11 of the Bankruptcy Code.[72] It authorizes a court to "allow reasonable compensation under section 330 [of the Bankruptcy Code]" to a chapter 11 trustee, for such "trustee's services" in an amount

> not to exceed 25 percent on the first $5,000 or less, 10 percent on any amount in excess of $5,000 but not in excess of $50,000, 5 percent on any amount in excess of $50,000 but not in excess of $1,000,000, and reasonable compensation not to exceed 3 percent of such moneys in excess of $1,000,000, upon all moneys disbursed or turned over in the case by the trustee to parties in interest, excluding the debtor, but including holders of secured claims.

11 U.S.C. § 326(a).

"While Bankruptcy Code § 326(a) sets a maximum limit on the compensation that may be awarded to a trustee, § 330 still operates to limit the compensation of trustees to a reasonable amount." *In re The 1031 Tax Grp., LLC*, No. 07-11448, 2009 WL 4806199, at *1 (Bankr. S.D.N.Y. Dec. 9, 2009) (citing *In re Brous*, 370 B.R. 563, 568-69 (Bankr. S.D.N.Y. 2007)). In calculating reasonable professional fees, courts typically apply the "lodestar" method, which involves multiplying the number of hours reasonably spent by the professional by a reasonable hourly rate. *See Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 551-52 (2010); *Millea v. Metro-North R.R. Co.*, 658 F.3d 154, 166 (2d Cir. 2011); *In re Northwest Airlines Corp.*, 382 B.R. 632, 645 (S.D.N.Y. 2008). That calculus is relevant in fixing a chapter 11 trustee's compensation. Section 330(a)(3) applies only to chapter 11 trustees and lists the factors courts must consider in determining such a trustee's "reasonable compensation." It states that

> [i]n determining the amount of reasonable compensation to be awarded to [a] . . . trustee under chapter 11 . . . the court shall consider the nature, the extent, and the value of such services, taking into account all relevant factors, including—
>
> (A) the time spent on such services;
>
> (B) the rates charged for such services;

---

[72]    Section 326(a) does not apply to a trustee appointed under subchapter V of chapter 11. *See* 11 U.S.C. § 326(a).

(C) whether the services were necessary to the administration of, or beneficial at the time which the service was rendered toward the completion of, a case under this title;

(D) whether the services were performed within a reasonable amount of time commensurate with the complexity, importance and nature of the problem, issue, or task addressed;

(E) with respect to a professional person, whether the person is board certified or otherwise has demonstrated skill and experience in the bankruptcy field; and

(F) whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.

11 U.S.C. § 330(a)(3). "Section 330 of the Bankruptcy Code incorporates the lodestar analysis by requiring that the bankruptcy court consider the time spent upon legal services and the rate charged for those services." *D.A. Elia Constr. Corp. v. Damon and Morey, LLP (In re D.A. Elia Constr. Corp),* No. 04-cv-975A, 2006 WL 1720361, at *5 (W.D.N.Y. Jun.19, 2006). "Fee applications are to be evaluated in light of all 'relevant factors' as set forth in section 330(a)(3) of the Bankruptcy Code." *In re Value City Holdings, Inc.,* 436 B.R. 300, 306 (Bankr. S.D.N.Y. 2010); *see also Connolly v. Harris Tr. Co. (In re Miniscribe Corp.),* 309 F.3d 1234, 1241 (10th Cir. 2002) ("[A] court awarding trustee fees must begin by assessing reasonableness under § 330(a) before applying the percentage-based cap under § 326(a).").

Pursuant to section 330(a)(7), "[i]n determining the amount of reasonable compensation to be awarded to a trustee, the court shall treat such compensation as a commission, based on section 326." 11 U.S.C. § 330(a)(7). This section "applies to all trustees, whether they are administering chapter 7 or chapter 11 cases." *In re Clemens,* 349 B.R. 725, 733 (Bankr. D. Utah 2006). For a chapter 11 trustee, that means the court "may be called upon in those cases to determine whether there exists a rational relationship between the amount of the commission [calculated under section 326(a)] and the type and level of services rendered." *Hopkins v. Asset*

46

*Acceptance LLC (In re Salgado-Nava)*, 473 B.R. 911, 921 (B.A.P. 9th Cir. 2012). That "determination necessarily requires consideration of the § 330(a)(3) factors, and also ordinarily includes a lodestar analysis." *Id.*; *see also In re Clemens*, 349 B.R. at 731 ("[T]he plain meaning of § 330(a)(7) requires the Court to consider the provisions of § 326 *as a part of* its reasonableness inquiry. In essence, the addition of § 330(a)(7) to the Code serves to now supplement the Court's Lodestar analysis." (emphasis in original)); *In re Bank of New England Corp.*, 484 B.R. 252, 283 (Bankr. D. Mass. 2012) ("The statute is clear that the 3% is not an entitlement, nor is it presumed to be reasonable. It is a statutory cap that the court is to consider as part of its reasonableness inquiry." (footnotes omitted)); 3 COLLIER ON BANKRUPTCY ¶ 330.02[1][a] (noting that while "the compensation of a chapter 11 trustee is, as is the case with other trustees, treated as a 'commission, based on section 326,' the application of the listed factors [in section 330(a)(3)] is mandatory in assessing the reasonableness of that compensation." (quoting 11 U.S.C. § 330(a)(7)).

Thus, in applying sections 326(a), 330(a)(3) and 330(a)(7) to the Fee Application, the Court will fix the Trustee's commission as "reasonable compensation" payable pursuant to section 330(a)(3) of the Bankruptcy Code, subject to the limits set forth in section 326(a) of the Bankruptcy Code. *See In re Brous,* 370 B.R. at 568-69 ("By its terms, § 326(a) sets a maximum limit, but does not create right to or standard for awarding compensation. Instead, it permits the Court to allow 'reasonable compensation under section 330,' the same provision that governs the compensation of attorneys and other professionals. Accordingly, the court must begin by assessing the reasonableness of the trustee's compensation under § 330 before applying the § 326(a) cap." (citations omitted)); *see also In re Salgado-Nava,* 473 B.R. at 919 ("Notwithstanding the applicability of paragraph (7) to chapter 11 trustees, they are still specifically included in paragraph (3) with its litany of reasonableness factors."); *In re Golden Park Ests., LLC,*

No. 14-12253, 2015 WL 5785756, at *4 (Bankr. D.N.M. Oct. 2, 2015) ("Chapter 11 trustees are limited to 'reasonable compensation' up to the statutory cap [in section 326(a) of the Bankruptcy Code].").

The Trustee's Lodestar—$11,958,625—is the product of 13,667 hours of time accrued over five years, between 2016 and 2021,[73] all charged at the Trustee's $875/hour billing rate in effect in 2021. Fee Application at 8, 71. In reviewing the Fee Application, the Court first applies section 330(a)(3) to the lodestar calculation.[74] The first factor listed in section 330(a)(3) for determination of the reasonableness of a chapter 11 trustee's compensation is subparagraph (A), "the time spent on such services." This factor is related to subparagraph (C) ("whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title"), and subparagraph (D) ("whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed").

In their Objection, the Creditor Plan Proponents explain that in light of the "dire straits" that CFG Peru faced as of the Petition Date, "creditors broadly supported the appointment of a chapter 11 trustee to provide stability to the process." Obj. ¶ 2. Moreover, they assert that creditors

---

[73] Those hours are summarized, as follows:

| Year | Hours |
|------|-------|
| 2016 | 409.7 hours |
| 2017 | 3,272.8 hours |
| 2018 | 3,471.7 hours |
| 2019 | 3,426.5 hours |
| 2020 | 1,949.2 hours |
| 2021 | 1,137.1 hours |

Brandt Decl. ¶ 10.

[74] Section 330(a)(3)(E) is not relevant to the analysis of section 330(a)(3) because it pertains solely to the qualifications of a "professional person," which is a term that is distinct from a "trustee" and other categories of officers compensable under section 330. *See* 11 U.S.C. § 330(a)(1)(A) (identifying "reasonable compensation for actual, necessary services rendered by the trustee, examiner, ombudsman, professional person").

generally supported the Trustee's initial efforts to stabilize the Peruvian Business by: (a) obtaining

dismissal of the Peruvian Insolvency Proceedings; (b) netting intercompany claims away from the

Peruvian Opcos to protect the cash proceeds available for creditor distributions; (c) commencing

the sale process for the CFGI Equity Interests; and (d) obtaining liquidity through the Non-Core

Asset sales and funding from the Peruvian Opcos. *Id*. Indeed, the Creditor Plan Proponents do not

contest that Mr. Brandt is entitled to reasonable compensation in accordance with sections 326(a)

and 330 of the Bankruptcy Code for the work he did in the early stages of his tenure. *Id.* ¶ 3. The

principal issue that they have with the Fee Application is with respect to the Trustee's actions after

he stabilized the operations of the Peruvian Business. They contend that the $25 million Proposed

Commission far exceeds what is reasonable based upon the events that transpired during that

period. *Id*.

The Creditor Plan Proponents complain first that the number of hours that the Trustee billed

is excessive. In substance, they question whether he actually worked 13,667 hours over the nearly

five-year period serving as the chapter 11 trustee of CFG Peru, including nearly an average of

3,400 hours per year between 2017 and 2019. Obj. ¶ 40. They note that the Trustee spent 1.86 times

the total hours billed in the aggregate throughout the case by the six Senior Managing Directors

and Managing Directors employed by DSI as Mr. Brandt's financial advisors throughout the case.

*Id.*[75] They say that they are "particularly concerned with the aggregate time Mr. Brandt alleges he

spent administering these cases while he concurrently served as the chapter 11 trustee of the cases

styled *In re San Luis and Rio Grande R.R., Inc., et al.*, No. 19-18905 (Bankr. D. Col.) (the '*San*

---

[75]    *See Thirteenth Interim and Final Fee Application of Development Specialists, Inc. for Compensation for Services Rendered and Reimbursement of Expenses as Accountant to the Chapter 11 Trustee for (I) the Thirteenth Interim Period from November 1, 2020 Through and Including June 10, 2021 and (II) the Entire Case Period from November 10, 2016 Through and Including June 10, 2021*, ECF No. 2663 at A-12 to A-13 (stating that DSI's Senior Managing Directors and Directors billed a combined total of 7,330.4 hours during Mr. Brandt's tenure as Trustee).

*Luis* Cases').” *Id.* They assert that in 2020, the Trustee billed 1,949 hours in this case and an additional 1,725 hours in the *San Luis* Cases—a total of nearly 3,675 hours in 2020. *Id.*[76] The Creditor Plan Proponents say that “something is amiss” because this would imply that in 2020, solely in respect of CFG Peru's case and the *San Luis* Cases, Mr. Brandt worked on average over ten hours every day, for 365 days, or nearly fourteen hours per day, excluding weekends and holidays. *Id.* They also note that, during this period, the Trustee took more than sixty international business trips for which he did not bill non-working travel time, and that he participated in “a lot” of speaking engagements during the course of this case. *Id.* (citing Brandt Dep. at 12:17-19).[77]

The Creditor Plan Proponents also assert that by 2018, it was clear that the Trustee's sale process was doomed to fail. They maintain that, given the way in which the sales process dragged out, there is no rational explanation for Mr. Brandt's refusal to adapt to changed circumstances, engage with key creditors, and abandon his strategy to find a cash buyer for the CFGI Equity Interests. Obj. ¶ 4. They complain that in the three years after the Ad Hoc Group first proposed an alternative path forward in 2018, Mr. Brandt billed a total of approximately $5.6 million for 6,512 hours of work, some of which he spent fighting a creditor-backed restructuring process. They assert that the Court should determine the portion, if any, of those fees that represents work “necessary,” “beneficial,” or “commensurate” to the ultimate outcome achieved here—an equitization of debt at substantial losses to creditors. *Id.* ¶ 40. They also assert that the Trustee's alleged unwillingness to change course ultimately imposed significant unnecessary costs on CFG Peru's estate and its creditors. They contend that CFG Peru incurred more than $40 million in professional fees (exclusive of any ultimate trustee commission) through June 2021, and that

---

[76]    Copies of the fee applications filed by Mr. Brandt in the *San Luis* Cases are annexed as Exhibit F to the Objection.

[77]    “Brandt Dep.” refers to the transcript of the November 5, 2021, deposition of Mr. Brandt taken by the Creditor Plan Proponents. It is annexed as Exhibit B to the Objection.

millions of dollars in professional fees and expenses were incurred after creditors began to demand

a course correction. *Id*. ¶ 4. They also maintain that because CFG Peru is a corporate shell with no

hard assets, the delay (and its attendant professional fee burn) caused the estate to fall deeper into

debt to its Peruvian affiliates, which had provided an interest-bearing line of credit to fund estate

administrative costs. *Id.*

The Trustee defends the amount of time he worked on this case by citing his mandate from

the Court to protect the Debtors' "crown jewels" and only considerable assets—the Peruvian

Opcos. He contends that for five years, he operated CFG Peru and its sprawling subsidiaries and

assets in a manner equivalent to the CEO of an international enterprise. Fee Application at 53. He

contends that doing so necessitated constant, nearly round-the-clock work from the day he was

appointed Trustee, as he could not simply be a passive shareholder awaiting an "as-is" purchaser

for CFG Peru's equity interests in subsidiaries that were embroiled in their own Peruvian

Insolvency Proceedings. *Id.* He further contends that his efforts to preserve and reorganize the

Peruvian Business—work that required him to organize and attend a bevy of world-wide meetings

and personally oversee an international web of managers and businesses—were necessary to

preserve and maximize the value of such assets for the benefit of creditors, including those

creditors of the Peruvian Opcos who sought the appointment of a chapter 11 trustee specifically to

protect the Peruvian Opcos. *See id.* at 31, 53.

In analyzing the reasonableness of the fee request, the Court considers whether the actions

that the Trustee took in furtherance of his appointment were reasonable at the time that he took

them. *See In re Brous*, 370 B.R. at 570 ("A decision reasonable at first may turn out wrong in the

end. The test is an objective one, and considers 'what services a reasonable lawyer or legal firm

would have performed in the same circumstances.'" (quoting *In re Ames Dep't Stores, Inc.*, 76

51

F.3d 66, 72 (2d Cir. 1996))). The Trustee's detailed time records reflect that, during his tenure, he

worked on this case virtually every day, including weekends and holidays. It is plain from the

events that have transpired over the course of the Chapter 11 Cases, and from the hours that the

Trustee has recorded in his time records (which this Court credits), that throughout his tenure, he

devoted vast amounts of time to the oversight of the operations of the Peruvian Opcos. As Trustee,

Mr. Brandt had full responsibility for CFG Peru and the operation of its assets—the Peruvian

Opcos. That presented multiple challenges. First, prior to his appointment, the Ng Family—as

equity owners—controlled the operation of the Peruvian Opcos. They were active "hands-on"

shareholders who acted as "general managers" of the Peruvian Opcos.[78] Through the Trustee

Motion, the Creditor Plan Proponents sought to oust the Ng Family from that position of authority

and insert a fiduciary to assume oversight control of the Peruvian Opcos. With the appointment of

the Trustee (over the objection of the Ng Family), they got what they asked for: as the record

reflects, and as discussed above, that the Trustee spent the time necessary to become expert on the

operation of the Peruvian Business and, thereafter, to rehabilitate and grow the business. Through

---

[78]    At the evidentiary hearing that preceded this Court's ruling on the Motion to Appoint Trustee, the Court heard
the following testimony from Francisco Paniagua:

> Q.   And Mr. Paniagua, members of the Ng family are also general managers at the fishmeal
> companies, right?
>
> A.   Yes.
>
> Q.   And you and Mr. Tirado coordinate with members of the Ng family regarding the operation of
> the fishmeal companies, right?
>
> A.   Yes.

*Transcript Regarding Hearing Held on August 30, 2016*, ECF No. 159 at 275:8-14.

his "hands on" approach, he effectively acted as the CEO of the Peruvian Opcos.[79] Moreover, the

Trustee has demonstrated that there was good reason for him to spend the time and effort to

develop a sound working relationship with the Ng Family. Through their equity interests, the Ng

Family controlled entities in the Pacific Andes Group corporate structure, like PAIH and PARD,

that indirectly held governance rights in CFG Peru. A number of the actions that the Trustee took

on behalf of CFG Peru and the Peruvian Opcos required shareholder approval. He was able to

obtain the requisite consents, in part due to the relationship he developed with the Ng Family. Mr.

Brandt also needed to develop a working relationship with the manager of the Peruvian Opcos and

with local civic officials with oversight responsibility for entities operating in the Peruvian fishing

industry, like the Peruvian Opcos. Finally, the Peruvian Business is substantial. As noted, it

employs approximately 2,800 people (2,400 in Peru), and its operating assets include sixty-six

fishing vessels and ten plants located in eight towns and villages in Peru. *See* First Day

Decl. ¶ 37, 52. It was also in poor financial shape when Mr. Brandt was appointed Trustee. The

---

[79]    For example, Mr. Brandt's undisputed testimony is that he operated the Peruvian Opcos as their effective CEO and made the decisions that determined salaries and bonuses, sales of non-core assets, resolution of operational disputes, and budgets that determined operations impacting vendors:

> A    . . . I gave orders and instructions and budgets as to what would be paid. I ran this company, so, ultimately, these decisions rest on my desk, yes.

> Q    Were you a manager or general manager of any non-debtor entities in the group?

> A    I was effectively the CEO. I replaced the people who had been managing the larger business from Hong Kong. The local managers in Peru had reported to Hong Kong both on accounting and on managerial and I replaced that.

> Q    So what supervisory authority did you exercise over payroll at subsidiary entities?

> A    Total. I sat with the payroll and did a review every year. I did all the adjustments. I gave out the bonuses. They were all run past me. My decisional authority as to payroll between both the union and non-union employees and the employee bonuses was solely [sic].

Brandt Dep. at 114:5-23.

record shows that during his tenure, Mr. Brandt spent the time, and expended the effort, necessary to stabilize and rehabilitate the business.

The record is clear that throughout his tenure, Mr. Brandt acted "as the fiduciary for the estate. He [was] the estate's chief executive officer and its chief financial officer with . . . full responsibility for the assets and affairs of the estate, a responsibility that he [could not] delegate." *Connolly v. Harris Tr. Co. (In re Miniscribe Corp.)*, 241 B.R. 729, 749 (Bankr. Colo. 1999); *see also In re Cardinal Indus.*, 151 B.R. 843, 845 (Bankr. S.D. Ohio 1993) (noting that the nature of the chapter 11 trustee's "services encompassed the role of a chief executive officer. He also had the fiduciary duties of a trustee under the Bankruptcy Code."); *Wall v. Wilson (In re Missionary Baptist Found.)*, 77 B.R. 552, 554 (Bankr. N.D. Tex. 1987) ("the Trustee was not engaged in a liquidation, but rather a reorganization and continuing operation of [an] [on]going business. The Trustee occupies the position of a chief executive officer of a business which requires a myriad of items over the course of the business day."). Moreover, Mr. Brandt's time spent properly includes matters such as administration, personnel and human resources, strategy and other such tasks that would not appear on a legal bill. *See In re Greenley Energy Holdings, Inc.*, 102 B.R. 400, 405 (E.D. Pa. 1989) (suggesting that trustees need not keep billing records given the significant difference in their tasks versus an attorney).

The Court finds that Mr. Brandt has demonstrated that his mandate as Trustee necessitated the monumental hours of time he spent on this case—practically from the day he was appointed, including on weekends and holidays. *See, e.g*., Brandt Decl. ¶ 13 ("preservation of the value of the Peruvian Opcos required immediate and delicate action . . . . [Such action included] spending the 2016 Thanksgiving holiday in Peru laying the groundwork."). In reviewing the Trustee's time

records,[80] the Court finds that the Trustee exercised appropriate billing judgment, delegated work to DSI as necessary,[81] and otherwise has demonstrated that the tasks he performed required the around-the-clock commitment he assumed as Trustee over more than half a decade. The Court finds that the Trustee performed those tasks within a reasonable amount of time commensurate with the complexity, importance and nature of the particular problems, issues, or tasks addressed. As set forth in detail above, in addition to operating the Peruvian Business, these tasks included, among other things, (i) resolving the Peruvian Insolvency Proceedings and the chapter 15 Recognition Petitions filed herein, Brandt Decl. ¶¶ 36-42; (ii) establishing a process to sell the Peruvian Opcos' Non-Core Assets, id. ¶¶ 64-70; (iii) negotiating the Netting Agreement, id. ¶¶ 71-75; (iv) negotiating and resolving proofs of claim filed against CFG Peru, id.; and (v) coordinating the mediation of the Intercompany Disputes, the FTI Hong Kong Litigation and the HSBC-HK/Trustee Litigation. Id. ¶¶ 84-85. The fact that the Trustee failed to locate a cash buyer for the CFGI Equity Interests does not detract from the work he did to market the assets and to restore and maximize the value of the Peruvian Business. The Trustee performed this work professionally and did so in the unique context of facing a mandate from this Court to preserve and enhance the value of the Debtors' non-debtor "crown jewels"—the Peruvian Opcos—a task that entailed serving as the de facto CEO of an enterprise with employees and operations that

---

[80]    Throughout the course of his tenure, the Chapter 11 Trustee regularly provided in-court status reports on all aspects of these cases generally, and particularly with regard to the operation of the Peruvian Business and the process for marketing and selling the CFGI Equity Interests. Moreover, as described herein, the Trustee frequently sought relief of this Court in connection with matters relevant to the case. The time records comprise approximately 5,218 pages. The Court has not reviewed every page of the time records. Rather, it reviewed what it believes to be a representative sample of the records. The Court finds that review of the time records, coupled with the Trustee's presentations to the Court, have provided the Court with a very clear picture of the Trustee's efforts during these cases and the benefits derived by the estate from those efforts.

[81]    There is nothing odd about the fact that the Trustee spent far more time addressing his fiduciary duties as Trustee of CFG Peru than the senior DSI personnel did in supporting his efforts.

stretched from Hong Kong to Peru. *See, e.g.*, Brandt Dep., 114:4-23; 127:16-23. The Court finds

that overseeing and performing this work, and the context in which Mr. Brandt did so, necessitated

the vast hours Mr. Brandt accumulated as Trustee.

The Creditor Plan Proponents also focus on the CFG Peru Plan confirmation process and

contend that since they first proposed an alternative path forward in 2018 (i.e., a restructuring for

the Debtors that did not entail a sale), Mr. Brandt fought the proposal, including after it evolved

into the proposed reorganization plan. *See* Obj. ¶¶ 25, 40. They note that on April 14, 2021, the

Trustee filed an objection to Disclosure Statement Motion.[82] Pursuant to the Disclosure Statement

Objection, Mr. Brandt sought a unilateral two-month extension of the plan confirmation schedule

to permit him to restart the marketing process. The next day, April 15, 2021, Mr. Brandt filed a

new bidding procedures motion.[83] The Creditor Plan Proponents say that those actions were

"counterproductive," and that Mr. Brandt obstructed confirmation of the CFG Peru Plan. Obj. ¶ 26.

The Court attaches no weight to those complaints. Ultimately, the Creditor Plan Proponents agreed

to a process that afforded the Trustee an opportunity to find a cash buyer for the business without

extending the proposed confirmation schedule. *See* Apr. 21, 2021 Hr'g Tr. at 55:4-13 ("we agree

with the process that was laid out [i.e., whereby the Trustee will inform the Court if it obtained a

qualified bid to sell the Peruvian Opcos] . . . . [I]f Mr. Brandt is successful in finding a bidder that

can pay us, . . . in full in cash . . . we're interested in supporting that[.]"). Moreover, the Chapter

11 Trustee did not "obstruct" confirmation of the plan. The Trustee opposed certain terms of the

plan. To that end, the Trustee expressed concerns about (i) the release that the Creditor Plan

---

[82]    *Chapter 11 Trustee's Limited Objection to the Motion of Movants for Entry of an Order Approving (I) the Adequacy of the Disclosure Statement; (II) Solicitation and Notice Procedures; (III) Form of Ballots and Notices in Connection Therewith; and (IV) Certain Dates With Respect Thereto*, ECF No. 2401 (the "Disclosure Statement Objection").

[83]    *Chapter 11 Trustee's Emergency Motion for an Order (I) Approving Bidding Procedures, (II) Approving the Form and Manner of Notice Thereof, and (III) Granting Related Relief*, ECF No. 2409.

Proponents gave to the Ng Family, and (ii) plan terms that left non-consenting creditors able to pursue their rights in a manner that, in the Trustee's estimate, could disrupt the plan. Reply at 9. He also expressed his concerns about the wisdom of funding an interim distribution in advance of confirmation. *Id.* The Court declines to discount the number of hours underlying the Fee Application. The Court finds the 13,667 hours billed by Mr. Brandt to be reasonable, necessary to the administration of the Debtor's estate, and commensurate with the complexity, importance, and nature of the particular problems, issues, or tasks that he addressed during his tenure.

The second and sixth prongs applied in assessing the reasonableness of the Trustee's fee under section 330(a)(3) are related. Section 330(a)(3)(B) addresses "the rates charged for such services," and section 330(a)(F) addresses "whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title." Pursuant to those provisions, in calculating the lodestar amount, the Court must assess whether the Trustee's hourly rate is "in line with those [rates] prevailing in the community for similar services by [professionals] of reasonably comparable skill, experience, and reputation." *Nisselson v. Empyrean Inv. Fund, L.P. (In re MarketXT Holdings Corp.)*, No. 04-12078, 2006 WL 2583644, at *4 (Bankr. S.D.N.Y. July 21, 2006) (quoting *Blum v. Stenson*, 465 U.S. 886, 896 n.11 (1984)). The Trustee's hourly rate has varied over his five years—six calendar years—on this case, from $695/hour in 2016, to $875/hour in 2021. Fee Application at 66. The Trustee has not been paid any compensation at any time in this case (other than limited expense reimbursement). He calculates his lodestar based on the rate in effect in 2021—$875 per hour. *Id.* at 10. The Creditor Plan Proponents assert that even assuming the reasonableness of each of the 13,667 hours that the Trustee worked, the proposed lodestar amount reflects a retroactive and entirely unprecedented change to Mr. Brandt's billing rate—which was set at $695 per hour

in 2016, when his engagement began—to his 2021 billing rate of $875 per hour. Obj. ¶ 6. Thus, he has applied his 2021 billing rate to every hour he has worked in these cases, rather than the rate in effect when the services were rendered. It is undisputed that the rate change alone increases the purported lodestar amount by nearly $1.1 million, which in turn increases the Proposed Commission by over $2.2 million using the proposed 2.09x "multiplier." *Id.* ¶ 6.

As part of its business plan, DSI sets the rates of its professional—including Mr. Brandt—that permit it to remain competitive for middle-market restructurings. In this case, Mr. Brandt set his hourly rate in accordance with DSI's hourly billing rates. *See* Brandt Decl. ¶¶ 8, 92. In arguing that his $875/hour rate is more than "reasonable," the Trustee cites to three bankruptcy cases in the Southern District of New York in which the hourly rates charged by the court-appointed chapter 11 trustees (and their counsel) dwarf the $875/hour rate that the Trustee asks the Court to apply, even though many of the timekeepers at those rates have fewer years of experience in restructuring than the Trustee. *See* Fee Application at 68-69. The Trustee makes those comparisons to demonstrate that his current hourly rate is more than reasonable in relation to comparable market rates and is the appropriate rate for calculation of his lodestar amount. *Id*. The Court finds that the Trustee's standard billing rates over the course of his tenure in this case are reasonable in relation to comparable market rates and are the appropriate rates for calculation of his lodestar amount. *See In re McKenna*, 93 B.R. 238, 239 n.1 (Bankr. E.D. Cal. 1988) (noting that "when [a trustee] seeks more than [a] standard billing rate, there is a 'strong presumption' that a fee award at the attorney's standard billing rate at or near the time services are rendered affords reasonable compensation" (quoting *In re Manoa Fin. Co*., 853 F.2d 687, 692 (9th Cir. 1988))).

As noted, at the outset of his tenure, the Trustee agreed with the U.S. Trustee not to seek interim compensation. As such, the Trustee has not been paid any compensation in these cases. He

asserts that "[i]t is precisely in circumstances such as these" that courts generally, and the Second

Circuit in particular, have applied a trustee's current rate in the lodestar calculation for all years of

service. Fee Application 66-67. As support, the Trustee cites to *Missouri v. Jenkins ex rel. Agyei*,

491 U.S. 274 (1989), and its progeny. In *Jenkins*, the Supreme Court reasoned that an award of

attorney's fees under the Civil Rights Attorney's Fees Award Act, 42 U.S.C. § 1988, could be

appropriately enhanced "whether by the application of current rather than historic hourly rates or

otherwise" in order to compensate an attorney for the "delay in payment"—i.e., the gap between

when services are rendered and paid for—of awards under the statute.[84] 491 U.S. at 283-84. As

the Creditor Plan Proponents contend, the civil rights context is inapplicable on the facts here and,

indeed, to the bankruptcy context more generally. Obj. ¶ 44. That is because the risks of

non-payment are far greater in the civil rights litigation context than in chapter 11 because a civil

rights attorney's compensation is wholly dependent upon litigating a claim to judgment or settling

a dispute. *See Jenkins*, 491 U.S. at 282 (noting that when "entitlement to attorney's fees depends

on success, [a plaintiff's] lawyers are not paid until a favorable decision finally eventuates, which

may be years later" (quoting *Pennsylvania v. Del. Valley Citizens' Council*, 483 U.S. 711, 716

(1987))). In contrast, trustees have the option to receive payment on an interim basis, before a

contested matter is resolved, a transaction closes, or the trustee monetizes other property of the

estate. *See* 11 U.S.C. § 331. Moreover, as the Creditor Plan Proponents note, chapter 11 trustees

in the Southern District of New York routinely receive interim compensation.[85] Moreover, Mr.

---

[84]    The Civil Rights Attorney's Fees Award Act provides that courts may award the "prevailing party . . . reasonable attorney's fees." 42 U.S.C. § 1988(b). By use of the word "prevailing", the statute makes clear that any award will be made only at the conclusion of a litigation—potentially years after it commenced. *See Jenkins*, 491 U.S. at 283 ("Clearly, compensation received several years after the services were rendered—as it frequently is in complex civil rights litigation—is not equivalent to the same dollar amount received reasonably promptly as the legal services are performed, as would normally be the case with private billings.").

[85]    *See, e.g.*, Order Authorizing Interim Compensation to the Trustee in Partial Satisfaction of His Reasonable Compensation Under Section 326 of the Bankruptcy Code, *In re Firestar Diamond, Inc.*, No. 18-10509 (Bankr.

Brandt confirmed in his deposition that no creditor induced him not to file an interim application,

and that he did not revisit the U.S. Trustee's expectation that he not seek interim compensation

until 2020—more than four years into his trusteeship. *See* Brandt Dep. 43:22-25.[86] Mr. Brandt

relinquished that right pursuant to his agreement with the U.S. Trustee. That voluntary undertaking

is not akin to the express statutory requirement that fee awards under 42 U.S.C. § 1988 may not

occur until the conclusion of a litigation. *See Jenkins*, 491 U.S. at 283.[87]

---

S.D.N.Y. Dec. 21, 2018), ECF No. 648; Order Granting (I) Second Interim Application of Togut, Segal and Segal LLP as Bankruptcy Counsel for the Chapter 11 Trustee for Allowance of Compensation for Services Rendered for the Period July 1, 2016 Through September 30, 2018 and for Reimbursement of Expenses; (II) Second Interim Application of Duff & Phelps, LLC as Accountant to the Chapter 11 Trustee for Allowance of Compensation for Services Rendered for the Period July 1, 2016 Through September 30, 2018 and for Reimbursement of Expenses, and (III) Chapter 11 Trustee's Report and First Interim Application for Allowance of Statutory Commission, *In re TS Emp., Inc.*, No. 15-10243 (Bankr. S.D.N.Y. Dec. 20, 2018), ECF No. 307; First Interim Application of Corinne Ball, Chapter 11 Trustee, for Allowance of Compensation for Professional Services Rendered Through September 30, 2015, *In re SoundView Elite*, No. 13-13098 (Bankr. S.D.N.Y. Dec. 14, 2015), ECF No. 922.

[86]   In November 2020—four years after he was appointed—the Trustee sought reimbursement of his expenses through February 29, 2020. *See First Interim Application of the Chapter 11 Trustee, William A. Brandt, Jr., for Reimbursement of Expenses for the Period From November 10, 2016 Through and Including February 29, 2020*, ECF No. 2231. The U.S. Trustee did not oppose the application. On December 20, 2020, the Court granted that application. *Order Granting Application for Reimbursement of Expenses*, ECF No. 2272.

[87]   The Trustee contends that *Jenkins* has been adopted by bankruptcy courts and, accordingly, the Court should apply it here and approve calculating his lodestar using his current hourly rate. Fee Application at 67; Reply at 43. As support, he cites to *In re Com. Consortium of Cal.*, 135 B.R. 120 (Bankr. C.D. Cal. 1991) ("*Commercial Consortium*"); *In re Fall*, 93 B.R. 1003 (Bankr. D. Ore. 1988) and *In re D.C. Sullivan & Co., Inc.*, 69 B.R. 212 (Bankr. D. Mass. 1986). The court finds those cases to be distinguishable.

In *Commercial Consortium*, the Court applied *Jenkins* in awarding an interim payment of attorneys' fees to counsel to the chapter 7 trustee of an involuntary debtor whose principals did not cooperate with the chapter 7 trustee, and whose only asset was a disputed claim under a fire insurance policy. 135 B.R. at 126-27. Four years after the commencement of the case, the chapter 7 trustee settled the litigation in consideration for a payment of $273,000 by the insurer to the estate. *Id.* at 121. At that point, counsel filed its interim fee application. In it, counsel requested it be permitted to calculate the lodestar using its current billing rates. The U.S. Trustee objected to that aspect of the application. The court overruled the objection. In awarding interim fees to counsel calculated at his current hourly rate, the court reasoned:

> Interim fee applications are supposed to help avoid undue delays in payment. When delay has nevertheless occurred, counsel should not have to bear the full brunt of the resulting financial impact. Therefore, this Court holds that use of current hourly rates should be permitted to compensate counsel for unavoidable delay in allowance of fees.

*Id.* at 127. In so ruling, the court relied on *In re Fall*, and *In re D.C. Sullivan & Co., Inc.* In *In re Fall*, the court allowed a fee enhancement in the form of retroactive adjustment to current rates for the long-unpaid chapter 7 trustee's counsel who eventually recovered substantial assets for the estate. 93 B.R. at 1010. In *In re D.C. Sullivan & Co., Inc.*, the court granted chapter 7 trustee's counsel's request for compensation at the current hourly rates rather than the rates charged

For these reasons, the Court finds that a reasonable rate for the Trustee's services in this chapter 11 case is his hourly rate at the time he provided his services. This rate provides him with reasonable compensation under section 330(a)(3) of the Bankruptcy Code when applied to the hours billed as Trustee. Subtracting Mr. Brandt's retroactive rate increase reduces the lodestar applicable herein from $11,958,625.00 to $10,905,914.00 (the "Adjusted Lodestar"). *See* Obj. ¶ 41.

<u>The Statutory Cap</u>

A chapter 11 trustee's compensation is calculated according to the monies the trustee distributes to parties in interest. *See* 11 U.S.C. § 326(a). For Mr. Brandt, the application of section 326(a) hinges primarily on whether the case involves an operating trustee or a liquidating trustee, as the duties of a chapter 7 trustee differ materially from those of a chapter 11 trustee. Fee Application at 72. In substance, he contends that in his capacity as an "operating trustee" he has exercised control over multiple entities (i.e., CFG Peru and the Peruvian Opcos) and that he should be compensated for the work required to operate those businesses. He maintains that he is entitled to a commission for managing, preserving, and ultimately enhancing the value of the Peruvian Business, for the benefit of the Debtors' creditors, and that the disbursements to parties in interest in the course of his operation of those business are properly considered within the Statutory Cap in calculating the commission.

---

at the time the services were performed. The court reasoned that there had been a delay in payment "to a degree that would not normally occur outside of the bankruptcy context, and seldom even in bankruptcy. The excess in current hourly rates over rates charged in prior years is a justifiable compensating factor for this delay." 69 B.R. at 218 (citing *Grendel's Den, Inc. v. Larkin*, 749 F.2d 945, 955 (1st Cir. 1984)).

Here, the Trustee did not file an interim fee request in deference to the U.S. Trustee's request that he not do so. His agreement not to seek interim compensation is not a basis to authorize him to bill his services at his 2021 hourly rate.

Mr. Brandt calculates the Statutory Cap with reference to two sources of disbursements aggregating approximately $2.95 billion. The first source is the cash disbursements reflected on the MOR Disbursements. Fee Application at 77. For the period of the Fee Application, the MOR Disbursements total approximately $1.894 billion, consisting of approximately $48 million paid by CFG Peru to its administrative creditors during the administration of its chapter 11 case (i.e., retained professionals and the U.S. Trustee), and $1.846 billion in disbursements by the Peruvian Opcos to their creditors in the operation of the Peruvian Business. O'Malley Decl. ¶¶ 6, 9; *see also* MOR June 2021.[88] The second source of disbursements is the equity and cash that the Trustee turned over to the Plan Administrator and that was thereafter distributed to creditors under the CFG Peru Plan. Fee Application at 82-83. The Trustee values the CFGI Equity Interests at $850 million,[89] and he says that he turned over at least $211 million in cash to the Plan Administrator. O'Malley Decl. ¶ 5. The Trustee asserts that, utilizing those figures, the Statutory Cap totals approximately $88.6 million (i.e., 3% of $2.95 billion), which is well in excess of the $25 million Proposed Commission. *See id.* ¶ 8.[90]

---

[88]  *Monthly Operating Report for June 2021*, ECF No. 2614.

[89]  In advocating that value, the Trustee cites the declaration of Mr. Bradley submitted by the Creditor Plan Proponents in support of the CFG Peru Plan. In it, Mr. Bradley states that for purposes of the plan only, the total enterprise value of the CFGI Equity Interests would be approximately $850 million upon emergence. *Declaration of Bradley Jordan in Support of the Creditor Plan Proponents' Chapter 11 Plan for CFG Peru Investments Pte. Ltd. (Singapore)*, ECF No. 2542 (the "Jordan Confirmation Decl.") ¶ 23.

[90]  The Trustee explains that because the Statutory Cap essentially is calculated as 3% of the monies disbursed to parties in interest, it will exceed $25 million if it is based on either the MOR Disbursements or the CFGI Equity Interests (if valued at $850 million), and that adding the Trustee's cash disbursements widens the gap such that the Trustee's requested commission is only 28.2% of the proposed Statutory Cap. *See* Fee Application at 66-68. Moreover, according to the Trustee:

> (i) The Statutory Cap calculated based upon the value of the CFGI Equity Interests, the Plan Cash Payments (not including a reserve for the Trustee's commission), and the $48 million that was disbursed from CFG Peru's accounts for obligations incurred during the Chapter 11 Cases, totals approximately $33.3 million.

The Creditor Plan Proponents assert that an "operating trustee" like Mr. Brandt is entitled to no greater leeway in calculating the Statutory Cap than a liquidating trustee. Obj. ¶¶ 66-68. They contend that. notwithstanding that the Trustee recorded the Peruvian Opcos' disbursements to their creditors among the MOR Disbursements, under the clear and unambiguous language of section 326(a), he cannot credit them in calculating the Statutory Cap because they are not disbursements "by the Trustee" and were not disbursed to "parties in interest," as the Peruvian Opcos' trade creditors do not qualify as creditors in the Chapter 11 Cases. *Id*. ¶¶ 55-62. They argue that the Trustee is not entitled to include any portion of the value of the CFGI Equity Interests in the calculation of his commission because the Trustee did not sell the CFGI Equity Interests for cash and distribute the cash proceeds to creditors, and that by definition, the equity that creditors will receive under the CFG Peru Plan is not "moneys disbursed" as required by section 326(a). *Id*. ¶ 9. They also say that, in any event, the Trustee has failed to establish that the equity has any value, let alone that it is worth $850 million. *Id*. ¶¶ 10-11.[91] Finally, they assert that the Trustee did not turn over $211 million in cash to the Plan Administrator. *Id*. ¶ 12. In sum, they argue that at least approximately $2.87 billion of the Trustee's approximately $2.95 billion in purported creditor distributions are not creditable "moneys disbursed" under section 326(a). They say the

---

(ii) The Statutory Cap calculated based upon the value of all the MOR Disbursements and Plan Cash Disbursements, but not upon the value of the CFGI Equity Interests, totals approximately $63.1 million.

O'Malley Decl. ¶¶ 9-11.

[91]    They assert that the only "disbursements" made by Mr. Brandt of the CFGI Equity Interests came when he abandoned the CFGI Equity Interests to CFG Peru's estate in connection with the Plan's confirmation hearing. They argue that even assuming, arguendo, a debtor-to-debtor transfer is appropriately included in the Statutory Cap calculation, Mr. Brandt has not independently valued the CFGI Equity Interests as of that date. Obj. ¶ 10 (citing Brandt Dep. at 53:6-9). They say that at the time of his turnover, those interests were burdened by nearly $1.2 billion of funded indebtedness and, therefore, were no doubt worthless. *Id*. ¶ 9.

amount of "moneys disbursed" is limited to, at most, $98 million[92] and, as such, the Statutory Cap

cannot exceed $2.96 million. *Id*. ¶ 13.

    The Court considers those matters below.

    Section 326(a) is derived from a similar provision in the Bankruptcy Act of 1898. which

included the identical concept of "moneys disbursed or turned over." *See* H.R. Rep. No. 95-595,

at 327 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6283 (stating that section 326(a) "is derived

in part from section 48c of the [Bankruptcy Act of 1898]"). The few courts that have applied

section 326(a) (or the same language in its predecessor statute) to chapter 11 cases that involve

multiple entities under a trustee's control have applied the term "moneys disbursed or turned over

in the case" in broad terms to include disbursements made by the business under its control. In *In

re Toole*, 294 F. 975, 976 (S.D.N.Y. 1920), the District Court broadly construed the phrase

"moneys disbursed or turned over" in Section 48c of the former Bankruptcy Act to allow

"compensation to trustees and receivers for all property properly administered by the bankruptcy

court, irrespective of whether it turns out to belong to the general estate or not," as the phrase was

a "very broad provision."[93] The Second Circuit followed *Toole*, in a pre-Bankruptcy Code case, to

hold that a trustee should not be barred from claiming a commission on a fund that was property

---

[92]    They say that the $98 million consists of (i) approximately $48 million in disbursements from CFG Peru's accounts for obligations incurred during the Chapter 11 Cases (Obj. ¶ 8), and (ii) approximately $50 million distributed to creditors under the CFG Peru Plan. *Id*. ¶ 12.

[93]    In so construing the statute, the District Court explained that complex restructurings, such as the stockbroker firm before it, require any receiver or trustee to provide:

        great industry, capacity for detail, and unusual expenditure of time and energy. To deal with them satisfactorily demands an experienced and able receiver and counsel. It is usually the case that the amounts available for general creditors are far less than the moneys or securities which are successfully reclaimed by third parties, and often they are negligible in amount as compared with the so-called reclamation claims. If no compensation can be awarded, except commissions which may be calculated upon the general estate, it is literally true that no competent person would wisely accept the office of receiver or trustee of such an estate.

*In re Toole*, 294 F. at 976.

of an insurance company, and not property of the estate, but which the trustee administered prior

to payment. *See In re Dutcher Constr. Corp.*, 378 F.2d 866, 871-72 (2d Cir. 1967) (relying on

*Toole* in holding that, even though funds due to an insurance company never became property of

the estate, it "is not to say that the Trustee should not be allowed to recover the necessary expenses

of litigation or a commission for handling this fund"). Indeed, the case law is clear that property

of non-debtors and third parties will frequently be obtained, controlled, or impacted by a trustee's

work in a manner that courts find appropriate for inclusion in such a calculation:

> The statute [section 326(a)] plainly does not require that disbursed funds be
> "property of the estate." Some courts interpreting this language agree and
> conclude that "[t]he base is not limited to distributions of property of the
> estate, as a trustee may disburse monies to parties in interest, within the
> meaning of Section 326(a) without in the process having actually distributed
> property of the estate."

*In re Robert Plan Corp.*, 493 B.R. 674, 686 (Bankr. E.D.N.Y. 2012) (second alteration in original)

(quoting *In re N. Am. Oil & Gas, Inc.*, 130 B.R. 473, 478 (Bankr. W.D. Tex. 1990)); *see also In*

*re Orient River Inv., Ltd.*, 133 B.R. 729, 732 (Bankr. E.D. Pa. 1991) (noting that the Bankruptcy

Code's uniform provisions for compensation of all trustees "requires bankruptcy courts to make

some allowances for operating trustees who perform their services diligently").

    The Peruvian Opcos constitute the most valuable assets of the Pacific Andes Group, but

neither entity is eligible to be a debtor herein. *See* Trustee Decision and Order at 8, 30. Nonetheless,

the Debtors' desire to preserve the value of the assets and operations of those non-Debtors for the

benefit of all of the Debtors in the Chapter 11 Cases drove the Initial Debtors to commence the

Chapter 11 Cases. They sought to prevent a "fire sale" of the Peruvian Opcos to the prejudice of

the Debtors' creditors. First Day Decl. ¶ 20 ("[T]he purpose of these chapter 11 cases is simple—

to provide the Debtors with a breathing spell in order to implement a restructuring of their

businesses and utilize the automatic stay to prevent creditors from forcing a fire sale [of the

Peruvian Opcos], which would preclude structurally subordinated creditors and shareholders [i.e., the Initial Debtors' creditors and shareholders] from realizing values."). The Club Lender Parties filed the Trustee Motion precisely because the Peruvian Opcos are outside of the scope of the Chapter 11 Cases. They sought the appointment of a chapter 11 trustee in the Chapter 11 Cases "to ensure independent fiduciary oversight" over the non-Debtor Opcos—which they could not directly obtain over the Opcos—"to preserve the estates' equity stakes in a lucrative fishery business and processing plants in Peru operated by certain non-Debtor affiliates." Club Lender Parties' Statement at 5. As previously noted, they got what they asked for.

Although CFG Peru had neither operations nor material funds of its own, the Court appointed a trustee for CFG Peru because it is the 100% direct and indirect owner of the Peruvian Opcos, and pursuant to applicable corporate law, and with the cooperation of the Ng Family, the trustee could exert control over those non-Debtor entities. Trustee Decision and Order at 48-49. The Court found that a trustee appointed for CFG Peru would be in a position "to evaluate the optimal way to maximize the value of the Peruvian Business and to determine how to realize that value for the benefit of the Debtors' estates and creditors." *Id.* at 48. The Court tasked the Trustee with the job of protecting, preserving, and enhancing the value of the non-debtor Peruvian Opcos for the benefit of all creditors, whether they were creditors of CFG Peru, or other entities within the CFG Peru corporate enterprise. *Id.* at 48-49 ("It will be incumbent upon the appointed trustee, in furtherance of his or her fiduciary duties, without limitation, to assess the highest and best use of those assets in the context of the resolution of these Chapter 11 cases and the means for the Debtors to realize maximum benefits from those assets."). The Court's mandate to the Trustee did not permit him simply to retain the stock of the Peruvian Opcos as a passive shareholder. It required the Trustee to adopt the "hands on" approach to the operation of the Peruvian Opcos that he

brought to these cases. Throughout his tenure, the Trustee regularly appeared in Court to provide

detailed reports on the status of his work, including, particularly, updates on the operations of the

Peruvian Opcos. In those reports, the Trustee highlighted his oversight of the day-to-day operations

of the Peruvian Opcos. No one objected to the level of control that he asserted over the Peruvian

Business by his management of the operations of the Peruvian Opcos, or to the MOR

Disbursements reflected in the MORs.

The record is clear that, essentially from the day he was appointed, the Trustee asserted

hands-on control over the operations of the Peruvian Business, including the Opcos, and that

through his efforts, the Trustee protected, preserved, and enhanced the value of the Peruvian Opcos

for the benefit of the Opcos' estates and creditors. The Court finds that to properly compensate the

Trustee for the work he was required to do in operating the Peruvian Opcos, it will calculate the

Statutory Cap based on the MOR Disbursements during the Fee Application Period by CFG Peru

and the Peruvian Opcos—which constitute the businesses under his control. *See In re Orient River

Inv., Ltd.*, 133 B.R. at 729 ("We hold that, considering the extensive scope of duties which

operating trustees perform for debtors' estates, beyond that of trustees who merely liquidate

debtors' estates, operating costs are properly included in the computation."); *In re N. Am. Oil &

Gas, Inc.*, 130 B.R. at 478-79 (holding that trustee's disbursements to "third party operators"

operating the debtor's wells, and other "administrative expenses" all qualified as disbursements

under section 326); *In re Ades*, No. 00-11733, 2007 Bankr. LEXIS 5122, *26-27 (Bankr. D. Nev.

Sept. 4, 2007) (following *Orient River* to calculate cap "including operating expenses during the

Chapter 11 proceeding").[94] To that end, the case of *In re MACCO Props., Inc.*, 540 B.R. 793

(Bankr. W.D. Okla. 2015) ("*MACCO Props.*"), is consistent with that precedent and is instructive.

---

[94]    In reaching this determination, the Court notes that sections 704(a) and 1106(a) of the Bankruptcy Code
enumerate the duties of chapter 7 and chapter 11 trustees, respectively. As now relevant, section 704(a)(1) mandates

In *MACCO Props.*, Michael Deeba ("Mr. Deeba") was appointed as chapter 11 trustee for

the estate of MACCO Properties, Inc. ("MACCO"). 540 B.R. at 800. MACCO was a property

acquisition and management company that was the sole or controlling member and/or manager of

approximately thirty limited liability companies that MACCO created as "single-purpose entities"

at the request of lenders (the "SPEs"). *Id.* at 801. Each such SPE owned a multifamily apartment

complex or commercial real estate (i.e., income-producing properties). *Id.* Historically, MACCO

and its subsidiary SPEs acquired properties that they managed for a period and then sold them for

a profit. MACCO owned 100% of the interests in most of the SPEs and a 99% interest in the

remaining SPEs. *Id.* at 801-02. MACCO's guaranty of $60 million of the SPEs' debts represented

the majority of MACCO's unsecured debt, although it identified vendors, service providers, and

utilities as unsecured creditors. In addition, as of the petition date, several contract and/or tort

claims against MACCO were in various stages of litigation, thus constituting disputed and

unliquidated unsecured claims. *Id.* at 802.

Five years after his appointment, Mr. Deeba liquidated MACCO's operations. In doing so,

he provided unsecured creditors a less-than-full recovery, and no recovery for the equity. The court

attributed this outcome largely to the equity holders' "self-inflicted" conduct. *Id.* at 801. In his

---

that a chapter 7 trustee "collect and reduce to money the property of the estate for which such trustee serves, and close such estate as expeditiously as is compatible with the best interests of parties in interest." 11 U.S.C. § 704(a)(1). In contrast, although section 1106(a) requires a Chapter 11 trustee to perform some duties listed in section 704(a), it specifically excludes subsection (a)(1) from the list. *See* 11 U.S.C. § 1106(a). The Creditor Plan Proponents say that the Trustee contends that the Statutory Cap calculation should include MOR Disbursements by the non-debtor Peruvian Opcos based on his view that trustees that run operating businesses are entitled to greater compensation than trustees that merely liquidate assets. Obj. ¶ 66. There is no support for that position in section 326(a) since it "makes no special provisions for compensation for Chapter 11 trustees, even though the function of the trustee in Chapter 11 is undeniably, and intentionally, different from that of a Chapter 7 trustee." *In re Swenning*, No. 15-11408, 2017 WL 1379349, at *5 (Bankr. N.D. Okla. Apr. 14, 2017) (quoting 5 NORTON BANKR. L. & PRAC. 3d § 99:28). But the Creditor Plan Proponents misconstrue the Trustee's argument. He does not contend that he is entitled to "greater compensation" merely because he is an "operating trustee." Rather, he maintains that the Statutory Cap calculation should include MOR Disbursements by the non-debtor Peruvian Opcos to compensate him for the work he was required to perform to operate the Peruvian Business in the Chapter 11 Cases. Reply at 29. The Court credits that position.

final fee application, Mr. Deeba requested a commission in the full amount of the Statutory Cap,

calculated based on all distributions made by the MACCO parent and subsidiary SPEs. The

debtor's equity holders argued that disbursements by the subsidiaries fell outside the scope of

section 326(a), because Mr. Deeba was not appointed as trustee for the non-debtor entities.

*Id.* at 848. The court disagreed and ruled in favor of the trustee, reasoning that:

> . . . maintaining the businesses of all debtor and non-debtor SPEs, including
> receiving and disbursing funds, was necessary to preserve the value of MACCO's
> estate. Trustee's obligation to the MACCO enterprise *required* him to actively
> oversee and direct the operations of dozens of large multi-family and business
> properties, manage the demands of creditors, and determine how to realize from
> each asset the best result for the estate. All funds flowing through the entire business
> enterprise were managed and accounted for by Trustee. Again, Trustee rendered
> significant services that can be compensated only by including SPE disbursements
> in the Section 326 Base.

*Id.* (emphasis in original). The *MACCO* court also grounded its interpretation of the scope of the

section 326(a) on the fact that the operations of the subsidiary SPEs—most of which were not

debtors—benefited the parent and its creditors. *Id.* at 849 ("Disbursements that [Mr. Deeba] made

to creditors of MACCO's subsidiaries with proceeds of the sales eliminated MACCO's exposure

on its guarantees, and constituted valuable services to the MACCO estate").[95]

---

[95]    In *Connolly v. Morreale (In re Morreale)*, 959 F.3d 1002 (10th Cir. 2020), Samuel Morreale owned the sole membership interest in Morealle Hotels, LLC ("Hotels LLC"), which, in turn, owned two parcels of real property in Denver, Colorado (the "Denver Property"). Mr. Morreale acted as Hotels LLC's manager and personally guaranteed certain loans that Hotels LLC obtained, which were secured by the Denver Property. *See id.* at 1004. In 2012, Hotels LLC commenced a chapter 11 case. In 2013, Mr. Morreale commenced his own chapter 11 case that was later converted to a case under chapter 7 of the Bankruptcy Code. *Id.* The U.S. Trustee appointed Mr. Connolly as the chapter 7 trustee in that case. *Id.* As trustee, Mr. Connolly assumed Mr. Morreale's membership interest in Hotels LLC and appointed himself as its new manager. *Id.* Ultimately, the trustee caused Hotels LLC to liquidate the Denver Properties. With the sale proceeds, the trustee caused Hotels LLC to satisfy all the claims of its creditors. With the surplus funds, the trustee paid off 100% of the claims of the chapter 7 debtor. *Id.* at 1004-05. In support of his fee application, the chapter 7 trustee asserted that the Statutory Cap included the funds paid to Hotel LLC's creditors in its chapter 11 case, as well as the funds distributed in the chapter 7 case. *Id.* The bankruptcy and district courts rejected that contention and limited the trustee's compensation to the services he performed in the chapter 7 case and calculated the Statutory Cap solely upon the moneys he distributed in the chapter 7 case. *See id.* In affirming the lower courts, the Tenth Circuit distinguished that case from *MACCO*. It noted that in *MACCO*, the bankruptcy court "allowed the trustee to include in his section 326(a) base the moneys disbursed by special-purpose entities controlled by the debtor and managed by the Chapter 11 trustee, some of which were also bankrupt," but accorded the *MACCO* decision no weight because "the court in *Macco* [sic] cited no statute or case law to support its decision to include those other entities' disbursements in the trustee's § 326(a) base." *Id.* at 1008-09.

This case involves substantially identical considerations to *MACCO Props.* Like the parent/manager in *MACCO Props.*, the Trustee was appointed to administer a holding company, where all value was found in operating subsidiaries not in bankruptcy. And like the cross-corporate obligations in *MACCO Props.*, CFG Peru was a guarantor on CFG Investment's primary obligation to the Noteholders, which exceeded $300 million on the Petition Date. Every disbursement made by a Peruvian Opco inured to the benefit of their guarantor, CFG Peru, and properly constitutes a disbursement of moneys under Section 326(a). Moreover, like Mr. Deeba, to fulfill his mandate as CFG Peru's chapter 11 trustee, Mr. Brandt was required to operate non-debtor entities—the Peruvian Opcos. The Trustee did not leave operation of the Peruvian Opcos to the "discretion" of others. As the Club Lenders requested in the Trustee Motion and the Court directed in granting the motion, the Trustee asserted control over the Peruvian Business and replaced the Ng Family members as the manager of that business. Through his efforts, the Trustee substantially enhanced the value of the subsidiaries that reflect the value of the CFG Peru estate. To compensate him for that work, the disbursements that were made to parties in interest in the course of a trustee's operation of the business are properly considered within the Statutory Cap calculation.[96]

The term "parties in interest" is not defined in the Bankruptcy Code, and the Second Circuit has not provided direct guidance of the term's meaning as it is used in section 326(a) of the Bankruptcy Code. Under applicable law in this District, a person or entity is a party in interest if

---

[96] Moreover, it was abundantly clear in the Court's decision granting the Trustee Motion that the Trustee would be appointed as trustee for an entity that was entirely dependent upon Peruvian subsidiaries for cash. *See* Trustee Decision and Order at 43 ("the CF Group debtors rely on the Peruvian Opcos for substantially all of their income, and any income from the Peruvian Opcos is speculative and may not occur anytime soon due to the involuntary petitions against the Peruvian Opcos in Peru. . . . This factor supports the appointment of a Chapter 11 trustee"). The term "CF Group" is defined as "CFGL (the publicly traded holding company), Smart Group, Protein Trading, SPSA, CFG Peru Singapore, CFIL, Growing Management, Chanery, Champion, Target Shipping, Fortress, CFGLPL, and Ocean Expert." *Id.* at 8 n.11. Several of these entities are also guarantors of the Peruvian Opcos' debt and would benefit from the Trustee's restructuring and preservation of the Peruvian Opcos.

"it has a sufficient interest in the outcome of the case that would require representation, or a pecuniary interest that will be directly affected by the case." *In re Innkeepers Tr. USA*, 448 B.R. 131, 141 (Bankr. S.D.N.Y. 2011) ("*Innkeepers*") (citing *In re Stone Barn Manhattan LLC*, 405 B.R. 68, 74 (Bankr. S.D.N.Y. 2009)). The Creditor Plan Proponents assert that the disbursements made to creditors of the Peruvian Opcos do not qualify as disbursements to "parties in interest" under section 326(a) because the trade vendors in Peru and elsewhere have no pecuniary interest in the case since they "did not file proofs of claim and/or have direct claims against CFG Peru." Obj. at 5.[97]

The Court disagrees because in making that argument, the Creditor Plan Proponents overlook the fact that throughout these cases, the Court has treated the Club Lenders as "parties in interest," and appointed the Trustee for CFG Peru on the Club Lender Parties' motion to protect their interests in the Peruvian Opcos, even though they do not hold a claim against CFG Peru.[98]

---

[97]   The *Innkeepers* court noted that "[c]ourts in this District . . . have limited 'party in interest' standing where a party's interest in the proceeding is not a direct one." 448 B.R. at 141; *see also In re Saint Vincent's Cath. Med. Ctrs. of N.Y.*, 429 B.R. 139, 149 (Bankr. S.D.N.Y. 2010) (stating that the "'real party in interest' is the one who[,] under the applicable substantive law, has the legal right which is sought to be enforced or is the party entitled to bring suit") (quoting *Roslyn Savings Bank v. Comcoach Corp. (In re Comcoach Corp.)*, 698 F.2d 571, 573 (2d Cir. 1983)). The Creditor Plan Proponents liken the Trustee's control of the Peruvian Opcos' disbursements as payments to "creditors of creditors" of CFG Peru. Obj. ¶ 60 (citing *Innkeepers*). However, *Innkeepers* is distinguishable. There, trust security holders, which were effectively creditors of a creditor of the debtors, sought to be heard on various matters in the case. The *Innkeepers* court held that a creditor of a creditor—while it has important issues at stake in a debtor's bankruptcy case—does not constitute a party in interest in chapter 11. *See* 448 B.R. at 144. However, the Peruvian Opcos are not mere "creditors" of CFG Peru, they are its operating subsidiaries and its most valuable assets, and the Trustee properly controlled disbursements made by the Peruvian Opcos and, in doing so, enhanced the value of the CFG Peru estate.

[98]   Further, In October 2017, in enjoining the Club Lenders and others from filing any proceedings in Peru against the Peruvian Opcos, the Court found that a claim against the Peruvian Opcos is a claim against CFG Peru by reason of the entities' identity of interest. *See Motion of William A. Brandt, Jr., Chapter 11 Trustee for CFG Peru Investments Pte. Ltd. (Singapore), Pursuant to 11 U.S.C. §§ 105(a), 362(a), and 541(a)(1), for Entry of an Order Confirming Applicability of Automatic Stay to any Collection Actions Pursued in Peru by Holders of Club Facility and Senior Notes Claims and by Debtor CFIL Against Peruvian Operating Companies*, ECF No. 743 ¶ 31 ("Given the identity of interest between CFG Peru and the Peruvian OpCos, attempts to assert claims against the Peruvian OpCos constitute "[actions] to obtain possession of property of [CFG Peru's] estate" for purposes of section 362(a)(3) and "the commencement or continuation . . . of a proceeding against [CFG Peru]" for purposes of section 362(a)(1) of the Bankruptcy Code."); *Order Granting Motion of William A. Brandt, Jr., Chapter 11 Trustee for CFG Peru Investments Pte. Ltd. (Singapore), Pursuant to 11 U.S.C. §§ 105(a), 362(a), and 541(a)(1), for Entry of an Order Confirming Applicability of Automatic Stay to any Collection Actions Pursued in Peru by Holders of Club Facility and Senior Notes Claims and by Debtor CFIL Against Peruvian Operating Companies*, ECF No. 809.

71

Moreover, it has never been questioned that the Noteholders contingent guaranty rights against CFG Peru were sufficient grounds for the Noteholders to appear in this case as "parties in interest." Every creditor of the Peruvian Opcos during the Trustee's tenure had a contingent right under Peruvian law to pursue any unpaid claim against any general manager of the Peruvian Opcos, which included the Trustee acting in his official capacity, and which could have resulted in a claim against CFG Peru.[99] Thus, each vendor of the Peruvian Opcos had the same contingent guaranty right of a Noteholder, except by operation of Peruvian law instead of by contract. Further, the CFG Peru Plan demonstrates that certain of the creditors of the Peruvian Opcos had pecuniary interests in the CFG Peru Chapter 11 Case. That is because they are treated as "Releasing Parties" under the plan.[100]

The Creditor Plan Proponents cite *In re Swenning*, No. 15-11408, 2017 WL 1379349 (Bankr. N.D. Okla. Apr. 14, 2017), in support of their assertion that the requirement that disbursements "by the trustee" pass through the trustee's hands has also been applied to deny compensation where the disbursements were made by subsidiaries of the estate rather than by the trustee or the estate. Obj. ¶ 56. In that case, the bankruptcy court appointed a chapter 11 trustee for

---

[99]    Article 190 of the Peruvian General Law of Companies provides that a general manager may be liable to third parties, including creditors, "for the damages and losses procured by noncompliance with his obligations . . . ." Peruvian General Law of Companies, Chapter III, Management, Article 190. In a closed stock company, the general managers will also be responsible for irregularities arising from the functions that they exercise in replacement of the board of directors. *See id.* art. 189 (translates as "the provisions on impediments and actions of responsibility of the directors are applicable to the manager"); *id.* art. 247 (where a company does not have a board, all functions required under Peruvian law are carried out by the general manager); *id.* art. 177 (the board, or managers, are responsible for irregularities of their predecessors if they do not denounce them in writing).

[100]   Under Article VII.K of the CFG Peru Plan**,** all persons or entities holding claims "that have been released" are enjoined from taking any actions against the "Released Parties." CFG Peru Plan art. VII.K. Article VII.H provides that each "Releasing Party" releases against each "Released Party" all Claims against "CFG or any other Entity," including those arising from "the assertion or enforcement of rights and remedies against . . . the Peruvian Opcos." *Id.* art. VII.H. The definition of "Released Parties" includes "the Peruvian OpCos and their Related Parties." *See id.* art. I, ¶ 126. In turn, the definitions of "Releasing Parties" and "Related Parties," include the Peruvian Opcos and a large body of their creditors, including their "employees, . . . managers, independent contractors, . . . professionals, consultants, financial advisors, attorneys, [and] accountants . . . ." *Id.,* art. I.A.125, 127.

a debtor whose assets included his 100% interest in a professional corporation (the "PC") that provided medical services. *In re Swenning*, 2017 WL 1379349, at *5. After the Trustee was appointed, the Debtor continued to operate the PC. The PC's gross revenue "was disbursed to pay the PC's operating expenses, including Debtor's salary." *Id.* at *3. The Debtor and the PC's payroll agent—not the trustee—made those disbursements. *Id.* The trustee spent 122.4 hours working to benefit the estate, with "most of the time devoted to general case administration and to negotiating the terms of a consensual plan of reorganization." *Id.* at *2. A reorganization plan was eventually confirmed. *Id.* The trustee applied for compensation. Among other things, he asserted that in calculating the Statutory Cap, the "moneys disbursed" in that case included the PC's gross revenue which the debtor disbursed to pay the PC's operating expenses including the debtor's salary. *Id.* at *3. The court rejected that contention because the trustee did not take control of the debtor's PC and did not make decisions about how the business revenues would be paid out. *See id.* at *4. The court noted that "it was the Debtor that directed payments to the PC's trade creditors, contract laborers, insurers, and others." *Id.* In short, the court found that "the use of the funds appeared to be left to Debtor's discretion." *Id.*

The Creditor Plan Proponents misplace their reliance on *Swenning.* It is distinguishable because, in contrast to the trustee in *Swenning,* Mr. Brandt did not leave the operation of the Opcos to the "discretion" of others. He replaced the Ng Family and took direct and ongoing control over CFG Peru and the Opcos and, in doing so, preserved and enhanced the value of the subsidiaries that reflect the value of the CFG Peru estate. Nor is it relevant that some of these disbursements were ultimately made by an agent, such as a payroll company, as they were disbursements made under the Trustee's control and direction. *See In re Tyczka*, 287 B.R. 465, 469 (Bankr. E.D. Mo. 2002) ("It is of no consequence that the disbursements of sale proceeds to the secured creditors

and for expenses were actually made by the title company, rather than by Trustee. Trustee authorized these disbursements through his participation in the closing process"); *In re Reid*, 251 B.R. 512, 518 (Bankr. W.D. Mo. 2000) (finding disbursement by third party pursuant to instructions from trustee are included in cap).[101] The Court includes the approximately $1.895 billion in MOR Disbursements for the period of the Fee Application in the calculation of the Statutory Cap equal to approximately $57 million. On that basis, the cap dwarfs the Trustee's requested commission.

Under the terms of the CFG Peru Plan, the Trustee turned over the estate of CFG Peru to the Plan Administrator, who effected a transaction that distributed the value of the CFG Peru estate to Noteholders/Club Lenders as a mix of debt and the CFGI Equity Interests. The Bankruptcy Code does not define the terms "money" or "disbursed" or the phrase "moneys disbursed," used in section 326(a). The Creditor Plan Proponents contend that in determining whether the equity interests fall within the scope of section 326(a), the Court must apply the "plain and ordinary meaning" of the terms used in the statute. *See Ransom v. FIA Card Servs., N.A.*, 562 U.S. 61, 69-70 (2011); *Tamm v. U.S. Tr. (In re Hokulani Square, Inc.)*, 776 F.3d 1083, 1085 (9th Cir. 2015). They maintain that the plain and ordinary meaning of "moneys" is money (i.e., cash, monetary currency, a general medium of exchange used for trade) and does not encompass the much broader category of "property" or a court's determination of the value of property in money and, as such, the Court should not consider the CFGI Equity Interests in calculating the Statutory Cap. Obj. ¶ 71. They

---

[101]    In any event, it would be inequitable for the Trustee to have been appointed as trustee for the parent entity (as in *MACCO Props.*), specifically tasked with protecting and preserving the value of the subsidiary and affiliate non-debtor entities, and have been required to pay quarterly fees based on all "disbursements" by those subsidiary and non-debtor entities yet be unable to claim compensation arising from those mandated tasks. A proper calculation of the statutory cap must be based on the full scope of the Trustee's mandate, including all MOR Disbursements made in fulfillment of that mandate—whether they were disbursements made at the parent level (such as administrative expense claims paid by CFG Peru), or at the subsidiary level (the Peruvian Opcos, and others, disclosed in the MORs). *MACCO Props.*, 540 B.R. at 848, 860. Were it any other way, "it is literally true that no competent person would wisely accept the office of receiver or trustee of such an estate." *In re Toole*, 294 F. at 976.

assert that each of the circuit courts of appeals that have considered the issue has applied section 326(a) according to its ordinary meaning, distinguishing between cash and property that has not been reduced to cash, and they rely on *Hokulani Square* and *Staiano v. Cain (In re Lan Assocs. XI, L.P.)*, 192 F.3d 109, 118 (3d Cir. 1999). In those cases, the Ninth and Third Circuits, respectively, held that a credit bid under section 363(k) of the Bankruptcy Code did not constitute "moneys disbursed" under section 326(a) of the Bankruptcy Code. *See Hokulani Square,* 776 F.3d at 1086 ("Taken together, this language seems to say that the trustee may collect fees only on those transactions for which he pays interested parties (in this case, secured creditors) in some form of generally accepted medium of exchange."); *Lan Assocs.,* 192 F.3d at 118 (court held that a credit bid was not "moneys disbursed" under section 326(a) of the Bankruptcy Code, because the statutory language is limited to "something generally accepted as a medium of exchange.").

As set forth in the Restructuring Support Agreement, the equity interests paid out to Noteholders and Club Lenders under the Plan "shall be freely transferable (subject at all times to the tagalong rights and right of first offer described below)."[102] The $300 million in Plan Notes granted to the Noteholders and Club Lenders are tradable in a transaction with "an exemption from, or in a transaction not subject to, the registration requirements of the Securities Act . . . ." Restructuring Support Agreement at 52. It is undisputed that, for the most part, the recipients of these securities and notes are hedge funds and other investors who hold claims in this case because they purchased them on the open market. Just as such investors know how to acquire notes and securities of these types, they know how to sell them. Indeed, the investors who acquired bank debt in this case and drove their own creditor-led plan would not have confirmed a plan that limits their ability to sell those investments.

---

[102]    CFG Peru Plan, Exhibit A ("Restructuring Support Agreement") at 49.

The Peruvian Opcos plainly are not encumbered assets that held no value for the CFG Peru estate; rather, they are the sole meaningful value of the CFG Peru estate. The Noteholders/Club Lenders are not secured creditors enforcing a lien against those assets. Every dollar of value that exists in the Peruvian Opcos to be disbursed to Noteholders/Club Lenders is a product of the Trustee's efforts to "justifiably administer" those assets. And the value that he has restored in the Peruvian Opcos is now being handed to Noteholders/Club Lenders in satisfaction of their unsecured claims in the form of stock and notes, not abandoned as encumbered real property. As such, the "credit bid" cases discussed above are not relevant to the calculation of the Statutory Cap. *See Lam Assocs.*, 192 F.3d at 119 (refusing to accept a credit bid for encumbered real property as "moneys" disbursed under section 326(a)). Instead, the Court looks to those cases where the value of an estate turned over by a trustee to prepetition debtors or to creditors is value that is included in the calculation of the statutory cap. Fee Application at 83; *see In re Toole*, 294 F. at 977 (the court found that a receiver's commission "ought to be calculated upon cash, as well as upon the securities already turned over to claimants under orders of this court . . . [and] commissions on the remaining securities when administered by the trustee."); *In re Lehrenkrauss*, 16 F. Supp. 792, 793-94 (E.D.N.Y. 1936) (holding that the mortgages of a debtor turned over to certificate holders are "moneys disbursed or turned over," but requiring evidence of value); *In re Greenley Energy Holdings, Inc.*, 102 B.R. 400, 404 (E.D. Pa. 1989) (reversing bankruptcy court's denial of trustee fees, holding that the cap could include the value of contracts negotiated by the trustee that provided the estate with certain future value, and including the value of guarantee contracts turned over to creditors); *In re N. Am. Oil & Gas, Inc.*, 130 B.R. at 479-80 n.15 (relying on *Greenley Energy* for the proposition that property other than cash, such as "equity instruments,

notes, or even assignments," may be included in calculating the statutory cap where reducing such

assets to cash is not appropriate and cash value can be "easily and readily" quantified).[103]

In *Lan Assocs.*, the Third Circuit held that the term "moneys" in section 326(a) is

"ambiguous," overruling the lower court's holding to the contrary. 192 F.3d at 116. The court did

not enforce a narrow definition of "moneys," instead looking to legislative history to conclude

that:

> despite . . . the ambiguity of the term "moneys," we are persuaded by the
> legislative history of § 326(a) and by the general policies underlying
> bankruptcy administration that Congress did not intend to include credit
> bids in the trustee's compensation base.

*Id.* at 121. The Third Circuit did not hold that stocks or notes cannot qualify as "moneys." Rather,

it cited *In re Toole,* for its holding on securities. *Id*. at 119. The court explained that it refused to

accept a credit bid for encumbered real property as "moneys" disbursed under section 326(a)

because "fully encumbered assets" such as real property "are unlikely to benefit the estate, and,

therefore, such assets are not likely to be justifiably administered." *Id*. at 119.[104] The Court finds

---

[103]   Although the court in *N. Am. Oil & Gas* concluded that "unliquidated assets" turned over to the chapter 11 plan's liquidating agent could not be considered for calculation of the Statutory Cap, the court noted that it could be appropriate to consider equity interests turned over to satisfy the claims of creditors:

> In the rare case, distributions of property other than cash might be includable in the base, where the distribution constitutes a liquidation of the estate and, for reasons having to do with the unique factual posture of the case, actual conversion to cash is not appropriate. For example, a trustee might in certain circumstances be called upon to distribute equity instruments, notes, or even assignments, in satisfaction of outstanding claims against the estate. To the extent that these distributions can easily and readily be quantified in money or money's worth, the transactions could justifiably be included in the base.

*N. Am. Oil & Gas*, 130 B.R. at 480 n.15 (citing *In re Greenley Energy Holdings of Pennsylvania, Inc.*, 102 B.R. 400, 405 (E.D. Pa. 1989)).

[104]   In an effort to distinguish the cases cited by the Trustee, the Creditor Plan Proponents assert that *In re N. Am. Oil & Gas, Inc.* and *In re Greenley Energy Holdings, Inc.* have both been "overruled" or disapproved by *Pritchard v. U.S. Tr. (In re England)*, 153 F.3d 232, 237 (5th Cir. 1998). Obj. ¶ 73. There is no merit to that contention. In *In re England*, the Fifth Circuit considered whether a chapter 7 trustee could receive a commission for abandoning real property to creditors. In the course of listing cases that have accepted certain instruments such as securities as "moneys," including *In re N. Am. Oil & Gas*, *In re Greenley*, and *In re Toole*, the Fifth Circuit did not state that any of these cases were wrongly decided, but rather that "[w]e disagree that the plain language of § 326(a) permits a different result from that

that the value of the CFGI Equity Interests should be included in the calculation of the Statutory Cap.

The Creditor Plan Proponents also assert that the value of the CFGI Equity Interests should not be included in the calculation of the Statutory Cap because Mr. Brandt abandoned the CFGI Equity Interests to CFG Peru's estate in connection with the Plan's confirmation hearing, and the Plan Administrator, not Mr. Brandt, will distribute the CFGI Equity Interests and cash to creditors on the Plan's Effective Date. They contend that, pursuant to the plain language of the statute, "debtor to debtor" distribution of the equity interests is excepted from the scope of section 326(a). Obj. ¶¶ 9, 78, 81. The Court finds no merit to that contention. The case law is clear that the "debtor" that is referenced in section 326(a) is neither a plan trustee or administrator, nor a liquidating agent, nor any other recipient that is not the prepetition debtor. It is not even a reorganized debtor if that debtor has administrative duties under a plan. *See, e.g.*, *In re N. Am. Oil & Gas,* 130 B.R. at 479-80 (ruling that disbursements to a liquidating agent created under a confirmed plan of reorganization are counted in calculating the trustee's maximum compensation under section 326(a)); *In re Acis Cap. Mgmt., L.P.*, 603 B.R. 300, 306 (Bankr. N.D. Tex. 2019) (holding that disbursements made to a reorganized debtor qualified for the section 326(a) statutory cap because the reorganized debtor had "duties under the Plan similar to those performed by the liquidating agent" in *N. Am. Oil & Gas*); *In re Fin. Corp. of Am.*, 114 B.R. 221, 225-26 (B.A.P. 9th Cir. 1990) (noting that a chapter 11 trustee's "[t]urnovers made to a successor trustee should be included in the amount used to calculate" a statutory cap, and that "failure to include turnovers under Section 326(a) would

---

reached by the bankruptcy court in this case" involving encumbered real property. *In re England*, 153 F.3d at 237. That is not "overruled," or even "disapproved." It is a different fact scenario. Likewise, in *In re Lan Assocs.*, the Third Circuit discusses *In re Greenley* in a string cite with *In re Sw. Media, Inc. v. Rau*, F.2d 419, 423 (9th Cir. 1983), concluding that "[w]e are not persuaded by these authorities' adoption of the constructive disbursement theory . . ." to include credit bid value from encumbered real property in the statutory cap. *In re Lan Assocs.*, 192 F.3d at 118.

result in an artificial and mechanical limitation on the trustee's compensation"), *aff'd*, 946 F.2d 689 (9th Cir. 1991).

Finally, the Creditor Plan Proponents assert that, in any event, the value of the CFGI Equity Interests should not be included in the calculation of the Statutory Cap because the Trustee relies entirely on the Creditor Plan Proponents' $850 million "total enterprise value" and provided no evidence of the equity value of CFG Peru. Obj. ¶¶ 10, 79. In their Disclosure Statement, the Creditor Plan Proponents described the $850 million as "the post-Effective Date total enterprise value of the Peruvian OpCos." In support of plan confirmation, Mr. Jordan stated that "the total enterprise value of CFG Peru's equity interests in CFGI would be approximately $850 million upon emergence." Jordan Plan Decl. ¶ 23. Under the CFG Peru Plan, on account of their more than $1 billion of claims, the Club Lenders/Noteholders will receive the CFGI Equity Interests (through NewCo), and $300 million in new notes along with participation rights in $150 million in a new money facility.

The Trustee contends that under the Plan, the value of the CFGI Equity Interests is $850 million, and that the Court should include that value in calculating the Statutory Cap. Fee Application at 88. The Court finds no merit to that contention. It is clear that, as used in the Disclosure Statement, the term "enterprise value" is not a proxy for the value of the CFGI Equity Interests. Any such valuation of the CFGI Equity Interests in June 2021 would require consideration of materially more factors than were used by the Creditor Plan Proponents in connection with the terms and conditions of the Plan. That is because for these purposes, the "enterprise value" is "the underlying value of the Peruvian operating companies." Jordan Dep. at

59:6-10.[105] It is the value of a "pool of assets" without "taking a position on the capitalization of

the assets." *Id*. at 22:2, 21-22. As the Creditor Plan Proponents explain:

> to value the CFGI Equity Interests as of June 2021, one would need to factor in all
> of the attendant risks and issues surrounding ownership of those shares as of June
> 2021, including the risk that the Effective Date and the transactions contemplated
> by the Plan would not occur. The transactions contemplated by the Plan to occur
> on or in connection with the Effective Date include: (a) the discharge of the Senior
> Notes and the Club Facility; (b) the implementation of the Mediated Intercreditor
> Settlement; (c) the implementation of the remaining transactions contemplated by
> the Intercompany Netting Agreements; and (d) the implementation of the Global
> Settlement Agreement with the Other Debtors and the Ng family. For instance, to
> assess the value of the CFGI Equity Interests in June 2021, one would need to
> consider how such a buyer of the CFGI Equity Interests would evaluate their ability
> to extinguish or pay off the significant liabilities associated with the CFGI Equity
> Interests before value would accrue to the holders of those shares. The TEV set
> forth in the Disclosure Statement does not include an analysis of those types of
> issues, among others, and therefore should not be used as a proxy for the value of
> the CFGI Equity Interests in June 2021.

Obj. ¶ 78.[106] The Trustee did not conduct any independent valuation of the CFGI Equity Interests

as of the Effective Date. *See* Brandt Dep. at 52:24-53:8. He has failed to meet his burden of

demonstrating the value of the CFGI Equity Interests as of the Plan's Effective Date. For that

---

[105]  *Deposition of Brad Jordan*, ECF No. 2834 (the "Jordan Dep.").

[106]  During his deposition, Mr. Jordan discussed the difference between "equity" and "enterprise" value, as follows:

> It sounds like you're asking me what the recovery value is for the creditors, and the recovery value
> is not the same thing as the enterprise value under the disclosure statement. The enterprise value is
> the starting point. That's the amount of value you have to start with.
>
> And then the plan has expenses and other provisions that determine what each party gets, and
> so when we do the calculations of recovery values, whether it be for a noteholder or a loan holder,
> that analysis of recovery values, yes, would have been reduced for all kinds of payments like these
> and other things that had to happen because it comes out of the value they would otherwise have.

Jordan Dep. at 50:2-15; *see also id*. at 51:17-52:1 (explaining that the enterprise value reflected in the Disclosure
Statement is "a top gross number before deducts of expenses. And here it assumes . . . that all the planned transactions
happened, and the plan goes effective. That's what the assets would be worth. It's not saying what is the recovery
value of the stakeholders at the end of the day after the plan goes effective because it doesn't reflect all the deducts
along the way. This is just referring to the gross value of the underlying business.").

reason, the Court rejects the Trustee's assertion that the Statutory Cap should account for $850 million in CFGI Equity Interests.

The Creditor Plan Proponents also assert that the Statutory Cap should exclude the cash that the Trustee says he turned over to the Plan Administrator and was distributed to creditors under the CFG Peru Plan. Obj. ¶¶ 12, 81. They contend that collectively, CFG Peru and the Peruvian OpCos had approximately $119.8 million, not $211 million, as of his departure. *Id*. ¶¶ 12, 81. They also say that, in calculating the Statutory Cap, the Court should exclude at least $161.4 million of the $211 million of the CFG Peru Plan's required cash distributions, upon which Mr. Brandt bases his statutory cap calculation in the Fee Application.[107] *Id*. ¶¶ 12, 81. They assert that Mr. Brandt's reliance on $161.4 million of the CFG Peru Plan's cash payments is not "reasonable" because they, not Mr. Brandt, spent months finalizing, negotiating, and documenting the Ng Family settlement, and that there is no legitimate reason why he should get credit for it. *Id*. ¶¶ 12, 81. They also assert that Mr. Brandt should not profit from distributions in respect of the creditor professional fees and expenses paid, or consent and work fees payable, under the plan he long opposed. They maintain that it is not reasonable to give Mr. Brandt credit for the $75-million Interim Distribution, which he failed to effectuate for years and opposed in open court.[108] *Id*. ¶¶ 12, 81. Finally, separate and apart from the issues relating to the $161.4 million in disbursements, they say that the substantial majority of funds that CFG Peru will disburse on the Effective Date will come from the proceeds of the $150 million New Money Facility that the Creditor Plan

---

[107]  Those cash payments relate to the Ng family settlement ($25 million), creditor work fees ($13.4 million), creditor consent fees ($33 million), consenting creditor professional fees ($15 million), and the $75 million interim distribution.

[108]  *See Transcript Regarding Hearing Held on June 9, 2021*, ECF No. 2577 at 43:14-17 ("I put on the record that the Peruvian OpCos and, in turn, the plan debtors, are unable to make the seventy-five-million-dollar distribution after confirmation."); *id.* at 48:12-14 ("I believe the distribution should be clearly delayed until after the effective date.").

Proponents and other creditors will fund at emergence, and that Mr. Brandt fails to explain why his cap should be calculated in reference to loan proceeds arranged without his support. *Id*. ¶¶ 12, 81.

The Court finds no merit to those contentions. Exhibit A to the Jordan Confirmation Declaration is a Sources and Uses Analysis, which shows that in addition to the $150 million New Money Facility, the Peruvian Opcos/SFR will contribute $234 million in cash balances and operational income to jointly fund $384 million of cash disbursements necessary for the CFG Peru Plan to become effective.[109] Which "cash" is used for which disbursements is irrelevant, as it does not change the fact that the Peruvian Opcos' cash is available for such uses from a business turned over by the Trustee. The date of the turnover is not relevant, as the cash was in the financed fishing season and would shortly return as operating capital sufficient to fund $234 million of plan disbursements. Further, the Creditor Plan Proponents' argument to extract certain plan disbursements from consideration on the ground that the Trustee had raised concerns about their payment—such as the Interim Distributions—is baseless. The fact that the Plan Proponents had the means to make the payments is a testament to the Trustee's work in restoring value to the Peruvian Opcos. It is cash that was available solely because of the Trustee's accomplishments. How the Plan Proponents chose to spend that cash is irrelevant to whether or not the Trustee should be compensated for creating that value. The Court finds that, in addition to the MOR Disbursements, the Court will credit the $211 million in cash turned over to the Plan Administrator towards the Statutory Cap. In that light, the Statutory Cap totals approximately $63.15 million (i.e., 3% of $2.105 billion).

---

[109] Jordan Confirmation Decl., Exhibit A.

The Request for A Fee Enhancement

The Court now considers the Trustee's request for a fee enhancement in the form of a 2.09 multiplier of his lodestar. In *Perdue*, the Supreme Court expressed favor for the "objective" lodestar method to determine reasonable fees over the more "subjective" factors enumerated in the seminal *Johnson* opinion (the "*Johnson* Factors"). *Perdue*, 559 U.S. at 551-52; *see Johnson v. Georgia Highway Exp., Inc*., 488 F.2d 714, 717-19 (5th Cir. 1974). The Supreme Court further "reject[ed] any contention that a fee determined by the lodestar method may not be enhanced in any situation," holding that the lodestar's strong presumption of reasonableness "may be overcome in those rare circumstances in which the lodestar does not adequately take into account a factor that may properly be considered in determining a reasonable fee." *Id*. at 553-54. Bankruptcy courts in the Second Circuit, both before and after *Perdue*, have held that the *Johnson* Factors apply at the fee enhancement stage. *See Nicholas v. Oren (In re Nicholas)*, 496 B.R. 69, 74 (Bankr. E.D.N.Y. 2011) (relying on *Perdue* and its progeny for the view that the lodestar is the "starting point" for determining a reasonable fee, which "can then be adjusted on the basis of case specific considerations"); *see also In re The 1031 Tax Grp., LLC*, 2009 WL 4806199, at *2 (applying the *Johnson* Factors to the fee enhancement stage); *In re Northwest Airlines Corp*., 382 B.R. at 645 (same). The Creditor Plan Proponents do not contend otherwise. However, they assert that the Trustee has failed to demonstrate any basis on which to enhance the fee. *See* Obj. ¶ 47. They also assert that the total hours spent by Mr. Brandt on this matter were excessive and, in certain circumstances, appear implausible. *Id*. ¶ 48. They contend that the gross number of hours spent by Mr. Brandt on this matter weighs against a fee enhancement because, even in the absence of any fee enhancement, he would be compensated extraordinarily well for his efforts.

The *Johnson* Factors are as follows:

(1) the time and labor required for the matter; (2) the novelty and difficulty of the questions presented; (3) the skill needed to perform the services appropriately; (4) the preclusion of the professional from taking other cases by working on the matter; (5) the customary fee involved in similar instances; (6) whether the fee is fixed or contingent; (7) any time limitations imposed by the client; (8) the sums involved and the results obtained; (9) the experience and ability of the employed professional; (10) whether the case is "desirable" or not; (11) the length of the relationship between the professional and the client; and (12) what awards were granted in similar cases.

*Johnson*, 488 F.2d at 717-19. The Trustee "bears the burden of establishing that an adjustment is necessary to the calculation of a reasonable fee." *Grant v. Bethlehem Steel Corp.*, 973 F.2d 96, 101 (2d Cir. 1992); *see also In re Kohl*, 421 B.R. 115, 131 (Bankr. S.D.N.Y. 2009) ("Lodestar analyses consist of two steps. First, a court calculates the lodestar amount by multiplying the number of hours expended on the case by a reasonable billing rate . . . then [it] examine[s] whether any adjustment is necessary, looking to section 330 of the Bankruptcy Code . . . ."). Some courts perform an analysis of each of the factors, while others consider the factors together in a more holistic way. *Compare In re MACCO Props., Inc.*, 540 B.R. at 855-60 (conducting a factor-by-factor analysis of the *Johnson* Factors), *with In re The 1031 Tax Grp., LLC*, 2009 WL 4806199, at *2-4 (conducting a generalized inquiry).

It is settled that a court should enhance a lodestar "only in the rare case where the fee applicant offers specific evidence to show that the quality of service rendered was superior to that one reasonably should expect in light of the hourly rates charged and that the success was 'exceptional.'" *Blum v. Stenson*, 465 U.S. 886, 899 (1984). Put differently, "[e]nhancement of the lodestar calculation is only appropriate in *exceptional and rare circumstances* and must be

84

supported by detailed evidence and specific findings." *In re Kohl*, 421 B.R. at 131 (emphasis in

original). As one bankruptcy court explained:

> Simple rhetoric describing a trustee's or professional's efforts with catch phrases such as "exceptional," "unprecedented," "extraordinary," and the like are insufficient, standing alone, to justify a fee enhancement. But when those laudations are accompanied by a "specific showing of exceptional activity," bankruptcy courts have been persuaded that the objectively-calculated lodestar amount is unreasonable inasmuch as it fails to adequately compensate the trustee or the professional for work in a particular case.

*In re New England Compounding Pharm., Inc.*, 544 B.R. 724, 736 (Bankr. D. Mass. 2016)

(citations omitted).

    Not all of the *Johnson* Factors are relevant to the analysis of the Trustee's request for a fee

enhancement. The eleventh *Johnson* factor focuses on the "the nature and length of the

professional relationship with the client." *Johnson*, 488 F.2d at 719. The *Johnson* court explained

that in applying this factor, "[a] lawyer in private practice may vary his fee for similar work in the

light of the professional relationship of the client with his office. The Court may appropriately

consider this factor in determining the amount that would be reasonable." *Id.* By its terms, that

factor is not germane to this matter because the Trustee, in his capacity as the Court-appointed

fiduciary in these cases, did not have (and could not have had) a relationship with CFG Peru prior

to his appointment herein.

    More fundamentally, the lodestar may be adjusted according to a *Johnson* factor only if

that factor is not already accounted for by the lodestar. *See Shipes v. Trinity Industries*, 987 F.2d

311, 320 (5th Cir. 1993). In that light, the first *Johnson* factor—time and labor involved—is not

applicable because it is "subsumed within the Court's lodestar analysis." *Connolly v. Harris Tr.

Co. of Cal. (In re Miniscribe Corp.)*, 241 B.R.729, 749 (Bankr. D. Colo. 1999). Other courts have

held that the *Johnson* Factors pertaining to the professional's skill and the complexity of the case

(*Johnson* Factors 2, 3, 8, and 9) remain relevant only in exceptional cases. *See ASARCO, L.L.C. v.*

85

*Jordan Hyden Womble Culbreth & Holzer, P.C. (In re ASARCO, L.L.C.)*, 751 F.3d 291, 295 (5th Cir. 2014) ("Because the four *Johnson* Factors related to attorney skill and legal complexity are presumably fully reflected in the lodestar, those four factors can only form the basis for a fee enhancement in 'rare and exceptional circumstances.'" (quoting *In re Pilgrim's Pride Corp.*, 690 F.3d 650, 656 (5th Cir. 2012))), *aff'd sub nom. Baker Botts L.L.P. v. ASARCO LLC*, 576 U.S. 121, (2015). The Trustee contends, and the Court agrees, that this case is a "rare and exceptional" case as it pertains to the duties required of this Trustee, and that each of those four factors pertaining to the professional's skill and the complexity of the case remains relevant to a calculation of the requested fee enhancement. Accordingly, the Court considers application of *Johnson* Factors 2-10 and 12 to the Trustee's actions in these cases.

The second *Johnson* factor is the "novelty and difficulty of the questions." *Johnson*, 488 F.2d at 718. In formulating this factor, the Fifth Circuit noted that "[c]ases of first impression generally require more time and effort on the attorney's part," and that the attorney "should be appropriately compensated for accepting the challenge." *Id*. This is plainly a unique case that has given rise to novel and complex legal and non-legal issues—very much akin to matters of "first impression." As detailed above, as of the date of the Trustee's appointment, the Peruvian Business was in "free fall" as it had no financing and was struggling to recover from the devastating effects of the El Niño weather pattern, and the Peruvian Opcos were mired in the Peruvian Insolvency Proceedings and certain criminal investigations. The Trustee assumed the role without any assurance that foreign courts or agencies would recognize his authority,[110] that he could resolve the Peruvian Insolvency Proceedings, or that he could obtain financing for the Peruvian Business.

---

[110] In granting the Trustee Motion, the Court noted, among other things, that "it is not clear whether an appointed Chapter 11 trustee will be recognized under applicable foreign law as the authorized representative of the Debtors." Trustee Decision and Order at 48.

To preserve the value of the Opcos for the benefit of the creditors of the CFG Peru enterprise and other Debtors, the Trustee had to quickly find a source of financing for the business, gain the trust and confidence of the Peruvian Opcos' management and employees, learn the intricacies of the anchovy/fish meal industry in Peru, shore up the operations of the Peruvian Opcos, and then fashion a plan for maximizing the value of the Peruvian Opcos. As set forth above, he did just that, as he successfully operated the Opcos during his five-year tenure and, in doing so, preserved and enhanced the value of CFG Peru and the Peruvian Opcos. The application of this factor supports the Trustee's request for an enhancement to the lodestar. *See In re MACCO Props., Inc.*, 540 B.R. at 855 (noting that application of the second Johnson factor "weigh[ed] strongly in favor of enhancing Trustee's compensation" where the trustee's duties included "not only operating and administering MACCO's own assets, but also . . . operating, protecting, and preserving the [subsidiary single-purpose entities'] property as well.").

The third *Johnson* Factor focuses on the level of "skill necessary [for the trustee] to properly perform the . . . services." *See Johnson*, 488 F.2d at 718. This factor overlaps with the ninth *Johnson* Factor ("the experience, reputation, and ability of the [trustee]"). *Id.* at 718-19. As to the latter, the *Johnson* court noted that "[m]ost fee scales reflect an experience differential with the more experienced attorneys receiving larger compensation." *Id.* Mr. Brandt is a well-known practitioner in the insolvency/restructuring market and rightfully enjoys a stellar reputation for his work in chapter 11 cases. The *Johnson* court explained that in applying the third *Johnson* Factor, "[t]he trial judge's expertise gained from past experience as a lawyer and his observation from the bench of lawyers at work become highly important in this consideration." *Id.* Throughout his tenure, Mr. Brandt demonstrated to the Court that he was uniquely qualified to address the political, financial, and legal challenges that arose in the cases, negotiate with creditors, political bodies,

87

and other authorities, maintain existing management at the Peruvian Opcos, and restructure the non-debtor entities' operations and asset base. Moreover, the wealth of his experience and the breadth of his abilities clearly benefited CFG Peru, as reflected in the high-quality work that he did in and out of court during his tenure as Trustee. In short, the Trustee "demonstrated the highest caliber of stewardship under the most challenging circumstances." *MACCO Props.*, 540 B.R. at 857. Application of the third and ninth *Johnson* Factors supports the Trustee's request for an enhancement to the lodestar.

The fourth *Johnson* Factor focuses on the "preclusion of other employment due to accepting the case." *Johnson*, 488 F.2d at 718. This factor "involves the dual consideration of otherwise available business which is foreclosed because of conflicts of interest which occur from the representation, and the fact that once the employment is undertaken the attorney is not free to use the time spent on the client's behalf for other purposes." *Id.* The "conflicts of interest" aspect of this factor is not relevant. However, the Trustee asserts that the effort required for him to fulfill his duties in this case had a preclusive effect that largely prevented him from accepting other engagements, including engagements that would have provided the Trustee with timely and certain fees, rather than the risks and delays inherent in the CFG Peru assignment. Fee Application at 93.[111] The seventh *Johnson* Factor is the "time limitations imposed by the court or the client." *Johnson*, 488 F.2d at 718. The court explained that "[p]riority work that delays the lawyer's other legal work is entitled to some premium." *Id.* This is related to the fourth *Johnson* factor but "is particularly important when a new counsel is called in to prosecute the appeal or handle other

---

[111] The Creditor Plan Proponents note that Mr. Brandt's retention as Trustee did not preclude him from continuing to serve as the Executive Chairman of DSI. Obj. ¶ 48. However, that has no bearing on the Court's assessment of this *Johnson* factor because it is an emeritus position—"pretty much just oversight." *See* Brandt Dep. at 7:24-25. Mr. Brandt transitioned to the emeritus position at the beginning of his tenure herein, specifically to permit work on cases such as this one. *See id.*

matters at a late stage in the proceedings." *Id.* The seventh *Johnson* Factor is not applicable because the Trustee's workload was not impacted by new matters arriving late in his tenure. In applying the fourth *Johnson* Factor, the Court finds that the evidence shows that during his tenure, Mr. Brandt served as the plan administrator for Equipment Acquisition Resources, Inc. and Aéropostale, and as chapter 11 trustee in the *San Luis* cases. Moreover, there is no evidence in the record demonstrating that the Trustee turned down or was precluded from pursuing other opportunities due to the press of matters in this case. He suggests that if such opportunities existed, he would likely have been on the "short list" for those opportunities. *See* Fee Application at 93 ("It is fair to say that William A. Brandt, Jr. is a professional who would have easily replaced the CFG Peru engagement with other work if this appointment had not been made"). However, the Trustee has not met his burden of demonstrating that application of the fourth *Johnson* Factor supports his request for an enhancement to the lodestar.

The fifth *Johnson* Factor focuses on the "customary fee for similar work in the community." *Johnson*, 488 F.2d at 718. It is related to the sixth factor—whether the fee is fixed or contingent. *Id.* Mr. Brandt says that application of these factors supports his request for a fee enhancement because, as demonstrated above, fee applications that have been filed by chapter 11 trustees appointed in other chapter 11 cases that are pending or recently were pending in the Southern District of New York demonstrate that his hourly rate—before application of any fee enhancement—(i) is far below the hourly rates charged by comparable trustees, and (ii) is about one-half of what his rate would be if he were to charge an hourly rate comparable to senior restructuring attorneys working on these same chapter 11 cases, even though he has many more years of experience in the restructuring field. He says that, if approved, the 2.09 multiplier effectively would double his hourly rate, and bring it in line with rates charged by professionals in

cases in this district. He also contends that there is precedent in this case to support such a multiplier because Houlihan's fees, as the Creditor Plan Proponent's investment banker, will be nearly doubled by a $4 million success fee that Houlihan is entitled to receive under its engagement agreement.[112] Application of this factor does not support the Trustee's request for an enhancement. First, Mr. Brandt selected his billing rate as part of his business plan for obtaining this assignment. *See* Brandt Decl. ¶¶ 8, 92. Thus, the putatively higher rates of other practitioners in the community do not represent a basis for enhancing Mr. Brandt's hourly rate long after he was engaged for this case, notwithstanding the high-quality work that he performed. Moreover, the Court finds the success fee that the Creditor Plan Proponents agreed to pay to Houlihan irrelevant to whether Mr. Brandt is entitled to a fee enhancement. Mr. Brandt did not act as an investment banker in this case, and the Creditor Plan Proponents do not consent to the multiplier. That pre-negotiated success fee does not provide a ground for the Court to award a fee enhancement to Mr. Brandt in this case.

The eighth *Johnson* Factor is the "amount involved, and the results obtained." *Johnson*, 488 F.2d at 718. There is no formula for measuring a trustee's success in a chapter 11 case. Rather, courts rely on a "multitude of factors . . . in concluding that a trustee or professional is (or is not) deserving of a fee enhancement over the lodestar amount." *In re New England Compounding Pharm., Inc.*, 544 B.R at 736. That court found that the single overarching theme that can be gleaned from the case law is that "[i]n the majority of cases, courts rely heavily on the outcome of

---

[112] *See Creditor Plan Proponents' Motion for Entry of an Order Pursuant to the Creditor Plan Proponents' Chapter 11 Plan for CFG Peru Investments Pte. Ltd. (Singapore) and Section 1129(a)(4) of the Bankruptcy Code (I) Approving All Pre-Confirmation Fees, Expenses, Costs and Disbursements Incurred by Houlihan Lokey, Inc. and (II) Authorizing and Directing the Plan Administrator to Promptly Pay All Such Preconfirmation Fees, Expenses, Costs and Disbursements*, ECF No. 2582 at 7 n.6.

a case (generally measured by the funds available for creditors) in deciding whether an enhancement is warranted." *Id*. at 737 (footnote omitted). The court noted, as follows:

> Whether discussed in the context of the "results obtained," "value of services rendered," or "benefits received by the bankruptcy estate," the fundamental inquiry is the same—have the trustee's or professional's actions in this case benefited the bankruptcy estate to such an admirable degree that a mere multiplication of the hours expended by the hourly rate fails to adequately compensate the individual for the work they have done?

*Id.*

The Creditor Plan Proponents concede that Mr. Brandt provided stability to the case during the early months of his trusteeship but assert that since at least late 2018, his pursuit of a "third-party cash sale at any cost effectively trapped CFG Peru in chapter 11 and prevented a creditor-driven course correction." Obj. ¶ 48. However, they assert that the result of this case is an outcome far different than what Mr. Brandt long predicted, and that outcome is possible only due to the efforts of the creditors to file and confirm the CFG Peru Plan. *Id.* They assert that in five years, Mr. Brandt:

> (1) never accomplished the sale that he viewed as the exclusive path out of bankruptcy;
>
> (2) never proposed a plan;
>
> (3) opposed the plan that was filed with overwhelming creditor support and ultimately confirmed by the Court;
>
> (4) allowed hundreds of millions of dollars in additional debt to accrue;
>
> (5) doled out unnecessary fees to the U.S. Trustee; and
>
> (6) required the estate to incur extremely large professional fees while he pursued his sales agenda.

Obj. ¶ 48. It is plain that the Trustee determined that the means for CFG Peru to exit bankruptcy was through the sale of the CFGI Equity Interests, that he worked toward that goal right up to the

plan confirmation hearing, and that he failed to realize the goal. However, it was not for lack of

effort, and, contrary to the Creditor Plan Proponents' assertion, the Trustee's failure to find a buyer

for the equity does not render his administration of the CFG Peru estate a failure. To the contrary,

when he took possession of the CFG Peru estate, its assets were subject to a liquidation proceeding

that gave equal footing to massive insider claims. Through his efforts described above, the Trustee

restructured the Peruvian Business, including its debt structure, to become a profitable business

that, through the CFG Peru Plan, was turned over to the Club Lenders and Noteholders—who had

sought the appointment of the Trustee. Without the Trustee's considerable efforts, the Peruvian

Opcos would have held little to no value to the Club Lenders and Senior Noteholders. His work

provided the basis for them to restructure their debt through the CFG Peru Plan. Moreover, at the

outset of these cases, the Club Lenders stated to this Court that they "remain[ed] very concerned

that the valuable Peruvian Business is outside the Chapter 11 estates and that local management

may take precipitous action to destroy the value under the direction of the Debtors' sponsors." *See*

Club Lenders' First Day Statement ¶ 11. The Trustee's mandate was not merely to take control of

the CFG Peru estate, but also to protect and enhance the value of its subsidiaries—primarily the

Peruvian Opcos, entities with a value in excess of one billion dollars, yet facing a material risk in

their then-pending insolvency proceedings. As summarized above, the Trustee plainly met that

challenge. Application of this factor supports the Trustee's request for a fee enhancement.

The tenth Johnson Factor is the "undesirability of the case." *Johnson*, 488 F.2d at 719. That

prong was developed in *Johnson* in the context of difficult civil rights cases, which could present

attorneys with "hardships in their communities because of their desire to help the civil rights

litigant." *Id.* (citing *NAACP v. Button*, 371 U.S. 415, 443 (1963); *Sanders v. Russell*, 401 F.2d 241

(5th Cir. 1968)). For their part, in arguing that application of this factor does not support the

92

Trustee's request for a fee enhancement, the Creditor Plan Proponents advise that they "understand that there was no shortage of qualified candidates that sought to serve as trustee in this case due to, among other reasons, (1) the complicated issues presented by the filing, (2) the international aspects of the case, and (3) the fact that serving as trustee in a chapter 11 case in this District is an important professional accomplishment." Obj. ¶ 48. That may be, but there is no probative value to their "understanding" of the undesirability of the case. On the other hand, the Trustee says that the "undesirability" of the CFG Peru trusteeship has been "substantial and unique." Fee Application at 98. The Court finds merit to that contention. As the trustee for CFG Peru—the parent company of an international enterprise (i.e., the Peruvian Business)—and the de facto CEO of the Peruvian Opcos, Mr. Brandt encountered inordinately complex and time-consuming legal, financial, and political challenges that called for him to be "on call" and able to be available for frequent international travel. Furthermore, the international nature of the assets and subsidiaries exposed the Trustee to risks of personal liability. The Trustee correctly notes that the Hong Kong Court in which the Trustee sued HSBC-HK refused to recognize the Trustee's appointment by this Court. It is undisputed that the effect of that ruling, under Hong Kong law, was that the Trustee was litigating the case as an individual and risking personal exposure to claims arising from the litigation, as well as risking liability for the fees and costs that a losing party must pay under Hong Kong's judicial procedures. It was plainly a risk that was unique to the particular circumstances of this case. On balance, the Trustee has demonstrated that, in applying the tenth *Johnson* factor, there are risks associated with his appointment in this case that are properly compensated by adjustment of the Lodestar.

The twelfth *Johnson* Factor is "fee awards in similar cases." *Johnson,* 488 F.2d at 719. In applying that factor, the court noted that "[t]he reasonableness of a fee may also be considered in

the light of awards made in similar litigation within and without the court's circuit." *Id.* The Trustee

is correct that there are cases in which courts have awarded 2.0+ multipliers of the lodestar in

awarding commissions to chapter 7 and chapter 11 trustees. For example, in *In re Miniscribe*

*Corp.*, 309 F.3d at 1239, 1245-46, the Tenth Circuit approved a bankruptcy court's upward

revision of a chapter 7 trustee's base lodestar calculation from $711,600 to $1,828,812, or a

$1.1 million upward revision (constituting a 2.57 multiplier, equal to 60% of the Statutory Cap).

In *Miniscribe*, the trustee took over an administratively insolvent estate with $3 million in

chapter 11 fees and only $150,000 in hand, facing a superpriority claim of $17 million and total

claims of over $900 million. *Id.* at 1237. The trustee lowered the superpriority claim from

$17 million to $1 million and persuaded the entity holding the superpriority claim to loan the estate

$1 million to finance litigation which eventually yielded the estate $80 million. The trustee

conducted 45 different adversary proceedings, recovering $17 million for the estate, and reduced

outstanding claims against the estate from $900 million to $168 million. *Id.* In *In re The 1031 Tax*

*Grp., LLC*, 2009 WL 4806199 at *3, the court approved an upward revision of the chapter 11

trustee's lodestar calculation of $998,559 to $1,997,118 (constituting a 2.0 multiplier, equal to

70% of the Statutory Cap). The trustee was appointed to an administratively insolvent estate in

which no substantial investigation or analysis had been conducted regarding the estate's potential

claims against the debtor's former principal. The trustee led an investigation of the estate and

attempted to reconstruct the transactions that the debtor's principal and others used to carry out

their fraud. *Id.* Because of the absence of reliable books and records, this investigation involved

"Herculean efforts" by the trustee and his professionals. *Id.* The results of the investigation led to

months of litigation and settlement negotiations with third parties against whom the Trustee filed

or threatened to file adversary complaints. *Id.* The Trustee spent a great deal of time negotiating

94

numerous settlements, including the settlement agreements that eventually became the basis for funding the reorganization plan. The Trustee also obtained approval for settlements resulting in substantial recoveries to the estate from the Debtors' insurers, from the former owners, and from the principal's former lawyers. *Id.* The trustee also drafted and shepherded to approval a disclosure statement and plan of reorganization. Due in no small part to the trustee's efforts, the estate made a 34-cent initial distribution to its unsecured creditors. *Id.*

There are some similarities between those cases and this one. Like the trustees in *Miniscribe* and *1031 Tax Grp.*, Mr. Brandt was appointed to an administratively insolvent estate, and like the trustee in *1031 Tax Grp.*, Mr. Brarndt's efforts furthered the confirmation of a chapter 11 plan. The CFG Peru Plan was proposed by the Creditor Plan Proponents, but it plainly could not have been proposed and confirmed had the Trustee not fulfilled his mandate to protect, preserve, and enhance the value of the Peruvian Opcos. While the trustees in *Miniscribe* and *1031 Tax Grp.* created value for their respective estates through their investigations and affirmative litigation, the Trustee enhanced the value of the Peruvian Opcos through his careful and sound management of the Peruvian Business—under challenging conditions. Indeed, the business that remains today is one that has preserved value—it has retained management, retained primary assets, and retained fishing quotas, while simultaneously being reorganized in terms of intercompany debts, liquidation of non-material assets, and resolution of material proceedings that were pending against many of the companies, both civil and criminal. All of the that is a testament to Mr. Brandt's contributions to the successful operation of the business in fulfillment of the Court's mandate.

It is particularly appropriate for a court to consider approving an enhancement to the lodestar where the applicant is operating a business. *See In re Residences at Bear Creek, Inc.*,

No. 00-33139, 2002 Bankr. LEXIS 1986, at *11 (Bankr. N.D. Tex. June 13, 2002) (explaining that, where a chapter 7 trustee was authorized to operate the debtor's business, "[t]he lodestar does not reflect the compensation of the operator of a business. The lodestar also does not contemplate the risks of the operation of a business while in a fiduciary capacity."). Still, Mr. Brandt bears the burden of establishing that an adjustment to the lodestar is necessary to the calculation of a reasonable fee. In fixing the multiplier, Mr. Brandt likens the 2.09 multiplier to a "success fee" payable to an investment banker or other financial advisor for successfully completing a transaction. *See* Fee Application at 99 ("The Court need look no further than the instant case for a comparison of a fee enhancement, in the form of the $4 million "success fee" that Houlihan is entitled to receive on the Effective Date of the CFG Peru Plan, which is an approx. 2.0 multiplier of its $4,625,000 fee request." (footnote omitted)). The Court attaches no weight to that contention. The Trustee is not an investment banker, and the Creditor Plan Proponents have not agreed to the commission.

There is no uniform standard assisting bankruptcy courts to determine what level of upward adjustment of a lodestar amount is reasonable, but any modification cannot represent a windfall to the applicant. *In re The 1031 Tax Grp.*, 2009 WL 4806199, at * 2. In fixing the multiplier, Mr. Brandt did not apply a standard. The Trustee explains that to arrive at the 2.09 multiplier, first, during his negotiations with the U.S. Trustee, he determined that a "reasonable" commission for the work that he did in this case equals $25 million. He then calculated the multiplier by dividing the $25 million Proposed Commission by the Trustee's Lodestar ($11,958,625.00). *See* Fee Application at 10; Brandt Dep. at 32:15-33:3. Mr. Brandt sets his own hourly rate and acknowledges his choice to set his rate at a level that will allow him to stay competitive for middle-market assignments. He asserts that if he set his rate in the range comparable to his

competitors based in this District, it would likely be about $1,600/hour for 2021. He says at that rate the Trustee's Lodestar would be $21,867,200, and that to obtain a $25 million Proposed Commission for his work, he would be seeking a fee enhancement of only 1.143. Fee Application at 8-9. Thus, the Trustee contends that "the number of the multiplier itself is less relevant than the overall commission that he has requested for the work performed in this case, and the success of his efforts." *Id.*

The Court has carefully reviewed the Fee Application and all documents submitted by and on behalf of Mr. Brandt in support of the application. As noted, during his tenure, Mr. Brandt frequently appeared in court and addressed the Court on matters relating to the administration of the CFG Peru estate, and particularly with respect to the Peruvian Business and the status of the operations of the Peruvian Opcos. As such, the Court has a very good understanding of the services Mr. Brandt provided during his tenure as Trustee and the benefits derived by the CFG Peru debtor, the Peruvian Opcos and third parties like the Club Lenders and Noteholders from those services. Moreover, the Court has carefully considered the Creditor Plan Proponents' Objection. The Court finds that based on the foregoing analysis of the *Johnson* Factors, the Trustee is entitled to a 1.5 multiplier to the Adjusted Lodestar ($10,905,914.00). Accordingly, the Court awards Mr. Brandt fees totaling $16,358,871.00.

## EXPENSE REIMBURSEMENT

The Trustee seeks to recover the expenses totaling $409,382.02 that he incurred during the current (second) expense period.[113] Among those expenses are the Trustee's attorney's fees incurred in connection with the Fee Application, as follows:

(i) The Trustee's engagement of Baker Hostetler to prepare his Fee Application (the

---

[113]   The Court previously approved reimbursement of the Trustee's expenses totaling $355,051.93 on an interim basis. *See* Fee Application at 9.

"Baker Fees"—$286,127.50); and

(ii) The involvement of DSI's inhouse counsel in preparation of the Fee Application (the "In-House Fees"—$84,296.00).

As the Court-appointed Trustee, Mr. Brandt is entitled to "reimbursement for actual necessary expenses" that he incurred in discharging his duties under the Bankruptcy Code. *See* 11 U.S.C. § 330(a)(1)(A). It is settled that he may properly recover attorneys' fees in connection with the preparation of his fee application. *In Mesa Air Grp., Inc*., 449 B.R. 441, 445 (Bankr. S.D.N.Y. 2011) ("Since fee applications are required under the Bankruptcy Code, courts may award fees for time spent in actually preparing a fee application 'based on the level and skill reasonably required to prepare the application.'" (quoting 11 U.S.C § 303(a)(6))). "It is proper . . . for the bankruptcy court to examine the amount and value of the time spent preparing the [fee] application, and reasonable limits may be placed on compensation for such work." *In re Bennett Funding Grp., Inc.*, 213 B.R. 234, 249 (Bankr. N.D.N.Y. 1997).

The Creditor Plan Proponents object to the payment of the Baker Fees and In-House Fees. In so objecting, they do not challenge the reasonableness of the fees. Rather, they object on the ground that the Trustee incurred the fees defending the Fee Application and, as such, under the rule established by *Baker Botts L.L.P. v. ASARCO LLC*, 576 U.S. 121 (2015), reimbursement of those expenses is not authorized under section 330 of the Bankruptcy Code. They also contend that the Court should disallow the In-House Fees because they constitute non-reimbursable overhead expenses. The Court considers those matters below.

Baker Hostetler

In or about March 2021, Mr. Brandt, in his individual capacity, engaged Baker Hostetler to prepare his Fee Application and to address issues pertaining to the Fee Application that arose

during CFG Peru Plan confirmation negotiations. Fee Application at 103.[114] In *Baker Botts*, the

Supreme Court held that section 330(a)(1) of the Bankruptcy Code does not permit a bankruptcy

court to award attorneys' fees for work performed in defending a fee application in court. 576 U.S.

at 131-35. In part, the Court noted that section 330(a)(1)(A) authorizes reasonable compensation

only for "actual, necessary services rendered," which implies "'loyal and disinterested service in

the interest of' a client." *Id.* at 121-22 (quoting *Woods v. City Nat. Bank & Tr. Co.*, 312 U.S. 262,

268 (1941)). The Court found that a "professional's preparation of a fee application is best

understood as a 'servic[e] rendered' to the estate administrator under § 330(a)(1), whereas a

professional's defense of that application is not." *Id.* at 132 (alteration in original). Notably, the

Court opined that "[t]ime spent litigating a fee application against the administrator of a

bankruptcy estate cannot be fairly described as 'labor performed for' . . . that administrator." *Id.*

at 122.[115] To highlight the difference between preparing a fee application and defending one, the

Court offered the following analogy:

> it would be natural to describe a car mechanic's preparation of an itemized bill as
> part of his "services" to the customer because it allows a customer to understand—

---

[114]  Mr. Brandt did not and was not required to retain Baker Hostetler under section 327 of the Bankruptcy Code.

> [N]othing in the language of section 327 suggests that counsel retained to represent a retained
> professional in connection with its retention or fee applications should or even could be retained
> under section 327—that is work being done for the professional, not for the estate. And nothing in
> section 327 excludes such expenses as "necessary" where the work was required to comply with the
> Bankruptcy Code, Rules, or General Orders. . . . [W]here the fees are incurred in representing the
> professionals, and not in performing work for the debtor, section 327 does not apply.

*In re Borders Group, Inc.*, 456 B.R. 195, 208-10 (Bankr. S.D.N.Y. 2011) (allowing trustee to recover reasonable
attorney's fees and expenses of counsel retained in an individual capacity, for work done solely on his behalf rather
than on behalf of debtor); *see also In re Am. Preferred Prescription, Inc.*, 218 B.R. 680, 686 (Bankr. E.D.N.Y. 1998)
(awarding debtor's accounting firm its attorney's fees for retention dispute, despite no court-approved application
under Section 327, as engagement to protect its own interests which did not require Section 327 approval). The
Creditor Plan Proponents do not contend otherwise.

[115]  In *Baker Botts*, the Supreme Court also reaffirmed the American Rule that "[e]ach litigant pays his own attorney's
fees, win or lose, unless a statute or contract provides otherwise. 576 U.S. at 126 (quoting *Hardt v. Reliance Standard
Life Ins. Co.*, 560 U.S. 242, 252-53 (2010)). The Court ruled that it would "not deviate from the American Rule 'absent
explicit statutory authority,'" *id.* (quoting *Buckhannon Bd. & Care Home, Inc. v. West Virginia Dep't of Health &
Human Resources*, 532 U.S. 598, 602 (2001)), and recognized departures from the American Rule "only in 'specific

and, if necessary, dispute—his expenses. But it would be less natural to describe a subsequent court battle over the bill as part of the "services rendered" to the customer.

526 U.S. at 132. Thus, "[t]he touchstone . . . for determining whether fees are recoverable under *Baker Botts* is not when the fees were incurred (i.e., before or after an objection) but rather whether they were incurred in service to the estate." *In re Stanton*, 559 B.R. 781, 785 (Bankr. M.D. Fla. 2016).[116]

The Creditor Plan Proponents assert that the Court should disallow all of the Baker Fees because legal fees associated with researching and drafting the 200-page Fee Application are not comparable to "a car mechanic's preparation of an itemized bill." Obj. ¶ 89 (quoting *Baker Botts*, 576 U.S. at 132-33). They maintain that the extensive legal arguments in support of Mr. Brandt's right to the requested fees were in no way necessary to allow parties in interest to understand or dispute such fees. *Id.* Courts have found that fees charged in connection with advocating for a trustee's right to certain fees are not compensable under *Baker Botts* even when such actions

---

and explicit provisions for the allowance of attorney's fees under selected statutes,'" *id.* (quoting *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y,* 421 U.S. 240, 260 (1975)). The Court concluded that section 330(a) did not authorize compensation for fee-defense litigation. That section authorized "reasonable compensation for actual, necessary services rendered" but did not explicitly or specifically authorize courts "to shift the costs of adversarial litigation from one side to the other—in this case, from the attorneys seeking fees to the administrator of the estate—as most statutes that displace the American Rule do." *Id.* at 128.

[116]    In *Stanton*, a chapter 7 trustee submitted his first interim fee application. Although it contained all the information called for under the applicable local rules, the U.S. Trustee objected to the application. *Stanton,* 559 B.R. at 783. The U.S. Trustee sought additional information not ordinarily required in fee applications filed in a chapter 7 case; effectively insisting "on the level of detail required for a fee application in a chapter 11 case." *Id.* The trustee submitted an 18-page supplement that addressed the U.S. Trustee's objections, and the court approved the first interim fee application in its entirety. *Id.* In his second interim fee application, the chapter 7 trustee, in part, sought payment of $33,840.00 for fees incurred in drafting the first interim fee application. *Id.* at 783-84. The U.S. Trustee objected to $27,520 of that amount, proposing "a bright-line rule for determining whether fees are recoverable under *Baker Botts*: if time is spent on a fee application after an objection has been lodged, then that time is necessarily for work defending the fee application and therefore unrecoverable under § 330(a)." *Id.* at 784. The court rejected that proposed test, since it did not account for work performed after an objection that served the estate, and on the facts in *Stanton*, the trustee's provision of supplemental information in response to the U.S. Trustee's request was such a service. The court opined that "it is the nature of the work—not when it is performed—that determines whether it is compensable," and accordingly, "work done *in service of* the estate administrator is compensable." *Id.* at 787 (emphasis in original).

occurred before the fee application was filed, because such actions do not benefit the estate but the trustee himself. *See In re Nilhan Devs., LLC*, No. 15-58443, 2021 WL 408977, at *18. (Bankr. N.D. Ga. Feb. 4, 2021) (disallowing certain fees in connection with preparation of a trustee's fee application because "the time spent researching and advocating for a commission on the credit bid or for a fee enhancement was not for the benefit of the estate, but rather for the benefit of the Trustee, and was not necessary to the administration of the estate"); *In re Robert Plan Corp.*, No. 08-74573, 2018 WL 1267870, at *14 (Bankr. E.D.N.Y. Mar. 1, 2018) (disallowing fees related to litigation over the compensation that a chapter 7 trustee was entitled to as ERISA plan administrator under *Baker Botts* because "the Supreme Court ruled that § 330(a)(1) does not authorize courts to award compensation for fee-defense litigation. While the Trustee took prospective action in this case, this is no different from defending the fee after the fact"). The Creditor Plan Proponents say that Baker Hostetler clearly rendered services for Mr. Brandt's benefit and that those services did not benefit the estate. They also contend that when Mr. Brandt retained Baker Hostetler to draft the Fee Application, he knew that the Creditor Plan Proponents had significant concerns regarding the quantum of his potential commission and that Baker Hostetler drafted that application with an eye toward defusing those concerns.[117] *Id.*

Mr. Brandt contests that argument. He says that the Creditor Plan Proponents incorrectly argue that the Trustee may not recover attorney's fees for preparing his Fee Application simply

---

[117]    They contend that the time entries provided by Baker Hostetler included in the Fee Application crystalize the point. For example, Mr. Brandt seeks reimbursement for time entries for researching and drafting arguments in support of the trustee's right to compensation for fee enhancements and reimbursement of fees under *Baker Botts*. *See* Brandt Decl., Exhibit L ("Research case law on trustee fee enhancement issues and work on memo re: same"); *id.* at Exhibit O ("Research ASARCO case law re limits of recovery of fees for application (0.70), research case law re ability of trustee to recover fees of counsel retained as individual for preparation of fee application, and draft argument for fee app re same (2.20), research case law on standards for fees permitted for fee application, and draft argument re same (1.70)."). Mr. Brandt also seeks reimbursement for time spent developing strategy for arguments in the Fee Application. *See id.* at Exhibit M ("Draft, revise and final outline of fee application strategy, and email to B. Brandt"); *id.* at Exhibit N ("Communications with R. Julian re: strategy issues for fee app").

because an objection from the Plan Proponents could be anticipated. Reply at 46. He asserts that *Stanton* stands for the proposition that the mere fact of an objection to a fee application is not a "bright line rule" for compensability of the trustee's fees. *Id*. at 786-87; *see also In re Migell*, No. 15-bk-10569, 2020 WL 5745652, at *2 (Bankr. M.D. Fla. Sept. 18, 2020) (noting that "a law firm may recover time spent on explaining its requested fees but not necessarily for defending its fees upon an objection"). Mr. Brandt contends that *Stanton* supports his view, since it permitted reimbursement for work performed after an objection was filed. Reply at 46. He asserts that the Creditor Plan Proponents' suggestion that threatening a future objection can erase a trustee's right to compensation for preparing a fee application is baseless and would create a remarkably simple means for creditors to deny fees to future trustees for preparation of fee applications, regardless of the validity of asserted grounds for objection. *Id.*

When determining whether work was performed in defending a fee application, "it is the nature of the work—not when it is performed—that determines whether it is compensable." *Stanton*, 559 B.R. at 787. As an initial matter, Mr. Brandt appears to have anticipated that his fee application would be contested, and he represents that he does not request fees that will be incurred in the defense of his application. Fee Application at 103 ("Consistent with applicable authority, the Trustee has *not* requested fees that he may incur defending his Fee Application"). In accordance with this representation, Brandt has not sought attorneys' fees or other expenses in connection with filing his reply to the objection to the Fee Application. The filing of the Fee Application was necessary to the administration of the CFG Peru estate and was a service to the Trustee. Section 330(a)(6) permits recovery of reasonable fees for the preparation of fee applications. 11 U.S.C. § 330(a)(6). Baker Hostetler expended significant time and effort in drafting the Fee Application. In resolving this objection, the Court must consider whether the Baker Fees represent fees for legal

work done "in service of the estate," as opposed to fees incurred for the Trustee's benefit. *See Stanton*, 559 B.R. at 787; *see also In re Nilhan Devs., LLC*, 2021 WL 408977, at *18 (reducing a request for $1,763.50 in attorneys' fees expenses incurred in preparing a fee application by $1,388 to $375, where the bankruptcy court determined that the $1,388 correlated with "time spent researching and advocating for a commission . . . or for a fee enhancement"); *see also In re Morreale*, No. 13-27310, 2019 WL 3385163, at *1114 (Bankr. D. Colo. July 3, 2019) (declining to approve an expense of $63,091 in attorneys' fees explicitly incurred in defense of the trustee's fee application).

Accordingly, the Court has conducted a detailed review of the Baker Hostetler timesheets for this interim period. *See* Brandt Decl., Exhibits L-P. Of the 295.7 total hours for which attorneys' fees are expensed, the Court finds that 104.1 of those hours are supported by time entries that the Court finds denote work performed in anticipation of the Trustee's defense of the Fee Application. For example, the Trustee incurred legal fees for legal research on "case law on fee enhancements" (Brandt Decl., Exhibit L at 3), various aspects of the lodestar issue (e.g., *id.* Exhibit M at 3), and section 326 issues in general. *See, e.g.*, *id.* Exhibit P at 3. Baker Hostetler billed all of those hours at the rate of $795.00 per hour.[118] Accordingly, the Court disallows $82,759.50 of the Baker Fees, as fees incurred in the defense of the Fee Application, and allows reimbursement of the Baker Fees totaling $203,368.00.

---

[118] The Court notes that the bulk of the work performed on the Fee Application was performed by the same legal professional, who appears to have performed essentially all of the Fee Application defense work, in addition to numerous other tasks. Reduction of fees from only that professional simply reflects that that professional performed the lion's share of the work on the Fee Application—it is by no means a criticism of the work's quality, which was undoubtedly of a high caliber.

Legal Fees for In-House Counsel

Mr. Brandt seeks reimbursement of $84,296.00 in expenses for the work related to the Fee Application performed by Cathy Vance, DSI's in-house counsel. These fees are on account of 205.6 hours of work at a rate of $410 per hour. Fee Application at 9, 105. The Creditor Plan Proponents object to the reimbursement of those fees on three grounds. First, they assert that Ms. Vance's time records reflect that she "was actively assisting Baker & Hostetler in its efforts to defend Mr. Brandt's application." *Id.* ¶ 90 . Second, they maintain that Ms. Vance provided no benefit to the estate—because Mr. Brandt "was not engaged to provide legal counsel to the estate, the services of his attorney were not furnished for the benefit of the estate, but rather for the benefit of the Trustee." *Id.* Finally, they characterize Ms. Vance's expense as non-reimbursable "overhead expenses." In response, Mr. Brandt says that DSI's use of in-house counsel "at a reduced billable hour is not non-compensable 'overhead,'" and compares this to the general practice of law firms that draft their own fee applications. Reply at 46. The Court considers those matters below.

The Creditor Plan Proponents contend that Ms. Vance's time records show that she actively assisted Baker Hostetler in its efforts to defend Mr. Brandt's application. Obj. ¶ 90. The Court disagrees. The Objection does not identify a single time entry by Ms. Vance that denotes work of that nature. Moreover, the Court's review of Ms. Vance's time entries confirms that she did not bill time for work of that nature. *See* Brandt Decl., Exhibit R. Rather, the time records reflect that Ms. Vance provided Baker Hostetler with basic information necessary to the filing of the Fee Application. For example, she billed time for "research for citations of confirmation of factual information," gathering information on non-core asset sales, and preparing privilege and confidentiality protocols for review of the Trustee's fee records. *Id.* at 2-13. She also spent significant time conferring with colleagues in connection with various privilege and confidentiality

issues, as well as overseeing a document review team. *Id.* These activities all relate to the substantive work she performed in connection with preparation of the underlying Fee Application. She provided no services in defense of the Fee Application. Her work is related to, but is independent from Baker Hostetler's work on the Fee Application. It did not run afoul of *Baker Botts*.

The second element of the Creditor Plan Proponent's objection is essentially the same argument they raised with respect to Baker Hostetler. As discussed above, only a portion of Baker Hostetler's work was preparation for the defense of the Fee Application—the majority of the work Baker Hostetler did was simply to complete the Fee Application, a necessary task. Likewise, Ms. Vance's time entries demonstrate that she performed significant work in preparation of the Fee Application. Brandt Decl., Exhibit R. Ms. Vance's preparation of the Fee Application was necessary work in service of the estate. *See Stanton*, 559 B.R. at 78; *In re Nilhan Devs., LLC*, 2021 WL 408977, at *18. The fact that she worked in house for DSI is irrelevant. It is "well-settled that attorneys' fees and costs should be awarded for litigation performed by in-house counsel if such fees would be awarded for the same work provided by outside counsel." *Video-Cinema Films, Inc. v. Cable News Network, Inc.*, 2004 WL 213032, at *6 (S.D.N.Y. Feb. 3, 2004). Courts in this Circuit have routinely allowed attorneys' fees for in-house counsel at a reasonable rate. *See id.* (rejecting a plaintiff's argument that it should pay attorneys' fees for work performed by the defendant's in-house counsel after the court awarded such fees under 17 U.S.C. § 505); *Baiul v. NBCUniversal Media, LLC*, No. 13-cv-2205, 2014 U.S. Dist. LEXIS 97527, at *9 n.5 (S.D.N.Y. July 14, 2014) ("That the . . . Defendants request attorneys' fees for work performed by their in-house counsel is of no moment . . . ."), *aff'd*, 607 F. App'x 99 (2d Cir. 2015) (summary order); *United States ex rel. ATC Distrib. Grp., Inc. v. Ready-Built Transmissions, Inc.*, No. 03 Civ. 2150,

2007 WL 2522638, at *2 (S.D.N.Y. Sept. 7, 2007) (rejecting, in a magistrate judge's order in a

False Claims Act case, the argument that attorneys' fees should not be awarded for work performed

by in-house counsel). Mr. Brandt's decision to employ in-house counsel to assist retained counsel

represents a cost-saving measure that ultimately seems to have benefited the estate. Because Ms.

Vance's work could have been performed by outside counsel, it is properly requested in the Fee

Application.

Finally, the Objection asserts that these costs are non-reimbursable overhead expenses and,

in any event, were provided only for the benefit of Mr. Brandt, not the Debtors or their estates.

Obj. ¶ 90. The U.S. Trustee Guidelines sheds light on the subject of non-reimbursable overhead

costs and they do not include the expense of in-house counsel:

> Whether the expenses are or should be non-reimbursable overhead costs incident
> to the operation of the applicant's office and not particularly attributable to an
> individual client or case. Without limitation, the United States Trustee will
> ordinarily consider the following expenses to be overhead: Word processing,
> proofreading, secretarial and other clerical services, rent, utilities, office equipment
> and furnishings, insurance, taxes, telephone charges (other than actual charges for
> multi-party conference calls incurred by counsel in connection with the case), and
> library and publication charges.

U.S. Trustee Guidelines ¶ B(3)(e).[119] Moreover, the Creditor Plan Proponents have failed to cite

any case in which a court disallowed the legal fees of an in-house attorney as overhead. Instead,

they cite to *In re Fibermark* for the proposition that "[o]verhead expenses are those incurred day

---

[119]   The Guidelines also describe in less specific terms the consideration of overhead in connection with the fee
portion of fee applications.

> Whether the application includes activities that should be considered part of the applicant's overhead
> and not billed to the estate. Tasks that the United States Trustee may object to as overhead include
> clerical tasks and word processing. The United States Trustee may also object to fees for summer
> clerks or summer associates, which are more properly the firm's overhead for recruiting and
> training.

*Id.* ¶ B(2)(j).

to day by a law office regardless of whom it represents." *In re Fibermark*, No. 04-10463, 2007 WL 2522638, at *3 (citing *In re S.T.N. Enterprises, Inc.*, 70 B.R. 823 (Bankr. D. Vt. 1987)). However, the *Fibermark* court also provides a non-exhaustive list of overhead expenses, including "rent, insurance, taxes, utilities, secretarial and clerical pay, library, computer costs, office supplies, local postage and telephone charges, meals, and local travel." *Id.* This mirrors the language in the U.S. Trustee's Guidelines, which describes similar non-substantive tasks appurtenant to the administrative operation of an office. *See* UST Guidelines ¶ B(3)(e).[120] Overhead includes simple administrative costs, not the fees of in-house counsel.

Except to the extent set forth above, the Court overrules the Creditor Plan Proponents' objection to the Trustee's request for expense reimbursement.  Accordingly, with respect to expenses for the Final Expense Period, the Court awards $203,368.00 in connection with the Baker Fees, $84,296.00 in connection with the In-House Fees, and an additional $38,958.52 for traditional expenses (such as document review services, airfare, and lodging), which have not been challenged.  *See* Fee Application at 8-9.  This totals $326,622.52 in approved expenses for the Final Expense Period.

## CONCLUSION

Based upon the foregoing, and for the reasons stated herein, the Court awards the Trustee a commission in the form of (i) an adjusted lodestar of $10,905,914.00 arising from the Trustee's 13,667 hours of time spent on this case at the hourly rates charged when he recorded the hours, (ii) a fee enhancement in the form of a 1.5 multiplier applied to the Lodestar for a total commission

---

[120]    The Creditor Plan Proponents also include a quote ultimately attributable to the 1996 version of the U.S. Trustee Guidelines, which states that "[o]verhead consists of all continuous administrative or general costs incident to the operation of the applicant's office and not particularly attributable to an individual client or case." Obj. ¶ 90 (quoting *In re GSC Grp., Inc.*, No. 10-14653, 2012 WL 676409, at *18 (Bankr. S.D.N.Y. Feb. 29, 2012)). Similarly, they omit the portion of the quotation that describes the perfunctory nature of expenses defined as "overhead." *See* UST Guidelines ¶ B(3)(e).

of $16,358,871.00, and (iii) expenses in the amount of $326,622.52 incurred in the Final Expense

Period, and directs the parties identified in the CFG Peru Plan as being responsible for payment of

the Trustee's commission and expenses to pay the commission and expenses. The Court approves,

on a final basis, the $355,051.93 in interim expenses previously allowed and paid.

      IT IS SO ORDERED.


Dated: New York, New York
     January 27, 2023


                        /s/ *James L. Garrity, Jr.*
                        Hon. James L. Garrity, Jr.
                        U.S. Bankruptcy Judge